SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3316-98T4

STATE OF NEW JERSEY,          :          CRIMINAL ACTION

    Plaintiff-Respondent,     :     On Appeal from a Judgment
                                  of Conviction of the Superior
    v.                        :     Court of New Jersey, Law
                                  Division, Union County.
MARVIN MATHIS,                :

    Defendant-Appellant.      :     Sat Below:

                              :     Hon. Rudolph N. Hawkins, J.S.C.
                              :     Hon. John F. Malone, J.S.C.,
                                    and a jury.

---

BRIEF AND APPENDIX ON BEHALF OF DEFENDANT-APPELLANT

---

IVELISSE TORRES
Public Defender
Office of the Public Defender
Appellate Section
31 Clinton Street, 9th Floor
P.O. Box 46003
Newark, New Jersey 07101
(973) 877-1200

PAUL M. KLEIN
Deputy Public Defender II

Of Counsel and
On the Brief

DEFENDANT IS CONFINED

TABLE OF CONTENTS

PAGE NOS.

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . 3

LEGAL ARGUMENT

    POINT I

        THE DECISION OF THE FAMILY PART JUDGE TO WAIVE
        JUVENILE JURISDICTION OVER MARVIN MATHIS CON-
        STITUTED A CLEAR ERROR OF JUDGEMENT AND SHOULD
        BE REVERSED . . . . . . . . . . . . . . . . . . . 17

    POINT II

        DEFENDANT'S CONVICTION MUST BE REVERSED DUE TO
        THE IMPROPER ADMISSION OF HEARSAY EVIDENCE
        THAT HIS GIRLFRIEND WAS ACCOSTED ON THE STREET
        BY A MAN WHO TOLD HER THAT DEFENDANT HAD
        KILLED SOMEONE.   SUCH EVIDENCE VIOLATED
        DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL
        RIGHTS TO CONFRONTATION. U.S. CONST., Amends.
        VI and XIV; N.J. Const. (1947), Art. I, par.
        10 . . . . . . . . . . . . . . . . . . . . . . . 26

    POINT III

        DEFENDANT'S CONVICTION MUST BE REVERSED DUE TO
        ACTS OF PROSECUTORIAL MISCONDUCT, WHICH
        INCLUDED REFERRING TO DEFENDANT AS A THUG AND
        COMMENTING ON FACTORS OUTSIDE OF THE RECORD.  . . . 34

    POINT IV

        THE BASE TERM OF 50 YEARS' IMPRISONMENT IS
        EXCESSIVE AND SHOULD BE MODIFIED BY THIS COURT
        . . . . . . . . . . . . . . . . . . . . . . . . 39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 43

## INDEX TO APPENDIX

PAGE NOS.

Juvenile Complaint No. FJ-20-01786-96 . . . . . . . . . . . Da 1

Union County Indictment No. 97-01-00123 . . . . . . . Da 2 to 5

Judgment of Conviction . . . . . . . . . . . . . . . Da 6 to 7

Oder Granting Leave to File
Notice of Appeal Nunc Pro Tunc . . . . . . . . . . . . . Da 8

Notice of Appeal . . . . . . . . . . . . . . . . . . . . Da 9

Psychological Report of Cheryl L. Thompson, Ph.D. . Da 10 to 13a

Psychological Report of Martha H. Page . . . . . . . Da 14 to 23

Psychological Report of Louis B. Schlesinger, Ph.D . Da 24 to 39

Psychological Report of Herminia Garcia . . . . . . . . . Da 40

Statement of Sharlama Brooks . . . . . . . . . . . . Da 41 to 47

Statement of April Diggs . . . . . . . . . . . . . . Da 48 to 53

Statement of Renee Diggs . . . . . . . . . . . . . . Da 54 to 62

First Statement of Marvin Mathis . . . . . . . . . . Da 63 to 72

Second Statement of Marvin Mathis . . . . . . . . . Da 73 to 81

TABLE OF CASES CITED

PAGE NOS.

<u>Berger v. United States</u>, 295 U.S. 78,
55 S.Ct. 629 (1935) . . . . . . . . . . . . . . . . . . 37

<u>California v. Green</u>, 399 U.S. 149,
90 S.Ct. 1930 (1970) . . . . . . . . . . . . . . . . . 32

<u>Coy v. Iowa</u>, 487 U.S. 1012,
108 S.Ct. 1798 (1988) . . . . . . . . . . . . . . . . . 32

<u>Greenberg v. Stanley</u>, 30 N.J. 485 (1959) . . . . . . . . . 29

<u>Idaho v. Wright</u>, 497 U.S. 805,
110 S.Ct. 3139 (1990) . . . . . . . . . . . . . . . . . 32

<u>Miranda v. Arizona</u>, 384 U.S. 1034,
104 S.Ct. 1304 (1966) . . . . . . . . . . . . . . . . . . 2

<u>Pointer v. Texas</u>, 308 U.S. 400, 405,
85 S.Ct. 1065 (1965) . . . . . . . . . . . . . . . . . 32

<u>State in the Interest of C.A.H. and
B.A.R.</u>, 89 N.J. 326 (1982) . . . . . . . . . . . 18, 20, 21, 24

<u>State v.  Hipplewith</u>, 33 N.J. 300 (1960) . . . . . . . . . 36

<u>State v. Alston</u>, 312 N.J. Super. 102
(App. Div. 1998) . . . . . . . . . . . . . . . . . . . 31

<u>State v. Baker</u>, 228 N.J. Super. 135
(App. Div. 1988) . . . . . . . . . . . . . . . . . . . 32

<u>State v. Bankston</u>, 63 N.J. 263 (1973) . . . . . . . . . 31, 32

<u>State v. Bowens</u>, 219 N.J. Super. 290
(App. Div. 1987) . . . . . . . . . . . . . . . . . . . 31

<u>State v. Briggs</u>, 279 N.J.Super. 555
(App. Div. 1995) . . . . . . . . . . . . . . . . . . . 33

## TABLE OF CASES CITED (cont'd)

PAGE NOS.

State v. Burks, 208 N.J. Super. 595
(App. Div. 1986) . . . . . . . . . . . . . . . . . . . .   30

State v. Clausell, 121 N.J. 298 (1990) . . . . . . . . .   35

State v. DiFrisco, 142 N.J. 148 (1995) . . . . . . . . .   35

State v. DiPaglia, 64 N.J. 288 (1974) . . . . . . . . . .   35

State v. Dunbar, 108 N.J. 80 (1987) . . . . . . . . . . .   41

State v. Farrell, 61 N.J. 99 (1972) . . . . . . . . . . 36, 37

State v. Ferguson, 255 N.J. Super. 530, 535-36
(App. Div. 1992) . . . . . . . . . . . . . . . . . . . .   24

State v. Jarbath, 114 N.J. 394 (1989) . . . . . . . . . .   40

State v. Johnson, 31 N.J. 489 (1960) . . . . . . . . . .   37

State v. LiButti, 146 N.J. Super. 565
(App. Div. 1977) . . . . . . . . . . . . . . . . . . . .   33

State v. Macon, 57 N.J. 325 (1971) . . . . . . . . . . .   37

State v. Manning, 82 N.J. 417 (1980) . . . . . . . . . .   30

State v. Marks, 201 N.J. Super. 514 (App. Div.
1985), certif. denied, 102 N.J. 393 (1986) . . . . . . .   37

State v. O'Donnell, 117 N.J. 210 (1989) . . . . . . . . .   40

State v. Pennington, 119 N.J. 547 (1990) . . . . . . . .   34

State v. Pindale, 249 N.J. Super. 266
(App. Div. 1991) . . . . . . . . . . . . . . . . . . . .   41

State v. R.G.D., 108 N.J. 1 (1987) . . . . . . . . . . 17, 19

-iv-

## TABLE OF CASES CITED (cont'd)

PAGE NOS.

State v. Ramseur, 106 N.J. 99 (1987) . . . . . . . . . . . . 36

State v. Rose, 112 N.J. 454 (1988) . . . . . . . . . . 36, 37

State v. Scott, 141 N.J. 459 (1995) . . . . . . . . . . 19, 24

State v. Sims, 140 N.J. Super. 164
(App. Div. 1976) . . . . . . . . . . . . . . . . . . . . 34

State v. Spano, 64 N.J. 566 (1974) . . . . . . . . . . . . . 37

State v. Stewart, 162 N.J. Super. 96
(App. Div. 1978) . . . . . . . . . . . . . . . . . . . . 35

State v. Tanksley, 245 N.J. Super. 390
(App. Div. 1991) . . . . . . . . . . . . . . . . . . . . 41

State v. Vitale, 102 N.J. 350 (1985) . . . . . . . . . . . . 40

State v. Von Atzinger, 81 N.J.Super. 509
(App. Div. 1963) . . . . . . . . . . . . . . . . . . . . 34

# TABLE OF STATUTES CITED

**PAGE NOS.**

<u>N.J.S.A.</u> 2A:4-48 . . . . . . . . . . . . . . . . . . 18

<u>N.J.S.A.</u> 2A:4A-(2)(a) . . . . . . . . . . . . . . 18, 19

<u>N.J.S.A.</u> 2A:4A-26a . . . . . . . . . . . . . . . . 19

<u>N.J.S.A.</u> 2A:4A-26a(1) . . . . . . . . . . . . . . . 18

<u>N.J.S.A.</u> 2A:4A-26a(3) . . . . . . . . . . . . . . . 18

<u>N.J.S.A.</u> 2A:4A-44d . . . . . . . . . . . . . . . . 19

<u>N.J.S.A.</u> 2C:11-3(a)(3) . . . . . . . . . . . . . . . 1

<u>N.J.S.A.</u> 2C:11-3a(1) . . . . . . . . . . . . . . . . 1

<u>N.J.S.A.</u> 2C:11-3a(2) . . . . . . . . . . . . . . . . 1

<u>N.J.S.A.</u> 2C:11-3b . . . . . . . . . . . . . . . . . 39

<u>N.J.S.A.</u> 2C:15-1 . . . . . . . . . . . . . . . . . . 1

<u>N.J.S.A.</u> 2C:2-6 . . . . . . . . . . . . . . . . . . 1

<u>N.J.S.A.</u> 2C:39-4a . . . . . . . . . . . . . . . . . 1

<u>N.J.S.A.</u> 2C:39-5b . . . . . . . . . . . . . . . . . 1

<u>N.J.S.A.</u> 2C:44-1 . . . . . . . . . . . . . . . . . 40

<u>N.J.S.A.</u> 2C:44-1a(1) . . . . . . . . . . . . . . 39, 40

<u>N.J.S.A.</u> 2C:44-1a(9) . . . . . . . . . . . . . . . 39

<u>N.J.S.A.</u> 2C:44-1b.(11) . . . . . . . . . . . . . . 42

<u>N.J.S.A.</u> 2C:44-1b(13) . . . . . . . . . . . . . . 42

<u>N.J.S.A.</u> 2C:44-b(7) . . . . . . . . . . . . . . . 40

## TABLE OF RULES CITED

PAGE NOS.

R. 1:7-2 . . . . . . . . . . . . . . . . . . . . .  37

R. 2:10-2 . . . . . . . . . . . . . . . . . . . . .  37

## NEW JERSEY RULES OF EVIDENCE CITED

N.J.R.E. 801 . . . . . . . . . . . . . . . . . . .  32

N.J.R.E. 803(b)(2) . . . . . . . . . . . . . . . .  29

## CONSTITUTIONAL PROVISIONS CITED

N.J. Const. (1947), Art. I, par. 10 . . . . . . . . . . . .  26

U.S. Const., Amend. VI . . . . . . . . . . . . . . . . . .  26

U.S. Const., Amend. XIV . . . . . . . . . . . . . . . . . .  26

## OTHER AUTHORITIES CITED

5 Wigmore, Evidence (3d ed. 1940) . . . . . . . . . . . . .  32

ABA Standards for Criminal Justice, "The
Prosecution Function," ¶3-1(c) (2d ed. 1980) . . . . . . . .  36

P. Hahn, The Juvenile Offender and the Law 180
(3rd ed. 1984) . . . . . . . . . . . . . . . . . . . . . . .  18

## PROCEDURAL HISTORY

Marvin Mathis, a boy two months shy of his sixteenth birthday, was charged in Union County Juvenile Complaint No. FJ 20-1786-96 with acts which, if committed by an adult, would constitute armed robbery (<u>N.J.S.A.</u> 2C:15-1 and 2C:2-6) and felony murder (<u>N.J.S.A.</u> 2C:11-3(a)(3)). (Da 1)[1]

Following a waiver hearing held on October 10 and November 1, 1996, the Honorable Rudolph N. Hawkins, J.S.C., decided to waive juvenile jurisdiction. (2MT 19-15 to 29-21)

On February 4, 1997, a Union County Grand Jury returned Indictment No. 97-01-001231 charging Mathis with first-degree murder (<u>N.J.S.A.</u> 2C:11-3a(1) and/or (2)), first-degree robbery (<u>N.J.S.A.</u> 2C:15-1), first-degree felony murder (<u>N.J.S.A.</u> 2C:11-3a(3)), second-degree possession of a firearm for an unlawful purpose (<u>N.J.S.A.</u> 2C:39-4a) and third degree possession of a weapon for an unlawful purpose (<u>N.J.S.A.</u> 2C:39-5b). (Da 2-5)

---

[1] "Da" refers to the appendix to this brief.
"1MT" refers to the transcript of the October 10, 1996, juvenile
    waiver hearing.
"2MT" refers to the transcript of the November 1, 1996, juvenile
    waiver hearing.
"3MT" refers to the transcript of the June 19, 1998, <u>Miranda</u>
    hearing.
"1T" refers to the trial transcript of June 10, 1998
"2T" refers to the trial transcript of June 11, 1998 (a.m.)
"3T" refers to the trial transcript of June 11, 1998 (p.m.)
"4T" refers to the trial transcript of June 16, 1998
"5T" refers to the trial transcript of June 17, 1998 (a.m.)
"6T" refers to the trial transcript of June 17, 1998 (p.m.)
"7T" refers to the trial transcript of June 18, 1998
"ST" refers to the sentencing transcript of August 14, 1998
"PSR" refers to the Presentence Report.

Following an unsuccessful Miranda[2] motion before the Honorable John F. Malone, J.S.C., on June 9 and 10, 1998, Mathis was tried before Judge Malone and a jury on June 10, 11, 16, 17, and 18, 1998.  Mathis was found guilty of all charges. (7T 82-18 to 84-1)

On August 14, 1998, the court sentenced Mathis to an aggregate term of 50 years in prison, with a parole bar of 30 years.  The appropriate statutory penalties were imposed, and Mathis was given credit of 934 days for time spent in custody.  (Da 6-7; ST 10-16 to 12-6)

By order of March 15, 1999, this Court granted Mathis's motion to file a Notice of Appeal nunc pro tunc. (Da 8-9)

---

[2]Miranda v. Arizona, 384 U.S. 1034, 104 S.Ct. 1304 (1966).

-2-

## STATEMENT OF FACTS

On the night of January 22, 1996, Antonio Saraiva was killed in front of his store by a gunshot wound to the head. The issue at trial was whether Marvin Mathis, a 15-year-old special-education student, who was in the company of a 20-year-old man and two women: shot Mr. Saraiva by his own hand during a robbery; was assisting the 20-year-old codefendant in a robbery when that codefendant shot Saraiva; or whether the gun went off during a struggle while Mathis was trying to stop the codefendant from shooting Saraiva.

Antonia Saraiva and her husband, Antonio, owned the Portuguese American Wine and Liquor store on East Jersey Street in Elizabeth, and lived in an apartment above the store. According to Mrs. Saraiva, on January 22, 1996, sometime after 10:00 p.m., Mr. Saraiva closed the store and carried the trash cans out to the street. Mrs. Saraiva, who remained in the store, heard shots, ran out from the back of the store, and down an alleyway to the locked security gates. She saw her husband on the ground. A "dark man," a "Jamaican" who used to frequent their store, was calling her husband by name. (1T 41-9 to 44-1; 1T 47-2 to 9) Mrs. Saraiva ran back into the house to get the keys for the security gates. When she returned and opened the gates, her husband was alone and unconscious. (1T 44-2 to 16)

Union County Medical Examiner Graciela Linares found a single bullet wound to Mr. Saraiva's head; she estimated that the gun was shot from a distance of eighteen inches or less. (4T 23-1 to 5; 4T 25-3 to 28-18; 4T 34-7 to 12) The wound would have caused death

-3-

within a few minutes. (4T 31-15 to 18)

Elizabeth police officers Gene Antonucci and Rocco Malgieri responded to the scene of the shooting. (1T 48-18 to 50-10; 1T 51-16 to 18)   Antonucci searched the area for bullets or bullet casings, but found none. (1T 52-12 to 17)  Malgieri found Saraiva's brown leather wallet on nearby South Park Street. (1T 59-14 to 63-13)

When Mathis's girlfriend, Sharlama Brooks, saw him in school the morning after the shooting, he asked her to tell anyone who asked that he was with her the night before between the hours of seven and 11.  Brooks, who was home alone during those hours, was not willing to say they had been together. (1T 65-1 to 66-18)  When she questioned Mathis about his request, he turned away from her and said that if he told her, she would "black out," which she took to mean that she would "get mad at him." (1T 66-21 to 67-7)  Brooks told Mathis that on the previous night a man had confronted her and told her that Mathis had killed someone.  At first, Mathis denied it, but he then told Brooks that "they was struggling I guess when the man was taking out the garbage and gun [sic] had went off, but it was by mistake." (1T 74-1 to 75-13).  In her statement to the police, Brooks stated that Mathis told her he was walking with some friends, and "Marvin went to grab the guy, and as soon as he grab [sic] the guy the gun went off."  (1T 76-24 to 77-3)

After Mathis told Brooks about the shooting, she became upset and started to cry.  A school security guard who observed her crying took her to Janice Sutton, a substance abuse counselor.

-4-

Brooks was still upset and crying when she related the story to Ms. Sutton. (1T 77-2 to 79-51)  The police were summoned, and Brooks was transported to the police station where she gave a statement. (1T 79-9 to 14)

Janice Sutton, the high-school counselor, testified about her meeting with Sharlama Brooks.  Brooks said her boyfriend had been involved in a shooting or a murder; Sutton could not remember the exact words used by Brooks.  Sutton also stated that Brooks may have indicated that her boyfriend's name was Marvin. (4T 19-1 to 21-3; 4T 22-9 to 17)  Sutton took Brooks to the principal's office. She later accompanied her to the police station and was present when Brooks gave her statement. (4T 21-20 to 22-6)

Detective Thomas Koczur took Brooks's statement, after which he had Mathis transported to the police station. (2T 3-17 to 5-2; 2T 6-6 to 7-12)  When Koczur first encountered Mathis in a conference room, he was not under arrest and was not in handcuffs. (2T 8-1 to 15)  Koczur had another officer transport Mathis's mother to headquarters. (2T 8-19 to 9-10)

Koczur advised Mathis's mother that her son was a suspect in a homicide.  He explained the procedures they would be following and what their rights were. (2T 9-15 to 10-3)  Koczur also advised Mathis of his rights.  Mathis indicated that he understood those rights and agreed to answer questions.  Mathis's mother added her consent. (2T 12-6 to 16-11)

At first, Mathis denied any involvement in the homicide, stating that he was either at a different location or with his

-5-

girlfriend at the time.  When Koczur confronted him with Brooks's statement, Mathis called her a liar.  As he was confronted with further inconsistencies in his story, he asked that his mother leave the room, and he then gave a statement admitting his presence at the shooting.  He repeated the statement in his mother's presence. (2T 17-2 to 19-21)  In his oral statement, Mathis said that he, Antwan Harvey, and a man from Carteret called "Boz," were involved in the shooting.  At the conclusion of the oral interview, Koczur took what would be the first of two written statements. (2T 20-17 to 21-18; 2T 36-16 to 24)

In the first statement, Mathis indicated that he met Harvey and Boz sometime after 7:00 p.m. on January 22, 1996.  Harvey and Boz were looking for someone to rob, and they wanted Mathis to hold the gun.  Mathis refused. (2T 21-21 to 30-23)  Harvey came upon a man who owned a liquor store as he was taking out the garbage and told the man, later identified as Saraiva, to empty his pockets. When Saraiva said no, Harvey tried to go through his pockets:

> Then they started fighting.  The man threw a
> punch at Antwan [Harvey], and then Antwan
> threw a punch back.  Then Antwan pushed him,
> then he shot him.  The man fell.  Antwan went
> into his pockets.  He then told me to go into
> his pockets.  I said no.  He then called me a
> punk.  Then I was in shock.

(2T 31-9 to 18)  Following the shooting, they ran off. (2T 31-19 to 22)  Before leaving, Harvey took the victim's wallet from his right back pocket. (2T 34-12 to 16)

After they took the first statement, the police executed a warrant at a residence in Carteret, where Detective John Furda of

-6-

the Union County Prosecutor's Office seized items of clothing described by Mathis. (2T 43-23 to 44-23)  With the consent of Mathis and his mother, Detective Furda searched their home and seized pants fitting the description Mathis gave of the pants he wore on the night of the robbery.  (2T 47-19 to 49-25; 3T 158-3 to 159-25)

While Furda was searching Mathis's home, Koczur met with other investigators.  He returned to question Mathis again, telling Mathis he did not believe what he had said in his first statement. (2T 50-13 to 51-12)

At his second interview, Mathis indicated that the gun went off during a struggle between him and Harvey. Mathis was trying to stop Harvey from shooting the liquor store owner.  In his second statement, Mathis indicated that at about eight o'clock on the night of the offense, he met Harvey on a street corner in Elizabeth, and they then met April and Renee Diggs at a nearby Chinese restaurant. Mathis, Harvey, and the Diggs cousins intended to participate in a robbery. (2T 51-13 to 21; 2T 56-23 to 59-14; 2T 63-17)  While walking on Elizabeth Avenue, Harvey displayed a black revolver and asked Mathis to act as lookout during the robbery. When Harvey suggested robbing a man standing nearby, Mathis told him not to.  Mathis also told Harvey he would not participate in the robbery of a nearby deli. (2T 59-15 to 61-5)  As they continued walking, the four of them came upon "two Spanish boys." Harvey and April "started running after them real hard, and me and the other girl jogged after them."  The Spanish boys outran them. (2T 61-20

-7-

to 62-6)

The four continued walking.   By the time they came upon
Saraiva, it was no longer Mathis's intention to take part in a
robbery.  Mathis explained that Saraiva was shot while Harvey was
attempting to rob him.   Harvey first tried to search Saraiva's
pockets, prompting Saraiva to slap Harvey's hand. Harvey grabbed
Saraiva, who then grabbed Harvey.   They exchanged punches, and
Harvey pulled out a gun, which Saraiva grabbed.   Mathis joined the
struggle to prevent Harvey from shooting Saraiva.   During the
three-way struggle, the gun went off twice.  The second shot struck
the victim.   Mathis did not believe that Harvey intended to shoot
anyone.  After the shooting, Harvey went through Saraiva's pockets.
Neither Mathis or the two women, who had been serving as lookouts,
touched Saraiva.  (2T 62-7 to 15;   2T 63-25 to 66-18)   During
Mathis's statement, the detective asked him: "So all four of you
committed this robbery?"    Unlike Mathis's other answers, which
were all typed, that question was answered with a handwritten
"yes," followed by Mathis's initials.  Koczur believed that Mathis
had written the answer when he read the completed statement.  (2T
69-6 to 70-14; 2T 88-4 to 89-12)   During his testimony, defendant
denied ever having written "yes" on the statement.  (4T 155-9 to 24)

As a result of Mathis's statements, arrest warrants were
authorized for April and Renee Diggs and Antwan Harvey, and the
police seized clothing Mathis had said they wore during the
robbery, including a black ski which was obtained pursuant to a
warrant from the home of Stephen Owens, a close friend of all the

-8-

defendants. (2T 76-2 to 79-4)

Migdalia Hernandez, who lived with Owens in Elizabeth, testified that Mathis, Harvey, and the Diggs were friends of hers, and regularly visited her apartment. (3T 166-5 to 167-24)  They were all in her apartment on January 22, 1996.  As the four were leaving, Hernandez heard "one of them say they had a gun."  She did not know who made the statement, nor did she ever see a gun.  (3T 167-25 to 168-14; 3T 174-2 to 3)  When they left, Mathis and Harvey were carrying black face masks.  The four returned about an hour later, and the two males were still carrying the face masks.

