# Superior Court of New Jersey

## Appellate Division

### DOCKET NO. A-3316-98T4

| | | |
|---|---|---|
| STATE OF NEW JERSEY, | : | <u>CRIMINAL ACTION</u> |
|     Plaintiff-Respondent, | : | On Appeal From a Final Judgment Of Conviction of the Superior Court |
| v. | : | of New Jersey, Law Division, Union County. |
| MARVIN MATHIS, | : | Sat Below: |
|     Defendant-Appellant. | : | Hon. Rudolph N. Hawkins, J.S.C. (juvenile waiver hearing); Hon. John F. Malone, J.S.C., and a jury. |

---

### BRIEF ON BEHALF OF THE STATE OF NEW JERSEY

---

JOHN J. FARMER, JR.
ATTORNEY GENERAL OF NEW JERSEY
ATTORNEY FOR PLAINTIFF-RESPONDENT
STATE OF NEW JERSEY
RICHARD J. HUGHES JUSTICE COMPLEX
TRENTON, NEW JERSEY  08625

TERESA A. BLAIR
DEPUTY ATTORNEY GENERAL
DIVISION OF CRIMINAL JUSTICE
APPELLATE BUREAU
P.O. BOX 086
TRENTON, NEW JERSEY  08625
(609) 292-9086

    OF COUNSEL AND ON THE BRIEF

## TABLE OF CONTENTS

PAGE

COUNTER-STATEMENT OF PROCEDURAL HISTORY . . . . . . . . . .   1

COUNTER-STATEMENT OF FACTS   . . . . . . . . . . . . . .   4

LEGAL ARGUMENT

POINT I

THE FAMILY COURT PROPERLY EXERCISED ITS
LIMITED DISCRETION IN WAIVING DEFENDANT, A
CHART 1 OFFENDER, TO ADULT COURT   . . . . . . . .   16

POINT II

BECAUSE SHARLAMA BROOKS' TESTIMONY THAT SHE
WAS APPROACHED BY A MALE WHO TOLD HER THAT
DEFENDANT HAD "KILLED SOMEONE" WAS ADMITTED
AS AN ADOPTIVE ADMISSION AND FOR THE LIMITED
PURPOSE OF EXPLAINING BROOKS' ACTIONS IN
CONFRONTING DEFENDANT THE DAY AFTER THE
MURDER, THE STATEMENT WAS NOT HEARSAY AND
THEREFORE DEFENDANT WAS NOT DENIED HIS RIGHT
TO DUE PROCESS   . . . . . . . . . . . . . . . . .   29

POINT III

THE PROSECUTOR'S SUMMATION COMMENTS DID NOT
DEPRIVE DEFENDANT OF A FAIR TRIAL . . . . . . . .   41

POINT IV

DEFENDANT'S SENTENCE WAS MANIFESTLY PROPER   . . .   48

CONCLUSION   . . . . . . . . . . . . . . . . . . . . . . .   56

- i -

## TABLE OF AUTHORITIES

### CASES

Boyd v. California, 494 U.S. 370 (1990)   . . . . . . . . . . 47

Greenberg v. Stanley, 30 N.J. 485 (1959)   . . . . . . . . 34,35
36

Spragg v. Shore Care, 293 N.J. Super. 33 (App. Div. 1996)   34,36
37

State in Interest of C.A.H. and B.A.R., 89 N.J. 326 (1982)   25,26
52

State in the Interest of A.B., 109 N.J. 195 (1988)   . . . . . 21

State in the Interest of A.J., 232 N.J. Super. 274
    (App. Div. 1989)   . . . . . . . . . . . . . . . . . . 21,22

State in the Interest of B.G., 247 N.J. Super. 403
    (App. Div. 1991)   . . . . . . . . . . . . . . . . . . . 21

State in the Interest of S.M., 211 N.J. Super. 675
    (App. Div. 1986)   . . . . . . . . . . . . . . . . . . . 21

State v. Bankston, 63 N.J. 263 (1973)   . . . . . . . . . . 38

State v. Briggs, 269 N.J. Super. 555 (App. Div.), certif.
    denied, 41 N.J. 99 (1995)   . . . . . . . . . . . . . 34,35

State v. Chew, 150 N.J. 30 (1997)   . . . . . . . . . . 41,42

State v. Colella, 298 N.J. Super. 668 (App. Div.), certif.
    denied, 151 N.J. 73 (1997)   . . . . . . . . . . . . 48,49

State v. Devlin, 234 N.J. Super. 545 (App. Div.), certif.
    denied, 117 N.J. 653 (1989)   . . . . . . . . . . . . . 53

State v. DiPaglia, 64 N.J. 288 (1974)   . . . . . . . . . . 45

State v. Diaz, 308 N.J. Super. 504 (App. Div. 1998)   . . . . 38

State v. Doss, 310 N.J. Super. 450 (App. Div.), certif.
    denied, 155 N.J. 589 (1998)   . . . . . . . . . . . . . 53

State v. Dreher, 302 N.J. Super. 408 (App. Div.), certif.
    denied, 152 N.J. 10 (1997)   . . . . . . . . . . . . . 34

State v. Engel, 249 N.J. Super. 336 (App. Div.), certif.
    denied, 130 N.J. 393 (1991)   . . . . . . . . . . . . . 47

CASES (Cont'd)

State v. Foreshaw, 245 N.J. Super. 166 (App. Div.), certif.
    denied, 126 N.J. 327 (1991) . . . . . . . . . . . . . . 55

State v. Frost, 158 N.J. 76 (1999) . . . . . . . . . 41,42
                                                        44

State v. Gallagher, 286 N.J. Super. 1 (App. Div. 1995),
    certif. denied, 146 N.J. 569 (1996) . . . . . . . . . 51

State v. Ghertler, 114 N.J. 383 (1989) . . . . . . . . . 48

State v. Gorrell, 297 N.J. Super. 142 (App. Div. 1996) . . . 34

State v. Hightower, 120 N.J. 378 (1990) . . . . . . . 39,41

State v. Hodge, 95 N.J. 369 (1984) . . . . . . . . . . 48

State v. Irving, 114 N.J. 427 (1989) . . . . . . . . . . 42
                                                      44,46

State v. Jack, 144 N.J. 240 (1996) . . . . . . . . . 20,21
                                                        27

State v. Jarbath, 114 N.J. 394 (1989) . . . . . . . . . 52

State v. Johnson, 216 N.J. Super. 588 (App. Div. 1987) . 34,38

State v. Johnson, 274 N.J. Super. 137 (App. Div.), certif.
    denied, 138 N.J. 265 (1994) . . . . . . . . . . . . . 49

State v. Johnson, 31 N.J. 489 (1960) . . . . . . . . 44,45

State v. Kotter, 271 N.J. Super. 214 (App. Div.), certif.
    denied, 137 N.J. 313 (1994) . . . . . . . . . . . . . 48

State v. Marks, 201 N.J. Super. 514 (App. Div. 1985),
    certif. denied, 102 N.J. 393 (1986) . . . . . . . . . 45

State v. Marshall, 123 N.J. Super. 1 (1991), cert. denied,
    507 U.S. 929 (1993) . . . . . . . . . . . . . . . . 37,44

State v. Megargel, 143 N.J. 484 (1996) . . . . . . . . . 48

State v. Modell, 260 N.J. Super. 227 (App. Div. 1992),
    certif. denied, 133 N.J. 432 (1993) . . . . . . . . 34,39

State v. O'Donnell, 117 N.J. 210 (1989) . . . . . . . . . 48

CASES (Cont'd)

State v. Onque, 290 N.J. Super. 578 (App. Div.), certif.
    denied, 146 N.J. 497 (1996)  . . . . . . . . . . .   21,22
                                                         25,26
                                                         28

State v. Pennington, 119 N.J. 547 (1990)  . . . . . . . .  46

State v. Pickell, 136 N.J. Super. 340 (App. Div. 1975)  . . .  52

State v. R.G.D., 108 N.J. 1 (1987)  . . . . . . . . . .   20,21
                                                         22,25

State v. Ramseur, 106 N.J. 123 (1987)  . . . . . . . .   41,42

State v. Roach, 146 N.J. 208 cert. denied, 519 U.S. 117
   (1996)  . . . . . . . . . . . . . . . . . . . . . .   41

State v. Roth, 95 N.J. 334 (1984)  . . . . . . . . . .   22,48
                                                         55

State v. Rush, 278 N.J. Super. 44 (App. Div. 1994)  . . . . .  49

State v. Scherzer, 301 N.J. Super. 363 (App. Div.), certif.
    denied, 151 N.J. 466 (1997)  . . . . . . . . . . .   42,44

State v. Scott, 141 N.J. 457 (1996)  . . . . . . . . .   20,21
                                                         22,25
                                                         26,28

State v. Thompson, 59 N.J. 396 (1971)  . . . . . . . . .  34

State v. Timmendequas, 161 N.J. 515 (1999)  . . . . . .   41,42

State v. Winter, 96 N.J. 640 (1984)  . . . . . . . . .   38,47

State v. Yarbough, 100 N.J. 627 (1985), cert. denied, 475
   U.S. 1014 (1986)  . . . . . . . . . . . . . . . . .   55

United States v. Bergman, 416 F. Supp. 496 (S.D.N.Y. 1976)  .  52

STATUTES CITED

N.J.S.A. 2A:4A-26  . . . . . . . . . . . . . . . . . .   1,20
                                                         22,54

N.J.S.A. 2A:4A-26(a)(3)  . . . . . . . . . . . . . . .   21

N.J.S.A. 2C:2-6  . . . . . . . . . . . . . . . . . . .   1,40

## STATUTES (Cont'd)

N.J.S.A. 2C:11-3a(1) . . . . . . . . . . . . . . . . . . 2

N.J.S.A. 2C:11-3a(2) . . . . . . . . . . . . . . . . . . 2

N.J.S.A. 2C:11-3a(3) . . . . . . . . . . . . . . . . . 1,2

N.J.S.A. 2C:11-3b(1) . . . . . . . . . . . . . . . . . . 54

N.J.S.A. 2C:15-1 . . . . . . . . . . . . . . . . . . . 1,2

N.J.S.A. 2C:39-4a . . . . . . . . . . . . . . . . . . . . 2

N.J.S.A. 2C:39-5b . . . . . . . . . . . . . . . . . . . . 2

N.J.S.A. 2C:44-1a . . . . . . . . . . . . . . . . . . . 53

N.J.S.A. 2C:44-1a(1) . . . . . . . . . . . . . . . . . . 49

N.J.S.A. 2C:44-1a(9) . . . . . . . . . . . . . . . . . . 49

N.J.S.A. 2C:44-1b . . . . . . . . . . . . . . . . . . . 53

N.J.S.A. 2C:44-1b(7) . . . . . . . . . . . . . . . . . . 49

N.J.S.A. 2C:44-1b(11) . . . . . . . . . . . . . . . . . 53

N.J.S.A. 2C:44-1b(13) . . . . . . . . . . . . . . . . . 53

N.J.S.A. 2C:44-1b(11) . . . . . . . . . . . . . . . . . 53

N.J.S.A. 2C:44-5 . . . . . . . . . . . . . . . . . . . 55

## RULES CITED

N.J.R.E. 801(c) . . . . . . . . . . . . . . . . . . . . 34

N.J.R.E. 801[4] . . . . . . . . . . . . . . . . . . . . 37

N.J.R.E. 803(b)(2) . . . . . . . . . . . . . . . . . . 34

## OTHER SOURCES CITED

Cannel, Criminal Code Annotated, Comment 3 to
   N.J.S.A. 2C:44-1a(1) . . . . . . . . . . . . . . . . . . .   51

Biunno, Current N.J. Rules of Evidence, Comment 4 to
   N.J.R.E. 801[4]  . . . . . . . . . . . . . . . . . . . .   36

II John W. Strong, McCormick on Evidence § 249
   (4th ed. 1992)  . . . . . . . . . . . . . . . . . . . .   36,37

## COUNTER-STATEMENT OF PROCEDURAL HISTORY

On January 25, 1996, Union County Juvenile Delinquency Complaint No. FJ 20-01786-96-E was filed against defendant-appellant Marvin Mathis for acts which, if committed by an adult, would constitute the crime of armed robbery, contrary to N.J.S.A. 2C:15-1 and N.J.S.A. 2C:2-6, and felony murder, contrary to N.J.S.A. 2C:11-3a(3). (Da1).

