NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3316-98T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARVIN MATHIS,

    Defendant-Appellant.

FILING DATE
APPELLATE DIVISION

JUN 2 2000

_(signature)_ Clerk

Submitted: May 10, 2000 - Decided: JUN 2 2000

Before Judges King, Lefelt and Lintner.

On appeal from the Superior Court of New Jersey, Law Division, Union County.

Ivelisse Torres, Public Defender of New Jersey, attorney for appellant (Paul M, Klein, Deputy Public Defender II, of counsel and on the brief).

John J. Farmer, Jr., Attorney General of New Jersey, attorney for respondent (Teresa A. Blair, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

I

This case arises from a homicide in Elizabeth on January 22, 1996. Defendant Marvin Mathis was sentenced to a fifty-year base term of imprisonment with a thirty-year period of parole ineligibility for murder, armed robbery, and unlawful possession of a weapon. He was age 15 at the time of the commission of the

RECEIVED

JUN 0 1 2000

DIV. OF CRIMINAL JUSTICE
APPELLATE BUREAU

crime.  He raises these issues on this appeal:

I     WHETHER THE DECISION OF THE FAMILY PART
JUDGE TO WAIVE JUVENILE JURISDICTION OVER
MARVIN MATHIS CONSTITUTED A CLEAR ERROR
OF JUDGMENT AND SHOULD BE REVERSED.

II    WHETHER DEFENDANT'S CONVICTION MUST BE
REVERSED DUE TO THE IMPROPER ADMISSION OF
HEARSAY EVIDENCE THAT HIS GIRLFRIEND WAS
ACCOSTED ON THE STREET BY A MAN WHO TOLD
HER THAT DEFENDANT HAD KILLED SOMEONE.
WHETHER SUCH EVIDENCE VIOLATED
DEFENDANT'S FEDERAL AND STATE
CONSTITUTIONAL RIGHTS TO CONFRONTATION.
U.S. CONST., Amends. VI and XIV; N.J.
Const. (1947), Art. I, par. 10.

III   WHETHER DEFENDANT'S CONVICTION MUST BE
REVERSED DUE TO ACTS OF PROSECUTORIAL
MISCONDUCT, WHICH INCLUDED REFERRING TO
DEFENDANT AS A THUG AND COMMENTING ON
FACTORS OUTSIDE OF THE RECORD.

IV   WHETHER THE BASE TERM OF FIFTY YEARS'
IMPRISONMENT IS EXCESSIVE AND SHOULD BE
MODIFIED BY THIS COURT.

We find no reversible error and affirm.

II

On January 25, 1996 a Union County Juvenile Delinquency
complaint was filed against defendant for acts which, if committed
by an adult, would constitute the crimes of armed robbery, contrary
to N.J.S.A. 2C:15-1 and N.J.S.A. 2C:2-6, and felony murder,
contrary to N.J.S.A. 2C:11-3a(3).  On October 10 and November 11,
1996 a hearing was held before Judge Hawkins to consider the
State's motion to waive juvenile jurisdiction.  Judge Hawkins
determined that the State had met its burden in proving that there
was probable cause to believe defendant had committed the acts

2

charged in the complaint and was over the statutory age of 14 when the acts were committed; he also found defendant had failed to meet his burden that he could be rehabilitated by the time he was age 19. Judge Hawkins granted the State's motion to waive jurisdiction to adult court.

On February 4, 1997 a Union County Grand Jury returned Indictment Number 97-02-00123 charging defendant with first-degree murder, N.J.S.A. 2C:11-3a(1) or N.J.S.A. 2C:11-3a(2) (Count I); first-degree armed robbery, N.J.S.A. 2C:15-1 (Count II); first-degree felony murder, N.J.S.A. 2C:11-3a(3) (Count III); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4a (Count IV), and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-5b (Count IV).

On June 9 and 10, 1998 Judge Malone conducted a hearing on defendant's motion to suppress and ruled that defendant's statements to police were knowing and voluntary and admissible at trial. Defendant was tried over five days before Judge Malone from June 10 to 18, 1998. On June 18, 1998 the jury returned its verdict finding defendant guilty of all charges.

On August 14, 1998, after merging the felony-murder and possession of a weapon for an unlawful purpose conviction under counts three and four into the murder conviction under count one, Judge Malone sentenced defendant to a base term of fifty-years imprisonment with a thirty-year parole ineligibility term. The appropriate statutory penalties were imposed and defendant was

3

given 934 days credit for time spent in custody.

### III

On January 22, 1996 defendant Marvin Mathis, age 15, and his friend Antwan Harvey, age 20, visited Migdalia Hernandez and her "live-in" boyfriend, Stephen Owens, at 224 Third Street, Apartment 6, in Elizabeth. April Diggs, age 17, and her cousin Renee Diggs, age 22, also visited the Hernandez household at the same time. April and Renee decided to get something to eat at the Chinese restaurant across the street. Defendant and Harvey agreed to join them. As the four were leaving the apartment, Hernandez observed defendant and Harvey carrying a ski mask and overheard one of the four say he had a gun. Both Renee and Harvey had their coats on inside out to camouflage their appearance. April was wearing pink Reeboks.

After leaving the restaurant, the four walked towards Elizabeth Avenue. According to April Diggs, when they reached Seventh Street, Harvey announced that he wanted to rob someone and he wanted April, Renee, and defendant to act as "lookouts." Initially, none of the three responded. According to April, when they encountered two "Spanish guys," Harvey and defendant chased them, intending to rob them; the "Spanish guys" outran them, however.

According to April, as the group proceeded to East Jersey Street, Harvey said "something about busting somebody," meaning that he was going to shoot somebody. Defendant said he "would do

4

it too" and Harvey handed defendant the gun.  About two or three minutes later, the group observed a man taking out trash.  Antonio Saraiva, owner of a Portugese American Wine and Liquor Store at 709 East Jersey Street, had just closed up his shop at 10 p.m. and was taking out trash.  His wife and two daughters were inside the store.  Harvey ran toward Saraiva first; defendant followed. Saraiva grabbed defendant by his jacket, shots were fired, and Saraiva fell to the ground.  April and Renee Diggs both identified defendant as the shooter.

After the shots were fired, April asked Renee whether defendant shot Saraiva because she did not actually see the shots fired.  Renee responded "[y]eah."  April then asked where defendant shot Saraiva and Renee responded "in the chest"; however, April said that based on the way Saraiva fell it appeared he was shot in the head.  The four fled the scene.  Harvey and defendant ran toward Seventh Street; April and Renee ran in the opposite direction.  All four returned to Hernandez's apartment.  While at the Hernandez's, April asked defendant why he shot defendant. According to April, defendant responded "because the man grabbed him."  April gave a statement to police on January 25, 1996.

