Marvin Mathis #304144/244859-C
New Jersey State Prison
P.O. Box 861.
Trenton, New Jersey 08625-0861

December 14, 2009

Jodi Ferguson, Esq.
Assistant Deputy Public Defender
Office of the Public Defender
Appellate Section
31 Clinton Street, 9th Floor
P.O. Box 46003
Newark, New Jersey 07101

Re: **State v. Marvin Mathis**
    **App. Div. Dkt. No. A-3695-07T4**

Dear Ms. Ferguson:

Enclosed for filing in the referenced matter, please find a copy of my <u>pro se</u> supplemental brief and appendix on the merits of the instant appeal.

Upon filing please send the needed copies of the same to Designated counsel, Allen I. Smith, the Clerk of the Appellate Division and to the Office of the Attorney General.

Thank you very much for your courtesy.

Very truly yours,

Marvin Mathis

Marvin Mathis #304144/244859-C
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3695-07T4

STATE OF NEW JERSEY,                  :

     Plaintiff-Respondent;           :

                           :

V.                                    :

MARVIN MATHIS,                        :

     Defendant-Appellant.            :

                           :

### CRIMINAL ACTION

On Appeal from a Denial
of Petition for Post-
Conviction Relief from
the Superior Court of
New Jersey Law Division,
Union County

Sat Below:

Hon. John F. Malone, J.S.C.

## PRO SE SUPPLEMENTAL BRIEF AND APPENDIX ON BEHALF OF DEFENDANT-APPELLANT MARVIN MATHIS

Marvin Mathis
#304144/244859-C
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625

APPELLANT IS CONFINED

TABLE OF CONTENTS

PAGE NOS.

PROCEDURAL HISTORY .......................................   1

STATEMENT OF FACTS .......................................   4

LEGAL ARGUMENT

   POINT I

       THE DEFENDANT RIGHT TO EFFECTIVE ASSISTANCE OF
       COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO
       THE UNITED STATES CONSTITUTION AND ART I, PAR
       10 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED
       BY ASSIGNED PCR COUNSEL FAILURE TO COMPLY WITH
       R. 3:22-6(d) BY NOT ADVANCING THE DEFENDANT'S
       ARGUMENTS SET FORTH IN HIS FEBRUARY 24, 2005
       PRO SE MEMORANDUM OF LAW AND APPENDIX ON PCR ....   18

                A.

       PCR COUNSEL FAILED TO INVESTIGATE, INTERVIEW
       AND SECURE AFFIDAVITS FROM THREE EXPERT
       WITNESSES, SUCH PSYCHOLOGICAL EVIDENCE WAS
       CRUCIAL IN ADVANCING DEFENDANT'S COMPETENCY
       CLAIM ON PCR, CONTRARY TO THE SIXTH AND
       FOURTEENTH AMENDMENT .........................   24

                B.

       PCR COUNSEL FAILED TO RAISE ON PCR INEFFECTIVE
       ASSISTANCE ON APPELLATE COUNSEL FAILURE TO RAISE
       ON DIRECT APPEAL, TRIAL COUNSEL'S FAILURE TO
       ELICIT THE AID OF AN EXPERT WITNESS TO
       ILLUSTRATE DEFENDANT'S LIMITED MENTAL ABILITY
       AND HIS STATUS AS A SPECIAL EDUCATION STUDENT,
       CONTRARY TO THE SIXTH AND FOURTEENTH
       AMENDMENT ....................................   32

-i-

## INDEX TO APPENDIX

**PAGE NOS.**

Order Denying Defendant's Petition for
Post-Conviction Relief ............................ Da 1

Order Denying Motion for Reconsideration of
the Denial of Defendant's Petition for Post-
conviction Relief and letter Opinion by
Judge John F. Malone ............................. Da 2,3

Notice of Appeal ..................................... Da 4

Order Granting Defendant's Motion to Proceed As An
Indigent and Free transcripts ..................... Da 6

Defendant's pro se Memorandum of Law and Appendix
in Support of Petition for Post-Conviction Relief ..... Da 7 to 76

New Jersey State Prison's CO-30a "Postage Remit
Form" ............................................. Da 77, 78
                                                          79

New Jersey State Prison's Inmate Trust Account
Statement ......................................... Da 80

Letter to Criminal Division Manager,
Andrea Ferraro .................................... Da 81

New Jersey State Prison's CO-30a "Postage Remit
Form" ............................................. Da 82

New Jersey State Prison's Inmate Trust Account
Statement ......................................... Da 83

Letter to PCR Counsel Lewis D. Thompson via
Certified Mail .................................... Da 84, 85
                                                     86 & 87

Letter to Criminal Division Manager,
Bernadetta A. Fiore, Ph.D. ........................ Da 88

New Jersey State Prison's CO-30a "Postage Remit
Form" ............................................. Da 89, 90
                                                        & 91

New Jersey State Prison's Inmate Trust Account
Statement ......................................... Da 92

## INDEX TO APPENDIX (cond't)

PAGE NOS.

Defendant's pro se Second Amended Petition in
Support of Petition for Post-Conviction
Relief .............................................. Da 93, 94
                                                                95 & 96

Letter to PCR Counsel Lewis D. Thompson via
Certified Mail ...................................... Da 97, 98
                                                                & 99

Appellate Counsel Paul Klein's Letter Dated
July 21, 1999 ...................................... Da 100, 101

Defendant's Letter to Appellate Counsel
Paul Klein via Certified Mail Dated
May 23, 2000 ....................................... Da 102, 103

## TABLE OF AUTHORITIES

### CASES

PAGE NOS.

Ake v. Oklahoma, 470 U.S. 68,
105 S.Ct. 1087 (1985) ................................. 35, 36, 37

Evitts v. Lucey, 469 U.S. 387,
105 S.Ct. 830 (1985) .................................         38

In Re Cannady, 126 N.J. 486 (1991) .................         35

In Re Kanffman, 126 N.J. 499 (1991) ................         35

Miranda v. Arizona, 384 U.S. 103,
104 S.Ct. 1304 (1966)................................          2

State v. Afanador, 151 N.J. 41 (1997) ..............         22

State v. Casimono, 298 N.J. Super. 22
(App. Div. 1997) ....................................         22

State v. Cummings, 321 N.J. Super. 154
(App. Div. 1999), Certif. Denied 162 N.J. 199
(1999) ..............................................         29

State v. Difrisco, 174 N.J. 195 (2002) .............         35

State v. Fritz, 105 N.J. 42 (1987) .................     30, 38

State v. Green, 55 N.J. 13 (1969) ..................         35

State v. King, 117 N.J. Super. 109
(App. Div. 1971) ....................................         22

State v. Mayron, 344 N.J. Super. 540
(App. Div. 2001) ....................................         22

State v. Morrison 215 N.J. Super. 540
(App. Div. 1987) ....................................         38

State v. Orrecchio, 16 N.J. 125 (1954) .............         39

State v. Preciose, 129 N.J. 451 (1992) .............     22, 30

State v. Rue, 175 N.J. 1 (2002) .................... 18, 21, 22,
                                                     23, 24, 29, 31

TABLE OF CASES (cont'd)

PAGE NOS.

State v. Sexton, 311 N.J. Super. 70
(App. Div. 1998), aff'd on other grounds.
160 N.J. 93 (1999) ..................................   36

Strickland v. Washington, 4   U.S. 668,
104 S.Ct. 2052 (1984) ..............................   30, 38

State v. Velez, 329 N.J. Super. 128
(App. Div. 2000) ...............................22, 29, 30,
                                                         31

State v. Webster, 187 N.J. 254 (2007) ...............18, 21, 23,
                                                    24, 29, 31

United States v. Cronic, 466 U.S. 648,
104 S.Ct. 2039 (1984) ..............................   30

## TABLE OF STATUTES CITED

PAGE NOS.

N.J.S.A. 2A:4A-26 ........................................  1

N.J.S.A. 2C:2-6 .........................................  1

N.J.S.A. 2C:11-3a(a) ....................................  1

N.J.S.A. 2C:11-3a .......................................  1

N.J.S.A. 2C:15-1 ........................................  2

N.J.S.A. 2C:39-4(a) .....................................  2

N.J.S.A. 2C:39-5b .......................................  2

N.J.S.A 2C:158A-5 ....................................  35, 37

## TABLE OF RULES CITED

R. 3:22-6(d) ...................................18, 21, 23,
                                               24 29, 31

## CONSTITUTIONAL PROVISION CITED

N.J. Const. Art. I, par. 10 ..........................  34

U.S. Const., amend. XIV ...........................35, 36,
                                                   37

## PROCEDURAL HISTORY

On January 25, 1996, Union County Juvenile Delinquency Complaint No. FJ 20-01786-96-E was filed against defendant-appellant Marvin Mathis for acts which, if committed by an adult, would constitute the crime of armed robbery, contrary to N.J.S.A. 2C:15-1 and N.J.S.A. 2C:2-6, and felony murder, contrary to N.J.S.A. 2C:11-3a(a).

On October 10 and November 11, 1996, the Honorable Rudolph N. Hawkins, Jr. J.S.C., considered via stipulation by the parties the state's motion to refer defendant to the Superior Court Criminal Division, pursuant to N.J.S.A. 2A:4A-26. Judge Hawkins granted the state's motion to waive jurisdiction of the acts alleged in the juvenile complaint to adult court. (2MT 19-15 to 29-21).[1]

On February 4, 1997, a Union County Grand Jury returned Indictment No. 97-02-00123 charging defendant with first degree murder, contrary to N.J.S.A 2C:11-3a (1) and/or (2); in count

---

[1]   "1MT" refers to the transcript of October 10, 1996, Juvenile waiver hearing.
      "2MT" refers to the transcript of November 11, 1996, Juvenile waiver hearing.
      "3MT" refers to the transcript of June 9, 1998, Miranda hearing
      "1T"  refers to the transcript of June 10, 1998
      "2T"  refers to the transcript of June 11, 1998 (a.m.)
      "3T"  refers to the transcript of June 11, 1998 (p.m.)
      "4T"  refers to transcript of June 16, 1998
      "5T"  refers to the transcript of June 17, 1998 (a.m.)
      "6T"  refers to the transcript of June 17, 1998 (p.m.)
      "7T"  refers to the transcript of June 18, 1998
      "ST"  refers to the sentencing transcript of August 14, 1998
      "PCR" refers to transcript of February 29, 2008 (PCR hearing)
      " Da" refers to the appendix to this brief

two with first-degree armed robbery, contrary to N.J.S.A. 2C:15-1; in count three with felony murder, contrary to N.J.S.A. 2C:11-3a(3); in count four with second-degree possession of a firearm for an unlawful purpose, contrary to N.J.S.A. 2C:39-4a; and in count five with third-degree unlawful possession of a weapon contrary to N.J.S.A. 2C:39-5b.

