facts at a transfer of jurisdiction hearing pursuant to R. 5:22-2 that result in the decision to prosecute and sentence a juvenile as an adult, because the finding of those facts results in the juvenile receiving a sentence in excess of the maximum term authorized for juveniles.

In Apprendi and Ring, the factual determinations that resulted in enhanced punishment were made after the respective defendants were found guilty of the charged crimes. Here, on the other hand, the factual determinations that resulted in Defendant's enhanced sentence were made before Defendant was found guilty of the charged crimes. But, although the transfer of jurisdiction hearing came before the trial, this hearing was the functional equivalent of the sentencing hearing in Apprendi and the penalty hearing in Ring. As such, Defendant contends that the transfer of jurisdiction hearing in the present case falls squarely within the reach of Apprendi, Jones, and Ring. See Apprendi, 530 U.S. at 494 (question "is one not of form, but of effect").

Accordingly, Defendant proposes that the constitutional procedure to be followed when a prosecutor wishes that a juvenile be punished as an adult is that the juvenile must first be prosecuted as an adult, with all the attendant safeguards, such as indictment by grand jury, with the indictment stating the facts to be found before the juvenile can be sentenced as an adult. If, at a trial, a jury finds the juvenile guilty of the charged offense or offenses, a penalty hearing to determine

2



whether the juvenile should be punished as an adult should then be conducted before the same jury, based on proof beyond a reasonable doubt; or before a different jury under conditions specified by statute.  Thereafter, the juvenile should be sentenced according to the jury's determination.[1]

Aside from protections under the federal constitution, Defendant contends that, under the right to indictment by grand jury clause of the state constitution, N.J. Const. Art. I, paragraph 8, extension of Jones v. United States, supra, requires that the facts to be found before a juvenile can be prosecuted and punished as an adult must be charged in an indictment. Compare State v. Fortin, 178 N.J. 540 (2004) (capital sentencing aggravating factors must be submitted to grand jury and returned in an indictment); see California v. Ramos, 463 U.S. 992, 1014-1015, 103 S.Ct. 3446, 3460, 77 L.Ed.2d 1171 ("It is elementary that States are free to provide greater protections in their criminal justice system than the Federal Constitution requires."); see generally, State v. Gerald, 113 N.J. 40 (1988) (protection under the state constitution must be at least coextensive with those of the federal constitution).  Defendant further contends that he is entitled under the right to trial by jury clause of the state constitution, N.J. Const. Art. I,

---

[1] Of course, the New Jersey State Legislature would have to grant the Superior Court of New Jersey, Law Division, the authority to impose sentences that are now only authorized to be imposed by the Superior Court of New Jersey, Chancery Division, Family Part.

3



paragraph 9, to at least the same protection Apprendi carved out to safeguard the analogous provision of the federal constitution. Gerald, supra.

Defendant also contends that the challenged errors cannot be disregarded as harmless.

Pursuant to R. 5:22-2(b), a motion for transfer of jurisdiction, as it pertains to the present matter, shall be granted only if:

> (1) The juvenile was 14 years of age or older at the time of the alleged delinquent act; and
> (2) There is probable cause to believe that the juvenile committed a delinquent act or acts which if committed by an adult would constitute
> A. criminal homicide . . . robbery which would constitute a crime of the first degree . . .; and
> . . . .
> (4) The juvenile has failed to show that the probability of rehabilitation prior to his reaching the age of 19 by the use of the procedures, services and facilities available to the court substantially outweighs the reasons for waiver.

Here, the criteria of R. 5:22-2(b)(1) and (2) have been met: Defendant was 15 at the time of the alleged delinquent acts, and he was charged with crimes that if committed by an adult would constitute criminal homicide and robbery. Because R. 5:22-2(b)(4) relies on subjective criteria, however, that could turn, for example, solely on the testimony of Defendant, it cannot be said that the conclusion is inescapable that a jury would conclude beyond a reasonable doubt that waiver of jurisdiction was appropriate, especially given the conflicting

4



expert testimony regarding the probability that Defendant could be rehabilitated prior to his reaching the age of 19 by use of the procedures, services and facilities available to the juvenile court.  (See 1T5-2 to 29-21.)

Moreover, given the obvious difficulty in assessing the effect of a defendant's presence and allocution before twelve of his peers who are to decide whether his or her fate is to remain in the protective environment of the juvenile court system or that he or she should be subjected to all the harsher penalties that come with being prosecuted as an adult, it may well be that the challenged errors are not amenable to harmless error review.  Cf. State v. Zola, 112 N.J. 384, 429-430 (1988) (discussing the importance of a capital defendant's right to allocution before he is sentenced).

Point II

Defendant's Federal and State Constitutional
Right to a Jury Trial were Violated when
the Trial Judge Found the Aggravating Factors
used to Increase Defendant's Sentence for
Murder Beyond the Prescribed Maximum.
Furthermore, Defendant's (State Constitu-
tional) Right to Indictment by Grand Jury
was Violated when the Aggravating Factors
used to Increase the Sentence for Murder
were not Charged in an Indictment.

As stated earlier, in Apprendi v. New Jersey, the United

States Supreme Court declared that, "Other than the fact of

a prior conviction, any fact that increases the penalty for

a crime beyond the prescribed statutory maximum must be submitted

to a jury, and proved beyond a reasonable doubt." · 530 U.S.

466, 490, 120 S.Ct. 2348, 2363 (2000).

In Blakely v. Washington, 542 U.S. ___ , 124 S.Ct. 2531

(2004), the Court reaffirmed this principle.  There, the

defendant (in a domestic-violence case) was sentenced to 90

months for second-degree kidnaping, although the standard

sentencing range was 49 to 53 months.  Id. at 2534-2535.  The

sentencing judge based the 37-month increase beyond the standard

range "on the ground that petitioner had acted with 'deliberate

cruelty,' a statutorily enumerated ground for departure in

domestic-violence cases."  Id. at 2435.

"Petitioner appealed, arguing that this sentencing procedure

deprived him of his federal constitutional right to have a jury

determine beyond a reasonable doubt all facts legally essential

to his sentence."  Id. at 2536.  The Supreme Court agreed:

6



In this case, petitioner was sentenced
to more than three years above the 53-month
statutory maximum of the standard range
because he had acted with 'deliberate
cruelty.'  The facts supporting that finding
were neither admitted by petitioner nor
found by a jury.  The State nevertheless
contends that there was no <u>Apprendi</u> violation
because the relevant 'statutory maximum'
is not 53 months, but the 10-year maximum
for class B f. onies . . .  Our precedents
make clear, however, that the 'statutory
maximum' for <u>Apprendi</u> purposes is the maximum
sentence a judge may impose <u>solely on the</u>
<u>basis of the facts reflected in the jury</u>
<u>verdict or admitted by the defendant.</u> .
. .  In other words, the relevant 'statutory
maximum' is not the maximum sentence a judge
may impose after finding additional facts,
but the maximum he may impose <u>without</u> any
additional findings.  When a judge inflicts
punishment that the jury's verdict alone
does not allow, the jury has not found all
the facts 'which the law makes essential
to the punishment,' . . . and the judge
exceeds his proper authority.

<u>Id.</u> at 2537 (Citations omitted).

Here, the sentencing judge likewise exceeded his proper

authority when the judge imposed a sentence of fifty years on

the conviction for murder.  The jury's verdict was based on

a finding that Defendant purposely or knowingly caused death

or serious bodily injury which then resulted in death.  This

was the only finding upon which Defendant's sentence could be

based.  And based on this finding, Defendant could have been

sentenced to only thirty years.

<u>N.J.S.</u> 2C:11-3b.(1) reads:

Murder is a crime of the first degree but
a person convicted of murder shall be
sentenced . . . to a term of 30 years, during
which the person shall not be eligible for

7



parole, or be sentenced to a specific term
of years which shall be between 30 years
and life imprisonment of which the person
shall serve 30 years before being eligible
for parole.

Properly interpreted, in light of <u>Apprendi</u> and <u>Blakely</u>,

under this sentencing scheme, the maximum term that can be

imposed on a jury verdict of murder is 30 years.  Any other

sentence would require the sentencing court to make additional

findings; otherwise, a court's selection of a specific term

between 30 years and life would be arbitrary.

Here, the sentencing judge ran afoul of <u>Apprendi</u> and <u>Blakely</u>

and the state constitutional provision guaranteeing the right

to a trial by jury when the judge based Defendant's sentence

on additional findings, to wit: the nature of the offense and

the need to deter the defendant and others.  (4T9-25 to 10-5.)

The sentencing procedure employed by the judge thus deprived

Defendant of his right to have a jury determine beyond a

reasonable doubt all facts legally essential to the sentence.

<u>State v. Natale</u>, 373 <u>N.J. Super.</u> 226 (App. Div. 2004) (ruling

that New Jersey's sentencing guidelines pursuant to <u>N.J.S.</u>

2C:44-1a runs afoul of <u>Blakely</u>); <u>see also</u> <u>U.S. v. Booker</u>, 543

<u>U.S.</u> ___ (Jan. 12, 2005) (federal sentencing guidelines would

violate the Sixth Amendment if its application is mandatory);

<u>contra</u> <u>State v. Abdullah</u>, 372 <u>N.J. Super.</u> 252 (App. Div. 2004)

(declining to find that <u>Blakely</u> applies to murder); <u>State v.</u>

<u>King</u>, 372 <u>N.J. Super.</u> 227 (App. Div. 2004) (same).

In addition to the violation of the right to a trial by

8



jury, Defendant's right to indictment by grand jury was violated because the aggravating facts used to increase the sentence for murder beyond the prescribed maximum term were not charged in an indictment.  N.J. Const. Art. I, par.8; see Jones v. United States, supra (so construing federal grand jury clause).

A 21

### Point III

Defendant's Waiver of his Miranda[2] Rights
was not Knowing and Intelligent Because
Defendant was not Informed that, Although
He was a Juvenile, any Statement made by
Him could be used Against Him in a
Prosecution as an Adult.

At the time of his interrogation by police, Defendant was

fifteen years old. (2T72-6 to 11.) Prior to making his

statement, Defendant, in the presence of his mother, was advised

as follows:

Q. So that between 12:07 and 12:09 you
read to him You have the right to remine
[sic] silent, do you understand this?
A. Yes, sir.

. . . .

Q. Then you asked him Anything you say
can and will be used against you in a court
of law. Do you understand this?
A. That is correct.

. . . .

Q. . . . Then you asked him third
question: You have the right to talk to
a lawyer and have him present while you
are being questioned. Do you understand
this? That was asked, is that correct?
A. Yes, sir. It was.

. . . .

Q. Then you asked him If you cannot
afford to lawyer, a lawyer, one will be
appointed to represent you before any
questioning, if you wish. Do you understand
this?

. . . .

A. Yes, sir.

. . . .

Q. And you also asked, You can decide
at any time to exercise these rights and
not answer any questions or make any
statements. Do you understand this?

. . . .

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).

10



A.  Yes.

Q.  And then you read--Did you read it to them or have them read--I have read these, this statement of my rights and I understand what my rights are.  I am willing to make a statement and answer questions.  No promises or threats have been made to me, and no pressure or coercion of any kind has been used against me.  Did they read that, did you read that to them?

A.  I read that to them.

Q.  And at that time you asked, simply, whether they understood it, and they responded affirmatively?

A.  Yes.

(2T45-20 to 47-16.)

To be admissible, a statement made in police custody, by an adult or a juvenile, must be preceded by a knowing, voluntary and intelligent waiver of the so-called Miranda rights.  State v. Presha, 163 N.J. 304, 312-313 (2004).  The warnings given to Defendant were an adequate recitation of the Miranda rights if given to an adult--but, because Defendant was a juvenile, Defendant contends that the warnings should have done more: specifically, Defendant should have been advised that he could be prosecuted as an adult and that any statement given by Defendant would be admissible against him in a prosecution as an adult.

The United States Supreme Court has not had occasion to rule on the propriety of advising a juvenile of his possible prosecution as an adult.  Nor has any New Jersey court.  Other courts, however, have adopted the rule that, in view of the risks involved when a confession is to be admitted against a juvenile in adult criminal court, before a judge can conclude

11



that the statements were made knowingly and intelligently, the
juvenile, when facing a charge that would be a felony if
committed by an adult, must have been advised of the possibility
of his being tried as an adult and of his being subject to adult
criminal sanctions. State v. Benoi . 490 A.2d 295, 303-304
(N.H. 1985) (citing cases).

The New Jersey Supreme Court has consistently taken an
expansive view regarding the protection of a juvenile's rights
during police interrogation, insisting, for example, that
whenever possible a parent must be present during interrogation.
State v. Presha, supra; State ex rel. O.F., 327 N.J. Super.
102, 117 (App. Div. 1999).  Though the presence of a parent
is indeed invaluable, Defendant contends that more is required
in order to ensure that a child understands the rights that
he or she is waiving, because a parent, like the child, may
not fully understand the consequences of the child's exposure
to prosecution as an adult.[3]

Although perhaps not required by either the state or federal

_____

[3]Some of the courts cited in Benoit support the proposition
that a juvenile's awareness of his possible prosecution as an
adult could be imputed to the juvenile on the basis of the
adversary character and setting of the interrogation.
Application of this rule here would be unfair, however, because
Defendant had no prior experience as a suspect in police custody.
Furthermore, that juveniles are treated differently from adults
is generally known.  Thus, a "child, in making a statement,
may reasonably believe that the statement will be used only
in the protective and rehabilitative setting of the juvenile
court." Benoit, at 303.

12



constitutions, even New Jersey state prisoners charged with a violation of a prison rule receive greater protection with regards to their privilege against self-incrimination than juveniles currently receive.  Under New Jersey Department of Corrections standards, before a prisoner can be asked to give a statement about an alleged prison rule infraction, the prisoner must be informed that he or she has "the right to make a statement concerning the charge.  This statement or any evidence derived directly or indirectly from your statement may be used against you at the disciplinary hearing but cannot be used against you in any future criminal proceedings."  State of New Jersey Department of Corrections, Disciplinary Report - Inmate's Copy, Notice to Inmate of Rights.  See Memorandum Appendix at 32.

The rationale for the rule is clear:  Because a prisoner would receive considerably harsher punishment if prosecuted in Superior Court for an act committed in prison that would constitute a crime than the prisoner would receive if prosecuted in a prison disciplinary hearing, the prisoner would be understandably hesistant to give a statement about the act if that statement were to be used against the prisoner in a prosecution in Superior Court.

Surely, the same concern to safeguard the right against self-incrimination is present when a juvenile is charged with an act which could be prosecuted as a crime.  Accordingly, this Court should adopt Defendant's proposed new rule because it

13



is entirely consistent with the expansive view taken under the

state constitution by the New Jersey Supreme Court with regards

to protection of a juvenile's rights during police interrogation.

### Point IV

Trial Counsel was Ineffective for Failing
to Present Evidence of Defendant's Low
Intellectual Functioning in Order to
Establish that Defendant's Waiver of His
<u>Miranda</u> Rights was not Knowing and
Intelligent.

In arguing that Defendant did not voluntarily, knowingly,

and intelligently waive his <u>Miranda</u> rights before making

statements to police, trial counsel summarized his position

as follows:  "I don't think in that two minutes period that

those five questions could be read and initialed and answered

in two minutes and in a knowing manner, especially since my

clients own testimony indicated that he didn't understood these

rights at that time."  (3T10-22 to 11-1.)

The portion of Defendant's testimony (at the <u>Miranda</u>

hearing) counsel referred to was as follows:

> Q.  Back then what didn't you understand?
> Let's go through it all over.
> You have a right to remain silent.  Did
> you understand that at that point in time?
> A.  Yes.
> Q.  I mean, that's as simple as it can
> be: You can keep your mouth shut.  You knew
> that, right?
> A.   Yes.
> Q.   And anything you say can and will
> be used against you in a court of law: And
> you understood that right, because that's
> also very simple?
> A.  Yes.
>      . . . .
> Q.   <u>You have a right to talk to a lawyer</u>
> <u>and have him present while you are being</u>
> <u>questioned?</u>
>      <u>You knew what a lawyer was?</u>
> A.  <u>Yes.  I, at that time I didn't know</u>
> <u>I could have had a lawyer present, you know,</u>
> <u>I didn't know that.</u>

15



Q.   Did you think you could have a lawyer
only later on?
A.   Like on in the future.  Yes.
Q.   But in terms of present, you didn't
understand that?
A.   I didn't understand.
Q.   Was it the word "present" that you
didn't understand?
A.   Sort of.
Q.   All right.  So when they read this
to you:  You have a right to talk to a
lawyer, you understood that up to that point,
right?
A.   Yes.
Q.   And have him present while you were
being questioned.  Okay.  You understand
while you are being questioned, right?
A.   Yes.
Q.   And have him, you understood?
A.   Right.
Q.   So 'present' was the only word you
didn't understand?
A.   Yes.

.  .  .  .

Q.   If you cannot afford to hire a lawyer
one will be appointed to represent you before
any questioning if you wish: Did you
understand that back then?
A.   No.
Q.   What didn't you understand?
A.   The part, 'if you wish,' I didn't
understand.
Q.   'If you wish' you did not understand?
A.   Yes.

