THE STATE OF NEW JERSEY,

      Plaintiff-Respondent,

vs.

MARVIN MATHIS,

      Defendant-Appellant.

: Superior Court of New Jersey
: Appellate Division
: Docket No. A-3222-11T1
: Criminal Action
:
: On Appeal from Denial of Petition
: For Post-Conviction Relief
: Superior Court, Law Division
: Criminal Part, Union County
:
: Sat Below
: Hon. John F. Malone, J.S.C.
:
:

---

## BRIEF ON BEHALF OF DEFENDANT-APPELLANT

---

JOSEPH E. KRAKORA
PUBLIC DEFENDER
ATTORNEY FOR APPELLANT
31 CLINTON STREET – 9TH FLOOR
NEWARK, NJ 07101

DEFENDANT IS CONFINED

KIMMO Z. H. ABBASI, ESQ.
103 Godwin Avenue, PMB235
Midland Park, NJ 07432

      Designated Counsel
      Of Counsel and on Brief

# TABLE OF CONTENTS

Page

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . 3

LEGAL ARGUMENT

POINT ONE

THE PCR COURT ERRED IN DENYING MATHIS AN EVIDENTIARY HEARING EVEN THOUGH MATHIS PRESENTED A *PRIMA FACIE* CASE OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL. . . . . . . . . . . . . . . . . .19

POINT TWO

THE PCR COURT ERRED IN DENYING MATHIS'S PETITION FOR POST-CONVICTION RELIEF AS MATHIS SUCCESSFULLY DEMONSTRATED THAT HIS STATEMENTS TO THE POLICE SHOULD HAVE BEEN SUPPRESSED AND MATHIS DID NOT RECEIVE REASONABLE REPRESENTATION OF TRIAL COUNSEL AT THE MIRANDA HEARING . . . . . . . . . . . . . . . . . . 25

POINT THREE

THE PCR COURT ERRED IN DENYING MATHIS'S PETITION FOR POST-CONVICTION RELIEF EVEN THOUGH THE SENTENCE IMPOSED BY THE TRIAL COURT WAS EXCESSIVE, IMPROPER AND OTHERWISE UNCONSTITUTIONAL AND MATHIS DID NOT RECEIVE THE REASONABLE REPRESENTATION OF TRIAL COUNSEL AT SENTENCING . . . . . . . . . . . . . . . . . 37

POINT FOUR

MATHIS INCORPORATES BY REFERENCE THE ARGUMENTS CONTAINED IN HIS INITIAL VERIFIED PETITION AND BRIEF . . . . . . . . . . . 46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . .47

## INDEX TO THE APPENDIX

Juvenile Complaint No. FJ-20-01786-96. . . . . . . . . . . . Da1

Union County Indictment No. 97-01-0123 . . . . . . . . . . . Da2

Judgment of Conviction . . . . . . . . . . . . . . . . . . . Da6

Appellate Division Decision, dated June 2, 2000. . . . . . . Da8

Notice of Petition for Certification . . . . . . . . . . . .Da48

Order Denying Petition for Certification . . . . . . . . . .Da49

Pro-Se Petition for Post-Conviction Relief . . . . . . . . .Da50

Pro-Se Memorandum of Law in Support of Post-Conviction Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Da58

Pro-Se Letter Brief in Support of PCR . . . . . . . . . . .Da127

State's Brief in Opposition to PCR. . . . . . . . . . . . .Da143

Order Denying PCR . . . . . . . . . . . . . . . . . . . . .Da150

Appellate Division Decision . . . . . . . . . . . . . . . .Da151

Supplemental Brief in Support of PCR. . . . . . . . . . . .Da162

Order Denying PCR . . . . . . . . . . . . . . . . . . . . .Da245

Notice of Appeal. . . . . . . . . . . . . . . . . . . . . .Da246

## TABLE OF CASES CITED

**Federal Cases**

Apprendi v. New Jersey, 530 U.S. 466. 120 S.Ct. 2348 (2000) . 44

Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004) . .44

Columbe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860 (1961) . .28

Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880 (1981) . . . 25

Evitts v. Lucey, 469 U.S. 387, 105 S.Ct. 830 (1985) . . . . . 19

Jones v. Barnes, 463 U.S. 648, 103 S.Ct. 3308 (1983). . . . . 20

Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215 (1999) . 45

Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489 (1964) . . . . . . 26

Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d. 182
(1974). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d. 694
(1966). . . . . . . . . . . . . . . . . . . . . . . . passim

New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626 (1984). . . 25

Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d. 923
(1965). . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 204 (1973). 28

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2051 (1984) .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United State v. Cronic, 466 U.S. 648, 104 S.Ct. 2039 (1984) . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Withrow v. Williams, 507 U.S. 680, 113 S.Ct. 1745 (1993). . . 28

**State Cases**

State v. Afanador, 151 N.J. 41 (1991) . . . . . . . . . . . 19

(iii)

State v. Benoit, 126 N.J. 6 (1985) . . . . . . . . . . .26

State v. Budis, 125 N.J. 519 (1991). . . . . . . . . . .41

State v. Cook, 47 N.J. 402 (1966). . . . . . . . . . . .35

State v. Dalziel, 182 N.J. 494 (2005). . . . . . . . . .43

State v. Davis, 116 N.J. 341 (1989). . . . . . . . . . .21

State v. Dunbar, 108 N.J. 80 (1987). . . . . . . . . . .40

State v. Fritz, 105 N.J. 42 (1987) . . . . . . . . . 19,21

State v. James, 144 N.J. 538 (1996). . . . . . . . . . .43

State v. Johnson, 116 N.J. 99 (1989) . . . . . . . . 26,28

State v. Preciose, 129 N.J. 451 (1992) . . . . . . . . .19

State v. Presha, 163 N.J. 304 (2000) . . . . . . . . . .34

State v. Roth, 95 N.J. 334 (1984). . . . . . . . . . 37,43

State v. Rue, 175 N.J. 1 (2002). . . . . . . . . . . . .3

State v. Smith, 58 N.J. 202 (1971) . . . . . . . . . . .25

State v. Webster, 187 N.J. 254 (2006). . . . . . . . .3,46

State v. Yough, 49 N.J. 587 (1967) . . . . . . . . . 26,28

State in the Interest of R.W., 200 N.J. Super. 560 (App. Div. 1985) modified, 104 N.J. 14 (1986) . . . . . . . . . . . . .21

State v. Martelli, 201 N.J. Super. 378 (App. Div. 1985). . . .38

State v. Natale, 373 N.J. Super. 226 (App. Div. 2004), aff'd in part rev'd in part, 184 N.J. 458 (2005). . . . . . . . . . . .44

State v. Spano, 128 N.J. Super. 90 (App. Div. 1973), aff'd, 64 N.J. 566 (1974). . . . . . . . . . . . . . . . . . . . .21

State v. Tanksley, 245 N.J. Super. 390 (App. Div. 1991). . . .40

**CONSTITUTIONS**

United States Const., Amend V. . . . . . . . . . . . . . . .44

United States Const., Amend VI . . . . . . . . . . . . . . .44

United States Const., Amend XIV. . . . . . . . . . . . . . .44

N.J. Const., Art. I, Para 7. . . . . . . . . . . . . . . . .44

N.J. Const., Art. I, Para. 9 . . . . . . . . . . . . . . . .44

N.J. Const., Art. I, Para. 10. . . . . . . . . . . . . . . .44

**STATUTES**

N.J.S.A. 2C:11-3 . . . . . . . . . . . . . . . . . . . . . . 1

N.J.S.A. 2C:15-1 . . . . . . . . . . . . . . . . . . . . . . 1

N.J.S.A. 2C:39-5 . . . . . . . . . . . . . . . . . . . . . . 1

**RULES**

R. 3:10-2. . . . . . . . . . . . . . . . . . . . . . . . . .21

R. 3:22-2. . . . . . . . . . . . . . . . . . . . . . . . . .19

## PROCEDURAL HISTORY

Marvin Mathis was charged in Union County Juvenile Complaint No. FJ-20-1786-96 with acts which, if committed by an adult, would constitute armed robbery, N.J.S.A. 2C:15-1 and 2C:2-6, and felony murder, N.J.S.A. 2C:11-3(a)(3). ("Da1")[1]