Hernandez did not remember what time the four left or when they returned.  (3T 169-15 to 170-16)  Hernandez waited six months before giving this information to the police, claiming that although they were all close friends, and Harvey visited her virtually every day, she did not know that they had all been arrested in January.  She did not learn of the arrests until the police came to her house six months later.  (3T 172-10 to 173-20)

In exchange for their pleas to armed robbery, April Diggs, who was 17 years old at the time of the shooting, and her cousin Renee, who was 22, both testified for the state.  As a condition of their plea agreements, they were to receive sentences of 15 years with five-year parole bars.  As part of the agreement, which would shield them  from charges of murder, they had to testify against both Mathis and Harvey. (3T 177-3 to 16; 4T 51-14 to 51-23; 4T 74-1 to 10)  According to April, on January 22, she and her cousin Renee met Harvey and Mathis, not in the Hernandez apartment as Hernandez

-9-

testified, but at a Chinese restaurant.   When they left the restaurant, April believed they were headed toward a liquor store. As they reached the pharmacy across the street from the Portuguese American Liquor store, Harvey announced that he "wanted to go rob somebody, and he wanted us to be the lookout." (3T 180-14 to 181-16; 3T 211-9 to 17)  April and Mathis continued walking, but said nothing.   Harvey said "something about busting somebody," and Mathis said he would, too.   April thought they meant to shoot someone.  At this point, Harvey gave Mathis a small black gun. (3T 181-17 to 182-15; 3T 183-9 to 15)  When the prosecutor showed April the gun taken from Harvey's house, she stated that this was not the gun Harvey had on the night of the shooting.  Harvey's gun had a different color handle. (3T 182-19 to 183-4)

As they walked, April observed a man, later identified as Saraiva, coming out of his house with the garbage.   Harvey ran toward Saraiva, with Mathis following.  April continued walking, but turned when she heard one or two gunshots.  She saw Saraiva fall and Mathis and Harvey run off.  April did not seen the shooting, but Renee told her that Mathis shot Saraiva. (3T 183-19 to 185-16; 3T 186-12 to 15; 3T 204-10 to 17)  Later that evening, at Hernandez's house, April asked Mathis why he shot Saraiva. Mathis said it was because the man grabbed him. (3T 187-5 to 16) In her statement to the police and at her guilty plea, April indicated that it was Mathis who fired the gun. (3T 188-4 to 10; 3T 196-19 to 25)  In her statement she also indicated that she did not participate in the robbery or serve as a lookout.  She pled guilty

-10-

because the state agreed not to prosecute her for felony-murder. (3T 199-3 to 200-10)

According to April, they did not chase anyone before they assaulted Saraiva, and they did not discuss robbing a deli. (3T 201-16 to 202-6)  She did not remember seeing Mathis or Harvey wearing masks on the night of the shooting. (3T 206-2 to 12)  After the shooting, both April and Renee saw a man from the neighborhood, whom she knew as "Jamaica" going through the victim's pockets. (3T 204-21 to 205-15; 4T 72-15 to 73-3)  April denied that Harvey told her to place the blame on Mathis. (3T 203-8 to 12)

Herminia Garcia, a social worker at the Union County juvenile detention center, testified that April told her that neither she, her cousin Renee, nor Mathis had anything to do with the shooting, and that a fourth individual who was with them was responsible for the shooting. (4T 110-1 to 111-22)  Garcia could not remember the date April made that statement, nor did she make a written notation of the conversation.  She advised April to give the information to her attorney.[3] (4T 112-2 to 115-23; 4T 123-19 to 22)

Renee Diggs testified that Harvey and Mathis asked her and her cousin to serve as lookouts for a robbery. (4T 45-6 to 47-8)  Although April testified that they did not accost anyone else prior to the Saraiva robbery (3T 201-16 to 202-6), Renee stated that Harvey and Mathis had chased two "Spanish men." (4T 47-16 to 48-7)

---

[3]April Diggs admitted that after her arrest she was taken to the Union County Detention Center and met with social worker Garcia.  She did not recall, however, telling Garcia that it was Harvey, and not Mathis, who did the shooting: "I doubt if I said that." (3T 206-23 to 207-4)

At some point, Harvey pulled a gun from his pants and started "acting crazy with the gun." According to Renee, Harvey was "just showing off," although he released the safety control and indicated that he was going to shoot some cops who were walking nearby. (4T 61-17 to 62-6; 4T 64-3 to 19)

When they came upon the man taking out the garbage, Renee heard Mathis say, "That one right there." (4T 49-19 to 50-1) Although she did not see the transaction, Renee assumed that Harvey gave his gun to Mathis, because she observed Harvey give something to Mathis and saw Mathis go up to the man taking out the garbage. Renee saw the man grab Mathis by the jacket, saw a flash of light, and then saw the man fall. Mathis and Harvey then ran from the scene together. (4T 50-3 to 51-8; 4T 63-11 to 25)

Renee also claimed that when she saw Harvey hand Mathis the gun, Mathis said, "Oh, yes, it's on." (4T 54-5 to 13) On the day of her arrest, January 25, 1996, Renee gave a statement to the police identifying Mathis as the shooter. (4T 51-24 to 52-13) Contrary to April's testimony, Renee claimed they did not encounter Mathis on the stairs when they returned to Hernandez's apartment. (4T 65-3 to 23)

Renee admitted that she was afraid of Harvey and did not leave the group when there was talk of committing a robbery because Harvey physically prevented her from doing so. She denied, however, that Harvey threatened her and told her to place blame on Mathis because Mathis was a juvenile. (4T 66-23 to 67-5)

Damina Arcos testified that she met Renee Diggs in jail. In

-12-

November of 1997, Renee told her that it was Harvey who shot the liquor store owner. (6 140-20 to 141-19)  Arcos had learned about the trial from Detective Koczur a week before the trial.  She told Koczur about Renee's statement, and he told her to bring the information the prosecutor.[4] (6T 142-22 to 144-24)

Three days after the shooting, Detective Furda, accompanied by Carteret Police Detective-Sergeant McFadden, arrested Harvey at his home in Carteret.  McFadden retrieved an unloaded .32 caliber revolver from a crawl space at the top of the stairs leading to the second floor.  The gun was dark blue and appeared to be almost black. (3T 160-1 to 161-23; 3T 164-11 to 165-22)  According to Furda, without bullets or casings, there was no way to determine whether the firearm was the one used to shoot Saraiva. (3T 162-2 to 7)  Neither Mathis nor Harvey had a permit to purchase or carry a handgun. (4T 36-17 to 37-12)

Two of Mathis's teachers, Ronald Orr and Belquis Fernandez, testified on his behalf, indicating that they knew Mathis to be truthful. (4T 91-7 to 15; 4T 97-15 to 102-24)

Marvin Mathis denied that he possessed a gun, participated in a robbery, or shot anyone on January 22, 1996. (4T 157-8 to 18)  On the evening of January 22, he was walking in Elizabeth with Harvey and the Diggs cousins.  Harvey noticed a man waiting for a bus and asked the girls to see if the man was wearing any gold jewelry.  When the girls reported that he was, and Mathis realized that

---

[4]During her testimony, Renee Diggs denied knowing Arcos and that she had ever admitted defendant was not the shooter. (4T 67-5 to 68-4)

-13-

Harvey wanted to rob him, Mathis told Harvey not to. (4T 130-20 to 133-17)  April then urged Harvey to rob the owner of a deli they were passing.  Mathis refused to serve as a lookout, and they continued walking. (4T 133-23 to 134-7; 5T 39-3 to 22)  Thereafter, Harvey and April ran after two "Spanish boys," and Mathis and Renee jogged behind, but the boys outran them. (4T 134-8 to 17; 5T 95-1 to 6)  Mathis did not know Harvey had a gun until he pulled it out and started "acting crazy" and "showing off."  At one point, Harvey said he wanted to shoot at police officers who were walking nearby. He took the safety attachment off of the gun, but did not pull the trigger.  Mathis was scared, but thought that if he tried to leave Harvey would shoot him.  When Renee had tried to leave, Harvey grabbed her and refused to let her leave. (4T 134-18 to 135-25; 5T 57-15 to 21)

When they reached the corner of Seventh and East Jersey, Harvey noticed Saraiva taking out his garbage out and told the girls to serve as lookouts.  Harvey asked Mathis to be a lookout, but he refused. (4T 136-10 to 16)  Mathis was scared.  He walked across the street and stood next to a Chinese restaurant.  Harvey approached Saraiva and it sounded like he was telling Saraiva to empty his pockets.  Harvey tried to reach into Saraiva's pockets, and Saraiva slapped Harvey's hand down.  At that point, Harvey grabbed Saraiva and the man grabbed Harvey, and they traded punches.  Harvey pulled out his gun and Saraiva grabbed for it.  As the two struggled, Mathis grabbed Harvey's arm to prevent him from shooting Saraiva.  The gun went off once, missing Saraiva, and

-14-

Harvey fired a second shot that struck him. (4T 136-17 to 25; 4T 139-1 to 140-10)  Mathis was shocked when Saraiva fell, and he ran off with Harvey. (4T 140-13 to 17)

Mathis had not intended to participate in the robbery or help Harvey in any way. (4T 141-2 to 5)  He did not leave Harvey once he realized Harvey wanted to commit a robbery because he was afraid Harvey would shoot him. (4T 152-19 to 21)  After the shooting, Mathis ran home, refusing to take the gun from Harvey. At no time did Mathis possess the gun. (4T 141-15 to 142-10)

Mathis denied asking his girlfriend Sharlama Brooks to say that he was with her on the night of the shooting.  According to Mathis, "I say if anyone ask if I was with her...that she don't know." (4T 142-22 to 143-20)  He also denied ever telling her that he had shot someone accidentally. (5T 69-23 to 25)  With regard to the questioning at police headquarters, Mathis indicated that he was not given a choice about going there, and he lied to the police when he gave his first statement because he was scared.  Moreover, although he signed the rights form, the police were "rushing" him, and his understanding of his rights was "not that good."  Although his first statement to the police was not true, due to his being scared and confused, his second statement was truthful. (4T 145-22 to 152-8; 4T 168-25 to 169-5; 5T 3-11 to 4-18)

On the morning of January 24, Mathis's mother, Linda Mathis, was taken by the police from her job to police headquarters so that she could be present while they questioned her son.  Ms. Mathis did not recall much of what transpired, but she did remember that her

-15-

son claimed he had not known what Harvey was up to and that he "didn't do anything"; "he said he wasn't involved." (6T 146-20 to 148-13; 6T 155-15 to 17) Her son was questioned until midnight. At one point she and her son signed a consent-to-search form, and she accompanied the police to her house where they conducted a search. (6T 149-2 to 151-14) Ms. Mathis indicated that she signed and understood the form explaining Mathis's constitutional rights. (6T 151-16 to 23) Although Mathis believed one of the detectives was "putting words" in her son's mouth (6T 156-24 to 25), she and her son both signed his statement. (6T 157-4 to 21)

## LEGAL ARGUMENT

### POINT I

**THE DECISION OF THE FAMILY PART JUDGE TO WAIVE JUVENILE JURISDICTION OVER MARVIN MATHIS CONSTITUTED A CLEAR ERROR OF JUDGEMENT AND SHOULD BE REVERSED.**

The Family Court had before it a special-education student just under 16 years of age who had never before committed a criminal offense and had no exposure to the juvenile-justice system. The court indicated that it weighed the expert reports, the offense charged, and the circumstances surrounding the offense. The court rejected the defense experts' conclusions that Mathis could be rehabilitated in the three years before he reached the age of 19, and concluded that the juvenile had not met the burden of demonstrating that he could be rehabilitated: "I don't believe that Marvin Mathis can be rehabilitated by age 19. And, therefore, I don't have to decide whether or not rehabilitation outweighs the reasons for waiver." (2MT 29-9 to 21) Given the circumstances of this case and the juvenile's background and his progress since his incarceration in the Union County Juvenile Detention Center, his rehabilitation by age 19 was probable. Moreover, the probability of his rehabilitation before the age of 19 substantially outweighed the deterrent value of the more serious adult penalties. It is respectfully submitted that the Family Part judge erred in waiving juvenile jurisdiction over this matter.

Waiver of a juvenile to adult court "is the single most serious act the juvenile court can perform." State v. R.G.D., 108

-17-

N.J. 1, 4-5 (1987) (quoting P. Hahn, The Juvenile Offender and the Law 180 (3rd ed. 1984)). "This is because once waiver of jurisdiction occurs, the child loses all the protective and rehabilitative possibilities available to the Family Part." Id. at 5.

The Family Part may waive jurisdiction of a juvenile case to the Law Division for adult prosecution where the State shows that (1) the juvenile was 14 years of age or older at the time of the offense and (2) there was probable cause to believe that the juvenile committed certain acts which, if committed by an adult, would constitute certain enumerated offenses, including homicide. N.J.S.A. 2A:4A-26a(1) and (2)(a).[5] Under such circumstances waiver should occur unless the juvenile can demonstrate that the probability of his or her rehabilitation by the use of the resources available to the court before he or she reaches the age of 19 substantially outweighs the deterrent value of the more serious adult penalties. N.J.S.A. 2A:4A-26a(3); State v. R.G.D., 108 N.J. at 11-12; see also State in the Interest of C.A.H. and B.A.R., 89 N.J. 326, 342-343 (1982) (interpreting prior waiver statute, N.J.S.A. 2A:4-48).

In R.G.D., 108 N.J. at 12-13, the Court explained that under the then-new juvenile code, the waiver decision continued to turn upon the "evidential axis" earlier described in C.A.H. & B.A.R., 89 N.J. at 344-45. The axis is tipped in the direction of deterrence

_____

[5]Mathis was over 14, and he did not challenge the finding of probable cause. (2MT 3-14 to 22)

-18-

and waiver as evidence accumulates of the "commission of a grave offense, deliberateness of conduct, an older juvenile offender, a past record of infractions, and a background of delinquency and exposure to the juvenile justice system." In those cases where the "evidential axis" nears balance, the R.G.D. Court suggested that the Family Court consider the proportionality of a juvenile sentence vis-a-vis the corresponding adult sentence, including the increased authority of family-court judges to incarcerate and the presumption of incarceration in cases involving serious crimes. R.G.D., 108 N.J. at 13.

It has been said that N.J.S.A. 2A:4A-26a seeks to deal more harshly with serious juvenile offenders by creating a "presumption" of waiver for those crimes listed under N.J.S.A. 2A:4A-26a(2)(a). State v. Scott, 141 N.J. 459, 463 (1995); State v. R.G.D., 108 N.J. at 11-12. Consequently, the discretion of Family Part judges in such cases has been narrowed from the prior law. Although for Chart 1 offenses the axis has been "heavily tilted" by N.J.S.A. 2A:4A-26a(2)(a) in favor of waiver, State v. R.G.D., 108 N.J. at 12, it is not irreversibly so. Penalties for these offenses continue to exist within the juvenile-justice system. See N.J.S.A. 2A:4A-44d. Thus the Legislature did not intend a wholesale waiver of all Chart 1 cases, and the "presumption" created by N.J.S.A. 2A:4A-26a(2)(a) is rebuttable. Ultimately, a court making a waiver decision is required to "weigh the need for justice and fairness to the individual against the need for deterrence which serves primarily society's demands for justice." R.G.D., 108 N.J. at 12.

Moreover, in <u>C.A.H. & B.A.R.</u>, the Court referred to a need to balance the gravity of the crime against <u>weak</u> evidence of rehabilitation: "the gravity of the crime. . .may serve to overcome <u>problematic</u> or <u>debatable</u> evidence of rehabilitation." 89 N.J. at 345 (emphasis supplied). Intuitively, this is so, for it is when there is reason to doubt that an errant juvenile will not mend his or her ways before reaching adulthood that the need for strong measures to monitor and correct his or her behavior is most evident. Equally evident is the converse: where, as here, there is strong rehabilitative evidence, the risk of recidivism, and hence the need for waiver to achieve a more lengthy incarceration than the juvenile system would allow, is diminished.

When measured against the above standard, it is evident that Marvin Mathis should not have been waived to adult court. Indeed, Mathis presented compelling expert testimony of his probable rehabilitation by age 19. The proofs showed that Mathis, who had significant intellectual impairment and was easily influenced by others, would respond poorly in an adult prison environment, but would be an excellent candidate for rehabilitation before his nineteenth birthday if held in a juvenile facility.

Both the experts for the defense, psychologists Cheryl Thompson and Martha Page, and the expert for the state, psychologist Louis Schlesinger, recognized Mathis's extreme intellectual deficiencies. Dr. Thompson noted Mathis's severe learning problems necessitating placement in a special-education program, and expressed concern that he might be functioning at a

-20-

level close to retardation. (Da 11 and Da 13)   Dr. Page also
observed that Mathis was functioning on the borderline level of
intelligence. (Da 22)   Although the state's expert found that
Mathis was at the high end of the borderline to dull-normal range
of intelligence, that his fund of general information was weak and
his social comprehension below average (Da 30 and Da 37), he
nonetheless believed that Mathis's potential was higher than the
current scores and school performances suggest. (Da 32)

The fact that Mathis was 15 at the time of the offense should
have played a more significant role in the court's decision.
Unlike a 17- or 18-year-old juvenile, there were almost three years
available to effectuate Mathis's rehabilitation.   The defense
experts made it clear that a boy of Mathis's age is much more
impressionable and malleable than an older teenager, and thus a
much better candidate for rehabilitation.   Dr. Thompson noted in
her report that "[Marvin] is cooperative, he seeks adult authority
and if surrounded by people who foster pro-social behavior and
leave Mathis with a sense of competence, his adaptation would be
good." (Da 13)

As the court noted in C.A.H. & B.A.R., one of the factors that
tip the "evidential axis" in favor of waiver is the presence of "an
older juvenile offender".   89 N.J. at 344-45.   Conversely, logic
dictates that the fact that Mathis was a very young juvenile
offender is a factor that tips the "evidential axis" in favor of
rejecting the drastic action of waiving jurisdiction to adult
court.   The fact that Mathis was young and a "follower" should have

-21-

militated against the decision to confine him to prison with hardened, anti-social adults for 30 to 50 years.   Dr. Thompson recognized that Mathis, if surrounded by people who foster decent conduct and leave Mathis with a sense of competence, could be rehabilitated in three years time, but that if Mathis were sent to prison, as a follower, he "could be easily persuaded by more successful anti-social characters to become involved with them." (Da 12)   That is precisely what happened in the present case when Mathis was influenced by the actions of a 20-year-old adult.

Dr. Page also expressed her profound concern about Mathis's prospects if he were tried as an adult and sent to prison: "If he were placed with adults, he would continue to be exposed to negative influences.  Because of his poor problem-solving abilities resulting from his poor analytical skills, he would have a difficult time, without very specific help, in dealing with the negative role models and input in an adult prison." (Da 23)

Both defense psychologists referred to Mathis's good adjustment at the Union County Juvenile Detention Center.  Indeed, the social worker at the Center, Herminia Garcia, who worked with and observed Mathis for nine months during his incarceration at the facility, noted that he was consistently polite, respectful, and cooperative as a resident, and had earned the highest status available in detention.  Moreover,

> During these last nine months, Marvin has learned to verbalize his concerns in an appropriate way.  He reports problems and works toward solutions when problems first occur.  He has responded well to the guidance of his teachers and the Juvenile officers.

-22-

> With the help of counseling, Marvin has learned to distinguish between being a follower and evaluating situations as they occur.
>
> * * *
>
> Given his character, his respect for authority, his willingness to accept guidance and his ability to learn and respond to changing situations, it is my opinion that Marvin's prospects for rehabilitation before age 19 are excellent.

(Da 40)

Mathis's teachers also described him as very respectful and cooperative, someone who made a difference in class. They were shocked to hear that he was involved in a killing. (Da 21 to Da 22)

The primary focus of the state's psychologist, Dr. Schlesinger, was his perception that Mathis did not recognize that there was a problem or that he had done something wrong, "except being in the wrong place at the wrong time," and that he "showed almost no remorse for the victim, not even knowing his name, and implied that he was the victim being lured into this whole event by others." (Da 38) According to Dr. Schlesinger, the first step of rehabilitation is to recognize that there is a problem. He concluded that since the first step of rehabilitation had not been met, it was his judgment that Mathis could not be rehabilitated by the time he reached 19. (Da 38)

It is not remarkable that Mathis "implied that he was the victim by being lured into this whole event by others." He was lured into these tragic events by a man five years his senior. And contrary to Schlesinger's recollection, Mathis expressed his

-23-

remorse.  He told Dr. Thompson that he was ashamed and sad that an innocent person lost his life (Da 13), and when he was asked by Dr. Schlesinger if he had any feelings regarding the death of the victim, Mathis stated, "I just feel sorry, can't explain it." (Da 36)  Given his age and intellectual deficiencies, Mathis probably expressed his feelings of remorse as best he could.  Mathis did not minimize the gravity of the offense and its impact upon the victim's family.

In large part Mathis's action on the night of January 22, 1996 was a tragic aberration by a boy who had never been engaged in violence.  While there is no question but that Mathis's actions merited punishment by means of incarceration, that could adequately be accomplished through the juvenile-justice system.  Not every juvenile who commits a first-degree crime, even a homicide, must automatically be waived to adult court.  See generally, State v. Ferguson, 255 N.J. Super. 530, 535-36, 543-44 (App. Div. 1992).

Marvin Mathis is an excellent candidate for rehabilitation, as attested to by two psychologists, the comments of his teachers, and the statements of the social worker at the Union County Youth Detention Center.  Where there is strong rehabilitative evidence, the risk of recidivism, and hence the need for waiver to achieve a longer incarceration than the juvenile system would allow, is diminished.  The need for deterrence -- individual and general -- could have been amply satisfied here by a juvenile adjudication. See Scott, 141 N.J. at 464, quoting C.A.H. & B.A.R., 89 N.J. at 344 ("The statute requires a balancing of `the need for deterrence

-24-

against the prospects of rehabilitation'"). The decision to relinquish jurisdiction in this case constitutes a clear error of judgment and should be reversed.

## POINT II

DEFENDANT'S CONVICTION MUST BE REVERSED DUE TO
THE IMPROPER ADMISSION OF HEARSAY EVIDENCE
THAT HIS GIRLFRIEND WAS ACCOSTED ON THE STREET
BY A MAN WHO TOLD HER THAT DEFENDANT HAD
KILLED SOMEONE.    SUCH EVIDENCE VIOLATED
DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL
RIGHTS TO CONFRONTATION. U.S. CONST., Amends.
VI and XIV; N.J. Const. (1947), Art. I, par.
10.

Sharlama Brooks was a cornerstone of the State's case.
Brooks, Mathis's girlfriend, testified that Mathis admitted to her
that he was involved in the shooting of the store owner.  Brooks
was the state's most credible witness both because Mathis allegedly
admitted to her that he was involved in the shooting, and because,
unlike prosecution witnesses April and Renee Diggs, Brooks was not
involved in the offense.

Over strenuous objection, Brooks was permitted to testify that
an unidentified man accosted her on the night of the shooting and
told her that Mathis had been the one to shoot the gun.  The
objection was first raised when Brooks was asked by the prosecutor
about an incident that occurred on the night of the crime.  Brooks
started to testify that she had been accosted by four or five men,
one of whom pulled her into a hallway.  As she began to relate what
one of the men told her, defense counsel objected. (1T 67-8 to 17)
The prosecutor argued that the statement was "not being offered for
the truth, but as state of mind." (1T 67-18 to 19)  At sidebar, the
prosecutor explained:

What [Sharlama Brooks] is going to say is

-26-

> that one of the guys said that your boyfriend
> Marvin did a murder, and one of my...relatives
> got locked up for the murder....And your
> boyfriend better come clean.   And we are
> looking for him.
>       Why this becomes relevant is because then
> she uses the same words to Marvin, is what I
> was told this, what's going on.   Marvin does
> not deny it.   Later on he admits it.
>       So it becomes an adoptive admission
> because she says someone is calling you a
> murderer, and that's something someone
> normally would deny.   If you said, you know,
> Bill Kolano [the prosecutor], you are a
> murderer, if it's not true, I say I am not.
>       Admissible as an adoptive admission.

(1T 67-24 to 68-12)   The prosecutor also maintained that he was

eliciting the testimony as a "stepping stone," to show why Brooks

asked Mathis about the shooting when she saw him in school the next

day. (1T 69-21 to 25)

Defense had no objection to the witness testifying that she

questioned Mathis as a result of something she had been told; he

objected that it would be improper to repeat verbatim the words of

a third party stating that Mathis had killed someone. (1T 70-4 to

23)

The court ultimately decided to admit the testimony, both as

an "adoptive admission" and to explain Brooks's conduct after she

was accosted.  The court further indicated that while it "could be

confusing," it would give a limiting instruction. (1T 72-18 to 25)

The limiting instruction given focused solely on why Brooks

confronted Mathis in school:

> I am going to instruct you as to a
> limitation with respect to the anticipated
> information that is going to come as a result
> of that particular question.   This question is
> going to be posed by the prosecutor as he did.

-27-

> I am going to ask him to restate the question.
> The answer that is being given by this
> witness is not to be considered by you for the
> truth of that answer.  So you are not to
> consider that what her answer is contains
> information that is truthful, only that the
> information that she is about to relay in
> response to this question is to be used by you
> to, as an explanation as to what it is that
> she did as a result of receiving the
> information.  <u>So it explains her motivation
> for what she did next.  So only this, this
> answer to this question is to be limited to
> the use as an explanation of what the witness
> did next.</u>

(1T 73-16 to 25; emphasis added)

Thereafter, the prosecutor repeated his question, first asking
Brooks whether she had had a conversation on her way home on the
night of the shooting, and, specifically, "[W]hat did the persons
tell you that Marvin had done?" (1T 74-1 to 5) Brooks responded as
follows:

> The man approached me -- I was on my way up to
> my house -- and he said, You know, do you know
> such and such?  I said yes, I know Marvin.
> And he said you know he killed someone.  I was
> like, okay, go further on, what you were
> telling me.  He was like, Well, my cousin was
> there at the wrong time, and they got him.
> And if you see your boyfriend again tell him
> they are out to get him.

(1T 74-5 to 12)   The prosecutor then asked Brooks if she told
Marvin when she saw him at school the next day, that "the guys said
that he had killed somebody."  Brooks replied, "Yes, I did." (1T
74-23 to 25)  The following colloquy then took place between the
prosecutor and Brooks:

> Q. At the initial time when...you told
> [Marvin] that some guy approached you and said
> that Marvin had killed somebody, did he deny
> that at that point?

-28-

A. Yes, Marvin did, he denied at first,
then he confessed by [the] guidance office.

(1T 75-6 to 10)  Brooks recounted Mathis's "confession," which did
not admit that he held or fired the gun, and was not inconsistent
with his statement that the gun went off when he was trying to stop
Harvey from shooting Saraiva:

> He told me him and his friends were walking,
> and that he...went to grab the guy, and as
> soon as he grab the guy the gun went off.

(1T 76-24 to 77-2)

Sharlama Brooks's testimony that she heard unspecific and
unsubstantiated information from an unidentified man that Mathis
had killed someone constituted impermissible hearsay.   The
prejudice inherent in the testimony operated to deny Mathis a fair
trial and due process of law.

Since Mathis specifically denied what the unidentified man
accused him of doing, the hearsay statement was not, contrary to
the court's ruling, admissible as an "adoptive admission."  Receipt
into evidence of an adoptive admission is governed by N.J.R.E.
803(b)(2), which renders "a statement whose content the party had
adopted by word or conduct or in whose truth the party has
manifested belief" admissible.  The New Jersey Supreme Court has
warned that this exception "must be used with caution." Greenberg
v. Stanley, 30 N.J. 485, 498-99 (1959).  When the Mathis responded
to Brooks's statement about the stranger's accusation, he did not
"adopt" the statement or admit to what was said about him.  He did
precisely the opposite.  According to Brooks, Mathis, at first,
denied the accusation. (1T 75-6 to 10)  Even when he admitted his

-29-

involvement, he never stated that he had killed anyone. He told
Brooks that "they was struggling I guess when the man was taking
out the garbage and gun [sic] had went off, but it was by mistake."
(1T 74-1 to 75-13)  There was no indication who "they" referred to,
and it may well have meant, as Mathis later testified, that he had
grabbed Harvey's arm during the struggle with the victim, whereupon
the gun discharged.  Brooks also testified that Mathis told her he
was walking with some friends, and that he "went to grab the guy,
and as soon as he grab the guy the gun went off."  (1T 76-24 to 77-
3)  Once again, Mathis's "admission" is consistent with his
testimony that he tried to grab Harvey when the gun discharged.
Mathis in no way "adopted" the unnamed accuser's statement that he
had killed anyone.

The other reason given by the court for admitting the hearsay
information, and the only reason given in the limiting instruction,
was that it explained why Brooks questioned Mathis in school the
next day:

> [T]he information that she is about to relay
> in response to this question is to be used by
> you to, as an explanation as to what it is
> that she did as a result of receiving the
> information.  So it explains her motivation
> for what she did next.

(1T 73-20 to 25)

The court was wrong.  The introduction of evidence that a non-
testifying witness has implicated the defendant constitutes a
direct violation of the rule against hearsay.  State v. Burks, 208
N.J. Super. 595, 610 (App. Div. 1986) (informant told police that
defendant was involved in killing); cf. State v. Manning, 82 N.J.

-30-

417 (1980) (in referring to defendant's statement, detective noted that he told defendant that co-defendant had implicated him in crime).   Furthermore, when the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given evidence of the defendant's guilt, the testimony should be disallowed as hearsay.  State v. Alston, 312 N.J. Super. 102, 113 (App. Div. 1998) (finding reversible error where anonymous telephone caller implicated defendants as suspects in shooting).

Here, defense counsel specifically argued that it would be improper to repeat verbatim the words of a third party stating that Mathis had killed someone.  He suggested instead that the court circumvent the problem of prejudicial hearsay by having the witness testify that she approached and questioned Mathis as a result of something she had been told. (1T 70-4 to 23)  This would have been consistent with the Supreme Court ruling in State v. Bankston, 63 N.J. 263, 268 (1973):

> It is well settled that the hearsay rule is not violated when a police officer explains the reason he approached a suspect or went to the scene of a crime by stating that he did so "upon information received."