On October 10 and November 11, 1996, the Honorable Rudolph N. Hawkins, Jr. J.S.C., considered via stipulation by the parties the State's motion to refer defendant to the Superior Court Criminal Division, pursuant to N.J.S.A. 2A:4A-26. Judge Hawkins determined that the State had met its burden in proving that there was probable cause to believe defendant had committed the acts charged in the complaint, and that defendant was over the statutory age of 14 when the acts were committed, and found that defendant had failed to meet his burden that he could be rehabilitated by the time he was 19 years of age. Thus, Judge Hawkins granted the State's motion to waive jurisdiction of the acts alleged in the juvenile complaint to adult court. (MT2-9 to 10; 2MT5-2 to 29-21).[1]

---

[1]    MT denotes waiver transcript of October 10, 1996.
     2MT denotes waiver transcript of November 11, 1996.
     3MT denotes motion to suppress transcript of June 9, 1998.
      1T denotes trial transcript of June 10, 1998.
      2T denotes trial transcript of June 11, 1998.
      3T denotes trial transcript of June 16, 1998.
      4T denotes trial transcript of June 17, 1998.
      5T denotes trial transcript of June 18, 1998.
      ST denotes sentencing transcript of August 14, 1998.

- 1 -

On February 4, 1997, a Union County Grand Jury returned
Indictment No. 97-02-00123 charging defendant in count one with
purposeful and/or knowing murder, contrary to N.J.S.A. 2C:11-
3a(1) and/or (2); in count two with first degree armed robbery,
contrary to N.J.S.A. 2C:15-1; in count three with felony murder,
contrary to N.J.S.A. 2C:11-3a(3); in count four with second
degree possession of a weapon, a firearm, for an unlawful
purpose, contrary to N.J.S.A. 2C:39-4a; and in count five with
third degree unlawful possession of a weapon, a firearm, contrary
to N.J.S.A. 2C:39-5b.   (Da2 to 5).   Defendant pled not guilty to
the indictment.

On June 9 and 10, 1998, the Honorable John F. Malone,
J.S.C., conducted a hearing on defendant's motion to suppress and
ruled that defendant's statements to police were knowing and
voluntary and would therefore be admissible at trial.   (3MT4-7 to
117-12; 1T14-6 to 17-4).

From June 10 to 18, 1998, defendant was tried by jury with
Judge Malone presiding.   On June 18, the jury returned its
verdicts, finding defendant guilty of serious bodily injury
murder under count one, and of all the remaining counts in the
indictment.   (5T82-22 to 83-25).

On August 14, 1998, after merging the felony murder and
possession of a weapon for an unlawful purpose convictions under
counts three and four into the murder conviction under count one,
Judge Malone sentenced defendant on count one to the custody of
the Commissioner of the Department of Corrections to a term of 50

- 2 -

years imprisonment with a 30 year parole ineligibility period, to a concurrent 18 year term with a six year parole ineligibility period on the armed robbery count, and to a concurrent four year term with an 18 month parole ineligibility period on the unlawful possession of a weapon count.  Also imposed was a total $250 Victims of Crime Compensation Board penalty and a total $225 Safe Neighborhood Services Fund assessment.  (ST10-18 to 11-15; Da6 to 7).

By Order of this Court filed on March 15, 1999, defendant was permitted to file his Notice of Appeal nunc pro tunc on February 24, 1999.  (Da8; Da9).

- 3 -

## COUNTER-STATEMENT OF FACTS

On January 22, 1996, 15-year old defendant Marvin Mathis and his 20-year old friend, Antwan Harvey, were visiting Migdalia Hernandez and her live-in boyfriend, Stephen Owens, at 224 Third Street, Apartment 6, in Elizabeth.  Seventeen-year old April Diggs and her 22-year old cousin Renee Diggs were also visiting the Hernandez household.  (2T166-8 to 23; 2T167-25 to 168-2; 2T177-5 to 6; 2T178-2 to 3; 3T42-15 to 44-7).  April and Renee decided to get something to eat at the Chinese Restaurant across the street.  (2T44-8 to 13).  Defendant and Harvey agreed to join them.  (2T180-21 to 22; 3T44-17 to 20).  As the group of four was leaving the apartment, Hernandez observed defendant and Harvey each carrying a ski mask and overheard one of the four say that they had a gun.  (2T168-6 to 12; 2T169-20 to 170-12).  Both Renee and Harvey had their coats on inside out to camouflage their appearance; April was wearing pink Reeboks.  (2T189-23 to 191-7; 3T46-8 to 23).

After leaving the restaurant, the four friends walked down Elizabeth Avenue.  (2T180-23 to 181-4; 3T45-21 to 25).  When they reached Seventh Street, Harvey announced that he wanted to "rob somebody" and that he wanted April, Renee and defendant to be lookouts.  (2T181-9 to 16; 3T46-24 to 47-6).  None of the three responded, they all just kept walking with Harvey.  (2T181-17 to 22).  When they came upon two Spanish guys Harvey and defendant chased them.  However, the young men outran defendants so they discounted their pursuit.  (3T47-16 to 25).

- 4 -

As the group proceeded to East Jersey Street Harvey announced that he wanted to "bust someone" which meant that he wanted to shoot somebody. (2T183-9 to 11). Defendant said he "would do it also" so Harvey gave defendant the gun. (2T181-23 to 182-15). Taking possession of the gun, defendant said, "Yeah, oh yes, oh yeah it's on" meaning he was going to "rob someone." (3T54-3 to 14).

Some two to three minutes later, the group observed a man putting out garbage cans. (2T183-16 to 23; 3T49-16 to 18). Antonio Saraiva, who owned the Portuguese American Wine and Liquor Store at 709 East Jersey Street, had just closed up shop at 10:00 p.m. and was putting out the garbage. His wife and two daughters were inside the store. (1T42-2 to 43-12).

Defendant started walking towards the man saying, "That one right there." (3T49-22 to 50-2). Defendant and Harvey ran up to the victim. Saraiva grabbed defendant by the jacket and defendant shot him, firing the gun twice. Saraiva fell to the ground. (2T183-21 to 184-25; 3T50-25 to 51-2).

April turned towards her cousin and asked Renee "did Marvin shoot that man?" Renee responded "yes." (2T185-2 to 5). April asked where the victim had gotten shot and Renee told her in the chest; however, April told Renee that based on the way the victim had fallen, it looked like he had gotten shot in the head. (2T185-5 to 7). The four perpetrators fled from the scene, returning to Hernandez's apartment an hour from when they had first left. (2T168-18 to 169-19; 2T185-10 to 16; 2T187-5 to 11;

- 5 -

3T51-3 to 10; 3T52-16 to 23).

Saraiva's wife heard shots and went to check on her husband.
(1T43-13 to 20).  When she saw him laying on the ground "full of
blood" she told her daughters to call an ambulance.  (1T43-22 to
23).  Their younger daughter, Suzana, joined her mother and her
unconscious father outside to await the arrival of the ambulance.
(1T44-7 to 10).

When the four cohorts had returned to Hernandez's house,
April asked defendant why he had shot the man.  Defendant
explained that he had done it because the man had grabbed him.
(2T187-14 to 16).  Defendant and Harvey told April and Renee not
to tell anyone about the shooting.  (3T53-1 to 3).

Meanwhile, Patrolman Gene Antonucci, Jr. was dispatched to
the scene.  (1T49-16 to 50-1).  When he arrived, he observed the
victim laying on the ground bleeding from the head with one of
the victim's daughters and a neighbor, Andre Fisher,
administering cardio pulmonary resuscitation.  (1T50-3 to 51-18).
The ambulance and other police personal, including Detective
Thomas Koczur, arrived soon after.  Police searched the area for
spent bullets, casings and other items of evidential value but
found nothing.  (1T51-12 to 15; 1T55-1 to 2; 1T59-29 to 60-25).
The victim's wallet was found several blocks away on Park Street.
(1T60-21 to 61-8; 2T84-8 to 10).  While Koczur was interviewing
the victim's family, Saraiva was transported to Elizabeth General
Hospital where he was pronounced dead.  (1T4-4 to 22; 1T44-13 to
16; 1T51-4 to 8).

- 6 -

Dr. Graciela Linares performed an autopsy on the victim. He determined that the victim had a bullet wound to the head with the entrance wound next to the left eye near the nose and lower eyelid and the exit wound in the back of the head. (3T26-4 to 8; 3T27-7 to 11). The victim also had powder deposits on the skin which indicated that the gun was fired from no more than 18 inches away. (3T26-10 to 20). Linares concluded that the cause of death was a bullet wound to the head involving the brain. (3T34-1 to 2). Based on the nature of the wounds, Linares opined that the victim died within a few minutes of being shot because the bullet entered the brain, causing it to swell and then herniate. (3T31-15 to 18).

Continuing the investigation, Detective Koczur arrested both Jameel Miller and Green for the murder. (2T4-25 to 5-11). Meanwhile, defendant's girlfriend, 15-year old Sharlama Brooks, saw defendant at school the day after the shooting. (1T65-6 to 66-5). Defendant told her that if anyone approached her to tell them that he was with her between 7:00 p.m. and 11:00 p.m. on Monday, which was the evening of the murder. (1T66-6 to 12). Knowing this to be false and not knowing why defendant wanted her to lie for him, Brooks refused to go along with defendant's request. (1T66-13 to 20). Brooks questioned defendant about why he wanted her to lie for him but defendant would not reveal anything to her. He told her that she would "black out" or get mad if she knew so Brooks just left the matter alone. (1T66-25 to 67-7).