Meanwhile, Saraiva's wife heard the shots, ran outside from the back of the store, and down an alleyway to the locked security gates.  When she saw her husband lying on the ground, she told her daughters to call an ambulance as their father was on the ground "full of blood."  Mrs. Saraiva ran back into the house to get the

5

keys for the security gates.  When she returned and opened the gates her husband was alone and unconscious.  The ambulance arrived and took Saraiva to the hospital.

Patrolman Gene Antonucci, Jr. was dispatched to the scene. When Antonucci arrived, he observed the victim lying on the ground, with the daughter of the victim and Andre Fisher, a neighbor, administering C.P.R.  Police officer Rocco Malgieri also responded to the scene.  The ambulance and other police personnel, including Detective Koczur, quickly arrived at the scene.  Police searched the area for bullets and casings but found nothing.  Officer Malgieri found Saraiva's brown leather wallet several blocks away in front of 658 South Park Street.  While Kozcur interviewed the victim's family, Saraiva was transported to Elizabeth General Hospital where he was pronounced dead.

Union County Medical Examiner Graciela Linares found a single bullet wound to Saraiva's head with the entrance wound next to the left eyelid and the exit wound in the back of the head.  She estimated that the gun was fired from a distance of eighteen inches or less.  Based on the nature of the wounds, Linares thought that the victim died within a few minutes of the shooting.

Later that day, Detective Koczur arrested Jameel Miller and a man named Green for the murder.  Defendant's girlfriend Sharlama Brooks, then age fifteen, saw him at school the day after the shooting, January 23, 1996.  According to Brooks, defendant told her that if anyone approached her to tell them that he was with her

6

between 7 p.m. and 11 p.m. on Monday, January 22, the night of the murder. Brooks refused. Brooks testified that when she questioned defendant about his request, he turned away from her and said if he told her, she would "black out," meaning she would be upset with him. Brooks said that on her way home from the fish market, she was approached by four or five young men. One of them pulled her aside and told her that defendant killed someone.

According to Brooks, defendant initially denied the accusation. After reviewing her statement to police, Brooks said that defendant told her that "they were walking, him and his friends, — Marvin, I am saying, he went to grab the guy, and as soon as he grab the guy the gun went off."

Brooks said that she began to cry when defendant told her this. Brooks then went to her first period class but left because she was too upset. As she was leaving class, she came in contact with the security guard who escorted her to Janice Sutton, the substance-abuse counselor. Brooks told Sutton what defendant had told her. Janice Sutton testified about her meeting with Sharlama Brooks. She said that Brooks came into her office hysterically crying. When Sutton asked Brooks what was wrong, according to Sutton, Brooks said that her boyfriend had been involved in a murder. Detective Brown was summoned and Brooks was transported to the police station where she gave a statement.

Detective Koczur took Brook's statement. As a result of her statement, the focus of the investigation shifted to defendant.

7

Defendant was brought to the police station at about 11:15 a.m. on January 24. He was not handcuffed and he was not placed under arrest. Once in the conference room, Koczur told defendant that he was the principal suspect in this case and told him that he should not say anything until he had a parent or guardian present. Mrs. Mathis, defendant's mother, then was escorted to the police station. She was advised that defendant was a potential suspect in the homicide which occurred at 709 East Jersey Street. Mrs. Mathis was very cooperative with the detective. She and Koczur entered the conference room where defendant, Detective Lieutenant Gary Lewis, and Detective John Furda from the Union County Prosecutor's office were waiting. At 12:07 p.m. Koczur also advised defendant of his rights. Both defendant and Mrs. Mathis said they understood their rights.

After he was advised of his rights, defendant first gave an oral statement to the police. He denied any involvement in the homicide, stating at the time of the homicide he was in the area of Third Street in Elizabeth or with his girlfriend. About halfway through the interview, Koczur advised defendant that Brooks had given the police a statement indicating he was not with her at the time of the homicide. Confronted with this information, defendant became very angry and called her a liar. After Koczur advised defendant of certain inconsistencies in his statement, defendant requested that his mother leave the room. At that time, he admitted he was present at the scene of the homicide, "and that he

8

was walking with a man named Antwan, a scuffle broke out, and a man was shot." Koczur then brought Mrs. Mathis back into the room. When his mother returned, defendant repeated his involvement in the offense. He made no mention of April Diggs' or Renee Diggs' involvement in the crime; he identified two individuals, Antwan Harvey and a man named "Boz," as participants in the shooting.

Defendant then gave the first of two written and signed statements on January 24, 1996 at 2:30 p.m. He said that he met Harvey on Second Street at about 7 p.m. Harvey and a third-person "were looking to rob someone," but he was not. Harvey wanted him to hold the gun but he refused; he said he never handled the gun; he said

> then he seen [sic] this man who owned the liquor store and he, and then he told him to empty his pockets. The man said no, then Antwan tried to go into his pockets. Then they started fighting. The man threw a punch at Antwan, and then Antwan threw a punch back. Then Antwan pushed him, then he shot him. The man fell. Antwan went into his pockets. He then told me to go into his pockets. I said no. He then called me a punk. Then I was in shock.

Following the shooting, they fled the scene. According to defendant's first statement, before leaving, Harvey took the victim's wallet from his right back pocket. Defendant claimed he did not believe Harvey was going to rob anyone and when he spoke to Harvey after the shooting, he warned defendant not to tell anyone about it or he would kill him.

9

After defendant gave his first signed statement, the police executed a warrant at a residence in Carteret, where Detective John Furda seized items of clothing described by defendant. With the consent of defendant and his mother, Detective Furda searched their home and seized pants fitting the description defendant gave of the pants he wore on the night of the robbery.

While Detective Furda searched defendant's house, Koczur met with other investigators. At 5:40 p.m. he returned to question defendant again, advising defendant that he did not believe what he had said in his first statement. After being readvised of his rights and waiving them, defendant gave a second written and signed statement. Defendant stated he met Harvey at about 8 p.m. on the night of the offense at the corner of Third and Bond Streets. He said he and Harvey met April and Renee Diggs at a nearby Chinese restaurant. This was the first time defendant mentioned the Diggs cousins. Defendant stated that all four intended to commit a robbery. While walking up Elizabeth Avenue, Harvey displayed a black revolver and asked defendant to act as the lookout during the robbery. Harvey asked the girls "to see if that man had any gold on him." When Harvey suggested robbing a man standing nearby, defendant told him not to rob the man. Defendant also told Harvey he would not participate in the robbery of a small delicatessen nearby. Defendant admitted that he and Harvey were looking for someone to rob because he wanted "to know how it felt." As the four continued walking, they encountered two "Spanish boys."