Following an unsuccessful Miranda[2] motion before the Honorable Judge John F. Malone, J.S.C., on June 9 and 10, 1998. Defendant was tried before Judge Malone and a jury on June 10, 11, 16, 17, and 18, 1998. Defendant was found guilty of all charges. (7T 82-18 to 84-1).

On August 14, 1998, the court sentenced defendant to an aggregate term of 50 years in prison, with a parole bar of 30 years. The appropriate statutory penalties were imposed, and defendant was given credit of 934 days for time in custody. (ST 10-16 to 12-6).

By Order of March 15, 1999, the Appellate Division granted the defendant's motion to file a notice of Appeal nunc pro tunc.

On appeal to the Superior Court of New Jersey Appeallate Division, defendant's conviction were affirmed on June 02, 2000.

Thereafter defendant sought further review of his case by way of a petition for certification which was filed with the Supreme Court of New Jersey, his petition was denied without a opinion on October 10, 2000.

On April 26, 2001 defendant filed a timely petition for

---

[2] Miranda v. Arizona, 384 U.S. 1034, S.Ct. 1303 (1966).

post-conviction relief with the Criminal Case Manager of the Union County Superior Court.

On February 29, 2008, the Honorable Judge John F. Malone, J.S.C. denied defendant's petition for post-conviction relief without scheduling an evidentiary hearing. (Da 1).

On March 10, 2008, defendant filed a motion for reconsideration of the order denying defendant's petition for post-conviction relief. The matter was denied by Judge Malone on July 02, 2008 and expressed in his written letter opinion on July 03, 2008. (Da 2 and 3).

By Order of this Court filed on May 06, 2008, defendant was permitted to file his Notice of Appeal; to proceed as an indigent and for free transcripts on March 25, 2008. (Da 4).

## STATEMENT OF FACTS

On the night of January 22, 1996, Antonio Saraiva was killed
in front of his store by a gunshot wound to the head. The issue
at trial was whether Marvin Mathis, a 15-year old special
education student, who was in the company of a 20-year old man
and two women shot Mr. Saraiva by his own hand during a robbery;
was assisting the 20-year-old Antwan Harvey in a robbery when
that the codefendant shot Saraiva; or whether the gun went off
during a struggle while Mathis was trying to stop the codefendant
Harvey from shooting Saraiva.

Antonia Saraiva and her husband, Antonio, owned the
Portuguese American Wine and Liquor store on East Jersey Street
in Elizabeth, and lived in an apartment above the store.
According to Mrs. Saraiva, on January 22, 1996, sometime after
10:00 p.m., Mr. Saraiva closed the store and carried the trash
cans to the street. Mrs. Saraiva, who remained in the store,
heard shots, ran out from the back of the store, and down an
alleyway to the locked security gates. She saw her husband on
the ground. A "dark man," a "Jamaican" who used to frequent
their store, was calling her husband by name. (1T 41-9 to 44-
1; 1T 47-2 to 9) Mrs. Saraiva ran back into the house to get
the keys for the security gates. When she returned and opened
the gates, her husband was alone and unconscious. (1T 44-2 to
16).

Union County Medical Examiner Graciela Linares found a
single bullet wound to Mr. Saraiva's head; she estimated that
the gun was shot form a distance of eighteen inches or less.

(4T 23-1 to 5; 4T 25-3 to 28-18; 4T 34-7 to 12). The wound would have caused death within a few minutes. (4T 31-15 to 18)

Elizabeth police officers Gene Antonucci and Rocco Malgieri responded to the scene of the shooting. (1T 48-18 to 50-10; 1T 51-1 to 18) Antonucci searched the area for bullets or bullet casings, but found none. (1T 52-12 to 17) Malgieri found Saraiva's brown leather wallet on nearby South Park Street. (1T 59-14 to 63-13)

When Mathis' girlfriend, Sharlama Brooks, saw him in school the morning after the shooting, he asked her to tell anyone who asked that he was with her the night before between the hours of seven and 11. Brooks, who was home alone during those hours, was not willing to say they had been together. (1T 65-1 to 66-18) When she questioned Mathis about his request, he turned away from her and said that if he told her, she would "black out," which she took to mean that she would "get mad at him." (1T 66-21 to 67-7) Brooks told Mathis that on the previous night a man had confronted her and told her that Mathis had killed someone. At first, Mathis denied it, but he then told Brooks that "they was struggling I guess when the man was taking out the garbage and gun [sic] had went off, but it was by mistake." (1T 74-1 to 75-13) In her statement to the police, Brooks stated that Mathis told her he was walking with some friends, and "Marvin went to grab the guy, and as soon as he grab [sic] the guy the gun went off." (1T 76-24 to 77-3)

After Mathis told Brooks about the shooting, she became upset and started to cry. A school security guard who observed

5

her crying took her to Janice Sutton, a substance abuse counselor
Brooks was still upset and crying when she related the story
to Ms. Sutton. (1T 77-2 to 79-51) The police were summoned,
and Brooks was transported to the police station where she gave
a statement. (1T 79-9 to 14)

Janice Sutton, the high-school counselor, testified about
her meeting with Sharlama Brooks. Brooks said her boyfriend
had been involved in a shooting or a murder; Sutton could not
remember the exact words used by Brooks. Sutton also stated
that Brooks may have indicated that her boyfriend's name was
Marvin. (4T 91-1 to 21-3; 4T 22-9 to 17) Sutton took Brooks
to the principal's office. She later accompanied her to the
police station and was present when Brooks gave her statement.
(4T 21-20 to 22-6)

Detective Thomas Koczur took Brook's statement, after which
he had Mathis transported to the police station. (2T 3-17 to
5-2; 2T 6-6 to 7-12) When Koczur first encountered Mathis in
a conference room, he was not under arrest and was not in
handcuffs. (2T 8-1 to 15) Koczur had another officer transport
Mathis's mother to police headquarters. (2T 8-19 to 9-10)

Koczur advised Mathis's mother that her son was a suspect
in a homicide. He explained the procedures they would be
following and what their rights were. (2T 9-15 to 10-3) Koczur
also advised Mathis of his rights. Mathis indicated that he
understood those rights and agreed to answer questions. Mathis's
added her consent. (2T 12-6 to 16-11)

At first, Mathis denied any involvement in the homicide,

6

stating that he was either at a different location or with his
girlfriend at the time. When Koczur confronted him with Brook's
statement, Mathis called her a liar. As he was confronted with
further inconsistencies in his story, he asked that his mother
leave the room, and he then gave a statement admitting his
presence at the shooting. He repeated the statement in his
mother's presence. (2T 17-2 to 19-21) In his oral statement,
Mathis said that he, Antwan Harvey, and a man from Carteret
called "Boz" were involved in the shooting. At the conclusion
of the oral interview, Koczur took what would be the first of
two written statements. (2T 20-17 to 21-18; 2T 36-16 to 24)

In the first statement, Mathis indicated that he met Harvey
and Boz sometime after 7:00 p.m. on January 22, 1996. Harvey
and Boz were looking for someone to rob, and they wanted Mathis
to hold the gun. Mathis refused. (2T 21-21 to 30-23) Harvey
came upon a man who owned a liquor store as he was taking out
the garbage and told the man, later identified as Saraiva, to
empty his pockets. When Saraiva said no, Harvey tried to go
through his pockets:

> Then they started fighting. The man threw a
> punch at Antwan [Harvey], and then Antwan
> threw a punch back. Then Antwan pushed
> him, then he shot him. The man fell. Antwan
> went into his pockets. He then told me to go
> into his pockets. I said no. He then called
> me a punk. Then I was in shock.

(2T 31-9 to 18) Following the shooting, they ran off. (2T 31-
19 to 22) Before leaving, Harvey took the victim's wallet from
his right back pocket. (2T 34-12 to 16)

After they took the first statement, the police executed

a warrant at a residence in Carteret, where Detective John Furda
of the Union County Prosecutor's Office seized items of clothing
described by Mathis. (2T 43-23 to 44-23) With the consent of
Mathis and his mother, Detective Furda searched their home and
seized pants fitting the description Mathis gave of the pants
he wore on the night of the robbery. (2T 47-19 to 49-25; 3T
158-3 to 159-25)

While Furda was searching Mathis's home, Koczur met with
other investigators. He returned to question Mathis again,
telling Mathis he did not believe what he had said in his first
statement. (2T 50-13 to 51-12)

At his second interview, Mathis indicated that the gun
went off during a struggle between him and Harvey. Mathis was
trying to stop Harvey from shooting the liquor store owner.
In his second statement, Mathis indicated that at about eight
o'clock on the night of the offense, he met Harvey on a street
corner in Elizabeth, and they met April Diggs and Renee Diggs
(cousins) at a nearby Chinese restaurant. Mathis, Harvey, and
the Diggs cousins intended to participate in a robbery. (2T
51-13 to 21; 2T 56-23 to 59-14; 2T 63-17) While walking on
Elizabeth Avenue, Harvey displayed a black revolver and asked
Mathis to act as lookout during the robbery. When Harvey
suggested robbing a man standing nearby, Mathis told him not
to. Mathis also told Harvey he would not participate in the
robbery of a nearby deli. (2T 59-15 to 61-5) As they continued
walking, the four of them came upon "two Spanish boys." Harvey
and April "started running after them real hard, and me and

the other girl jogging after them." The Spanish bys outran them.
(2T 61-20 to 62-6)

The four continued walking. By the time they came upon
Saraiva, it was no longer Mathis's intention to take part in
a robbery. Mathis explained that Saraiva was shot while Harvey
was attempting to rob him. Havrvey first tried to search Saraiva
pockets, prompting Saraiva to slap Harvey's hand. Harvey grabbed
Saraiva, who then grabbed Harvey. They exchanged punches, and
Harvey pulled out a gun, which Saraiva grabbed. Mathis joined
the struggle to prevent Harvey from shooting Saraiva. During
the three-way struggle, the gun went off twice. The second shot
struck the victim. Mathis did not believe that Harvey intended
to shoot anyone. After the shooting, Harvey went through
Saraiva's pockets. Neither Mathis or the two women, who had
been serving as lookouts, touched Saraiva. (2T 62-7 to 15; 2T
63-25 to 66-18) During Mathis's statement, the detective asked
him: "So all four of you committed this robbery?" Unlike Mathis's
other answers, which were all typed, that question was answered
with a handwritten "yes," followed by Mathis's initials. Koczur
believed that Mathis had written the answer when he read the
completed statement. (2T 69-6 to 70-14; 2T 88-4 to 89-12) During
his testimony, defendant denied ever having written "yes" on
the statement. (4T 155-9 to 24)

As a result of Mathis's statements, arrest warrants were
authorized for April and Renee Diggs and Antwan Harvey, and
the police seized clothing Mathis had said they wore during
the robbery, including a black ski which was obtained pursuant

9

to a warrant from the home of Stephen Owens, a close friend

of all the defendants. (2T 76-2 to 79-4)

Migdalia Heranadez, who lived with Owens in Elizabeth,

testified that Mathis, Harvey, and the Diggs were friends of

hers, and regularly visited her apartment. (3T 166-5 to 167-

24) They were all in her apartment on January 22, 1996. As the

four were leaving, Hernandez heard "one of them say they had

a gun." She did not know who made the statement, nor did she

ever see s gun. (3T 167-25 to 168-14; 3T 174-2 to 3) When they

left, Mathis and Harvey were carrying black face masks. The

four returned about an hour later, and the two males were still

carrying the face masks.