(2T114-14 to 117-3.)


In denying the motion to suppress, the trial court stated:

I do not find credible defendant's testimony
that he didn't understand what was being
read to him.  On cross examination, Mr.
Kolano went through the form with him and
indicated phrase by phrase almost word by
word what was contained in the form, and
there the answers given by the defendant
did not suggest that he was, that he did
not understand what was contained in the
form.

(3T16-7 to 13.)

A 28

What the trial court did not know, however, was that
evidence of Defendant's severe learning disability would have
corroborated Defendant's testimony that he did not fully
understand the <u>Miranda</u> rights.  The only reference the court
heard of this extensive evidence were contain  in three
questions trial counsel posed to Detective Koczur at the <u>Miranda</u>
hearing:

> Q.   And were you aware that he was a
> special education student in the school?
> A.   No.
> Q.   So you weren't aware he may have
> had certain learning disabilities that made
> it difficult for him to understand any of
> these things?
> A.   No.
> Q.   So you just assumed in the two
> minutes that you read this that he understood
> everything?
> A.   Yes.

(2T48-15 to 24.)

Defendant's special education status counsel referred to
was documented in Defendant's school records and by three
psychologists, to whom Defendant was referred to in order that
they assess the likelihood of successful rehabilitation of
Defendant within the juvenile court system prior to reaching
the age of 19 years.  These psychologists also determined through
testing that Defendant functioned at a low intellectual level.

Cheryl L. Thompson, PHD, who, among other things,
administered a mental status exam and reviewed Defendant's school
records, see Memorandum Appendix at 1, estimated Defendant's
intelligence as "Borderline to Low Average[,]" see Appendix

17



at page 2.  Defendant described himself to Dr. Thompson as "a school person[,]" but [Defendant's] school record reflect severe learning problems that became obvious in first grade. [Defendant] was retained in first and second grades.  He was placed in a special education program because he was never able to learn basic reading, writing and computation."  Appendix at 2.  Dr. Thompson described Defendant as "not bright and is easily confused."  Appendix at 3.  She concluded that "[Defendant] should have a complete diagnostic assessment as he may be functioning as [sic] the level of retardation." Appendix at 4.

Dr. Martha H. Page administered several tests to Defendant and also reviewed his school records.  See Appendix at 6.  In her report, she recounts Defendant's school history, which documents years of learning disability, including that Defendant was classified as Special Education, Communication Handicap. Appendix at 7-9.

The results of the several tests Dr. Page administered to Defendant showed him to be "functioning at the intellectually deficient to borderline range of intelligence[,]" though "[p]otential intellectual functioning was in the borderline to low average level of intelligence."  Appendix at 11. According to Dr. Page, "[Defendant] found it difficult to process verbally presented material rapidly.  Ability to define words was well below average. . . .  Certainly, the . . . classification of [Defendant] as Communication Handicapped was

18

A 30

an appropriate one." <u>Ibid</u>.  "[I]t was evident that [Defendant's]
academic skills were still quite low and further impaired when
he felt under pressure to achieve or was in a less than
well-controlled and structured situation." Appendix at 12.
Dr. Page concluded that "Defendant had considerable difficulty
in thinking analytically and accurately especially when he felt
under pressure." Appendix at 14.

    In his report, Dr. Louis B. Schlesinger wrote:

> [Defendant] is currently functioning within
> the high **d of the borderline range of
> intelligence, gaining a Full Scale IQ of
> 79 . . . Verbal skills *** within low end
> of dull-normal range.  Fund of general
> information is weak, suggesting that
> [Defendant] has not profited a great deal
> from school or experience.  For example,
> he did not know the number of weeks in a
> year, the identity of Louis Armstrong, the
> direction travelled from Chicago to Panama,
> the location of Brazil, the author of Hamlet,
> the President during the Civil War, and
> other such simple facts.  <u>Vocabulary is
> equally poor and far below average capacity
> as he was unable to define such words as
> fabric, assemble, conceal, consume, regulate,
> and the like</u>. . . .  In general, verbal
> skills fall within low end of dull-normal
> range, which seems to be a f***** *ccurate
> assessment of his current and potential
> capacity.

Appendix at 22-23.

    Trial counsel represented Defendant at the juvenile waiver
hearing and was aware of the evidence of Defendant's low
intellectual functioning since counsel was the one who had
referred Defendant to Dr. Thompson and to Dr. Page and since
counsel undoubtedly received through discovery a copy of the



report of Dr. Schlesinger (to whom Defendant was referred to by the State). Under these circumstances, Defendant contends that trial counsel was ineffective for failing to present at the Miranda hearing the extensive evidence of Defendant's low intellectual functioning.

In order to sustain his claim of ineffective assistance of counsel, Defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed defendant by the Sixth Amendment[,]" and that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[; a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"In determining whether a defendant in police custody has voluntarily, knowingly, and intelligently waived his Miranda rights, a trial court looks at several factors, including the defendant's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved . . ." State v. Presha, 163 N.J. 304, 313 (2000). "[A] suspect's previous encounters with the law has [also] been mentioned as [a] relevant factor." Ibid.

Here, trial counsel rightly focused on the fact that



Defendant was a juvenile and on Defendant's lack of a prior record. (4T9-24 to 10-8.) Counsel was remiss, however, in failing to present the evidence of Defendant's low intellectual functioning. As a result, Defendant's testimony about his inability to understand simple words in the language of the rights read to him came off as incredible and appeared as a transparent attempt to get a favorable ruling.

Dr. Thompson described Defendant "as not bright and easily confused." Appendix at 3. Dr. Page, that "[Defendant] found it difficult to process verbally presented material rapidly." Appendix at 11. And Drs. Page and Schlesinger found that Defendant's ability to define words was well below average. Appendix at 11 and 23. This documented evidence of Defendant's verbal skills shortcomings amply supports and is consistent with Defendant's testimony at the <u>Miranda</u> hearing that he could not understand the word "present" in the statement "You have the  right to talk to a lawyer and have him present while you are being questioned," and the phrase "if you wish" in the statement "If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning if you wish." Counsel's failure to introduce this evidence at the <u>Miranda</u> hearing can only be characterized as unreasonable because the omitted evidence bore directly on the question whether Defendant voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights.

Counsel's failure to present this highly relevant evidence

21



also prejudiced Defendant because a reasonable probability exists that the inclusion of this evidence combined with the fact of Defendant's age and lack of a prior record would have affected the outcome of the Miranda hearing.  Compare State v. Cook, 47 N.J. 402, 418 (1966) (defendant's low intelligence combined with other factors weighed against a finding that his confessions were the product of a free and unconstrained will) with State v. Flower, 224 N.J. Super. 208 (Law. Div. 1988) (confessions of adult defendant with mentality of a six- or seven-year old held involuntary).  Furthermore, a reasonable probability exists that suppression of Defendant's statement would have affected the outcome of his trial because Defendant's statements constituted a significant part of the State's case.

22

A 34

## Point V

Trial Counsel was Ineffective for not
Presenting in Mitigation of Sentence the
Evidence of Defendant's Low Intellectual
Functioning and Personality Disorder.

As outlined in Point IV, Defendant's intellectual
functioning (at the time of the charged offenses) was estimated
at Borderline to Low Average.  Dr. Louis B. Schlesinger also
reported that "Results of the projective and personality tests
are consistent with clinical impression showing a late adolescent
(16 years 6 months of age [at the time of the testing])
displaying the early signs of a developing personality disorder
with impulsive and antisocial traits.  The Rorschach shows a
young man with the early signs of developing mild to moderate
characterological disturbance . . . ."  Appendix at 25.
"[Defendant] responds to the outside world as well as to his
****rnal processes.  With regard to the former, he often over-
reacts in loose and poorly controlled ways.  His inner life
is dominated somewhat by impulsive tendencies, making the
likelihood of acting-out rather high."  Appendix at 25-26.

In her report, Dr. Cheryl L. Thompson wrote:

> [Defendant] presents as a follower,
> someone who could be easily persuaded by
> more successful anti-social characters to
> become involved with them.
>
>      . . . .
> [Defendant] presents as a pleasant
> cooperative young man whose behavior reflects
> a negative idealization of a group of people
> he started to associate with.  That is,
> [Defendant] does not appear to have the
> ability to judge the social appropriateness
> of the group he selected to involve himself

23



with.  One of the people shown on the video
tape was a relative of [Defendant's].
        . . . .
    [Defendant] presents as a young man who
does not have an anti-social identification.
He describes himself as a school person
and he was in the correct grade for his
age.  He states that he can't explain what
allowed him to engage in such behavior.
He is ashamed and sad that an innocent person
lost his life as a result of the actions
of the group.  [He] does believe that he
would not have been in such behavior had
his cousin not been involved with him.
    [Defendant's] behavior is that of a person
whose judgment was clouded, probably as
a result of the overstimulation in the house,
substance abuse and a desire to feel that
he was a part of the group.

Appendix at 3-5.

    In her report, Dr. Martha H. Page wrote:

        The Porteus Mazes provide a measure of
    planning ability in every day life as well
    as the ability to follow the rules.  A high
    Qualitative Score has been found to be
    characteristic of juvenile delinquents
    who tend to feel the end justifies the means.
    It also provides a measure of tension level
    and impulsivity.  Performance is also
    affected by the individual's ability to
    visualize and plan ahead.  [Defendant]
    received a Qualitative Score of 94 for 16
    trials, well in excess of the cutoff score
    for delinquents of 40 to 50.  [Defendant's]
    score was detrimentally affected by his
    difficulties in visualizing and planning
    ahead. . . .  Between his perceptual-motor
    difficulties and desire to achieve, he found
    it very difficult to follow the rules.
    Even though his Quantitative Score of 90
    placed him in the average range, under
    pressure he would have difficulty in
    utilizing his ability to plan ahead.

Appendix at 11.

    Dr. Page further wrote that, "Impulse control could be

                            24



quite poor when he was in a stressful situation.  He could act with poor judgment because he had difficulty in thinking things through carefully when he was in an unfamiliar situation, or when he felt challenged or thought that he had to act as though he were cool and tough."  Appendix at 13.  Dr. Page diagnosed Defendant as having an Adjustment Disorder with Mixed Disturbance of Emotions and Conduct.  Appendix at 14.

At the sentencing hearing, as at the _Miranda_ hearing, counsel referred to Defendant being "a special ed student," (4T3-1 to 2), but counsel did not explain nor present evidence to establish exactly what that meant.  Defendant contends that, under the circumstances here, counsel was ineffective for not presenting the extensive evidence of Defendant's low intellectual functioning and personality disorder, which could have been presented as a mitigating factor pursuant to _N.J.S._ 2C:44-1b(4)[3]. Furthermore, the evidence of Defendant's intellectual and mental deficiencies would have supported counsel's contention that Defendant's age should be accepted as a mitigating factor, (4T2-17 to 18).

Defendant's susceptibility to influence by an adult is abundantly supported by the portions of Dr. Thompson's and Dr. Page's respective reports outlined earlier.  Defendant's personality disorder, though insufficient to amount to a defense

---

[3]That statute reads: "There were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense[.]"



to the charges, was also abundantly supported by the record.
The importance of the evidence of Defendant's intellectual
functioning and personality disorder as mitigating evidence
is perhaps best illuminated by the following comments in Dr.
Schlesinger's report:

> This is not a homicide which is a direct
> ***** of a mental illness such as psychosis,
> or a depression, nor ******* any type of
> compulsive pathological murder with sexual
> dynamics.  It also does not seem to be an
> explosive homicide, but rather an impulsive
> offense within the context of antisocial
> goals.  As far as this examiner can determine
> there was really no purpose to the original
> idea of committing an armed robbery, except
> to just commit an armed robbery, 'to see
> how it felt'.  The idea was not to get money
> for any specific purpose such as drugs or
> alcohol, but just to do something excessively
> antisocial.

Appendix at 29-30.

In short, Defendant's youth combined with his low
intellectual functioning, personality disorder and poor impulse
control provided substantial grounds to mitigate Defendant's
sentence of 50 years; and Counsel's failure to present this
available mitigating evidence satisfies both prongs of the
Strickland test.

26



### Point VI

**The New Rule Proposed in <u>Point III</u> Should
be Applied Retroactively to Defendant.**

The first step in a retroactivity analysis of a state law
rule is whether the rule in question is indeed a new rule.
Defendant concedes that the rule he asks the Court to adopt
is in fact a new state law rule.  See <u>State v. Lark</u>, 117 <u>N.J.</u>
331, 338 (1990) (A new rule "clear[ly] break[s] with the past,"
and "disrupts a practice long accepted and widely relied upon
. . . ." [internal quotations omitted]).

In deciding whether to apply a new state law rule
retroactively, a New Jersey court looks at:

> (1) the purpose of the rule and whether
> it would be furthered by a retroactive
> application, (2) the degree of reliance
> placed on the old rule by those who
> administered it, and (3) the effect a
> retroactive application would have on the
> administration of justice.

<u>State v. Nash</u>, 64 <u>N.J.</u> 464, 471 (1974).

Here, the purpose of the new rule is to afford a juvenile
the greatest protections before a statement he or she makes
in police custody is used against the juvenile in his or her
prosecution as an adult.  Only unlimited retroactive application
of the new rule can ensure that a juvenile's statement in police
custody was truly voluntarily, knowingly, and intelligently
made, because a juvenile's awareness of possible prosecution
as an adult is undoubtedly the most important circumstance
influencing a juvenile's decision to make a statement.



A 39

As to the second and third of the Nash factors, Defendant does not dispute that the old rule was widely relied on by those who administered it and that retroactive application of the new rule would place a heavy burden on the administration of justice. The new rule is so fundamentally important, however, that the widespread reliance on the old rule is an insufficient factor to sway the scales in favor of non-retroactive application of the new rule. See Ivan V. v. City of New York, 407 U.S. 203, 205, 92 S.Ct. 1951, 32 L.Ed.2d 659 (1972). Furthermore, because of the important right at stake, the administration of justice should bear the burden of the potentially numerous petitions for postconviction relief in which defendants may seek benefit of the new rule. See Ivan V. at 407 U.S. 206.

Defendant also reminds the Court that it can give Defendant the benefit of the new rule without authorizing unlimited retroactive application.

In deciding whether to apply a new rule retroactively, a court has four options:

> (1) make the new rule of law purely prospective, applying it only to cases whose operative facts arise after the new rule is announced; (2) apply the new rule to future cases and to the parties in the case announcing the new rule, while applying the old rule to all other pending and past litigation; (3) grant the new rule limited retroactivity, applying it to cases in (1) and (2) as well as to pending cases where the parties have not yet exhausted avenues of direct review; and, finally, (4) give the new rule complete retroactive effect, applying it to all cases, even those where final judgments have been entered and all

28



avenues of direct review exhausted.

State v. Nash, supra, at 468-70.

The Court can thus choose the second or third of the Nash options if it determines that the fourth option would not significantly furth  the interests to be served by the new rule Defendant proposes.

## Point VII

The Claims for Relief are not Barred by
a Procedural Rule.

Claims in a petition for postconviction relief (PPCR) are subject to bar if they were not raised on appeal. R. 3:22-4. The bar, however, is relaxed if the claims, as do the claims argued _supra_, involve the deprivation of a right guaranteed by the constitution of the United States or the constitution or laws of the State of New Jersey. R. 3:22-4(c); see also State v. Preciose, 129 N.J. 451, 459-461 (1992), specifically with regards to the unsuitability of application of R. 3:22-4 to bar ineffective assistance of counsel claims raised in a PPCR.

Furthermore, a claim raised for the first time in a PPCR is not barred if enforcement of R. 3:22-4 would create a fundamental injustice. R. 3:22-4(b).  The claim for relief argued in Point I falls within this category because of the severe disparity between the sentence Defendant could have received as a juvenile and the one he is currently serving. Compare State v. Lawton, 298 N.J. Super. 27 (App. Div. 1997) (fundamental injustice would occur if defendant's challenge to erroneous instruction on passion provocation manslaughter was barred because of inequality between sentence of murder defendant was serving and that for manslaughter).

The claim for relief argued in Point III also falls within this category because of the disparity between the sentence

30



of 30 years Defendant should have received and the sentence
of 50 years he did receive.  R. 3:22-4 also cannot bar the claim
for relief argued in <u>Point III</u> because the challenged error
renders Defendant's sentence illegal and thus correctable at
any time pursuant to <u>R.</u> 3:22-12.  See <u>State v. Levine</u> 253 <u>N.J.</u>
<u>Super.</u> 149 (App. Div. 1992) (claim that a sentence is illegal
is not barred by <u>R.</u> 3:22-4 for failure of assertion in prior
proceedings).  <u>R.</u> 3:22-4 should also not be used to bar the
claim argued in <u>Point III</u> because the claim is based primarily
on the recently-issued opinion in <u>Blakely v. Washington</u>, 124
<u>S.Ct.</u> 2531 (June 24, 2004).

31

## Conclusion

Based on the foregoing, Defendant asks the Court to grant him postconviction relief.