Following a juvenile waiver hearing, the Hon. Rudolph N. Hawkins, J.S.C., waived juvenile jurisdiction. (1T 19-15 to 29-21)

On February 4, 1997, a Union County Grand Jury returned Indictment 97-01-1231 charging Mathis with first-degree murder, in violation of N.J.S.A. 2C:11-3(a)(1) and (2), first-degree robbery, in violation of N.J.S.A. 2C:15-1; first-degree felony murder, in violation of N.J.S.A. 2C:11-3(a)(3); second-degree possession of a firearm of an unlawful purpose, in violation of N.J.S.A. 2C:39-4(a); and third-degree possession of a weapon for

---

[1] Da refers to Petitioner's Appendix
1T    refers to Transcript of November 11, 1996 Juvenile Waiver Hearing
2T    refers to Transcript of June 9, 1998 Miranda Hearing
3T    refers to Transcript of June 10, 1998 Miranda Hearing
4T    refers to Transcript of June 11, 1998 Trial, a.m. session
5T    refers to Transcript of June 11, 1998 Trial, p.m. session
6T    refers to Transcript of June 16, 1998 Trial
7T    refers to Transcript of June 17, 1998 Trial, a.m. session
8T    refers to Transcript of June 17, 1998 Trial, p.m. session
9T    refers to Transcript of June 18, 1998 Trial
10T   refers to Transcript of August 14, 1998 Sentence
11T   refers to Transcript of February 29, 2008 PCR Motion
12T   refers to Transcript of January 27, 2012 PCR Motion

an unlawful purpose, in violation of N.J.S.A. 2C:39-5(b). ("Da2 to Da5")

Following an unsuccessful Miranda[2] motion before the Hon. John F. Malone, J.S.C., on June 9 and 10, 1998, Mathis was tried before Judge Malone and a jury on June 10, 11, 16, 17 and 18, 1998. Mathis was convicted of all charges. (7T 82-18 to 84-1)

On August 14, 1998, Judge Malone sentenced Mathis to an aggregate term of 50 years in New Jersey State Prison, with 30 years of parole ineligibility. The appropriate statutory penalties were imposed and Mathis was given credit of 934 days for time spent in custody. ("Da6-Da7")(8T 10-16 to 12-6)

A Notice of Appeal was filed on behalf of Mathis. On June 2, 2000, in a *per curiam* opinion, the Appellate Division affirmed Mathis's convictions and the sentences imposed. ("Da8-Da47") A Notice of Petition for Certification was filed on or about June 15, 2000. ("Da48") On October 11, 2000, the New Jersey Supreme Court denied certification. ("Da48-Da49")

On September 25, 2003, Mathis filed a first Petition for Post-Conviction relief. ("Da50-Da57");("Da58-Da126");("Da127 to Da142") On February 29, 2008, Judge Malone denied Mathis's petition for post-conviction relief. ("Da150")

Mathis appealed the denial of his petition for post-conviction relief. On October 12, 2010, in a *per curiam*

---

[2] Miranda v. Arizona, 384 U.S. 1034, 104 S. Ct. 1304 (1966)

2

decision, the Appellate Division reversed and remanded the matter predicated upon PCR Counsel's failure to comply with R. 3:22-6(d), Rue and Webster."[3] ("Da151-Da161") A Supplemental Brief in Support of Post-Conviction Relief was filed on or about October 11, 2011. ("Da162-Da244.5") On January 27, 2012, the Hon. John F. Malone, J.S.C., denied Mathis's Petition for Post-Conviction Relief. ("Da245") A Notice of Appeal was subsequently filed. ("Da246")

**STATEMENT OF FACTS**

Antonia Saraiva and her husband, Antonio, owned the Portuguese American Wine and Liquor store on East Jersey Street in Elizabeth, N.J. According to Mrs. Saraiva, on January 22, 1996, sometime after 10:00 p.m., Mr. Saraiva closed the store and carried the trash out to the street. Mrs. Saraiva, who remained in the store, heard shots, ran out from the back of the store, and down an alleyway to the locked security gates. She saw her husband on the ground. A "dark man," a "Jamaican" who used to frequent their store, was calling her husband by name. (1T 41-9 to 44-1; 1T47-2 to 9) Mrs. Saraiva ran back into the house to get keys for the security gates. When she returned and opened the gates, her husband was alone and unconscious. (1T 44-2 to 16)

---

[3] State v. Rue, 175 N.J. 1 (2002); State v. Webster, 187 N.J. 254 (2006)

The Union County Medical Examiner found a single bullet wound to Mr. Saraiva's head; she estimated that the gun was shot from a distance of eighteen inches or less. (4T 23-1 to 5; 4T 25-3 to 28-18; 4T 34-7 to 12) The wound would have caused death within a few minutes. (4T 31-15 to 18)

Elizabeth police officers Gene Antonucci and Rocco Malgieri responded to the scene of the shooting. (1T 48-18 to 50-10; 1T 51-16 to 18) Antonucci searched the area for bullets or bullet casings, but found none. (1T 52-12 to 17) Malgieri found Saraiva's brown leather wallet on nearby South Park Street. (1T 59-14 to 63-13)

When Mathis' girlfriend, Sharlama Brooks, saw him in school the morning after the shooting, he asked her to tell anyone who asked that he was with her the night before between the hours of 7pm to 11pm. Brooks, who was home alone during those hours, was not willing to say they had been together. (1T 65-1 to 66-18) When she questioned Mathis about his request, he turned away from her and said that if he told her, she would "black out," which she took to mean that she would "get mad at him." (1T 66-21 to 67-7) Brooks told Mathis that on the previous night a man had confronted her and told her that Mathis had killed someone. At first, Mathis denied it, but he then told Brooks that "they was struggling I guess when the man was taking out the garbage and gun [sic] had went off, but it was by mistake." (1T 74-1 to

4

75-13) In her statement to the police, Brooks stated that Mathis told her he was walking with some friends, and "Marvin went to grab the guy, and as soon as he grab [sic] the guy the gun went off." (1T 76-24 to 77-3)

After Mathis told Brooks about the shooting, she became upset and started to cry. A school security guard who observed her crying took her to Janice Sutton, a substance abuse counselor. Brooks was still upset and crying when she related the story to Janice Sutton, a high school counselor.(1T 77-2 to 79-51) The police were summoned, and Brooks was transported to the police station where she gave a statement. (1T 79-9 to 14)

Janice Sutton, the high-school counselor, testified at trial about her meeting with Sharlama Brooks. Brooks said her boyfriend had been involved in a shooting or a murder; Sutton could not remember the exact words used by Brooks. Sutton also stated that Brooks may have indicated that her boyfriend's name was Marvin. (4T 19-1 to 21-3; 4T 22-9 to 17) Sutton took Brooks to the principal's office. She later accompanied her to the police station and was present when Brooks gave her statement. (4T 21-20 to 22-6)

Detective Thomas Koczur took Brook's statement, after which he had Mathis transported to the police station. (2T 3-17 to 5-2; 2T 6-6 to 7-12) When Koczur first encountered Mathis in a conference room, he was not under arrest and was not in

5

handcuffs. (2T 8-1 to 15) Koczur had another officer transport Mathis's mother to headquarters. (2T 8-19 to 9-10)