This limited amount of information may be admitted to show that the police were not acting arbitrarily, but no further details of what the police were told may be admitted.  As the Court stated:

> However, when the officer becomes more specific by repeating what some other person told him concerning a crime by the accused the testimony violates the hearsay rule.

Bankston, 63 N.J. at 268.

In State v. Bowens, 219 N.J. Super. 290 (App. Div. 1987), the

-31-

Court found plain error where the trial judge allowed the officer to testify that he had received a report of abuse to explain why he was investigating the defendant.  Despite the lack of objection, this slight reference was found to have implicated the defendant and made it clear that someone had reported an offense against him. See also State v. Baker, 228 N.J. Super. 135 (App. Div. 1988).

In addition to violating the hearsay rules, N.J.R.E. 801 et seq., Brooks's testimony violated Mathis's right to confrontation. Bankston, supra, 63 N.J. at 269.  An essential component of the Sixth Amendment right to confrontation is the opportunity to cross-examine witnesses through whom the evidence is given.  Pointer v. Texas, 308 U.S. 400, 405, 85 S.Ct. 1065, 1068 (1965).  The Confrontation Clause promotes fair results based upon reliable evidence by requiring that a witness give testimony under oath, submit to cross-examination, and allow the jurors to assess his credibility and demeanor. California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935 (1970).  Lack of confrontation impugns the integrity of the factfinding process. Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139 (1990); Coy v. Iowa, 487 U.S. 1012, 108 S.Ct. 1798 (1988).  As Professor Wigmore has noted, "the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." 5 Wigmore, Evidence (3d ed. 1940).

The court's disposition of the issue here, which allowed the jury to hear about the statement of an unidentified man accusing Mathis of the killing, deprived Mathis of his fundamental right to

-32-

confront that individual. Cf. State v. LiButti, 146 N.J. Super. 565, 572-73 (App. Div. 1977) (prosecutor's arguments based on demonstration performed during summation improperly covered matters outside the evidence and afforded defendant no opportunity for cross-examination, defense or reply).  See also State v. Briggs, 279 N.J.Super. 555 (App. Div. 1995), where this Court reversed a murder conviction because the jury was permitted to infer an inculpatory meaning to an ambiguous statement.  This Court noted that the improper admission of a hearsay statement as an adoptive admission "implicates the confrontation clause" and was thus not "harmless beyond a reasonable doubt." Id. at 565.

In the present case, the evidence showing that Mathis was the killer was not overwhelming.  It consisted entirely of statements from witnesses whose credibility was strongly challenged.  It was reversible error for the jury to hear such highly irrelevant and prejudicial evidence that some unnamed individual, not subject to cross-examination, told Brooks that Mathis had done the killing. Counsel's objection should have been sustained.  The admission of hearsay evidence warrants reversal of Mathis's convictions.

<u>POINT III</u>

**DEFENDANT'S CONVICTION MUST BE REVERSED DUE TO**
**ACTS OF PROSECUTORIAL MISCONDUCT, WHICH**
**INCLUDED REFERRING TO DEFENDANT AS A THUG AND**
**COMMENTING ON FACTORS OUTSIDE OF THE RECORD.**
**(Not Raised Below)**

In his summation, the prosecutor engaged in name-calling, and suggested to the jury that he was aware of facts outside the record. The prosecutor's actions denied Mathis a fair trial.

Twice during his summation the prosecutor referred to Mathis and those in his company as thugs:

> [Mr. Saraiva] was a man basically protecting
> his castle. A man who resented being
> approached by a couple of thugs and being told
> to run his pockets. And if we were teaching
> courses we would say better to submit and
> fight it out another day. He didn't do that
> because he was insulted by the fact these
> thugs could come and just walk up, point a gun
> at him, and take his money.

(6T 209-2 to 8) This type of summation comment is clearly improper. In <u>State v. Von Atzinger</u>, 81 N.J. Super. 509, 516 (App. Div. 1963), this Court reversed the conviction where the prosecutor called the defendants "bums," "hoods," and "punks" in his summation. It found that these terms were associated with habitual lawbreakers, inviting the jurors to speculate on the defendants' character and prior record. See <u>State v. Sims</u>, 140 N.J. Super. 164, 175 (App. Div. 1976) (improper to refer to defendants as a "pack of wolves"). In <u>State v. Pennington</u>, 119 N.J. 547, 576 (1990), the prosecutor was criticized for referring to the defendant in his opening statement as "'a jackal,' 'a stranger to

-34-

humanity,' 'a coward,' and someone with 'ice ... where his heart should be.'"   Our appellate courts have repeatedly criticized similar incidents of name-calling by prosecutors.   <u>State v. Clausell</u>, 121 N.J. 298, 341 (1990) (improper to call defendants "maniacs"); <u>State v. DiPaglia</u>, 64 N.J. 288, 296 (1974) (improper to call defendant a "leg breaker"); <u>State v. Stewart</u>, 162 N.J. Super. 96, 102-03 (App. Div. 1978) (improper to refer to defendant as a "young punk").

Prior to his calling Mathis and his codefendants thugs, the prosecutor told the jurors that Mathis's actions constituted some form of initiation or rite of passage:

> Now [defense counsel] says why would [Antwan Harvey] give up the gun? I tell [sic] you why he would give up the gun.   Very simple. Because, as Marvin said in his statement that was read to you, earlier before this written statement do you recall telling this detective and your mother that you and Antwan were looking to rob someone because you wanted to know how it felt.   <u>And this gun was given up to Marvin Mathis because Marvin was going to make his bones, so to speak</u>, he wanted to know how it felt.

(6T 201-12 to 20; emphasis added)   There was evidence that Mathis told the police during his oral interview, prior to giving a written statement, that he wanted to <u>rob</u> someone to see how it felt.   Mathis denied this at trial. (5T 92-21 to 93-7; Da 75). Even if Mathis did make such a statement, however, this is not at all the same as someone indicating that he wanted to "make his bones," a term employed in street parlance and understood by many to signify an individual's first <u>kill</u> in order to prove himself or gain acceptance in the mob or criminal milieu. <u>See State v.</u>

-35-

DiFrisco, 142 N.J. 148, 250-251 (1995) (O'Hern, J., dissenting). Thus, the jurors may well have been left with the impression that the prosecutor knew more than he was telling and that Mathis had indicated he wanted to kill someone in order to ingratiate himself, or to pass some kind of initiation, with a gang.[6]

In State v. Rose, 112 N.J. 454, 514 (1988), the Court declared: "Statements by the prosecutor which are not based on any evidence adduced at trial are plainly improper." See also State v. Farrell, 61 N.J. 99 (1972) (Supreme Court reversed a conviction due to prejudicial comments by the prosecutor about matters not in evidence and expressions of personal belief). Accord State v. Hipplewith, 33 N.J. 300, 311-13 (1960).

The Sixth Amendment to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee a fair trial to all persons accused of a crime. To ensure that this right is not compromised, the courts emphasize that the primary duty of the prosecutor is "not to obtain convictions but to see that justice is done." State v. Ramseur, 106 N.J. 99, 104 (1987); ABA Standards for Criminal Justice, "The Prosecution Function," ¶3-1(c) (2d ed. 1980). Prosecutors, as official representatives of the State, wield great influence simply by reason of their status, automatically enjoying enhanced credibility with jurors; jurors can

---

[6]April Diggs testified that prior to the robbery Antwan said "something about busting somebody," which April took to mean that he was going to shoot someone. According to April, defendant then said that he would, too. (3T 181-17 to 182-15; 3T 183-9 to 15) She never indicated that defendant took part in the offense to "prove" anything or to pass some kind of initiation.

-36-

be expected to believe what a prosecutor tells them. <u>Farrell</u>, 61 N.J. at 105 (juror unlikely to believe prosecutor would intentionally mislead him) (citing <u>Berger v. United States</u>, 295 U.S. 78, 88, 55 S.Ct. 629, 633 (1935) and <u>State v. Johnson</u>, 31 N.J. 489, 511 (1960)). "Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." <u>Rose</u>, 112 N.J. at 509 (quoting <u>Berger v. United States</u>, 295 U.S. at 88. It is therefore incumbent on every prosecutor to "put aside any tendency or inclination to stray beyond the bounds of fair play. . . ." <u>State v. Marks</u>, 201 N.J. Super. 514, 535 (App. Div. 1985), certif. denied, 102 N.J. 393 (1986). A prosecutor's failure to heed this warning vitiates the defendant's right to a fair trial. <u>State v. Spano</u>, 64 N.J. 566, 568 (1974).

Since defense counsel did not object to the comment about Mathis "making his bones" or to the name-calling, the issue of prosecutorial misconduct is raised as plain error. <u>See</u> <u>R.</u> 2:10-2. Plain error is reversible if it is "clearly capable of producing an unjust result." <u>R.</u> 2:10-2. <u>See also</u> <u>R.</u> 1:7-2. The test is whether the possibility of injustice is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." <u>State v. Macon</u>, 57 N.J. 325, 336 (1971). The prosecutor's "bones" comments and "thugs" comments left the distinct impression that Mathis killed Mr. Saraiva as some kind of initiation rite and invited the jurors to speculate on

-37-

Mathis's character and prior record.  The possibility of injustice under these circumstances was sufficient to warrant a reversal of Mathis's convictions.

## POINT IV

### THE BASE TERM OF 50 YEARS' IMPRISONMENT IS EXCESSIVE AND SHOULD BE MODIFIED BY THIS COURT.

The trial court imposed a sentence of 50 years, with a 30-year period of parole ineligibility for the murder (Count One), an 18-year term with a six-year period of parole ineligibility for robbery (Count Two), and a four-year term with a parole bar of 18 months for the unlawful possession of a weapon (Count Five). The charges of felony-murder and possession of a weapon for an unlawful purpose (Counts Three and Four) were merged into the murder. All sentences were to be served concurrently. (Da 5 to Da 6; ST 10-16 to 12-6) Mathis maintains that the imposition of a base term of 50 years is excessive.

N.J.S.A. 2C:11-3b provides that the term of imprisonment for murder shall be between 30 years and life imprisonment, with a mandatory 30-year period of parole ineligibility. Mathis, who was 15 years old at the time of the offense, thus received a base term much higher than the minimum possible sentence for his first criminal conviction. In its assessment of the aggravating factors, the court found the nature of the offense and the need to deter (N.J.S.A. 2C:44-1a(1) and (9)):

> The need of this court to impose a sentence that will deter him and others from this type of activity is incredibly strong. The manner of the commission of this crime is an additional aggravating factor, one that cries out for this court to impose a serious sentence because of the seriousness of what took place.

-39-

(ST 9-25 to 10-5)  The court noted that it had heard testimony and had received positive information from Mathis's friends and relatives about Mathis being a truthful person, a good and law-abiding person who had not been involved in any criminal activity. (ST 8-5 to 12)  The court found as the only mitigating factor, the lack of any criminal record. (N.J.S.A. 2C:44-b(7))  It concluded, however, that "the aggravating factors...are so substantial and so clearly and convincingly outweigh the mitigating factors that a sentence above the minimum...must be imposed. (ST 10-12 to 15)

It is respectfully submitted that the sentencing court's evaluation of the aggravating and mitigating factors was improper, and it led to the imposition of an base term 20 years in excess of what it should have been.  First, the nature and circumstances of this offense and the role of Mathis therein should not have been weighed in aggravation.  By definition, N.J.S.A. 2C:44-1a(1), the nature of the offense, cannot be an aggravating factor in every case.  Rather, it applies where the crime "was committed in an especially heinous, cruel, or depraved manner." State v. Jarbath, 114 N.J. 394, 404 (1989); State v. Vitale, 102 N.J. 350 (1985)(mem.)(holding that record must demonstrate how the sentencing judge "resolved the factual issue as to the aggravating factor number (1) under N.J.S.A. 2C:44-1 as to the role of the defendant as actor and whether the offense occurred in an 'especially heinous, cruel or depraved manner,'").  As used in this factor, "cruel" means an intent to inflict pain and suffering on the victim. State v. O'Donnell, 117 N.J. 210, 217-18 (1989)(finding

-40-

that defendant "selected a method of beating that would increase
the victim's pain" by "hoisting [him] in the air and striking him
on the legs"). While all murders by their very nature are
extremely serious, and while all murders may be considered "cruel"
by the relatives and friends left behind, in the universe of
murders or felony-murders, this particular offense cannot be said
to be "especially heinous, cruel, or depraved." The facts show
that the victim was shot once during the course of a robbery and
that death was quick. (4T 31-15 to 18) Although it is not
suggested that the harm caused in this case was anything less than
extreme, the offense was no more serious than others in its class.
See, e.g., State v. Dunbar, 108 N.J. 80, 96 (1987).

With respect to the deterrence aggravator, which the court
found to be "incredibly strong," the need to deter did not justify
an increase of Mathis's base term to a term of 50 years. Moreover,
the court should have afforded the same weight to Mathis's lack of
a prior record and his family support as it did to the need to
deter.

The trial court also erroneously failed to consider Mathis's
youth as a mitigating factor. This Court has held that it should
be considered in sentencing. State v. Pindale, 249 N.J. Super. 266,
289 (App. Div. 1991); State v. Tanksley, 245 N.J. Super. 390, 397
(App. Div. 1991) (holding that the youth of a defendant may be
considered as a mitigating factor even if there is no evidence he
was influenced by an older person). The incident here occurred
when Mathis was 15. At the time of the offense he was accompanied

-41-

by three older people, two of them adults.  It was the adult male, Antwan Harvey, who possessed and introduced the gun, and suggested the robbery.  Surely, Mathis was influenced by an older person (<u>N.J.S.A.</u> 2C:44-1b(13)).

Finally, it is urged that the court erred in failing to consider as a mitigating factor the hardship that Mathis's imprisonment would have on him (<u>N.J.S.A.</u> 2C:44-1b.(11)).  A life sentence is a hardship for a boy who committed an offense at such a young age and whose life will be molded in prison.

Once the aggravating and mitigating factors are considered in their proper context, a base sentence in excess of the minimum 30-year term for murder cannot be supported.

## CONCLUSION

For the reasons expressed in Point I of this brief, the Family Part's decision to waive juvenile jurisdiction in this case should be reversed, and this matter should be remanded for further proceedings. In the alternative, for the reasons expressed in Points Two and Three, Mathis's convictions should be reversed and the matter remanded for a new trial. Should this Court reject the arguments set forth in Points One through Three, it should modify the base term of 50 years, or remand for the imposition of a base term not to exceed 30 years.

Respectfully submitted,

IVELISSE TORRES

Public Defender
Attorney for Defendant-Appellant

BY: *Paul M. Klein*

PAUL M. KLEIN
Deputy Public Defender II

Date: September 30, 1999

-43-

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION, FAMILY PART
COUNTY OF _____

Page _____ of _____

## COMPLAINT - JUVENILE DELINQUENCY

The State of New Jersey in the interest of:
**Marvin Mathis**

Docket number:
FJ-_____ - **20-01786-96-E** _____ -_____

Mailing address: (Street)
**538 Magnolia Ave.**

Juv/Party ID number:
_____

City, state and zip code:
**Elizabeth, NJ 07201**

Name and address of school (and grade) or employer:
**Elizabeth High School**

Residing in: (township or municipality)
**Elizabeth, NJ**

Phone:
**None**

| Race: **2** | Height: **5-7** | Weight: **130** |

1 caucasian; 2 black; 3 hispanic; 4 asian/oriental; 5 american indian; 6 other; 7 unknown

Age: **15**  Date of birth: **3/23/80**  Sex: **Male**

Color of eyes: **Brown**  Color of hair: **Black**

AKA:

1. The parent(s) or guardian of the above named juvenile are: (first name, last name)
**Linda Mathis**

Address: **538 Magnolia Ave, Eliz**  Phone: **N/P**  Relationship: **Mother**

2. If the above named juvenile is not residing with parent or guardian, he/she is residing with: (name)
**N/A**

Address:  Phone:  Relationship:

Charge No:  The undersigned complainant: (first name, last name)
**Det. Thomas Koczur**

Of: (identify department or agency)
**Elizabeth Police Department**

Address:
**1 Police Plaza, Elizabeth, NJ**

says: The above named juvenile is alleged, upon ☐ personal knowledge, ☒ information supplied by others, to be delinquent in that, on or about **1 /22/96**
at **10:12** a.m./p.m. the above named juvenile did: [Set forth facts regarding time, manner, place and the essential elements of the alleged act]

with the purpose of promoting and/or facilitating the armed robbery of Antonio Saraiva at 709 E. Jersey Street, Elizabeth, NJ by aiding or agreeing or attempting to aid another person in the planning or committing of said crime PROBABLE CAUSE; SWORN STATEMENT OF MARVIN MATHIS which ARE ATTACHED

Co-Defendant(s) Name, Address, and Phone No:
Antawan Harvey, April Diggs, and Renee Diggs

**FILED**

Witness(es) Name, Address, and Phone No:

Violation of (statutory citation and title):
**NJSA 2C:15-1/NJSA 2C:2-6 (Armed Robbery)**

**JAN 25 1996**
**SUPERIOR COURT**
**FAMILY DIVISION**

I certify that the foregoing statements made by me are true to the best of my knowledge, information and belief. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Signature of Complainant / Date: **1/25/95**  Officer and Department filing police report:

Charge No: **2**  The undersigned complainant: (first name, last name)
**Det. Thomas Koczur**

Of: (identify department or agency)
**Elizabeth Police Department**

Address:
**1 Police Plaza, Elizabeth, NJ**

says: The above named juvenile is alleged, upon ☐ personal knowledge, ☒ information supplied by others, to be delinquent in that, on or about **1 /22/96**
at **10:12** a.m./p.m. the above named juvenile did: [Set forth facts regarding time, manner, place and the essential elements of the alleged act]

Acting either alone or with one or more persons was engaged in the commission or, was an attempt to commit, or flight after committing or attempting to commit the armed robbery of Antonio Saraivaandin the course of such crime or in the immediate flight thereafter, cause the death of Antonio Saraiva PROBABLE CAUSE; SWORN STATEMENT OF MARVIN MATHIS

Co-Defendant(s) Name, Address, and Phone No:

Witness(es) Name, Address, and Phone No:

Violation of (statutory citation and title):
**2C:11-3(a)(3) Felony Murder**

I certify that the foregoing statements made by me are true to the best of my knowledge, information and belief. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Signature of Complainant / Date: **1/25/95**  Officer and Department filing police report:

**1a**

ORIGINAL: Court  BLUE: Prosecutor  GREEN:  PINK: Police  GOLD: Juvenile, Parents

CF0011 (2/92)

*171*

PROSECUTOR'S DOCKET NO. 96004593
C.D.R. NO. W286525

RECEIVED AND FILED
SUPERIOR COURT
UNION COUNTY
Criminal Case Management Center

FEB 0 4 1997

ANDREA FERRARO
Criminal Division Manager

EDWARD M. NEAFSEY
Assistant Attorney General
Acting Prosecutor of Union County
Union County Administration Building
Elizabeth, New Jersey 07207
(908) 527-4500
Attorney for the State of New Jersey

|  |  |
|---|---|
| | SUPERIOR COURT OF NEW JERSEY |
| | LAW DIVISION – UNION COUNTY |
| | CRIMINAL |
| THE STATE OF NEW JERSEY | : |
| | 97-01-001231 |
| v. | : INDICTMENT NO. |
| MARVIN MATHIS, | : N.J.S.A. 2C:11-3a(1) AND/OR (2) |
| | MURDER |
| Defendant. | : (FIRST DEGREE) |
| | |
| | : N.J.S.A. 2C:15-1 |
| | ROBBERY |
| | : (FIRST DEGREE) |
| | |
| | : N.J.S.A. 2C:11-3a(3) |
| | FELONY MURDER |
| | : (FIRST DEGREE) |
| | |
| | : N.J.S.A. 2C:39-4a |
| | POSSESSION OF A FIREARM FOR AN |
| | : UNLAWFUL PURPOSE |
| | (SECOND DEGREE) |
| | : |
| | N.J.S.A. 2C:39-5b |
| | : UNLAWFUL POSSESSION OF A WEAPON |
| | (THIRD DEGREE) |
| | : |

**2a**

## COUNT ONE

The Grand Jurors of the State of New Jersey, for the County of Union, upon their oaths present that MARVIN MATHIS, on or about the 22nd day of January, 1996, in the City of Elizabeth, in the County of Union, aforesaid, and within the jurisdiction of this Court, did purposely and/or knowingly cause serious bodily injury to Antonio Saraiva resulting in his death, and/or did purposely and/or knowingly cause the death of Antonio Saraiva, contrary to the provisions of N.J.S.A. 2C:11-3a(1) and/or (2) and against the peace of this State, the government and dignity of the same.

## COUNT TWO

The Grand Jurors of the State of New Jersey, for the County of Union, upon their oaths present that MARVIN MATHIS, on or about the 22nd day of January, 1996, in the City of Elizabeth, in the County of Union, aforesaid, and within the jurisdiction of this Court, did, while in the course of committing a theft, knowingly threaten immediate bodily injury to Antonio Saraiva, and/or purposely put Antonio Saraiva in fear of immediate bodily injury and/or did commit a crime of the first degree, to wit: Murder, in violation of N.J.S.A. 2C:11-3a(1) and/or (2), and/or did purposely inflict serious bodily injury upon Antonio Saraiva, and/or was armed with, and/or used and/or threatened the immediate use of a deadly weapon, contrary to the provisions of N.J.S.A. 2C:15-1, and against the peace of this State, the government and dignity of the same.

**3a**

### COUNT THREE

The Grand Jurors of the State of New Jersey, for the County of Union, upon their oaths present that MARVIN MATHIS, on or about the 22nd day of January, 1996, in the City of Elizabeth, in the County of Union, aforesaid, and within the jurisdiction of this Court, did cause the death of Antonio Saraiva acting either alone or with one or more persons during the commission of, or attempted commission of, or flight after the commission of the crime of Robbery, contrary to the provisions of N.J.S.A. 2C:11-3a(3), and against the peace of this State, the government and dignity of the same.

### COUNT FOUR

The Grand Jurors of the State of New Jersey, for the County of Union, upon their oaths present that MARVIN MATHIS, on or about the 22nd day of January, 1996, in the City of Elizabeth, in the County of Union, aforesaid, and within the jurisdiction of this Court, did possess a firearm with the purpose to use it unlawfully against the person of another, contrary to the provisions of N.J.S.A. 2C:39-4a, and against the peace of this State, the government and dignity of the same.

### COUNT FIVE

The Grand Jurors of the State of New Jersey, for the County of Union, upon their oaths present that MARVIN MATHIS, on or

**4a**

about the 22nd day of January, 1996, in the City of Elizabeth, in the County of Union, aforesaid, and within the jurisdiction of this Court, did knowingly possess a handgun without having first obtained a permit to carry same as provided in N.J.S.A. 2C:58-4, contrary to the provisions of N.J.S.A. 2C:39-5b, and against the peace of this State, the government and dignity of the same.

_____

SDAG/ACTING ASSISTANT PROSECUTOR

ENDORSED:

_____

FOREMAN

**5a**

-4-

*State of New Jersey*

v.

PG 96004593

RECEIVED AND FILED
SUPERIOR COURT
UNION COUNTY
Criminal Case Management Office

AUG 18 1998

ANDREA FERRARO
Criminal Division Manager

**New Jersey Superior Court**
**Union    County**
**Law Division - Criminal**

[X] Judgment of Conviction
[ ] Change of Judgment
[X] Order for Commitment
[ ] Indict/Accusation Dismissed
[ ] Judgment of Acquittal

MARVIN MATHIS
Defendant (Specify Complete Name)

| | |
|---|---|
| 03/23/80 | DATE OF BIRTH |
| 244859C | S.B.I. # |
| 01/24/96 | DATE OF ARREST |
| 02/05/97 | DATE IND/ACC FILED |
| | DATE OF ORIGINAL PLEA |

[ ] NOT GUILTY    [ ] GUILTY  ORIGINAL PLEA

ADJUDICATION BY:    DATE
[ ] GUILTY PLEA
[X] JURY TRIAL    06/18/98
[ ] NON-JURY TRIAL
[ ] DISMISSED/ACQUITTED

ORIGINAL CHARGES

| IND/ACC NO. | Count | Description | Degree | Statute |
|---|---|---|---|---|
| 97-02-00123-I | 1 | MURDER | 1st | 2C:11-3(a)(1)&(2) |
| | 2 | ROBBERY | 1st | 2C:15-1 |
| | 3 | FELONY MURDER | 1st | 2C:11-3(a)(3) |
| | 4 | POSSESSION OF A FIREARM FOR UNLAWFUL PURPOSE | 2nd | 2C:39-4(a) |
| | 5 | UNLAWFUL POSSESSION OF WEAPON | 3rd | 2C:39-5(b) |

FINAL CHARGES

| Count | Description | Degree | Statute |
|---|---|---|---|
| | **SAME AS ABOVE** | | |

It is, therefore, on AUGUST 14, 1998 ORDERED AND ADJUDGED that the defendant is sentenced as follows:    COUNTS 1, 3 & 4 ARE MERGED FOR SENTENCING

- Defendant is remanded to the custody of the commissioner of the Department of Corrections for a period of 50 YEARS and until released in accordance with law.
- Defendant shall be ineligible for parole for 30 YEARS of that term.
- All sums to be collected through the Department of Corrections.
- All assessments shall be deducted from any income which the defendant receives from a prison work program while incarcerated or shall be deducted from any personal account maintained for the defendant's benefit.
- $100.00 VCCB assessment. - $75.00 assessment for the S.N.S.F.

COUNT 2 - Defendant is remanded to the custody of the commissioner of the Department of Corrections for a period of 18 YEARS and until released in accordance with law. -Defendant shall be ineligible for parole for 6 years of that term. - $100.00 VCCB assessment. - $75.00 assessment for the S.N.S.F.
- All sums to be collected through the Department of Corrections.
- All assessments shall be deducted from any income which the defendant receives from a prison work program while incarcerated or shall be deducted from any personal account maintained for the defendant's benefit.

COUNT 5 - Defendant is remanded to the custody of the commissioner of the Department of Corrections for a period of 4 YEARS and until released in accordance with law. -Defendant shall be ineligible for parole for 18 MONTHS of that term. $50.00 VCCB assessment. $75.00 assessment for the S.N.S.F.
- All sums to be collected through the Department of Corrections.
- All assessments shall be deducted from any income which the defendant receives from a prison work program while incarcerated or shall be deducted from any personal account maintained for the defendant's benefit.

The sentences imposed under Counts 1,2, & 5 are concurrent.