- 7 -

On her way home from the fish market that evening, Brooks was approached by four to five guys. One pushed her against the wall in the hallway of her apartment and asked if she knew defendant; she responded that she did. (1T67-8 to 13; 1T74-1 to 8). The guy then told her, "You know he killed someone." (1T74-8 to 9). He then explained that his cousin had been there at the wrong time and that he was arrested. The guy also told Brooks that if she saw her boyfriend again to tell him that the group was out to get him. (1T74-9 to 12).

Brooks saw defendant the next day at school. She told him about her encounter with the group of guys and that they had said he had killed someone. (1T74-13 to 25). At first defendant denied the accusation. (1T75-6 to 10). However, as Brooks and defendant walked out of the cafeteria and stopped in front of the guidance counselor's office, defendant confessed. He told Brooks that "they were struggling when the man was taking out the garbage and the gun went off, but it was by mistake." (1T75-2 to 5). He explained that he and his friends were walking and that he went to grab the victim and as soon as he did the gun went off. (1T76-24 to 77-2).

When Brooks heard this confession she got scared and began to cry. She went to her first period class but was so upset that she had to leave the room. (1T77-2 to 6; 1T77-25 to 78-2). She came in contact with the security guard who took Brooks to Janice Sutton, the substance abuse counselor. (1T77-7 to 19; 3T19-1 to 17). Sutton asked Brooks what was wrong. After taking several

- 8 -

minutes to calm down, Brooks told the counselor it had to do with
her boyfriend.  (1T19-18 to 20-1).  She then told Sutton that her
boyfriend, "Marvin," had been involved in a murder. (1T78-12 to
79-7; 3T20-6 to 7; 3T20-25 to 21-3).  Sutton immediately
contacted the principal and Brooks repeated her story to him.
(1T20-7 to 8).  Brooks was taken to police headquarters by the
undercover officer who patrolled her school.  (1T79-9 to 14).

Detective Koczur interviewed Brooks and took a statement
from her.  (2T24 to 6-19; Da41 to 47).  As a result of her
statement in which she implicated defendant, the charges against
Miller and Green were dropped and the focus of the investigation
turned to defendant.  (2T4-25 to 5-20; 2T6-20 to 24).

Defendant was brought to headquarters at 11:15 a.m. that
same day.  He was not handcuffed nor had he been arrested.  (2T7-
22 to 8-4).  Once in the conference room Koczur told defendant
that he was the principal suspect in the victim's murder but that
because he was a minor, he should not speak until his parent was
present.  (2T8-6 to 15).  Defendant identified his mother, Linda
Mathis, as the person to be contacted and she was brought in to
headquarters.  (2T8-16 to 9-10).

Koczur advised Mrs. Mathis that defendant was a potential
suspect in the homicide occurring at 709 East Jersey Street.
Defendant's mother was familiar with the murder and was very
cooperative.  (2T9-11 to 20).  She and Koczur then entered the
conference room where defendant, along with Detective Lieutenant
Gary Lewis and Detective John Furda, were waiting.  (2T10-15 to

- 9 -

11-6).  With his mother at his right side, defendant voluntarily
and knowingly agreed to waive his rights and give a statement.
(2T11-7 to 14-10).  Mrs. Mathis consented to the waiver and both
signed the waiver form.  (2T14-13 to 16-2).

Defendant first gave an oral statement in which he denied
his involvement and claimed he was with his girlfriend Brooks.
(2T16-12 to 17-13).  Koczur advised defendant that Brooks had
given a statement indicating that he was not with her at the time
of the murder.  (2T17-23 to 24).  Defendant became angry and
accused Brooks of lying.  (2T17-25 to 18-1).  When, after
defendant's statement, the detectives as well as his mother
pointed out the various inconsistencies in his statement,
defendant again became angry.  He then asked to have his mother
leave the room.  (2T18-3 to 16).

Once she was gone, defendant admitted that he was present at
the scene of the murder.  He stated that he was walking with a
man named Antwan, that a scuffle broke out and a man was shot.
(2T19-5 to 7).  Mrs. Mathis returned to the room and defendant
again admitted his involvement in the murder.  (2T19-8 to 20-2).
In this second oral statement, defendant only mentioned Harvey
and a man named "Boz" as being involved in the murder; he did not
bring up April or Renee Diggs.  (2T20-9 to 21-5).

Defendant then gave the following written statement:  that
he was with his friend, Antwan, who tried to get him (defendant)
to hold the gun but he refused; that Antwan approached a man who
owned a liquor store and ordered him to empty his pockets; that

- 10 -

the man refused so Antwan tried going into the man's pockets and
the two began fighting; that after each threw a punch, Antwan
pushed the man then shot him and the man fell; that Antwan fired
the gun two times aiming at the man's chest, but the first shot
missed; and that Antwan removed the victim's wallet after the
shooting and threw it on the ground when he fled.  (2T28-15 to
36-2).  Defendant claimed that he did not think Antwan was going
to rob anyone, and that when he spoke to him after the shooting,
he warned defendant not to tell anyone about it or he would kill
him.  (2T38-16 to 39-25).  At the conclusion of the statement,
defendant signed it.

Koczur then told defendant that he did not believe
defendant's statement was true.  He explained that a lot of it
made no sense, especially in relation to Brooks' statement.
(2T50-6 to 9; 2T51-10 to 12).  Defendant then indicated that he
would tell the truth.  (2T51-13 to 17).  After being readvised of
his rights and waiving them, defendant gave a second written
statement.  (2T52-2 to 10; 2T53-18 to 54-20; 2T55-4 to 5).

Defendant stated that he met Antwan that evening around 8:00
p.m. at the corner of Third and Bond Streets where they met up
with April and Renee Diggs at the Chinese store and they
discussed going to Elizabeth Avenue to do a robbery.  Antwan had
a gun which he showed to defendant and he, defendant, was looking
for someone to rob because he wanted "to know how it felt."
Antwan suggested robbing a gas station attendant and then a man
working at a delicatessen but defendant rejected both

- 11 -

suggestions.  They chased two Spanish guys but were outrun by them.  When the four reached East Jersey Street Antwan told him he was going to rob the guy there and he wanted defendant and the Diggs cousins to look out for police.  He and Antwan walked up to the victim, Antwan grabbed him and tried going through his pockets but the victim slapped away Antwan's hand.  Antwan grabbed the victim who then grabbed and punched at Antwan. Antwan returned the punch then pushed the man off him, took out his gun and shot the victim.  (2T55-19 to 64-12).  Defendant explained that Antwan went through the victim's pockets but he, defendant, did not touch the man.  (2T64-17 to 21).  Defendant denied helping Harvey but stated that the gun went off when all three were struggling with the gun, and that the gun was pointed at the victim's forehead when it went off and was one to two feet away.  (2T65-7 to 20).  Defendant further stated that there were two shots but one missed, and that shell casings came out when the gun was fired.  (2T65-21 to 66-5).  Defendant admitted that all four of them, he, Harvey, and April and Renee Diggs, committed the robbery and that there was no person named "Boz" involved in the murder.  (2T66-19 to 24; 2T72-22 to 73-5).

After giving the second written statement, defendant identified each of his cohorts from a photographic lineup.  He also confirmed that during the robbery April was wearing pink Reeboks, and that Renee wore her jacket inside out.  (2T70-16 to 74-5).  Defendant signed his statement and was arrested for the victim's murder.  (2T74-17 to 75-19).

- 12 -

The following day, Harvey, April Diggs, and Renee Diggs were arrested and each gave statements to police.[2]  (2T75-24 to 76-11; 2T80-10 to 82-5; 2T160-1 to 15; 2T163-13 to 19; 2T178-8 to 12; 3T51-24 to 25; Da48 to 53; Da54 to 72).  Police also seized the black ski masks from Hernandez's apartment.  (2T78-8 to 18).[3]  It was determined that defendant was never given a permit to possess or own a gun.  (2T80-1 to 5).

Defendant presented several witnesses in his behalf who testified to defendant's reputation for truthfulness.  (3T91-16 to 93-15; 3T97-22 to 102-24).  He also presented April Diggs' social worker, Herminia Garcia, who testified that April had told her that Renee and defendant were present at the shooting but that neither had done anything; rather, April identified a fourth individual, whose name Garcia could not recall, as the shooter. (3T110-11 to 111-22).  On cross-examination, however, Garcia admitted that she had not made a written report of the discussion with April Diggs.  (3T112-15 to 17).  She also admitted that although she assigned herself to be defendant's intake worker,

---

[2]   April Diggs was charged as a juvenile for robbery and murder but was waived up to adult court where she pled guilty to armed robbery.  She agreed to testify truthfully against defendant and Harvey in exchange for a sentence recommendation of 15 years with a five year parole ineligibility period.  (2T178-8 to 179-9).  Renee Diggs pled guilty to armed robbery with a recommended sentence of a 15 year term with a five year parole disqualifier if she testified against defendant and Harvey. (3T51-14 to 23).

[3]   A gun was later recovered from the crawl space of Harvey's apartment.  However, because no bullets or casings were ever found, it could not be determined if the gun was the one used in the murder.  (2T79-5 to 25; 2T160-20 to 161-20).

- 13 -

she never bothered to mention this exculpatory statement to him. (3T119-14 to 124-1).

Damina Arcos testified that she had met April Diggs in the Union County jail and that in discussing her case, April had told her that Harvey had shot the liquor store owner. April had also mentioned that Renee was involved in the murder but never mentioned defendant. (3T140-25 to 141-18). Defendant's mother testified and denied that defendant had admitted his involvement in the robbery when giving his statement to police. (4T154-15 to 149-24).

Defendant took the stand on his own behalf. He claimed that initially he was unaware of Harvey's intentions to rob anyone but figured it out when Harvey had the Diggs cousins reporting to him those persons who appeared to be likely robbery victims. (3T133-2 to 17). He realized Harvey had a gun when they crossed Elizabeth Avenue and he pulled it out, "acting crazy," showing it off. This frightened defendant causing him not to leave the group. (3T134-18 to 135-4). Defendant denied that Harvey gave him the gun while they were walking. (3T136-1 to 3). Defendant claimed that upon Harvey noticing a man taking out garbage, Harvey asked defendant, April and Renee to be lookouts. Defendant told Harvey "no" but when Harvey repeated his request, defendant became frightened so he went across the street by the Chinese store; however, he denied he was acting as a lookout. (3T136-10 to 23). Defendant testified, consistent with his second written statement to police, that Harvey approached the

- 14 -

victim, that the two fought, that Harvey pulled out the gun and while they were struggling over it the gun went off. Defendant claimed that during the struggle he grabbed Harvey's arm to prevent him from shooting the victim but the gun went off. (3T139-2 to 140-17). Defendant also denied that he ever asked his girlfriend Brooks to lie for him. (3T142-25 to 143-21). Defendant claimed he gave a false statement implicating "Boz" because he was scared and confused. (3T150-13 to 151-23). He admitted giving the second statement and initialing it, but claimed that he never told police that he helped in any way with the robbery. (3T154-18 to 157-7). Defendant denied ever shooting anyone on the night of the incident, denied possessing the gun, and denied helping or being a lookout for Harvey or anyone else to commit a robbery. (3T140-25 to 141-5; 3T142-3 to 10; 3T157-8 to 18). On cross-examination, defendant admitted that his first written statement was a lie, and that his second written statement was true. (4T12-24 to 13-1).