10

Harvey and April "started running after them real hard, and me and the other girl jogged after them."  The "Spanish boys" outran them.

The four continued walking toward East Jersey Street. Defendant said at this time, it was no longer his intention to participate in a robbery.   According to defendant, when the four reached East Jersey Street, Harvey told defendant that he was going to rob the man there and he wanted defendant and the Diggs' to act as "lookouts."  Defendant said

> [w]e walked up to the guy.  Antwan grabbed
> him, and he tried going into his pockets.
> Then the man slapped Antwan's hand from going
> into his pockets.  Antwan grabbed the man and
> the man grabbed Antwan.  The man then threw a
> punch at Antwan.  Then Antwan threw a punch
> back at him.  Then Antwan pushed the man off
> him and he took the gun and shot him.

Defendant explained that Harvey went through the victim's pockets but he, defendant, did not touch the man.   After the struggle ensued between Harvey and Saraiva, defendant denied helping Harvey. He said, however, the gun went off "[w]hen all three were struggling for the gun" and that the gun was pointed one to two feet from the victim's forehead.  Defendant stated that there were two shots fired, but one missed.   He did not believe it was Harvey's intention to shoot Saraiva. After the shooting, defendant and Harvey ran down Seventh Street.  The Detective asked defendant the following question:  "So all four of you committed this robbery?"  Unlike defendant's other answers, which were all typed,

that question was answered with a handwritten "yes." Koczur believed that when defendant reviewed his statement, "he realized that the word A was the answer and the answer 'Yes' wasn't there. He [defendant] obviously placed his name, he obviously added the answer and placed the word 'Yes' next to it." During his testimony defendant denied ever having written "yes" on the statement.

After giving the second written statement, defendant identified the other three participants from a photographic lineup. He also confirmed that during the robbery April was wearing pink Reeboks and that Renee wore her jacket inside out. Defendant signed this second statement.

The following day, on January 25, 1996, Harvey, April Diggs, and Renee Diggs were arrested and each gave statements to the police. Police also seized the black ski mask from Hernandez's apartment. April Diggs, who was age 17 at the time of the incident, was charged as a juvenile for robbery and murder. Her case was waived to adult court where she pled guilty to armed robbery. She agreed to testify truthfully against defendant and Harvey in exchange for a sentence recommendation of fifteen years with a five-year parole ineligibility period. Renee Diggs, who was age 22 at the time of the incident, pled guilty to armed robbery with a recommended sentence of a fifteen-year term with a five-year parole ineligibility period if she testified against defendant and Harvey.

In the defense case, two of defendant's teachers, Ronald Orr

and Belquis Fernandez, testified on his behalf. They considered him a truthful person. Herminia Garcia, a social worker at the Union County juvenile detention center, testified that April had told her that Renee and defendant were present at the shooting but that neither had done anything. Rather, April indicated that a fourth individual was responsible for the shooting. April Diggs admitted that after her arrest she was taken to the Union County Detention Center and met with Garcia. She did not recall, however, telling Garcia that it was Harvey, not defendant, who shot Saraiva: "I doubt if I said that." Garcia did not make a written report of her discussion with April Diggs. She admitted that although she assigned herself as defendant's intake worker, she never bothered to mention this exculpatory statement to him.

Damina Arcos testified that she met Renee Riggs in the Union County jail. In November 1997 April had told her that Harvey had shot the liquor store owner. April had also mentioned that Renee was involved in the murder but never mentioned defendant. Defendant's mother testified and denied that defendant had admitted his involvement in the robbery when giving his statement to police.

Defendant also testified at trial. Defendant denied that he possessed a gun, participated in a robbery, or shot anyone on January 22, 1996. He admitted his first statement was a lie. He testified that on January 22, 1996 he, Harvey and the Diggs cousins were walking on Elizabeth Avenue. As they were walking Harvey noticed a man waiting for a bus and asked the girls to see if the

13

man was wearing any gold jewelry.  When the girls reported that he was wearing gold jewelry, and defendant realized Harvey wanted to rob the man, defendant urged Harvey not to do it.  April urged Harvey to rob the owner of a delicatessen nearby.  Defendant refused to act as a lookout.  As the four continued walking, Harvey and April ran after two "Spanish boys," while defendant and Renee jogged behind; the boys outran them.  Defendant said he realized Harvey had a gun when they crossed Elizabeth Avenue.  He said Harvey "pull[ed] out the gun acting crazy" and began "showing off." Defendant testified he was frightened, wanted to leave, and "thought [Harvey] was going to shoot me or something."  When Renee attempted to leave, Harvey grabbed her and refused to let her leave.

When they reached the corner of Seventh and East Jersey Street, Harvey noticed a man taking out his trash.  Harvey asked the Diggs cousins and defendant to act as lookouts.  Defendant refused because he was "too scared."  He said he walked across the street and stood next to a Chinese restaurant.  Harvey approached Saraiva and it "sounded like he said empty his pockets."  Defendant testified:

> And man looked at him, and Antwan tried to go
> in his pockets, tried to go in his pocket.
> Then the man slapped his hand down.  And
> that's when Antwan grabbed the man, and the
> man grabbed Antwan, and the man threw a punch
> at Antwan, and that's when Antwan threw a
> punch back at the man.

Then Antwan pulled out the gun.  When the man noticed the gun he was like shocked, you know seeing the gun.  And that's when the man grabbed the gun, they was [sic] struggling, and that's when I noticed they was [sic] struggling and I tried, went over there and tried to stop, you know, what was about to happen.  But it was too late.

Defendant explained that as the two struggled, he grabbed Harvey's arm to try to prevent Harvey from shooting Saraiva.  Defendant said two shots were fired; the first bullet missed; the second shot struck Saraiva.  Defendant was shocked after he saw Saraiva fall down.  He then ran off with Harvey toward Seventh Street.  Defendant said he ran home.

Defendant denied ever holding the gun, denied shooting anyone, and denied helping anyone commit a robbery.  He also denied asking his girlfriend, Brooks, to lie for him.  Defendant said "if anyone asks if I was with her, you know, that she don't know."  He claimed he gave a false statement implicating "Boz" because he was scared and confused.  He admitted giving the second statement and initialing it, but claimed that he never told police that he helped in any way with the robbery.  Although he signed the statement, defendant claims the police were "rushing" him and his understanding of his rights was "not that good."  Defendant admitted that he lied in his first statement because he was scared; he claimed his second statement was truthful.  Defendant consistently claimed Antwan shot Saraiva.