Hernandez did not remember what time the four left or when

they returned. (3T 169-15 to 170-16) Hernandez waited six months

before giving this information to the police, claiming that

although they were all close friends, and Harvey visited her

virtually every day, she did not know that they had all been

arrested in January. She did not learn of the arrests unitl

the police came to her house six months later. (3T 172-10 to

173-20)

In exchanged for their pleas to armed robbery, April Diggs,

who was 17-years old at the time of the shooting, and her cousin

Renee Diggs, who was 22-years old, both testified for the state.

As a condition of their plea agreements, they were to receive

sentences of 15 years with five-year parole bars. As part of

agreement, which would shield them from the charges of murder

and felony murder, they had to testify against both Mathis and

Harvey. (3T 177-3 to 16; 4T 51-14 to 51-23; 4T 74-1 to 10)
According to April, on January 22, she and her cousin Renee
met Harvey and Mathis, not in the Hernandez apartment as
Hernandez testified, but at a Chinese restaurant. When they
left the restaurant, April believed they were headed toward
a liquor store. As they reached the pharmacy across the street
from the Portuguese American Liquor store, Harvey announced
that he "wanted to go rob somebody, and he wanted us to be the
lookout." (3T 180-14 to 181-16; 3T 211-9 to 17) April and Mathis
continued walking, but said nothing. Harvey said "something
about busting somebody," and Mathis said he would, too. April
thought they meant to shoot someone. At this point, Harvey gave
Mathis a small black gun. (3T 181-17 to 182-15; 3T 183-9 to
15) When the prosecutor showed April the gun taken from Harvey's
house, she stated that this was not the gun Harvey had on the
night of the shooting. Harvey's gun had a different color handle.
(3T 182-19 to 183-4)

   As they walked, April observed a man, later identified
as Saraiva, coming out of his house with the garbage. Harvey
ran toward Saraiva, with Mathis following. April continued
walking, but turned when she heard one or two gunshots. She
saw Saraiva fall and Mathis and Harvey run off. April did not
see the shooting, but Renee told her that Mathis shot Saraiva.
(3T 183-19 to 185-16; 3T 186-12 to 15; 3T 204-10 to 17) Later
that evening, at Hernandez's house, April asked Mathis why he
Saraiva. Mathis said it was because the man grabbed him. (3T
187-5 to 16) In her statement to the police and at her guilty

11

plea, April indicated that it was Mathis who fired the gun.
(3T 188-4 to 10; 3T 196-19 to 25) In her statement she also
indicated that she did not participate in the robbery or serve
as a lookout. She guilty because the state agreed not to
prosecute her for felony-murder. (3T 199-3 to 200-10)

According to April, they did not chase anyone before they
assaulted Saraiva, and they did not discuss robbing a deli.
(3T 201-16 to 202-6) She did not remember seeing Mathis or Harvey
wearing masks on the night of the shooting. (3T 206-2 to 12)
After the shooting, both April and Renne was a man from the
neighborhood, whom she knew as "Jamaica" going though the
victim's pockets. (3T 204-21 to to 205-15; 4T 72-15 to 73-3)
April denied that Harvey told her to place the blame on Mathis.
(3T 203-8 to 12)

Herminia Garcia, a social worker at the Union County
juvenile detention center, testified that April told her that
neither she, her cousin Renee, nor Mathis had anything to do
with the shooting, and that a fourth individual who was with
them them was responsible for the shooting. (4T 110-1 to 111-
22) Garica could not remember the date April made that statement,
nor did she make a written notation of the conversation. She
advised April to give the information to her attorney.[3] (4T 112-
2 to 115-23; 4T 123-19 to 22)

---

[3]
   April Diggs admitted that after her arrest she was taken
to the Union County Detention Center and met with social worker
Garica. She did not recall, however, telling Garica that it
was Harvey, and not Mathis, who did the shooting: I doubt if
I said that." (3T 206-23 to 207-7)

Renee Diggs testified that Harvey and Mathis asked her
and her cousin to serve as lookouts for a robbery. (4T 45-6
47-8) although April testified that they did not accost anyone
else prior to the Saraiva robbery (3T 201-16 to 202-6), Renee
stated that Harvey and Mathis had chased two "Spanish men."
(4T 47-16 to 48-7) At some point, Harvey pulled a gun from his
pants and started "acting crazy with the gun." According to
Renee, Harvey was "just showing off," although he released the
safety control and indicated that he was going to shoot some
cops who were walking nearby. (4T 61-17 to 62-6; 4T 64-3 to
19)

When they came upon the man taking out the garbage, Renee
heard Mathis say, "That one right there." (4T 49-19 to 50-1)
Although she did not see the transaction, Renee assumed that
Harvey gave his gun to Mathis, because she observed Harvey give
something to Mathis and saw Mathis go up to the man taking out
the garbage. Renee saw the man grab Mathis by the jacket, saw
a flash of light, and then saw the man fall. Mathis and Harvey
then ran from the scene together. (4T 50-3 to 51-8; 4T 63-11
to 25)

Renee also claimed that when she saw Harvey hand Mathis
the gun, Mathis said, Oh, yes, it's on." (4T 54-5 to 13) On
the day of her arrest, January 25, 1996, Renee gave a statement
to the police identifying Mathis as the shooter, (4T 51-24 to
52-13) Contrary to April's testimony, Renee claimed they did
not encounter Mathis on the stairs when they returned to
Hernandez's apartment. (4T 65-3 to 23)

Renee amitted that she was afraid of Harvey and did not leave the group when there was talk of committing a robbery because Harvey physically prevented her from doing so. She denied, however, that Harvey threatened her and told her to place the blame on Mathis because Mathis was a juvenile. (4T 66-23 to 67-5)

Damina Arcos testified that she met Renee Diggs in jail. In November of 1997, Renee told her that it was Harvey who shot the liquor store owner. (6T 140-20 to 141-19) Arcos had learned about the trial from Detective Koczur a week before the trial. She told Koczur about Renee's statement, and he told her to bring the information the prosecutor.[4] (6T 142-22 to 144-24)

Three days after the shooting, Detective Furda, accompanied by Carteret Police Detective-Sergeant McFadden, arrested Harvey at his home in Carteret. McFadden retrieved an unloaded .32 caliber revolver from a crawl space at the top of the stairs leading to the second floor. The gun dark blue and appeared to be almost black. (3T 160-1 to 161-23; 3T 164-11 to 165-22) According to Furda, without bullets or casings, there was no determine whether the firearm was the one used to shoot Saraiva. (3T 162-2 to 7) Neither Mathis nor Harvey had a permit to purchase or carry a handgun. (4T 36-17 to 37-12)

Two of Mathis's teachers, Ronald Orr and Belquis Fernandez, testified on his behalf, indicating that they knew Mathis to be truthful. (4T 91-7 to 15; 4T 97-15 to 102-24)

---

[4] During her testimony, Renee Diggs denied knowing Arcos and that she had ever admitted defendant was not the shooter. (4T 67-5 to 68-4)

14

Marvin Mathis denied that he possessed a gun, participated in a robery, shot anyone on January 22, 1996. (4T 157-8 to 18) On the evening of January 22, he was walking in Elizabeth with Harvey and the Diggs cousins. Harvey noticed a man waiting for a bus and asked girls to see if the man was wearing any gold jewelry. When the girls reported that he was, and Mathis realized that Harvey wanted to rob him, Mathis told Harvey not to. (4T 130-20 to 133-17) April then urged Harvey to rob the owner of a deli they continued walking. (4T 133-23 to 134-7; 5T 39-3 to 22) Thereafter, Harvey and April ran after two "Spanish boys," Mathis and Renee jogged behind, but the boys outran them. (4T 134-8 to 17; 5T 95-1 to 6) Mathis did not know Harvey had a gun until he pulled it out and started "acting crazy" and "showing off." At one point, Harvey said he wanted to shoot at police officers who were walking nearby. He took the safety attachment off of the gun, but did not pull the trigger. Mathis was scared, but thought that if he tried to leave Harvey would shoot him. When Renee had tried to leave, Harvey grabbed her and refused to let her leave. (4T 134-18 to 135-25; 5T 57-15 to 21)

When they reached the corner of Seventh and East Jersey, Harvey noticed Saraiva taking out his garbage out and told the girls to serve as lookouts. Harvey asked Mathis to be a lookout, but refused. (4T 136-10 to 16) Mathis was scared. He walked across the street and stood next to a Chinese restaurant. Harvey approached Saraiva and it sounded like he was telling Saraiva to empty his pockets. Harvey tried to reach into Saraiva's pockets, and Saraiva slapped Harvey's hand down. At that point,

15

Harvey grabbed Saraiva and the man grabbed Harvey, and they
traded punches. Harvey pulled out his gun and Saraiva grabbed
for it. As the two struggled, Mathis grabbed Harvey's arm to
prevant him from shooting Saraiva. The gun went off once, missing
Saraiva, and Harvey fired a second shot that struck him. (4T
136-17 to 25, 4T 139-1 to 140-10) Mathis was shocked when Saraiva
fell, and ran off with Harvey. (4T 140-13 to 17)