Dated:   February 24, 2005          Respectfully,

Marvin Mathis

1

Cheryl L. Thompson, Ph.D.
57 Maple Street
Millburn, New Jersey 07041
(201) 762-6475

Psychological Assessment

Marvin Mathis
Age: 15-11
DOB: 3/23/80            Date Seen: February 10, 1996

Reason for Referral:  To assess the likelihood of successful rehabilitation within the Juvenile Justice System of the State of New Jersey prior to the achievement of age 19 years.

Referred by:  William B. Eisert, Attorney-at-Law

Procedures: Clinical Interview including mental status examination; Bender-Gestalt Test of Motor Perception; House-Tree-Person Test; review of available records; interview with Youth House social worker assigned to the case; and viewing of video tape made by the defendants prior to this incident.

Findings:  Marvin Mathis is a soon to be 16 year old African-American adolescent. He is a brown skinned, wide-eyed, short adolescent who looks somewhat older than his stated age. He has some adolescent acne. He was poorly groomed on the day of the visit with hair being particularly disheveled. He had been in the detention center for 15 days at the time of the interview (2/10/96) and was complaining about loss of appetite and homesickness.

Marvin was fully aware of my role in his judicial process but did not seem to have a full picture of the seriousness of his judicial position. This is a first arrest and detention for Marvin. He is charged with an armed robbery and homicide.

Marvin states that he was with another young man and two young women when they decided they would commit robbery, walked to a liquor store and tried to rob the man outside the store. The man was the store owner. The victim resisted the robbery and the older boy had the gun, the man grabbed at the gun. Marvin states that he then tried to come between his friend and the man at which point the gun went off, firing one shot into the man's chest, killing him. The group separated after the shooting. Marvin states that he knew a robbery would occur but the he did not know this specific robbery would transpire. After the shooting, the other boy and girl



2

ran away quickly and Marvin and the second girl ran more slowly. Marvin states that all of the people involved in the incident are in detention. The other male and one of the females have been detained in the county jail. The second female is in the Youth Detention Center with Marvin.

Marvin states that he told the older male not to rob the man and that he tried to intervene in the shooting. He also reports that all of the other people involved are saying that he shot the man and that the robbery was entirely his idea.

After the robbery, Marvin states that he kept thinking about it. He knew the victim was shot but did not know he was dead. Marvin states that he did empty the victim's pockets. He did not tell his mother about the event but did tell his girlfriend. The girlfriend heard about the incident from another person before Marvin told her about it. Marvin was arrested at his school two days after the incident occurred.

Marvin is one of three children. He has one brother aged 25 years and one sister aged 12 years. Marvin does not get along with his 25 year old brother. That brother is incapacitated as a result of juvenile diabetes and lives apart from Marvin and the younger sister. His mother is described as 40-41 years old and a homemaker. She is also described as an asthmatic who has more trouble in winter than in summer. The father, age unknown is a truck driver. The parents are separated and Marvin is only in touch when there is business. He states that his parents separated a very long time ago. His family came to New Jersey from North Carolina when Marvin was four years old. His parents have spoken to him about his legal situation. Marvin states his mother told him not to hang out with the wrong crowd and his father told him is sad to be in trouble so young.

Marvin then responded that he never thought he would be in here, that he is a school person and that he didn't get into trouble. However, Marvin's school record reflects severe learning problems that became obvious in first grade. Marvin was retained in first and second grades. He was placed in a special education program because he was never able to learn basic reading, writing and computation.

On Mental Status: Marvin was oriented to time, place and person. He denied hallucinations (sensory experiences in the absence of a stimulus) and no delusional thinking was elicited (false fixed beliefs). Suicidal and/or homicidal ideation and gesture were denied. Marvin's speech was clear and goal directed. His intelligence is estimated as Borderline to Low Average. He did not His problem solving skills are very inconsistent, for example when



3

asked what he would do with a stamped, sealed and addressed letter, he responded, "take it to the post office. When asked what he would do if he were the first person in a movie to see real smoke and fire, he responded, "go back and get some popcorn." He was no able to understand that the fire was separate from the movie. His ability to think abstractly is also poorly developed. He is concr e, simplistic and referential. When asked about the similarity between beer and wine, he stated, "Guess dark beer, wine lighter, I don't know about beer and wine." Attention and concentration are impaired. He has no vegetative symptoms of depression except poor appetite. He denies all substance use/abuse.

In Sum: Marvin presents with a mental status that reflects no acute psychiatric disability.

Marvin presents as a cooperative young man, with a bright-eyed expression. However, he is not bright and is easily confused.

Marvin made two statements to the police. The first statement described three guys who were involved in the crime. The second statement reported that four people were involved in the crime, with two of the group members being female. He states that he changed that version of the story when his mother told him not to lie and when he realized that his male friend had told about the presence of the two females. Marvin acknowledged involvement in the incident but states that he served mostly as the lookout. He further states that he thinks he was in shock after he saw the man get shot. He shared that his girlfriend had asked him why he didn't stay at the crime scene and see to it that the victim received assistance. Marvin believes it was his disbelief, that allowed him to run away. He thinks that man became a victim because the other male was angry that the liquor store was closed. Marvin states that he knew the other male since he was 5 or 6 years old. He also knew that this boy had been in trouble and had been to Jamesburg.

Marvin appears to be a young man who is caught between his wishes for himself and the reality of his future. He states he would like to go to college to become and electrician. He hopes to go the Rutgers or to a school in Georgia. However, his special education classification because of his never having become literate makes a goal like that impossible. His profound sense of academic failure appears to have served as an impetus to engage in this anti-social behavior. Marvin reports that his girlfriend does well in school and is headed for college.

Marvin presents as a follower, someone who could be easily persuaded by more successful anti-social characters to become involved with them.



4

Marvin should have a complete diagnostic assessment as he may be functioning as the level of retardation. If so, he would do well if connected to some of the programs of the Department of Developmental Disability. He is cooperative, he seeks adult authority and if surrounded by people who foster pro-social behavior and leave Marvin with a sense of competence, his adaptation would be good.

This is a very serious crime. Marvin does not present as the initiator of such a crime. This is his first arrest. He has told at least two versions of the story, one version appeared to be his attempt at protecting the two females involved in the episode. None of the other participants appear to have tried to protect Marvin. He was the youngest member of the group and as such may have been implicated as having greater responsibility than he had in reality because of the wide-spread belief that juveniles are punished less harshly. In reviewing the video tape, it becomes apparent that the people were overstimulated in that they lived in constant noise, indulged in dangerous behavior, allowed substance abuse and encouraged the younger members of the group to mistreat women as well as promoting substance abuse for them. In the video tape, Marvin appears to play an insignificant role in the many interactions. His level of involvement at least indicates that he is not a leader of this group.

Marvin appears quite confused about his involvement in such a serious event. He acknowledges that he knew that a robbery would occur and he was fully prepared to participate in the robbery. He states that he did not want to see anybody hurt and that he and one of the women served essentially as look-outs while the event proceeded. However, he also states that he tried to intervene and protect the victim from the shooting. Marvin also shared that his girlfriend wanted to know why he left the man before help arrived for him. Marvin states that he ran from the crime because he was completely overwhelmed by the incident. He further states that he had no idea that the man had been killed.

Marvin presents as a pleasant cooperative young man whose behavior reflects a negative idealization of a group of people he had started to associate with. That is, Marvin does not appear to have the ability to judge the social appropriateness of the group he selected to involve himself with. One of the people shown on the video tape was a relative of Marvin's.

Marvin presents as a young man who does not have an anti-social identification. He describes himself as a school person and he was in the correct grade for his age. He states that he can't explain what allowed him to engage in such behavior. He is ashamed and sad that an innocent person lost his life as a result of the actions of



5

the group. Marvin does believe that he would not have been in such behavior had his cousin not been involved with him.

Marvin's behavior is that of a person whose judgment was clouded, probably as a result of the overstimulation in the house, substance abuse and a desire to feel that he was a part of the group.

Marvin presents as an excellent candidate for successful rehabilitation within the juvenile justice system of the State of New Jersey prior to the achievement of age 19 years. He has no prior record, he is responsive to adult authority, his adjustment to youth house has been good, he is not a leader, he has had a good adjustment to school even though he probably has significant learning problems. Marvin has achievable career goals. He wants to become an electrician.

In Sum: Marvin Mathis with a chronological age of 15- presents as an excellent candidate for successful rehabilitation within the Juvenile Justice System of the State of New Jersey prior to the achievement of age 19 years. He is responsive to adult authority, has no prior criminal record and does not prevent as a leader in anti-social action. He would do extremely well in a structured setting that includes educational and vocational training. He would also benefit from personal counseling to help him learn to assess his involvement with others.


Cheryl L. Thompson, Ph.D.
New Jersey # 1729



0̸7̸/15/96    08:12    ☎201 773 9699    MARTHA H PAGE    ☒004

# Martha H. Page, Ed.D.

Licensed Psychologist

185 PAULISON AVENUE
PASSAIC, NJ 07055-4809
201-773-7673

RECEIVED
JUN 1 x 1996
By _____

PSYCHOLOGICAL EVALUATION OF MARVIN MATHIS
DATE OF BIRTH:   3/23/80
TESTS ADMINISTERED:
5/14/96 (Two Hours);
1)   Interview
2)   Bender Gestalt
3)   House Tree Person Test
4)   Porteus Mazes
5)   WISC-III
6)   Kaufman Short Neuropsychological Assessment Procedure (K-SNAP)
5/30/96 (½ hour)
Interview with Mrs. Mathis
6/14/96 (1¼ hour):
Interview with 4 Teachers at the High School:  Ms. Almaradel, Ms.
      Fernandez, Mr. Firestone, Mr. Orr
6/25/96 (1½ hours):
7)   Wide Range Achievement Test-3
8)   Incomplete Sentences, High School Form
9)   Make A Picture Story Test (MAPS)
10) Rorschach
11) Test of Nonverbal Intelligence (TONI-2)
MATERIAL SUBMITTED:
Letter of Referral from William Eisert, Esq., 5/1/96
Complaint--Juvenile Delinquency, 1/25/96
Report of Medical Examiner, 1/23/96
Investigation Report, Police Department of Elizabeth, 1/22/96
Investigation Report, 1/22/96
Property Slip, 1/22/96
Investigation Report, 1/22/96
Voluntary Statements, Marvin Mathis, 1/24/96
Complaint against April Diggs, 1/25/96
Alpha Card, April Diggs
Alpha Card, Marvin Mathis
Voluntary Statement, April Diggs, 1/25/96
Voluntary Statement, Renee Diggs, 1/25/96
Statement of Antwan Lee Harvey, 1/25/96
Statement of Abdul Rodriguez, 1/23/96
statement of Bradley Harrell, 1/23/96
Statement of Khaled Murray, 1/23/96
Statement of Kashia Andrews, 1/23/96
Statement of Mrs. Linda Mathis, 1/24/96
Statement of Sharlama Brooks, 1/26/96
Supplementary Investigation Report
Video
SCHOOL REPORTS:
Child Study Team Reports, IEP, 11/12/92
Elementary School Records, 9/6/84-9/5/91
Speech and Language Report, 11/21/89
Educational Evaluation, 10/16/89

Mathis, Marvin
-2-

Classification Conference Report and IEP, 11/22/89
Undated Report of Teacher of Communication Handicapped, Room 405A,
     1988-1989
Student Guidance Record, 1991-1992
Progress Report, Elizabeth High School
IEP, 11/27/89
Re-evaluation, 1992
Speech and Language Re-Evaluation Report, 10/8/92
Progress Reports
Letters to Mrs. Mathis, 2/1/91, 3/25/91, 3/17/92, 3/2/92
Request for Assistance, 4/89
IEP for Home Instruction
Classification Conference Report, IEPs, 1992, 1993, 1994

REASON FOR REFERRAL:
     Marvin Mathis, 16-3 and in the 10th grade (Special Education,
Communication Handicapped) was referred by William Eisert, Esq., Office
of the Public Defender, Union County.  Marvin was charged with felony
murder.  He was alleged, either alone or with one or more persons, to
have been engaged in the commission or an attempt to commit or flight
after committing or attempting to commit the armed robbery of Antonio
Saraiva, and in the course of such crime in the immediate flight there-
caused the death of Mr. Saraiva on 1/22/96.
     On 1/22/96 Mr. Saraivas apparently received a gun shot to the
head.  He was pronounced dead at Elizabeth General Medical Center.
     In  Voluntary Statement of 1/24/96 Marvin Mathis said that he
was in the area of 34d and Broad St. on 1/22/96 at about 6 P. M.  He
met up with another boy, then with Antwan.  He said that Antwan and the
person were walking.  He said that Antwan and the other person were
looking to rob somebody.  Antwan wanted Marvin to hold the gun.  Marvin
denied that he handled the gun.  He claimed that Antwan saw the man who
owned the liquor store and told him to empty his pockets.  The man said
no.  Marvin claimed that the man threw a punch at Antwan, and Antwan
threw a punch back.  Antwan pushed the man, then shot him.  He claimed
that Antwan wanted him to go through the victim's pockets, but Marvin
refused.  They ran away.  Marvin claimed that he was five feet away
from Antwan when the man was hot.  He claimed that Antwan threatened
to kill him, if he said something.  He admitted to telling his girl
friend that he shot a man by accident.  He claimed that Antwan told
him to say it; that if he didn't say it, he would kill him.
     In his second statement he said that he met with Antwan and two
girls.  He admitted to planning to rob some one with Antwan.  Antwan
planned to rob, and Marvin was to be the lookout.  One robbery was not
carried out because Marvin told Antwan not to do it.  However, on the
next attempt he acted as lookout.  He alleged that the man grabbed
Antwan, after Antwan grabbed him.  The man punched Antwan, Antwan
punched back, pushed the man off him, took the gun and shot him.
Antwan then went through the man's pockets.  He claimed that neither
he nor the girls touched the man.
     In the Supplementary Investigation Report, at the beginning of

15a



07/15/96  08:13  ☎201 773 9699          MARTHA H PAGE          ☒006

Mathis, Marvin
-3-

the interview of 1/24/96 Marvin denied having any knowledge of the
hoimicide and stated that he had been with his girlfriend and a
friend.  He was described as very nervous, kept is hands folded in his
lap, and continuall kept rocking back and forth.  When questioned
for details of wher he was before and during the time of the homicide,
he became very inconsistent.  He became angry when confronted with
these inconsistencies, first by the detectives and then by his mother.
He said that Sharlama Brooks was a liar with respect to what he had
said to her.  He asked his mother to leave, then told of being with
Antwan and a third person.  He alleged that Antwan shot the owner
of the liquor store.  In the second statement he said that he became
involved in the struggle between Antwan and the victim, and the gun
went off.  He then mentioned that 2 females were involved in this.
April Diggs in her statement of 1/25/6 described Marvin and Antwan as
over to the man.  She said that Marvin said that he shot the man
because the man tried to grab him.  Renee Diggs in her statement of
1/25/96 claimed that Marvin was struggling with the man who had Marvin
by his coat.  She mentioned the video where they bragged about the
robberies that they committed.

    Marvin had no previous arrests or involvement with the juvenile
justice system.

    With respect to his school history, Marvin had been in Pre-K in
9/6/84.  He repeated first and second grades.  In 1/2/90 he was
classified Communication Handicapped, was on Home Instruction from 1/2/90
until 5/25/90.  He was awaiting special class placement.  He received
BSI in reading, language and math from 1986 until he was tested in
the fall of 1989.  A speech and language report of 11/21/89 indicated
that when he was in grade 3, he was evaluated by his Child Study Team.
He had difficulty with grade level work in reading and written language.
Behavior deteriorated when he did not meet with success.  He had
difficulties in expressive and receptive language. (He was unable to
retain details in a story.  He had difficulty with auditory compre-
hension and following multiple step directions.  Reading achievement
grade score fell within the severely deficit range of functioning.  He
had poor short term memory.  He experienced problems in retaining and
processing information.  The IEP of 11/27/89 found him to have a
language disorder related to language form and use.  He had been re-
ferred to his Child Study Team because he interfered with the other
students and liked to dominate them physically.  "He threatens and
intimidates them constantly."  The Social Assessment of 11/14/89
indicated that Mrs. Mathis had been married for nineteen years.  She
had separated from her husband, a truck driver, in 1984.  Both parents
had been born and raised in North Carolina.  His mother moved to
Elizabeth when he was 3.  He had a sister Patricia, then 6.  His
brother Dwayne, a diabetic, was 19.  There had been no history of
learning disabilities in the family.  There had been no DYFS contact.
Mrs. Mathis had a limited support system.  She said that Marvin walked
at 1 year and talked at 1½.  He had a positive attitude in preschool
and kindergarten, but became more negative as academics became increas-
ingly difficult for him.  He was described as a follower.  He was able

Mathis, Marvin
-4-

to develop and maintain positive peer relationships. He never set
fires or hurt pets or small children. He had become increasingly sad
about school. He was very sensitive to criticism.

Speech was re-evaluated in 10/92. Language skills were signifi-
cantly discrepant from those of peers and from age-appropriate norms
as determined by observation and informal measures. He had difficulty
with memory skills, formulating sentences and age-appropriate vocabulary.
The IEP of 11/12/92 indicated that Marvin had been on medication for
asthma. There was a history of a pain in his eyes for the past five
years. The Annual Review of 4/2 indicated that he related well to
others and had improved in all academic areas. He continued to show a
significant deficit in Broad Reading, Broad Mathematics, Broad Written
Language, and Broad Knowledge and Skills. He was seen as a "very
personable, cooperative youngster in a one to one setting." Specific
remedial goals for subject matter and behavior were set out in the IEP.
Marvin was classified on 1/2/90 as Communication Handicapped and
assigned to a Special Education Program.