Koczur advised Mathis's mother that her son was a suspect in a homicide. He explained the procedures they would be following and purportedly informed them of Mathis's rights. (2T 9-15 to 10-3) Koczur also advised Mathis of his rights. Mathis indicated that he understood those rights and agreed to answer questions. Mathis's mother added her consent. (2T 12-6 to 16-11)

At first, Mathis denied any involvement in the homicide, stating that he was either at a different location or with his girlfriend at the time. When Koczur confronted Mathis with Brooks's statement, Mathis called her a liar. As he was confronted with further inconsistencies in his story, Mathis requested that his mother leave the room, and he then gave a statement admitting his presence at the shooting. (2T 17-2 to 19-21) In his oral statement, Mathis said that he, Antwan Harvey, and a man from Carteret called "Boz," were involved in the shooting. At the conclusion of the oral interview, Koczur took what would be the first of the two written statements. (2T 20-17 to 21-18; 2T 36-16 to 24)

In the first statement, Mathis indicated that he met Harvey and Boz sometime after 7:00p.m., on January 22, 1996. Harvey and Boz were looking for someone to rob, and they wanted Mathis to hold the gun. Mathis refused. (2T 21-21 to 30-23) Harvey came

upon a man who owned a liquor store as he was taking out the garbage and told the man, later identified as Saraiva, to empty his pockets. When Saraiva said no, Harvey tried to go through his pockets. According to Mathis, the following events transpired,

> Then they started fighting. The man threw a punch at Antwan (Harvey), and then Antwan threw a punch back. Then Antwan pushed him, then he shot him. The man fell. Antwan went into his pockets. He then told me to go into his pockets. I said no. He then called me a punk. Then I was in shock.

(2T 31-9 to 18)

Following the shooting, they ran off. (2T 31-19 to 22) Before leaving, Harvey took the victim's wallet from his right back pocket. (2T 34-12 to 16)

After they took the first statement, the police executed a warrant at a residence in Carteret, where Detective John Furda of the Union County Prosecutor's office seized items of clothing described by Mathis. (2T 43-23 to 44-23) With the consent of Mathis and his mother, Detective Furda searched their home and seized pants fitting the description Mathis gave of the pants he wore the night of the robbery. (2T 47-19 to 49-25; 3T 158-3 to 159-25)

While Furda was searching Mathis's home, Koczur met with other investigators. He returned to question Mathis again,

telling Mathis he did not believe what he had said in his first statement. (2T 50-13 to 51-12)

At his second interview, Mathis indicated that the gun went off during a struggle between him and Harvey. Mathis was trying to stop Harvey from shooting the liquor store owner. In his second statement, Mathis indicated that at about eight o'clock on the night of the offense, he met Harvey on a street corner in Elizabeth, and they then met April and Renee Diggs at a nearby Chinese restaurant. Mathis, Harvey, and the Diggs cousins intended to participate in a robbery. (2T 51-13 to 21; 2T 56-23 to 59-14; 2T 63-17) While walking on Elizabeth Avenue, Harvey displayed a black revolver and asked Mathis to act as lookout during the robbery. When Harvey suggested robbing a man standing nearby, Mathis told him not to. Mathis also told Harvey he would not participate in the robbery of a nearby deli. (2T 59-15 to 61-5) As they continued walking, the four of them came upon "two Spanish boys." Harvey and April "started running after them real hard, and me and the other girl jogged after them." The Spanish boys outran them. (2T 61-20 to 62-6)

The four continued walking. By the time they came upon Saraiva, it was no longer Mathis's intention to take part in a robbery. Mathis explained that Saraiva was shot while Harvey was attempting to rob him. Harvey first tried to search Saraiva's pockets, prompting Saraiva to slap Harvey's hand. Harvey grabbed

8

Saraiva, who then grabbed Harvey. They exchanged punches, and Harvey pulled out a gun, which Saraiva grabbed. Mathis joined the struggle to prevent Harvey from shooting Saraiva. During the three-way struggle, the gun went off twice. The second shot struck the victim. Mathis did not believe that Harvey intended to shoot anyone. After the shooting, Harvey went through Saraiva's pockets. Neither Mathis nor the two women, who had been serving as lookouts, touched Saravia. (2T 62-7 to 15; 2T 63-25 to 66-18) During Mathis's statement, the detective asked him: "So all four of you committed this robbery?" Unlike Mathis's other answers, which were all typed, that question was answered with a handwritten "yes," followed by Mathis's initials. Koczur believed that Mathis had written the answer when he read the completed statement. (2T 69-2 to 70-14; 2T 88-4 to 89-12) During his testimony, Mathis denied ever having written "yes" on the statement. (4T 155-9 to 24)

As a result of Mathis's statements, arrest warrants were authorized for April and Renee Diggs and Antwan Harvey, and the police seized clothing Mathis had said they wore during the robbery, including a black ski mask which was obtained pursuant to a warrant from the home of Stephen Owens, a close friend of all the defendants. (2T 76-2 to 79-4)

Migdalia Hernandez, who lived with Owens in Elizabeth, testified that Mathis, Harvey, and the Diggs were friends of

hers, and regularly visited her apartment. (3T 166-5 to 167-24) They were all in her apartment on January 22, 1996. As the four were leaving, Hernandez heard "one of them say they had a gun." She did not know who made the statement, nor did she ever see a gun. (3T 167-25 to 168-14; 3T 174-2 to 3) When they left, Mathis and Harvey were carrying black face masks. The four returned about an hour later, and the two males were still carrying the face masks.

Hernandez did not remember what time the four left or when they returned. (3T 169-15 to 170-16) Hernandez waited six months before giving this information to the police, claiming that although they were all close friends, and Harvey visited her virtually every day, she did not know that they had all been arrested in January. She did not learn of the arrests until the police came to her house six months later. (3T 172-10 to 173-20)

In exchange for their pleas to armed robbery, April Diggs, who was 17 years old at the time of the shooting, and her cousin Renee, who was 22, both testified for the State. As a condition of their plea agreements, they were to receive sentences of 15 years with five-year parole bars. As part of the agreement, which would shield them from charges of murder, they had to testify against both Mathis and Harvey. (3T 177-3 to 16; 4T 51-14 to 51-23; 4T 74-1 to 10) According to April, on January 22, she and her cousin Renee met Harvey and Mathis, not in the

10

Hernandez apartment as Hernandez testified, but at a Chinese restaurant. When they left the restaurant, April believed they were headed toward a liquor store. As they reached the pharmacy across the street from the Portuguese American Liquor store, Harvey announced that he "wanted to go rob somebody, and he wanted us to lookout." (3T 180-14 to 181-16; 3T 211-9 to 17) April and Mathis continued walking, but said nothing. Harvey said "something about busting somebody," and Mathis said he would too. April thought they meant to shoot someone. At this point, Harvey gave Mathis a small black gun. (3T 181-17 to 182-15; 3T 183-9 to 15) When the prosecutor showed April the gun taken from Harvey's house, she stated that this was not the gun Harvey had on the night of the shooting. Harvey's gun had a different color handle. (3T 182-19 to 183-4)

As they walked, April observed a man, later identified as Saraiva, coming out of his house with the garbage. Harvey ran toward Saraiva, with Mathis following. April continued walking, but turned when she heard one of two gunshots. She saw Saraiva fall and Mathis and Harvey run off. April did not see the shooting, but Renee told her that Mathis shot Saraiva. (3T 183-19 to 185-16; 3T 186-12 to 15; 3T 204-10 to 17) Later that evening, at Hernandez's house, April asked Mathis why he shot Saraiva. Mathis said it was because the man grabbed him. (3T 187-5 to 16) In her statement to the police and at her guilty