[ ] You are hereby sentence to community supervision for life.
[ ] The court finds that your conduct was characterized by a pattern of repetitive and compulsive behavior.
[X] It is further ORDERED that the sheriff deliver the defendant to the appropriate correctional authority.
[x] Defendant is to receive credit for time spent in custody. (R. 3:21-8).

| 934 | 01/24/96 - 08/14/98 |
|---|---|
| TOTAL NO. DAYS | DATES(From/To) |

Total Custodial Term 50 YEARS  Institution STATE PRISON   Total Probation Term

Administrative Office of the Courts
State Bureau of Identification
COPIES TO: CHIEF PROBATION OFFICER, STATE POLICE

6a

CFO106(Rev. 7/94) Replaces LR-34 & LR-35
CDR 4 (Rev. 7/94)
DPT OF CORRECTIONS OR COUNTY PENAL INSTITUTION

State v. _____ MARVIN MATHIS _____    SBI# 244859C _____    IND/ACC# 97-02-00123-I _____

TOTAL FINE    $ _____
$
TOTAL RESTITUTION $ _____

If the offense occurred on or after December 23, 1991, an assessment of $50 is imposed on each count on which the defendant was convicted unless the box below indicates a higher assessment pursuant to N.J.S.A. 2C:43-3.1. (Assessment is $30 if offense is on or after January 9, 1986 but before December 23, 1991, unless a higher penalty is noted. Assessment is $25 if offense is before January 9, 1986.)

[ ] Assessments imposed on count(s) _____
_____ is $ _____ each.

TOTAL VCCB ASSESSMENT $ see sentence

[ ] Installment payments are due at
rate of $ _____ per _____,
beginning _____
                    (Date)

If any of the offenses occurred on or after July 9, 1987, and is for a violation of Chapter 35 or 36 of Title 2C;

1) A mandatory Drug Enforcement and Demand Reduction (D.E.D.R.) penalty is imposed for each count. (Write in X times for each.)
____1st Degree @ $3000      ____4th Degree @ $750
____2nd Degree @ $2000     ____Disorderly Persons of Petty
____3rd Degree @ $1000      ____Disorderly Persons @ $500.
                                      TOTAL D.E.D.R PENALTY $ _____

[ ] Court further ORDERS that collection of the D.E.D.R. penalty be suspended upon defendant's entry into a residential drug program for the term of the program.

2) A forensic laboratory fee of $50 per offense is ORDERED.
_____ Offenses @ $50.  TOTAL LAB FEE $ _____

3) Name of Drugs Involved _____

4) A mandatory driver's license suspension of _____ months is ORDERED.
The suspension shall begin today, _____ and end _____
Driver's License Number _____

(IF THE COURT IS UNABLE TO COLLECT THE LICENSE, PLEASE ALSO COMPLETE THE FOLLOWING)

Defendant's Address _____

Eye Color _____    Sex _____    Date of Birth _____

[ ] The defendant is the holder of an out-of-state driver's license from:
Jurisdiction _____    Driver's License# _____

[ ] Defendant's non-resident driving privileges are hereby revoked for _____ months.

---

If the offense occurred on or after February 1, 1993 and the sentence is to probation or to a State Correctional facility, a transaction fee of up to $1.00 is ordered for each occasion when a payment or installment payment is made. (P.L. 1992, c. 169) If the offense occurred on or after March 13, 1995 and the sentence is to probation, or the sentence otherwise requires payments of financial obligations to the probation division, a transaction fee of up to $2.00 is ordered for each occasion when a payment is made. (P.L. 1995, c.9).

If the offense occurred on or after August 2, 1993, a $75 Safe Neighborhood Services Fund assessment is ordered for each conviction. P.L. 1993, c. 220.

If the offense occurred on or after January 9, 1997 an assessment of $30.00 is imposed pursuant to the Law Enforcement Officers' Protection Act.

If the offense occurred on or after January 5, 1994 and the sentence is to probation, a fee of up to $25 per month for the probationary term is ordered. (P.L. 1993, c. 275) Amount per month _____.

NAME (Person who prepares this form)    TELEPHONE NUMBER    NAME(Attorney for Defendant)/State

/pfk    908-527-4177    WALTER E. FLORCZAK, ESQ.

STATEMENT OF REASONS

The court is fixing a minimum term of 30 years incarceration without eligibility for parole because it finds that aggravating factors 2 and 9 clearly, convincingly, and substantially outweigh mitigating factor 7.

There is a need to protect the public by incarcerating the defendant.

A PAROLE DISQUALIFER IS MANDATED BY N.J.S.A. 2C:11-3(b) and this is a Graves offense.

JUDGE(Name)    JUDGE(Signature)    DATE
HON. JOHN F. MALONE, J.S.C.    8/14/98
Administrative Office of the Courts    CPO106(Rev. 11/93) Replaces LR-34 & LR-35
State Bureau of Identification    CDR 4 (Rev. 11/93)
COPIES TO: CHIEF PROBATION OFFICER, STATE POLICE. AOC CRIMINAL PRACTICE, DEPT OF CORRECTIONS OR COUNTY PENAL INSTITUTION

7a

A 3316-98 T4

ORDER ON MOTION
----------------

STATE OF NEW JERSEY                    SUPERIOR COURT OF NEW JERSEY
VS                                     APPELLATE DIVISION
MARVIN MATHIS                          DOCKET NO.   A -003316-98T4
                                       MOTION NO.   M -003958-98
                                       BEFORE PART:
                                       JUDGE(S):    PRESSLER


MOTION FILED:      FEBRUARY 24, 1999   BY: MARVIN   MATHIS
ANSWER(S) FILED:

                                              FILED
                                         APPELLATE DIVISION

SUBMITTED TO COURT:   MARCH 15, 1999          MAR 15


                        O R D E R
                        ---------

THIS MATTER HAVING BEEN DULY PRESENTED TO THE COURT, IT IS ON THIS

15TH DAY OF   MARCH         , 1999, HEREBY ORDERED AS FOLLOWS:


                                       GRANTED    DENIED    OTHER
                                       (XX )      (  )      (  )
MOTION BY APPELLANT
- TO FILE NOTICE OF APPEAL NUNC PRO TUNC

SUPPLEMENTAL:    It appearing that the preconditions of the Supreme Court in
                 its "NOTICE TO APPELLATE BAR", 100 N.J.L.J. 1208 (1977),
                 identified and explained in State v. Altman, 181 N.J. Super.
                 539 (App. Div. 1981), have been met, the motion to file the
                 notice of appeal nunc pro tunc is granted.




UNN 97-02-00123-9    I hereby certify that the
                     foregoing is a true copy of the   FOR THE COURT:
                     original on file in my office.


JUDHD                              Clerk     SYLVIA B. PRESSLER   P.J.A.D.

                        8a

IVELISSE TORRES
Public Defender
Office of the Public Defender
Appellate Section
31 Clinton Street, 9th Floor
Newark, New Jersey 07102
(973) 877-1200 - Fax (973) 877-1239

ORIGINAL FILED

FEB 24 1999

A-3316-98T4

Smilla R. Cox, Esc.
Clerk

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
INDICTMENT NO(S.) 97-02-00123

| | | |
|---|---|---|
| STATE OF NEW JERSEY, | : | **Criminal Action** |
| Plaintiff-Respondent, | : | NOTICE OF APPEAL |
| v. | : | |
| MARVIN MATHIS, | : | |
| Defendant-Appellant. | : | |

PLEASE TAKE NOTICE that the defendant confined at

New Jersey State Prison appeals to this Court from the final

judgment of conviction of murder, robbery, unlawful possession of

a weapon which was entered on August 18, 1998 in the Superior

Court, Law Division, Union County in which a sentence of 50 years

with a 30 year parole disqualifier, $250. VCCB penalty, $225. SNSF

penalty was imposed by the Honorable John F. Malone.

IVELISSE TORRES
Public Defender
Attorney for Defendant-Appellant

BY: _Deborah Collins_
DEBORAH C. COLLINS
Assistant Deputy Public Defender

The undersigned certifies that the requirements of <u>R</u>. 2:5-3(a) have
been complied with by ordering the transcript(s) on 2/17/99 as
indicated on the accompanying transcript request form(s) and that
a copy of this Notice has been mailed to the tribunal designated
above.

_Deborah Collins_
DEBORAH C. COLLINS
Assistant Deputy Public Defender

**9a**

1

Cheryl L. Thompson, Ph.D.
57 Maple Street
Millburn, New Jersey 07041
(201) 762-6475

Psychological Assessment

Marvin Mathis
Age: 15-11
DOB: 3/23/80                    Date Seen: February 10, 1996

Reason for Referral:  To assess the likelihood of successful rehabilitation within the Juvenile Justice System of the State of New Jersey prior to the achievement of age 19 years.

Referred by:  William B. Eisert,  Attorney-at-Law

Procedures: Clinical Interview including mental status examination; Bender-Gestalt Test of Motor Perception; House-Tree-Person Test; review of available records; interview with Youth House social worker assigned to the case; and viewing of video tape made by the defendants prior to this incident.

Findings:  Marvin Mathis is a soon to be 16 year old African-American adolescent. He is a brown skinned, wide-eyed, short adolescent who looks somewhat older than his stated age. He has some adolescent acne. He was poorly groomed on the day of the visit with hair being particularly disheveled. He had been in the detention center for 15 days at the time of the interview (2/10/96) and was complaining about loss of appetite and homesickness.

Marvin was fully aware of my role in his judicial process but did not seem to have a full picture of the seriousness of his judicial position. This is a first arrest and detention for Marvin. He is charged with an armed robbery and homicide.

Marvin states that he was with another young man and two young women when they decided they would commit robbery, walked to a liquor store and tried to rob the man outside the store. The man was the store owner. The victim resisted the robbery and the older boy had the gun, the man grabbed at the gun. Marvin states that he then tried to come between his friend and the man at which point the gun went off, firing one shot into the man's chest, killing him. The group separated after the shooting. Marvin states that he knew a robbery would occur but the he did not know this specific robbery would transpire. After the shooting, the other boy and girl

**10a**

2

ran away quickly and Marvin and the second girl ran more slowly. Marvin states that all of the people involved in the incident are in detention. The other male and one of the females have been detained in the county jail. The second female is in the Youth Detention Center with Marvin.

Marvin states that he told the older male not to rob the man and that he tried to intervene in the shooting. He also reports that all of the other people involved are saying that he shot the man and that the robbery was entirely his idea.

After the robbery, Marvin states that he kept thinking about it. He knew the victim was shot but did not know he was dead. Marvin states that he did empty the victim's pockets. He did not tell his mother about the event but did tell his girlfriend. The girlfriend heard about the incident from another person before Marvin told her about it. Marvin was arrested at his school two days after the incident occurred.

Marvin is one of three children. He has one brother aged 25 years and one sister aged 12 years. Marvin does not get along with his 25 year old brother. That brother is incapacitated as a result of juvenile diabetes and lives apart from Marvin and the younger sister. His mother is described as 40-41 years old and a homemaker. She is also described as an asthmatic who has more trouble in winter than in summer. The father, age unknown is a truck driver. The parents are separated and Marvin is only in touch when there is business. He states that his parents separated a very long time ago. His family came to New Jersey from North Carolina when Marvin was four years old. His parents have spoken to him about his legal situation. Marvin states his mother told him not to hang out with the wrong crowd and his father told him is sad to be in trouble so young.

Marvin then responded that he never thought he would be in here, that he is a school person and that he didn't get into trouble. However, Marvin's school record reflects severe learning problems that became obvious in first grade. Marvin was retained in first and second grades. He was placed in a special education program because he was never able to learn basic reading, writing and computation.

On Mental Status: Marvin was oriented to time, place and person. He denied hallucinations (sensory experiences in the absence of a stimulus) and no delusional thinking was elicited (false fixed beliefs). Suicidal and/or homicidal ideation and gesture were denied. Marvin's speech was clear and goal directed. His intelligence is estimated as Borderline to Low Average. He did not His problem solving skills are very inconsistent, for example when

**11a**

3

asked what he would do with a stamped, sealed and addressed letter, he responded, "take it to the post office. When asked what he would do if he were the first person in a movie to see real smoke and fire, he responded, "go back and get some popcorn." He was no able to understand that the fire was separate from the movie. His ability to think abstractly is also poorly developed. He is concrete, simplistic and referential. When asked about the similarity between beer and wine, he stated, "Guess dark beer, wine lighter, I don't know about beer and wine." Attention and concentration are impaired. He has no vegetative symptoms of depression except poor appetite. He denies all substance use/abuse.

In Sum: Marvin presents with a mental status that reflects no acute psychiatric disability.

Marvin presents as a cooperative young man, with a bright-eyed expression. However, he is not bright and is easily confused.

Marvin made two statements to the police. The first statement described three guys who were involved in the crime. The second statement reported that four people were involved in the crime, with two of the group members being female. He states that he changed that version of the story when his mother told him not to lie and when he realized that his male friend had told about the presence of the two females. Marvin acknowledged involvement in the incident but states that he served mostly as the lookout. He further states that he thinks he was in shock after he saw the man get shot. He shared that his girlfriend asked him why he didn't stay at the crime scene and see to it that the victim received assistance. Marvin believes it was his disbelief, that allowed him to run away. He thinks that man became a victim because the other male was angry that the liquor store was closed. Marvin states that he knew the other male since he was 5 or 6 years old. He also knew that this boy had been in trouble and had been to Jamesburg.

Marvin appears to be a young man who is caught between his wishes for himself and the reality of his future. He states he would like to go to college to become and electrician. He hopes to go the Rutgers or to a school in Georgia. However, his special education classification because of his never having become literate makes a goal like that impossible. His profound sense of academic failure appears to have served as an impetus to engage in this anti-social behavior. Marvin reports that his girlfriend does well in school and is headed for college.

Marvin presents as a follower, someone who could be easily persuaded by more successful anti-social characters to become involved with them.

**12a**

4

Marvin should have a complete diagnostic assessment as he may be functioning as the level of retardation. If so, he would do well if connected to some of the programs of the Department of Developmental Disability. He is cooperative, he seeks adult authority and if surrounded by people who foster pro-social behavior and leave Marvin with a sense of competence, his adaptation would be good.

This is a very serious crime. Marvin does not present as the initiator of such a crime. This is his first arrest. He has told at least two versions of the story, one version appeared to be his attempt at protecting the two females involved in the episode. None of the other participants appear to have tried to protect Marvin. He was the youngest member of the group and as such may have been implicated as having greater responsibility than he had in reality because of the wide-spread belief that juveniles are punished less harshly. In reviewing the video tape, it becomes apparent that the people were overstimulated in that they lived in constant noise, indulged in dangerous behavior, allowed substance abuse and encouraged the younger members of the group to mistreat women as well as promoting substance abuse for them. In the video tape, Marvin appears to play an insignificant role in the many interactions. His level of involvement at least indicates that he is not a leader of this group.

Marvin appears quite confused about his involvement in such a serious event. He acknowledges that he knew that a robbery would occur and he was fully prepared to participate in the robbery. He states that he did not want to see anybody hurt and that he and one of the women served essentially as look-outs while the event proceeded. However, he also states that he tried to intervene and protect the victim from the shooting. Marvin also shared that his girlfriend wanted to know why he left the man before help arrived for him. Marvin states that he ran from the crime because he was completely overwhelmed by the incident. He further states that he had no idea that the man had been killed.

Marvin presents as a pleasant cooperative young man whose behavior reflects a negative idealization of a group of people he had started to associate with. That is, Marvin does not appear to have the ability to judge the social appropriateness of the group he selected to involve himself with. One of the people shown on the video tape was a relative of Marvin's.

Marvin presents as a young man who does not have an anti-social identification. He describes himself as a school person and he was in the correct grade for his age. He states that he can't explain what allowed him to engage in such behavior. He is ashamed and sad that an innocent person lost his life as a result of the actions of

**13a**

5

the group. Marvin does believe that he would not have been in such behavior had his cousin not been involved with him.

Marvin's behavior is that of a person whose judgment was clouded, probably as a result of the overstimulation in the house, substance abuse and a desire to feel that he was a part of the group.

Marvin presents as an excellent candidate for successful rehabilitation within the juvenile justice system of the State of New Jersey prior to the achievement of age 19 years. He has no prior record, he is responsive to adult authority, his adjustment to youth house has been good, he is not a leader, he has had a good adjustment to school even though he probably has significant learning problems. Marvin has achievable career goals. He wants to become an electrician.

In Sum: Marvin Mathis with a chronological age of 15- presents as an excellent candidate for successful rehabilitation within the Juvenile Justice System of the State of New Jersey prior to the achievement of age 19 years. He is responsive to adult authority, has no prior criminal record and does not prevent as a leader in anti-social action. He would do extremely well in a structured setting that includes educational and vocational training. He would also benefit from personal counseling to help him learn to assess his involvement with others.

Cheryl L. Thompson
Cheryl L. Thompson, Ph.D.
New Jersey # 1729

13 aa

07/15/96   08:12   ☎201 773 9699        MARTHA H PAGE                                    ☒004

# Martha H. Page, Ed.D.

**Licensed Psychologist**

185 PAULISON AVENUE
PASSAIC, NJ 07055-4809
201-773-7673

RECEIVED
JUL 18 1996
By_____

PSYCHOLOGICAL EVALUATION OF MARVIN MATHIS
DATE OF BIRTH:   3/23/80
TESTS ADMINISTERED:
5/14/96 (Two Hours):
1)   Interview
2)   Bender Gestalt
3)   House Tree Person Test
4)   Porteus Mazes
5)   WISC-III
6)   Kaufman Short Neuropsychological Assessment Procedure (K-SNAP)
5/30/96 (½ hour).
Interview with Mrs. Mathis
6/14/96 (1½ hour):
Interview with 4 Teachers at the High School:  Ms. Almaradel, Ms.
      Fernandez, Mr. Firestone, Mr. Orr
6/25/96 (1½ hours):
7)   Wide Range Achievement Test-3
8)   Incomplete Sentences, High School Form
9)   Make A Picture Story Test (MAPS)
10)  Rorschach
11)  Test of Nonverbal Intelligence (TONI-2)
MATERIAL SUBMITTED:
Letter of Referral from William Eisert, Esq., 5/1/96
Complaint--Juvenile Delinquency, 1/25/96
Report of Medical Examiner, 1/23/96
Investigation Report, Police Department of Elizabeth, 1/22/96
Investigation Report, 1/22/96
Property Slip, 1/22/96
Investigation Report, 1/22/96
Voluntary Statements, Marvin Mathis, 1/24/96
Complaint against April Diggs, 1/25/96
Alpha Card, April Diggs
Alpha Card, Marvin Mathis
Voluntary Statement, April Diggs, 1/25/96
Voluntary Statement, Renee Diggs, 1/25/96
Statement of Antwan Lee Harvey, 1/25/96
Statement of Abdul Rodriguez, 1/23/96
statement of Bradley Harrell, 1/23/96
Statement of Khaled Murray, 1/23/96
Statement of Kashia Andrews, 1/23/96
Statement of Mrs. Linda Mathis, 1/24/96
Statement of Sharlama Brooks, 1/26/96
Supplementary Investigation Report
Video
SCHOOL REPORTS:
Child Study Team Reports, IEP, 11/12/92
Elementary School Records, 9/6/84-9/5/91
Speech and Language Report, 11/21/89
Educational Evaluation, 10/16/89

**14a**

Mathis, Marvin
-2-

Classification Conference Report and IEP, 11/22/89
Undated Report of Teacher of Communication Handicapped, Room 405A,
    1988-1989
Student Guidance Record, 1991-1992
Progress Report, Elizabeth High School
IEP, 11/27/89
Re-evaluation, 1992
Speech and Language Re-Evaluation Report, 10/8/92
Progress Reports
Letters to Mrs. Mathis, 2/1/91, 3/25/91, 3/17/92, 3/2/92
Request for Assistance, 4/89
IEP for Home Instruction
Classification Conference Report, IEPs, 1992, 1993, 1994

REASON FOR REFERRAL:

Marvin Mathis, 16-3 and in the 10th grade (Special Education, Communication Handicapped) was referred by William Eisert, Esq., Office of the Public Defender, Union County. Marvin was charged with felony murder. He was alleged, either alone or with one or more persons, to have been engaged in the commission or an attempt to commit or flight after committing or attempting to commit the armed robbery of Antonio Saraiva, and in the course of such crime in the immediate flight there-caused the death of Mr. Saraiva on 1/22/96.

On 1/22/96 Mr. Saraivas apparently received a gun shot to the head. He was pronounced dead at Elizabeth General Medical Center.

In Voluntary Statement of 1/24/96 Marvin Mathis said that he was in the area of 34d and Broad St. on 1/22/96 at about 6 P. M. He met up with another boy, then with Antwan. He said that Antwan and the person were walking. He said that Antwan and the other person were looking to rob somebody. Antwan wanted Marvin to hold the gun. Marvin denied that he handled the gun. He claimed that Antwan saw the man who owned the liquor store and told him to empty his pockets. The man said no. Marvin claimed that the man threw a punch at Antwan, and Antwan threw a punch back. Antwan pushed the man, then shot him. He claimed that Antwan wanted him to go through the victim's pockets, but Marvin refused. They ran away. Marvin claimed that he was five feet away from Antwan when the man was hot. He claimed that Antwan threatened to kill him, if he said something. He admitted to telling his girl friend that he shot a man by accident. He claimed that Antwan told him to say it; that if he didn't say it, he would kill him.

In his second statement he said that he met with Antwan and two girls. He admitted to planning to rob some one with Antwan. Antwan planned to rob, and Marvin was to be the lookout. One robbery was not carried out because Marvin told Antwan not to do it. However, on the next attempt he acted as lookout. He alleged that the man grabbed Antwan, after Antwan grabbed him. The man punched Antwan, Antwan punched back, pushed the man off him, took the gun and shot him. Antwan then went through the man's pockets. He claimed that neither he nor the girls touched the man.

In the Supplementary Investigation Report, at the beginning of

15a

Mathis, Marvin
-3-

the interview of 1/24/96 Marvin denied having any knowledge of the hoimicide and stated that he had been with his girlfriend and a friend. He was described as very nervous, kept is hands folded in his lap, and continually kept rocking back and forth. When questioned for details of where he was before and during the time of the homicide, he became very inconsistent. He became angry when confronted with these inconsistencies, first by the detectives and then by his mother. He said that Sharlama Brooks was a liar with respect to what he had said to her. He asked his mother to leave, then told of being with Antwan and a third person. He alleged that Antwan shot the owner of the liquor store. In the second statement he said that he became involved in the struggle between Antwan and the victim, and the gun went off. He then mentioned that 2 females were involved in this. April Diggs in her statement of 1/25/6 described Marvin and Antwan as over to the man. She said that Marvin said that he shot the man because the man tried to grab him. Renee Diggs in her statement of 1/25/96 claimed that Marvin was struggling with the man who had Marvin by his coat. She mentioned the video where they bragged about the robberies that they committed.

Marvin had no previous arrests or involvement with the juvenile justice system.

With respect to his school history, Marvin had been in Pre-K in 9/6/84. He repeated first and second grades. In 1/2/90 he was classified Communication Handicapped, was on Home Instruction from 1/2/90 until 5/25/90. He was awaiting special class placement. He received BSI in reading, language and math from 1986 until he was tested in the fall of 1989. A speech and language report of 11/21/89 indicated that when he was in grade 3, he was evaluated by his Child Study Team. He had difficulty with grade level work in reading and written language. Behavior deteriorated when he did not meet with success. He had difficulties in expressive and receptive language. He was unable to retain details in a story. He had difficulty with auditory compre- hension and following multiple step directions. Reading achievement grade score fell within the severely deficit range of functioning. He had poor short term memory. He experienced problems in retaining and processing information. The IEP of 11/7/90 found him to have a language disorder related to language form and use. He had been re- ferred to his Child Study Team because ha interfered with the other students and liked to dominate them physically. "He threatens and intimidates them constantly." The Social Assessment of 11/14/89 indicated that Mrs. Mathis had been married for nineteen years. She had separated from her husband, a truck driver, in 1984. Both parents had been born and raised in North Carolina. His mother moved to Elizabeth when he was 3. He had a sister Patricia, then 6. His brother Dwayne, a diabetic, was 19. There had been no history of learning disabilities in the family. There had been no DYFS contact. Mrs. Mathis had a limited support system. She said that Marvin walked at 1 year and talked at 1½. He had a positive attitude in preschool and kindergarten, but became more negative as academics became increas- ingly difficult for him. He was described as a follower. He was able

**16a**

Mathis, Marvin
-4-

to develop and maintain positive peer relationships. He never set fires or hurt pets or small children. He had become increasingly sad about school. He was very sensitive to criticism.

Speech was re-evaluated in 10/92. Language skills were significantly discrepant from those of peers and from age-appropriate norms as determined by observation and informal measures. He had difficulty with memory skills, formulating sentences and age-appropriate vocabulary. The IEP of 11/12/92 indicated that Marvin had been on medication for asthma. There was a history of a pain in his eyes for the past five years. The Annual Review of 4/2 indicated that he related well to others and had improved in all academic areas. He continued to show a significant deficit in Broad Reading, Broad Mathematics, Broad Written Language, and Broad Knowledge and Skills. He was seen as a "very personable, cooperative youngster in a one to one setting." Specific remedial goals for subject matter and behavior were set out in the IEP. Marvin was classified on 1/2/90 as Communication Handicapped and assigned to a Special Education Program.

The IEP review of 11/12/92 indicated that Marvin continued to function academically at levels which were significantly below his age (13) and grade level. He was described as a "polite young man generally, although he has exhibited an impulsive and extremely hostile tendency. At most times he appears controlled and somewhat guarded and tense. He can be taskoriented in the classroom setting...He works well in a structured setting, with positive verbal reinforcement." The IEP review of 4/13/94 when he was 14 found him still functioning at below his grade level. He was "very motivated to push himself into higher levels. "Marvin can be very cooperative and pleasant when he is happy or when he wants something from you. On the other hand, Marvin can be very difficult at times. He has been a leader in the classroom, the other students will do almost anything to win his approval. Marvin needs to know that rules apply to him as well as others." The Speech/Language specialist found that his behavior in the language therapy session was greatly improved in 1993-1994. He was better able to follow directions.

The IEP Annual Review of 4/3/95 described him as being "extremely aware of his educational needs and will push himself to perform higher level tasks. He tends to read haphazardly and look for answers." He was described as "a pleasant and outgoing young man. Sometimes Marvin finds it difficult to remain focused for an entire period. He works well in a small group as well as one-on-one." He was seen as exhibiting leadership qualities. "He is respected and admired by his classmates." He made slow but positive academic growth this year. Presently Marvin was functioning adequately in his classes exclusive of outside intervention. He continued classified Communication Handicapped. He needed assistance with concepts and skills related to the organization of ideas. One of the IEP goals was to reduce class absenses for unacceptable reasons.

Marvin was referred for a psychological evaluation to assess his current level of cognitive and emotional functioning and to assist the court ion determining whether he was amenable to the rehabilitative

**17a**

Mathis, Marvin
-5-

processes afforded by the juvenile system by age 19, given the serious-
ness of the allegations and his level of maturity and sophistication.

### BEHAVIOR AND ATTITUDE:

When seen on 5/14/96 Marvin was subdued.  He was cooperative in
the testing session.  He spoke in a soft voice.  He expressed himself
relevantly and coherently with no pathology of affect or cognition.
He said that he lived with his mother.  He had a brother of 25 and a
sister of 12.  He denied any previous problems with the law.