Convicted of murder, felony murder, armed robbery, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon, defendant now appeals.

- 15 -

LEGAL ARGUMENT

POINT I

THE FAMILY COURT PROPERLY EXERCISED
ITS LIMITED DISCRETION IN WAIVING
DEFENDANT, A CHART 1 OFFENDER, TO
ADULT COURT.

Defendant contends that the family court abused its
discretion in waiving jurisdiction to adult court.  Specifically,
defendant argues that given his young age of 15 at the time of
the offense, his low intellect and the circumstances of this
case, his rehabilitation by age 19 was probable. (Db17).  The
State submits the seriousness of the offense, the absence of
evidence that defendant could be rehabilitated prior to reaching
age 19, and the strong need for deterrence weighed heavily in
favor of waiver.  Because the judge's waiver determination was
based on these factors and thus grounded in competent, credible
evidence, it should not be disturbed on appeal.

On November 11, 1996, Judge Hawkins began the juvenile
waiver hearing by noting that the case had been submitted via
stipulation with the parties having submitted their respective
psychologist reports along with the police reports and various
statements involved in the case.  (2MT2-13 to 3-1).  Before
making his ruling, however, he gave counsel the opportunity to be
heard with regard to their positions on the issue of waiver.
(2MT3-2 to 5).

Defense counsel argued that the psychologist report
submitted on behalf of the State by Dr. Louis Schlesinger focused
too heavily on defendant's involvement in the offense and his

- 16 -

lack of remorse.  (2MT5-2 to 14).  He noted that Schlesinger failed to distinguish between defendant believing he had done no wrong, and his failing to admit to a stranger, Schlesinger, that he had done anything wrong.  (2MT5-14 to 17).  While acknowledging that Schlesinger had recognized defendant's borderline intelligence and history of several learning disabilities and that this was an isolated incident, defense counsel nonetheless argued that Schlesinger had not given enough weight to these factors and to defendant's lack of a prior criminal record.  (2MT6-8 to 23).  He claimed that because the report submitted by Dr. Cheryl Thompson, one of the defense psychologists, was corroborated in its findings regarding defendant being polite, respectful and cooperative, her report should be given more weight than that of Schlesinger.  (2MT6-24 to 8-5).

Defense counsel acknowledged that this was a serious Chart 1 offense but maintained that it was not committed in a heinous manner because there was only one shot that hit the victim.  He argued that given defendant's limited intelligence, his minor role in the shooting, and the lack of heinousness regarding the offense, there was a probability that defendant could be rehabilitated by the age of 19.  (2MT8-1 to 9-19).

The prosecution emphasized that defense counsel's argument as well as the psychologist reports submitted on defendant's behalf, particularly the one submitted by Dr. Martha Page, overlooked the seriousness and callousness of the offense.  He

- 17 -

stressed that the three codefendants who were also eyewitnesses
to the shooting identified defendant as the shooter and all
indicated that defendant shot the victim intentionally in the
face just below the eyelid so that he could escape.   (2MT9-22 to
15-24).   The prosecutor stressed Schlesinger's finding that
defendant was in the early stages of developing a personality
disorder with impulsive and antisocial traits.   Also telling were
Schlesinger's findings that defendant did not take responsibility
for his actions and the only remorse he felt was for himself.
(2MT17-12 to 19-4).   Consequently, the prosecutor argued that
defendant had not met his burden of proving that defendant could
be rehabilitated by the age of 19.   (2MT19-5 to 10).

Judge Hawkins then made his ruling.   First, he found that
the State had met its burden of proof regarding waiver:
defendant was 15 years old at the time he committed the offense,
and there was probable cause to believe that defendant had
committed the acts that would constitute murder.   (2MT20-5 to 21-
6).

Turning to Phase II of the waiver hearing, the juvenile
judge stressed that the burden now shifted to defendant to make a
two-fold showing:   1) that there was a probability of
rehabilitation within the juvenile justice system before reaching
the age of 19, and 2) that such rehabilitation substantially
outweighed the reasons for waiver.   (2MT21-7 to 22-5).

He then pointed out that he considered the time defendant
had available to be rehabilitated and concluded that he had two

- 18 -

years and five months.  (2MT22-20 to 23-9).  Judge Hawkins noted that while defendant had no substantial history of delinquency, defendant "must be seen through the psychologists' eyes in order to see the type of person that he is."  (2MT23-10 to 24-1).  In this regard he noted that the reports classified defendant as a follower, which led to the instant offense, and as having borderline intelligence.  (2MT24-2 to 12).  The juvenile judge pointed out that "this follower" went out intending to rob someone, anyone, took a gun and blew the victim's brains out and then tried to concoct a story to establish an alibi.  (2MT24-13 to 25-11).  He found that the crime was "completely without sense" because they did not even take the victim's wallet. (2MT25-12 to 23).

Thus, in looking at the facts of the case, the fact that defendant was classified as a follower, that he has an inability to make his own decisions, and that he possessed a borderline acumen, the judge found that defendant lacked the ability to make good decisions on his own.  (2MT25-24 to 26-25).  He found that the two years, five months defendant had available for rehabilitation was not long enough to "bring defendant into the mainstream when he had 16 years of one way of doing it."  (2MT27-4 to 15).

Even assuming, arguendo, that defendant could be rehabilitated in this amount of time, the judge emphasized that he must still consider whether the probability of rehabilitation substantially outweighed the need to deter.  Judge Hawkins found

- 19 -

the need for a <u>strong</u> message that this type of "dastardly deed"
cannot be tolerated and needs to be deterred.  (2MT27-16 to 28-
25).  Having weighed all of the psychologist reports and other
material submitted by the parties along with having considered
the offense and circumstances surrounding it, the juvenile judge
determined that defendant could not be rehabilitated by the age
19.  (2MT29-1 to 12).  Although finding, as a result of the
above, that he did not need to decide if the probability of
rehabilitation outweighed the reasons for waiver, Judge Hawkins
nonetheless concluded that in this case there is a need to deter
defendant and others because "this was the most wanton
inexcusable act" that he had seen in his entire 11 years on the
bench.  (2MT29-13 to 19).  Accordingly, the judge granted the
State's motion to waive jurisdiction.  This decision was a valid
exercise of discretion.

   <u>N.J.S.A.</u> 2A:4A-26 of the New Jersey Code of Juvenile Justice
creates a presumption that the Family Part shall transfer
jurisdiction of a juvenile aged fourteen or over to an adult
court and prosecuting authority if it finds probable cause to
believe that the juvenile has committed any of certain enumerated
serious offenses, which have been designated "Chart 1" offenses.
<u>State v. Jack</u>, 144 <u>N.J.</u> 240, 246 (1996); <u>State v. Scott</u>, 141 <u>N.J.</u>
457, 463-64 (1996); <u>State v. R.G.D.</u>, 108 <u>N.J.</u> 1, 12 (1987).
There is no question that a criminal homicide is a Chart 1
offense.  <u>R.G.D.</u>, 108 <u>N.J.</u> at 10, n. 2.  "Once it is established
by the prosecution that a juvenile is fourteen years of age or

- 20 -

older at the time of the commission of the alleged offense and that there is probable cause to believe the juvenile committed the offense in question, 'no additional showing is required in order for waiver to occur.'" Scott, 141 N.J. at 463, quoting R.G.D., 108 N.J. at 11.  The presumption of waiver can be overcome, however, if the juvenile can show that there is a probability that he can be rehabilitated prior to reaching the age of nineteen and that the probability of rehabilitation substantially outweighs the reasons for waiver.  Jack, 144 N.J. at 246; Scott, 141 N.J. at 464; State in the Interest of S.M., 211 N.J. Super. 675, 681 (App. Div. 1986); N.J.S.A. 2A:4A-26(a)(3).

If the juvenile establishes the probability of rehabilitation, then the court must balance "the need for deterrence against the prospects of rehabilitation." Scott, 141 N.J. at 464; State v. Onque, 290 N.J. Super. 578, 584-86 (App. Div.), certif. denied, 146 N.J. 497 (1996); State in the Interest of B.G., 247 N.J. Super. 403, 423 (App. Div. 1991); State in the Interest of A.J., 232 N.J. Super. 274, 292 (App. Div. 1989). General deterrence is the paramount factor to be considered in the waiver consideration; rehabilitation is the "second goal." Onque, 290 N.J. Super. at 585.

With respect to Chart 1 offenders, the Code has curtailed the range of discretion available to Family Part judges when making the waiver decision.  State in the Interest of A.B., 109 N.J. 195, 199 (1988); Onque, 290 N.J. Super. at 586.  Indeed,

- 21 -

juveniles charged with the more serious crimes set forth in N.J.S.A. 2A:4A-26, which unquestionably includes homicide, are the primary candidates for waiver to adult courts because the statute has created a "presumption" of waiver for such juveniles. Scott, 114 N.J. at 463, citing R.G.D., 108 N.J. at 12; State in the Interest of A.J., 232 N.J. Super. at 292.  In fact, the Legislature has "tilt[ed]" the "evidential axis" of the balancing equation "heavily ... in favor of waiver." Onque, 290 N.J. Super. at 585; see R.G.D., 108 N.J. at 12.

A trial judge's determination that waiver to adult court is warranted is a discretionary one which will not be disturbed absent an abuse of that discretion. Onque, 290 N.J. Super. at 584.  When reviewing the lower court's determination, an appellate court should apply the same principles that are used to determine whether the trial court has abused its sentencing discretion.  Ibid; see State v. Roth, 95 N.J. 334, 363-64 (1984). If the trial court has applied the correct legal principles, has considered appropriate factors, and the judge's exercise of discretion did not constitute a "clear error of judgment" considering all relevant circumstances, the appellate court should not interfere.  Scott, 141 N.J. at 467; Onque, 290 N.J. Super. at 584.

When the instant record is reviewed, there is simply no doubt that the lower court did not abuse its discretion in waiving defendant to adult court.  Indeed, as a Chart 1 offender, defendant's burden in overcoming the strong presumption in favor

- 22 -

of waiver is a heavy one.  Here, defendant simply could not meet his burden.  In point of fact, defendant could not even meet the first prong of the two-fold test to establish that there was a probability of rehabilitation.