IV

Defendant first argues that Judge Hawkins' decision to waive juvenile jurisdiction over defendant constituted a clear error of judgment and should be reversed. Defendant asserts that given the defendant's background and his progress since his incarceration in the Union County Juvenile Detention Center, his rehabilitation by age 19 was probable.

The State argues that the judge properly exercised his discretion in waiving defendant to adult court. The State stresses the seriousness of the offense, the absence of evidence that defendant could be rehabilitated prior to reaching age 19, and the strong need for deterrence weigh heavily in favor of waiver.

N.J.S.A. 2A:4A-26 of the New Jersey Code of Juvenile Justice provides in pertinent part:

> a.  On motion of the prosecutor, the court shall, without the consent of the juvenile, waive jurisdiction over a case and refer that case from the Superior Court, Chancery Division, Family Part to the appropriate court and prosecuting authority having jurisdiction if it finds, after hearing that:
>
>   (1)  The juvenile was 14 years of age or older at the time of the charged delinquent act; and
>
>   (2)  There is probable cause to believe that the juvenile committed a delinquent act or acts which if committed by an adult would constitute:
>
>   (a)  Criminal homicide other than death by auto, strict liability for drug

16

induced deaths, pursuant to N.J.S.
2C:35-9, robbery which would
constitute a crime of the first
degree, aggravated sexual assault,
sexual assault, aggravated assault
which would constitute a crime of
the second degree, kidnapping or
aggravated arson; or

(b)    A crime committed at a time when the
juvenile had previously been
adjudicated delinquent, or
convicted, on the basis of any of
the offenses enumerated in
subsection a.(2)(a);

*****

(3)   . . . the State has shown that the
nature and circumstances of the charge or
the prior record of the juvenile are
sufficiently serious that the interests
of the public require waiver.

However, if in any case the juvenile can
show that the probability of his
rehabilitation by the use of the procedures,
services and facilities available to the court
prior to the juvenile reaching the age of 19
substantially outweighs the reasons for
waiver, waiver shall not be granted.

A trial judge's determination that waiver to the Law Division
is warranted is discretionary and will not be disturbed unless
discretion has been abused.  State v. Onque, 290 N.J. Super. 578
(App. Div.), certif. denied, 146 N.J. 497 (1996); see State v.
Bessix, 309 N.J. Super. 126 (App. Div. 1998).  If the trial judge
has applied the correct legal principles, has considered the
appropriate factors, and the exercise of discretion did not
constitute a "clear error of judgment," we should not interfere.
Ibid.

17

Under N.J.S.A. 2A:4A-26(a), if a juvenile is charged with certain enumerated offenses the juvenile is subject to trial as an adult. State v. Scott, 141 N.J. 457 (1995). The family court may waive jurisdiction and transfer the case for criminal prosecution. Ibid. If a juvenile defendant is charged with a "Chart I" serious offense, the State's burden is to establish probable cause that the juvenile committed that Chart I offense at a time when he was age fourteen or older. State in the Interest of A.L., 271 N.J. Super. 192 (App. Div. 1994). "No additional showing is required for waiver to occur." Ibid. Once the prosecutor sustains the burden of establishing probable cause, the statute creates a rebuttable presumption that the juvenile shall be transferred to adult court. Ibid.; State in the Interest of A.B., 109 N.J. 195, 199 (1988); State v. R.G.D., 108 N.J. 1, 12 (1987); State in the Interest of A.J., 232 N.J. Super. 274, 292 (App. Div. 1989). That presumption of waiver can be overcome if the juvenile can demonstrate the probability of rehabilitation before reaching age nineteen. State v. Scott, 141 N.J. at 464; State in the Interest of A.L., 271 N.J. Super. at 203. The juvenile must also demonstrate that the probability of rehabilitation substantially outweighs the reasons for transfer. State in the Interest of A.L., 271 N.J. Super. at 203.

In this case, both experts for the defense, Cheryl L. Thompson, Ph.D. and Martha H. Page, Ed.D., and the expert for the State, Louis B. Schlesinger, Ph.D., recognized defendant's severe

18

intellectual problems.   Dr. Thompson, in her report, observed

"Marvin presents as a cooperative young man, with a bright-eyed

expression.   However, he is not bright and is easily confused."

She further noted "Marvin presents as a follower, someone who could

easily be persuaded by more successful anti-social characters to

become involved with them."   She added "Marvin's behavior is that

of a person whose judgment was clouded probably as a result of the

overstimulation in the house, substance abuse and a desire to feel

that he was part of the group."   She concluded that:

> Marvin Mathis with a chronological age of
> 15 presents as an excellent candidate for
> successful rehabilitation within the Juvenile
> Justice System of the State of New Jersey
> prior to the achievement of age 19 years.   He
> is responsive to adult authority, has no prior
> criminal record and does not prevent [sic] as
> a leader in anti-social action.   He would do
> extremely well in a structured setting that
> includes educational and vocational training.
> He would also benefit from personal counseling
> to help him learn to assess his involvement
> with others.

Dr. Page included in her report comments from some of defendant's

teachers.   The teachers described defendant as a "good kid" who was

never disrespectful.   Dr. Page said that defendant's "past history

indicates that he could be positively influenced by the

rehabilitative processes afforded by the juvenile system by age 19

and could effect pro-social changes in his behavior."   She

expressed concern for defendant if he was placed with adults and

exposed to "negative influences."

The State relied on the report of Louis B. Schlesinger, Ph.D. Dr. Schlesinger focused on defendant's inability to recognize that "there is a problem." He found that "[s]ince the first step of rehabilitation has not been met, it is the examiner's professional judgment to a reasonable degree of psychological certainty, that Marvin cannot be rehabilitated by the time he reaches 19 years of age in approximately two and a half years."

Judge Hawkins found that the State satisfied its burden of establishing probable cause and that the juvenile was age fourteen or older at the time of the commission of the crime. After the State meets this burden, the defendant has the burden of demonstrating that he can be rehabilitated prior to his nineteenth birthday and that the probability of rehabilitation substantially outweighs the reasons for waiver. "The statute requires a court to balance the value of probable rehabilitation of the juvenile offender, if shown, against the general deterrent value of exposing the offender to more severe sentences." State v. R.G.D., 108 N.J. at 11.

Judge Hawkins recognized that defendant "does not have a substantial history of delinquency." The judge deemed defendant a follower who "has not been the benefactor of academic achievement." He found that:

> [i]n weighing the offense charged and the circumstances surrounding that offense, I am of this belief. I don't believe that Marvin Mathis can be rehabilitated by age 19. And

20

therefore, I don't have to decide whether or not rehabilitation outweighs the reasons for waiver. But I do think that there is a need in this case for deterrence. Not only from him, but from others. Because in my mind, this was the most wanton inexcusable act that I, that I've seen in my eleven years sitting here on the bench. There is just no rhyme or reason for this, for this kind of behavior.