Mathis had not intended to participate in the robbery or
help Harvey in any way. (4T 141-2 to 5) He did not leave Harvey
once he realized Harvey wanted to commit a robbery because he
he was afraid Harvey would shoot him. (4T 152-19 to 21) After
the shooting, Mathis ran home, refusing to take the gun from
Harvey. At no time did Mathis possess the gun. (4T 141-15 to
142-10)

Mathis denied asking his girlfriend Sharlama Brooks to
say that he was with her on the night of the shooting. According
to Mathis, "I say if anyone ask if I was with her...that she
don't know." (4T 142-22 to 143-20) He also denied ever telling
her that he had shot someone accidentally. (5T 69-23 to 25)
With regard to the questioning at police headquarters, Mathis
indicated that he was not given a choice about going there,
and he lied to the police when he gave his first statement
because he was scared. Moreover, although he signed the rights
form, the police were "rushing" him, and his understanding of
his rights was "not that good." Although his first statement
to the police was not true, due to his being scared and confused,
his second statement was truthful. (4T 145-22 to 152-8; 4T 168-

16

25 to 169-5; 5T 3-11 to 4-18)

On the morning of January 24, 1996, Mathis's mother, Linda
Mathis, was taken by the police from her job to the police
headquarters so that she could by present while they questioned
her son. Mrs. Mathis did not recall much of what transpired,
but she did remember that her son claimed he had not known what
Harvey was up to and that he "didn't do anything", "he said
he wasn't involved." (6T 146-20 to 148-13; 6T 155-15 to 17)
Her son was questioned until midnight. At one point she and
her son signed a consent-to-search form, and she accompanied
the police to her house where they conducted a search. (6T 149-
2 to 151-14) Mrs. Mathis indicated that she signed and understood
the form explaining Mathis's constitutional rights. (6T 151-
16 to 23) Although Mathis believed one of the detectives was
"putting words" in her son's mouth (6T 156-24 to 25), she and
her son both signed his statement. (6T 157-4 to 21)

<u>POINT I</u>

THE DEFENDANT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART I, PAR 10, OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY ASSIGNED PCR COUNSEL'S FAILURE TO COMPLY WITH <u>R.</u> 3:22-6(d) BY NOT ADVANCING THE DEFENDANT'S ARGUMENTS SET FORTH IN HIS FEBRUARY 24, 2005 <u>PRO SE</u> MEMORANDUM OF LAW AND APPENDIX ON PCR

Pursuant to the New Jersey Court Rules, <u>Rule</u> 3:22-6(d) requires that assigned PCR counsel bring forth to the PCR Court <u>all</u> claims raise by the defendant. <u>R.</u> 3:22-6(d) provides in pertinent part:

> Counsel [assigned to represent a defendant on a petition for post-conviction relief] should advance any grounds insisted upon by defendant notwithstanding that counsel deems them without merit.

Interpreting this rule, New Jersey Supreme Court stated in <u>State v. Rue</u>, 175 <u>N.J.</u> 1 (2002):

> [C]ounsel must advance the claim the client desires to forward in a petition and brief and make the available arguments in support of them. Thereafter, as in any case in which a brief is filed. counsel may choose to stand on it at the hearing, and is not required to further engage in expository argument. In no event however, is counsel empowered to denigrate or dismiss the client's claims, to negatively evaluate them, or to render aid and support to the state's opposition. That kind of conduct contravences [<u>R.</u> 3:22-6(d)].

> [<u>Id</u>. at 19].

In <u>State v. Webster</u>, 187 <u>N.J.</u> 254 (2007), the New Jersey Supreme Court refined <u>Rue</u>, stating:

> Reduced to its essence, <u>Rue</u> provides that PCR

counsel must communicate with the client, investigate the claims urged by the client, and determine whether there are additional claims that should be brought forward. Thereafter, counsel should advance all the legitimate arguments that the record will support. If after investigation counsel can formulate no fair legal argument in support of a particular claim raised by defendant, no argument need be made on that point. Stated differently, the brief must advance the arguments that can be made in support of the petition and include defendant's remaining claims, either by listing them or incorporating them by reference so that the judge may consider them.

[Id. at 257].

In the instant case, on the date of February 24, 2005, appellant filed a pro se memorandum of law and appendix in support of his petition for post-conviction relief, which presented the following argument:

Point I: Defendant's State Constitutional Right to Indictment by Grand Jury was Violated when the Facts Required to be found before Defendant could be tried as a Adult were not Charged in the indictment. Furthermore, Defendant's Federal and State Constitutional Rights to Trial by Jury were Violated when a judge made the Findings that Resulted in Defendant being Tried as an Adult, and not as a Juvenile.

Point II: Defendant's Federal and State Constitutional Right to a Jury Trial were Violated when the Trial Judge Found the Aggravating Factors used to Increase Defendant's Sentence for Murder Beyond the Prescribed Maximum. Furthermore, Defendant's (State Constitutional) Right to Indictment by Grand Jury was Violated when the Aggravating Factors used to Increase the Sentence for Murder were not Charged in an Indictment.

Point III: Defendant's Waiver of his Miranda Rights was not Knowing and intelligent Because Defendant was not Informed that, Although He was a Juvenile, any Statement made by him could be used Against Him in a Prosecution as an Adult.

-19-

Point IV:   Trial Counsel was Ineffective for Failing to Present
            Evidence of Defendant's Low Intellectual Functioning
            in Order to Establish that Defendant's Waiver of
            His <u>Miranda</u> Rights was not Knowing and Intelligent.

Point V:    Trial counsel was Ineffective for not Presenting
            in Mitigation of Sentence the Evidence of Defendant's
            Low Intellectual Functioning and Personality Disorder.

Point VI:   The New Rule Proposed in <u>Point III</u> Should be
            Retroactively to Applied to Defendant.

Point VII:  The Claims for Relief are not Barred by a Procedural
            Rule.

(Da 13, 18, 22, 27, 35, 39 and 42).

        Appellant's <u>pro</u> <u>se</u> memorandum of law and appendix was
submitted to the trial court, through the criminal case manage-
ment office, which was mailed by way of first class United States
postage, pre-paid, through the New Jeresy State Prison's CO-
30a "Postage Remit System." Postage fees were withdraw from
appellant's "Inmate Trust Account Statement." (Da 77, 78, 79
and 80).

        On April 25, 2005, appellant wrote a follow-up letter to
the criminal division manager, Andrea Ferraro requesting
notification of the filing of appellant's <u>pro</u> <u>se</u>  memorandum
of law and appendix. The follow-up letter was also mailed by
way of first class United States postage, pre-paid, through
the New Jersey State Prison's CO-30a "Postage Remit System."
Postage fees were withdraw from appellant's "Inmate Trust Account
Statement." (Da 81, 82 and 83).

        The same follow-up letter of April 25, 2005, that was

written by appellant was forwarded back to him from the criminal
division manager, Andrea Ferraro time-stamping the letter as
"Received and Filed." on May 02, 2005. (Da 81).

During the preliminary hearing for post-conviction relief,
PCR counsel testified to the following:

> [PCR counsel]: Okay. Thank you, Your Honor.
> I'm not going to go through all the details.
> You've read the briefs.

(PCR-T 5-2 to 4).

PCR counsel was remiss, however, in failing to present
any of appellant's remaining claims Point I (Da 13) and Point
III (Da 22) contained in his pro se memorandum of law at the
PCR hearing.

Appellant subsequently filed a pro se motion for
reconsideration of the order denying his petition for post-
conviction relief, the basis for the rehearing request was that
PCR counsel failed to advance appellant's remaining claims in
his pro se memorandum of law and appendix at the PCR hearing
as required by R. 3:22-6(d), Rue, supra. and Webster, supra.

On July 02, 2008, the PCR trial court denied appellant's
motion for reconsideration and discussed it in his written letter
opinion dated July 03, 2008. (Da 2 and 3).

Appellant contends that PCR counsel is in direct violation
of R. 3:22-6(d) Rue, supra. and Webster, supra., it was
incumbent upon counsel to advance the remaining claims contained
in appellant's pro se brief. By not advancing the remaining
claims therein was contrary to Rue, supra. 175 N.J. at 19. In
Webster, supra. the court explained that the brief must advance
the arguments that can be made in support of the petition and

-21-

include defendant's remaining claims, either by listing them
or incorporating them by reference, so that the judge may
consider them. 187 N.J. at 257.

Post-conviction relief is New Jersey's analogue to the
federal writ of habeas corpus and is a safeguard to ensure that
a defendant is not fairly convicted. State v. Afanador, 151
N.J. 41, 49 (1997). Ordinarily, PCR allows a defendant to
challenge the legality of a sentence or final judgment of
conviction by presenting arguments that could not have been
raised on direct appeal. Ibid. As stated in State v. Preciose,
129 N.J. 451 (1992), the New Jersey Supreme Court has a compel-
ling judicial interest in sustaining only those convictions
free from constitutional errors." Id. at 454; See also State
v. Mayron 344 N.J. Super. 382, 386 (App. Div. 2001) (remarking
that post-conviction relief is crucial component of criminal
process provided to defendants).

The Rue court further stated that:

> PCR is a defendant's last chance to raise
> constitutional error that may have affected the
> reliability of his or her criminal conviction.
> It is not a pro se forma ritual. That is why we
> require provision of counsel. Under our scheme
> that attorney is responsible to communicate with
> his client and investigate the claims. State v.
> Velez, 329 N.J. Super. 128, 133 (App. Div. 2000);
> State v. Casimono 298 N.J. Super. 22, 27 (App.
> Div. 1997) remanding case to trial court to
> determine whether PCR counsel fulfilled his
> obligations to interview trial counsel, meet with
> defendant, submit brief, and argue on behalf of
> defendant); State v. King, 117 N.J. Super. 109,
> 111 (App. Div. 1971). Based on that communication
> and investigation, counsel then must "fashion the
> most effective arguments possible." Velez, supra.
> 329 N.J. Super. at 133.

[Rue, supra. 175 N.J. at 18].

-22-

As demonstrated herein, appellant did not receive the representation guaranteed by R. 3:22-6(d). Assigned PCR counsel on appellant's first petition for post-conviction relief failed to comply with his obligations under R. 3:22-6(d), as interpreted in Rue and Webster.