The IEP review of 11/12/92 indicated that Marvin continued to
function academically at levels which were significantly below his
age (13) and grade level. He was described as a "polite young man
generally, although he has exhibited an impulsive and extremely hostile
tendency. At most times he appears controlled and somewhat guarded
and tense. He can be taskoriented in the classroom setting...He works
well in a structured setting, with positive verbal reinforcement."
The IEP review of 4/13/94 when he was 14 found him still functioning at
below his grade level. He was "very motivated to push himself into
higher levels. "Marvin can be very cooperative and pleasant when he
is happy or when he wants something from you. On the other hand,
Marvin can be very difficult at times. He has been a leader in the
classroom, the other students will do almost anything to win his
approval. Marvin needs to know that rules apply to him as well as
others." The Speech/Language specialist found that his behavior in
the language therapy session was greatly improved in 1993-1994. He was
better able to follow directions.

The IEP Annual Review of 4/3/95 described him as being "extremely
aware of his educational needs and will push himself to perform higher
level tasks. He tends to read haphazardly and look for answers." He
was described as "a pleasant and outgoing young man. Sometimes Marvin
finds it difficult to remain focused for an entire period. He works
well in a small group as well as one-on-one." He was seen as exhibiting
leadership qualities. "He is respected and admired by his classmates."
He made slow but positive academic growth this year. Presently Marvin
was functioning adequately in his classes exclusive of outside inter-
vention. He continued classified Communication Handicapped. He needed
assistance with concepts and skills related to the organization of ideas.
One of the IEP goals was to reduce class absenses for unacceptable
reasons.

Marvin was referred for a psychological evaluation to assess his
current level of cognitive and emotional functioning and to assist the
court ion determining whether he was amenable to the rehabilitative

17a

53

Mathis, Marvin
-5-

processes afforded by the juvenile system by age 19, given the serious-
ness of the allegations and his level of maturity and sophistication.

## BEHAVIOR AND ATTITUDE:

When seen on 5/14/96 Marvin was subdued. He was cooperative in
the testing session. He spoke in a soft voice. He expressed himself
relevantly and coherently with no pathology of affect or cognition.
He said that he lived with his mother. He had a brother of 25 and a
sister of 12. He denied any previous problems with the law.

Asked about the events of 1/22/96, he said that he was with this
boy Antwan. There were two girls with them. Antwan wanted to rob a
liquor store. "he told me he was going to get somebody. He told me
watch out for him. We started walking." They tried one store, but the
door was locked. They kept walking. They saw two Puerto Rican boys,
who started running. After that Antwan said, "He was going to get
somebody before the night was over." Antwan allegedly went after this
man (the victim) and tried to reach in his pocket. Antoine whipped out
the gun. "I tried to stop him from shooting but by accident the gun
went off."

Seen again on 6/25/96, Marvin was cooperative. He said that he
was learning more in his classes. It was noted that during Sentence
completion Marvin had difficulty in finding the words to complete the
sentences which were presented orally.

## TEST RESULTS:
### Intellectual Aspects
On WISC-III Marvin received the following test results:

| | IQ/Index | Percentile | Classification |
|---|---|---|---|
| Verbal Scale | 69 | 2 | Intellectually Deficient |
| Performance Scale | 71 | 3 | Borderline |
| Full Scale | 68 | 2 | Intellectually Deficient |
| Verbal Comprehension | 72 | 3 | Borderline |
| Perceptual Organization | 75 | 5 | Borderline |
| Freedom from Distractibility | 72 | 3 | Borderline |
| Processing Speed | 61 | 0.5 | Intellectually Deficient |

He received the following Scaled Scores (average - 10) and Test-
Age Equivalents C. A. = 16-1):

| Verbal Tests | Scaled Scores | Test-Age Equivalents |
|---|---|---|
| Information | 7 | 11:2 |
| Similarities | 7 | 11:8 |
| Arithmetic | 3 | 8:6 |
| Vocabulary | 1 | 7:10 |
| Comprehension | 4 | 10:6 |
| (Digit Span) | | 9:10 |

Mathis, Marvin
-6-

| Performance Tests | Scaled Scores | Test-Age Equivalents |
|---|---|---|
| Picture Completion | 5 | 9:6 |
| Coding | 4 | 10:10 |
| Picture Arrangement | 6 | 9:6 |
| Block Design | 6 | 10:10 |
| Object Assembly | 5 | 8:10 |
| (Symbol Search) | (1) | Below 8:2 |

Marvin was functioning at the intellectually deficient to border-
line range of intelligence. Test results were affected negatively by
the high noise level and frequent distractions during the testing
session. Potential intellectual functioning was in the borderline to
low average level of intelligence. Fund of knowledge and ability to
think abstractly were at the low average level of intelligence, as was
his auditory memory for numbers. However, he found it difficult to
process verbally presented material rapidly. Ability to define words
was well below average. This reflected not only processing problems,
but also reflected his socio-cultural background. Certainly, the CST's
classification of him as Communication Handicapped was an appropriate
one. His handling of test tasks was quite variable with Scaled Scores
of 1 on Vocabulary and Symbol Search and 7 on Information, Similarities,
and Digit Span. He tended to be quite concrete in his approach to
problems. He did not examine social situations in depth. However,
a high level of anxiety interfered with his ability to respond with
accuracy and rapidity. He was very concerned about doing well.

Bender Gestalt reproductions showed a number of perceptual-motor
problems. He appeared to be somewhat depressed. However, he worked
slowly and carefully. Rorschach responses reflected borderline to
low average intelligence. He was capable of sensitivity and imagina-
tiveness when he did not feel under pressure to succeed.

The Porteus Mazes provide a measure of planning ability in every-
day life as well as the ability to follow the rules. A high Qualitative
Score has been found to be characteristic of juvenile delinquents who
tend to feel the end justifies the means. It also provides a measure
of tension level and impulsivity. Performance is also affected by the
individual's ability to visualize and plan ahead. Marvin received a
Qualitative Score of 94 for 16 trials, well in excess of the cutoff
score for delinquents of 40 to 50. Marvin's score was detrimentally
affected by his difficulties in visualizing and planning ahead. He pre-
traced, lifted his pencil from the paper repeatedly, even after being
warned. It was very difficult for him to find his way out of the maze
by visual cues alone. Between his perceptual-motor difficulties and
desire to achieve, he found it very difficult to follow the rules.
Even though his Quantitative Score of 90 placed him in the average
range, under pressure he would have difficulty in utilizing his ability
to plan ahead.

The Wide Range Achievement Test-3 measures the codes which are
needed to learn the basic skills of reading, spelling and arithmetic.
Marvin received the following test results:

(6) JA 55

Mathis, Marvin
-7-

| | Standard Score | Percentile | Grade Score |
|---|---|---|---|
| Reading | 58 | .6 | 2 |
| Spelling | 71 | 2 | 3 |
| Arithmetic | 66 | 1 | 4 |

Marvin was functioning on the deficient level on a measure of written decoding (reading) and numerical computation (arithmetic) and on the borderline level on o measure of written encoding (spelling). Performance was detrimentally affected by less than ideal testing conditions. However, it was evident that arvin's academic skills were still quite low and further impaired when he felt under pressure to achieve or was in a less than well-controlled and structured situation.

On K-SNAP, a short neuropsychological assessment procedure, his score on the Mental Status Subtest was below average. He was below average on the Gestalt Closure Subtest, which provides a measure of simultaneous processing. This test also measures broad visual intelligence, long-term memory, perceptual organization and visual perception and processing. On the Number Recall Subtest he did quite well. Testing conditions were much better. Attention span was good, and he was able to concentrate. He performed in the moderately deficient classification on the Four-Letter Words Subtest, where he was required to develop strategies to figure out "secret" letters or words by generating and evaluating hypotheses. He lacked the verbal fluency and the abstract thinking necessary to develop complex hypotheses in a novel situation. He needed assistance and guided learning.

In an attempt to minimize linguistic, motoric, and cultural factors, the TONI-2, a language-free measure of abstract/figural problem solving, was administered. The TONI-2 items require test subjects to solve problems by identifying relationships among abstract figures and then solving problems created by the manipulation of these relationships. Each item presents a stimulus pattern in which one or more of the figures comprising the pattern is missing. The subject completes the pattern by selecting the correct response from among either four or six alternatives. Marvin did very poorly on this test. It was very difficult for him to use perceptual cues to aid him in problem-solving. Marvin had definite verbal and visual processing difficulties which made problem-solving in both verbal and nonverbal situations difficult for him, when he was left to his own devices. It was hard for him to see relationships when he was confronted with an unfamiliar situation, unless he was given considerable help.

Affective Aspects

House Tree Person drawings were done with a great deal of detail, but reflected his intellectual limitations. The house was somewhat carelessly done, while the fence was done with much detail. Marvin was experiencing considerable anxiety. His drawing of a person was of a man showing all of his teeth in a smile. Marvin had problems in handling aggressive and hostile feelings.

Rorschach responses reflected adequate reality testing. He was also able to see things as others saw them. Marvin had a strong predilection for thrills and excitement at this point in his emotional

20a



Mathis, Marvin
-8-

development.  Impulse control could be quite poor when he was in a
stressful situation.  He could act with poor judgment because he had
difficulty in thinking things through carefully when he was in an un-
familiar situation, or when he felt challenged or thought that he had
to act as though he were cool and tough.  He did not see himself as
being that competent, in part  a result of his academic shortcomings.
Repeating first and second gr  and still not mastering the skills
that other children were mastering would hardly make him feel positive
about himself.  However, he did not want that part of him to surface,
because it was too painful and humiliating.

On Make a Picture Story Test (MAPS) the subject is presented
with 67 figures and background pictures, one at a time.  The subject
selects from these figures and places them on the background picture
as they might be in real life, then tells a story about the situation
he has made.  Marvin's stories depicted pleasant family interactions
and helpful policemen.  People behaved in prosocial ways.  There were
strong desires to be treated as some one special.  He wanted very much
to be accepted.

Sentence Completion responses reflected his feelings of homesick-
ness.  When he was younger, "I used to mock other people."  His nerves
were not that good.  He suffered a lot of things in his life.  To "my
mind" he replied, "Is something that is not to be wasted."  What pained
him "is I got myself into a tight situation."  He saw himself as very
kind.  He wished he were a football player.

Interview with Mrs. Mathis, 5/30/96

Mrs. M shocked by what happened.  She had never been in any trouble.
However, she did not know all of his friends.  He watched TV, he had a
girl friend for about 2 years.  Her 26 year old son did not live with
her 12 year old daughter.  Her older son had been a diabetic since he
was 6.  He was now on dialysis.

Prior to being placed in Special Education Marvin used to get into
a lot of fights.  However, his behavior had improved since he was in
special classes.  Mrs. Mathis had been a volunteer in a hospital and
had been hired as a worker there.

Interviews with Teachers, 6/14/96

Mr. Firestone was Marvin's physical education teacher.  "In my
setting everything was fine."  He described Marvin as a low-keyed kid,
a very respectful kid.  He did not lose his temper.  "Basically he was
a good kid."  He was cooperative.  "He liked us, we liked him.  When we
heard what happened, we were very surprised."

Ms. Almaradel had him for Science.  She said that he had to do
everything step by step.  The plan had been to mainstream him.  She
described him as the "type you could talk to.  He was not an angry
kid, only if someone did something to him.  He was never disrespectful.
He was a leader, never a follower with peers his age."  She described
him as a good kid.  He was never one to start up fights, although he
would react when something was done to him.  She did not know about
his after-school activities.  He admired his mother and never said that
he had any problems at home.  He was definitely aware of his reading
problems.  When the teachers learned of the murder, "We all said, it
can't be.  It was not his typical behavior."  She said that Marvin



21a

Mathis, Marvin
-9-

would think before he did things. "He might have been threatened to do it, if he did it." He would report to the teacher if he were being hassled by others and would warn them. With respect to his school work, "you could not overwhelm him with information." He worked very hard, was very neat. His penmanship was "beautiful." He was admired by the other children.

Ms. Fernandez had Marvin in her class for two years. "When we found out he was in prison, it was the biggest shock." He never had been rude. The other children respected him. There were never any problems with him. He had improved academically. He was very loyal to his friends. It took him a long time to process information. He had enough sense to know where to find information. There were no problems socially. He had a girl friend for a couple of years. She was in a regular class. Marvin kept in touch with Ms. Fernandez. He would call her every two weeks. In the classroom and in the school he knew the rules, and he followed them. He knew what was expected of him. "I miss him in class. He made a difference in the class."

Mr. Orr was also quite positive in his comments about Marvin. He found it hard to believe that Marvin had murdered anyone.

DIAGNOSIS:
    Axis I.   309.4  Adjustment Disorder with Mixed Disturbance of
                       Emotions and Conduct
    Axis II.  315.00  Reading Disorder
             315.1  Mathematics Disorder
             315.2  Disorder of Written Expression
    Axis III.  History of Asthma
    Axis Iv.  Educational Problems, Problems Related to Interaction
               with the Legal System/Crime
    Global Assessment of Functioning--55

SUMMARY AND RECOMMENDATIONS:
    Marvin was functioning on the borderline level of intelligence. He had a long history of severe learning disabilities. He had repeated first and second grade and began to display problem behaviors in school. He was classified as Communication Handicapped in 1990 and, after a period of home instruction, was placed in a classroom geared to his needs. There were some problems with respect to behavior in 1991 and 1992, but, for the most part his behavior was acceptable in the High School. His teachers had many positive things to say about his behavior in 1995. He showed no anti-social behavior trends and had not been involved with the Division of Youth and Family Services nor with the juvenile justice system. The family was headed by the mother, who had progressed from volunteer to paid worker in a hospital. This was not the typical unstable, chaotic and/or abusive family often associated with delinquency. Marvin had considerable difficulty in thinking analytically and accurately especially when he felt under pressure. He also tended to be somewhat impulsive, crave excitement and to be accepted. Although he had had problems in dealing with angry behavior in the past, his current teachers did not see this as a problem. He



Mathis, Marvin
-10-

was seen as a good kid. Marvin became involved with a group of young people who displayed little prosocial behavior and poor impulse control. Marvin, craving excitement as part of his growing up, was very naive. He also did not think very deeply or causally. He probably saw this behavior as cool and the way to behave if you wanted to be accepted by this group.

Marvin had no history of anti-social behavior. He was not a sophisticated delinquent who had been the recipient of various intervention techniques and not benefitted from them. If he were to be tried as an adult and sentenced as an adult, would that act as a deterrent for him and for others. In an article on the Transfer of Juveniles to Criminal Court: Does It Make a Difference?, it appeared that the tough approach did not reduce recidivism. Marvin had been able to modify his aggressive behavior when placed in the appropriate educational setting. He could definitely profit from a rehabilitative, reparative approach where he would be taught to understand and deal with violence; be given training in problem-solving, especially in stressful situations; be given vocational training; and given help in dealing with his learning problems. Marvin did not display cynical or opportunistic attitudes toward others. The events of 1/22/96 appeared to be an isolated incident. He became involved with an older group of young people whom he, with his simplistic thinking saw as role models. He was influenced negatively by them. However, his past history would indicate that he could be positively influenced by the rehabilitative processes afforded by the juvenile system by age 19 and could effect prosocial changes in his behavior. Corrections has an intensive serious offender program which might be considered. If he were placed with adults, he would continue to be exposed to negative influences. Because of his poor problem-solving abilities resulting from his poor analytical skills, he would have a difficult time, without very specific help, in dealing with the negative role models and input in an adult prison.

_Martha N. Page_
Martha H. Page, Ed.D.
7/13/96

# LOUIS B. SCHLESINGER, PH.D

Psychologist. NJ Lic. No. 1162

12 TOWER DRIVE

MAPLEWOOD, N.J. 07040-1008

(201) 762-6431

October 2, 1996

Susan M. MacMullan, Esq..

Office of the Prosecutor

Union County Administration Building

Elizabeth, New Jersey  07207

Re:  State in the Interest of Marvin Mathis

Dear Mrs. MacMullan,

At your request, I conducted a psychological evaluation of the above named juvenile on September 26 and September 29, 1996.  The focus of the evaluation was to assess Marvin's capacity to be rehabilitated by the time he reaches 19 years (he is now 16 years, 6 month old) as the State has filed a motion to refer the juvenile defendant to adult court.  Marvin has been charged with felony murder and aiding and abetting an armed robbery which occurred on January 22, 1996, when Marvin was approximately 15 years 10 months old.  In addition to a clinical interview and review of volumes of discovery material that were supplied (over one hundred specific different items), I administered the following psychological tests: Rorschach, TAT, Bender-Gestalt, Projective Figure Drawings, MMPI-A and the Wechsler Adult Intelligence Scale (Revised).  The time spent with Marvin was approximately 5 hours.