11

plea, April indicated that it was Mathis who fired the gun. (3T 187-5 to 16). In her statement she also indicated that she did not participate in the robbery or serve as a lookout. She pled guilty because the state agreed not to prosecute her for felony-murder. (3T 199-3 to 200-10)

According to April, they did not chase anyone before they assaulted Saraiva, and they did not discuss robbing a deli. (3T 201-16 to 202-6) She did not remember seeing Mathis or Harvey wearing masks on the night of the shooting. (3T 206-2 to 12) After the shooting, both April and Renee saw a man from the neighborhood, whom she knew as "Jamaica" going through the victim's pockets. (3T 204-21 to 205-15; 4T 72-15 to 73-3) April denied that Harvey told her to place the blame on Mathis. (3T 203-8 to 12)

Herminia Garcia, a social worker at the Union County juvenile detention center, testified that April told her that neither she, her cousin Renee, nor Mathis had anything to do with the shooting, and that a fourth individual who was with them was responsible for the shooting. (4T 110-1 to 111-12) Garcia could not remember the date April made that statement, nor did she make a written notation of the conversation. She advised April to give the information to her attorney. (4T 112-2 to 115-23; 4T 123-19 to 22)

Renee Diggs testified that Harvey and Mathis asked her and her cousin to serve as lookouts for a robbery. (4T 45-6 to 47-8) Although April testified that they did not accost anyone else prior to the Saraiva robbery (3T 201-16 to 202-6), Renee stated that Harvey and Mathis had chased two "Spanish men." (4T 47-16 to 48-7) At some point, Harvey pulled a gun from his pants and started "acting crazy with the gun." According to Renee, Harvey was "just showing off," although he released the safety control and indicated that he was going to shoot some cops who were walking nearby. (4T 61-17 to 62-6; 4T 64-3 to 19)

When they came upon the man taking out the garbage, Renee heard Mathis say, "That one right there." (4T 49-19 to 50-1) Although she did not see the transaction, Renee assumed that Harvey gave his gun to Mathis, because she observed Harvey give something to Mathis and saw Mathis go up to the man taking out the garbage. Renee saw the man grab Mathis by the jacket, saw a flash of light, and then saw the man fall. Mathis and Harvey then ran from the scene together. (4T 50-3 to 51-8; 4T 63-11 to 25)

Renee also claimed that when she saw Harvey hand Mathis the gun, Mathis said, "Oh, yes, it's on." (4T 54-5 to 13) On the day of her arrest, January 25, 1996, Renee gave a statement to the police identifying Mathis as the shooter. (4T 51-24 to 52-13) Contrary to April's testimony, Renee claimed they did not

13

encounter Mathis on the stairs when they returned to Hernandez's apartment. (4T 65-3 to 23)

Renee admitted that she was afraid of Harvey and did not leave the group when there was talk of committing a robbery because Harvey physically prevented her from doing so. She denied, however, that Harvey threatened her and told her to place blame on Mathis because Mathis was a juvenile. (4T 66-23 to 67-5)

Damina Arcos testified that she met Renee Diggs in jail. In November of 1997, Renee told her that it was Harvey who shot the liquor store owner. (6T 140-20 to 41-19)   Arcos had learned about the trial from Detective Koczur a week before the trial. She told Koczur about Renee's statement, and he told her to bring the information to the prosecutor. (6T 142-22 to 144-24)

Three days after the shooting, Detective Furda, accompanied by Carteret Police Detective-Sergeant McFadden, arrested Harvey at his home in Carteret. McFadden retrieved an unloaded .32 caliber revolver from a crawl space at the top of the stairs leading to the second floor. The gun was dark blue and appeared almost black. (3T 160-1 to 161-23; 3T 164-11 to 165-22) According to Furda, without bullets or casings, there was no way to determine whether the firearm was the one used to shoot Saraiva. (3T 162-2 to 7) Neither Mathis nor Harvey had a permit to purchase or carry a handgun. (4T 36-17 to 37-12)

Two of Mathis's teachers, Ronald Orr and Belquis Fernandez, testified on his behalf, indicating that they knew Mathis to be truthful. (4T 91-7 to 15; 4T 97-15 to 102-24)

Marvin Mathis denied that he possessed a gun, participated in a robbery, or shot anyone on January 22, 1996. (4T 157-8 to 18) On the evening of January 22, he was walking in Elizabeth with Harvey and the Diggs cousins. Harvey noticed a man waiting for a bus and asked the girls to see if the man was wearing any gold jewelry. When the girls reported that he was, and Mathis realized that Harvey wanted to rob him, Mathis told Harvey not to. (4T 130-20 to 133-17) April then urged Harvey to rob the owner of the deli they were passing. Mathis refused to serve as a lookout, and they continued walking. (4T 133-23 to 134-7; 5T 39-23 to 22) Thereafter, Harvey and April ran after two "Spanish boys," and Mathis and Renee jogged behind, but the boys outran them. (4T 134-8 to 17; 5T 95-1 to 6) Mathis did not know Harvey had a gun until he pulled it out and started "acting crazy" and "showing off". At one point, Harvey said he wanted to shoot at police officers who were walking nearby. He took the safety attachment off the gun, but did not pull the trigger. Mathis was scared, but thought that if he tried to leave Harvey would shoot him. When Renee had tried to leave, Harvey grabbed her and refused to let her leave. (4T 134-18 to 135-25; 5T 57-15 to 21).

15

When they reached the corner of Seventh and East Jersey, Harvey noticed Saraiva taking out his garbage and told the girls to serve as lookouts. Harvey asked Mathis to be a lookout, but he refused. (4T 136-10 to 16) Mathis was scared. He walked across the street and stood next to a Chinese restaurant. Harvey approached Saraiva and it sounded like he was telling Saraiva to empty his pockets. Harvey tried to reach into Saraiva's pockets and Saraiva slapped Harvey's hand down. At that point, Harvey grabbed Saraiva and the man grabbed Harvey, and they traded punches. Harvey pulled out his gun and Saraiva grabbed for it. As the two struggled, Mathis grabbed Harvey's arm to prevent him from shooting Saraiva.  The gun went off once, missing Saraiva, and Harvey fired a second shot that struck him. (4T 136-17 to 25; 4T 139-1 to 140-10) Mathis was shocked when Saraiva fell, and he ran off with Harvey. (4T 140-13 to 170).

Mathis had not intended to participate in the robbery or help Harvey in any way. (4T 141-2 to 5) He did not leave Harvey once he realized Harvey wanted to commit a robbery because he was afraid Harvey would shoot him. (4T 152-19 to 21)  After the shooting, Mathis ran home, refusing to take the gun from Harvey. At no time did Mathis possess the gun. (4T 141-15 to 142-10)

Mathis denied asking his girlfriend Sharlama Brooks to say that he was with her on the night of the shooting. According to

16

Mathis, "I say if anyone ask if I was with her…that she don't know." (4T 142-22 to 143-20) He also denied ever telling her that he had shot someone accidentally. (5T 69-23 to 25) With regard to the questioning at police headquarters, Mathis indicated that he was not given a choice about going there, and was scared. Moreover, although he signed the rights form, the police were "rushing" him, and his understanding of his rights was "not that good". Although his first statement to the police was not true, due to his being scared and confused, his second statement was truthful. (4T 145-22 to 152-8; 4T 168-25 to 169-5; 5T 3-11 to 4-18)

On the morning of January 24, Mathis's mother, Linda Mathis, was taken by the police from her job to police headquarters so that she could be present while they questioned her son. Ms. Mathis did not recall much of what transpired, but she did remember that her son claimed he had not known what Harvey was up to and that he "didn't do anything"; "he said he wasn't involved." (6T 146-20 to 148-13; 6T 155-15 to 17) Her son was questioned until midnight. At one point she and her son signed a consent-to-search form, and she accompanied the police to her house where they conducted a search. (6T 149-2 to 151-14) Ms. Mathis indicated that she signed and understood the form explaining Mathis's constitutional rights. (6T 151-16 to 23) Although Mathis believed one of the detectives was "putting

17

words" in her son's mouth (6T 156-24 to 25), she and her son

both signed his statement. (6T 157-4 to 21)

LEGAL ARGUMENT

POINT ONE

THE PCR COURT ERRED IN DENYING MATHIS AN EVIDENTIARY HEARING EVEN THOUGH MATHIS PRESENTED A *PRIMA FACIE* CASE OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

Mathis presented a *prima facie* case of ineffective assistance of trial counsel.