Asked about the events of 1/22/96, he said that he was with this
boy Antwan.  There were two girls with them.  Antwan wanted to rob a
liquor store.  "he told me he was going to get somebody.  He told me
watch out for him.  We started walking."  They tried one store, but the
door was locked.  They kept walking.  They saw two Puerto Rican boys,
who started running.  After that Antwan said, "He was going to get
somebody before the night was over."  Antwan allegedly went after this
man (the victim) and tried to reach in his pocket.  Antoine whipped out
the gun.  "I tried to stop him from shooting but by accident the gun
went off."

Seen again on 6/25/96, Marvin was cooperative.  He said that he
was learning more in his classes.  It was noted that during Sentence
completion Marvin had difficulty in finding the words to complete the
sentences which were presented orally.

### TEST RESULTS:
#### Intellectual Aspects
On WISC-III Marvin received the following test results:

| | IQ/Index | Percentile | Classification |
|---|---|---|---|
| Verbal Scale | 69 | 2 | Intellectually Deficient |
| Performance Scale | 71 | 3 | Borderline |
| Full Scale | 68 | 2 | Intellectually Deficient |
| Verbal Comprehension | 72 | 3 | Borderline |
| Perceptual Organization | 75 | 5 | Borderline |
| Freedom from Distractibility | 72 | 3 | Borderline |
| Processing Speed | 61 | 0.5 | Intellectually Deficient |

He received the following Scaled Scores (average - 10) and Test-
Age Equivalents C. A. = 16-1):

| Verbal Tests | Scaled Scores | Test-Age Equivalents |
|---|---|---|
| Information | 7 | 11:2 |
| Similarities | 7 | 11:8 |
| Arithmetic | 3 | 8:6 |
| Vocabulary | 1 | 7:10 |
| Comprehension | 4 | 10:6 |
| (Digit Span) | 7 | 9:10 |

## 18a

Mathis, Marvin
-6-

| Performance Tests | Scaled Scores | Test-Age Equivalents |
|---|---|---|
| Picture Completion | 5 | 9:6 |
| Coding | 4 | 10:10 |
| Picture Arrangement | 6 | 9:6 |
| Block Design | 6 | 10:10 |
| Object Assembly | 5 | 8:10 |
| (Symbol Search) | (1) | Below 8:2 |

Marvin was functioning at the intellectually deficient to border-line range of intelligence. Test results were affected negatively by the high noise level and frequent distractions during the testing session. Potential intellectual functioning was in the borderline to low average level of intelligence. Fund of knowledge and ability to think abstractly were at the low average level of intelligence, as was his auditory memory for numbers. However, he found it difficult to process verbally presented material rapidly. Ability to define words was well below average. This reflected not only processing problems, but also reflected his socio-cultural background. Certainly, the CST's classification of him as Communication Handicapped was an appropriate one. His handling of test tasks was quite variable with Scaled Scores of 1 on Vocabulary and Symbol Search and 7 on Information, Similarities, and Digit Span. He tended to be quite concrete in his approach to problems. He did not examine social situations in depth. However, a high level of anxiety interfered with his ability to respond with accuracy and rapidity. He was very concerned about doing well.

Bender Gestalt reproductions showed a number of perceptual-motor problems. He appeared to be somewhat depressed. However, he worked slowly and carefully. Rorschach responses reflected borderline to low average intelligence. He was capable of sensitivity and imagina-tiveness when he did not feel under pressure to succeed.

The Porteus Mazes provide a measure of planning ability in every-day life as well as the ability to follow the rules. A high Qualitative Score has been found to be characteristic of juvenile delinquents who tend to feel the end justifies the means. It also provides a measure of tension level and impulsivity. Performance is also affected by the individual's ability to visualize and plan ahead. Marvin received a Qualitative Score of 94 for 16 trials, well in excess of the cutoff score for delinquents of 40 to 50. Marvin's score was detrimentally affected by his difficulties in visualizing and planning ahead. He pre-traced, lifted his pencil from the paper repeatedly, even after being warned. It was very difficult for him to find his way out of the maze by visual cues alone. Between his perceptual-motor difficulties and desire to achieve, he found it very difficult to follow the rules. Even though his Quantitative Score of 90 placed him in the average range, under pressure he would have difficulty in utilizing his ability to plan ahead.

The Wide range Achievement Test-3 measures the codes which are needed to learn the basic skills of reading, spelling and arithmetic. Marvin received the following test results:

**19a**

Mathis, Marvin
-7-

|  | Standard Score | Percentile | Grade Score |
|---|---|---|---|
| Reading | 58 | .6 | 2 |
| Spelling | 71 | 2 | 3 |
| Arithmetic | 66 | 1 | 4 |

Marvin was functioning on the deficient level on a measure of written decoding (reading) and numerical computation (arithmetic) and on the borderline level on o measure of written encoding (spelling). Performance was detrimentally affected by less than ideal testing conditions. However, it was evident that arvin's academic skills were still quite low and further impaired when he felt under pressure to achieve or was in a less than well-controlled and structured situation.

On K-SNAP, a short neuropsychological assessment procedure, his score on the Mental Status Subtest was below average. He was below average on the Gestalt Closure Subtest, which provides a measure of simultaneous processing. This test also measures broad visual intelligence, long-term memory, perceptual organization and visual perception and processing. On the Number Recall Subtest he did quite well. Testing conditions were much better. Attention span was good, and he was able to concentrate. He performed in the moderately deficient classification on the Four-Letter Words Subtest, where he was required to develop strategies to figure out "secret" letters or words by generating and evaluating hypotheses. He lacked the verbal fluency and the abstract thinking necessary to develop complex hypotheses in a novel situation. He needed assistance and guided learning.

In an attempt to minimize linguistic, motoric, and cultural factors, the TONI-2, a language-free measure of abstract/figural problem solving, was administered. The TONI-2 items require test subjects to solve problems by identifying relationships among abstract figures and then solving problems created by the manipulation of these relationships. Each item presents a stimulus pattern in which one or more of the figures comprising the pattern is missing. The subject completes the pattern by selecting the correct response from among either four or six alternatives. Marvin did very poorly on this test. It was very difficult for him to use perceptual cues to aid him in problem-solving. Marvin had definite verbal and visual processing difficulties which made problem-solving in both verbal and nonverbal situations difficult for him, when he was left to his own devices. It was hard for him to see relationships when he was confronted with an unfamiliar situation, unless he was given considerable help.

Affective Aspects

House Tree Person drawings were done with a great deal of detail, but reflected his intellectual limitations. The house was somewhat carelessly done, while the fence was done with much detail. Marvin was experiencing considerable anxiety. His drawing of a person was of a man showing all of his teeth in a smile. Marvin had problems in handling aggressive and hostile feelings.

Rorschach responses reflected adequate reality testing. He was also able to see things as others saw them. Marvin had a strong predilection for thrills and excitement at this point in his emotional

20a

Mathis, Marvin
-8-

development.  Impulse control could be quite poor when he was in a
stressful situation.  He could act with poor judgment because he had
difficulty in thinking things through carefully when he was in an un-
familiar situation, or when he felt challenged or thought that he had
to act as though he were cool and tough.  He did not see himself as
being that competent, in part as a result of his academic shortcomings.
Repeating first and second grade and still not mastering the skills
that other children were mastering would hardly make him feel positive
about himself.  However, he did not want that part of him to surface,
because it was too painful and humiliating.

On Make a Picture Story Test (MAPS) the subject is presented
with 67 figures and background pictures, one at a time.  The subject
selects from these figures and places them on the background picture
as they might be in real life, then tells a story about the situation
he has made.  Marvin's stories depicted pleasant family interactions
and helpful policemen.  People behaved in prosocial ways.  There were
strong desires to be treated as some one special.  He wanted very much
to be accepted.

Sentence Completion responses reflected his feelings of homesick-
ness.  When he was younger, "I used to mock other people."  His nerves
were not that good.  He suffered a lot of things in his life.  To "my
mind" he replied, "Is something that is not to be wasted."  What pained
him "is I got myself into a tight situation."  He saw himself as very
kind.  He wished he were a football player.

Interview with Mrs. Mathis, 5/30/96
Mrs. M shocked by what happened.  She had never been in any trouble.
However, she did not know all of his friends.  He watched TV, he had a
girl friend for about 2 years.  Her 26 year old son did not live with
her 12 year old daughter.  Her older son had been a diabetic since he
was 6.  He was now on dialysis.

Prior to being placed in Special Education Marvin used to get into
a lot of fights.  However, his behavior had improved since he was in
special classes.  Mrs. Mathis had been a volunteer in a hospital and
had been hired as a worker there.

Interviews with Teachers, 6/14/96
Mr. Firestone was Marvin's physical education teacher.  "In my
setting everything was fine."  He described Marvin as a low-keyed kid,
a very respectful kid.  He did not lose his temper.  "Basically he was
a good kid."  He was cooperative.  "He liked us, we liked him.  When we
heard what happened, we were very surprised."

Ms. Almaradel had him for Science.  She said that he had to do
everything step by step.  The plan had been to mainstream him.  She
described him as the "type you could talk to.  He was not an angry
kid, only if someone did something to him.  He was never disrespectful.
He was a leader, never a follower with peers his age."  She described
him as a good kid.  "He was never one to start up fights, although he
would react when something was done to him.  She did not know about
his after-school activities.  He admired his mother and never said that
he had any problems at home.  He was definitely aware of his reading
problems.  When the teachers learned of the murder, "We all said, it
can't be.  It was not his typical behavior."  She said that Marvin

**21a**

Mathis, Marvin
-9-

would think before he did things. "He might have been threatened to do it, if he did it." He would report to the teacher if he were being hassled by others and would warn them. With respect to his school work, "you could not overwhelm him with information." He worked very hard, was very neat. His penmanship was "beautiful." He was admired by the other children.

Ms. Fernandez had Marvin in her class for two years. "When we found out he was in prison, it was the biggest shock." He never had been rude. The other children respected him. There were never any problems with him. He had improved academically. He was very loyal to his friends. It took him a long time to process information. He had enough sense to know where to find information. There were no problems socially. He had a girl friend for a couple of years. She was in a regular class. Marvin kept in touch with Ms. Fernandez. He would call her every two weeks. In the classroom and in the school he knew the rules, and he followed them. He knew what was expected of him. "I miss him in class. He made a difference in the class."

Mr. Orr was also quite positive in his comments about Marvin. He found it hard to believe that Marvin had murdered anyone.

DIAGNOSIS:
    Axis I.    309.4   Adjustment Disorder with Mixed Disturbance of
                       Emotions and Conduct
    Axis II.   315.00  Reading Disorder
               315.1   Mathematics Disorder
               315.2   Disorder of Written Expression
    Axis III.  History of Asthma
    Axis IV.   Educational Problems, Problems Related to Interaction
               with the Legal System/Crime
    Global Assessment of Functioning--55

SUMMARY AND RECOMMENDATIONS:
    Marvin was functioning on the borderline level of intelligence. He had a long history of severe learning disabilities. He had repeated first and second grade and began to display problem behaviors in school. He was classified as Communication Handicapped in 1990 and, after a period of home instruction, was placed in a classroom geared to his needs. There were some problems with respect to behavior in 1991 and 1992, but, for the most part his behavior was acceptable in the High School. His teachers had many positive things to say about his behavior in 1995. He showed no anti-social behavior trends and had not been involved with the Division of Youth and Family Services nor with the juvenile justice system. The family was headed by the mother, who had progressed from volunteer to paid worker in a hospital. This was not the typical unstable, chaotic and/or abusive family often associated with delinquency. Marvin had considerable difficulty in thinking analytically and accurately especially when he felt under pressure. He also tended to be somewhat impulsive, crave excitement and to be accepted. Although he had had problems in dealing with angry behavior in the past, his current teachers did not see this as a problem. He

22a

Mathis, Marvin
-10-

was seen as a good kid.  Marvin became involved with a group of young people who displayed little prosocial behavior and poor impulse control. Marvin, craving excitement as part of his growing up, was very naive. He also did not think very deeply or causally.  He probably saw this behavior as cool and the way to behave if you wanted to be accepted by this group.

Marvin had no history of anti-social behavior.  He was not a sophisticated delinquent who had been the recipient of various intervention techniques and not benefitted from them.  If he were to be tried as an adult and sentenced as an adult, would that act as a deterrent for him and for others.  In an article on the Transfer of Juveniles to Criminal Court:  Does It Make a Difference?, it appeared that the tough approach did not reduce recidivism.  Marvin had been able to modify his aggressive behavior when placed in the appropriate educational setting.  He could definitely profit from a rehabilitative, reparative approach where he would be taught to understand and deal with violence; be given training in problem-solving, especially in stressful situations; be given vocational training; and given help in dealing with his learning problems.  Marvin did not display cynical or opportunistic attitudes toward others.  The events of 1/22/96 appeared to be an isolated incident.  He became involved with an older group of young people whom he, with his simplistic thinking saw as role models. He was influenced negatively by them.  However, his past history would indicate that he could be positively influenced by the rehabilitative processes afforded by the juvenile system by age 19 and could effect prosocial changes in his behavior.  Corrections has an intensive serious offender program which might be considered.  If he were placed with adults, he would continue to be exposed to negative influences. Because of his poor problem-solving abilities resulting from his poor analytical skills, he would have a difficult time, without very specific help, in dealing with the negative role models and input in an adult prison.

Martha H. Page, Ed.D.
7/13/96

**23a**

@008                    MARTHA H PAGE        ☎201 773 9699        08:21   07/15/96

# LOUIS B. SCHLESINGER, PH.D

Psychologist, NJ Lic. No. 1162

**12 TOWER DRIVE**
**MAPLEWOOD, N.J. 07040-1008**

(201) 762-6431

October 2, 1996

Susan M. MacMullan, Esq.,

Office of the Prosecutor

Union County Administration Building

Elizabeth, New Jersey  07207

Re: State in the Interest of Marvin Mathis

Dear Mrs. MacMullan,

At your request, I conducted a psychological evaluation of the above named juvenile on September 26 and September 29, 1996.  The focus of the evaluation was to assess Marvin's capacity to be rehabilitated by the time he reaches 19 years (he is now 16 years, 6 months old) as the State has filed a motion to refer the juvenile defendant to adult court.  Marvin has been charged with felony murder and aiding and abetting an armed robbery which occurred on January 22, 1996, when Marvin was approximately 15 years 10 months old.  In addition to a clinical interview and review of volumes of discovery material that were supplied (over one hundred specific different items), I administered the following psychological tests; Rorschach, TAT, Bender-Gestalt, Projective Figure Drawings, MMPI-A and the Wechsler Adult Intelligence Scale (Revised).  The time spent with Marvin was approximately 5 hours.

**24a**

State in the Interest of Marvin Mathis                    2

PRESENTING PROBLEM:

Marvin described his involvement with the homicide as follows:
"We were at my cousin's house, Steven Owens, with Antwan Harvey,
April Diggs, and Renee Diggs. I was on my way to go home, In the
living room. Antwan and Steven Owens were talking about going to
a liquor store to get beer. I was about to go out. Antwan said to
wait for him. I walked with Antwan to the liquor store and bumped
into Renee and April Diggs downstairs".

"Antwan said to everyone, 'walk with us to the liquor store'".
Antwan and Renee were "poking along", while Marvin and April were
apparently ahead. They found the liquor store closed and Antwan
said let's go to the liquor store at Elizabeth Avenue! We were
walking and got on Elizabeth Avenue. April walked around to the
liquor store to see how many people were it. She was p... into
it. Then Antwan said he is about to rob this man waiting for a
bus. I told him don't do that. He wanted me to watch out for him.
I shook my head. He didn't rob him: nothing happened".

According to Marvin, April then walked up to a deli store and
"was peeking in it; April and Renee. Renee told Antwan he should
rob this store. I didn't say nothing". "Antwan went to open the
door at the deli store; the door was locked. We started walking up
this Avenue. They wanted to rob the deli store; they wanted me to
watch out".

"The four of us were walking up Elizabeth Avenue. We saw two
Puerto Rican guys. Antwan said Marvin, 'let's get these guys'. I
was poking along walking slow. He said 'you're not going to help

State in the Interest of Marvin Mathis                                    3

~e?'.  I shook my head, no.  He was walking fast, pulled his mask over his face".

"He took off to chase the two guys.  The Puerto Ricans.  April tried to see what happened.  Me and Renee started jogging to see what happened.  He was mad; he said 'I am going to get somebody before the night is over'.  I just looked at him.  I was just watching".

The defendant stated that they were then walking up Elizabeth Avenue and turned onto East Jersey Street when "Antwan saw a man taking out his garbage.  Antwan stopped all three of us.  He asked me, 'Marvin are you going to watch out?'  I didn't answer him. Then I said 'yeah, I'll watch out for you'.  I met April and Renee. We walked across the street.  I crossed the street to watc.. t for Antwan.  He pulled his mask down.  He told the man to ... his pockets" (the defendant explained that meant to give him money). "The man looked at Antwan.  Then Antwan pulled out a gun to show the man the gun.  I guess to get his attention or something. Antwan grabbed the man; tried to yoke him up, tried to throw him against the wall.  The man grabbed Antwan.  The man pushed Antwan in the face.  Then Antwan pushed the man.  He had one hand on the gun and the other he was pushing the man.  Then Antwan raised the gun up.  The man grabbed the gun.  They were struggling".

"That's when I ran over there.  I put my hand on the top of the gun.  The man had his hand on Antwan.  Antwan was holding the gun.  I touched the top of it, the gun, and it went off.  The man

**26a**

State in the Interest of Marvin Mathis                                    4

got shot.   The man fell; his eyes were still open.   Antwan was
checking his pockets and stuff.   He said,'Marvin help me get some
money out of his pockets'.   I didn't touch the man's pockets".

    Marvin went on to explain that "Antwan got up; he was on one
knee.   He snatched me up; we started running up Seventh Street.   He
was yelling.   He was trying to give me the gun.   I wouldn't take
it.   Antwan had the gun.   I ran home".

    When questioned as to whether or not he ran home or to some
other location, Marvin then responded "we went to Steven Owen's
house with Antwan, not the girls.   Steven Owens asked me what
happened.   Antwan said he shot somebody.   He said he shot some man.
He said Marvin was there when I shot the man.   Steven Owens told me
to go home.   Then I went home.   Then I bumped into April and Renee
on Third Street.   They were asking me who shot the man.   I didn't
say nothing.   I was in shock.   Then I went home, went into my room.
I was sitting on my bed thinking about what happened.   Thinking
about the man, that he got shot.   Antwan shot him.   I went to
sleep".

    Marvin stated that the next morning "I went to school.   I
don't remember what happened in the house.   It was Wednesday when
I got locked up.   The Director of the School got me.   The detective
wanted to talk to me.   I was taken to the police station and my
mother arrived.   At first I didn't cooperate with them; I don't
know why.   I wasn't truthful at first; I don't know why.   They made
me make statements.   The first statement was untrue.   I told them

**27a**

State in the Interest of Marvin Mathis                                            5

about some guys from Carteret.  Then I told them the truth".

When questioned as to his handling of the gun, Marvin denied
having the gun, even when asked several times.  He denied seeing
the gun at Steven Owen's apartment or at any other time.  He stated
that the first time he saw the gun was on Elizabeth Avenue when
"Antwan showed it to me.  I looked at him and said to myself he is
crazy".

When questioned as to whether or not he h d planned to commit
an armed robbery with his three co-defendants, he denied planning
an armed robbery and denied knowing about any gun.  He stated he
did not know there was going to be a robbery.  "I th_nk I had
something to do with it; I was watching out.  I never touched the
gun.  I didn't know he had a weapon.  He showed me the gun, half
way out, on Elizabeth Avenue.  I shook my head and said, he is
crazy".

The day after the homicide, when Marvin was at school, he
stated "I told this girl, Sharlama Brooks, my girlfriend.  I told
her what happened.  She asked me who shot the man; I didn't say
nothing.  I said I don't remember.  When Marvin was questioned as
to whether or not he asked Sharlama to lie for him and state that
he was with her at the time of the homicide, he responded "if
anybody asked you, tell them I was at your house.  She said no".
When asked why he wanted Sharlama to lie, he responded "don't
know".  He also stated "I don't remember telling her I did it".

Marvin was questioned as to the truthfulness of his statement

**28a**

Case 2:15-cv-02092-JLL   Document 10-2   Filed 08/07/15   Page 81 of 133 PageID: 233

since it is in complete contrast to the statements given by his three co-defendants, as well as eyewitnesses, all of whom say that Marvin alone had the gun and shot the victim.  Marvin's response was that everyone is lying, but him.

When questioned specifically, as to whether he wore a mask, Marvin completely denied wearing a mask.  When it was pointed out that others made statements indicating he was wearing a mask, he said that they were being untruthful.  Specifically with regard to the statement given by Migdalia Hernandez, who stated that prior to the armed robbery, Marvin and Antwan were discussing the gun in the room of one of her children, and that both men had masks in their hands, Marvin stated that these statements were "lies".

When Marvin was questioned regarding his own statement about seeing the gun and how Antwan wanted him to hold it, he responded "I don't remember".

When questioned, specifically, regarding Marvin's prior statement that he wanted to see how it "felt" to rob someone, he was unable to explain this and stated "I just wanted to see how it felt".  He still denied planning to rob anyone and kept repeating "to see how it felt", offering no explanation, just continuing to repeat the phrase.

When questioned regarding April's statement that the robbery was planned and Marvin had the gun, his response was "it's untrue". When questioned about the statement of Steven Owen's that also implicated Marvin as the shooter, he stated that it was untrue

**29a**

State in the Interest of Marvin Mathis                    7

also.  He also stated that Antwan Harvey's statement was untrue,
"all untrue; I didn't have no gun".  He again denied having a ski
mask.  When questioned as to eye witness testimony that it was
Marvin alone who shot the victim, his response was "it's wrong".

Eventually Marvin stated that he knew Antwan wanted to rob
someone.  When asked why he did not leave, he stated "can't
explain".

<u>PSYCHOLOGICAL TEST RESULTS</u>

Marvin was alert, oriented, in good contact with his
surroundings, pleasant and generally cooperative.  He did not
really seem depressed but his affect and emotions were somewhat
flat.  He was not friendly, but he was not really hostile or
oppositional either.  He completed all that was asked of him and
showed only some difficulty in concentration.  His attention span
was adequate.  There was no evidence of any bizarre or grossly
inappropriate behavior or thought content.  The most outstanding
clinical feature wa. Marvin's emotional flatness and lack of
expression.  Overall test-taking behavior and attitude were
adequate.

<u>INTELLECTUAL FUNCTIONING</u>:

Marvin is currently functioning within the high  nd of the
borderline range of intelligence, gaining a Full Scal: IQ of 79
(Verbal IQ ≈ 80; Performance IQ ≈ 83).  Verbal skills ` .1 within
low end of dull-normal range.  Fund of general information is weak,
suggesting that Marvin has not profited a great deal from school or

**30a**

State in the Interest of Marvin Mathis                    8

experience.  For example, he did not know the number of weeks in a
year, the identity of Louis Armstrong, the direction travelled from
Chicago to Panama, the location of Brazil, the author of Hamlet, the
President during the Civil War, and other such simple facts.
Vocabulary is equally poor and far below average capacity as he was
unable to define such words as fabric, assemble, conceal, consume,
regulate, and the like.  Arithmetic skills were quite poor.  Marvin
can add and subtract but he did not memorize his multiplication
tables; therefore, he had trouble with multiplication and division
(although he could multiply and divide some very simple numbers).
Poor concentration also negatively affected his performance on
several of the arithmetic tasks.  Social comprehension is at a
comparable level below average range.  Marvin has some basic
understanding of the world around him, but it is not that deep or
extensive.  Verbal abstract tasks proved to be a relative strength,
but he functions still below average limits, within dull-normal
range.  His thinking is somewhat concrete and he has some
difficulty drawing superordinate relations between objects and
ideas.  More complex abstractions, such as proverb interpretation,
were  so difficult for him.  In general, verbal skills fall within
low end of dull-normal range, which seems to be a fe      ccurate
assessment of his current and potential capacity.

Nonverbal subtests fall within the dull-normal ra      Marvin
is quite alert to details of a problems, and he can easily
differentiate what is important from what is irrelevant.   His

**31a**

performance on the picture completion subtest was his highest and falls within average limits.   Marvin could also solve problems utilizing familiar material (such as puzzles) at a level falling just below average limits.   The other nonverbal subtests fall within dull-normal range in an even manner.  The defendant has some difficulty analyzing, synthesizing and integrating parts into a whole concept (block design), although he does somewhat better in recognizing logical and sequential relationships with various types of social stimuli.  He can learn new material, but he is really not that quick, and several repetitions are often necessary in order to transfer new knowledge into pre-existing structures.   Throughout all of the structured objective tasks, there were no signs of associative looseness or of paralogical reasoning.   Marvin processes information in a mildly scattered fashion, and he does better when structure is provided.

Focus for organic pathology is positive and extends within the mild range.   There is mild impairment in perceptual motor coordination, as seen on the various copying tasks such as the Bender-Gestalt.  On the latter, major signs of organicity were not noted, but some distinct mild or soft signs are found. Short-term memory for graphic forms falls above average range, as Marvin was able to correctly recall 6 out of a possible 9 geomet.   figures ( an indication that his intellectual potential is probably higher than his current scores suggest, as 4 or 5 is average recall). Long-term memory is difficult to assess due to such a poor fund of

**32a**

State in the Interest of Marvin Mathis                    10

basic knowledge, but it is probably generally intact.   Verbal-
performance IQ disparity is not significant, but examination of
some subtests typically sensitive to organicity, suggests the
likelihood of mild involvement.   This type of mild organicity is
very common in individuals with long-standing learning disabilities
and even in some cases of attention deficit disorder.   Marvin has
a history of special education placement; however, in this
examiner's judgment, Marvin's potential is higher than his current
scores and school performance suggest.

PERSONALITY FUNCTIONING

Results of the projective and personality tests are consistent
with clinical impression showing a late adolescent (16 years 6
months of age) displaying the early signs of a developing
personality disorder with impulsive and antisocial traits.   The
Rorschach shows a young man with the early signs of developing mild
to moderate characterological disturbance, but without evidence of
severe psychopathology such as schizophrenia, psychosis, or marked
borderline traits.   There was one regressive and aggressive
Rorschach perception typical of developing personality disturbance
illustrated by his perception of "two bulls wrestling; looks like
his blood on something; the red; it's just splattered".   The
remainder of the responses given were of adequate form quality and
fairy well elaborated, even with some degree of it.   Marvin
responds to the outside world as well as to his internal processes.
With regard to the former, he often over-reacts in loose and poorly

controlled ways. His inner life is dominated somewhat by impulsive tendencies, making the likelihood of acting-out rather high. Marvin's reality testing is good and his thinking is relatively clear and follows logical lines.

Projective figure drawings were done in a somewhat immature fashion, but not really that remarkable for an adolescent. TAT stories involved themes of unfaithfulness ("the lady's telling this man she loves him, and he is not paying her no mind; he thinks she is fooling around with someone else. His expression on his face; he might leave her; he might forget her"), with one aggressive theme triggered by unfaithfulness and rejection: "...He stabbed her; killed her. He found her in bed with another man; he is crying; he gets caught by the police; they questioned him; the cops arrest him, he gets incarcerated, that's it. She is dead; he'll start a new life over. He goes to jail for five to six years". There was also a TAT story involving a theme of peer ridicule, as he stated "she is crying or something. Somebody hurt her feelings; somebody said something stupid to her. Someone picked on her; someone did it just to be funny. She feels sad; s[.] [.]idn't mean to hurt her feelings; the girl took it out of proportion" There was one other brief reference to an individual who "cou[.] be depressed" and another reference to an individual who "f[.] [.]od about himself". There were no suicidal themes [.]r themes of deeply depressive ideation, guil [.]morse.