Indeed, Judge Hawkins had before him a "follower" with low intelligence who stood on the periphery of developing a personality disorder with impulsive and antisocial traits.  The judge properly recognized that based on the psychologist reports and defendant's low academic acumen that defendant lacked the ability to make good decisions on his own.  In fact defendant's own psychologist, Dr. Thompson, found that he "could be easily persuaded by more successful anti-social characters to become involved with" and that he lacked the "ability to judge the social appropriateness of the group" with which he was involved. (Da12; Da13).  Further, according to the reports of Thompson and Page, the only way defendant could thrive would be if he were in a nurturing structured environment.  (Da13; Da23).  Absence such structure, defendant would be lost.  With his own psychologists admitting that defendant, having borderline intelligence, lacks good judgment in choosing his peers and would have trouble thriving outside of an unstructured environment, it is evident that he would not have the ability to choose the proper friends or the types of social activities that would be appropriate. Thus, as Judge Hawkins aptly reasoned, given that defendant had lived as a follower for some 16 years, 7 months, that he possessed low intelligence, an inability to make good independent

- 23 -

decisions and was facing the onset of an impulsive antisocial personality disorder, prospects for rehabilitation are clearly lacking. Defendant has surely failed to prove that he could be rehabilitated by age 19.

Moreover, defendant continued to minimize his responsibility for his part in the murder. Defendant downplayed his role to his own psychologist when he claimed that although he knew a robbery would occur he was unaware that _this_ particular robbery would occur; that in leaving the scene he ran more slowly than two of the codefendants; and that he tried to intervene in the shooting to prevent its occurrence. (Da10 to 11). Even in the face of his three compatriots identifying him as the shooter, defendant maintained that they were wrong and that he had not been the one who fired the gun. Schlesinger, however, stated that the first step to rehabilitation is to admit there is a problem which defendant had not done in this case. (Da38). And, although defendant claimed he "felt bad about a lot of stuff," (Da36), the issues to which he referred mainly pertained to his own plight regarding his criminal status. (_Ibid_). The reports show that often when confronted with a question requiring him to justify and explain his actions of that night, defendant would express that he was confused, or that he "couldn't explain" or that he just "d[id]n't know." (Da24 to 39). Such inability to explain his actions suggests that he had not fully appreciated what he had done and was not accepting responsibility for his conduct.

In fact Thompson found that defendnat "did not seem to have

- 24 -

a full picture of the seriousness of his judicial position" and "appears quite confused about his involvement in such a serious event." (Da10; Da13). With his own psychologist acknowledging that he has not fully appreciated his role in the offense, defendant cannot possibly establish that he is even in a position to be rehabilitated by age 19. Not only has defendnat failed to admit that there is a problem, he has not even realized the severity of his involvement in the offense to begin the process of turning his life around.

Further, in addition to ruling that defendant had not met the first prong of the test for non-waiver, Judge Hawkins correctly found that defendant also failed to satisfy the second prong of the test. Defendant was unable to prove that the probability of rehabilitation substantially outweighed the reasons for waiver. Onque, 290 N.J. Super. at 582.

With regard to the second prong, the statute requires a balancing of "the need for deterrence against the prospects of rehabilitation." Scott, 141 N.J. at 464, quoting State in the Interest of C.A.H. and B.A.R., 89 N.J. 326, 343 (1982). Rehabilitation or specific deterrence, which are "essentially the same thing," is the "second goal" of the juvenile waiver scheme, while general deterrence is the "paramount factor." Onque, 290 N.J. Super. at 585-86; see Scott, 141 N.J. at 471 (deterrence is "central" to the balancing between rehabilitation and the reasons for waiver); R.G.D., 108 N.J. at 11-12. Put differently, because an individual who can be rehabilitated by age 19 does not need to

be individually deterred beyond that date, the Legislature has deemed general deterrence, rather than rehabilitation, as the more valuable tool in preventing crime. Onque, 290 N.J. Super. at 585. In fact, the Supreme Court of New Jersey has stated that general deterrence is an important factor to be considered when punishing offenders because the harsher sentences mandated after conviction in adult court "will be a vicarious penal lesson to other similarly disposed persons," and "will serve to prevent future crime by the particular individual involved as well as by others." State in the Interest of C.A.H. & B.A.R., 89 N.J. at 334-35; see Scott, 141 N.J. at 472; Onque, 290 N.J. Super. at 585-86. Thus, the closeness of the juvenile's age to 18, his calculated behavior in the criminal episode under consideration and the gravity of the crime will "strongly impel a need for deterrence" and waiver. Onque, 290 N.J. Super. at 586, quoting State in the Interest of C.A.H. & B.A.R., 89 N.J. at 338.

In this case, defendant had a mere two years and 5 months to be rehabilitated. Judge Hawkins found this time frame to be too short to undo what defendant had learned in his 16 years and 7 months of life. Indeed, although knowing that his "friends" intended to rob someone that night, defendant exhibited poor judgment in following them and agreeing to commit a robbery simply to "see how it felt." This robbery was completely senseless, as it was not done for money or revenge or the like. It was simply for the experience. As Judge Hawkins properly found the shooting was a most "dastardly deed."

- 26 -

Thus, Judge Hawkins correctly found that it was important that society, particularly juveniles, receive a clear message from defendant's crime -- that committing such a callous and wanton act of murdering someone just to "see how it felt" would be severely punished.  And, whether defendant likes it or not, the offense he committed, criminal homicide, has been deemed a serious offense by the Legislature and specifically enumerated as a Chart 1 offense, which carries the presumption of waiver, not retention in the juvenile system.  Jack, 144 N.J. at 246.  When the record of the waiver hearing is reviewed as a whole, it is clearly devoid of an abuse of judicial discretion.

Given defendant's low intelligence and the fact that he is a follower who lacks the ability to make good judgments on his own underscores that defendant cannot be rehabilitated.  Moreover, because of the strong need for general deterrence, and because he was charged with the most serious of all offenses, murder, there is no question that the trial judge correctly waived jurisdiction.

In sum, the State submits that the lower court's determination that defendant, a Chart 1 offender, did not overcome the presumption in favor of waiver was not an abuse of discretion and should not be disturbed on appeal.  In fact, the trial court applied the correct legal principles, considered all appropriate factors and, in the end, properly concluded that defendant had not established the probability of his rehabilitation before the age of 19, and that "any prospect for

- 27 -

rehabilitation that exists," is substantially outweighed by the reasons for waiver. <u>Scott</u>, 141 <u>N.J.</u> at 467; <u>Onque</u>, 290 <u>N.J.</u> <u>Super.</u> at 584. Accordingly, the trial court's ruling to waive defendant to adult court and his subsequent convictions should be affirmed.

POINT II

BECAUSE SHARLAMA BROOKS' TESTIMONY
THAT SHE WAS APPROACHED BY A MALE
WHO TOLD HER THAT DEFENDANT HAD
"KILLED SOMEONE" WAS ADMITTED AS AN
ADOPTIVE ADMISSION AND FOR THE
LIMITED PURPOSE OF EXPLAINING
BROOKS' ACTIONS IN CONFRONTING
DEFENDANT THE DAY AFTER THE MURDER,
THE STATEMENT WAS NOT HEARSAY AND
THEREFORE DEFENDANT WAS NOT DENIED
HIS RIGHT TO DUE PROCESS.

Defendant claims that the trial court erred in admitting
into evidence the statement of defendant's girlfriend, Sharlama
Brooks, that she was confronted by a man who told her that
defendant had "killed someone." Defendant argues that this
statement was inadmissible hearsay not falling within any
exception and that its admission deprived him of a fair trial.
The State submits this statement was not offered to prove the
truth of the matter asserted. Rather, it was admitted with a
limiting instruction as an adoptive admission and to explain why
Brooks confronted defendant about the murder the following day.
Furthermore, given the fleeting nature of this testimony as well
as the overwhelming evidence of defendant's guilt, any possible
prejudice from this testimony was clearly harmless beyond a
reasonable doubt. Thus, defendant is not entitled to a reversal
of his justly secured convictions.

To understand just how inconsequential and fleeting this
testimony was some background information is necessary. The
issue as to how this testimony came to be admitted arose while
Brooks was testifying about how she had learned of defendant's

- 29 -

involvement in the murder.  During his direct examination of
Brooks, the prosecutor asked her questions about her encounter
with defendant at school on January 23, 1996, which was the day
after the murder.  Brooks testified that when she saw defendant
that day he inexplicably told her that if anyone approached her,
to tell them he was with her between 7:00 p.m. to 11:00 p.m. on
Monday which was the day of the murder.  (1T66-3 to 12).  Knowing
this was not true, Brooks told defendant "no" because she did not
know the reason she would be lying for him, and did not know what
was going on at all.  (1T66-18 to 20).  When she asked defendant
the reason he wanted her to lie, defendant merely turned away
from Brooks and said if he told her that she would "black out,"
meaning get mad at her.  Brooks then abandoned the subject.
(1T66-25 to 67-7).

Continuing in her testimony, Brooks established that on that
evening, as she entered her apartment building, she was
approached in the hallway by four to five guys, one of whom put
her against the wall.  (1T67-8 to 13).  When she began to explain
what was said to her by one of the men during this hallway
confrontation, defense counsel objected on hearsay ground.
(1T67-15 to 17).  The prosecutor requested a sidebar to explain
why this testimony was "not being offered for the truth, but as
state of mind."  (1T67-18 to 20).

At sidebar the prosecutor proffered that Brooks would
testify that one of the guys in the hallway had told her that her
boyfriend, defendant, did a murder; that one of his relatives had

- 30 -

gotten locked up for it; and that defendant had better come clean. (1T67-24 to 68-4). The prosecutor also indicated that he would show that others were arrested for the murder. (Ibid). He argued that this testimony was relevant because Brooks used the same words when she confronted defendant the next day about what she was told and that although defendant at first denied the accusation he then admitted it. Consequently, the statement constituted an adoptive admission because normally such accusation, if untrue, would be denied. (1T68-5 to 12). The prosecutor indicated that he was also offering the statement to show the states of mind of both Brooks and defendant to show where Brooks got her information from when she confronted defendant. (1T68-13 to 19; 1T68-21 to 25). The testimony also served as part of the foundation to where he was going with his questioning of Brooks. (1T69-24 to 25).

Defense counsel argued that the statement was hearsay and too prejudicial. (1T68-20 to 23; 1T69-1 to 7). He requested that instead of having Brooks repeat the words of the third party, that she should simply testify that she was approached by someone about the murder which resulted in her confronting defendant about it. (1T40-4 to 71-1).