And therefore, I'm, I rule that this juvenile should be waived to the adult court for trial.

As a Chart I offender, defendant's burden in overcoming the strong presumption of waiver is a heavy one. Under the statute, juveniles charged with the crimes of murder, robbery, sexual assault and similar serious offenses are the primary candidates for waiver to the adult courts. _State v. R.G.D._, 108 _N.J._ 1 (1987). While experts for defendant were of the opinion that defendant could be rehabilitated by the time he reached age 19, the judge found it important that society, particularly juveniles, receive a clear message from defendant's crime — that committing a callous and wanton act of murder would be severely punished. The judge's waiver determination is grounded in competent, credible evidence, and will not be disturbed on appeal.

V

Defendant next argues that the judge's ruling allowing the jury to hear about the statement of an unidentified man accusing him of the killing, deprived defendant of his fundamental right to confront that individual. Defendant contends the statement was hearsay, not falling within any recognized exception. Sharlama

21

Brooks, defendant's girlfriend, was permitted to testify that an unidentified man approached her on the night of the shooting and told her that defendant had been the one to shoot the victim.  The judge decided to admit the testimony both as an "adoptive admission" and to explain Brook's conduct after she was approached and so informed.

The defense first raised an objection when the prosecutor asked Brooks about an incident which occurred on the night of the crime.  Brooks began to testify that she had been accosted by four or five men, one of whom pulled her into a hallway.  As she began to relate what one of the men told her, defense counsel objected. The prosecutor argued that the statement was "not being offered for the truth, but as state of mind."  At sidebar, the prosecutor explained:

> What [Shalama Brooks] is going to say is one of the guys said that your boyfriend Marvin did a murder, and one of my . . . relatives got locked up for the murder . . . . And your boyfriend better come clean.  And we are looking for him.
>
> Why this becomes relevant is because then she uses the same words to Marvin, is what I was told this, what's going on.  Marvin does not deny it.  Later on he admits it.
>
> So it becomes an adoptive admission because she says someone is calling you a murderer, and that's something someone normally would deny.  If you said, you know, Bill Kolano [the prosecutor], you are a murderer, if it's not true I say I am not.
>
> Admissible as an adoptive admission.

22

The prosecutor also maintained that he was eliciting the testimony as a "stepping stone" to demonstrate why Brooks asked defendant about the shooting when she saw him in school the next day.

The defense had no objection to Brooks testifying that she questioned defendant as a result of something she had been told; counsel objected on the basis that it was improper to repeat verbatim the words of a third party stating defendant had killed someone. The judge admitted the testimony, both as an adoptive admission and to explain why Brooks confronted defendant about the murder the following day. The judge indicated that while it "could be confusing," he would give a limiting instruction. The judge instructed the jury as follows:

> Ladies and gentleman, as a result of the discussion with counsel, I am overruling the objection that has been made with respect to the question posed by [the prosecutor.]
>
> However, I am going to instruct you as to a limitation with respect to the anticipated information that is going to come as a result of that particular question. This question is going to be posed by the prosecutor as he did. I am going to ask him to restate the question.
>
> The answer that is being given by this witness is not to be considered by you for the truth of that answer. So you are not to consider that what her answer is contains information that is truthful, only that the information that she is about to relay in response to this question is to be used by you to, as an explanation as to what it is that she did as a result of receiving the information. So it explains her motivation for what she did next. So only this, this answer to this question is to be limited to

23

the use as an explanation of what the witness did next.

In the presence of the jury, this colloquy took place between the prosecutor and Brooks:

Brooks:    The man approached me — I was on my way up to my house — and he said, you know, do you know such and such? I said yes, I know [defendant]. And he said you know he killed someone. I was like, okay, go further on, what you were telling me. He was like, well, my cousin was there at the wrong time, and they got him. And if you see your boyfriend again tell him they are out to get him.

*****

Prosecutor:  Did you tell him the guys said that he had killed somebody?

Brooks:    Yes, I did.

Prosecutor:  And what was his reaction to that?

Brooks:    He then, we had left out the cafeteria and we stopped by [the] guidance office. And he confessed to me, he said that they was [sic] struggling I guess when the man was taking out the garbage and [the] gun had went [sic] off, but it was by mistake.

Prosecutor:  At the initial time when he told you, when you told him that some guy approached you and said that [defendant] had killed somebody, did he deny that at that point?

Brooks:    Yes, [defendant], he denied at first, then he confessed by [the] guidance office.

*****

Brooks:    He told me him and his friends were

24

walking, and that he . . . went to grab
the guy, and as soon as he grab [sic] the
guy the gun went off.   And I started
crying.   Then I went to my first period
class.

"Hearsay" is technically defined as those statements, other
than ones made by the declarant while testifying at trial, which
are "offered in evidence to prove the truth of the matter
asserted." N.J.R.E. 801 (c); Spragg v. Shore Care, 293 N.J. Super.
33, 56 (App. Div. 1996); State v. Modell, 260 N.J. Super. 227, 247
(App. Div. 1992), certif. denied, 133 N.J. 432 (1993); State v.
Johnson, 216 N.J. Super. 588, 600 (App. Div. 1987).   Brooks'
statement clearly included hearsay matter because the declarant was
not testifying.   The judge admitted the statement under the
"adoptive admission" exception and the "state of mind" exception.

The adoptive admission exception to the hearsay rule is
described in N.J.R.E. 803(b)(2).   It provides that "[a] statement,
offered against a party which is . . . a statement whose content
the party had adopted by word or conduct or in whose truth the
party has manifested belief" is admissible.   State v. Dreher, 302
N.J. Super. 408, 505-06 (App. Div.) certif. denied, 152 N.J. 10
(1997); State v. Gorrell, 297 N.J. Super. 142, 151 (App. Div.
1996); State v. Thompson, 59 N.J. 396, 408-10 (1971).   While due
caution must be exercised when dealing with a hearsay statement
such as an adoptive admission, admission of a statement under this
exception is permitted.   State v. Dreher, 302 N.J. Super. at 506;
State v. Briggs, 269 N.J. Super. 555, 562 (App. Div.), certif.

25

denied, 41 <u>N.J.</u> 99 (1995), citing <u>Greenberg v. Stanley</u>, 30 <u>N.J.</u>
485, 498 (1959).   Critical to such admission is the requirement
that the defendant disclose, or be made aware of, the content of
the assertion he is allegedly admitting.   <u>State v. Briggs</u>, 279 <u>N.J.</u>
<u>Super.</u> at 562-63.