Furthermore, fundamental precept of law was violated in this case and as such, appellant's case should be remanded back to the trial court for assignment of new counsel as if on a first PCR petition, and conduct a new hearing in conformity with Rue, supra.[175] N.J. at 12-13.

## A.

PCR COUNSEL FALIED TO INVESTIGATE, INTERVIEW AND SECURE AFFIDAVITS FROM THREE EXPERT WITNESSES, SUCH PSYCHOLOGICAL EVIDENCE WAS CRUCIAL IN ADVANCING DEFENDANT'S COMPETENCY CLAIM ON PCR, CONTRARY TO THE SIXTH AND FOURTEENTH AMENDMENTS.

As stated earlier, R. 3:22-6(d) provides that:

> Counsel [assigned to represent a defendant on a petition for post-conviction relief] should advance any grounds insisted upon by defendant notwithstanding that counsel deems them without merit.

The Rue court interpreted R. 3:22-6(d) as requiring that:

> [C]ounsel must advance the claims the client desires to forward in a petition and brief and the best available arguments in support of them. Thereafter, as in any case in which a brief is filed, counsel may choose to stand on it at the hearing, and is not required to further engage in expository argument. In no event however, is counsel empowered to denigrate or dismiss the client's claims, to negatively evaluate them, or to render aid and support to the state's opposition. That kind of contravenes [Rule 3:22-6(d)]. 175 N.J. at 19

The New Jersey Supreme Court in Webster refined Rue stating that:

> Reduced to it's essence, Rue provides that PCR counsel must communicate with the client, investigate the claims urged by the client, and determine whether there are additional claims that should be brought forward. Thereafter, counsel should advance all of legitimate arguments that the record will support. If after investigation counsel can formulate no fair legal argument in support of a particular claim raised by defendant no argument need be made on that point. Stated differently, the brief must advance the arguments that can be made in support of the petition and include defendant's remaining claims, either by listing them or incorporating them by reference so that the judge may consider them. 187 N.J. 257.

-24-

In the instant case, on July 31, 2006, appellant wrote a letter to assigned PCR counsel Lewis D. Thompson and mailed it by way of certified mail. (Da 85). In the contents of the letter appellant provided counsel with addresses of the three expert witnesses: Dr. Cheryl L. Thompson, Dr. Martha H. Page (for the defense) and Dr. Louis B. Schlesinger (for the state) in order to advance appellant's competency claim on PCR. (Da 86 and 87).

On September 14, 2006, appellant filed with the Criminal Case Management Office a second amended petition in support of his petition for post-conviction relief, which provides in pertinent part as follows:

> 4. To substantiate [defendant's] competency claim set forth in his supplemental verified petition for post-conviction relief, which was submitted [dated February 02, 2006] [Defendant] requests that assigned counsel Lewis D. Thompson to interview and obtain affidavits from the expert witnesses: Dr. Martha H. Page, Ed. D., Dr. Cheryl L. Thompson, Ph. D., and Dr. Louis B. Schlesinger, Ph.D.

(Da 95 and 96).

Appellant second amended petition for post-conviction relief was mailed by way of first class United States postage, pre-paid, through the New Jersey State Prison's CO-30a "Postage Remit System", which postage fees were withdraw from appellant's "Inmate Trust Account Statement." (Da 89, 90, 91, and 92).

PCR counsel was aware of the expert witnesses through the juvenile waiver hearing transcripts where three expert reports were stipulated into evidence (2MT 20-19) and then summarized 5 by defense counsel for appellant (2MT 4-18 to 9-20) and by

-25-

counsel for the state. (2MT 9-21 to 10).

PCR counsel was plainly aware of the family court's findings with respect to the appellant: 15 years and ten months old at the time of the charged crimes (2MT 10-1); does not have any substantial history of delinquency (2MT 23-19 to 20); the appellant had not benefited from education (2MT 24-5 to 12); was a follower (2MT 24-2); was unable to make decision on his own (2MT 25-25); appellant's mental acumen was borderline (2MT 26-24); and that appellant's lack of academic acumen was so severe as to be relevant to the appellant's rehabilitate potential. (2MT 27-4 to 15).

Dr. Cheryl L. Thompson, Ph.D., defense expert, conducted a mental status exam and reviewed appellant's school records. In her reports dated February 10, 1996, she reported that the appellant was fully aware of [my] role in his judicial process, but did not seem to have a full picture of his judicial position. (Da 45). The appellant's intelligence was borderline to low average. (Da 46). Appellant's ability to think abstractly was poorly developed. (Da 47). attention and concentration were impaired. (Da 47). appellant "is not bright and is easily confused." (Da 47). appellant was not capable of realizing incompatible career goals. (Da 47). Appellant was quite confused about his involvement in a serious crime. (Da 48). appellant behavior was that of a person whose judgment was clouded. (Da 49).

---

[5] Defense counsel Walter Florczak also represented the appellant at trial.

It is also significant, with respect to PCR counsel's notice of facts materially relevant to the issue of appellant's competency, that Dr. Thompson explicitly found that the "appellant should have a complete diagnostic assessment as he may be functioning a[t] the level of retardation." (Da 48).

Dr. Martha H. Page, Ed. D., defense expert, performed a comprehensive psychological evaluation encompassing numerous types of examinations, sources, and analytical methods on May 14, 1996. Dr. Page cataloged the appellant's numerous cognitive, analytical and decision making deficiencies on practically every page of her report. She reported that appellant: repeated first and second grades. (Da 52). was communication handicapped. (Da 52). was unable to retain details in a story. (Da 52). had problems in retaining and processing information. (Da 52). had difficulty remaining focused. (Da 52). Had a need for assistance with concepts and skills related to organization of ideas. (Da 53). Had difficulty completing sentences. (Da 54). scored intellectually deficient on processing speed I.Q. and verbal scale I.Q. (Da 54). had difficulty verbal materal quickly. (Da 55). had difficulty planning ahead. (Da 55). lacked abstract thinking necessary to develop complex hypotheses in a novel situation. (Da 56). had difficulty in using perceptual cues to aid in solving problems. (Da 56). had difficulty seeing relationships in an unfamiliar situation. (Da 56). had difficulty in seeing things through carefully when in an unfamiliar situation. (Da 57). was slow to process information. (Da 58). and lacked problems solving skills. (Da 59).

Dr. Louis B. Schlesinger, Ph.D., the state's expert, conducted a thorough psychological assessment of the appellant in his report dated October 10, 1996, Dr. Schlesinger noted that the appellant's low level of intellectual functioning throughout his report: appellant had an I.Q. of 79. (Da 66). and had verbal skills at the low end of the dull-normal range. (Da 66). appellant had a weak "fund" of general information suggesting that appellant has not profited a great deal from school or experience. (Da 67). has some basic understanding of the world around him, but it is not that deep or extensive (Da 67). had difficulty drawing supertoidinate relations between objects and ideas, and "More complex abstractions, such as proverb interpretation, were to difficult." (Da 67). has difficulty analyzing, sythesizing, and integrating parts into a whole concept. (Da 68). appellant can learn new material, but is not really quick, and "several repetitions and often necessary to transfer new knowledge into pre-existing structures." (Da 68). appellant was displaying signs of personality disorder with impulse and antisocial traits. (Da 69). and showed indications of suspiciousness and mistrust. (Da 71).

During the preliminary hearing for post-conviction relief, excerpt of Dr. Cheryl Thompson's finding was read into the record by PCR counsel as evidenced by the foolowing:

> [PCR counsel]: Your Honor, Dr. Thompson in her own report stated that [appellant] should have a subsequent evaluation, a psychiatric evaluation, to determine his level of retardation and competence. That was not done.

(PCR-T 7-6 to 10).

In <u>Rue</u>, the New Jersey Supreme Court explained that in a PCR setting, "an attorney is responsible to communicate with his client and investigate claims." <u>Rue</u>, <u>supra</u>. 175 <u>N.J.</u> at 18. Further, such an attorney must also advance any claim insisted upon by a defendant, regardless of whether the attorney deems them without merit. <u>Id</u>. at 17. <u>See</u> <u>R</u>. 3:22-6(d) and also <u>Webster</u>, <u>supra</u>. 187 <u>N.J.</u> at 257.

In the instant case, it is clear that PCR counsel never investigated appellant's competency claim nor did he interview any of the three expert witnesses and secure their affidavits. In a PCR matter, this type of showing is most certainly necessary to advance a defendant's PCR claim. <u>See</u> <u>State v. Cummings</u> 321 <u>N.J. Super.</u> 154 (App. Div. 1999), certif. denied. 162 <u>N.J.</u> 199 (1999), this court stated that:

> Thus, when a petitioner claims his trial attorney inadequately investigated his case, he must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification. <u>See</u> <u>R</u>. 1:6-6.
>
> [<u>Id</u>. at 170].

In <u>State v. Velez</u>, 329 <u>N.J. Super.</u> 129 (App. Div. 2000), This court recognized "it was not enough for counsel to blandly recite defendant's poorly articulated and inadequately presented arguments. The attorney's passing familiarity with defendant's claims satisfied neither the mandate of our rules nor counsel's professional obligations." <u>Velez</u>, <u>supra</u>. 129 <u>N.J. Super.</u> at 134. The <u>Velez</u> court went on to state:

> The benchmark for judging ineffective assistance of counsel claims is whether the defense attorney's professional errors "materially

contributed" to the defendant's conviction [citing State v. Fritz, 105 N.J. 42 (1987)]. As a general rule, the defendant must prove prejudice -- that is, he must establish "a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2068, 80 L.Ed.2d. 674, 698 (1984). A reasonable probability "is a probability sufficient to undermine confidence in the outcome. Ibid.

That standard is difficult to apply in the context of evaluating a claim of ineffective assistance of post-conviction relief counsel Only by an exhaustive examination of the entire trial record can it be determined whether a viable attack might have been made on the underlying conviction. It is arguable that this should be the job of the appellate attorney's who challenge the quality of the defense lawyer's representation of the defendant in the post-conviction relief proceedings. But often the trial record will not fully disclose all avenues that could have been pursued by post-conviction relief counsel in attacking the underlying judgement. Cf. State v. Preciose, 129 N.J. 451, 609 A.2d. 1280 (1992).