24a

State in the Interest of Marvin Mathis                                    2

PRESENTING PROBLEM:

Marvin described his involvement with the homicide as follows:
"We were at my cousin's house, Steven Owens, with Antwan Harvey,
April Diggs, and Renee Diggs.  I was on my way to go home.  In the
living room.  Antwan and Steven Owens were talking about going to
a liquor store to get beer.  I was about to go out.  Antwan said to
wait for him.  I walked with Antwan to the liquor store and bumped
into Renee and April Diggs downstairs".

"Antwan said to everyone, 'walk with us to the liquor store'".
Antwan and Renee were "poking along", while Marvin and April were
apparently ahead.  They found the liquor store closed and Antwan
said let's go to the liquor store at Elizabeth Avenue!  We were
walking and got on Elizabeth Avenue.  April walked around to the
liquor store to see how many people were it.  She was going into
it.  Then Antwan said he is about to rob this man waiting for a
bus.  I told him don't do that.  He wanted me to watch out for him.
I shook my head.  He didn't rob him; nothing happened".

According to Marvin, April then walked up to a deli store and
"was peeking in it; April and Renee.  Renee told Antwan he should
rob this store.  I didn't say nothing".  "Antwan went to open the
door at the deli store; the door was locked.  We started walking up
this Avenue.  They wanted to rob the deli store; they wanted me to
watch out".

"The four of us were walking up Elizabeth Avenue.  We saw two
Puerto Rican guys.  Antwan said Marvin, 'let's get these guys'.  I
was poking along walking slow.  He said 'you're not going to help



State in the Interest of Marvin Mathis                              3

me?'.  I shook my head, no.  He was walking fast, pulled his mask
over his face".

"He took off to chase the two guys.  The Puerto Ricans.  April
tried to see what happened.  Me and Renee started jogging to see
what happened.  He was mad; he said 'I am going to get somebody
before the night is over'.  I just looked at him.  I was just
watching".

The defendant stated that they were then walking up Elizabeth
Avenue and turned onto East Jersey Street when "Antwan saw a man
taking out his garbage.  Antwan stopped all three of us.  He asked
me, 'Marvin are you going to watch out?'  I didn't answer him.
Then I said 'yeah, I'll watch out for you'.  I met April and Renee.
We walked across the street.  I crossed the street to watch   t for
Antwan.  He pulled his mask down.  He told the man to run his
pockets" (the defendant explained that meant to give him money).
"The man looked at Antwan.  Then Antwan pulled out a gun to show
the man the gun.  I guess to get his attention or something.
Antwan grabbed the man; tried to yoke him up, tried to throw him
against the wall.  The man grabbed Antwan.  The man pushed Antwan
in the face.  Then Antwan pushed the man.  He had one hand on the
gun and the other he was pushing the man.  Then Antwan raised the
gun up.  The man grabbed the gun.  They were struggling".

"That's when I ran over there.  I put my hand on the top of
the gun.  The man had his hand on Antwan.  Antwan was holding the
gun.  I touched the top of it, the gun, and it went off.  The man

26a
(3)

State in the Interest of Marvin Mathis                          4

got shot.  The man fell; his eyes were still open.  Antwan was
checking his pockets and stuff.  He said, 'Marvin help me get some
money out of his pockets'.  I didn't touch the man's pockets".

Marvin went on to explain that "Antwan got up; he was on one
knee.  He snatched me up; we started running up Seventh Street.  He
was yelling.  He was trying to give me the gun.  I wouldn't take
it.  Antwan had the gun.  I ran home".

When questioned as to whether or not he ran home or to some
other location, Marvin then responded "we went to Steven Owen's
house with Antwan, not the girls.  Steven Owens asked me what
happened.  Antwan said he shot somebody.  He said he shot some man.
He said Marvin was there when I shot the man.  Steven Owens told me
to go home.  Then I went home.  Then I bumped into April and Renee
on Third Street.  They were asking me who shot the man.  I didn't
say nothing.  I was in shock.  Then I went home, went into my room.
I was sitting on my bed thinking about what happened.  Thinking
about the man, that he got shot.  Antwan shot him.  I went to
sleep".

Marvin stated that the next morning "I went to school.  I
don't remember what happened in the house.  It was Wednesday when
I got locked up.  The Director of the School got me.  The detective
wanted to talk to me.  I was taken to the police station and my
mother arrived.  At first I didn't cooperate with them; I don't
know why.  I wasn't truthful at first; I don't know why.  They made
me make statements.  The first statement was untrue.  I told them



27a

(4)

State in the Interest of Marvin Mathis                                    5

about some guys from Carteret.  Then I told them the truth".

When questioned as to his handling of the gun, Marvin denied
having the gun, even when asked several times.  He denied seeing
the gun at Steven Owen's apartment or at any other time.  He stated
that the first time he saw the gun was on Elizabeth Avenue when
"Antwan showed it to me.  I looked at him and said to myself he is
crazy".

When questioned as to whether or not he had planned to commit
an armed robbery with his three co-defendants, he denied planning
an armed robbery and denied knowing about any gun.  He stated he
did not know there was going to be a robbery.  "I think I had
something to do with it; I was watching out.  I never touched the
gun.  I didn't know he had a weapon.  He showed me the gun, half
way out, on Elizabeth Avenue.  I shook my head and said, he is
crazy".

The day after the homicide, when Marvin was at school, he
stated "I told this girl, Sharlama Brooks, my girlfriend.  I told
her what happened.  She asked me who shot the man; I didn't say
nothing.  I said I don't remember.  When Marvin was questioned as
to whether or not he asked Sharlama to lie for him and state that
he was with her at the time of the homicide, he responded "if
anybody asked you, tell them I was at your house.  She said no".
When asked why he wanted Sharlama to lie, he responded "don't
know".  He also stated "I don't remember telling her I did it".

Marvin was questioned as to the truthfulness of his statement



State in the Interest of Marvin Mathis                                          6

since it is in complete contrast to the statements given by his three co-defendants, as well as eyewitnesses, all of whom say that Marvin alone had the gun and shot the victim. Marvin's response was that everyone is lying, but him.

When questioned specifically, as to whether he wore a mask, Marvin completely denied wearing a mask. When it was pointed out that others made statements indicating he was wearing a mask, he said that they were being untruthful. Specifically with regard to the statement given by Migdalia Hernandez, who stated that prior to the armed robbery, Marvin and Antwan were discussing the gun in the room of one of her children, and that both men had masks in their hands, Marvin stated that these statements were "lies".

When Marvin was questioned regarding his own statement about seeing the gun and how Antwan wanted him to hold it, he responded "I don't remember".

When questioned, specifically, regarding Marvin's prior statement that he wanted to see how it "felt" to rob someone, he was unable to explain this and stated "I just wanted to see how it felt". He still denied planning to rob anyone and kept repeating "to see how it felt", offering no explanation, just continuing to repeat the phrase.

When questioned regarding April's statement that the robbery was planned and Marvin had the gun, his response was "it's untrue". When questioned about the statement of Steven Owen's that also implicated Marvin as the shooter, he stated that it was untrue



State in the Interest of Marvin Mathis                                    7

also.   He also stated that Antwan Harvey's statement was untrue,
"all untrue; I didn't have no gun".   He again denied having a ski
mask.   When questioned as to eye witness testimony that it was
Marvin alone who shot the victim, his response was "it's wrong".

        Eventually Marvin stated that he knew Antwan wanted to rob
someone.   When asked why he did not leave, he stated "can't
explain".

### PSYCHOLOGICAL TEST RESULTS

    Marvin was alert, oriented, in good contact with his
surroundings, pleasant and generally cooperative.   He did not
really seem depressed but his affect and emotions were somewhat
flat.   He was not friendly, but he was not really hostile or
oppositional either.   He completed all that was asked of him and
showed only some difficulty in concentration.   His attention span
was adequate.   There was no evidence of any bizarre or grossly
inappropriate behavior or thought content.   The most outstanding
clinical feature wa. Marvin's emotional flatness and lack of
expression.   Overall test-taking behavior and attitude were
adequate.

### INTELLECTUAL FUNCTIONING:

    Marvin is currently functioning within the high  d of the
borderline range of intelligence, gaining a Full Scal  IQ of 79
(Verbal IQ = 80; Performance IQ = 83).   Verbal skills  .l within
low end of dull-normal range.   Fund of general information is weak,
suggesting that Marvin has not profited a great deal from school or



State in the Interest of Marvin Mathis                            8

experience.  For example, he did not know the number of weeks in a
year, the identity of Louis Armstrong, the direction travelled from
Chicago to Panama,the location of Brazil, the author of Hamlet, the
President during the Civil War, and other such  imple facts.
Vocabulary is equally poor and far below average capacity as he was
unable to define such words as fabric, assemble, conceal, consume,
regulate, and the like.  Arithmetic skills were quite poor.  Marvin
can add and subtract but he did not memorize his multiplication
tables; therefore, he had trouble with multiplication and division
(although he could multiply and divide some very simple numbers).
Poor concentration also negatively affected his performance on
several of the arithmetic tasks.  Social comprehension is at a
comparable level below average range.  Marvin has some basic
understanding of the world around him, but it is not that deep or
extensive.  Verbal abstract tasks proved to be a relative strength,
but he functions still below average limits, within dull-normal
range.  His thinking is somewhat concrete and he has some
difficulty drawing superordinate relations between objects and
ideas.  More complex abstractions, such as proverb interpretation,
were  oo difficult for him.  In general, verbal skills fall within
low end of dull-normal range, which seems to be a fe     ccurate
assessment of his current and potentia' capacity.

     Nonverbal subtests fall within the dull-normal ra    Marvin
is quite alert to details of a problems, and he can easily
differentiate what is important from what is irrelevant.  His



State in the Interest of Marvin Mathis                                    9

performance on the picture completion subtest was his highest and falls within average limits.  Marvin could also solve problems utilizing familiar material (such as puzzles) at a level falling just below average limits  The other nonverbal subtests fall within dull-normal range in an even manner.  The defendant has some difficulty analyzing, synthesizing and integrating parts into a whole concept (block design), although he does somewhat better in recognizing logical and sequential relationships with various types of social stimuli.  He can learn new material, but he is really not that quick, and several repetitions are often necessary in order to transfer new knowledge into pre-existing structures.  Throughout all of the structured objective tasks, there were no signs of associative looseness or of paralogical reasoning.  Marvin processes information in a mildly scattered fashion, and he does better when structure is provided.

Focus for organic pathology is positive and extends within the mild range.  There is mild impairment in perceptual motor coordination, as seen on the various copying tasks such as the Bender-Gestalt.  On the latter, major signs of organicity were not noted, but some distinct mild or soft signs are found. Short-term memory for graphic forms falls above average range, as Marvin was able to correctly recall 6 out of a possible 9 geometric designs ( an indication that his intellectual potential is probably higher than his current scores suggest, as 4 or 5 is average recall). Long-term memory is difficult to assess due to such a poor fund of



State in the Interest of Marvin Mathis                    10

basic knowledge, but it is probably generally intact.  Verbal-
performance IQ disparity is not significant, but examination of
some subtests typically sensitive to organicity, suggests the
likelihood of mild involvement.  This type of mild organicity is
very common in individuals with long-standing learning disabilities
and even in some cases of attention deficit disorder.  Marvin has
a history of special education placement; however, in this
examiner's judgment, Marvin's potential is higher than his current
scores and school performance suggest.

PERSONALITY FUNCTIONING

Results of the projective and personality tests are consistent
with clinical impression showing a late adolescent (16 years 6
months of age) displaying the early signs of a developing
personality disorder with impulsive and antisocial traits.  The
Rorschach shows a young man with the early signs of developing mild
to moderate characterological disturbance, but without evidence of
severe psychopathology such as schizophrenia, psychosis, or marked
borderline traits.  There was one regressive and aggressive
Rorschach perception typical of developing personality disturbance
illustrated by his perception of "two bulls wrestling; looks like
his blood on something; the red; it's just splattered".  The
remainder of the responses given were of adequate form quality and
fairy well elaborated, even with some degree of … arvin
responds to the outside world as well as to his … ernal processes.
With regard to the former, he often over-reacts in loose and poorly



State in the Interest of Marvin Mathis                          11

controlled ways.  His inner life is dominated somewhat by impulsive
tendencies,  making  the  likelihood  of  acting-out  rather  high.
Marvin's reality testing is good and his thinking is relatively
clear and follows logical lines.

Projective figure drawings were done in a somewhat immature
fashion, but not really that remarkable for an adolescent.   TAT
stories involved themes of unfaithfulness ("the lady's telling this
man she loves him, and he is not paying her no mind; he thinks she
is fooling around with someone else.  His expression on his face;
he might leave her; he might forget her"), with one aggressive
theme triggered by unfaithfulness and rejection: "...He stabbed
her; killed her.  He found her in bed with another man; he is
crying; he gets caught by the police; they questioned him; the cops
arrest him, he gets incarcerated, that's it.  She is dead; he'll
start a new life over.  He goes to jail for five to six years".
There was also a TAT story involving a theme of peer ridicule, as
he stated "she is crying or something.  Somebody hurt her feelings;
somebody said something stupid to her.  Someone picked on her;
someone did it just to be funny.  She feels sad; s       idn't
mean to hurt her feelings; the girl took it out of proportion"
There was one other brief reference to an individual who "cou   be
depressed" and another reference to an individual who "fe    ood
about himself".  There were no suicidal themes   or
themes of deeply depressive ideation, guil    morse

The MMPI-A showed a profile of an individual without serious



State in the Interest of Marvin Mathis                                    12

psychopathology in terms of symptom expression; although, there are some indications of slight somatic preoccupation, suspiciousness and mistrust.   The validity scales are illuminating since his highest overall score was on the Lie scale, which shows an attempt to present himself in a socially desirable way, to the extent that Marvin might even lie to achieve this impression.  The elevation on the Lie scale was by far his highest scale elevation.  There was a borderline elevation on the K scale, showing defensiveness and guardedness.

Test results are generally consistent with clinical presentation, where Marvin denied all symptoms and traits of significant psychopathology and disturbance.  He completely denied ever having any suicidal thoughts, and he also denied impulsiveness, feelings of inadequacy, narcissistic traits, substance abuse, sleep or appetite disturbance, depression, or even anxiety.

EXAMINATION OF DEFENDANT'S SENSE OF RESPONSIBILITY AND ﹏FEELINGS OF REMORSE:

Marvin was questioned regarding whether or not he felt ﹏ anything wrong, notwithstanding his denial of shooting the victim. He responded "I was just there; I was watching out; when I put my hand on top of the gun it went off.  No, I didn't do ﹏ wrong; I should have went home in the first place".

When questioned regarding any feeling﹏ ﹏ responded "that man got his life taken away and I got myself in



State in the Interest of Marvin Mathis                                    13

this predicament.  I feel bad about a lot of stuff.  Not in school
no more, I am not being home for my mother; that's all.  I see
myself up here; it's my first time being locked up, I can't go to
college or whatever".  When asked if there was anything el   he
felt bad about, he responded "that's all I can think of".  When
asked if he knew the name of the victim, he did not and responded
"I know he owned a liquor store".  When questioned again if he had
any feelings regarding the death of the victim, he responded "I
just feel sorry, can't explain it".  When asked if he was curious
or ever asked anyone about the victim, he responded "no, only thing
I know is he owned a liquor store".  When asked if he ever thought
about the victim, his response was "I just don't know".  When asked
again, in a different way, if he could think of anything that he
took responsibility for or did wrong, he responded "I just did
something wrong for being there".  When asked if he felt he did
anything wrong associating with Antwan and April, since he admitted
that he knew they had been in a lot of legal trouble before, he
responded "I heard he has been incarcerated; I know April's been
locked up", but apparently this did not bother or concern Marvin
very much.  When asked if he felt that there was anything
with him, he responded "nothing, I am perfectly fine; I
trouble learning; that's the only thing that's wrong wi
Marvin explained that he had never been in difficulty be
when questioned as to his repetitive aggressive behavior in
elementary school, he completely denied this an  stated that he was



36a

State in the Interest of Marvin Mathis                                    14

the victim "they picked on me"      .en he was shown numerous teacher
reports of his aggressi behav    as a chi.    responded "they
were picking on me; I try to avoid violence".

FORMULATION:

In sum, we are dealing with a 16 year 6 month old male who
stands charged with felony murder and aiding and abetting an armed
robbery. The question to be addressed is whether or not Marvin can
be rehabilitated in less than three years. Test results and
clinical evaluation did not show evidence of severe
psychopathology; although, there is evidence of the early signs of
a developing personality disorder with impulsive and antisocial
traits. There is no evidence of significant depression and
apparently no history of substance abuse and certainly nothing
suggestive of schizophrenia, psychosis or any type of major mental
illness. His level of intelligence falls within the high end of
borderline to dull-normal range with evidence of mild organi  /.
He had evidenced a lot of aggressive conduct in elementary school
but he seems to have settled down in high scho  . Notwithstanding
Marvin's denial of guilt, we have an individual who gave
inconsistent stories, attempting to create an alibi with his
girlfriend, blamed others, and offers no specific explanation for
his alleged initial intention to "see how it felt" to commit an
armed robbery. This is not a homicide which is a direct c
of a mental illness such as psychosis, or a depression, nor is this
any type of compulsive pathological murder with sexual dynamics.