Post-conviction relief is New Jersey's analogue to the writ of habeas corpus. State v. Preciose, 129 N.J. 451, 458 (1992); State v. Afanador, 151 N.J. 41, 49 (1991). New Jersey Court R. 3:22-2 provides four grounds for post-conviction relief: (a) "substantial" denial in the conviction proceeding of a defendant's state and federal constitutional rights; (b) a sentencing court's lack of jurisdiction; (c) an unlawful sentence; and (d) any *habeas corpus*, common law, or statutory grounds for collateral attack.

A criminal defendant is guaranteed effective assistance of trial and appellate counsel. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2051 (1984), Evitts v. Lucey, 469 U.S. 387, 105 S.Ct. 830 (1985). New Jersey adopted the Strickland standard in State v. Fritz, 105 N.J. 42, 58 (1987). In some cases counsel's performance is so woefully inadequate that it amounts to a complete denial of counsel; prejudice is presumed and reversal is warranted. United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039 (1984).

19

To satisfy the Sixth Amendment requirement, counsel must function as an advocate for the defendant. Jones v. Barnes, 463 U.S. 745, 758, 103 S.Ct. 3308, 3316 (1983)(Brennan J. dissenting). If effectiveness is not presumed as in Cronic, Strickland v. Washington, 466 U.S. at 668, 104 S.Ct. at 2051, established a two-pronged test to identify whether counsel's assistance was inadequate:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed defendant by the Sixth Amendment. Second, the defendant must show the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction. . .resulted from a breakdown in the adversarial process that renders the result unreliable.

Strickland v. Washington, supra, 466 U.S. at 681, 104 S.Ct. at 2064.

With respect to deficient performance, the test is "whether counsel's conduct fell below an objective standard of reasonableness." Strickland v. Washington, Id. The proper measure of an attorney's conduct in the case is "reasonable under the prevailing professional norms." Id. If counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to

defendant's conviction, the constitutional rights will have been violated. State v. Fritz, 105 N.J. at 58.

In State v. Davis, 116 N.J. 341 (1989), the New Jersey Supreme Court noted that "the measure of an advocate's competence depends on the task to be accomplished." Id. at 356. Accordingly, an analysis of whether counsel has rendered "reasonably competent" representation must take into account consideration of the nature of the issues which could have been addressed on direct appeal and an analysis of whether trial counsel has rendered "reasonably competent" representation as well. When a defendant presents a prima facie showing of ineffective assistance of counsel, such a claim should be resolved at an evidentiary hearing. State v. Preciose, 129 N.J. at 462.

Here, Mathis presented a prima facie case of ineffective assistance of counsel and should have been granted an evidentiary hearing.

Mathis contends that trial counsel was ineffective in failing to argue the deficiency of the Indictment and grand jury proceedings. ("Da64-Da68") Ordinarily, defects in the Indictment should ordinarily be deemed waived unless raised by motion under R. 3:10-2 before trial. See State in the Interest of R.W., 200 N.J. Super. 560 (App. Div. 1985), modified, 104 N.J. 14 (1986); State v. Spano, 128 N.J. Super 90 (App. Div. 1973), aff'd, 64

21

N.J. 566 (1974). Nevertheless, because of the ineffective nature of Mathis's previous counsel, the deficiency of the grand jury should have been presented in the original petition for post-conviction relief taking into account the allegations of ineffective assistance of trial and appellate counsel.

Mathis also argued that the grand jury who returned the indictment against him was not made up of a fair cross section of the community. ("Da52") Mathis claims that he was denied Equal Protection and Due Process of Law because of the "lack of Blacks and Hispanics" on the grand jury and defense counsel failed to properly assert these constitutional deprivations on Mathis's behalf.

Mathis further argues that with regard to the petit jury, "[t]here was an under representation of Blacks and Hispanics in the pool that Mathis's jury was selected from." ("Da53") According to Mathis, he "is Black and should have been afforded a jury of his peers selected from a cross-section of the community." Mathis maintains that trial counsel was wholly ineffective in failing to argue for a proper jury panel.

A criminal defendant is entitled a fair trial by an impartial jury. In fact, the fundamental right to a fair trial and an impartial jury is guaranteed by the Sixth Amendment of the United States Constitution and Art. I, par. 10 of the New Jersey Constitution. Mathis maintains that by virtue of trial

counsel's ineffective representation, he was denied a fair trial.

Mathis maintained that, with regard to the Juvenile Waiver Hearing, "Other Groups (Caucasians) are Less Likely To Be Waived Up" and, therefore, as a result of his race, he was denied Equal Protection under the law. ("Da52" and "Da53") Nonetheless, in the administration of criminal justice, no person should be subject to greater or different punishment for an offense than that to which others of the same class are subjected. State v. Smith, 58 N.J. 202 (1971). Mathis submits that by virtue of the inequality at Juvenile Waiver Hearings, as aforementioned, he was exposed, and sentenced to a much more lengthy term of incarceration.

Finally in his *Pro Se* Petition for Post-Conviction Relief, Mathis stated that his convictions were wrongly based upon perjured testimony. Specifically, according to Mathis, "State's witness Migdalia Hernandez testified falsely about the events at her apartment when the four persons allegedly involved in the incident returned to her apartment. She also testified falsely about the date of the incident, masks and the person who stated that someone had been shot." ("Da52" and "Da53")(3T 180-14 to 181-16; 3T 211-9 to 17) Mathis asserts that his trial attorney did not adequately address the trial testimony of Hernandez or

the inconsistencies between her testimony and that of co-defendant April Diggs. (3T 180-14 to 181-16; 3T 211-9 to 17)

Mathis maintains that he was denied his constitutional right to the effective assistance of trial counsel; it is contended that trial counsel's performance was not reasonable and given trial counsel's failures, as aforementioned, the PCR Court erred in denying Mathis an evidentiary hearing.

## POINT TWO

THE PCR COURT ERRED IN DENYING MATHIS'S PETITION FOR POST-CONVICTION RELIEF AS MATHIS SUCCESSFULLY DEMONSTRATED THAT HIS STATEMENTS TO THE POLICE SHOULD HAVE BEEN SUPPRESSED AS MATHIS DID NOT RECEIVE REASONABLE REPRESENTATION OF TRIAL COUNSEL AT THE MIRANDA HEARING.

Mathis's statements to the police should have been suppressed as not voluntary. Interrogation by police in certain custodial circumstances is inherently coercive and statements made under those circumstances are inadmissible unless a suspect is specifically informed of his Miranda rights and freely decides to forgo those rights. Miranda v. Arizona, supra, 384 U.S. at 436, 86 S.Ct. at 1602. Requiring Miranda warnings before custodial interrogation provides reinforcement for the Fifth Amendment right against compulsory self-incrimination. New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626 (1984) citing Michigan v. Tucker, 417 U.S. 433, 444, 94 S.Ct. 2357, 2364 (1974); Edwards v. Arizona, 451 U.S. 477, 492, 101 S.Ct. 1880 (1981) (Powell, J., concurring).