The MMPI-A showed a profile of an individual without serious

psychopathology in terms of symptom expression; although, there are some indications of slight somatic preoccupation, suspiciousness and mistrust.  The validity scales are illuminating since his highest overall score was on the Lie scale, which shows an attempt to present himself in a socially desirable way, to the extent that Marvin might even lie to achieve this impression.  The elevation on the Lie scale was by far his highest scale elevation.  There was a borderline elevation on the K scale, showing defensiveness and guardedness.

Test results are generally consistent with clinical presentation, where Marvin denied all symptoms and traits of significant psychopathology and disturbance.  He completely denied ever having any suicidal thoughts, and he also denied impulsiveness, feelings of inadequacy, narcissistic traits, substance abuse, sleep or appetite disturbance, depression, or even anxiety.


EXAMINATION OF DEFENDANT'S SENSE OF RESPONSIBILITY AND FEELINGS OF REMORSE:

Marvin was questioned regarding whether or not he felt he did anything wrong, notwithstanding his denial of shooting the victim. He responded "I was just there; I was watching out; when I put my hand on top of the gun it went off.  No, I didn't do anything wrong; I should have went home in the first place".

When questioned regarding any feelings of remorse, Marvin responded "that man got his life taken away and I got myself in

State in the Interest of Marvin Mathis                              13

this predicament. I feel bad about a lot of stuff. Not in school
no more, I am not being home for my mother; that's all. I see
myself up here; it's my first time being locked up, I can't go to
college or whatever". When asked if there was anything else he
felt bad about, he responded "that's all I can think of". When
asked if he knew the name of the victim, he did not and responded
"I know he owned a liquor store". When questioned again if he had
any feelings regarding the death of the victim, he responded "I
just feel sorry, can't explain it". When asked if he was curious
or ever asked anyone about the victim, he responded "no, only thing
I know is he owned a liquor store". When asked if he ever thought
about the victim, his response was "I just don't know". When asked
again, in a different way, if he could think of anything that he
took responsibility for or did wrong, he responded "I just did
something wrong for being there". When asked if he felt he did
anything wrong associating with Antwan and April, since he admitted
that he knew they had been in a lot of legal trouble before, he
responded "I heard he has been incarcerated; I know April's been
locked up", but apparently this did not bother or concern Marvin
very much. When asked if he felt that there was anything
with him, he responded "nothing, I am perfectly fine; I
trouble learning; that's the only thing that's wrong with
Marvin explained that he had never been in difficulty bef.
when questioned as to his repetitive aggressive behavior in
elementary school, he completely denied this and stated that he was

**36a**

State in the Interest of Marvin Mathis                    14

the victim "they picked on me"       .en he was shown numerous teacher
reports of his aggressiv behav   as a chi'      .sponded "they
were picking on me; I try to av_.d violence".

FORMULATION:

In sum, we are dealing w'th a 16 year 6 .onth old male who
stands charged with felony murder and aiding and abetting an armed
robbery. The question to be addressed is whether or not Marvin can
be reharilitated in less than three years.   Test results and
clinical    evaluation    did    not    show    evidence    of    severe
psychopathology; although, there is evidence of the early signs of
a developing personality disorder with impulsive and antisocial
traits.    There is no evidence of significant depression and
apparently no history of substance abuse and certainly nothing
suggestive of schizophrenia, psychosis or any type of major mental
illness. His level of intelligence falls within the high end of
borderline to dull-normal range with evidence of mild organi.  /.
He had evidenced a lot of aggressive conduct in elementary school
but he seems to have settled down in high scho .  Notwithstanding
Marvin's denial of guilt, we have an individual who g..ve
inconsistent stories, attempting to create an alibi with his
girlfriend, blamed others, an. offers no speci^ic explanation for
his alleged initial intention to "see how it felt" to c  !t an
.med robbery. This is not a homicide  hich is a direct  .
of a mental illness such as psychosis, or a depression, nor  . this
any type of compulsive pathological murder with sexual dynamics.

37a

State in the Interest of Marvin Mathis                                15

It also does not seem to be an explosive homicide, but rather an impulsive offense within the context of antisocial goals. As far as this examiner can determine there was really no purpose to the original idea of committing an armed robbery, except to just commit an armed robbery, "to see how it felt". The idea was not to get money for any specific purpose such as drugs or alcohol, but just to do something excessively antisocial.

The first step in rehabilitation has to be an acknowledgement on the part of the offender (or the patient) that there is a problem. Marvin does not recognize that there is a problem. Notwithstanding his right to deny guilt, he still believes that he did nothing wrong, except being at the wrong place at the wrong time. He showed almost no remorse for the victim, not even knowing his name, and implied that Marvin is actually the victim by being lured into this whole event by others. He feels bad that he is not in school and not at home, but very little responsibility for his own actions was detected. Where does rehabilitation begin with an individual who does not believe he did all that much wrong? Marvin displayed pronounced antisocial thinking from the beginning of this episode and, in face of a tragedy that resulted, little responsibility is taken. Since the first step of rehabilitation has not been met, it is this examiner's professional judgment, to a reasonable degree of psychological certainty, that Marvin cannot be rehabilitated by the t   he reaches 19 years of age in approximately two or a half    ars.

**38a**

P 15? FLORCZAK                        050 201P4RPP3688        OCT-07 12:17

State in the Interest of Marvin Mathis                    16

    I hope these findings are of help to you in your further
understanding of this case.  If I may be of any further assistance,
please do not hesitate to contact me.

                              Very truly yours,

                              Louis B. Schlesinger, Ph.D.
                              Diplomate in Forensic Psychol
                              American   Board   of   Profess
                              Psychology


Dictated but not proofread

                              **39a**

October 15, 1996

Herminia Garcia
Social Service Department
Juvenile Detention Center
7 Elizabethtown Plaza
Elizabeth, NJ 07207

Walter Florczak, Esq.
Office of the Public Defender
65 Jefferson Avenue, 3rd Floor
Elizabeth, NJ 07201

Re: MARVIN MATHIS; D.O.B.; 3-23-80
    RO# 120–9240-96

Dear Mr. Florczak,

In response to your recent inquiry regarding Marvin Mathis and his behavior while detained in the Juvenile facility I submit the following: I first met Marvin on January 25th, 1996. Since that time, Marvin has proven to be a consistently polite, respectful and cooperative resident. Marvin gets along well with peers and staff members alike. His adjustment to his present situation has been excellent. Marvin has been on gold shirt status (the highest status available in detention) for most of the time he has been detained.

During these last 9 months, Marvin has learned to verbalize his concerns in an appropriate way. He reports problems and works towards solutions when problems first occur. He has responded well to the guidance of his teachers and the Juvenile officers. With the help of counseling, Marvin has learned to distinguish between being a follower and evaluating situations as they occur.

Marvin is a patient and benign adolescent who has both the ability and willingness to use support and guidance to better his present circumstances. Marvin is able to learn and respond appropriately during stressful situations. In addition, Marvin has a great interest in continuing with his education when he leaves this facility.

Given his character, his respect for authority, his willingness to accept guidance and his ability to learn and respond to changing situations, it is my opinion that Marvin's prospects for rehabilitation before age 19 are excellent. It is my hope that, whatever the outcome of this case, Marvin is given the support and guidance that he needs to continue progressing positively with his life plans.

Thank you for your time.

Sincerely,

*Herminia E. Garcia, MA*

Herminia Garcia, MA

cc: DH

**40a**

POLICE DEPARTMENT OF ELIZABETH, N.J.                                      **VOLUNTARY STATEMENT**

| DATE | TIME | CRIME | TYPIST | CASE NUMBER |
|------|------|-------|--------|-------------|
| 1/24/96 | 11:05 a.m. | | L. Martinez | 96-1962 |

Awareness Coordinator E.H.S.

VOLUNTARY STATEMENT OF  **Sharlama Brooks** in the presence of Janice Sutton Substance

| RESIDENCE  17E Pioneer Homes, Elizabeth, NJ | PHONE 527-6943 | | |
|---|---|---|---|
| OCCUPATION  **Student** | | AGE 15 | DOB 2/19/80 |

STATEMENT MADE TO  **Det. Thomas Koczur**

Page _____ of _____

Q. Miss Brooks, I'm Det. Koczur of the Elizabeth Police Department. I am presently conducting a homicide investigation which occurred on 1/22/96 which occurred at 709 E. Jersey Street, Elizabeth, New Jersey. I'm going to ask you some questions about your knowledge of possible suspects in this case. Are you willing to answer my questions truthfully and to the best of your ability?
A. Yes

Q. Do you read and write english?
A. Yes

Q. What is the extent of your education?
A. 10th

Q. Are you under the influence of alcohol or narcotics at this time?
A. No

Q. Do you need glasses to read?
A. No

Q. Where do you reside?
A. 17 E Pioneer Homes, Elizabeth, New Jersey

Q. How long have you lived there?
A. Since I was six

Q. Who is your boyfriend?
A. Marvin Mathews

Q. Where does Marvin live?
A. 538 Magnolia Ave. first floor

Q. How long has he been your boyfriend?
A. About a year and three months

Q. On 1/22/96, between the hours of 8
A. I was in bed

Q. Was your boyfriend with you?
A. No   S.B.

Sworn to before me this

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1998

**41a**

_____
Signature

POLICE DEPARTMENT OF                                                      CONTINUATION PAGE

| 1. REFERRAL No. OR REPORTS | 2. CODE | 4. TRANS DISC No. | 6. CASE NUMBER |
|---|---|---|---|
| - Continued statement of Sharlama Brooks, page 2 | | | |

Q. On Monday, the time you were home in bed did you know where Marvin was?
A. No

Q. Did you see Marvin at all on Monday the 22nd?
A. At school, we walk together.

Q. When was the last time you seen Mathews on that Monday the 22nd?
A. After school

Q. When is the next time you saw him again?
A. The next day

Q. When was the first time you saw him again?
A. In the cafeteria

Q. At approximately what time?
A. Like 7:45

Q. Can you describe his demeanor to me?
A. He seem alright to me his eyes looked like he was scared.

Q. How much time did you spend with him in the cafeteria?
A. About five minutes

Q. Were you by yourself or with a group of friends?
A. With a group of friends.

Q. When is the next time you saw him?
A. AFter my third period.

Q. And about what was that?
A. At 10:40

Q. Where was this at?
A. By my locker

Q. And were you alone?
A. Yeah

Q. Was there anything said between you and your boyfriend?
A. He walked me to lunch

Q. As you were speaking to him at this time did he ask you to do anything?
A. He told me if anybody ask you were I was at on Monday tell them I was with you from 7:00 to 11:00 and I told him no, no.

Q. Did you ask him?
A. I asked him why but he wasn't straight with me.

Q. What did he say?
A. If I tell you you're going to black out so I just left it at that.

S.B.

| 57. TYPE NAME | 58. BADGE NUMBER | 59. PAC | **42a** | | 60. DATE OF REPORT |
|---|---|---|---|---|---|
| LYDIA MARTINEZ | | | | PAGES | TIME |
| | | 61. TYPIST | 62. DESK SUPERVISOR | | |

POLICE DEPARTMENT OF                                          CONTINUATION PAGE

| 1. REFERRAL No OR REPORTS | 2. CODE | 4. TRANS DISC No. | 5. CASE NUMBER |
|---|---|---|---|
| Continued statement of Sharlama Brooks, | page 3 | | |

Q. When you told him no what was his response?
A. He sucked his teeth at me.

Q. Was this conversation with anyone else or with just you and Mathews?
A. Just me and Mathews

Q. Did he appear to be angry with you when you didn't cooperate with him?
A. No

Q. Was anything else discuss during this time?
A. No

Q. When is the next time you spoke to him again?
A. When I was coming from the end of my 7th period class.

Q. Were you alone with him at that time?
A. Yes

Q. And was this end of the school day?
A. No, he walked me to my biology class

Q. Did he say anything to you at this time?
A. No, he just kissed me and I went to my class and sat down.

Q. When did you see him again?
A. When I walked home with him at the end of the school day.

Q. And when you walked home was it only you and Mathews?
A. Yes

Q. What did Mathews tell you on your home?
A. We just had a conversation about nothing important just talking.

Q. What time did you leave Mathews that evening?
A. About 5:00 or 5:30

Q. Did you see anymore that night?
A. No

Q. Later on that evening were you approached by anyone who spoke to you about this homicide?
A. Yes

Q. And that was last night correct?
A. Yes

Q. AT approximately what time?
A. Like 7:30 I think

43a

Q. Who spoke to you?
A. Some guy approached me pulled me into the hallway and he said to me do you realize what your boyfriend did and I said no.  And he said he shot and killed somebody and I was like okay finish what you say and he said my cousin was at the scene at the wrong time and you know he is the wrong suspect do you know where your boyfriend is and I said no.  And he said we want to talk with him and if we can't speak to him then when I seen him to

POLICE DEPARTMENT OF
CONTINUATION PAGE

| Continued statement of | Shar Lama Brooks, | page 4 | CASE NUMBER |
|---|---|---|---|

tell him to watch his back they are out to get him.

Q. Did you ever see this man before that you spoke to?
A. No, never

Q. Was this conversation between you and this man alone?
A. Yes

Q. Can you describe this man to me?
A. He was a black male, light skinned, had a stripe jacket on, had a hat on and hazel eyes.

Q. Approximately how old was he?
A. 20 or 21

Q. How tall?
A. About six feet even

Q. Approximately how heavy was he?
A. Regular guy

Q. Did he speak to you with an accent?
a. No

Q. After he spoke to you where did you go?
A. In the house

Q. When you went inside the house did you mention this conversation to anyone?
a. No

Q. And why not?
A. I don't know

Q. Did you attempt to contact your boyfriend Mathews that night?
A. I wanted to but I didn't leave my house.

Q. When is the next time you saw Mathews?
A. This morning

Q. What time and where?
A. In the cafeteria around 7:45 or 8:00

Q. Were you alone with him at that time?
A. Yes

Q. Did you tell him about the conversation you had last night?
A. No

Q. Let me ask you again this morning in the cafeteria did you tell Mathews about the gentlemen who came to see you last night in regards to him shooting someone?
A. Yes  SB.

57. TYPE NAME
LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1996

Signature

44a

| PAGES | 60. DATE OF REPORT |
|---|---|
| 62. DESK SUPERVISOR | TIME |

POLICE DEPARTMENT OF                                                    CONTINUATION PAGE

| 1. REFERRAL No OR REPORTS | 2. CODE | 4. TRANS DISC No. | 6. CASE NUMBER |
|---|---|---|---|

Continued statement of Shariama Brooks, page 5

Q. What did your boyfriend Mathews say after you told him?
A. What guys and I described them as I just described him to you.

Q. What did he say then?
A. He just said what guys, what guys.

Q. What did your boyfriend say at that time?
A. He didn't say nothing

Q. What was he like after you told him this?
A. He was scared

Q. Was this said only you and him around?
A. Yes

Q. After this conversation where did you go?
A. To my first period class

Q. Did Mathews speak to you before you went to your first period class?
A. No

Q. When is the next time you speak to Mathews?
A. I went to my first period class I didn't feel comfortable so I left the class and the guard stopped me and asked me what was wrong and I started to cry and she said lets take a walk to the library.  When she took me to the library she took me to Miss Sutton.

Q. Earlier in the interview you stated to this detective that your boyfriend shot someone by accident, is that correct?
A. Yes

Q. When did he tell you this?
A. When we were alone by the guidance office.

Q. At about what time?
A. The bell had rung it was 8:30

Q. When you had the conversation when you told him about the guy that was looking for him where did that conversation take place?
A. In the cafeteria

Q. So he told you about the shooting between the time you left the cafeteria and the time you went to your first period class?
A. Yes

Q. In your own words can you tell me to the best of your recollection the exact words that he used when he told you about the shooting?
A. He told me him and his friend were walking and I guess they stopped and the man was bringing out his garbage and I think they got into a little argument and Marvin told me he went to just grab the guy and he said the gun had went off.  I shook my head, I started crying and I went to my first period class. SB.

| 57 TYPE NAME | 58 BADGE NUMBER | 59 PAGE | 60 DATE OF REPORT |
|---|---|---|---|
| LYDIA MARTINEZ | | 45a | 3 | TIME |

POLICE DEPARTMENT OF                                          CONTINUATION PAG

| 1 REFERRAL NO. OR REPORTS | | 2. CODE | 4 TRANS DISC No. | | 6. CASE NUMBER |
|---|---|---|---|---|---|

Continued statement of Sharlama Brooks, page 6

Q. Did he say anything else in regards to the shooting?
A. No

Q. Did he say who he was with?
A. Yes

Q. And who was that?
A. Antoine

Q. And do you know Antoine?
A. Yes

Q. How old is Antoine?
A. About 21 or 22

Q. How tall is Antoine?
A. About 6'1" or 6'2"

Q. How heavy is Antoine?
A. At least 200

Q. Does he have any facial hair?
A. Yes, he has a beard

Q. How long have you Antoine?
A. A good three months

Q. Where do you know him from?
A. He live across the court from me

Q. If you saw a photo of Antoine would you be able to recognize it?
A. Yes

Q. When is the last time you saw Antoine?
A. Yesterday afternoon

Q. What type of hair does he have?
A. He have his hair in braids

Q. How long has your boyfriend Mathis known Antoine for?
A. I don't even know I'd say about two months

Q. Do you know the name of the security guard that you were approached by in the hallway?
A. Mrs. ~~Bridgen~~ PRIDGEN JB

Q. To your knowledge have you ever seen your boyfriend in possession of a handgun?
A. No sir

Q. On the morning after the shooting do you recall what your boyfriend was wearing?
A. I forgot what he had on Monday

46a

| 57. TYPE NAME | 58. BADGE NUMBER | 59. | | 60. DATE OF REPORT |
|---|---|---|---|---|
| | | | PAGES | TIME |

Q. What is your boyfriend's name?
A. I forgot ... C O

Signature ...                    61. TYPIST          62. DESK SUPERVISOR

POLICE DEPARTMENT OF                                                      CONTINUATION PAGE

| 1 REFERRAL No. OR REPORTS | 2. CODE | 4. TRANS DISC No. | 6. CASE NUMBER |
|---|---|---|---|

Continued statement of Sharlama Brooks, page 7

Q. So earlier in the statement when we refer to the name of Mathews we are actually speaking about Marvin Mathis?
A. Yes

Q. Besides this detective, members of the Elizabeth Police Department and members of the Board of Education did you discuss this incident with anyone else?
A. No

Q. Why did you come forward with this information?
A. I don't know

Q. Did anyone force you to come here today?
A. No

Q. Did anyone threaten you today?
A. No

Q. Is there anything else you wish to add?
A. No

Q. After you read this statement and find it to be true and correct will you sign it in your own handwriting?
A. Yes S.B.

Sworn to before me this
24th day of January 1996

Notary Public

Sharlama Brooks

Janice Sutton

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1996

Det. Thomas Koczur

CASE NO.

| 57. TYPE NAME | 58 BADGE NUMBER | 59. | 47a | 60. DATE OF REPORT |
|---|---|---|---|---|
| | | | | PAGES  TIME |
| Signature | | 61. TYPIST | 62. DESK SUPERVISOR | |

ELIZABETH POLICE DEPARTMENT            CASE #: 96-1962

DATE: 1/25/96     TIME: 12:00

VOLUNTARY STATEMENT OF: APRIL DIGGS IN THE PRESENCE OF DARLENE
DOZIER

ADDRESS: 3A PIONEER HOMES, ELIZABETH, NJ

PHONE #: NONE

AGE: 17  D O.B.: 11/11/78

STATEMENT GIVEN TO: DET. KEITH WHITE


Q. APRIL, I'M DET. WHITE OF THE ELIZABETH POLICE DEPARTMENT AND I'M
GOING TO ASK YOU SOME QUESTIONS CONCERNING A HOMICIDE WHICH
OCCURRED ON 1/22/96 AT 22:12 HOURS IN FRONT OF 709 E. JERSEY ST. WILL YOU
ANSWER MY QUESTIONS TRUTHFULLY AND TO THE BEST OF YOUR
KNOWLEDGE?
A. YES

Q. APRIL, DO YOU READ AND WRITE ENGLISH?
A. YES, I DO

Q. WHAT IS THE EXTENT OF YOUR EDUCATION?
A. 11TH GRADE

Q. AT THIS PRESENT TIME ARE YOU UNDER THE CARE OF A DOCTOR?
A. NO

Q. WERE YOU ADVISED OF YOUR MIRANDA RIGHTS(CONSTITUTION RIGHTS)
WITH YOUR MOTHER PRESENT?
A. YES

Q. DID YOU UNDERSTAND THESE RIGHTS?
A. YES

Q. WITH THESE CONSTITUTIONAL RIGHTS IN MIND DO YOU STILL WISH TO MAKE
A STATEMENT?
A. YES

Q. ON MONDAY, 1/22/96 DID YOU HAVE A CHANCE TO MEET UP WITH A MARVIN
MATHIS AND ANTOINE HARVEY?

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1998

**48a**

A. YES

Q. WHERE DID YOU MEET UP WITH THEM?
A. ON THIRD AND BOND AT THE CHINESE RESTAURANT

Q. WAS THERE ANYONE WITH YOU WHEN YOU MET UP WITH MARVIN AND ANTOINE?
A. YES, RENEE DIGGS

Q. APPROXIMATELY WHAT TIME WAS THIS?
A. AROUND 9:45

Q. CAN YOU TELL ME WHAT WAS DISCUSSED AFTER YOU AND RENEE MET UP WITH MARVIN AND ANTOINE?
A. THEY SAID WERE GOING TO THE STORE.

Q. WHAT DID YOU DO NEXT?
A. SO I SAID LET ME WAIT FOR MY CHICKEN WINGS AND I'LL WALK WITH YOU TO THE STORE.

Q. AFTER YOU GOT YOUR CHICKEN WINGS DID YOU ALL FOUR LEAVE THE CHINESE RESTAURANT?
A. YES

Q. WHERE DID YOU GO FROM THE CHINESE RESTAURANT?
A. WE STARTED TO WALKING AND WALKED TO ELIZABETH AVE. AND THIRD BY THE GAS STATION. SO THEN I WAS LIKE GO AHEAD TO THE STORE AND THEN WE WERE WALKING SOME MORE UP THE AVENUE TOWARDS THE TURNPIKE BRIDGE AND THEN I SAID WHAT STORES ARE WE GOING TO AND ANTOINE SAID WERE NOT GOING TO NO STORE I'M GOING TO TELL YOU THE TRUTH WERE GOING TO ROB SOMEBODY. THEN HE SAID YALL DON'T HAVE TO DO NOTHING JUST WATCH OUT FOR THE COPS. THEN WHEN WE TURNED ON 7TH STREET FROM THE AVENUE. THEN AT E. JERSEY AND 7TH WE SAW THIS MAN TAKING OUT THE GARBAGE. THEN MARVIN AND ANTOINE RAN UP TO HIM AND I WAS LIKE WHAT ARE YOU DOING HE AIN'T GOT NOTHING. SO THEN WHEN I SEEN THEM OVER THERE TALKING WITH HIM I KEPT WALKING AND THEN I STOPPED BY THE DEAD END STREET(MILLER ST.) I HEARD A GUN SHOT AND I TURNED AROUND AND THE MAN FELL AND THEY RAN BACK TOWARDS 7TH ST. AND TURNED AROUND THE CHINESE RESTAURANT AND THEN RENEE WAS COMING TOWARDS ME AND I SAID TO HER WHERE DID THEY SHOOT THAT MAN AT AND SHE SAID IN THE CHEST AND I TOLD HER THE WAY HE FELL HE LOOKED LIKE HE GOT SHOT IN THE HEAD. THEN WE WAS WALKING HOME AND THEN WE STOPPED AT THIS PLACE WHERE MARVIN AND ANTOINE BE AT AND I ASKED MARVIN WHY DID YOU SHOOT HIM AND HE SAID HE GRABBED HIM. WHEN WE WAS WALKING ANTOINE SAID I'M JUST GOING TO BUST THEM IF THEY RESIST



LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1996

49a

AND MARVIN SAID I'LL DO IT TO AND ANTOINE SAID DO YOU WANT ME TO GIVE YOU THE GUN AND HE SAID YEAH OKAY.

Q. AT THAT TIME DID ANTOINE GIVE MARVIN THE GUN?
A. YEAH

Q. WHERE WERE YOU AT WHEN HE GAVE HIM THE GUN?
A. GETTING READY TO TURN ON 7TH ST. BY THE LIQUOR STORE.

Q. WHERE WERE YOU AND RENEE AT THIS TIME?
A. WE WAS WALKING BACK A COUPLE OF FEET.

Q. WHO WANTED TO ROB THE GUY PUTTING OUT THE GARBAGE?
A. THEY BOTH JUST RAN OVER THERE.

Q. DID YOU HEAR THEM SAY ANYTHING TO THE MAN PUTTING THE GARBAGE OUT?
A. NO, AT THIS TIME I WAS AHEAD OF THEM.

Q. WHERE WAS RENEE?
A. RIGHT THERE BY THEM

Q. DID YOU SEE ANY SORT OF A STRUGGLE TAKING PLACE?
A. I TURNED AROUND WHEN I HEARD THE GUN SHOT.

Q. WHO HAD THE GUN?
A. MARVIN

Q. HOW MANY SHOTS WERE FIRED?
A. IT HAD TO BE LIKE TWO

Q. DO YOU THINK IT WAS MARVIN'S INTENTION TO SHOOT THIS MAN?
A. NO

Q. WHY DO YOU SAY THAT?
A. BECAUSE WHEN WE GOT THERE ANTOINE RAN OVER THERE FIRST AND THEN MARVIN JUST STARTED RUNNING OVER THERE. AT THAT TIME THE MAN HAD ALREADY DUMPED THE GARBAGE AND WAS ON HIS WAY TO HIS STORE.

Q. AFTER THIS MAN FELL TO THE GROUND WHO WENT THROUGH HIS POCKETS?
A. RENEE WAS COMING TOWARDS ME AND WE SEEN THIS MAN NAMED JAMAICA(LAST NAME CASHWELL) WAS WALKING TOWARDS THE MAN AND THEN HE WENT THROUGH HIS POCKETS.

Q. DID YOU SEE HIM TAKE ANYTHING OUT?

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1996

**50a**

A. NO

Q. HOW LONG HAVE YOU KNOWN JAMAICA?
A. I SEEN HIM A COUPLE OF TIMES

Q. WHERE DID YOU AND RENEE GO AFTER THE SHOOTING?
A. WE STARTED WALKING HOME AND ALL THE COPS KEPT RIDING PASSED US SO
THEN WE WENT TO THE PLACE WHERE MARVIN AND ANTOINE BE AT AND I SAID
TO MARVIN WHY YOU SHOOT THE MAN AND MARVIN SAID HE TRIED TO GRAB
ME. THEN I WENT HOME AND TOLD MY MOTHER SOMEONE GOT SHOT.