The prosecutor argued for admission of the entire statement in order to give strength to what Brooks later repeated to defendant regarding the murder. He then read Brooks' statement she had given to police in which she stated that defendant "didn't say nothing" when she told him about the murder

- 31 -

accusation.  The prosecutor maintained that defendant failed to
deny the accusation when a "normal rational person would deny" it
if it were false.  (1T72-16 to 17).

While noting that it could be confusing because he would
have to give first a limiting instruction then a non-limiting
instruction, the judge nonetheless agreed with the prosecutor
that the second part of the statement where defendant failed to
deny the murder accusation constituted an adoptive admission and
should be admitted.  Accordingly, Judge Malone instructed the
jury as follows:

> THE COURT:  Ladies and gentlemen,
> as a result of the discussion with
> counsel, I am overruling the
> objection that has been made with
> respect to the question posed by
> [the prosecutor].
>
> However, I am going to instruct you
> as to a limitation with respect to
> the anticipated information that is
> going to come as a result of that
> particular question.  This question
> is going to be posed by the
> prosecutor as he did.  I am going to
> ask him to restate the question.
>
> The answer that is being given by
> this witness is not to be
> considered by you for the truth of
> that answer.  So you are not to
> consider that what her answer is
> contains information that is
> truthful, only that the information
> that she is about to relay in
> response to this question is to be
> used by you to, as an explanation
> as to what it is that she did as a
> result of receiving the
> information.  So it explains her
> motivation for what she did next.
> So only this, this answer to this
> question is to be limited to the

- 32 -

use as an explanation of what the
wetness did next.

[1T73-8 to 25].

Consequently, the following exchange between the prosecutor
and Brooks occurred:

> BROOKS: The man approached me -- I
> was on my way up to my house -- and
> he said, You know, do you know such
> and such? I said yes, I know
> [defendant]. And he said you know
> he killed someone. I was like,
> okay, Go further on, what you were
> telling me. He was like, Well, my
> cousin was there at the wrong time,
> and they got him. And if you see
> your boyfriend again tell him they
> are out to get him.

> *        *        *

> PROSECUTOR: At the initial time
> when he told you, when you told him
> that some guy approached you and
> said that [defendant] had killed
> somebody, did he deny that at that
> point.

> BROOKS: Yes, [defendant], he
> denied at first, then he confessed
> by [the] guidance office.

[1T74-6 to 12; 1T75-6 to 10].

Now on appeal, defendant argues that the trial judge erred
in allowing Brooks to testify regarding the statement made to her
that defendant had "killed someone." He maintains that the
statement was hearsay, not coming within any exception. The
State submits defendant's claim is meritless. The trial court
correctly admitted the statement under the adoptive admission
exception to the hearsay rule. It was also properly admitted to
establish Brooks' state of mind when she confronted defendant

- 33 -

about the murder.

It is well settled that hearsay is defined as those statements, other than ones made by the declarant while testifying at trial, which are "offered in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c); Spragg v. Shore Care, 293 N.J. Super. 33, 56 (App. Div. 1996); accord State v. Modell, 260 N.J. Super. 227, 247 (App. Div. 1992), certif. denied, 133 N.J. 432 (1993); State v. Johnson, 216 N.J. Super. 588, 600 (App. Div. 1987). Here, the State submits that the statement did not qualify as hearsay. Thus, it was properly admitted at trial.

The adoptive admission exception to the hearsay rule is set forth under N.J.R.E. 803(b)(2). It provides that "[a] statement, offered against a party which is . . . a statement whose content the party has adopted by word or conduct or in whose truth the party has manifested belief" is not excluded by the hearsay rule. State v. Dreher, 302 N.J. Super. 408, 505-06 (App. Div.), certif. denied, 152 N.J. 10 (1997); State v. Gorrell, 297 N.J. Super. 142, 151 (App. Div. 1996); accord State v. Thompson, 59 N.J. 396, 408-410 (1971). While due caution must be exercised when dealing with a hearsay statement as an adoptive admission, admission of a statement under this hearsay exception is nonetheless permitted. Dreher, 302 N.J. Super. at 506; State v. Briggs, 269 N.J. Super. 555, 562 (App. Div.), certif. denied, 41 N.J. 99 (1995), citing Greenberg v. Stanley, 30 N.J. 485, 498 (1959). Critical to such admission is the requirement that the defendant disclose, or be

34

made aware of, the content of that which he is allegedly admitting to. Briggs, 279 N.J. Super. at 562-63, citing Greenberg, 30 N.J. at 498. Moreover, it must be clear that the defendant "understood and unambiguously assented" to the statement. Briggs, 279 N.J. Super. at 563.

In the present case, Judge Malone proceeded "with caution" before admitting as an adoptive admission Brooks' testimony that defendant had "killed someone." Prior to allowing the testimony, he held a hearing on the matter and considered the position of both parties regarding the testimony. It was only after such hearing and after concluding that he would give a limiting instruction on this testimony that the judge felt satisfied that the statement qualified as an adoptive admission and that Brooks would thus be allowed to testify regarding the statement. Indeed, it was only after the prosecutor had read into the record Brooks' statement to police in which defendant gave absolutely no response when the accusation was made against him that the judge made his determination that the testimony should be admitted.

To be sure, in her statement to police, Brooks indicated that defendant had remained silent when she confronted him about his involvement in the murder. (Da44 to 45). There was no question, however, that he heard and understood the accusation lodged against him by the man in the hallway as Brooks specifically confronted defendant about the discussion she had had with the man. Greenberg, 30 N.J. at 498. That defendant made no reply in the face of such accusation indicates that he

- 35 -

assented to it.  Ibid.

Unlike in her statement to police where she indicated that defendant gave no response to the accusation, Brooks testified at trial that defendant responded to her after hearing the accusation.  This difference, however, does not render the trial court's ruling on the issue any less proper. Rather, it undergirds the fact that defendant was well aware of the nature of the accusation that he had "killed someone."  It showed that defendant understood the statement as he went so far as to initially deny the accusation that he had "killed someone." He then "unambiguously assented" to it when he confessed to the statement.  Ibid.  Clearly the statement was properly admitted on this basis.

Moreover, the statement was properly admitted to establish Brooks' state of mind in confronting defendant about the murder. Thus, as Judge Malone indicated in his limiting instruction to the jury, the statement was not being offered to prove its truthfulness but to explain Brooks' actions in approaching defendant the following day and raising the issue with him.

When a statement is offered to prove the probable state of mind it induced in the listener, such as to show information which the listener had which bore on the reasonableness or good faith of the listener's subsequent conduct, that evidence is not ordinarily excluded as hearsay.  Spragg, 293 N.J. Super. at 57 citing II John W. Strong, McCormick on Evidence § 249 at 103 (4th ed. 1992); Biunno, Current N.J. Rules of Evidence, Comment 4 to

- 36 -

N.J.R.E. 801[4].  In other words, "[w]henever an utterance is offered to evidence the state of mind which ensued in another person in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the hearsay rule is concerned." State v. Marshall, 123 N.J. Super. 1, 122 (1991), cert. denied, 507 U.S. 929 (1993), quoting 6 Wigmore, Evidence § 1789 (Chadbourn rev. 1976).  Because such out-of-court statement frequently has an impermissible hearsay aspect as well as a permissible non-hearsay aspect, the rule generally is to admit such evidence with a limiting instruction, unless the probative purpose of the statement is substantially outweighed by the danger of its improper use.  Spragg, 293 N.J. Super. at 57, citing McCormick on Evidence § 249 at 103-04.  In the present case, the trial court correctly allowed the admission of the statement.

Here, in addition to being an adoptive admission, it is clear that Brooks' statement was used to establish her state of mind to show why she approached defendant regarding the murder. Indeed, on the preceding day when Brooks and defendant spoke, defendant had mentioned nothing to Brooks about the incident. The only discussion they had with each other concerned defendant asking Brooks to lie for him regarding his whereabouts on the day of the murder.  When Brooks attempted to delve into the reasons for defendant trying to create a false alibi, defendant refused to respond.  That same night, however, Brooks was approached by

- 37 -

the man in the hallway who told her about defendant killing someone.  It was as a result of this hallway confrontation that Brooks raised the specific issue of the murder with the defendant the following day.  It is clear, however, that the accusation was not being offered for the truth of the matter.  Rather, it was offered to explain Brooks' new-found knowledge about the incident which defendant had kept from her during their conversation regarding the false alibi.  Thus, it explained the basis upon which Brooks confronted defendant about the murder and established why she would have a discussion with him regarding something about which she had no knowledge of the previous day. Clearly, the statement was properly used to establish Brooks' state of mind as to why she confronted defendant about the murder.  In this regard, the trial court gave the jurors a limiting instruction to explain how they were to use this evidence.  Surely they followed the court's explicit instructions.  State v. Winter, 96 N.J. 640, 648-49 (1984).[4]

Defendant's reference to State v. Bankston, 63 N.J. 263 (1973), in this instance is misplaced.  Bankston and its progeny concern situations where police are required to explain why they approached a suspect, Bankston, 63 N.J. at 268, and involve tips by anonymous informers.  See Johnson, 216 N.J. Super. at 601 (citations omitted).  The matter herein has nothing whatsoever to do with police officers, let alone officers testifying about

---

[4]   The statement was also part of the res gestae and therefore admissible on this basis.  See State v. Diaz, 308 N.J. Super. 504, 513 (App. Div. 1998).

- 38 -

their reasons for approaching suspects based on tips by informers. Brooks' testimony did not validate or give any credence to the statement that defendant had "killed someone." Rather, as stated above, Brooks' testimony merely explained her state of mind in approaching defendant regarding his possible involvement in the murder. It was clearly not being offered to prove the truthfulness of the statement, nor to give credence to the statement itself. Surely, defendant's reliance on Bankston is unavailing.

Finally, the admission of this singular fleeting statement was at most harmless, not capable of leading the jury to a result it otherwise might not have reached. Modell, 260 N.J. Super. at 247, citing State v. Hightower, 120 N.J. 378, 410 (1990). In point of fact, it was only during Brooks' testimony that any reference was made to this statement. As set forth above, the testimony was brief in nature and not repetitive. The prosecutor made no reference to it at all in his summation. (4T193-1 to 213-3). Thus, in relation to the entire case, this one reference had no prejudicial effect on defendant's case.

Furthermore, the statement was harmless inasmuch as defendant confessed to the murder. While he told Brooks that the shooting was done "by mistake," he nonetheless admitted to her that he had shot the victim. (1T75-2 to 79-7; Da45). Additionally, April Diggs and Renee Diggs, both eyewitnesses to the shooting, testified that defendant had shot the victim. (2T185-2 to 5; Da49; Da59). When the group of four had returned

- 39 -

to the Hernandez apartment and April asked defendant why he had shot the victim, defendant explained it was because Saraiva had grabbed his jacket. (2T187-14 to 16). Also, in his second written statement to police, which defendant at trial testified was "true," he admitted his involvement in the robbery. (2T55-19 to 66-24; 4T12-24 to 13-1). Although he claimed that Harvey was the actual shooter, defendant would still be guilty of the murder under a theory of accomplice liability. N.J.S.A. 2C:2-6. Surely, this one statement, in the overall scheme of the trial, did not have the capacity to prejudice defendant's right to a fair trial. Defendant's claim to the contrary is clearly meritless.