In the present case, it does not appear defendant adopted the
hearsay statement made by Brooks that defendant "killed someone."
According to Brooks, defendant initially denied the accusation.
Even when he "admitted" his involvement in the crime, he never
actually admitted he had killed anyone.   He told Brooks that "they
was struggling I guess when the man was taking out the garbage and
gun [sic] had went [sic] off, but it was by mistake." There was no
indication to whom "they" referred.   Brooks also testified that
defendant told her he was walking with some friends, and that he
"went to grab the guy, and as soon as he grab the guy the gun went
off."

We conclude that the out-of-court accusation related by Brooks
is a poor fit for the "adoptive admission" exception to the hearsay
rule.   Admissibility under this exception was not justified.   Any
alleged admission by defendant was too vague and factually
qualified in this circumstance for admission into evidence.

The judge also admitted the out-of-court accusation to Brooks
under the so-called "state of mind" exception to the hearsay rule.
This is explained in Biunno, <u>Current N.J. Rules of Evidence</u>, §
801[4] at 768-69 (2000 ed.):

Where "statements are offered not for the truthfulness of their contents, but only to show that they were in fact made and that the listener took certain action as a result thereof, the statements are not inadmissible hearsay." Spragg v. Shore Care, 293 N.J. Super. 33, 56 (App. Div. 1996). Many of the cases discussed in this section illustrate this concept.

When a statement is offered to prove the probable state of mind it induced in the listener, such as to show information which the listener had which bore on the reasonableness or good faith of his subsequent conduct, that evidence is not ordinarily excluded as hearsay. Id. at 57. "However, such an out-of-court statement frequently has an impermissible hearsay aspect as well as a permissible non-hearsay aspect." Id. Therefore, such evidence is generally admitted with a limiting instruction pursuant to N.J.R.E. 105, unless the evidence must be excluded under N.J.R.E. 403 because the probative purpose of the statement is substantially outweighed by the danger of its improper use. Id. See also State v. Alston, 312 N.J. Super. 102, 114 (App. Div. 1998), noting that even if the substance of an officer's telephone conversation with an anonymous tipster had been offered not for the truth of the matter contained therein (that defendant committed a crime), but merely to show why the officer went looking for the defendant, it should have been excluded under N.J.R.E. 403 because the probative value was substantially outweighed by the risk of undue prejudice.

In Ringwood Assoc's, Ltd. v. Jack's of Route 23, 166 N.J. Super. 36, 43 (App. Div. 1979), the court held that in a suit by a landlord against a commercial tenant, the extrajudicial statements of the principal stockholder of plaintiff's predecessor in title that he would not under any circumstances consent to an assignment of the lease, were not hearsay. The court reasoned that the statements were not offered to prove

27

> the truth of the matter asserted therein, but
> to show by the fact of the making of the
> statements that refusal to consent to an
> assignment was unreasonable and thereby
> breached the lease.   The court held the
> statements properly admissible as "verbal
> acts."   That same terminology was used in
> State v. Humanik, 199 N.J. Super. 283, 306
> (App. Div. 1985), certif. denied, 101 N.J. 266
> (1985), rev'd, 871 F.2d 432 (3rd Cir.), cert.
> denied sub norm., Beyer v. Humanik, 493 U.S.
> 812 (1989).

"It is well settled that the hearsay rule is not violated when a police officer explains the reason he approached a suspect or went to the scene of the crime by stating that he did so 'upon information received.'"   State v. Bankston, 63 N.J. 263 (1973). When the officer becomes more specific by repeating what some other person told him concerning a crime by the accused, the testimony violates the hearsay rule as well as defendant's fundamental right to confront that individual.   State v. Alston, 312 N.J. Super. 102, 113 (App. Div. 1998).   Further, "when the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the defendant's guilt, the testimony should be disallowed as hearsay."   Ibid.

In the present case, there is no doubt the implication drawn from Brooks' testimony was that someone told her defendant killed Saraiva.   Defense counsel expressly had no objection to Brooks testifying that she had questioned defendant as a result of something she had been told.   The State argued that the testimony was offered, not to prove the truth of the matter asserted, but to explain Brooks' reason for and state of mind in approaching

28

defendant regarding his possible involvement in the crime.  If we accept the contention that the contents of Brooks' statement were not to prove the truth of the matter asserted, and despite the limiting instruction, the statement had some prejudicial potential per N.J.R.E. 403(a), though slight in this context.  See also State v. Marshall, 123 N.J. 1, 132-33 (1991), cert. denied, 507 U.S. 929 (1993), where the Court stated:

> Defendant contends that Hahn's testimony that Rakoczy had arranged to have his car stolen was hearsay, admitted in violation of Evidence Rule 63.  In this context, however, we conclude that Hahn's testimony did not constitute hearsay because it was offered to prove her state of mind — her motive for firing Rokoczy [sic] — and not to prove the truth of the statements attributed to Rakoczy. Accord State v. Johnson, 216 N.J. Super. 588, 600, 524 A.2d 826 (App. Div. 1987); State v. Smith, 113 N.J. Super. 120, 138-39, 273 A.2d 68 (App. Div. 1971); 6 Wigmore, Evidence § 1789 (Chadbourn rev. 1976) ("Wherever an utterance is offered to evidence the state of mind which ensued in another person in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the hearsay rule is concerned.")  Hence we find no error in the admission of the challenged testimony, nor any prejudice from the trial court's omission to instruct the jury, sua sponte, on the limited relevance of the testimony.  See Evid. R. 6.  The issue concerning the type of mailbox in use at the motel was vigorously contested,  and  Rakoczy's  testimony  was supported by other witnesses.   It is most improbable that the testimony in question influenced the jury significantly.

[Id. at 132-33.]

29

As in Marshall, we think it most improbable that the out-of-court statement uttered by Brooks influenced the jury.

On balance, we find no reversible error in the admission of Brooks' testimony about the out-of-court accusation of defendant to Brooks by the unnamed person.  Unlike Bankston and Alston, this incident had nothing to do with police officers' hearsay statements, presumably motivated by investigative information of some reliability, in rendering testimony about why they approached a suspect.  Brooks never validated or gave any credence to the accusation.  Indeed, she surely did not want to believe it.  The judge gave careful guidance to the jury on the precise and very limited reason for admissibility.  Only Brooks made reference to the statement.  No other witness did.  As indicated, the single reference was brief and was not repeated.  The prosecutor made no reference to it in his summation.  This out-of-court statement provided no crucial evidence or critical link in a chain of evidence against defendant.  Cf., State v. Manning, 82 N.J. 417, 421-22 (1980) (hearsay statement critical to State's case).