We think a different rule should be applied in a case such as the one before us. where the defendant's post-conviction relief attorney entirely failed to subject the prosecution's case to meaningful adversarial testing. See United States Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d. 657, 688 (1984). Where, as here, the attorney's representation of the defendant amounts to no representation at all, the post-conviction relief process should begins anew with the appointment of an attorney willing and able to serve as an advocate for his client."

[Velez, supra. 129 N.J. Super. at 134-135].

In the instant case, there is simply no question that appellant did not receive effective assistance of counsel on his first petition for petition for post-conviction relief. PCR counsel's failure to investigate, interview and secure

affidavits from the three expert witnesses constitutes
ineffective assistance at appellant's PCR proceeding. PCR
counsel's representation, therefore, was constitutionally
deficient under the requirements and standards as set forth
in R. 3:22-6(d), Rue, Webster, and Velez. For the aforementioned
reason, the order denying post-conviction relief should be
reversed and the matter remanded for a full evidentiary hearing.

B.

PCR    COUNSEL   FAILED   TO   RAISE   ON   PCR
INEFFECTIVE   ASSISTANCE   ON   APPELLATE   COUNSEL
FAILURE   TO   RAISE   ON   DIRECT   APPEAL,
TRIAL   COUNSEL'S   FAILURE   TO   ELICIT   THE
AID   OF   AN   EXPERT   WITNESS   TO   ILLUSTRATE
DEFENDANT'S   LIMITED   MENTAL   ABILITY   AND   HIS
STATUS        A   SPECIAL   EDUCATION   STUDENT,
CONTRARY TO THE SIXTH AND FOURTEENTH AMENDMENT

On January 29, 2008, appellant wrote PCR counsel a letter

and mailed it by way of certified mail. (Da 99). In that letter,

appellant informed counsel that there were two potential issues

that he would like for him to examine on PCR, ineffective

assistance on trial and appellate counsel. Both counsels were

prejudicially ineffective for failing to illustrate appellant's

limited mental ability and his status as a special education

student. (Da 97). The contents of the letter appellant provided

PCR counsel with correspondences between appellate counsel Paul

Klein and appellant. (Da 98).

Appellate counsel Paul Klein wrote appellant a letter dated

July 21, 1999, informing appellant that the evidence of his

status as a special education student cannot raised on direct

appeal because there is nothing in the record to support the

argument. (Da 101).

Appellant then wrote appellate counsel a letter and mailed

it by way of certified mail dated May 23, 2000 (Da 104), bringing

to appellate counsel's attention the extended discussion between

trial counsel and the prosecutor at sidebar regarding the need

of expert testimony to illustrate appellant's status as a special

education student. (Da 103). (4T 114-19 to 117-12).

-32-

Throughout appellant's trial, trial counsel repeatedly made references of appellant's status as a special education student at the <u>Miranda</u> hearing (3MT 48-15 to 21); in defense opening statement (1T 39-12 to 15); during the testimony of Detective Thomas Koczar (2T 97-8 to 10); defense summation (6T 188-18 to 19). Counsel even made reference of appellant's mental status during sentencing. (ST 3-1 to 3).

Appellant's mental status became the focus of significant attention at sidebar where a lengthy discussion took place between trial counsel and the prosecutor. The prosecutor was troubled when trial counsel asked Detective Thomas Koczar if he was aware that appellant was a special education student. The prosecutor immediately requested the trial judge to give a curative instruction to the jury. The prosecutor and trial counsel exchanged the following:

> [Prosecutor]: While there is some testimony of special education, you know, you should not assume what the meaning of that is. You can only make determinations based, on the <u>evidence</u> and <u>testimony</u>. And that is something that requires expert testimony. Because that's a kind of reverse inflammatory.

> [Trial counsel]: I think the request is premature at this point.

> [Prosecutor]: <u>The jury is thinking [appellant] is too stupid to give a statement, he is more likely to be malleable and led into this.</u> Because I know I have thoughts about special education, <u>but I never had any experience so I don't know what it actually is.</u>

> [Trial counsel]: I asked the question based on the fact that he is a special education student.

> [Prosecutor]: <u>So what is he -- advanced, middle level, low level?</u>

> **[Trial counsel]:** It goes to the voluntariness of the statement, whether the officer was aware at the time. (emphasis added).

(4T 115-4 to 22).

The trial record clearly reveals that there was a dire need for an expert based on the fact that appellant was classified as a special education student. (4T 116-14 to 15). The record also reveals that the prosecutor was concerned that the jury was thinking [appellant] "was too stupid to give a statement ... [and] is more likely to be malleable and led into this." (4T 115-12 to 14). Had trial counsel called an expert to confirm appellant's mental status to highlight what the jury was already thinking, it is not a far stretch to reasonably assume that the outcome of the trial would have had different results.

Trial counsel had actual and constructive evidence that appellant was classified as special education and communication handicapped. Counsel, however, did not elicit the relevant evidence at trial. (4T 116-1 to 3). The trial record further demonstrates that counsel had ample opportunity to bring in an expert to explain what appellant's status as a special student meant, but counsel outrightly refused to elicit aid an expert as evidenced by the following:

> **[Trial counsel]:** I won't call an expert. All I am saying school administrator, custodian of that record saying he is classified as special ed. As to the basis of it you already have that discovery. (emphasis added).

(4T 116-13 to 16).

New Jersey courts  have found that the right to effective assistance of counsel under Article I, paragraph 10 of the New

Jersey Constitution includes the right to the assistance of
experts.[6] State v. Difrisco, 174 N.J. 195, 243-44 (2002); State
v. Green, 55 N.J. 13, 18 (1969). In Ake v. Oklahoma, 470 U.S.
68, 77, 105 S.Ct. 1087, 1093 (1985), the United States Supreme
Court declared that under the Fourteenth Amendment to the Federal
Constitution, an indigent defendant must be supplied with "the
basic tools of an adequate defense or appeal." The "basic tools"
include the assistance of psychiatrist (expert) when the
defendant's mental state is a significant factor at trial. Id.
at 470 U.S. 105 S.Ct. 1096.

Here, in the instant case, trial counsel was aware of
appellant's testimony and his difficulty testifying, remembering,
and describing facts and events: on direct examination (4T 151-
24 to 152-2; 154-21 to 24; 156-3 to 157); on cross-examination
(4T 158-23; 166-16; 5T 21-1 to 20; 24-5 to 16; 27-10 to 14;
28--20; 35-1 to 16; 42-12 to 23; 43-8 to 21; 49-1 to 8; 51-2
to 17; 55-8 to 17; 56-10 to 16; 61-3 to 14; 63-2 to 12; 66-9
to 67-4; 71-2 to 24; and especially at 5T 72-19 to 23; 77-16
to 19; 83-22 to 84-9; 92-7 to 11; 98-16 to 99-13; 108-1 to 20;
116-1 to 3; 116-4 to 20; 118-2 to 13); on redirect-examination
(5T 125-23 to 126-4; 127-6 to 11) and re-cross examination (5T
130-21 to 25). Given appellant's low level of intellectual

---

[6]
      The New Jersey Supreme Court has determined that a specific provision
of the Public Defender Act, N.J.S.A 2A:158A-5, grants indigent defendants
in New Jersey the statutory right to the assistance of experts necessary
to their defense. See In re Cannady, 126 N.J. 486, 492 (1991); In re Kauffman,
126 N.J. 499, 501 (1991), finding that the Public Defender Act mandates that
the office of the Public Defender pay for expert services that are necessary
to any indigent defendant's case.

functioning based on the three expert reports that were
stipulated into evidence at the juvenile waiver hearing, it
is clear that appellant's limited mental ability and status
as a special education student was a significant factor at his
trial. (2MT 2-13 to 3-7). Ake v. Oklahoma, supra. 470 U.S. at
74, 105 S.Ct. at 1091; and it was also materially relevant to
the jury's assessment of appellant's demeanor and credibility
as a witness at trial. See State v. Sexton, 311 N.J. Super.
70, 88 (App. Div. 1998), certif. denied 160 N.J. 93 (1999).

The Ake recognized the need for experts in cases where
a defendant's mental health was in question observed,
"[p]syhiatrists gather facts through professional examination,
interviews, and elsewhere, that they will share with the judge
or jury; they analyze the information gathered and from it draw
plausible conclusions about the defendant's mental condition,
and about the effects of any disorder or behavior; and they
offer opinions about how the defendant's mental condition might
have affected his behavior at the time in question. . .
Unlikely lay witnesses, who can merely describe symptoms they
believe might be relevant to the defendant's mental state[.]"
Id. 470 U.S. at 105 S.Ct. at 1095.

"Elementary principle that when a state brings its judicial
power to bear on a indigent defendant, it must take steps to
assume that defendant has fair opportunity to present defense,
grounded in significant part on the Fourteenth Amendment's due
process guarantee of fundamental fairness, derives from belief
that justice cannot be equal where, simply as result of his

poverty, a defendant is denied opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake." Ake, supra. 470 U.S. at 76, 105 S.Ct. at 1092.

In the instant case, the trial record makes perfectly plain that references of appellant being classified as a special education student permeated his trial. (4T 116-1 to 3). Trial counsel's refusal to elicit the aid of an expert deprived appellant of his Constitutional right pursuant to the "due process clause" of the Fourteenth Amendment and the Statutory right pursuant to the Public Defender Act, N.J.S.A. 2A:158A-5, that grant indigent defendants in New Jersey the statutory right to the assistance of experts necessary to their defense.

Trial counsel had no conceivable reason, or strategic grounds for not offering evidence and/or expert testimony to fairly describe appellant's mental status as a special education student. It is also clear from the record that the prosecutor firmly pointed out the the trial judge that appellant's status as a special education student needed to take the form of expert testimony. (4T 115-5 to 8 and 116-4 to 6). In addition, the trial judge never prescribed any curative instruction on this issue. (4T 117-11 to 12).

Therefore, under the circumstances in this case, an ineffective assistance of counsel claim was appropriate for appellate review, because all the necessary facts to raise trial counsel's ineffectiveness on direct appeal clearly lied inside the trial record. It could also have been discovered by simply inspecting the juvenile waiver hearing transcripts, where the same trial counsel also represented appellant. (1MT 2-5 to 6

-37-

and 2MT 2-6 to 7).