State in the Interest of Marvin Mathis                                    15

It also does not seem to be an explosive homicide, but rather an impulsive offense within the context of antisocial goals. As far as this examiner can determine there was really no purpose to the original idea of committing an armed robbery, except to just commit an armed robbery, "to see how it felt". The idea was not to get money for any specific purpose such as drugs or alcohol, but just to do something excessively antisocial.

The first step in rehabilitation has to be an acknowledgement on the part of the offender (or the patient) that there is a problem. Marvin does not recognize that there is a problem. Notwithstanding his right to deny guilt, he still believes that he did nothing wrong, except being at the wrong place at the wrong time. He showed almost no remorse for the victim, not even knowing his name, and implied that Marvin is actually the victim by being lured into this whole event by others. He feels bad that he is not in school and not at home, but very little responsibility for his own actions was detected. Where does rehabilitation begin with an individual who does not believe he did all that much wrong? Marvin displayed pronounced antisocial thinking from the beginning of this episode and, in face of a tragedy that resulted, little responsibility is taken. Since the first step of rehabilitation has not been met, it is this examiner's professional judgment, to a reasonable degree of psychological certainty, that Marvin cannot be rehabilitated by the time he reaches 19 years of age in approximately two and a half years.



P 15 FLORCZAK

State in the Interest of Marvin Mathis                                16

I hope these findings are of help to you in your further
understanding of this case.  If I may be of any further assistance,
please do not hesitate to contact me.

Very truly yours,

Louis B. Schlesinger, Ph.D.
Diplomate in Forensic Psychol...
American   Board   of   Profes...
Psychology

Dictated but not proofread



STATE OF NEW JERSEY
DEPARTMENT OF CORRECTIONS

**259 (p.3) (new 3/77)**
Revised 8/80
Disciplinary Report

## C.  DISCIPLINARY REPORT — INMATE'S COPY

*PRINT CLEARLY*

1. NAME OF INMATE (Last, First): _____ NO. _____

   INSTITUTION: _____ WING: _____ JOB ASSIGNMENT: _____

2. PROHIBITED ACT    (with code number ): _____

   _____

3. REPORTING EMPLOYEE'S NAME: _____ TITLE: _____

   DATE: _____ SIGNATURE: _____

4. PLACE OF ALLEGED INFRACTION : _____ DATE: _____ TIME: _____

5. ANY IMMEDIATE SPECIAL ACTION TAKEN: _____

   AUTHORIZED BY: _____ DATE: _____ TIME: _____

6. WITNESS(ES), NAME(S) AND NUMBER(S): _____

7. PHYSICAL EVIDENCE — DESCRIPTION AND DISPOSITION: _____

8. DESCRIPTION OF ALLEGED INFRACTION: _____

   _____

   _____

   _____

   _____

   _____

   _____

   _____

9. COPY OF THIS REPORT DELIVERED TO ABOVE INMATE BY: _____

   Printed Name

   SIGNATURE: _____ DATE: _____ TIME: _____

   INMATE READ "USE IMMUNITY" RIGHTS:    [ ] YES     [ ] NO

   THERE ARE _____ NUMBER OF ADDITIONAL PAGES ATTACHED TO THIS REPORT.

C.  DISCIPLINARY REPORT — INMATE'S COPY
D.  NOTICE TO INMATE OF RIGHTS

(Post Conviction Relief)
Brief and Appendix

CO-30 A
Rev. 3/16/00

NEW JERSEY STATE PRISON
POSTAGE REMIT

DATE: 02/24/05          LOCATION: 2-C
INMATE NAME: Marvin Mathis SBI# 244859-C
INMATE SIGNATURE: _Marvin Mathis_          DATE MAILED: 2/24/05

## TOTAL SHIPPING CHARGES

02-25-05                              PIECES: 1

CARRIER: Priority Mail
PICKUP RECORD:

TRACKING#
PACKAGE ID#   000715232b
CUSTOMER#     0
ACCOUNT#      0002244859C

ZIP/ZONE:     088/1        WT: 2 LBS   3.1 OZS

BASE RATE:    4.75

TOT CHGS:     4.75

WITNESS: _R. Clark_          APPROVED BY:
         PRINT                SIGNATURE
CHECK#                        DATE

---

CO-30 A
Rev. 3/16/00

NEW JERSEY STATE PRISON
POSTAGE REMIT

DATE: 02/24/05          LOCATION: 2-C
INMATE NAME: Marvin Mathis SBI# 244859-C
INMATE SIGNATURE: _Marvin_          DATE MAILED: 2/24/05

TO BUSINESS OFFICE
☑ Check and Coin/Box(s)

SEND DIRECT
TO MAILROOM

SENT TO: Andrea Farrazo, Superior Court Clerk
ADDRESS: Courthouse Annex 14th Floor
Elizabeth, New Jersey 07207

WITNESS: _____          APPROVED BY:
         PRINT                SIGNATURE
CHECK#                        DATE

Post Conviction Relief
Brief and Appendix

**Form 1 (top)**

CO-30 A
Rev. 3/16/00

**NEW JERSEY STATE PRISON**
**POSTAGE REMIT**

DATE: 02/24/05          LOCATION: 2-C

INMATE NAME: Marvin Mathis SB #244859-C

INMATE SIGNATURE: Marvin Mathis

TO: BUSINESS MANAGER          DATE MAILED: 2/24/05

Check Appropriate Box(s)

| | | $ |
|---|---|---|
| XX Legal Postage | | |
| Certified Cert # | | |
| Return Receipt Requested | | |
| Postage Attached, **SEND DIRECT** Legal Postage Only **TO MAILROOM** | | |
| X Regular Postage or UPS Property | | |
| Additional Insurance Amount $ | | |
| Total Postage and Fees | | $ |

SENT TO Union County Prosecutor Office

ADDRESS PRINT 32 Rahway Avenue
Elizabeth, New Jersey 07 2-2115

WITNESS: _____ PRINT _____          APPROVED BY: _____
SIGNATURE

CHECK#          DATE

**Form 2 (bottom)**

CO-30 A
Rev. 3/16/00

**NEW JERSEY STATE PRISON**
**POSTAGE REMIT**

DATE: 02/24/05          LOCATION: 2-C

INMATE NAME: Marvin Mathis SB #244859-C

INMATE SIGNATURE: Marvin Mathis          DATE MAILED: 2/24/05

02-25-05     **TOTAL SHIPPING CHARGES**

CARRIER: 1st Class Letter          PIECES: 1
PICKUP RECORD:

TRACKING#
PACKAGE ID# 0000715232b
CUSTOMER# 0
ACCOUNT# 0002244859C

ZIP/ZONE: /          WT: 0 LBS     12.5 OZS

BASE RATE: 3.13

TOT CHGS: 3.13

WITNESS: M. Clark PRINT M. Clark          APPROVED BY: MMOC
SIGNATURE
CHECK#          DATE 2/25/05

A 78

( Post Conviction Relief /
Brief And Appendix /

---

CO-30-A
Rev. 3/16/00

**NEW JERSEY STATE PRISON**
**POSTAGE REMIT**

DATE: 02/24/05     LOCATION: 2-C

INMATE NAME: Marvin Mathis S.B.I # 244859-C

INMATE SIGNATURE: _Marvin Mathis_

DATE MAILED 2/24/05

TO: BUSINESS MANAGER
Check Appropriate Box(s)

| Check | | $ |
|---|---|---|
| XX | Legal Postage | |
| | Certified Cert. # | |
| | Return Receipt Requested | |
| X | Postage Affixed   **SEND DIRECT** | |
| | Legal Postage Only   **TO MAILROOM** | |
| | Regular Postage or   UPS   Property | |
| | Additional Insurance Amount $ | |
| | Total Postage and Fees | $ |

SENT TO: Sheri Woliver, Esq.,
ADDRESS: Office of the Public Defender
75 Veterans Memorial Drive East, Suite
201, Somerville, New Jersey 08876

WITNESS: _____   APPROVED BY: _____
          PRINT

_____         _____
SIGNATURE                DATE

CHECK# _____

---

CO-30 A
Rev. 3/16/00

**NEW JERSEY STATE PRISON**
**POSTAGE REMIT**

DATE: 02/24/05     LOCATION: 2-C

INMATE NAME: Marvin Mathis S.B.I # 244859-C

INMATE SIGNATURE: _Marvin Mathis_

## TOTAL SHIPPING CHARGES

02-25-05

CARRIER: 1st Class Letter     PIECES: 1
PICKUP RECORD:

TRACKING#      00071715232b
PACKAGE ID#    0
CUSTOMER#      0002448590
ACCOUNT#

WT: 0 LBS     12.7 OZS

ZIP/ZONE: /

BASE RATE:     3.13

TOT CHGS:      3.13

APPROVED BY: _M9C_   v0076

WITNESS: _M. Clark_
SIGNATURE

PRINT: _Mrs. M. Clark_   DATE: 2-25-05

CHECK# _____

03/11/2005 11:40          DEPARTMENT OF CORRECTIONS          Page     172 Of   3404

COIRONA                   NEW JERSEY STATE PRISON                    OTRTASTA

                          TRUST ACCOUNT STATEMENT

             STATEMENT DATE: 02/01/2005    - 03/11/2005


SBI #:  000244859C        Name: MATHIS, MARVIN           DOB:      03/23/1980
LOCATION: NJSP-NORTH-2 C-CELL 35                          INM#     304144

---

TRANSACTION DESCRIPTIONS    2101 SPENDABLE SUB ACCOUNT

| DATE | LOCATION | TYPE | TRANSACTION DESCRIPTION | TRANSACTION AMT | BALANCE |
|------|----------|------|------------------------|----------------|---------|
| | | | BEGINNING BALANCE: | | 0.48 |
| 02/09/2005 | NJSP | FPAY | 017 /PAY SEMI/FPAY /RG:3 31 @1.50    01/01/2005- 01/31/2005 | 46.50 | 46.98 |
| 02/09/2005 | NJSP | DED | $15 DEDUCTION-DISCRETIONARY SPENDING RESERVE PER 10A. | (15.00) | 31.98 |
| 02/09/2005 | NJSP | ADD | $15 DEDUCTION-DISCRETIONARY SPENDING RETURN PER 10A. | 15.00 | 46.98 |
| 02/16/2005 | NJSP | MR | #7306 MAIL 309040 PENWELL | 15.00 | 61.98 |
| 02/22/2005 | NJSP | CRS | COMMISSARY SALE - ORD #2703286 | (61.27) | 0.71 |
| 02/25/2005 | NJSP | LGLML | LEGAL MAIL LOAN | 4.04 | 4.75 |
| 02/25/2005 | NJSP | POS | POSTAGE | (4.75) | 0.00 |
| 02/25/2005 | NJSP | LGLML | LEGAL MAIL LOAN | 3.13 | 3.13 |
| 02/25/2005 | NJSP | POS | POSTAGE | (3.13) | 0.00 |
| 02/25/2005 | NJSP | LGLML | LEGAL MAIL LOAN | 3.13 | 3.13 |
| 02/25/2005 | NJSP | POS | POSTAGE | (3.13) | 0.00 |
| 03/11/2005 | NJSP | FPAY | 017 /PAY SEMI/FPAY /RG:3 28 @1.50    02/01/2005- 02/28/2005 | 42.00 | 42.00 |
| 03/11/2005 | NJSP | DED | $15 DEDUCTION-DISCRETIONARY SPENDING RESERVE PER 10A. | (15.00) | 27.00 |
| 03/11/2005 | NJSP | ADD | $15 DEDUCTION-DISCRETIONARY SPENDING RETURN PER 10A. | 15.00 | 42.00 |
| 03/11/2005 | NJSP | DED | FPAY-DEDUCTION-LGLML-10142003 | (10.30) | 31.70 |

*brief & Appendix 2/24/05* (handwritten annotation)

JA 80 (handwritten)

Marvin Mathis #304144/244859-C
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861


April 25, 2005


Andrea Ferraro
Criminal Division Manager
Courthouse Annex 7th Floor
Elizabeth, New Jersey 07207

---

State v. Marvin Mathis
Union County Ind. No. 97-02-123


Re: Request Notification of filig of defendant's
    memorandum of law and appendix.


Dear Ms. Ferraro:

    On February 24, 2005, I timely submitted to your office
my memorandum of law and appendix in support of petition for
Post Conviction Relief in the above-captioned matter. I've
not received notice as to whether the brief and appendix has
been filed nor a filed copy return back to me.



                Thank you for your time and assistance.




                                    Very truly yours,

                                    Marvin Mathis




MM/file...

CO-30 A
Rev. 3/16/00

NEW JERSEY STATE PRISON
POSTAGE REMIT

DATE April 25, 2005   LOCATION: 2-C
INMATE NAME Marvin Mathis S B I# 44859-C
INMATE SIGNATURE

TO: BUSINESS MANAGER          DATE MAILED 4/25/05

| (✓) | Check Appropriate Box (s) | |
|---|---|---|
| X | Legal Postage | |
| | Certified Cert. # | |
| | Return Receipt Requested | |
| | Postage Affixed; SEND DIRECT Legal Postage Only TO MAILROOM | |
| | Regular Postage or UPS Property | |
| | Additional Insurance Amount $ | |
| | Total Postage and Fees | $ |

SENT TO: Andrea Ferraro, Crime Division Manager
ADDRESS Courthouse annex 7th Floor
        Eliabeth, New Jersey 07207

WITNESS: K. Grier          APPROVED BY:
PRINT
SIGNATURE                  DATE:

CHECK#

Request Notification of Filing of Defendants Memorandum of law
and Appendix.

CO-30 A
Rev. 3/16/00

NEW JERSEY STATE PRISON
POSTAGE REMIT

DATE April 25, 2005   LOCATION: 2-C
INMATE NAME Marvin Mathis S B I# 44859-C
INMATE SIGNATURE

TO: BUSINESS MANAGER          DATE MAILED 4/25/05

| (✓) | Check Appropriate Box (s) | |
|---|---|---|
| X | Legal Postage | |
| | Certified Cert. # | |
| | Return Receipt Requested | |
| | Postage Affixed; SEND DIRECT Legal Postage Only TO MAILROOM | |
| | Regular Postage or UPS Property | |
| | Additional Insurance Amount $ | |
| | Total Postage and Fees | $ |

SENT TO: Andrea Ferraro
ADDRESS Courthouse annex 7th Floor
        Eliabeth, New Jersey 07207

WITNESS:          APPROVED BY:
PRINT
SIGNATURE                  DATE:

CHECK#

05/06/2005 09:14     **DEPARTMENT OF CORRECTIONS**    **Page** 241 **Of** 3384

COIOGAR       **NEW JERSEY STATE PRISON**      OTRTASTA

**TRUST ACCOUNT STATEMENT**

**STATEMENT DATE:** 04/01/2005   - 05/06/2005

**SBI #:** 000244859C    **Name:** MATHIS, MARVIN     **DOB:**    03/23/1980
**LOCATION:** NJSP-NORTH-2 C-CELL 35              **INM#**    304144
**PED:**   01/22/2026     **As of Date:** 01/22/2026    **Max Date:** 01/22/2026

| LOCATION SUB ACCOUNT | | BEGINNING BALANCE | ENDING BALANCE | HOLD |
|---|---|---|---|---|
| NJSP | 2101 SPENDABLE | 50.03 | 190.70 | |
| NJSP | 2102 WORK RELEASE SAVINGS | 0.00 | 0.00 | |

### DEBTS AND LOANS SUMMARY

| TYPE | PAYABLE | DATE CREATED/INSTITUTION | ORIGINAL AMOUNT | AMOUNT PAID | AMOUNT OWING | STATUS |
|---|---|---|---|---|---|---|
| LGLML | LEGAL MAIL LOAN | 10/14/2003 @ NJSP | 17.87 | 17.87 | 0.00 | ACTIVE |
| COL | COMMISSARY LOAN | 09/20/2001 @ NJSP | 9.42 | 9.42 | 0.00 | ACTIVE |

### OBLIGATIONS SUMMARY

| TYPE | PAYABLE | INFO / INDICTMENT # | ORIGINAL AMOUNT | AMOUNT PAID | AMOUNT OWING | STATUS |
|---|---|---|---|---|---|---|
| PLRAS | STATE LITIGATION FILING FEE | A-487-02T3/M-534-02 | 7.35 | 7.35 | 0.00 | ACTIVE |
| TCF | TRANSACTION COLLECTION FEE | 05022000 @NJSP | | 14.00 | UNLIMITED | ACTIVE |
| SNSF | SAFE NEIGHBOURHOOD | 11/23/99 11:59:03 1 | 150.00 | 150.00 | 0.00 | ACTIVE |
| VCCB | $100 VICTIMS OF CRIME COMPENSATION BOARD | 11/23/99 11:59:02 1 | 100.00 | 100.00 | 0.00 | ACTIVE |
| VCCB | $100 VICTIMS OF CRIME COMPENSATION BOARD | 11/23/99 11:59:03 2 | 50.00 | 50.00 | 0.00 | ACTIVE |
| LEOTEF | LAW ENFOR. OFR. TRAIN. & EQUIP. FUND | 11/23/99 11:59:03 1 | 30.00 | 30.00 | 0.00 | ACTIVE |