To be valid, a waiver of the Defendant's rights to remain silent must be made "voluntarily, knowingly and intelligently." [emphasis added]. United States Constitution, Amend. V.; Miranda

v. Arizona, supra, 384 U.S. at 444, 86 S.Ct. at 1610 Pursuant to the decision of the United States Supreme Court in Miranda v. Arizona, when, on its case-in-chief, the State seeks to introduce into evidence a statement that is the product of a custodial interrogation, it must show that the defendant was advised of his right to remain silent and his right to retained or appointed counsel. Furthermore, a "heavy burden" rests on the government to demonstrate that the defendant knowingly and intelligently waived these rights. Id., 384 U.S. at 475, 86 S.Ct. at 1641.

In New Jersey, the State carries the burden of proof beyond a reasonable doubt. State v. Johnson, 116 N.J. 99 (1989); State v. Yough, 49 N.J. 587, 600 (1967).

The Fifth and Fourteenth Amendments of the Federal Constitution prohibit the State from forcing persons to disclose information that would tend to incriminate them in future proceedings. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489 (1964).

With regard to the case at bar, Mathis argues that because he was a juvenile (a boy just two months shy of his sixteenth birthday), he should have first been advised of the possibility of prosecution as an adult, in order for the statements to be admissible. Mathis further contends that law enforcement's failure to do so should have resulted in the suppression of his statements. (Da73-Da77)

Mathis argues that because he was not advised of the possibility that he would be prosecuted as an adult, it cannot be said that he knowingly and intelligently waived his rights. As a result, his purportedly voluntary statements should have been suppressed.

In this case, while trial counsel did seek to suppress Mathis's statements, Mathis's trial attorney did not raise this issue regarding law enforcement's failure to provide this additional warning concerning the possibility that Mathis would be prosecuted as an adult. Nonetheless, Mathis maintains that because he was not so advised that he might be prosecuted as an adult, he did not knowingly, voluntarily, and intelligently waive his constitutional rights thereby requiring that his statements be suppressed.

Unfortunately, in support of Mathis's motion to suppress his statements, trial counsel also failed to present evidence of Mathis's learning disability and special education status. This was clearly documented in Mathis's school records. In advance of the juvenile waiver hearing, Mathis was also evaluated by three psychologists to assess the likelihood of successful rehabilitation within the juvenile justice system. These psychologists determined that Mathis functioned at a low intellectual level.

Trial counsel's failure to present this evidence to the Court cannot be deemed to have been harmless. In denying the motion to suppress, the trial court noted that he did "not find credible defendant's testimony that he didn't understand what was being read to him." (1T 16-7 to 13)

Mathis maintains that had trial counsel presented evidence of his low intellectual functioning level, which would have corroborated his claims that he did not understand what was transpiring, the motion to suppress would have been granted. (Da78-Da85)

In determining whether or not Mathis gave a voluntary statement, the Court must assess the totality of all the surrounding circumstances. Columbe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860 (1961); Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041 (1973); Withrow v. Williams, 507 U.S. 680, 113 S.Ct, 1745 (1993); State v. Johnson, 116 N.J. at 99, State v. Yough, 49 N.J. at 600. Mathis contends that his mental or developmental condition impaired his ability to comprehend his choices and must be factored into the Court's determination of voluntariness. As a result of the ineffectiveness of trial counsel, this evidence was never presented and the PCR Court erred in denying Mathis's petition for post-conviction relief.

Mathis also argues that he did not voluntarily, knowingly, and intelligently waive his Miranda rights before making

28

statements to police. Trial counsel summarized Mathis's position as follows:

> "I don't think in that two minutes period that those five questions could be read and initialed and answered in two minutes and in a knowing manner, especially since my clients own testimony indicated that he didn't understood these rights at that time."

(1T 10-22 to 11-1)

Mathis testified at the Miranda hearing as follows:

> Q.   Back then what didn't you understand?   Let's go through it all over.   You have a right to remain silent.   Did you understand that at that point in time?
> A.   Yes
> Q.   I mean, that's as simple as it can be: You can keep your mouth shut.   You knew that, right?
> A.   Yes
> Q.   And anything you say can and will be used against you in a court of law: And you understood that right, because that's so very simple?
> A.   Yes.
> Q.   If you say something police are going to use it against you, right?
> A.   Yes.
> Q.   You have a right to talk to a lawyer and have him present while you are being questioned?   You knew what a lawyer was?
> A.   Yes.  I, at that time I didn't know I could have had a lawyer present, you know, I didn't know that.
> Q.   Did you think you could have a lawyer only later on?
> A.   Like on in the future.  Yes.
> Q.   But in terms of present, you didn't understand that?
> A.   I didn't understand.
> Q.   Was it the word "present" that you didn't understand?
> A.   Sort of.
> Q.   All right.   So when they read this to you: You have a right to talk to a lawyer, you understood up to that point, right?
> A.   Yes.

Q.   And have him present while you were being
questioned.  Okay.  You understand while you are being
questioned, right?
A.   Yes.
Q.   And have him, you understood?
     A.   Right.
Q.   So 'present' was the only word you didn't
understand?
A.   Yes.
           *      *      *      *      *
Q.   If you cannot afford to hire a lawyer one will be
appointed to represent you before any questioning if
you wish : Did you understand that back then?
A.   No.
Q.   What didn't you understand?
A.   The part, "if you wish," I didn't understand.
Q.   'If you wish' you did not understand?
A.   Yes.
(2T 114-14 to 117-3)

In denying the motion to suppress, the trial court
determined,

> **I do not find credible defendant's testimony that he
> didn't understand what was being read to him.** On cross
> examination, Mr. Kolano went through the form with him
> and indicated phrase by phrase almost word by what was
> contained in the form, and there the answers given by
> the defendant did not suggest that he was, that he did
> not understand what was contained in the form.

(1T 16-7 to 13)

When rendering this determination, the trial court was not
aware of Mathis's severe learning disability. Presentation of
this evidence by trial counsel of Mathis's severe learning
disability would have corroborated Mathis's testimony that he
did not fully understand the Miranda rights. The only reference
the Court heard of this extensive evidence were contained in

30

three questions trial counsel posed to Detective Koczur at the
Miranda hearing:

> Q. And were you aware that he was a special education
> student in school?
> A. No.
> Q. So you weren't aware he may have had certain
> learning disabilities that made it difficult for him
> to understand any of these things?
> A. No.
> Q. So you just assumed in the two minutes that you
> read this that he understood everything?
> A. Yes.

(2T 48-15 to 24)

Notwithstanding this testimony, Mathis's special education
status was documented in Mathis's school records and from
reports of the three psychologists aforementioned. These
psychologists also determined that Mathis functioned at a low
intellectual level.

Specifically, Cheryl L. Thompson, PHD, who administered a
mental status exam and reviewed Mathis's school records,
estimated Mathis's intelligence as "Borderline to Low
Average[,]" ("Da97") Mathis described himself to Dr. Thompson as
"a school person[,]" but Mathis's "school record reflects severe
learning problems that became obvious in first grade. Mathis was
retained in first and second grades. He was placed in a special
education program because he was never able to learn basic
reading, writing and computation." ("Da97")

31

Dr. Thompson described Mathis as "not bright" and "is easily confused." ("Da98") She concluded that the Mathis "should have a complete diagnostic assessment as he may be functioning as [sic] the level of retardation." Id.