Q. WHERE WAS THIS PLACE YOU SAW MARVIN AND ANTOINE?
A. I SAW MARVIN COMING DOWN THE STAIRS OF A HOUSE ON MAYBE 224 THIRD
ST.

Q. CAN YOU DESCRIBE THIS HOUSE TO ME?
A. YELLOW, IT GOT A RED DOOR, APARTMENTS

Q. WOULD YOU HAPPEN TO KNOW WHAT APARTMENT MARVIN WAS AT?
A. I HAVE NO IDEA

Q. WAS ANYONE ELSE WITH YOU OTHER THAN THE PEOPLE YOU MENTION IN
THIS STATEMENT?
A. NO

Q. HAVE YOU SPOKEN TO MARVIN, ANTOINE OR RENEE SINCE THIS SHOOTING?
A. THE SAME DAY YEAH ALL OF THEM.

Q. WHAT WAS DISCUSSED?
A. MARVIN SAID HE TRIED TO GRAB ME AND RENEE SAID THAT MAN OWN THE
LIQUOR STORE. MARVIN SAID HE WAS GOING TO TURN HIMSELF IN AND
ANTOINE SAID DON'T MENTION MY NAME.

Q. DO YOU KNOW WHAT KIND OF GUN MARVIN HAD?
A. IT WAS A LITTLE BLACK GUN

Q. DO YOU KNOW ANTOINE'S LAST NAME?
A. NOT REALLY

Q. DO YOU KNOW WHERE HE LIVES?
A. I KNOW HE LIVE ON PINE STREET SOMEWHERE RENEE KNOW SHE BE
SPENDING THE NIGHT WITH HIM.

Q. HOW LONG HAVE YOU KNOWN ANTOINE?

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1996

**51a**

A. I NEVER KNEW HIM I JUST SEEN HIM AROUND AND JUST STARTED KNOWING HIM AFTER RENEE STARTED GOING OUT WITH HIM

Q. HOW LONG HAVE YOU KNOWN MARVIN?
A. I KNOW HIM FOR TWO YEARS

Q. DO YOU KNOW WHERE MARVIN LIVES?
A. ON MAGNOLIA AVE. NEAR MIDTOWN 500 BLOCK

Q. NEAR ELIZABETH AVENUE AND SIXTH DID YOU DECIDE TO ROB TWO SPANISH BOYS?
A. I DON'T REMEMBER THAT

Q. WHILE YOU WERE WALKING UP THE AVENUE HOW MANY TIMES DID YOU DISCUSS ROBBING SOMEONE?
A. THEY ONLY SAID MAYBE TWICE AS LONG AS YOU DON'T ROB ANYONE THAT I KNOW AND I'M NOT PARTICIPATING AND THEY SAID WE DON'T WANT YOU TO DO ANYTHING JUST WATCH OUT FOR THE COPS.

Q. DO YOU REMEMBER WHAT MARVIN WAS WEARING ON THAT NIGHT?
A. A PUFFY JACKET DARK GREEN WITH BLACK ON THE SHOULDER IT WAS A FIRST DOWN WITH A HOOD.

Q. WHAT DID ANTOINE HAVE ON?
A. TOMMY HILLFIEGER JACKET INSIDE OUT

Q. WHAT WAS RENEE WEARING?
A. SHE HAD ON A WHITE TOMMY HILLFIEGER JACKET THE ONE SHE HAS ON NOW AND I HAD ON A SHORT BLACK JACKET.

Q. DO YOU REMEMBER WHAT COLOR OF SHOES YOU WERE WEARING?
A. I HAD ON MY PINK REEBOK'S

Q. SO WHEN THIS ROBBERY CAME DOWN DID ALL FOUR OF YOU VOLUNTARILY PARTICIPATED?
A. I DIDN'T KNOW THAT THE MAN WAS GOING TO GET SHOT AND I TOLD THEM I WASN'T GOING TO PARTICIPATE THATS WHY I WAS WALKING AHEAD OF THEM.

Q. APRIL, IS THERE ANYTHING YOU WISH TO ADD TO THIS STATEMENT?
A. I DON'T HAVE ANYTHING TO DO WITH IT BUT I WAS THERE.

Q. AFTER READING THIS STATEMENT AND HAVING YOUR MOTHER REVIEW IT WITH YOU WILL YOU SIGN IT IN YOUR OWN HANDWRITING TO BE A TRUE AND LAWFUL STATEMENT?
A. YES

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1996

**52a**

SWORN TO BEFORE ME THIS
25TH DAY OF JANUARY 1996

NOTARY PUBLIC

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1996

APRIL DIGGS

DARLENE DOZIER

DET. KEITH WHITE

**53a**

JP 104 REV 3/1778

**POLICE DEPARTMENT OF ELIZABETH, N.J.**                    **VOLUNTARY STATEMENT**

| DATE | TIME | CRIME | TYPIST | CASE NUMBER |
|------|------|-------|--------|-------------|
| 1-25-96 | 12:15-PM | | Jean Butler | 96-1962 |

VOLUNTARY STATEMENT OF   Renee Diggs

| RESIDENCE | 7 F Pioneer Homes, Eliz. N.J. | PHONE 353-1262 | |
|-----------|------------------------------|----------------|---|
| OCCUPATION | Student   Union County College | AGE 22 | DOB 11-3-73 |

STATEMENT MADE TO    Det. Thomas Koczur

Page_____ of_____

Q.    Renee I am Det. Thomas Koczur of the Eliz Police Dept. I am investigating the homicide which occurred on 1-22-96 at 709 E. Jersey St., Eliz. N.J. I have arrested you in connection with this homicide. Before I ask you any questions are you willing to answer them truthfully and to the best of your knowledge?
A. Yes.

Q.   Do you read and write English?
A. yes.

Q.   What is the extent of your education?
A. 11th grade

Q.   Do you need glasses to read?
a.   No.

Q.   Are you under the influence of alcohol or narcotics at this time?
A. No.

Q.   Are you under the care of a doctor at this time?
A. no.

Q.   How long have you resided at 7 F Pioneer HOmes?
A.   Since December.

Q.   Earlier this date did I and other members of the Eliz. Police Dept. place you under arrest at your home?
A. Yes.

Q.   Did I immediately advise you that you were being charged in connection with the homicide that occurred on E. Jersey St.?
A. yes.

Q.   I then placed you in handcuffs and transported you to the Eliz. Police Dept. is that correct?
A.   Yes.

Q.   Once you were in the conference room did I remove the handcuffs from you?
A. Yes.

Q.   We were then joined by Sgt. Malone who entered the room?

Sworn Before me this

LYDIA MARTINEZ _____ 19___

**54a**

Signature

**POLICE DEPARTMENT OF**                                                    **CONTINUATION PAG.**

| 1. REFERRAL No OR REPORTS | 2. CODE | 4. TRANS DISC No. | 6. CASE NUMBER |
|---|---|---|---|

Continued statement of Renee Diggs, page 2    1-25-96

Q.  Did I then hand you a copy of the complaint that was to be lodged against you?
A.  Yes.

Q.  I then advised you of your Const. Rights is that correct?
A. Yes.

Q.  Did you understand these rights?
A. Yes.

Q.  In keeping your Const. Rights in mind do you wish to speak to this detective and other detectives about your arrest is that correct?
A.  Yes/.

Q.  Do you still understand your Const. Rights at this time?
A. Yes.

Q. And you wish to proceed by giving a typewritten statement is that correct?
A. Yes.

Q.  Do you know Anthony Harvey?
A. Yes.

Q.  How long have you known Anthony Harvey?
A.  Since November.

Q.  I am now going to show you a Union County Sheriff's Office photo identification folder and I am going to ask you if you recognize anyone in these photos?
A. Yes, #4

Q.  And who is that?
A.  Anthony Harvey.

Q. I am now going to ask  you to place your initials  and the date on the back of this photo and initial and date the remaining photos?
A. Yes.

Ms. Diggs placed her name and date on the back of photo #4 and initialed and dated the remaining photos.

Q.  I am now going to show you the second Eliz. Police Dept. photo array containing the photos of six black females do you recognize anyone in the photos?
A. Yes #3.

Q   I am now going toask you to place your full signature on the back of that photo?.
A. Yes.

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1999

| 57. TYPE NAME | | | 58. | **55a** | | 60. DATE OF REPORT |
|---|---|---|---|---|---|---|
| | | | | | PAGES | TIME |

POLICE DEPARTMENT OF _____          CONTINUATION PAG

| 1. REFERRAL No. OR REPORTS | | 2. CODE | 4. TRANS DISC No. | 5. CASE NUMBER |
|---|---|---|---|---|

Continued statement of Renee Diggs, page 3,    1-25-96

Ms. Diggs placed her full signature on photo #3 and her initials and date
on the remaining photos.

Q.  Do you know Marvin Mathis?
A.  Yes.

Q.  How long have you known Marvin?
A.  Since November 95.

Q.  If you were shown a photo of Marvin would you be able to recognize
him?
A.  Yes.

Q.  Would you be willing to make that identification at the completion of
this statement or some time this afternoon?
A.  Yes.

Q.  On 1-22-96 did there come a point an time that you April, Mathis and
Antwoine were all together?
A.  Yes.

Q.  And was that at the Chinese Rest. at Third St. and Bond St.?
A.  No.   It was on Third between Bond and Mag.

Q.  How friendly are you with Antwoind and Marvin?
A.  We just drink together.

Q.  What did the four of you discuss?
A.  We were going to walk to get something to drink.

Q.  What were you going to drink?
A.  beer.

Q. Earlier you stated that you and your cousin April were going to take a
cab is that correct?
A.  Yes.

Q.  And where were you going to go and who were you going to see?
A.  We were going to see Jean on Anna St.

Q.  What is Jean's last name and address?
A.  He lives at 905 Anna St. I don't know his last name.

Q.  After meeting up with Marvin and Antwoine you changed your mind and
started to walk for beer is that correct?
A.  Yes.

Q.  And where you going to go to buy your beer?
A/.  Elizabeth Ave.

Q.  Did you walk to Eliz. Ave.
A.  Yes. RD

| 67. TYPE NAME | 58. BADGE NUMBER | 59. PAGE | 56a | | 60. DATE OF REPORT |
|---|---|---|---|---|---|
| LYDIA MARTINEZ | | | | AGES | TIME |

**POLICE DEPARTMENT OF**                                   **CONTINUATION PAGE**

| 1 REFERRAL No. OR REPORTS | | 2. CODE | 4. TRANS DISC No. | 6. CASE NUMBER |
|---|---|---|---|---|

Continued statement of Renee Diggs, page 4,   1-25-96

Q. On the way to Eliz. Ave. did you pass any open taverns?
A. Yes a bar.

Q. Why didn't you buy your beer at that bar?
A. I had no id.

Q. How old is Antwoine?
A. 20.

Q. How old is April?
A. 17.

Q. Have you ever purchased beer from any store on Eliz. Ave.?
A. That night no.

Q. When you went to the liqior store on 3rd St. and Eliz. Ave. what happened then?
A. I couldn't buy any they asked for ID.

Q. Did you go in that store?
A. Yes Marvin did too.

Q. Who was going to pay for the beer?
A. I had $3.00.

Q. After you left the liquor store where did the four of you go?
A. We stood outside the liquor store for about 15 minutes.

Q. Why?
A. We were talking about the movie we watched they were going to do a robbery.

Q. Did they ask you to be a look out during this robbery?
A. They said just act like your with us and Antwoine put his arm around me like he was my boyfriend.

Q. You then walked up Eliz. Ave. is that correct?
A. Yes.

Q. Why were you walking up Eliz. Ave.
A. I then changed my mind then they started following two puerto ricans.

Q. About where on Eliz. Ave. did you see these puerto ricans?
A., Between 5th and 6th.

Q. What happened then?
A. Antwoine Harvey started to chase them and Mathis also.

Q. Why were they chasing these two people?
A. I guess to beat them up. RD

| 57. TYPE NAME | 58 BADGE NUMBER | 59. P | 57a | | 60. DATE OF REPORT |
|---|---|---|---|---|---|
| LYDIA MARTINEZ NOTARY PUBLIC OF NEW JERSEY | | | | PAGES | TIME |
| | | | | 62 DESK SUPERVISOR | |

POLICE DEPARTMENT OF                                              CONTINUATION PAG:

| 1 REFERRAL No. OR REPORTS | | 2. CODE | 4. TRANS DISC No. | 5. CASE NUMBER |
|---|---|---|---|---|
| | | | | |

Continued statement of Renee Diggs, page 5    1-25-96

Q.  Why were they going to beat them up?
A. I thing they were going to rob them.

Q.  Were they successful in their robbery attempt?
A.  No.

Q.  After they talked about the robbery at 3rd and E. Jersey St. did you still want to go with them?
A.  No.

Q.  After they had the attempted robbery at 6th and Eliz. Ave. did you still want to go with them?

A.  No.

Q.  After this attempted robbery did there come a point and time when the four of you were back together?
A.  Yes, we started continuing to walk up Eliz. Ave.

Q.  What happened at the intersection of 7th and Eliz. Ave.?
A.  Someone started to say something to me Antwoine started acting crazy and he pulled a gun out of pants and Marvin said don't do it they're black then the said go by the bank where the Mac machine is and I said no.

Q. Describe the gun?
A.  All I know is black.

Q.  Did Antwoine put the gun back in his pocket?
A. Yes  in his pants.

Q.  Did you want to leave them at that time?
A. Yes.

Q.  When you all walked up to the Mac machine then what happened?
A.  We never went.

Q.  Why was that?.
A. I didn't want to go.

Q.  Then what happened?
A. We walked down Second St.

Q.  What happened next?
A.  While we were walking Antwoine gave Marvin the gun.

Q.  When he handed him the gun what did he say?
A. He said oh yeah.

Q.  Did he give him instructions? RD
A.  No.

| 57. TYPE NAME | 58 BADGE NUMBER | 59. PAGE | | 60. DATE OF REPORT |
|---|---|---|---|---|
| LYDIA MARTINEZ NOTARY PUBLIC OF NEW JERSEY | | **58a** | | |
| | 61. TYPIST | 62. DESK SUPERVISOR | | |

POLICE DEPARTMENT OF

CONTINUATION PAGE

| 1. REFERRAL No. OR REPORTS | | 2. CODE | 4. TRANS DISC No. | 6. CASE NUMBER |
|---|---|---|---|---|

Continued statement of Renee Diggs, page 6, 1-25-96

Q. Why did he give him the back?
A. I don't know I was in back of them.

Q. Getting back to 7th St. by Elin's Pizza when Antwoine pulled the gun out did he ask you to do anything?
A. No.

Q. Do you recall in your oral statement just prior to this statement you told me Antwoine told you to watch out for the cops?
A. When the cops came by he told me to look out for the cops he kicked the gun off safety and he was going to shoot at the cops.

Q. When the four of you got to the intersection of 7th and E. Jersey what happened then?
A. Me and my cousin April started walking towards the pathway they seen the man who was moving garbage and Marvin said oh yeah it's on now, and I said don't do that the man owns the liquor store. Antwoine had already ran down 7th St. Marvin was struggling with the man the man had Marvin by his coat. I turned around and the gun shot and a light flased. I then ran.

Q. How many shots were fired?
A. O ne.

Q. About how many feet were you away from Marvin and the man who was shot?
A. They were on the sidewalk,, I was walking down the street about a house away.

Q. Where was April?
A. She was with me.

Q. When the shot went off where was Antwoine?
A. Gone.

Q. Where did he go?
A. I think he ran down 7th St.

Q. After the shot went off, where did Marvin go?
A. The same way Antwoine went to.

Q. Were they side by side?
A. I don't know I didn't look.

Q. After the shot went off what did you see then?
A. There was a man standing outside where I was standing at and I seen him walk over I thought he was going to check his pulse and he went inside his pockets.

Q. Where was this man standing at the time this shot went off?
Q. Where I was standing, there was a pathway by a house where he lives at.

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY

59a

| 57. TYPE NAME | | 58. | | 60. DATE OF REPORT |
|---|---|---|---|---|
| | | 61. TYPIST | 62. DESK SUPERVISOR | TIME |

| 1. REFERRAL No. OR REPORTS | | 2. CODE | 4. TRANS DISC No. | 6. CASE NUMBER |
|---|---|---|---|---|
| | | | | |

Continued statement of Renee Diggs, page 7 1-25-96

Q.  When you mean he who are you referring to?
A.  The man my cousin said he might be a homosexual by the name Jamaica.

Q.  Did you personally see this man?
A. I seen him go over to the body.  I didn't see his face.

Q.  Did you see that man go in the guy who was shot pockets?
A. Yes.

Q.  How long of a time did it take from the time the shot went off until the man went into his pockets?
A. Not even two minutes he ran right away.

Q.  Right after the shot you ran also?
A.  I was running towards the path.

Q.  How many feet were you away from the path when the shot went off?
A.  One house away from the path.

Q.  and at that point were you on the sidewalk or in the street?
A. No I was in the street.

Q.  How far away were you from the curb?
A. I was right behind a car.

Q.  So after the shot went off you immediately started running correct?
A. I ran to the path and I turned around and seen that man go through his pockets and I started running.

Q  So the first time you saw this man who was going through the guy who was shot was when you were going through the path?
A.  Yes.    That's when I saw him going through his pockets.

Q.  Where was your cousin at this time?
A. She was with me at all times.

Q. Was she to your right or left?
A. Left.

Q. How many people were on the street at this time?
Q.  There were people in the chinese store.

Q.  What were the lighting conditions at that time?
A.  It was kind of dark.

Q. What was the weather like?
A. Cold.

Q.  What were you wearing at this time?
A. Black jeans and my coat was inside out.

POLICE DEPARTMENT OF _____                    CONTINUATION PAGE

| 1. REFERRAL No. OR REPORTS | 2. CODE | 4. TRANS DISC No. | 8. CASE NUMBER |
|---|---|---|---|

Continued statement of Renee Diggs, page 8, 1-25-96

Q.  And these were the shoes you were wearing at this time?
A.  Yes.

Q. I am now going to show you what appears to me to be a blood stain do you know what that stain is?
A. I think it's hot sauce.

Q.  What was Marvin wearing?
A.  I forgot what color jeans he was wearing but all dark colors.

Q.  What type of jacket?
A. First down.

Q. What type of hat?
A. Wool cotton hat.

Q.  What was Antwoine wearing?
A.  A mask a black hat, he had a coat turned inside out gold was on the inside.

Q.  What was April wearing?
A.  Pink sneakers, blue jean silver coat.

Q.  The man who you saw going thru the victim's pockets was he wearing a hat?
A. I think so, it was black

Q. What type of coat was he wearing?
A.  Long brown coat.

Q.  Was there any fur around the collar or where the buttons would be?
A.  Yes around the collar the jacket was open?
A. What color shirt was he wearing?
A. I couldn't see

Q. Did he have braided hair?
A.  I couldn't see.

Q.  Did he have a beard or mustach?
A.  No.

Q.  From the time that you left 3rd and Eliz. Ave. to the time that the man was shot how much time had passed by?
A.  Half hour forty minutes.

Q.  When you came up to the corner of 7th St. and E. Jersey St. did all four of you stop at that intersection?
A. No I started to walk away with April.

Q.  Why did Antwoine wearing his coat inside out?
A. He never said. R.D

| 57. TYPE NAME | 58. BADGE NUMBER | 59. PAGE | | 60. DATE OF REPORT |
|---|---|---|---|---|
| LYDIA MARTINEZ NOTARY PUBLIC OF NEW JERSEY | | | 61a | TIME |

POLICE DEPARTMENT

NARCOTICS DIVISION

# ADVISEMENT OF CONSTITUTIONAL RIGHTS

### YOUR RIGHTS

Case No. _____          Date _____

                                  Time  *1140*

BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS

1. You have the right to remain silent.
   Do you understand this? *RD*

2. Anything you say can and will be used against you in a court
   of law.
   Do you understand this? *R.D*

3. You have the right to talk to a lawyer and have him present
   while you are being questioned.
   Do you understand this? *RD*

4. If you cannot afford to hire a lawyer, one will be appointed
   to represent you before any questioning, if you wish.
   Do you understand this? *RD*

5. You can decide at any time to exercise these rights and not
   answer any questions or make any statements.
   Do you understand this? *RD*

---

### WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my
rights are.  I am willing to make a statement and answer questions.
No promises or threats have been made to me and no pressure or
coercion of any kind has been used against me.

Signed *Eric Darnell Diggs*

Witness *_____*

Advising Officer:

Date *1-25-96*

**62a**

Time *11:30*

POLICE DEPARTMENT OF ELIZABETH, N. J.                                          VOLUNTARY STATEMENT

| DATE | TIME | CRIME | TYPIST | CASE NUMBER |
|------|------|-------|--------|-------------|
| 1/24/93 | 2:30 PM | | A. McDonough | |

VOLUNTARY STATEMENT OF   Marvin Mathis

RESIDENCE.   538 Magnolia Ave/ Eliz NJ        PHONE  none

OCCUPATION   Student                          AGE        DOB

STATEMENT MADE TO   Det. Thomas Koczur

Page_____of_____

Q. Marvin, I'm Det. Thomas Koczur of the Elizabeth Police Dept. and I'm investigating a homicide which occurred on 1/22/96, before I ask you any questions, are you willing to answer them truthfully and to the best of your knowledge?
A. Yes

Q. Do you read and write english?
A. Yes

Q. What is the extent of your education?
A. 10th

Q. Are you under the influence of alcohol or narcotics at this time?
A. No

Q. Do you need glasses to read?
A. No

Q. Are you under the care of a doctor at this time?
A. No

Q. Where are you a student at?
A. Jefferson High

Q. Early this day, were you transported from your school and brought to the Elizabeth P.D.?
A. Yes

Q. Did you come here upon your own free will?
A. Yes
Q. When you came to the police dept., did I introduce myself to you and tell you the investigation I was conducting?
A. Yes

Q. And that was the shooting and robbery of a store owner on E.Jersey St. in Elizabeth, is that correct?
A. Yes

Q. Did I then ask you not to speak to this detective until I had your mother present?
A. yes

Q. And you were not asked any questions in regard to this is that correct?
A. yes

Sworn to before me this

____ ____ day of _____ 19___

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires

63a

Signature

| 1. REFERRAL No. OR REPORTS | | 3. CODE | 4. TRANS DISC No. | | 6. CASE NUMBER |
|---|---|---|---|---|---|
| cont statement of Marvin Mathis pg 2 | | | | | |

Q.   A short time later, you were brought from an interview room and placed in the conference room of the Detective Bureau, is that correct?
A. Yes

Q.   Who was in that room at that time?
A.   My mother, you and two other detectives.

Q.   Did I again in the presence of your mother, inform you of the investigation that I was going to conduct?
A. Yes

Q.   And I advised you of your Constitutional Rights, is that correct?
A Yes

Q.   And your mother witnessed this, is that correct?
A. Yes

Q.   Did you understand your rights?
A. yes

Q.   Do you still understand your rights?
A. Yes

Q.   Do you wish to proceed with this investigation by giving a type written statement?
A. Yes

Q.   On 1/22/96 were you in the area of Third St and Bond St?
A. Yes

Q.   About what time was that?
A.   6

Q.   Did you eventually meet up with one of your friends?
a. yes

Q.   What was your friend's name?
A. Ish

Q.   Did you eventually get together with Antoine?
A.   Yes

Q.   Where did you meet Antoine at?
A.   Second St.

Q.   About what time?
A.   Can't say, after 7.

Q.   How long have you known Antoine/
A. 6 years

Q.   Where did you meet him on Second St?
A. Between Second and Bond.

67. TYPE NAME                 68. BADGE NUMBER    69. PM          64a           80. DATE OF REPORT
        LYDIA MARTINEZ                                                              TIME
        NOTARY PUBLIC OF NEW JERSEY
Signature   My Commission Expires July 15, 1998    81. TYPIST      PAGES    82. DESK SUPERVISOR

| 1. REFERRAL NO. OR REPORT'S | | 2. CODE | 4. TRANS DOC No. | | 5. CASE NUMBER |
|---|---|---|---|---|---|
| cont statement of Marvin Mathis pg 3 | | | | | |

Statement ceased at 2:45 for coffee break.

Statement resumes at 2:50 PM

Q. To the best of your recollection, where does Antoine live?
A. Third court, first floor, Pioneer Homes.

Q. How old is Antoine?
A. 20

Q. How tall is he?
A. About 5'10"

Q. How heavy is he?
A. 170

Q. What type of hair does he have?
A. Braids

Q. Does he have any facial hair?
A. Beard

Q. When you met him, was he with anyone else?
A. Yes, but I don't know his name, he's from Carteret.

Q. Why were the three of you getting together?
A. We was just walking.

Q. Where were you walking to?
A. Court St. on the bridge.

Q. What were you looking to do?
A. they were looking to rob somebody.

Q. Were you looking to rob somebody?
A. No

Q. Did anything unusual happen under the bridge?
A. They wanted me to hold the gun.

Q. Who wanted you to hold the gun?
A. Antoine

Q. Why did he want you to hold the gun?
A. Cause he wanted to put it in my pocket and I said, no.

Q. What type of gun was it?
A. .380

Q. What color was it?
a. Black

Q. Did you ever handle that gun?
A. No

| 57. TYPE NAME | 58. BADGE NUMBER | 59. PAGE | | 60. DATE OF REPORT | |
|---|---|---|---|---|---|
| | | **65a** | | | TIME |
| Signature | LYDIA MARTINEZ NOTARY PUBLIC OF NEW JERSEY My Commission Expires July 15, 1996 | 61. TYPIST | | 62. DESK SUPERVISOR | |

POLICE DEPARTMENT OF

CONTINUATION PAGE

| 1 REFERRAL No  OR REPORTS | cont statement of Marvin Mathis pg 4 | 2. CODE | 4. TRANS DISC No. | 5. CASE NUMBER |
|---|---|---|---|---|

Q.   From the bridge under Court St. when he showed you the gun, where
did the three of you go then?
A.   We went straight to Alexian Bros.

Q.   What happened at Alexian Bros?
A.   First we was walking fast, then we slowed down, then he said, he
told me and his boy to "come on". Then he seen the man who owned the
liquor store and then he told him to empty his pockets. The man said,
"no", then Antoine tried to go in his pockets. Then they started fight-
ing. The man threw a punch at Antoine, then Antoine threw a punch back.
Then Antoine pushed him, then he shot him. The man fell, Antoine went
into his pockets, then he told me to go in his pockets, I said, "no".
Then he called me a punk, then I was in shock. Then he snatched me
and told me to "come on", we went straight up Second, cut through Court.
I turned and ran over Magnolia, then Antoine ran straight over Court.
Then he ran through the field at Court St.

Q.   When you were walking from the bridge to the time you got to the
liquor store, did Antoine discuss about who he was trying to rob?
A.   No

Q.   Did you look at other people along the way to see if Antoine wanted
to rob them?
A. He wanted to rob another person, but he got in the car, he was too
fast.

Q.   And where did this happen?
A.   NewPoint Rd.

Q.   When was it decided that the man that was shot was going to be robbed
A.   As we were just walking up Seventh, we got to the Chinese Rest.
and Antoine told me to stand by.