In sum, the trial judge properly admitted Brooks' statement as an adoptive admission, and as a basis for establishing Brooks' state of mind in approaching defendant regarding the murder. Moreover, given the minuscule nature of the testimony in relation to the entire case as well as the clear evidence of defendant's guilt, any possible error in admitting the statement was surely harmless beyond a reasonable doubt. Because no error resulted in this case, defendant's just convictions must be affirmed.

## POINT III

### THE PROSECUTOR'S SUMMATION COMMENTS DID NOT DEPRIVE DEFENDANT OF A FAIR TRIAL.

Defendant claims that the prosecutor's comments in his summation in which he referred to defendant as a "thug" and claimed that defendant was "making his bones" deprived him of a fair trial.  The State submits that neither comment denied defendant his right to a fair trial.  No reversal is warranted in this case.

The standard for reversal based upon prosecutorial misconduct is well-settled in the law.  It requires an evaluation of the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial.  State v. Timmendequas, 161 N.J. 515, 575 (1999).  It has long been held that prosecutorial misconduct is not grounds for reversal of a criminal conviction unless the conduct was so egregious as to deprive defendant of a fair trial.  State v. Frost, 158 N.J. 76, 83 (1999); State v. Chew, 150 N.J. 30, 84 (1997); State v. Roach, 146 N.J. 208, 219, cert. denied, 519 U.S. 117 (1996);  State v. Ramseur, 106 N.J. 123, 322 (1987).  To justify reversal, the prosecutor's conduct must have been "clearly and unmistakably improper," and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense.  Timmendequas, 161 N.J. at 575, citing Roach, 146 N.J. at 219; State v. Hightower, 120 N.J. 378, 411 (1990).

In determining whether the prosecutor's comments were

- 41 -

sufficiently egregious to deny defendant a fair trial, the court
will consider the tenor of the trial and the responsiveness of
counsel and the court to the improprieties when they occurred.
Frost, 158 N.J. at 83; State v. Scherzer, 301 N.J. Super. 363,
433 (App. Div.), certif. denied, 151 N.J. 466 (1997).
Specifically, the court should consider "whether defense counsel
made a timely and proper objection, whether the remark was
withdrawn promptly, and whether the court ordered the remarks
stricken from the record and instructed the jury to disregard
them." Timmendequas, 161 N.J. at 576, quoting Ramseur, 106 N.J.
at 322-23; Frost, 158 N.J. at 83; Chew, 150 N.J. at 84.
Generally, if no objection was made to the improper remarks, the
remarks will not be deemed prejudicial. Timmendequas, 161 N.J.
at 576; Ramseur, 106 N.J. at 323. Failure to make a timely
objection indicates that defense counsel did not believe the
remarks were prejudicial at the time they were made. State v.
Irving, 114 N.J. 427, 444 (1989). Failure to object also
deprives the court of the opportunity to take curative action.
Ibid.

In the instant case, defendant takes exception to two
comments made by the prosecutor, neither of which defendant
objected to at trial. It is the State's position that the
comments were not egregious, let alone so egregious as to deprive
defendant of a fair trial. Defendant's claims of error are
unfounded.

In the first comment to which defendant now takes exception,

- 42 -

the prosecutor stated:

> PROSECUTOR]: Now [defense counsel] says why
> would this crazy man give up the gun? I tell
> you why he would give up the gun.  Very
> simple.  Because, as [defendant] said in his
> statement that was read to you, earlier
> before this written statement do you recall
> telling this detective and your mother that
> you and [Harvey] were looking to rob someone
> because you wanted to know how it felt.
> That's what he said.  He wanted to know how
> it felt.  And this gun was given up to
> [defendant] because [defendant] was going to
> make his bones, so to speak, he wanted to
> know how it felt. And they came upon in [sic]
> man, and what happens. Antwan is talking
> tough.  And you heard from April, and defense
> brought this out.  If he gives me any
> resistance, I am going to bust him.  That's
> what Antwan said when he got the gun.
> [Defendant] says I will bust him too.  Well,
> now, [defendant] is getting into this.  You
> want the gun, says [Harvey]?  Yeah.  And
> [defendant] takes the gun.  Why does he give
> it up? Because his friend wants to know how
> it felt.  He wants to know how it feels to do
> the robbery, that's why he gives him the gun.

[4T201-12 to 202-4].

Defendant argues that this remark that defendant "was going

to make his bones" was improper because it was outside of the

evidence.  The State submits defendant's claim is meritless.

Based on the context in which it was made, it is obvious that the

remark was made in response to defense counsel's summation and

was a fair comment on the evidence.

Indeed, in his summation, defense counsel attempted to

portray defendant as an innocent youth who was neither involved

in the robbery nor the shooting.  He maintained that defendant

never handled the gun and rhetorically asked why Harvey, who was

the "one running the show" and who was "looking to rob," would

- 43 -

give up the gun to defendant.  (4T183-7 to 14).  It was in direct response to this question that the prosecutor made the "bones" comment.  "An appellate court 'must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occur[.]'" Frost, 158 N.J. at 83, quoting Marshall, 123 N.J. at 15; see also Scherzer, 301 N.J. Super. at 433.  Here, the record makes perfectly plain that the "bones" comment was not prejudicial.  Surely, responding to defense counsel's summation remarks was entirely proper in this case.  Marshall, 123 N.J. at 153.

Additionally, not only was the remark made in response to defense counsel's summation but it was also a fair comment on the evidence.  In giving his statement to police, defendant had told the officers that he was looking to rob someone because he wanted to "see how it felt."  (Da76; 2T61-9 to 15).  This "bones" comment was merely a colorful way of describing to the jury what defendant's admitted intent was in committing the robbery -- to "see how it felt."  Clearly the prosecutor's remark was nothing more than a graphic and forceful comment confined to the evidence.  State v. Johnson, 31 N.J. 489, 510-11 (1960).  In fact, defense counsel made no objection to the remark at the time it was made which indicates that he found nothing prejudicial in it.  Irving, 114 N.J. at 444.

Based on the tenor of the entire trial in addition to defense counsel's summation comments regarding why Harvey would give defendant the gun, it is obvious that the prosecutor's

- 44 -

remark was nothing more than a fair comment on the evidence presented at trial and made in response to defense counsel's summation.  Defendant's claim of prejudice is clearly unavailing.

Also raised for the first time on appeal is defendant's challenge to the following comment:

> [PROSECUTOR]: You see, what the defendant and
> [Harvey] didn't count on is Mr. Saraiva
> struggling and putting up a fight.  They
> figured two of them, they have a gun, he is
> just going to back down.  But this was a man
> was -- you heard from Mrs. Saraiva -- this
> was his business, this was his livelihood, he
> lived upstairs, this was his neighborhood.
> This was a man basically protecting his
> castle.  A man who resented being approached
> by a couple of thugs and being told to run
> [sic] his pockets.  And if we were teaching
> courses we would say better to submit and
> fight it out another day.  He didn't do that,
> because he was insulted by the fact these
> thugs could come and just walk up, point a
> gun at him, and take his money.
> Unfortunately, because of that, because he
> struggled he lost his life.

[4T208-22 to 209-9].

Here, the prosecutor was again merely characterizing the evidence in graphic and forceful language.  Indeed, while due process requires that a prosecutor operate within the bounds of fair play, his presentation my be vigorous and even forceful. State v. DiPaglia, 64 N.J. 288, 297 (1974); accord, Johnson, 31 N.J. at 510-11.  Given the dramatic appeals to the jury's emotions by defense counsel, "a prosecutor cannot be expected to present the State's case in a manner appropriate to a lecture hall."  State v. Marks, 201 N.J. Super. 514, 534-35 (App. Div. 1985), certif. denied, 102 N.J. 393 (1986).  In failing to

- 45 -

object, defense counsel did not even find this "thugs"
characterization offensive, Irving, 114 N.J. at 444, as surely
under the circumstances it was not.

In point of fact, the prosecutor sought to illustrate how
callous defendant's actions were in shooting the victim.  He
described how the victim had tried to protect his "livelihood,"
his "castle" by putting up a fight against the "thugs" defendant
and Harvey who came upon him to rob him, having absolutely no
regard for person or property.  This "thugs" characterization
amply put in perspective how heartless defendant's conduct was.
And, given the fact that the characterization was made only twice
in a lengthy summation spanning some 20 pages and without any
objection by defense counsel, and given the fact that defendant's
trial was fundamentally fair overall, it hardly can be said that
the remark was egregious.  See State v. Pennington, 119 N.J. 547,
577 (1990) (where prosecutor pursues a persistent pattern of
misconduct throughout the trial, the prosecutor's epithets made
in summation which had no bearing on the evidence were found to
be "especially egregious").  Surely no prejudice resulted in this
case.

Additionally, the trial judge twice carefully admonished the
jurors in both his preliminary instructions to them and then
again in his general instruction at the end of the case, that
counsels' remarks were not evidence and that they were to
determine questions of fact based on the evidence and exhibits
admitted at trial.  He also charged the jurors on burden of proof

- 46 -

and the presumption of innocence.   (1T24-4 to 29-14; 5T6-1 to 8-20).   See State v. Engel, 249 N.J. Super. 336, 377 (App. Div.), certif. denied, 130 N.J. 393 (1991).   It must be presumed that the jury respected and followed the court's explicit instructions.   State v. Winter, 96 N.J. 640, 648-49 (1984).   In fact, a trial court's instructions are recognized as carrying more weight than an attorney's comments.   Boyd v. California, 494 U.S. 370, 384 (1990).   Furthermore, based on defendant's obvious guilt of the murder, armed robbery and weapons possession, it is manifest that no error resulted from the prosecutor's conduct. Rather, the jury found defendant guilty because of the strong evidence against him, not because of any alleged impropriety by the prosecutor.

In sum, these remarks must be considered in their proper context.   And, when considering the record as a whole, it is clear that defendant's claims of error are unfounded.   Hence, because defendant was not denied a fair trial, his convictions must be affirmed.

## POINT IV

### DEFENDANT'S SENTENCE WAS MANIFESTLY PROPER.

Defendant contends that his aggregate sentence of 50 years imprisonment with a 30 year parole disqualifier for his murder, armed robbery, and weapons possession convictions is excessive. Specifically, he argues that the trial court erred in finding certain aggravating factors and in not finding certain mitigating factors.  The State submits that defendant is not entitled to any relief with respect to his sentence.  The trial judge was meticulous in balancing the aggravating and mitigating factors. Hence, defendant's sentence should be affirmed.