This was a singular and fleeting incident of an anonymous out-of-court accusation, carefully neutralized by the judge's instruction.  In light of the strong evidence of defendant's involvement in this robbery-murder episode, much of it unchallenged and furnished from defendant's own mouth and by his friends and cohorts, beyond any reasonable doubt, we see no potential for harm, no Confrontation Clause violation, and no reversible error.  White

v. Illinois, __ U.S. ___, 116 L. Ed.2d 848, 859 (1992) (firmly-
rooted exception to hearsay rule not Confrontation Clause
violation); Delaware v. VanArsdall, 475 U.S. 673, 684, 89 L. Ed.2d
674, 687, 106 S. Ct. 1431 (1986) (Confrontation Clause violations
subject to harmless error analysis by state court).

VI

Defendant next urges that defendant's conviction must be
reversed because of prosecutorial misconduct.  Defendant asserts
that the prosecutor engaged in name-calling and suggested to the
jury that he was aware of facts outside the record.  Because
defense counsel raised no objection at trial about defendant
"making his bones" or to the name-calling, the issue of
prosecutorial misconduct is raised as plain error.  R. 2:10-2.

In assessing whether prosecutorial misconduct, such as
improper remarks in summation, requires reversal, an appellate
court must determine whether "the conduct was so egregious that it
deprives the defendant of a fair trial." State v. Frost, 158 N.J.
76, 83 (1999); State v. Loftin, 146 N.J. 295, 386 (1996); State v.
Ramseur, 106 N.J. 123, 322 (1987).  Allegations of prosecutorial
misconduct require that an appellate court assess first, whether
the complained-of conduct was improper and second, whether the
impropriety was so egregious that the defendant was deprived of a
fair trial.  In considering the second point

> an appellate court must consider (1) whether
> defense counsel made timely and proper

31

> objections to the improper remarks; (2)
> whether the remarks were withdrawn promptly,
> and (3) whether the court ordered the remarks
> stricken from the record and instructed the
> jury to disregard them.

[State v. Frost, 158 N.J. at 83.]

The scope of a prosecutor's summation is limited to commenting upon the evidence and drawing reasonable inferences therefrom. State v. Feaster, 156 N.J. 1, 58 (1998); see State v. Perry, 65 N.J. 45, 48 (1974); see State v. Mayberry, 52 N.J. 413, 437 (1968); State v. Bucanis, 26 N.J. 45, 56, cert. denied, 357 U.S. 910 (1958). Comments which go beyond legitimate inferences drawn from the record constitute misconduct, but are not necessarily grounds for reversal. State v. Harris, 156 N.J. 122, 194 (1998).

In the present case, defense takes exception to two comments made by the prosecutor, neither of which defendant objected to at trial. With regard to the first comment, the prosecutor said:

> Now [defense counsel] says why would this
> crazy man give up the gun? I tell you why he
> would give up the gun. Very simple. Because,
> as [defendant] said in his statement that was
> read to you, earlier before this written
> statement do you recall telling this detective
> and your mother that you and [Harvey] were
> looking to rob someone because you wanted to
> know how it felt. That's what he said. He
> wanted to know how it felt. And this gun was
> given up to [defendant] because [defendant]
> was going to make his bones, so to speak, he
> wanted to know how it felt. And they came
> upon a man, and what happens. Antwan is
> talking tough. And you heard from April, and
> defense brought this out. If he gives me any
> resistance, I am going to bust him. That's
> what Antwan said when he got the gun.

> [Defendant] says I will bust him too.  Well,
> now, [defendant] is getting into this.  You
> want the gun, says [Harvey]?  Yeah.  And
> [defendant] takes the gun.  Why does he give
> it up?  Because his friend wants to know how
> it felt.  He wants to know how it feels to do
> the robbery, that's why he gives him the gun.

Defendant argues that this remark that defendant "was going to make bones" was improper because it was outside of the evidence. The State says defendant's claim is meritless.  The State contends that the remark was made in response to defense counsel's summation and was a fair comment on the evidence.  The reviewing court must consider "the tenor of the trial and the degree of responsiveness of both counsel and the court to the improprieties when they occurred."  State v. Marshall, 123 N.J. at 15.

Taking into account the tenor of the trial, it appears the prosecutor's "bones" comment was another way — clearly a more colorful and graphic way — of describing to the jury the defendant's intent to commit the robbery "to see how it felt." "Although generally limited to commenting on the evidence and drawing any reasonable inferences supported by the proofs, a prosecutor may nonetheless, make 'a vigorous and forceful presentation of the State's case.'" State v. Dixon, 125 N.J. 223, 259 (1991) (quoting State v. Bucanis, 26 N.J. at 56).  The "bones" comment is tangentially an allusion to defendant's comment that he committed the robbery "to see how it felt."  Also, the defense made no objection to the remark at the time it was made.  The lack of objection may be construed to mean that counsel did not consider

the error significant in the context of the trial.  State v. Macon, 57 N.J. 325, 333 (1971).  Moreover, arguably the prosecutor's remark may have been a fair comment on the evidence.  Even if this statement by the prosecutor constitutes error, we think it harmless in this fleeting, singular context.

With regard to the second comment, the prosecutor stated:

> [Mr. Saraiva] was a  man basically protecting his castle.  A man who resented being approached by a couple of thugs and being told to run his pockets.  And if we were teaching courses we would say better to submit and fight it out another day.  He didn't do that because he was insulted by the fact these thugs could come and just walk up, point a gun at him, and take his money.

In State v. Dixon, our Supreme Court considered whether comments made by the prosecutor deprived defendant of his right to a fair trial.  State v. Dixon, 125 N.J. at 258.  Specifically, the Court considered whether the prosecutor's remarks referring to defendant as a "big man" among "lesser thugs" deprived him of a fair trial.  The Court found that defendant's right to a fair trial was not violated by these comments.  Id. at 259.  The Court reasoned that these comments were sufficiently related to the evidence before the jury.  Ibid.

In the present case, the prosecutor's comment referring to defendant as a "thug" was also related to the scope of the evidence before the jury.  The "thugs" comment illustrated the callousness of Harvey and defendant's mugging of Saraiva, which turned into a

felony murder.   Again, defense counsel did not object to this comment during the prosecutor's summation.   Again, we find the claimed error, if it existed, was harmless.

In addition, the trial judge twice admonished the jurors in both his preliminary instructions and again in his general instruction at the conclusion of the case, that counsels' remarks were not evidence and that they were to determine questions of fact based on the evidence and exhibits at trial.