Appellate counsel's decision not to pursue the gross incompetence of appellant's trial counsel's failure to elicit expert testimony was objectively unreasonable because the omitted issue is obvious from the trial record. Strickland, supra. 466 U.S. at 688, 104 S.Ct. at 2052; Fritz, supra. 105 N.J. at 58 adopting two prong analysis announced in Strickland for evaluating claims of ineffective assistance of counsel); and also State v. Morrison, 215 N.J. Super. 540, 546 (App. Div. 1987) (adopting Strickland and Evitts v. Lucey, 469 U.S. 387, 396, 105 S.Ct. 83 (1985), framework for analyzing claims of ineffective assistance of appellate counsel).

In the instant case, appellant urges that appellate counsel's error in failing to raise trial counsel's ineffective assistance on direct appeal prejudiced the appellant. Had appellate counsel raised trial counsel's ineffectiveness on direct appeal appellant contends that he would have prevailed by relying on the trial record, but PCR counsel's failure to present this claim and argue this issue at the PCR proceeding denied appellant the opportunity to present a prima facie claim of appellate counsel's ineffectiveness which in essence warrants appellant a new PCR hearing.

## CUMULATIVE EFFORT OF ERRORS

Appellant contends that trial, appellate, and PCR counsels errors were not harmless. Moreover, when viewed cumulatively, the numerous errors by trial, appellate, and PCR counsels deprived appellant of a fair trial, appeal and PCR proceeding

-38-

and effective assistance of counsel guaranteed by the State
and Federal Constitutions.

In State v. Orrecchio, 16 N.J. 125 (1954), the New Jersey
Supreme Court upheld the Appellate Division's reversal of the
defendant's convictions on three counts of a 35 count indictment.
The reversal was based on the cumulative effect of the numerous
errors made throughout the trial. In affirming the Appellate
Division, the court observed:

> The sound administration of criminal justice
> in our democracy requires that both the end
> and means just. the accused, on matter
> abhorrent the offense charged, not how
> seemingly evident the guilt, is entitled to
> a fair trial surrounded by the substantive and
> procedural safeguards which have stood for
> centuries as bulwarks of liberty in english
> speaking countries. This of course, does not
> mean that incidental legal errors. Which creep
> into the trial but do not prejudice the rights
> of the accused or make the proceeding unfair,
> may be invoked to upset an otherwise valid
> conviction ... [citation omitted]. Where
> however, the legal errors are of such magnitude
> as to prejudice the defendant's rights, or in
> their aggregate have rendered the trial unfair,
> our fundamental constitutional concepts dictate
> the granting of a new trial before an impartial
> jury. [emphasis added]. Id. at 129.

Here, in the instant case, appellant urges that trial,
appellate, and PCR counsels numerous errors and omission
recounted above severely prejudiced the appellant and undermine
confidence in the outcome of the PCR proceeding in this case.

## C O N C L U S I O N

For the foregoing reasons, appellant respectfully requests that the order denying post-conviction relief be reversed and his convictions reversed. In the alternative, the appellant submits that the order denying post-conviction relief be reversed and the matter remanded for a full evidentiary hearing on the issue of ineffective assistance of trial, appellate and PCR counsels.

respectfully submitted,

Marvin Mathis, pro se

Dated: December 14, 2009.

-40-

BY ORDER OF THE COURT

FILED

FEB 29 2008

JOHN F. MALONE
J.S.C.

STATE OF NEW JERSEY,          :          SUPERIOR COURT OF NEW JERSEY

    Plaintiff-Respondent,

-v-                                       :          UNION COUNTY
                                                     CRIMINAL DIVISION

MARVIN MATHIS,                :                    INDICTMENT NO.
                                                         97-02-123
    Defendant-Petitioner.   :

                                                           ORDER

This matter having been opened to the court by defendant by Petition for

Post-Conviction Relief, Lewis D. Thompson, Esq., appearing for the defendant and

Sara B. Liebman, Assistant Prosecutor, appearing for the State and the court

having considered the pleadings submitted, the oral argument of counsel and for

good cause shown,

It is on this 29th day of February, 2008, ORDERED

That defendant's verified Petition for Post-Conviction Relief is hereby denied

for the reasons stated on the record on February 29, 2008.

JOHN F. MALONE, P.J.Ch.

A-1

STATE OF NEW JERSEY

v.

MARVIN MATHIS
_____
**Defendant**

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION – CRIMINAL
_____ UNION _____ COUNTY

INDICTMENT #: _97-02-123_

CASE OR PROMIS #: _96 004593-001_

## ORDER ON POST-CONVICTION APPLICATIONS
## ON INDICTABLE OFFENSES

This matter being opened on the application of defendant, _Marvin Mathis_ , by:

☐ Petition for Post-Conviction Relief determined to be defendant's

_____ first petition

_____ second or subsequent petition

☐ Motion for Change or Reduction of Sentence pursuant to *Rule* 3:21-10

☒ Motion for _reconsideration_ ~~and the defendant having been represented by:~~

_____, Assistant Deputy Public Defender

_____, Retained or Designated Counsel *(circle one)* or

☐ The court having concluded that there was no good cause entitling the assignment of counsel on the
application, and the State having been represented by:

_____ Assistant Prosecutor; and

☐ There having been proceedings conducted on the record on _____, 200_____ or

☒ The matter having been disposed of on the papers;

It is on this ___2__ day of _JULY_ , 200_8_ ORDERED THAT DEFENDANT'S APPLICATION IS HEREBY:

_____ Granted
___x___ Denied
_____ Other

For the reasons:

☒ Expressed in the court's written opinion of _____

☐ Expressed orally on the record on _____

_____

_JOHN F. MALONE_ , J.S.C.

ORIGINAL:    Office of the Public Defender
c:              Judge _____
                Criminal Division Manager's Office
                Prosecutor's Office
                Defendant

# SUPERIOR COURT OF NEW JERSEY

CHAMBERS OF
JOHN F. MALONE
PRESIDING JUDGE, CHANCERY



COURTHOUSE
ELIZABETH, NEW JERSEY 07207

July 3, 2008

Marvin Mathis
304144/244859C
P.O. Box 861 NJSP
Trenton, NJ 08625

Re:   State v. Marvin Mathis
      Indictment No. 97-02-123

Dear Mr. Mathis:

Please be advised that the Court has determined that your Motion for Reconsideration of the Denial of your Petition for Post Conviction Relief should be dismissed. The Petition was denied by Order entered February 29, 2008. The Court is advised that a Notice of Appeal of this matter was filed March 25, 2008, Appellate Division Docket A-3695-07-T4. Rule 2:9-1 provides that supervision and control of the proceedings on appeal shall be in the Appellate Court.

Very truly yours,

JOHN F. MALONE, P.J.Ch.

JFM/pfk



NOTICE OF APPEAL                    PLEASE PRINT OR TYPE

## SUPERIOR COURT OF NEW JERSEY - APPELLATE DIVISION

TITLE IN FULL (AS CAPTIONED BELOW):

State of New Jersey,

Plaintiff - Respondent

- V. -

Marvin Mathis,

Defendant - Appellant.

ATTORNEY OR PRO SE LITIGANT

NAME _Marvin Mathis #304144/244859-C_

ADDRESS _New Jersey State Prison_

_P.O. Box 861, Trenton, New Jersey 08625_

TELEPHONE NO. _None - Confined_

ATTORNEY FOR _Defendant - Appellant, Pro Se_

ON APPEAL FROM:

_Law Division - Union County_
TRIAL COURT OR STATE AGENCY

_Union County Ind. No. 97-02-123_
TRIAL COURT OR AGENCY NUMBER

_Hon. Judge John F. Malone, J.S.C._
TRIAL COURT JUDGE

CIVIL [ ]  CRIMINAL [✓]  JUVENILE [ ]

NOTICE IS HEREBY GIVEN THAT _Marvin Mathis, Defendant - Appellant_
APPEALS TO THE SUPERIOR COURT OF NEW JERSEY, APPELLATE DIVISION, FROM THE JUDGMENT [ ]
ORDER [✓] STATE AGENCY DECISION [ ] ENTERED IN THIS ACTION ON _February 29, 2008_
DATE

IF NOT APPEALING THE ENTIRE JUDGMENT, ORDER OR AGENCY DECISION, SPECIFY WHAT PARTS OR
PARAGRAPHS ARE BEING APPEALED. _Appellant is Appealing Honorable Judge John F._
_Malone's Order denying defendant's Petition for Post-Conviction Relief on_
_February 29, 2008._

HAVE ALL ISSUES AS TO ALL PARTIES BEEN DISPOSED OF IN THIS ACTION IN THE TRIAL COURT OR
AGENCY?  YES [✓]  NO [ ]

IF NOT, HAS THE ORDER BEEN CERTIFIED AS FINAL PURSUANT TO R. 4:42-2?  YES [ ]  NO [ ]

IN CRIMINAL, QUASI-CRIMINAL AND JUVENILE ACTIONS:

GIVE A CONCISE STATEMENT OF THE OFFENSE AND OF THE JUDGMENT, DATE ENTERED AND
ANY SENTENCE OR DISPOSITION IMPOSED. _On June 18, 1998, A jury found defendant guilty of_
_Murder, Felony Murder, Robbery, Possession of a weapon for unlawful purpose and unlawful_
_Possession of a weapon. On August 14, 1998 sentenced to an Aggregate term of 50 yrs. with a parole_
_of 30 yrs._

IS DEFENDANT INCARCERATED?  YES [✓]  NO [ ]

WAS BAIL GRANTED OR THE SENTENCE OR DISPOSITION STAYED?  YES [ ]  NO [ ]

IF IN CUSTODY, GIVE THE PLACE OF CONFINEMENT. _New Jersey State Prison, in_

_Trenton, New Jersey 08625_

(OVER)

A-4

ATTACH ADDITIONAL SHEETS IF NECESSARY

NOTICE OF APPEAL AND ANNEXED CASE INFORMATION STATEMENT HAVE BEEN SERVED ON:

| | NAME | DATE OF SERVICE |
|---|---|---|
| TRIAL COURT JUDGE | Honorable Judge John F. Malone, J.S.C. | 02/29/08 |
| TRIAL COURT CLERK OR STATE AGENCY | Clerk, Union County Courthouse | 02/29/08 |
| ATTORNEY GENERAL OR ATTORNEY FOR OTHER GOVERNMENTAL BODY PURSUANT TO R. 2:5-1(a), (e) or (h) | Ann Milgram, Office of the Attorney General | 02/29/08 |

OTHER PARTIES: Hughes Justice Complex, 25 Market Street, P.O. Box 112

Trenton, New Jersey 08625

| NAME AND DESIGNATION | ATTORNEY NAME, ADDRESS AND TELEPHONE NO. | DATE OF SERVICE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

ANNEXED TRANSCRIPT REQUEST FORM HAS BEEN SERVED ON:

| | NAME | DATE OF SERVICE | AMOUNT OF DEPOSIT |
|---|---|---|---|
| COURT REPORTER'S SUPERVISOR, CLERK OF COURT OR AGENCY | | | |
| COURT REPORTER | Frederick Wolfe III | 2/29/08 | $0 |
| | | | |

EXEMPT FROM ANNEXING THE TRANSCRIPT REQUEST FORM DUE TO THE FOLLOWING:

[ ] NO VERBATIM RECORD.