### TRANSACTION DESCRIPTIONS   2101 SPENDABLE SUB ACCOUNT

| DATE | LOCATION | TYPE | TRANSACTION DESCRIPTION | TRANSACTION AMT | BALANCE |
|---|---|---|---|---|---|
| | | | BEGINNING BALANCE: | | 50.03 |
| 04/01/2005 | NJSP | MR | #7410 MAIL RECEIPT 029788 WILLIAMS | 10.00 | 60.03 |
| 04/01/2005 | NJSP | DED | $15 DEDUCTION-DISCRETIONARY SPENDING RESERVE PER 10A. | (10.00) | 50.03 |
| 04/01/2005 | NJSP | ADD | $15 DEDUCTION-DISCRETIONARY SPENDING RETURN PER 10A. | 10.00 | 60.03 |
| 04/08/2005 | NJSP | FPAY | 017 /PAY SEMI/FPAY /RG:3 31 @1.50   03/01/2005-03/31/2005 | 46.50 | 106.53 |
| 04/08/2005 | NJSP | DED | $15 DEDUCTION-DISCRETIONARY SPENDING RESERVE PER 10A. | (5.00) | 101.53 |
| 04/08/2005 | NJSP | ADD | $15 DEDUCTION-DISCRETIONARY SPENDING RETURN PER 10A. | 5.00 | 106.53 |
| 04/22/2005 | NJSP | MR | #7460 MAIL REC.265968 MATHIS | 40.00 | 146.53 |
| 04/25/2005 | NJSP | POS | POSTAGE 04/25/05 | (0.83) | 145.70 |
| 05/05/2005 | NJSP | FPAY | 017 /PAY SEMI/FPAY /RG:3 30 @1.50   04/01/2005-04/30/2005 | 45.00 | 190.70 |
| 05/05/2005 | NJSP | DED | $15 DEDUCTION-DISCRETIONARY SPENDING RESERVE PER 10A. | (15.00) | 175.70 |
| 05/05/2005 | NJSP | ADD | $15 DEDUCTION-DISCRETIONARY SPENDING RETURN PER 10A. | 15.00 | 190.70 |



83/11

Marvin Mathis #304144/244859-C
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

July _31_ , 2006

Lewis D. Thompson
Attorney at Law
P.O. Box 403
Summit, New Jersey 07902

RE: **State v. Marvin Mathis**
    **Union County Indictment No. 97-02 123**

Dear Thompson:

       This is a follow-up letter inquiring as to whether you've
received my letter (dated  June 18, 2006) with enclosure
providing a **Rough Draft Memorandum of Law** with respect to the
Competency claim that I wish to have raise in support of my
Post Conviction Relief.


       Additionally, please note that I've enclosed the names
and addresses of the persons needing to be investigated, includ-
ing the expert witnesses that administered psychological assess-
ments prior to my Juvenile Waiver Hearing. These expert opinions
can support the Competency claim. Please read their reports
carefully it will assist you in preparation for your brief that
you will be submitting on my behalf.


       Mr, Thompson, I greatly appreciate it if you would schedule
a Attorney window visit or a Video Conference so we could
communicate further with my case.


       Awaiting your response.


                                        Sincerely,

                                        Marvin Mathis
                                        Marvin Mathis


MM/file.

Encl. Listing for investigation.

A 84

7004 0750 0002 6155 6622

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

**OFFICIAL USE**

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To _Lewis J. Thompson Esq_
Street, Apt. No.; or PO Box No. _P.O. Box 861_
City, State, ZIP+4 _Summit, New Jersey 07902_

PS Form 3800, June 2002       See Reverse for Instructions

---

**CO-30 A**         NEW JERSEY STATE PRISON         Rev. 3/16/00
**POSTAGE REMIT**

DATE: _July 31 2006_   LOCATION: _6-Left_
INMATE NAME: _Marvin Mathis_ S B # _244859-C_
INMATE SIGNATURE: _Marvin Mathis_

TO: BUSINESS MANAGER       DATE MAILED:
08-01-06           **TOTAL SHIPPING CHARGES**

CARRIER: 1st Class Letter
PICKUP RECORD:                 PIECES:   1

TRACKING#
PACKAGE ID#   000756566b
CUSTOMER#     0
ACCOUNT#      000244859C

ZIP/ZONE:     /        WT: 0 LBS    0.9 OZS

BASE RATE:    4.25

_52_

TOT CHGS:     4.25

WITNESS: _B. Xhu_          APPROVED BY:
SIGNATURE  PRINT _750_

CHECK#                      DATE: _8/1/06_

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

_Lewis J. Thompson_
_Attorney at Law_
_P.O. Box 861_
_Summit, New Jersey 07902_

2. Article Number
   (Transfer from service label)       7004 0750 0002 6155 6622

PS Form 3811, February 2004       Domestic Return Receipt       102595-02-M-1540

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Lewis O. Thompson_     □ Agent  ☑ Addressee
B. Received by ( Printed Name)   C. Date of Delivery
_Lewis Thompson_           _8/2/06_
D. Is delivery address different from item 1?  □ Yes
   If YES, enter delivery address below:       □ No

3. Service Type
   ☑ Certified Mail    □ Express Mail
   □ Registered        ☑ Return Receipt for Merchandise
   □ Insured Mail      □ C.O.D.

4. Restricted Delivery? (Extra Fee)        □ Yes

_J22_

## LIST FOR THE INVESTIGATOR

1. **Need to have interview and obtain affidavits from:**

    Dr. Cheryl L. Thompson, PH.D
        57 Maple Street
    Millburn, New Jersey 07041
        (201) 762-6475


    Dr. Martha H. Page, Ed.D
    182 Paulison Avenue
    Passaic, New Jersey 07055-4809
        (201) 773-7673


    Dr. Louis B. Schlesinger, PH.D
        12 Tower Drive
  Maplewood, New Jersey 07040-1008
        (201) 762-6431


These expert witnesses administered psychological assessments prior to my Juvenile Waiver Hearing. There expert opinions can support my **Competency Claim, (They can testify that I had significant mental delays and a below average IQ at the time of the charged crimes. And that I should have been evaluated prior to my trial.)**

    In Dr. Thompson's report dated February 10, 1996, She opined that [Defendant] was fully aware of my role in his judicial process but did not seem to have a full picture of the seriousness of his judicial position. His [Defendant] ability to think abstractly is also poorly developed. "[Defendant] should have a complete diagnostic assessment as he may be functioning as level of retardation." "[Defendant] appears quite confused about his involvement in such a serious event."

    According to Dr. Page's report dated July 15, 1996, She wrote: [Defendant] found it difficult to process verbally presented material rapidly. "Ability to define words was well below average." It was evident that [defendant] academic skills were still quite low and further impaired when he felt under pressure to achieve or was in a less than well-controlled and structured situation.

    In Dr. Schlesinger's report dated October 2, 1996, he opined that [Defendant] is currently functioning within the high *nd of the borderline range of intelligence, gaining a Full Scale IQ of 79 (Verbel IQ = 80; Performance IQ = 83) Verbal skills



**1 within low end of dull-normal range. Fund of general information is weak, "Vocabulary is equally poor and far below average capacity as he was unable to define such words as fabric, assemble, conceal, regulated and the like..." "In general verbal skills fall within low end of dull-normal range."

2. **Need to have interview and obtain affidavits from:**

Principal Walton of Thomas Jefferson High School in Elizabeth, New Jersey. On January 24, 1996, Principal Walton came to my first period class accompanied by Detective Rafael Garcia. And took me to the Principal's office. Detective Garcia informed me in the presence of principal Walton that he needed me to come to the Police Station. **(Principal Walton will witness that Detective Micheal Brown was not the actual Detective who accompanied him to my first period class nor to his office.)**

Mrs. Pridgin, Security Guard at Thomas Jefferson High School in Elizabeth, New Jersey. On January 24, 1996, Mrs. Pridgin stopped Sharlama Brooks in the hallway and asked Brooks what was wrong. Brooks started to cry, Mrs. Pridgin took her to the library to see Miss Janice Sutton, School Counselor. **(Mrs. Pridgin will say that she never saw Brooks' best friend Towana consoling her in the hallway when she came in contact with Brooks around 8:15 to 8:30 am)**

3. **Need to interview and secure affidavit from:**

Linda Mathis (my Mother)
538 Magnolia Avenue 1st Floor
Elizabeth, New Jersey 07206
(908) 354-7886

**(She was never informed by defense counsel Walter Florczak in regards of my Constitutional right to testify on my own behalf at the Waiver Hearing in Juvenile Court.)** Ferguson Issue.

mm/file.

Dated: July 31, 2006

RECEIVED AND FILED
SUPERIOR COURT
UNION COUNTY
Criminal Case-Management Office

OCT 0 1 2006

BERNADETTE A. FIORE, PhD.
Criminal Division Manager

RECEIVED AND FILED
SUPERIOR COURT
UNION COUNTY
Criminal Case-Management Office

SEP 1 5 2006

BERNADETTE A. FIORE, Ph.D,
Criminal Division Manager

Marvin Mathis #304144/244859-C
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861


September 14, 2006

Bernadetta A. Fiore, PH.D
Criminal Case Manager
Criminal Case Management Office
2 Broad Street
Elizabeth, New Jersey 07207


Re: State v. Marvin Mathis
    Union County Indictment No. **97-02-123**

Dear Miss Fiore:

    Enclosed for filing please find an original and a copy
of each of the following documents:

    1.  Second Supplemental Amended Petition for Post
        Conviction Relief; and

    2.  Certificate of Service.

    Enclosed please return the extra copy of this cover letter
to me stamped **"FILED"** in the self-addressed stamped envelope
provided as proof of filed for my records.


                                    Very Truly Yours,

                                    Marvin Mathis
                                    Marvin Mathis


Cc: w/2cpy. ea. encl. Union County Prosecutor.
    w/ 1 cpy. ea. encl. Lewis D. Thompson, Esq.

Da 37
JA 88

Second Supplemental Amended Petition

CO-30 A

NEW JERSEY STATE PRISON
**POSTAGE REMIT**                           Rev. 3/16/00

DATE: ___9/13/06___     LOCATION: ___6-Left___

INMATE NAME: __Marvin Mathis__ B I# __244859-C__

INMATE SIGNATURE: __Marvin Mathis__

TO: BUSINESS MANAGER     DATE MAILED: __9/13/06__

( ✓ )  Check Appropriate Box (s)

| XX | Legal Postage | $ |
|----|---------------|---|
|    | Certified Cert. # | $2 |
|    | Return Receipt Requested | |
|    | Postage Affixed; **SEND DIRECT**  Legal Postage Only **TO MAILROOM** | |
|    | Regular Postage  or  UPS   Property | |
|    | Additional Insurance Amount $ | |
|    | Total Postage and Fees | $ |

SENT TO: __Lewis D. Thompson__
ADDRESS: PRINT __Attorney at Law__
__P.O. Box 403__
__Summit, New Jersey 07902__

APPROVED BY:

WITNESS: _____  PRINT _____
SIGNATURE

CHECK# _____   DATE: _____

CO-30 A

NEW JERSEY STATE PRISON
**POSTAGE REMIT**                           Rev. 3/16/00

DATE    9/13/06      LOCATION   6-Left

INMATE NAME: Marvin Mathis B I# 244859-C

INMATE SIGNATURE:

TO: BUSINESS MANAGER     DATE MAILED: 9/13/06

Check Appropriate Box (s)

Legal Postage
Certified Cert. #
Return Receipt Requested
Postage Affixed;  SEND DIRECT  Legal Postage Only  TO MAILROOM
Regular Postage  or  UPS   Property
Additional Insurance Amount $
Total Postage and Fees

SENT TO:  Lewis D. Thompson
ADDRESS:  Attorney at Law
P.O. Box 403
Summit, New Jersey 07902

APPROVED BY:

WITNESS:
SIGNATURE

CHECK#                DATE:

A 89

Second Supplemental Amended Petition

CO-30 A

NEW JERSEY STATE PRISON   Rev. 3/16/00
POSTAGE REMIT

DATE: 9/13/06   LOCATION: 6-Left

INMATE NAME: Marvin Mathis SB # 244859-C

INMATE SIGNATURE: Marvin Mathis

TO: BUSINESS MANAGER   MAILED 9/13/06

Check Appropriate Box(s)

| | | | | | $ |
|---|---|---|---|---|---|
| XX | Legal Postage | | | | |
| | Certified Cert # | | | | |
| | Return Receipt Requested | SEND DIRECT TO MAILROOM | | | |
| | Postage Affixed | | | | |
| | Postal Postage Only | UPS - Thrifty | | | |
| | Overnight Postal | UPS | | | |
| | Additional Insurance Amount $ | | | | |
| | | Total Postage and Fees | | | $ |

SENT TO: Bernadette A. Flora, PH.D
ADDRESS: HealthCare Management Office
Elizabeth, New Jersey 07207

WITNESS: _____   DATE: _____

APPROVED BY: _____

CHECK #

---

CO-30 A

NEW JERSEY STATE PRISON   Rev. 3/16/00
POSTAGE REMIT

DATE: 9/13/06   LOCATION: 6-Left

INMATE NAME: Marvin Mathis SB # 244859-C

INMATE SIGNATURE: Marvin Mathis

## TOTAL SHIPPING CHARGES

09-13-06

CARRIER: 1st Class Letter   PIECES: 1
PICKUP RECORD:

TRACKING#
PACKAGE ID# 000756566b
CUSTOMER# 0
ACCOUNT# 0002244859C

ZIP/ZONE: /   WT: 0 LBS   4.6 OZS

BASE RATE: 1.35

TOT CHGS: 1.35

WITNESS: _____   APPROVED BY: _____

SIGNATURE PRINT _____

CHECK# _____   DATE: _____

90

Second Supplemental Amended Petition

CO-30 A            NEW JERSEY STATE PRISON            Rev. 3/16/00
                        POSTAGE REMIT

DATE:  9/13/06            LOCATION:  6-Left

INMATE NAME: Marvin Mathis SB #244859-C

INMATE SIGNATURE: _____

## TOTAL SHIPPING CHARGES

09-13-06

CARRIER: 1st Class Letter        PIECES:  1
PICKUP RECORD:

TRACKING#
PACKAGE ID#    0007565656b
CUSTOMER#      0
ACCOUNT#       0002448S9C

ZIP/ZONE:  /              WT: 0 LBS      3.3 OZS

BASE RATE:  1.11

TOT CHGS:   1.11

WITNESS: _____    APPROVED BY: _____
         PRINT
SIGNATURE _____

CHECK#                       DATE: _____



CO-30 A            NEW JERSEY STATE PRISON            Rev. 3/16/00
                        POSTAGE REMIT

DATE:  9/13/06            LOCATION:  6-Left

INMATE NAME: Marvin Mathis SB #244859-C

INMATE SIGNATURE: _____

TO BUSINESS MANAGER                DATE MAILED  9/13/06
   □ Check Applicable Box(s)

| | | |
|---|---|---|
| ✓✓ | 1st Mail Postage | $ |
| | Certified Mail | |
| | Return Receipt Requested | |
| | Postage Due Amount | SEND DIRECT |
| | 1st Class Certified Mail | TO WILLIKNOWN |
| | Insured Postage | □ UPS □ Property |
| | Additional Insurance Amount | |
| | | Total Postage and Insurance | $ |

SEND TO:  Union County Prosecutor Office
ADDRESS:  32 Rahway Ave
          Elizabeth, New Jersey 07202-2115

                                    APPROVED BY _____

WITNESS: _____
         Signature
CHECK#                       DATE

10/10/2006 07:03      **DEPARTMENT OF CORRECTIONS**     **Page  2200 Of  3240**

COIOGAR            **NEW JERSEY STATE PRISON**         OTRTASTA

**TRUST ACCOUNT STATEMENT**

**STATEMENT DATE:** 09/01/2006    — 10/10/2006

**SBI #:** 000244859C     **Name:** MATHIS, MARVIN     **DOB:**    03/23/1980
**LOCATION:** NJSP-WEST-6 LEFT-2 TIER-CELL 052     **INM#**    304144

---

**TRANSACTION DESCRIPTIONS   2101 SPENDABLE SUB ACCOUNT**

| DATE | LOCATION | TYPE | TRANSACTION DESCRIPTION | | TRANSACTION AMT | BALANCE |
|------|----------|------|-------------------------|--|-----------------|---------|
| | | | | BEGINNING BALANCE: | | 101.02 |
| 09/08/2006 | NJSP | FPAY | E11 /EDUC SK /FPAY /RG:3 0 @1.60  08/07/2006- 08/31/2006 | | 0.00 | 101.02 |
| 09/08/2006 | NJSP | FPAY | 30A /PAY UN /FPAY /RG:3 4 @1.40  08/01/2006- 08/04/2006 | | 5.60 | 106.62 |
| 09/08/2006 | NJSP | DED | $15 DEDUCTION-DISCRETIONARY SPENDING RESERVE PER 10A. | | (5.60) | 101.02 |
| 09/08/2006 | NJSP | ADD | $15 DEDUCTION-DISCRETIONARY SPENDING RETURN PER 10A. | | 5.60 | 106.62 |
| 09/12/2006 | NJSP | CRS | COMMISSARY SALE - ORD #3489533 | | (103.52) | 3.10 |
| 09/13/2006 | NJSP | POS | POSTAGE 09/13/06 | | (1.35) | 1.75 |
| 09/13/2006 | NJSP | POS | POSTAGE 09/13/06 | | (1.11) | 0.64 |
| 09/20/2006 | NJSP | LGLML | LEGAL MAIL LOAN | | 0.47 | 1.11 |
| 09/20/2006 | NJSP | POS | POSTAGE 09/20/2006 | | (1.11) | 0.00 |
| 10/06/2006 | NJSP | FPAY | E11 /EDUC SK /FPAY /RG:3 26 @1.60  09/01/2006- 09/30/2006 | | 41.60 | 41.60 |
| 10/06/2006 | NJSP | DED | $15 DEDUCTION-DISCRETIONARY SPENDING RESERVE PER 10A. | | (15.00) | 26.60 |
| 10/06/2006 | NJSP | ADD | $15 DEDUCTION-DISCRETIONARY SPENDING RETURN PER 10A. | | 15.00 | 41.60 |
| 10/06/2006 | NJSP | DED | FPAY-DEDUCTION-LGLML-10142003 | | (0.47) | 41.13 |

Honorable John F. Malone, J.S.C.