Dr. Martha H. Page also administered several tests to Mathis and also reviewed his school records. ("Da101 to Da110") In her report, she recounts Mathis's school history, which documents years of learning disability, including that Mathis was classified as Special Education, Communication Handicap. ("Da107 to Da109") The results of the tests Dr. Page administered to Mathis showed him to be "functioning at the intellectually deficient to borderline range of intelligence[,]" though "[p]otential intellectual functioning was in the borderline to low average level of intelligence." ("Da106")

According to Dr. Page, Mathis "found it difficult to process verbally presented material rapidly" and his "[a]bility to define words as well below average". "Certainly, the CST's classification of [Mathis] as Communication Handicapped was an appropriate one." "[I]t was evident that [Mathis's] academic skills were still quite low and further impaired when he felt under pressure to achieve or was in a less than well-controlled structured situation." ("Da107") Dr. Page concluded that Mr. Mathis "had considerable difficulty in thinking analytically and accurately especially when he felt under pressure." ("Da109")

In his report, Dr. Louis B. Schlesinger wrote:

> [Defendant] is currently functioning within the high end of the borderline range of intelligence, gaining a Full Scale IQ of 79 (Verbal IQ = 80; Performance IQ = 83). Verbal skills within low end of dull-normal range. Fund of general information is weak, suggesting that Marvin has not profited a great deal from school or experience. For example, he did not know the number of weeks in a year, the identity of Louis Armstrong, the direction travelled from Chicago to Panama, the location of Brazil, the author of Hamlet, the President during the Civil War, and other simple facts. Vocabulary is equally poor and far below average capacity as he was unable to define such words as fabric, assemble, conceal, consume, regulate, and the like...In general, verbal skills fall within low end of dull-normal range...(Da118)

Trial counsel represented Mathis at the juvenile waiver hearing and, therefore, was well aware of the evidence of Mathis's low intellectual functioning. In fact, it was trial counsel that was the one who had referred Mathis to Dr. Thompson and to Dr. Page. Moreover, trial counsel undoubtedly received through discovery a copy of the aforementioned report prepared by Dr. Schlesinger (to whom Mathis was referred to by the State.) Under these circumstances, Mathis contends that trial counsel was ineffective for failing to present at the Miranda hearing the extensive evidence of Mathis's low intellectual functioning.

In order to sustain his claim of ineffective assistance of counsel, Mathis must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed

defendant by the Sixth Amendment[,]" and that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, supra, 466 U.S. at 668, 104 S.Ct. at 2052.

"In determining whether a defendant in police custody has voluntarily, knowingly, and intelligently waived his Miranda rights, a trial court looks at several factors, including the defendant's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." State v. Presha, 163 N.J. 304, 313 (2000). "[A] suspect's previous encounters with the law also has [also] been mentioned as [a] relevant factor." Ibid.

Here, trial counsel rightly focused on the fact that Mathis was a juvenile and on Mathis's lack of a prior record. (1T 9-24 to 10-8) Counsel was remiss, however, in failing to present the evidence of Mathis's testimony about his inability to understand simple words in the language of the rights read to him came off as incredible and appeared as a transparent attempt to get a favorable ruling.

Yet, the aforementioned documented evidence of Mathis's verbal skills shortcomings amply supports, and is consistent

34

with, Mathis's testimony at the Miranda hearing that he could not understand the warnings. Moreover, trial counsel's failure to introduce this evidence at the Miranda hearing can only be characterized as unreasonable because the omitted evidence bore directly on the question whether Mathis voluntarily, knowingly, and intelligently waived his rights.

Counsel's failure to present this highly relevant evidence also prejudiced Mathis because a reasonable probability exists that the inclusion of this evidence, combined with Mathis's young age and lack of background in the criminal justice system, would have affected the outcome of the Miranda hearing. See State v. Cook, 47 N.J. 402, 418 (1966)(defendant's low intelligence combined with other factors weighed against a finding that his confessions were the product of a free and unconstrained will) Furthermore, a reasonable probability exists that suppression of Mathis's statement would have affected the outcome of his trial because Mathis's statements constituted a significant part of the State's case.

As can be seen from this overwhelming evidence, Mathis is an educationally impaired youth with a "borderline range of intelligence". ("Da106") The school records coupled with the psychological evaluations prepared for the juvenile waiver hearing, as illustrated about, clearly reflect that Mathis had "severe learning problems that became obvious in first grade."

In fact, Mathis was even retained in first and second grades. Moreover, Mathis was placed in a special education program "because he was never able to learn basic reading, writing and computation." ("Da97")

As a result of trial counsel failing to present this evidence to the Court during the suppression hearing, the Court was unable to properly weigh all the relevant factors in assessing the voluntariness of Mathis's statements and whether Mathis truly knowingly and intelligently waived his rights.

Mathis did not knowingly, voluntarily, and intelligently waive his constitutional rights. As a result, his statements should have been suppressed. It is further submitted that Mathis received the ineffective assistance of trial counsel, and by virtue of that ineffective representation, the PCR Court erred in denying Mathis's petition for post-conviction relief.

## POINT THREE

**THE PCR COURT ERRED IN DENYING MATHIS'S PETITION FOR POST-CONVICTION RELIEF EVEN THOUGH THE SENTENCE IMPOSED BY THE TRIAL COURT WAS EXCESSIVE, IMPROPER AND OTHERWISE UNCONSTITUTIONAL AND MATHIS DID NOT RECEIVE THE REASONABLE REPRESENTATION OF TRIAL COUNSEL AT SENTENCING.**

In reviewing a sentence imposed under the Code of Criminal Justice, the Supreme Court will always require that any exercise of discretion be based upon findings of fact that are grounded in competent, reasonably credible evidence, and that the fact finder apply correct legal principles in exercising its discretion, and will modify a sentence when the application of the facts to the law is such a clear error of judgment that it shocks the judicial conscience. State v. Roth, 95 N.J. 334, 353-366 (1984).

When reviewing a sentence, the court can determine if legislative policies were violated, can consider aggravating and mitigating factors found by the trial court to determine whether those factors were based upon competent, credible evidence in the record, and can determine whether, even though the court sentenced in accordance with the guidelines to the facts of the case makes the sentence clearly unreasonable. Id. at 358-366.

Here, the Court found two aggravating factors: aggravating factor (2), the gravity and seriousness of harm inflicted on the

victim, including whether or not the defendant knew of reasonably should have known that the victim of the offence was particularly vulnerable or incapable of resistance, and aggravating factor (9), the need for deterring the defendant and others from violating the law. The Court found only one mitigating factor: mitigating factor (7), the defendant has no history of prior delinquency or criminal activity or has led a law abiding life for a substantial period of time before the commission of present offense. The Court concluded that the aggravating factors in this case "clearly and convincingly outweighed the mitigating factors that a sentence above the minimum for this crime must be imposed." (8T 10-12 to 15)

Mathis argues that the sentencing court's findings as to the applicable aggravating and mitigating factors were flawed. Specifically, the aggravating factors applied by the Judge were enumerated without any effort to distinguish the instant case from other cases involving the same offense. State v. Martelli, 201 N.J. Super. 378, 386 (App. Div. 1985)(holding that that the aggravating factors found by a sentencing judge should be those which distinguish the case at hand from other cases involving the same offense). Otherwise, appellate review of the sentence is frustrated. Id. at 385.

Here, the sentencing judge failed to give any indication, whatsoever, as to how the aggravating factors were more

38

important considerations from other cases involving the same offense. State v. Martelli, supra, 201 N.J. Super. at 385-86 (sentencing ordered in part because record does not disclose "what special need to deterrence or non-depreciation of the offence differentiates this case for other cases. . .")

While it is true that mitigating factors were not properly presented by trial counsel, the sentencing Court, nonetheless, failed to properly apply mitigating factors that were clearly present in this case. By way of example, at the time of sentencing, Mathis expressed his sincere regret and remorse for the events that resulted in the loss of a life:

> I would like to say I am sorry to the family for what happened. I tried to stop what happened, but it was too late. I am very sorry it happened.
>
>            *     *     *     *     *
>
> I understand somebody got killed, you know. I am very sorry to the family, and I just say I am sorry.
>
> You know, I tried to stop what happened that night, but it was too late. If there was anything to go back in time and stop what happened, I would, but I can't. What's done is done. And I just, you know, I hurt a lot of people, I hurt my family, my friends, you know. Like I said, I am very sorry.

(8T 4-13 to 5-9)

Mathis took that opportunity solely to express his genuine remorse to the victim's family for what had happened. The underlying offense represented Mathis's first indictable conviction. Given Mathis's lack of record, coupled with his

remorse and regret, along with the realization of how he had hurt the ones closest to him, it is respectfully submitted that the Court should have also considered mitigating factor (8), the defendant's conduct was the result of circumstances unlikely to recur and mitigating factor (9), the character and attitude of the defendant indicate that he is unlikely to commit another offense.

Mathis further argues that the sentencing judge should have also given weight to the non-statutory mitigating factor of Mathis's relative youth, as Mathis was shy of his sixteenth birthday when this incident occurred.

New Jersey courts have held that a defendant's relative youth is a relevant factor that should be considered in sentencing. See State v. Dunbar, 108 N.J. 80, 96 (1987) (recognizing that defendant's relative youth "ordinarily would inure to his benefit"); State v. Tanksley, 245 N.J. Super. 390, 397 (App. Div. 1991) (holding that the youth of a defendant may be considered as a mitigating factor even if there is no evidence he was influenced by an older person).

Here, Mathis was also influenced by older persons. As pointed out by trial counsel at the sentencing hearing, "two of the three people who Mathis was involved with were older than him." (8T 3-1 to 3-3) This is especially true given that Mathis was also a special education student with a learning disability.

This was documented in Mathis's school records.  In advance of the juvenile waiver hearing, Mathis was also evaluated by psychologists to assess the likelihood of successful rehabilitation within the juvenile justice system.  With regard to Mathis's low intellectual functioning level, Mathis contends that the Court should have also found mitigating factor number (4). There were substantial grounds tending to excuse or justify the Mathis's conduct, though failing to establish a defense.

Mathis argues that the Court should have also found mitigating factor (11), the imprisonment of the defendant would entail excessive hardship to himself or his defendants. Again, Mathis, having been evaluated by experts, was found to be "not bright" and "easily confused." ("Da98") One expert even opined that Mathis "may be functioning at the level of retardation." ("Da99")

In any event, it is further submitted that the Mathis's limited intellectual abilities should have also been considered by the Court in assessing and weighing the other aforementioned mitigating factors. Not a single witness was proffered by trial counsel at the sentencing hearing, even though counsel was obviously aware that such witnesses were available. Trial counsel sought to have the Court consider such evidence without actually proffering same:

41

The court recalls the trial. **I think two teachers tried or attempted to testify as to his good character. There were other teachers present who weren't called.** In any case there were at least half dozen teachers that had him in class that were willing to come forward because he was such an excellent student. Even the primary witness I feel against him was his girlfriend, and she indicated that she was stunned.   Counselor who she went to was stunned, everyone was stunned; they couldn't believe that Marvin could get involved in something like this.

*      *      *      *      *

There was also Miss Garcia who testified in the case about what she was told by one of the Diggs sisters.

In any case, prior to that she had written a letter indicating her strong support for Marvin, and she felt that he could be rehabilitated and he was basically a good person.

[emphasis added] (8T 3-4 to 3-24)

Notwithstanding trial counsel's failure to call any witnesses at the sentencing hearing, as can be seen from trial counsel's remarks, there were obviously witnesses that could have, and should have, been called by counsel in support of the mitigating factors. Certainly witnesses would have been more persuasive that simply relying on counsel's argument. In fact, as can be seen from counsel's comments, he could not even remember how many witnesses were presented at trial, nor did he articulate well their assertions regarding the defendant's good character.

Notwithstanding trial counsel's shortcomings, it is submitted that the sentencing Court does not have discretion to reject, altogether, a mitigating factor that is supported by the

record. To the contrary, where mitigating factors are amply based in the record before the sentencing judge, they must be found. To be sure, there may be afforded such weight as the Court determines is appropriate. "That is a far cry, however, from suggesting that a judge may simply decline to take into account a mitigating factor that is fully supported by the evidence. Such a reading of the statute flies in the face of our sentencing scheme and the well-established rule that aggravating and mitigating factors must be supported by credible evidence." State v. Dalziel, 182 N.J. 494 (2005) citing State v. Roth, 95 N.J. 334, 356-64 (1984)

Based upon the foregoing, it is submitted that the sentence imposed by the sentencing court was improper as that Court did not apply all the appropriate mitigating factors that were present. It is further submitted that the weight given by the Judge to the aggravating and mitigating factors were inappropriate.

Mathis maintains that he received the ineffective assistance of trial counsel at the sentencing hearing thereby making his sentence further constitutionally deficient. It is respectfully submitted that trial counsel was wholly ineffective for not specifically setting forth the mitigating factors which were present in this case that should have been considered and applied by the Court at the time of sentencing. Trial counsel

also failed to object to the Court's improper consideration of, and/or weight given to, the aggravating factors.

Trial counsel also failed to proffer witnesses at sentencing that could have further substantiated the aforementioned mitigating factors.

In his *pro se* petition, Mathis contends that the sentencing Judge "exceeded his proper authority" when a sentence of fifty years was imposed; Mathis asserts that he should have received a maximum of thirty years because the findings to enhance the sentence were not found by a jury. See Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004), Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), State v. Natale, 373 N.J. Super. 226 (App. Div. 2004) (ruling that New Jersey's sentencing guidelines pursuant to N.J.S.A. 2C:44-1a runs afoul of Blakely).

"[T]he Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury." Blakely, supra, at 2540.

As such, Mathis submits that the enhanced sentence imposed upon him violates his state and federal constitutional rights to trial by jury and due process of law, and must be vacated. U.S Const. Amends. VI, XIV; N.J. Const. Art. I, Par. 1, 9 and 10.

In an earlier opinion, the Supreme Court held that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." Jones v. United States, 526 U.S. 227, 243, n.6, 119 S.Ct. 1215, (1999).

For the same reason, it is urged that Mathis was denied equal protection under the law. Specifically, in his *Pro Se* Petition, Mathis contends that he was denied equal protection because of his race. According to Mathis, "Other Groups (Caucasians) Are Less Likely To Be Waived Up To Adult Court, And Are Often Not." ("Da50 to Da57")

Based on the foregoing, the PCR Court erred in denying Mathis Petition for Post-Conviction Relief even though the sentence imposed by the trial court was excessive, improper and unconstitutional and Mathis did not receive reasonable representation by trial counsel at sentencing.

## POINT FOUR

**MATHIS INCORPORATES BY REFERENCE THE ARGUMENTS CONTAINED IN HIS INITIAL VERTIFIED PETITION AND BRIEF.**

Pursuant to State v. Webster, 187 N.J. 254 (2006), PCR Counsel is required to advance all arguments that can be made in support of the petition and to have the court consider them on their merits. Accordingly, Mathis asserts all claims and arguments contained in the Mathis's *pro-se* brief. These arguments, as presented in the Mathis's *pro-se* brief and petition are hereby incorporated by reference and presented to the court for consideration.

**CONCLUSION**

For all the foregoing reasons, Mathis respectfully requests that this Court reverse the PCR Court decision denying Mathis's petition post-conviction relief. Alternatively, the PRC Court erred in denying Mathis an evidentiary hearing on his petition for post-conviction relief.

Respectfully Submitted,

JOSEPH E. KRAKORA
PUBLIC DEFENDER
ATTORNEY FOR
DEFENDANT-PETITIONER

By: _____

Kimmo Z. H. Abbasi
Designated Counsel

February 25, 2013