Q.   What was Antoine wearing at this time?
A.   Tommy Hill figure jacket, royal blue, but it was turned inside out
so it was gold.

Q.   How long was that coat?
A.   About to his thigh, he had it tucked under his waist.

Q.   When did he turn his coat inside out?
A. When he was walking under the bridge.

Q. Did you or the boy from Carteret alter your clothing at all?
A.   No

Q.   When you first approached the chinese store, when did you first
see the man that was shot?
A. He was going in the driveway picking garbage up.

Q.   How far away were you from Antoine when he shot this man?
A.   About 5 feet.

| 57. TYPE NAME LYDIA MARTINEZ NOTARY PUBLIC OF NEW JERSEY Signature My Commission Expires July 15, 19 | 58. BADGE NUMBER | 59. PAGE  66a | 60. DATE OF REPORT |
|---|---|---|---|
| | | YES | TIME |
| 61. TYPIST | | 62. DESK SUPERVISOR | |

| | | | | | |
|---|---|---|---|---|---|
| POLICE | | | | | CONTINUATION PAGE |

| 1. REFERRAL NO. OR REPORTS | 2. CODE | 4. TRANS DISC NO. | 5. CASE NUMBER |
|---|---|---|---|
| cont statement of Marvin Mathis pg 5 | | | |

Q. How many shots were fired?
A. two, but I think the first one missed him.

Q. What makes you think the first one missed him?
A. Cause when the second shot went off, the man fell, the first time he didn't fall.

Q. Did you see where the man was struck with the bullet?
A. I couldn't see, I was in shock.

Q. Did Antoine use his right hand or his left hand?
A. Right hand.

Q. When Antoine pointed the gun at the man, what part of the man's body was Antoine aiming at?
A. It was to his chest.

Q. How far away was the gun when it went off to the man's body?
A. About 1 foot.

Q. Did you see Antoine remove anything from this man's pockets?
A. Yes

Q. Was this before or after he was shot?
A . After he was shot.

Q. Which pocket did Antoine go through?
A. I seen him in his front pockets.

Q. Did he remove anything from this man's pockets?
A. I seen something, but I don't know what it was.

Q. Earlier in the interview you stated you saw Antoine remove a wallet, is that correct?

A. Yes

Q. Where did he take that wallet from?
A. I think his right back pocket.

Q. Was there any money in that wallet?
A . I don't know.

Q. Have you ever visited that liquor store before this incident?
A. No

Q. Did you ever touch this man while he was on the ground?
A. No

Q. Was the gun an automatic or revolver?
A. Automatic

*[signature]*

| 57. TYPE NAME | 58 BADGE NUMBER | 59 PAGE | | 60 DATE OF REPORT |
|---|---|---|---|---|
| Signature | LYDIA MARTINEZ NOTARY PUBLIC OF NEW JERSEY My Commission Expires July 15, 1996 | | 67a | TIME |
| | 61. TYPIST | 62. DESK SUPERVISOR | | ES |

CASE NO.

POLICE DEPARTMENT OF                                    CONTINUATION PAGE

| 1. REFERRAL No. OR REPORTS | 2. CODE | 4. TRANS DISC No. | 6. CASE NUMBER |
|---|---|---|---|
| cont statement of Marvin Mathis pg 6 | | | |

Q.  What were the lighting street at that time?
A. The street lights were on.

Q.  What was the weather like?
A.  It was good.

Q.  Approximately how long of time did this robbery take place from the time you three approached this man to the time you fled?
A.  I don't know

Q.  How many other people were on the street at this time?
A.  Two people coming up the street.

Q.  Besides Antoine and the friend from Carteret, was there anyone else at that scene that you know?
A.  No

Q.  As you were running from the scene, which way did you flee?
A. Straight up Seventh, turned by Court.

Q.  Where was the gun at this time?
A. Still with Antoine.

Q.  Where was the wallet at this time?
A.  Antoine was emptying it at then he threw it.

Q.  Where did he throw the wallet?
A. Towards Court under a car.

Q.  As they were running, did Antoine remove any money from the wallet?
A. I don't know, I was busy running.

Q. Did you ever touch that wallet?
A. No

Q.  Where did you run to
A. Straight up Court and made a left, then made a right to Magnolia. Then I ran home.

Q.  Where did Antoine run?
A. Straight up Court, going downtown.

Q.  the last time you saw him, was he running by himself?
A. No, the boy from Carteret was with him.

Q.  How old was the boy from Carteret?
A . About 16-17

Q.  How many times had you met him before this robbery?
A. Once.

Q.  What do you call him?
A.  I forgot what I called him.

| 57. TYPE NAME | 58 BADGE NUMBER | 59 PAGE | 60. DATE OF REPORT |
|---|---|---|---|
| LYDIA MARTINEZ NOTARY PUBLIC OF NEW JERSEY My Commission Expires July 15, 1996 Signature | | 68a | TIME |
| | | 61. TYPIST | 62. DESK SUPERVISOR |

CASE NO.

| 1. REFERRAL No. OR REPORT'S | | 2. CODE | 4. TRANS DISC No. | | 6. CASE NUMBER |
|---|---|---|---|---|---|

cont statement of Marvin Mathis pg 7

Q. What does Antoine call him?
A. A funny name, Boz something like that.

Q. How did this boy from Carteret get to Elizabeth?
A. He got a ride from his brother.

Q What is his brother's name?
A. I don't know.

Q What type of car does he drive?
A. Honda Civic, royal blue.

Q. What's his brother's name?
A. I don't know

Q. How do you know his brother drove him to Elizabeth?
A. He told Antoine that was his brother.

Q. Where did you see him drop him off at?
A. The corner of Third and Bond.

Q. When you left under the bridge on Court St., your intention was to rob somebody, is that correct?
A. No

Q. Then why didn't you go home?
A. He said, "let's take a walk and he'd drop me back off home'.

Q. Did you walk past your home?
A. Yes

Q. Why didn't you go home?
A. Cause he told me to come to the Chinese store and he'd drop me back home.

Q. Was this before or after he was going to rob the guy on New Point Rd?
A. After

Q. After you left your house, is that when the robbery was going to happen on New Point Rd?
A. Yes

Q. When was the robbery going to take place on New Point Rd?
A. Before we passed my house.

Q. Why did you think Antoine wanted to keep walking?
A. He told me he was going to the Chinese store.

Q. Did you think he was going to rob anybody?
A. No

Q. Why not/
A. I just didn't think he was going to do it.

87. TYPE NAME
LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
Signature
My Commission Expires July 15, 1996

69a

CASE NO.

Q.   At the time of the shooting, what were you wearing/
A.   Black army pants, the jacket I'm wearing now and black sneakers.

Q.   And this is the same jacket and same shoes that you are wearing,
correct?
A. Yes

Q.   Where are the pants you were wearing/
A. Home

Q.   Where in your home/
A.   In my closet.

Q. Were you wearing a hat during this?
A.   Yes, I have it with me today.

Q.   After the robbery and shooting did you speak to Antoine in regards
to what happened?
A. No

Q.   Where did this take place at?
A. When he was running.

Q.   Did you speak to Antoine yesterday.
A.   Yes

Q.   How many times?
A.   Just a couple of words, on Second St. between Second and Bond.

Q. What time?
A.   Afternoon

Q. What was said?
A. He was like, he said, "if you say something I'll kill you" and I
thought he was joking and he said he wasn't./

Q. Is this the only time you spoke to Antoine since the shooting?
A. yes

Q.   What is your girlfriend's name?
A. Sharlema

Q.   Did you tell Sharlema that you shot the man by accident/
A.   Yes

Q.   Why did you say that?
A. Cause Antoine told me to say it, then he said if I didn't say it he
would kill me.

Q.   The boy from Carteret, what was he wearing at that time?
A. A black Columbia jacket, purple around the neck and light blue jeans
brown timberlands.

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1996

| 87. TYPE NAME | 88. BADGE NUMBER | 89 | 70a | | 80. DATE OF REPORT |
| Signature | | | | PAGES | TIME |
| | 81. TYPIST | | 82. DESK SUPERVISOR | | |

POLICE DEPARTMENT OF                                          CONTINUATION PAGE

| 1. REFERRAL NO. C/I RCPC 73 | 2. CODE | 4. TRANS DISC NO. | 5. CASE NUMBER |
|---|---|---|---|

cont statement of Marvin Mathis pg 9

Q. The pants you wearing that are hanging in the closet that you wore at the time of this homicide, did you wash them yet?
A. No

Q. How were you treated by members of the Eliz. Police Dept.
A. You treated me right.

Q. Were you abused by any member of the Eliz. Police Dept.
A. No

Q. Where you able to use the restroom?
A. Yes

Q. When you were hungry, did we stop this interview and provide you lunch?.
/a. Yes

Q. In the event you had to contact Antoine had would you reach him?
A./ Pager

Q. What is his pager number?
A. I don't know it by heart.

Q. Do you have that number written down anywhere?
a. yeah, in my bag at home.

Q. Do you have any objection keeping your Constitutional rights in mind that this detective and members of the Eliz. Pol.Dept and recover the pager number from the plastic bag and recover the pants you were wearing at the time of this homicide.
A. No objection

Q. Is there anything else you would like to add to this statement?
A. no

Q. Is there anything you wish to add to this statement?
A. No

Q. After you read this statement and find it correct will you sign it as a true, free and voluntary statement. This statement was done in the presence of Marvin's Mother, Linda Mathis.
A. Yes

Sworn to before me this
24th day of January 1996

*Marvin Mathis* (signature)
Marvin Mathis

*Lydia Martinez* (signature)
Notary Public

*(signature)*
Det. Thomas Koczur

*Linda Mathis* (signature)

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1996

71a

| 87. TYPE NAME | 88. BADGE NUMBER | 89. DATE OF REPORT | TIME |
|---|---|---|---|
| Signature | | 81. TYPIST | 82. DESK SUPERVISOR |

POLICE DEPARTMENT

NARCOTICS DIVISION

ADVISEMENT OF CONSTITUTIONAL RIGHTS

YOUR RIGHTS

Case No. _____          Date _____

                                    Time _12:_7__

BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

1.  You have the right to remain silent.
    Do you understand this? _____NM_____

2.  Anything you say can and will be used against you in a court
    of law.
    Do you understand this? _____NM_____

3.  You have the right to talk to a lawyer and have him present
    while you are being questioned.
    Do you understand this? _____NM_____

4.  If you cannot afford to hire a lawyer, one will be appointed
    to represent you before any questioning, if you wish.
    Do you understand this? _____NM_____

5.  You can decide at any time to exercise these rights and not
    answer any questions or make any statements.
    Do you understand this? _____NM_____

_____

WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my
rights are.  I am willing to make a statement and answer questions.
No promises or threats have been made to me and no pressure or
coercion of any kind has been used against me.

Signed _____

Advising Officer:                  Witness _Linda Mathis_

_____              Date _1/20/95_

**72a**                            Time _12:7_

ELIZABETH POLICE DEPARTMENT          CASE # 96-1962

DATE 1/24/96          TIME 6 50 P M

VOLUNTARY STATEMENT OF MARVIN MATHIS

IN THE PRESENCE OF LINDA MATHIS (MOTHER)

ADDRESS 538 MAGNOLIA AVENUE, ELIZABETH, NJ

PHONE # N/P

AGE 15 DATE OF BIRTH 3/23/80

STATEMENT GIVEN TO DET. THOMAS KOCZUR

Q MARVIN, I'M DET KOCZUR OF THE ELIZBETH POLICE DEPARTMENT AND I'M
GOING TO ASK YOU SOME MORE QUESTIONS IN REGARDS TO THIS HOMICIDE
INVESTIGATION ARE YOU WILLING TO ANSWER MY QUESTIONS TRUTHFULLY
AND TO THE BEST OF YOUR KNOWLEDGE?
A YES

Q AT APPROXIMATELY 5 40 P M THIS EVENING DID YOUR MOTHER AND I ENTER
THE INTERVIEW ROOM AND I INFORMED YOU I WOULD LIKE TO SPEAK TO YOU
AGAIN IS THAT CORRECT?
A. YES

Q. AND YOU INFORMED US THAT YOU WISHED TO SPEAK TO US. IS THAT
CORRECT?
A. YES

Q. MARVIN, I THEN ADVISED YOU OF YOUR MIRANDA RIGHTS, IS THAT
CORRECT?
A. YES

Q. AND DID YOU UNDERSTAND YOUR MIRANDA RIGHTS AT THAT TIME?
A. YES

Q. AND WITH YOUR CONSTITUTIONAL RIGHTS IN MIND DID YOU MAKE
STATEMENTS REGARDING THIS HOMICIDE?
A. YES

Q. AT THIS TIME YOU WISH TO CONTINUE BY GIVEN A TYPEWRITTEN SWORN
STATEMENT?

LYDIA MARTINEZ          **73a**          

A. YES

Q  MARVIN, WHEN DID YOU FIRST MEET ANTOINE THE EVENING OF THE SHOOTING?
A. ABOUT 8 00 O'CLOCK

Q  WHERE WAS THAT AT?
A. THIRD AND BOND

Q  AND THAT WAS AT THE CORNER?
A. YES

Q  WERE YOU TWO ALONE AT THAT TIME?
A. YES

Q  DID YOU MEET UP WITH ANYONE ELSE?
A. YES, TWO GIRLS

Q  WHERE WAS THAT AT?
A. THIRD AND BOND AT THE CHINESE STORE

Q  DO YOU KNOW WHO THESE GIRLS WERE?
A. YES

Q  WHO ARE THEY?
A. ONE WAS APRIL DIGGS

Q  HOW LONG HAVE YOU KNOWN APRIL DIGGS?
A. FOR TWO YEARS

Q. DO YOU KNOW THE OTHER GIRLS NAME?
A. NO, BUT IT WILL COME TO ME

Q. WHAT DID THE FOUR OF YOU DISCUSS IN FRONT OF THE CHINESE RESTAURANT?
A. TO GO TO THE AVENUE

Q. IN THE SECOND INTERVIEW AFTER 5:45 YOU STATED TO ME IN THE PRESENCE OF YOUR MOTHER BEFORE THE FIRST ATTEMPTED ROBBERY AND THE ROBBERY AND HOMICIDE YOU INTENDED TO ROB PEOPLE WITH ANTOINE.  IS THAT CORRECT?
A. YES

ALMOST
6 PM

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1996

74a

Q  WAS IT YOUR INTENTION, THE INTENTION OF ANTOINE AND THE INTENTION OF APRIL DIGGS AND THE OTHER FEMALE TO ROB ANYONE ON ELIZABETH AVENUE?
A  YES

Q  ON ELIZABETH AVENUE WAS ANYONE IN POSSESSION OF A HANDGUN?
A, YES

Q  HOW DO YOU KNOW ANTOINE WAS IN POSSESSION OF A HANDGUN?
A  BECAUSE HE SHOWED IT TO ME

Q  WHERE DID HE SHOW YOU THIS GUN AT?
A  WHEN HE WAS WALKING UP THE AVENUE

Q  DID HE DISCUSS WITH YOU AND THE OTHER GIRLS ABOUT DOING A ROBBERY?
A, YES

Q  WHAT TYPE OF GUN DID HE HAVE?
A  A BLACK REVOLVER THE KIND THAT COCKS BACK

Q  WHEN YOU WERE WALKING UP THE AVENUE DID THERE COME A POINT IN TIME WHEN SOMEONE SUGGESTED WHO TO ROB?
A, ANTOINE

Q  AND WHERE WAS THAT AT?
A  ON THE AVENUE ACROSS THE STREET FROM THE GAS STATION WHERE THAT STATUE IS AT

Q  WHAT DID ANTOINE TELL YOU WHAT YOU WERE TO DO DURING THIS ROBBERY?
A  HE ASKED ME TO BE A LOOK OUT

Q, WHAT DID HE ASK THE GIRLS TO DO?
A, HE ASKED THE GIRLS TO SEE IF THAT MAN HAD ANY GOLD ON.

Q, WHY WAS THIS ROBBERY NOT CARRIED OUT?
A, BECAUSE I TOLD HIM NOT TO DO IT,

Q, DID YOU LEAVE THE AREA RIGHT THERE AND THEN?
A, NO

Q  WHY?
A, BECAUSE APRIL NOTICED A SMALL DELI ON THE CORNER AND A MAN WAS THERE ALONE,

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW

**75a**

Q  WHY WASN'T THIS DELI ROBBED?
A. BECAUSE I TOLD HIM I WASN'T GOING TO DO IT

Q  YOU THEN LEFT THE AREA OF ELIZABETH AVENUE BY THIRD?
A. YES

Q  EARLIER BEFORE THIS WRITTEN STATEMENT DO YOU RECALL TELLING THIS
DETECTIVE AND YOUR MOTHER THAT YOU AND ANTOINE WERE LOOKING TO
ROB SOMEONE BECAUSE YOU WANTED TO KNOW HOW IT FELT?
A. YES

Q  WHEN YOU WERE WALKING UP ELIZABETH AVENUE WERE YOU AND ANTOINE
AND THE GIRLS LOOKING TO ROB SOMEONE?
A. YES

Q  DID THERE COME A POINT IN TIME WHEN THE FOUR OF YOU DECIDED TO ROB
SOMEONE ELSE?
A. YES

Q  AND WHERE WAS THAT?
A  ELIZABETH AVENUE AND 6TH STREET

Q  WHAT HAPPENED THEN?
A. ANTOINE SAW TWO SPANISH BOYS AND ANTOINE AND APRIL STARTED
RUNNING AFTER THEM REAL HARD AND ME AND THE OTHER GIRL JOGGED
AFTER THEM.

Q  WHICH WAY DID THEY RUN ON 6TH STREET?
A. WE ALL WENT TOWARDS FIRST AVENUE BUT THEY OUT RAN US.

Q. WHERE DID YOU GO AFTER THIS?
A. WE WENT STRAIGHT UP THE AVENUE AND MADE A RIGHT ON NEW POINT
ROAD

Q. WHAT HAPPEN THEN?
A. WE STARTED WALKING TOWARDS E. JERSEY STREET

Q. WAS IT STILL YOUR INTENTION AT THIS TIME TO CONTINUE DOING A
ROBBERY?
A. NO

Q. DID THERE COME A POINT IN TIME WHEN YOU CAME TO THE INTERSECTION
OF 7TH AND E. JERSEY ST. AND ON THAT CORNER IS THE CHINESE RESTAURANT.
IS THAT CORRECT?

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY            **76a**

A. YES

Q. WHAT DID ANTOINE TELL YOU AT THIS TIME?
A. HE WAS GOING TO ROB THIS GUY AND HE ASKED ME TO WATCH OUT.

Q. WHO DID HE WANT YOU WATCH OUT FOR?
A. FOR THE COPS

Q. DID YOU DO THAT FOR HIM?
A. YES

Q. AND YOU KNEW HE WAS GOING TO ROB THIS MAN, IS THAT CORRECT?
A. YES

Q. AND YOU DID NOT STOP HIM FROM DOING THIS ROBBERY?
A. NO

Q. WHERE WAS APRIL AT THIS TIME?
A. NEXT TO ANTOINE

Q. WHAT DID APRIL DO DURING THIS ROBBERY?
A. SHE WAS ALSO A LOOK OUT

Q. WHERE WAS THE OTHER GIRL?
A. SHE WAS STANDING NEXT TO ME   NOW I REMEMBER HER NAME IS RENEE

Q. WHAT HAPPEN BETWEEN YOU, ANTOINE AND THE MAN THAT WAS SHOT?
A. WE WALKED UP TO THE GUY, ANTOINE GRABBED HIM AND TRIED GOING INTO HIS POCKETS.  THEN THE MAN SLAPPED ANTOINE'S HAND FROM GOING INTO HIS POCKETS.  THEN ANTOINE GRABBED THE MAN AND THE MAN GRABBED ANTOINE.  THEN THE MAN THREW A PUNCH AT ANTOINE.  THEN ANTOINE THREW A PUNCH BACK AT HIM.  THEN ANTOINE PUSHED THE MAN OFF OF HIM AND HE TOOK THE GUN AND SHOT HIM.

Q. AFTER THE SHOTS WENT OFF AND THE MAN FELL TO THE GROUND WHO WENT THROUGH HIS POCKETS?
A. ANTOINE

Q. DID YOU EVER TOUCH THAT MAN?
A. NO

Q. DID EITHER OF THE TWO GIRLS TOUCH OR STRIKE THIS MAN?
A. NO

 LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission 

**77a**



Q. WHEN ANTOINE PULLED OUT HIS GUN AND POINTED IT AT THIS MAN DID THE MAN GRAB THIS GUN?
A. YES

Q. AND WERE THE TWO OF THEM STRUGGLING OVER THIS GUN?
A. YES

Q. AND YOU ATTEMPTED TO HELP ANTOINE, IS THAT CORRECT?
A. NO, I DIDN'T WANT HIM TO SHOOT THAT MAN

Q. HOW DID THE GUN GO OFF?
A. WHEN ALL THREE OF US WERE STRUGGLING FOR THE GUN

Q. HOW LONG DID THIS STRUGGLE TAKE PLACE?
A. NOT THAT LONG

Q. WHEN THE GUN WENT OFF WHERE WAS IT POINTED AT?
A. HIS FOREHEAD

Q. HOW FAR AWAY WAS THIS GUN FROM THIS MAN'S FOREHEAD?
A. ABOUT ONE OR TWO FEET

Q. HOW MANY SHOTS WERE FIRED?
A. TWO SHOTS BUT THE FIRST ONE MISSED HIM

Q. WAS IT ANTOINE'S INTENTION TO SHOOT THIS MAN?
A. I DON'T THINK SO

Q. WHEN THE GUN WENT OFF DID ANY SHELL CASINGS COME OUT?
A. YES

Q. WHERE DID YOU GO RIGHT AFTER THE SHOOTING?
A. ME AND ANTOINE RAN DOWN 7TH STREET LIKE I TOLD YOU BEFORE.

Q. DID YOU SPEAK TO RENEE SINCE THIS SHOOTING?
A. NO

Q. DID YOU SPEAK TO APRIL SINCE THIS SHOOTING?
A. NO

Q. WHEN THE ROBBERY OF THIS MAN WAS DISCUSSED DID APRIL AND RENEE OBJECT TO BEING THE LOOK OUT?
A. NO

Q. SO ALL FOUR OF YOU COMMITTED THIS ROBBERY?
A. YES

**78a**

A. YES

Q  HOW LONG HAVE YOU KNOWN APRIL?
A. 2 OR 3 YEARS

Q  HOW OLD IS SHE?
A. 16 GOING ON 17

Q. WHERE DOES SHE LIVE?
A. FIRST COURT OF PIONEER HOMES I'M NOT SURE OF THE REST OF THE ADDRESS

Q  HOW TALL IS SHE?
A. ABOUT 5'6"

Q  HOW HEAVY WOULD YOU SAY SHE IS?
A. 120 OR 130

Q  WHAT WAS SHE WEARING AT THE TIME OF THIS ROBBERY AND HOMICIDE?
A. ORANGE JACKET AND A SCARF ON HER HEAD AND SHE HAD BLUE JEANS ON AND PINK REEBOKS

Q  I'M NOW GOING TO SHOW YOU AN ELIZABETH POLICE DEPARTMENT PHOTO ARRAY CONTAINING SIX BLACK FEMALES.  I'M GOING TO ASK YOU IF YOU RECOGNIZE ANYONE IN THOSE PHOTOS?
A. NUMBER THREE

Q. I'M NOW GOING TO ASK YOU TO SIGN THE BACK OF THE PHOTO AND PLACE TODAY'S DATE.  ARE YOU WILLING TO DO SO?
A. YES

Q. CAN YOU DESCRIBE RENEE TO ME?
A. LIGHT SKIN, ABOUT MY HEIGHT, BIG EYES, ABOUT 5'10", ABOUT 130 OR 140

Q. WHAT WAS SHE WEARING AT THE TIME OF THIS HOMICIDE?
A. BLACK JEANS, TOMMY HILLFIGER AND SHE HAD IT TURNED OUTSIDE IN, THE COLOR IS BLACK, RED AND WHITE, AND SHE HAD A BANDANA, SHE'S 20 OR 21.

Q. HOW LONG HAVE YOU KNOWN HER?
A. NOT TO LONG

Q. TO YOUR KNOWLEDGE WHERE DO YOU BELIEVE THIS GUN IS AT RIGHT NOW?
A. I DON'T KNOW ANTOINE MIGHT HAVE IT.


LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 2000

79a

Q  SO THE BOY YOU TOLD US CAME FROM CARTERET HAD NOTHING TO DO WITH THIS ROBBERY.  IS THAT CORRECT?
A. YES

Q. AND THERE IS NO BOY FROM CARTERET INVOLVED IN THIS ROBBERY THAT YOU KNOW OF?
A. NO

Q. THE ONLY PEOPLE INVOLVED IN THIS ROBBERY ARE THE FOUR OF YOU THAT WERE THERE THAT NIGHT?
A. YES

Q. BEFORE WE COMPLETE THIS STATEMENT I WANT TO SHOW YOU A UNION COUNTY SHERIFF'S OFFICE PHOTO IDENTIFICATION FOLDER CONTAINING THE PHOTOS OF SIX BLACK MALES.  I'M GOING TO ASK YOU IF YOU RECOGNIZE ANYONE IN THESE PHOTOS?
A. YES, NUMBER FOUR

Q. WHO IS THAT?
A. ANTOINE

Q. I'M GOING TO ASK YOU TO PLACE YOUR SIGNATURE ON THE BACK OF THIS PHOTO YOU IDENTIFIED?
A. SAME COMPLIES.

Q. I'M ALSO GOING TO  ASK YOU TO PLACE YOUR INITIALS ON THE REMAINING FIVE PHOTOS?
A. SAME COMPLIES.

Q. I'M NOW GOING TO SHOW YOU AN ELIZABETH POLICE DEPARTMENT PHOTO ARRAY CONTAINING THE PHOTO SIX BLACK FEMALES DO YOU RECOGNIZE ANYONE IN THESE PHOTOS?
A. YES, NUMBER FIVE

Q. AND WHO IS THAT?
A. RENEE

Q. I'M GOING TO ASK YOU TO PLACE YOU SIGNATURE AND DATE ON THE BACK OF THE PHOTO YOU IDENTIFIED?
A. SAME COMPLIES.

Q. IS THERE ANYTHING ELSE YOU WISH TO ADD TO THIS STATEMENT?
A. NO

**LYDIA MARTINEZ**
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1996

**80a**

Q  FROM THE TIME YOU LEFT YOUR LAST WRITTEN STATEMENT TO THIS TIME HOW WERE YOU TREATED BY MEMBERS OF THE ELIZABETH POLICE DEPARTMENT?
A. OKAY

Q. AFTER YOU AND YOUR MOTHER READ THIS STATEMENT OVER AND FIND IT TO BE TRUE AND CORRECT ARE YOU WILLING TO SIGN IT IN YOUR OWN HANDWRITING?
A. YES
SWORN TO BEFORE ME THIS
24TH DAY OF JANUARY 1996

NOTARY PUBLIC

MARVIN MATHIS

LINDA MATHIS

LYDIA MARTINEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 15, 1996

DET. THOMAS KOCZUR

**81a**

(9)