The sentencing scheme established by the penal code makes clear that the severity of the crime is the single most important factor to consider in the sentencing process.  State v. Hodge, 95 N.J. 369, 379 (1984).  In evaluating the sentence's appropriateness, an appellate court must satisfy itself that the trial court properly applied the Code of Criminal Justice's standards and guidelines.  State v. Roth, 95 N.J. 334, 364 (1984); State v. Kotter, 271 N.J. Super. 214, 228 (App. Div.), certif. denied, 137 N.J. 313 (1994).  The reviewing court does not substitute its judgment for the trial court's, and must affirm a sentence as long as the sentencing court properly identified and balanced the relevant aggravating and mitigating factors.  State v. Megargel, 143 N.J. 484, 493-94 (1996); State v. O'Donnell, 117 N.J. 210, 215 (1989); see State v. Ghertler, 114 N.J. 383, 388 (1989); State v. Colella, 298 N.J. Super. 668,

- 48 -

675 (App. Div.), certif. denied, 151 N.J. 73 (1997). If the judge properly followed the guidelines, this Court may modify the sentence only where it "shocks the judicial conscience." State v. Rush, 278 N.J. Super. 44, 49 (App. Div. 1994); State v. Johnson, 274 N.J. Super. 137, 158 (App. Div.), certif. denied, 138 N.J. 265 (1994); accord Colella, 298 N.J. Super. at 675.

The State submits that defendant's sentence was proper in view of the Code's guidelines and the facts of this case. Thus, the State maintains that this sentence can in no way be considered "shocking."

In this case, Judge Malone found two aggravating factors: the nature and circumstances of the offense, N.J.S.A. 2C:44-1a(1), and the need to deter, N.J.S.A. 2C:44-1a(9). (ST9-25 to 10-5). The judge found one mitigating factor, the lack of a prior criminal record, N.J.S.A. 2C:44-1b(7). (ST10-9 to 11). Judge Malone found that "the aggravating factors in this case are so substantial and so clearly and convincingly outweigh the mitigating factors that a sentence above the minimum for this crime must be imposed." (ST10-12 to 15). Accordingly, after merging the convictions for felony murder and possession of a weapon for an unlawful purpose into the murder conviction, the judged sentenced defendant on the murder to a term of 50 years with a 30 year parole ineligibility period, to a concurrent term of 18 years with a six year parole disqualifier on the armed robbery conviction, and to a concurrent four year term with an 18 month parole ineligibility period on the unlawful possession of a

- 49 -

weapon conviction.  (ST10-24 to 11-15).  Thus, defendant's
aggregate sentence is 50 years imprisonment with a 30 year period
without parole.

Defendant, now on appeal, argues that his sentence is
excessive and that he should have received a 30-year base term
instead of the 50 years.  He claims that neither aggravating
factor is substantiated in the record, and that the trial court
should have applied certain mitigating factors.  The State
submits defendant's sentence was correct in all respects.

First, with regard to the aggravating factor of the nature
and circumstances of the offenses, it is evident that the judge
correctly determined that this factor applied.  In his feeble
attempt to minimize the heinousness of his actions, defendant
conveniently overlooks how he committed the murder.

As Judge Malone emphasized, however, defendant and his
cohorts, Harvey, April Diggs and Renee Diggs, went out looking to
commit a robbery on the night of January 2, 1996.  (ST8-21 to
25).  Defendant knew all to well that Harvey was armed with a
gun.  (ST8-25 to 9-1).  Defendant and his compatriots walked the
streets of Elizabeth rejecting, for one reason or another,
various persons as potential robbery victims until they came upon
Saraiva.  It incensed Judge Malone that defendant, in wanting to
know "how if felt" to rob someone, so willingly took the gun from
Harvey to "bust" someone.  The two approached the victim and
attacked him as the victim was performing a simple household task
of taking out the garbage.  He then tried to defend himself and

- 50 -

his property. Without a second thought to the consequences, however, defendant shot the victim in the face at point blank range when Saraiva grabbed at defendant's jacket during the struggle. The heinous and senseless act by defendant of shooting the victim for absolutely no reason cries out for severe punishment.

Defendant looks at the number of shots to the victim to claim this first aggravating factor does not apply. However, while only one shot was fired, defendant conveniently overlooks the fact that this one shot was made at an extremely close range of some 18 inches away. This one shot entered just below the victim's left eye in the nasal area and exited through the back of his head. This one shot struck the victim's brain causing it to swell and then herniate. Defendant cannot get around the fact that his senseless act of taking the gun to "see how it felt" to rob someone and then not hesitating to shoot the victim directly in the face merely because the victim tried to defend himself speaks volumes as to the nature and circumstances of the offense. See State v. Gallagher, 286 N.J. Super. 1, 20-21 (App. Div. 1995), certif. denied, 146 N.J. 569 (1996). Defendant's actions that fateful night were particularly cruel and heinous and thus supported this aggravating factor. See Cannel, Criminal Code Annotated, Comment 3 to N.J.S.A. 2C:44-1a(1).

Equally applicable is the aggravating factor of the need to deter defendant and others. Contrary to defendant's claim, this was properly found to be a particular weighty factor.

51

Since the goal of deterrence is to thwart future crimes and to modify the conduct both of the offender and others who might commit offenses, it constitutes a more potent factor in the treatment of persons who have committed crimes which are perceived to be avoidable or preventable. State in Interest of C.A.H. and B.A.R., 89 N.J. 326, 335 (1982); see State v. Pickell, 136 N.J. Super. 340, 342 (App. Div. 1975). Such crimes are usually those which result from volitional, deliberate and non-impulsive behavior. State in the Interest of C.A.H. and B.A.R., 89 N.J. at 335. This type of criminal behavior is presumably capable of being modified or reversed by punishment. Ibid. It is assumed that a person who has committed such a crime weighs the consequences of his actions and, if punished severely for his criminal act, will avoid its repetition. Ibid.; United States v. Bergman, 416 F. Supp. 496, 500 (S.D.N.Y. 1976). Cf. State v. Jarbath, 114 N.J. 394, 405 (1989) (defendant's impaired mental state coupled with the unintentional aspect of the crime negated the finding of specific deterrence).

There is no question that defendant's actions were deliberate. He chose to commit a robbery to "see how it felt;" he chose to accept the gun from Harvey in furtherance of this goal; and he chose to pull the trigger of the gun during the struggle with Saraiva. Such senseless, deliberate callous conduct cries out for deterrence. And, as Judge Malone found, such need to impose a sentence that will send a message of deterrence to defendant and others "from this kind of activity is

- 52 -

incredibly strong." (ST9-25 to 10-2).  Defendant's conduct is
clearly in need of deterrence.  The State submits that
defendant's contentions to the contrary are meritless.

Defendant also claims error in the trial court's failure to
find two mitigating factors, excessive hardship, N.J.S.A. 2C:44-
1b(11), and that his conduct as a youthful defendant was
substantially influenced by his cohorts who were older than he,
N.J.S.A. 2C:44-1b(13).  To the contrary, the State submits that
defendant's contentions are groundless.

In the first place, it is well within the trial court's
discretion to reject any or all of these mitigating factors as
the finding of mitigating factors is simply permissive under the
Code.  N.J.S.A. 2C:44-1b; State v. Doss, 310 N.J. Super. 450,
461-62 (App. Div.), certif. denied, 155 N.J. 589 (1998); State v.
Devlin, 234 N.J. Super. 545, 555 (App. Div.), certif. denied, 117
N.J. 653 (1989).  Cf. N.J.S.A. 2C:44-1a ("In determining the
appropriate sentence . . . the court shall consider the following
aggravating circumstances . . . .") (emphasis added).  Here,
there was no basis for Judge Malone to find either of these as
mitigating factors in this case.

With regard to the mitigating factor of hardship under
N.J.S.A. 2C:44-1b(11), defendant claims that being committed to
prison at such a young age will result in having his life molded
by the system and that this constitutes a hardship.  The State
disagrees.  The Legislature has seen fit to have a juvenile of 14
years and older waived up to adult court.  Such juvenile may be

- 53 -

tried as an adult, especially for such serious offenses as murder, the offense committed by defendant. N.J.S.A. 2A:4A-26. Having been waived up to adult court, defendant is subject to the penalties under the Code. And, for murder, the sentence is a mandatory minimum term of 30 years with the base sentence ranging between 30 years to life. N.J.S.A. 2C:11-3b(1). Because defendant undertook an adult act in planing an armed robbery with his cohorts, seeking out a vulnerable victim, then deliberately, shooting the victim at point blank range, defendant must be penalized for murder pursuant to the Legislative mandate under N.J.S.A. 2C:11-3b(1).

Furthermore, defendant's reliance on his youth to try and take advantage of the mitigating factor that he was influenced by his more mature codefendants is unavailing. As the record plainly shows, defendant made the decision to follow his friends and commit a robbery to "see how it felt." He then took the gun from Harvey for this purpose and of his own violation, shot the victim. Defendant was not pressured and influenced in any way by his cohorts. He went out to rob someone and shot the victim because he wanted to "see how it felt" to "bust" someone.

Finally, defendant overlooks the fact that although the Judge ran all the sentences concurrent he could have made defendant's sentence for the armed robbery run consecutive to the murder. Here, while there was one victim, the record clearly establishes that the robbery was separate and independent from the shooting, hence, warranting separate punishment. See

- 54 -

N.J.S.A. 2C:44-5; State v. Yarbough, 100 N.J. 627 (1985), cert. denied, 475 U.S. 1014 (1986).  Having received a benefit by being sentenced to all concurrent terms, defendant should not be heard to complain about the sentence imposed.  Given the entire record, defendant's sentence is most fair.

The State submits that "[t]he sentence imposed upon defendant with regard to his convictions for [murder, armed robbery, and weapons possession] complied with the provisions of the New Jersey Code of Criminal Justice and resulted from the trial court's thorough analysis and careful weighing of the relevant aggravating and mitigating factors."  State v. Foreshaw, 245 N.J. Super. 166, 187 (App. Div.), certif. denied, 126 N.J. 327 (1991).  This sentence was neither manifestly excessive nor unduly punitive.  Ibid.  Accordingly, defendant's sentence must be affirmed.  Roth, 95 N.J. 365.

## CONCLUSION

For the foregoing reasons, the State respectfully urges this Court to affirm the convictions and sentence below.

Respectfully submitted,

JOHN J. FARMER, JR.
ATTORNEY GENERAL OF NEW JERSEY
ATTORNEY FOR PLAINTIFF-RESPONDENT

BY: _____
Teresa A. Blair
Deputy Attorney General

TERESA A. BLAIR
DEPUTY ATTORNEY GENERAL
DIVISION OF CRIMINAL JUSTICE
APPELLATE BUREAU

OF COUNSEL AND ON THE BRIEF

DATED: December 1, 1999

- 56 -