VII

Finally, defendant contends that his base term of fifty-years is excessive.   Defendant argues that the judge's evaluation of the aggravating and mitigating factors was improper.   Specifically, defendant contends that the judge failed to consider defendant's youth, his lack of a prior record, and the hardship of imprisonment as mitigating factors.

Appellate review of sentences is quite limited.   State v. Megargel, 143 N.J. 484 (1996).   In State v. Roth, 95 N.J. 334, 364-66 (1984), our Supreme Court set forth the standard of appellate review for sentencing decisions.   First, the appellate court must insure that the sentencing judge followed the correct sentencing guidelines; second, the appellate court must insure that the trial judge based her findings regarding the sentencing factors on "competent, reasonably credible evidence", and third, this court must insure that the sentencing judge did not err in applying the facts to the law such that the sentence shocks the judicial

35

conscience.   An appellate court "must avoid the substitution of appellate judgment for trial court judgment."  State v. Megargel, 143 N.J. at 493 (citing Roth, 95 N.J. at 365).

N.J.S.A. 2C:11-3b provides that the term of imprisonment for murder shall be between thirty years and life imprisonment, with a mandatory thirty-year period of parole ineligibility.   After finding that the aggravating factors substantially outweighed the mitigating factors, Judge Malone sentenced defendant to an aggregate term of fifty years with a thirty-year period of parole ineligibility.   The judge found as aggravating factors the nature of the offense and the need to deter.  N.J.S.A. 2C:44-1a(1) and (9).   Judge Malone stated:

> The need of this court to impose a sentence that will deter him and others from this type of activity is incredibly strong.  The manner of the commission of this crime is an additional aggravating factor, one that cries out for this court to impose a serious sentence because of the seriousness of what took place.

The judge recognized the testimony from defendant's friends and relatives about defendant being a truthful, law-abiding individual. He found, however, that "[t]here must be two Marvin Mathises, because that person who participated in the crime is not the person that other people have written and spoken of."  The judge found as the only mitigating factor, the lack of any criminal record. N.J.S.A. 2C:44-b(7).

Defendant contends that the nature and circumstances of this

36

offense and the role of defendant in the commission of the offense should not have been weighed in aggravation. Defendant relies, in part, on N.J.S.A. 2C:44-1a(1) for the proposition that the nature of the offense cannot be an aggravating factor in every case; rather, it applies where the crime "was committed in an especially heinous, cruel, or depraved manner." State v. Jarbath, 114 N.J. 394, 404 (1989).

While all murders by their very nature are extremely serious, "[t]o justify the finding of that aggravating factor, the defendant must have intended to not only kill, but to 'inflict pain, harm, and suffering' — in addition to intending death." State v. O'Donnell, 117 N.J. 210 (1989) (citing State v. Ramseur, 106 N.J. 123 (1987)).

On the record, the sentencing court should identify the aggravating and mitigating factors, describe the balance of the factors, and explain how it determined defendant's sentence. State v. Kruse, 105 N.J. 354, 360 (1987). The judge found that

> this defendant, Marvin Mathis, apparently in some misguided desire to show what he was, to show off, to show that he could be as tough as the next guy, decided to participate in the attempted robbery of Mr. Saraiva, insisted on having the gun so that he could show, as I said, just how tough he could be.

> That activity by Mr. Mathis, that decision on his part to do that senselessly resulted in the death of Mr. Saraiva, a man who was doing nothing more than the task that we all do all the time, a simple household task of taking out the garbage. But Mr. Saraiva had the misfortune to come upon this

37

group of criminals who were, who had started out their evening's activity looking for someone to rob.

In the present case, the death of the victim is an element of murder and may not be considered as an aggravating factor. See State v. Rogers, 236 N.J. Super. 378, 387 (App. Div. 1989), aff'd, 124 N.J. 113 (1991). Nevertheless, the sentencing judge's analysis and weighing of the aggravating and mitigating factors seems appropriate. His finding of N.J.S.A. 2C:44-1a(1) as an aggravating factor seems supported by the evidence. The proofs show that the victim was shot once at close range. The bullet entered just below the victim's left eye in the nasal area and exited through the back of his head. While there is no evidence of an intention to inflict pain such that the death itself could not be considered an aggravating factor, where the judge is sentencing for a group of charges inherent elements of one charge can be used as aggravating factors for another. State v. Boyer, 221 N.J. Super. 387, 405-06 (App. Div. 1987), certif. denied, 110 N.J. 299 (1988)(death of victim cannot be used in sentence for murder but can for weapons charge). In this case, defendant was sentenced on several charges including murder, armed robbery, and unlawful possession of a weapon. The judge imposed concurrent terms of 18 years with a six-year parole bar for robbery and a four-year term with an 18-month parole bar for unlawful possession of a weapon.

Defendant also contends that the judge failed to consider defendant's youth as a mitigating factor. The defendant urges

38

that at the time of the crime defendant was age fifteen.  Defendant also urges that defendant was accompanied by three older people, two of them adults, and was influenced by them.  While the youth of an offender may be considered as a mitigating factor, the sentence imposed must reflect the Legislature's intention to focus on the degree of the crime itself as opposed to other factors personal to the defendant.  State v. Hodge, 95 N.J. 369 (1984).

In the present case, the defendant's acknowledged willingness to participate in a crime to "see how it felt" was reprehensible.  As Judge Malone found, "the need of this court to impose a sentence that will deter him and others from this type of activity is incredibly strong.  The manner of the commission of this crime is an additional aggravating fact, one that cries out for this court to impose a serious sentence because of the seriousness of what took place."

With regard to the mitigating factor of hardship under N.J.S.A. 2C:44-1b(11), defendant claims that being committed to prison at such a young age will result in having his life molded by the system and that this constitutes hardship.  The judge was not compelled to accept this as a mitigating factor.  See State v. Rivers, 252 N.J. Super. 142 (App. Div. 1991).

The trial judge properly found there was a need to deter or discourage defendant and others from violating the law.  While this court may not have imposed the same sentence, an appellate court does not sit to substitute its judgment in sentencing for the trial

judge. O'Donnell, 117 N.J. at 215. An appellate court is bound to affirm a sentence, even if it would have reached a different result, as long as the trial judge properly identifies and balances the aggravating and mitigating factors that are supported by competent credible evidence. Ibid. (Defendant's cohort Harvey, age 20, was convicted on December 9, 1998 and received a 60-year base term with a 30-year parole bar.)

Affirmed.

I hereby certify that the
foregoing is a true copy of the
original on file in my office.

Clerk

40