[ ] TRANSCRIPT IN POSSESSION OF ATTORNEY OR PRO SE LITIGANT. [FOUR COPIES, ALONG WITH THE COMPUTER DISKETTE FROM THE TRANSCRIPT PREPARER, MUST BE SUBMITTED.]

[ ] MOTION FOR ABBREVIATION OF TRANSCRIPT FILED WITH THE COURT OR AGENCY BELOW.

[✓] MOTION FOR FREE TRANSCRIPT FILED WITH THE COURT BELOW.

I CERTIFY THAT THE FOREGOING STATEMENTS ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF. I ALSO CERTIFY THAT, UNLESS EXEMPT, THE FILING FEE REQUIRED BY N.J.S.A. 22A:2 HAS BEEN PAID:

March 04, 2008
_____
DATE

_____
SIGNATURE OF ATTORNEY OR PRO SE LITIGANT

A 5

A 3695-07T4

ORDER ON MOTION
----------------

STATE OF NEW JERSEY
VS
MARVIN MATHIS

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.   A -003695-07T4
MOTION NO.   M -004522-07
BEFORE PART: H
JUDGE(S):   STERN

MOTION FILED:        MARCH 25, 2008        BY: MARVIN  MATHIS
ANSWER(S) FILED:

FILED
APPELLATE DIVISION

MAY 8 2008

RECEIVED
APPELLATE DIVISION

MAY 8 2008

SUPERIOR COURT
OF NEW JERSEY

SUBMITTED TO COURT:  MAY 05, 2008

O R D E R
---------

THIS MATTER HAVING BEEN DULY PRESENTED TO THE COURT, IT IS ON THIS
6th DAY OF May , 2008, HEREBY ORDERED AS FOLLOWS:

|  | GRANTED | DENIED | OTHER |
|---|---|---|---|
| MOTION BY APPELLANT<br>- TO PROCEED AS AN INDIGENT AND FOR FREE<br>  TRANSCRIPTS | (X) | ( ) | (X) |

SUPPLEMENTAL: The clerk advises that eventhough the
application was filed in 2001, this is an
appeal from the denial of defendant's first
petition for post conviction relief. It is
a timely appeal from a decision of
February 29, 2008. The matter is referred to the

UNN 97-02-123                    FOR THE COURT:
Public Defender for representation subject to
any necessary or appropriate

TURLC4                        EDWIN H. STERN    P.J.A.D.
investigation as to indigency.

I hereby certify that the foregoin
is a true copy of the original o
file in my office.

CLERK OF THE APPELLATE DIVISION

Marvin Mathis 304144 244859C
New Jersey State Prison
P.O. Box 861
Trenton NJ 08625

                                    Superior Court of New Jersey
                                    Law Division – Union County
                                    Ind. No. 97-02-123

State of New Jersey,             :

      Plaintiff-Respondent;    :    Criminal Action

      v.                     :    On Petition for Postconviction
                                  Relief
Marvin Mathis,              :

      Defendant-Petitioner.    :

---

Memorandum of Law and Appendix in Support
of Petition for Postconviction Relief

---

## Table of Contents

Page No.

Point I: Defendant's State Constitutional Right to
Indictment by Grand Jury was Violated when
the Facts Required to be Found Before
Defendant Could be Tried as an Adult were not
Charged in the Indictment. Furthermore,
Defendant's Federal and State Constitutional
Rights to Trial by Jury were Violated when a
Judge made the Findings that Resulted in
Defendant being Tried as an Adult, and not as
a Juvenile....................................  1

Point II: Defendant's Federal and State Constitutional
Right to a Jury Trial were Violated when the
Trial Judge Found the Aggravating Factors
used to Increase Defendant's Sentence for
Murder Beyond the Prescribed Maximum.
Furthermore, Defendant's (State Constitu-
tional) Right to Indictment by Grand Jury was
Violated when the Aggravating Factors used to
Increase the Sentence for Murder were not
Charged in an Indictment....................  6

Point III: Defendant's Waiver of his Miranda Rights was
not Knowing and Intelligent Because
Defendant was not Informed that, Although He
was a Juvenile, any Statement made by Him
could be used Against Him in a Prosecution
as an Adult..................................  10

Point IV: Trial Counsel was Ineffective for Failing
to Present Evidence of Defendant's Low
Intellectual Functioning in Order to
Establish that Defendant's Waiver of His
Miranda Rights was not Knowing and
Intelligent.................................  15

Point V: Trial Counsel was Ineffective for not
Presenting in Mitigation of Sentence the
Evidence of Defendant's Low Intellectual
Functioning and Personality Disorder......  23

Point VI: The New Rule Proposed in Point III
Should be Retroactively to Applied to
Defendant..................................  27

Point VII: The Claims for Relief are not Barred by
a Procedural Rule......................  30



## Table of Contents Cont'd

Page No.

Conclusion.........................................  .32

ii

## Table of Cases Cited

Page No.

Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).................... 1, 2, 4, 6, 7, 8

Blakely v. Washington, 542 U.S. ___, 124 S.Ct. 2531 (2004).................... 6, 7, 8, 31

California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171.................... 3

Ivan V. v. City of New York, 407 U.S. 203, 92 S.Ct. 1951, 32 L.Ed.2d 659 (1972).................... 28

Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).................... 1, 2, 3, 9

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).................... 10

Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).................... 1, 2

State v. Abdullah, 372 N.J. Super. 252 (App. Div. 2004).................... 8

State v. Benoit, 490 A.2d 295 (N.H. 1985).................... 12

State v. Cook, 47 N.J. 402, 418 (1966).................... 22

State v. Flower, 224 N.J. Super. 208 (Law Div. 1988).................... 22

State v. Fortin, 178 N.J. 540 (2004).................... 3

State v. Gerald, 113 N.J. 40 (1988).................... 3, 4

State v. King, 372 N.J. Super. 227 (App. Div. 2004).................... 8

State v. Lark, 117 N.J. 331 (1990).................... 27

State v. Lawton, 298 N.J. Super. 27 (App. Div. 1997).................... 30

State v. Levine 253 N.J. Super. 149 (App. Div. 1992).................... 31

-iii-



Table of Cases Cited Cont'd

State v. Nash, 64 N.J. 464 (1974)...................................... 27, 28, 29

Page No.

State v. Natale, 373 N.J. Super. 226 (App. Div. 2004)......................................

State ex rel. O.F., 327 N.J. Super. 102 (App. Div. 1999)...................................... 8

State v. Preciose, 129 N.J. 451 (1992)...................................... 12

State v. Presha, 163 N.J. 304 (2004)...................................... 30

State v. Zola, 112 N.J. 384 (1988)...................................... 11, 12, 20

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)...................................... 5

U.S. v. Booker, 543 U.S. ___ (2005)...................................... 20, 26

Table of Rules Cited

R. 3:22-4...................................... 8

R. 3:22-4(b)...................................... 30, 31

R. 3:22-4(c)...................................... 30

R. 3:22-12...................................... 30

R. 5:22-2...................................... 31

R. 5:22-2(b)...................................... 2

R. 5:22-2(b)(1) and (2)...................................... 4

R. 5:22-2(b)(4)...................................... 4

Table of Statutes Cited

N.J. Const. Art. I, paragraph 8...................................... 4

N.J. Const. Art. I, paragraph 9...................................... 3, 9

N.J.S. 2C:44-1a...................................... 3, 4

8

## Table of Statutes Cited Cont'd

Page No.

N.J.S. 2C:44-1b(4)................................    25

N.J.S. 2C:11-3b.(1)..............................     7

## Other Materials Cited

State of New Jersey Department of Corrections,
Disciplinary Report - Inmate's Copy...............    13

## Table of Transcript

1T refers to Juvenile Waiver Hearing Transcript dated November 11, 1996.

2T refers to trial transcript dated June 9, 1998.

3T refers to trial transcript dated June 10, 1998.

4T refers to sentencing transcript, dated August 14, 1998.

## Index to Appendix

Five-Page Report of Cheryl L. Thompson, PHD........     1

Ten-Page Report of Martha H. Page, Ed. D...........     6

Sixteen-Page Report of Louis B. Schlesinger, PHD...    16

State of New Jersey Department of Corrections,
Disciplinary Report - Inmate's Copy...............    32



## Point I

Defendant's State Constitutional Right to
Indictment by Grand Jury was Violated when
the Facts Required to be Found Before
Defendant Could be Tried as an Adult were
not Charged in the Indictment.   Furthermore,
Defendant's Federal and State Constitutional
Rights to Trial by Jury were Violated when
a Judge made the Findings that Resulted
in Defendant being Tried as  n Adult, and
not as a Juvenile.

In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348,

147 L.Ed.2d 435 (2000), the Supreme Court of the United States

held that "[o]ther than the fact of a prior conviction, any

fact that increases the penalty for a crime beyond the prescribed

statutory maximum must be submitted to a jury, and proved beyond

a reasonable doubt."  120 S.Ct. 2362-63.  In an earlier opinion,

the Court held that "under the Due Process Clause of the Fifth

Amendment and the notice and jury trial guarantees of the Sixth

Amendment, any fact (other than prior conviction) that increases

the maximum penalty for a crime must be charged in an indictment,

submitted to a jury, and proven beyond a reasonable doubt."

Jones v. United States, 526 U.S. 227, 243, n.6, 119 S.Ct. 1215,

143 L.Ed.2d 311 (1999).  More recently, in Ring v. Arizona,

the Court answered in the affirmative the question whether

Apprendi required that a jury, and not a judge, find the facts

necessary for imposition of capital punishment.  536 U.S. 584,

122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

Defendant contends that a logical extension of Apprendi,

Jones, and Ring requires that a jury, not a judge, find the

1