Marvin Mathis #304144/244859-C
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861
(Movant), Pro Se

**Presently Confined**

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION-UNION COUNTY

Indictment No. **97-02-123**

---

STATE OF NEW JERSEY,

      Plaintiff-Respondent
        (Respondent);

-VS.-

Marvin Mathis,

      Defendant-Petitioner
        (Movant)

**Criminal Action**

Second Supplemental Verified
Petition For Post-Conviction
Relief

---

Petitioner, Marvin Mathis, presently incarcerated at New Jersey State Prison, in the City of Trenton, and State of New Jersey, by way of this Second Supplemental Verified Petition for Post-Conviction Relief, says:

Union County Indictment No. **97-02-123** charged petitioner Marvin Mathis with: Murder, Contrary to N.J.S.A. 2C:11-3a(1) and/or (2) (count one); first degree robbery, Contrary to N.J.S.A. 2C:15-1 (count two); first degree felony murder, Contrary to N.J.S.A. 2C:11-3a (3); possession of a weapon for an unlawful purpose, Contrary to N.J.S.A. 2C:39-4d (count four) and unlawful possession of a weapon Contrary to N.J.S.A. 2C:39-5d (count five)

A 93

Following an unsuccessful Miranda motion before the Honorable John F. Malone, J.S.C. on June 9 and 10, 1998, Petitioner was tried before Judge Malone and a jury on June 10, 11, 16, 17, and 18th 1998. Petitioner was found guilty of all charges.

On August 14, 1998, the Court sentenced Petition to an aggregate term of 50 years in prison, with a parole bar of 30 years. The appropriate statutory penalties were imposed, and Petitioner was given credit of 934 days for time spent in custody.

By ORDER of March 15, 1999, the Appellate Court granted Petitioner's motion to file his Notice of Appeal Nunc Pro Tunc.

A Notice of Appeal was subsequently filed and docketed A-3316-98T4.

A brief was subsequently prepared on Petitioner's behalf raising the following points of contention:

THE DECISION OF THE FAMILY PART JUDGE TO WAIVE JUVENILE JURISDICTION OVER MARVIN MATHIS CONSTITUTED A CLEAR ERROR OF JUDGMENT AND SHOULD BE REVERSED.

DEFENDANT'S CONVICTION MUST BE REVERSED DUE TO THE IMPROPER ADMISSION OF HEARSAY EVIDENCE THAT HIS GIRLFRIEND WAS ACCOSTED ON THE STREET BY A MAN WHO TOLD HER THAT DEFENDANT HAD KILLED SOMEONE. SUCH EVIDENCE VIOLATED DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO CONFRONTATION. U.S. CONST.

DEFENDANT'S CONVICTION MUST BE REVERSED DUE TO ACTS OF PROSECUTORIAL MISCONDUCT, WHICH INCLUDED REFERRING TO DEFENDANT AS A THUG AND COMMENTING ON FACTORS OUTSIDE OF THE RECORD.

THE BASE TERM OF FIFTY YEARS IMPRISONMENT IS EXCESSIVE AND SHOULD BE MODIFIED BY THIS COURT.

A 94

On June 2, 2000 the Appellate Division affirmed Petitioner conviction. A Petition for Certification was subsequently filed with the State Supreme Court and denied on October 11, 2000.

This Second Amended Petition is intended to supplement and clarify the initial petition : Post-Conviction Relief filed in this matter on or about April 26, 2001 and the same is hereby incorporated as if set forth at length.

Accordingly petitioner respectfully requests assignment of counsel and a hearing afforded. The accompanying Post-Conviction Relief is being brought so that this Court can address the constitutional questions that will be submitted. Petitioner is ultimately seeking and requesting that the Court correct the errors that were committed during his trial by vacating the judgment of conviction and remanding the case for a new trial. And also correcting the errors that were committed during his Juvenile Waiver Hearing by remanding the case so that Petitioner may have a new Juvenile Waiver Hearing.

Petitioner conviction must be vacated because his right to effective assistance of counsel at trial and on direct appeal served to deny petitioner his rights to a fair trial and due process of law contrary to the Sixth and Fourteenth Amendment, guaranteed by Article I, paragraph 10 of the New Jersey Constitution. (4) To substantiate petitioner's Competency Claim set forth in his Supplemental Verified Petition for Post-Conviction Relief, which was submitted ( Dated February 2, 2006) Petitioner requests that assigned counsel Lewis D. Thompson to interview and obtain affidavits from expert witnesses: Martha

H. Page, Ed.D, Dr. Cheryl L. Thompson, PH.D and Dr. Louis B. Schlesinger, PH.D. (5) Defense counsel Walter Florczak failed to investigate the competence of the defendant's waiver of his constitutional right to testify at the waiver of jurisdiction hearing in Juvenile Court. Such waiver was not <u>Voluntarily</u>, <u>Knowingly</u>, and <u>Intelligently</u> made, Counsel had evidence and was aware of defendant's low intellectual functioning. Defendant was denied the right to effective assistance of counsel in violation of <u>U.S.C.A.</u> Const. Amend. 6 and 14. (6) Appellate counsel failed to raise on direct appeal defendant's constitutional right to testify on his own behalf at the waiver hearing in juvenile Court was not <u>Knowingly</u> and <u>Intelligently</u> waived. Defendant was denied the right to effective assistance of counsel and due process of law in violation of <u>U.S.C.A.</u> Const. Amend. 6 and 14. (7) Appellate counsel failed to raise on direct appeal evidence of defendant's limited mental ability and his status as a special education student was relevant. **(See Trial transcript, June 11, 1998, Morning Session 114-19 through 117-12)** Defendant was denied the right to effective assistance of counsel and due process of law in violation of <u>U.S.C.A.</u> Const. Amend. 6 and 14.

**WHEREFORE**, defendant asserts that he was denied due process of law, the right to a fair trial, the right to effective assistance of counsel and the compulsory process for obtaining witnesses in his favor, by both defense and appellate counsel, as guaranteed by both State and Federal Law.

Dated: _September 14,_ , 2006

_____
Marvin Mathis
Petitioner-Defendant

Da-8

Marvin Mathis #304144/244359-C
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

January 29, 2008

Lewis D. Thompson, Esq.
Attorney at law
P.O. Box 403
Summit, New Jersey 07902

Re: **State v. Marvin Mathis**
    <u>**Union County Ind. No. 97-02-123**</u>

Dear Mr. Thompson:

There are two potential issues that I would like for you
to closely examine on this PCR. **Ineffective assistance on Trial
and Appellate counsel.** Both counsel were prejudicially ineffective
for failing to illustrate my limited mental ability and status
as a special education student.

Throughout my trial, trial counsel emphasized several
references of my status as a special education student to the
jury, counsel even made reference of my status during Sentencing.
<u>see</u> the following transcripts:

"1T" Trial transcript, **Miranda hearing, June 9, 1998** (48-15
      21).

"2T" Trial transcript, **Defense Opening, June 10, 1998** (39-12
      to 15).

"3T" Trial transcript, **Testimony of Detective Thomas Koczar
      in the presence of the jury, June 11, 1998 (a.m.)** (97-8
      to 10).

"4T" Trial transcript, **At sidebar regarding my status as a
      special education student, June 11, 1998 (a.m.)** (114-19
      to 117-12).

"5T" Trial transcript, **Defense Summation, June 17, 1998 (p.m.)**
      (118-18 to 19).

"6T" Sentencing transcript, **Defense Opening, August 1-, 1998**
      (3-1 to 3).



I've enclosed a letter that I received from my previous
counsel Paul Klein [dated July 21, 1999], where he informed
me that evidence of my status as a special education student,
that this particular issue cannot be raised on direct appeal
because there is nothing in the record to support the argument.

I've also enclosed a letter that I wrote to appellate
counsel via certified mail [dated May 23, 2000], which I brought
to his attention pertaining to the extended discussion between
the prosecutor and trial counsel at sidebar regarding the need
of expert testimony to illustrate my status as a special
education student.

Trial counsel had both actual and constructive notice of
my status as being classified special education and communication
handicap. However, counsel did not produce it at trial. **(4T
116-1 to 3).** Trial counsel also deliberately refused to offer
relevant experts and/or appropriate school personnel, who could
be able to fairly describe my mental ability. **(4T 116-13).**

The evidence of my status as being classified as
"communication handicap" was very relevant to this case, as
a basis to explain the reasonableness of my perceptions during
the charged crimes and as basis for the jury to evaluate my
demeanor and credibility as a witness. see e.g., State v. Sexton,
311 N.J. Super. 70, 88 (1998).

Mr. Thompson, this is an area that needs to be seriously
explored and pursued on this PCR, because this is essentially
tantamount to "constructive denial of the assistance of counsel
altogether [which] is legally presumed to result in prejudice."
see Strickland v. Washington, 466 U.S. 688, 104 S.Ct. 2052,
2068 (1984) see also State v. Fritz, 105 N.J. 42, 58 (1987).

Please keep me posted on the progress of my case. Thank
you for your time and assistance.

Sincerely,

Marvin Mathis

Encl. (Letters from and to appellate counsel).

CC: Hon. Judge John F. Malone, J.S.C.

Ingrid Yurchenco, Esq.
Acting Deputy Public Defender PCR Unit.

A 98

CO-30 A        NEW JERSEY STATE PRISON        Rev. 3/16/00
**POSTAGE REMIT**

DATE: January 29, 2008   LOCATION: ____4-C____

INMATE NAME: Marvin Mathis   S B I # 244859-C

INMATE SIGNATURE: _Marvin Mathis_

TOTAL SHIPPING CHARGES

01-30-08

CARRIER: 1st Class Letter
PICKUP RECORD:                    PIECES

TRACKING#
PACKAGE ID#
CUSTOMER#     0
ACCOUNT#      000244859C          35

ZIP/ZONE                WT: 0 LBS   1.0 OZS

BAS. RATE:    .58
CERTIFIED:   2.85
RTURN RCT:   2.15

TOT CHGS:

Summit, New Jersey  07902

WITNESS: _____
SIGNATURE

APPROVED BY: _____

CHECK#                  DATE:

---

7001 2510 0003 3579 8195

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

Sent To: Lewis J. Thompson, Esq.
Street, Apt No.; or PO Box No.: Attorney at Law  P.O. Box 403
City, State, ZIP+4: Summit, New Jersey 07902

Postage $
Certified Fee
Return Receipt Fee (Endorsement Required)
Restricted Delivery Fee (Endorsement Required)
Total Postage & Fees $

Postmark Here

PS Form 3800, January 2001                See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Lewis J. Thompson, Esq.
Attorney at Law
P.O. Box 403
Summit, New Jersey 07902

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☐ Agent  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery  02/02/08

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

Lewis Thompson

3. Service Type
☑ Certified Mail     ☐ Express Mail
☐ Registered         ☑ Return Receipt for Merchandise
☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)     ☐ Yes

2. Article Number
(Transfer from service label)   7001 2510 0003 3579 8195

PS Form 3811, August 2001       Domestic Return Receipt       102595-01-M-2509

SA 99



## State of New Jersey

OFFICE OF THE PUBLIC DEFENDER
APPELLATE SECTION
31 CLINTON STREET, 9TH FLOOR
P.O. BOX 46003
NEWARK NJ 07101

CHRISTINE TODD WHITMAN
*Governor*

IVELISSE TORRES
*Public Defender*

TEL: (973) 877-1200
FAX: (973) 877-1239

July 21, 1999

Mr. Marvin Mathis, #304144
New Jersey State Prison
Second & Cass Streets
P.O. Box 861
Trenton, New Jersey  08625-0861

Re: **State v. Mathis**
    **Docket No. A-3316-98**

Dear Mr. Mathis:

I have received your letter dated July 12.  I have received almost all of the documents necessary for the appeal.  I am still waiting for copies of your statements and copies of the expert reports used at your waiver hearing.  I was told that I should expect them some time next week.  In the meantime, I have begun writing your brief, concentrating on the issues that do not relate to the missing documents.

You set forth various issues in your letter that you would like to see raised on appeal.  The only issues that I can raise on appeal at this time are issues that can be found in the trial transcript.  In other words, if the judge made improper rulings by allowing prejudicial testimony to come in, or if the prosecutor made improper comments in front of the jury, these are things that can be seen by reading the transcripts and pointed out to the appellate judges.  However, if you want to argue that your trial attorneys were ineffective for not developing the case properly, either by failing to bring in character witnesses or evidence of your status as a special education student, these issues cannot be raised in this appeal because there is nothing in the record to support the arguments.  If we are unsuccessful on appeal, you can then go back to the court on a motion for post-conviction relief, asking for a hearing to establish the issues relating to ineffectiveness of counsel.

DLA 100

-page 2-

    In the meantime, I will continue working on your brief.   If you should still have questions or issues you wish to bring to my attention, please contact me again, either by letter or by phone. As I said in my last letter, I can be reached at the above number between the hours of 9:00 a.m. and 11:00 a.m. or from 2:00 p.m. to 5:00 p.m. on most weekdays.

                Very truly yours,

                Paul M. Klein
                Deputy Public Defender II



Marvin Mathis #304144
New Jersey State Prison
3rd & Federal Street
P.O. Box- 861
Trenton, New Jersey 08625-0861

May 23, 2000

Re; State V. Marvin Mathis
Dockey No. A-3316-98

Dear Mr. Klein

I have received the copies of the transcripts of my
co-defendant's case. Thank you very much. But I also requested
for his jury instructions. And you didn't send that to me.
I really appreciate it, if you could send that to me as soon
as possible.

Mr. Klein, I understand that you have mentioned in all
your previous letters to me that the only issues that you can
raise on appeal are issues that can be found in the trial
transcript. I would like for you to look into a issue in my
trial transcript, Morning Session June 11, 1998, 114-19 thru
117-9. evidence of my status as a special education student.
Here expert testimony was needed in my case. I really appreciate
it, if you would lpok into this

I thank you for your time & patience, I await for your
to reply back to my letter.

Respectfully yours,

Marvin Mathis #304144

CC;filed

JA 102

CO-30 A   NEW JERSEY STATE PRISON
**POSTAGE REMIT**

DATE: 5/24/00   LOCATION: 2-C

INMATE NAME: Marvin Mathis # 304144

INMATE SIGNATURE: Marvin Mathis

TO: BUSINESS MANAGER   DATE MAILED: ____

( ✔ )   Check Appropriate Box (s)

| | | |
|---|---|---|
| | Regu | DUP 5-25-00 Acnt - 304144 Mathis |
| | Legal | TR #11366 I - 11367 |
| ✔ | Certif | 0 lb 0.1 oz T - |
| ✔ | Return | MAN POST $2.65 |
| | Postag | TOTAL=$2.65 |
| | Legal 1 | |
| | Other | |

3252

SENT TO: Paul Klein
ADDRESS: 31 Clinton Street, P.o. Box 46003
Newark, New Jersey 07101

WITNESS: S/O R. Tripe
SIGNATURE: R. Tripe   APPROVED BY: ____

CHECK# ____   DATE: ____

---

7099 3220 0004 4651 3252

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

Article Sent To: Paul Klein

Name (Please Print Clearly) (to be completed by mailer)
Marvin Mathis # 304144
Street, Apt. No., or PO Box No. 3rd & 4 Federal Street
City, State, ZIP + 4 Trenton New Jersey 08625

Postage $

Certified Fee

Return Receipt Fee
(Endorsement Required)

Restricted Delivery Fee
(Endorsement Required)

Total Postage & Fees $

Postmark Here 6/24/00

PS Form 3800, July 1999   See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Paul Klein
Appellate Section
31 Clinton Street 9th floor
P.o. Box 46003
Newark, New Jersey 07101

2. Article Number (Copy from service label)
7099 2220 0004 4651 3252

PS Form 3811   Return Receipt   102595-99-M-1789

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)   B. Date of Delivery

C. Signature
X   ☐ Agent
    ☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☑ No

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☑ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes