THE STATE OF NEW JERSEY,   : Superior Court of New Jersey
             : Appellate Division
   Plaintiff-Respondent,  : Docket No. A-3222-11T1
             : Criminal Action
vs.            :
             : On Appeal from Denial of Petition
MARVIN MATHIS,      : For Post-Conviction Relief
             : Superior Court, Law Division
             : Criminal Part, Union County
   Defendant-Appellant.  :
             : Sat Below
             : Hon. John F. Malone, J.S.C.
             :
             :

## APPENDIX ON BEHALF OF DEFENDANT-APPELLANT
## VOLUME III
## (Da151-Da246)

JOSEPH E. KRAKORA
PUBLIC DEFENDER
ATTORNEY FOR APPELLANT
31 CLINTON STREET – 9TH FLOOR
NEWARK, NJ 07101

DEFENDANT IS CONFINED

KIMMO Z. H. ABBASI, ESQ.
103 Godwin Avenue, PMB235
Midland Park, NJ 07432

   Designated Counsel
   Of Counsel and on Brief

## INDEX TO THE APPENDIX

Juvenile Complaint No. FJ-20-01786-96. . . . . . . . . . . . Da1

Union County Indictment No. 97-01-0123 . . . . . . . . . . . Da2

Judgment of Conviction . . . . . . . . . . . . . . . . . . . Da6

Appellate Division Decision, dated June 2, 2000. . . . . . . Da8

Notice of Petition for Certification . . . . . . . . . . . . .Da48

Order Denying Petition for Certification . . . . . . . . . . .Da49

Pro-Se Petition for Post-Conviction Relief . . . . . . . . .Da50

Pro-Se Memorandum of Law in Support of Post-Conviction Relief. .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Da58

Pro-Se Letter Brief in Support of PCR . . . . . . . . . . .Da127

State's Brief in Opposition to PCR. . . . . . . . . . . . .Da143

Order Denying PCR . . . . . . . . . . . . . . . . . . . . .Da150

Appellate Division Decision . . . . . . . . . . . . . . . .Da151

Supplemental Brief in Support of PCR. . . . . . . . . . . .Da162

Order Denying PCR . . . . . . . . . . . . . . . . . . . . .Da245

Notice of Appeal. . . . . . . . . . . . . . . . . . . . . .Da246

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3695-07T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARVIN MATHIS,

    Defendant-Appellant.

---

Submitted September 21, 2010 - Decided October 12, 2010

Before Judges Wefing, Baxter and Koblitz.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 97-02-0123.

Yvonne Smith Segars, Public Defender, attorney for appellant (Alan I. Smith, Designated Counsel, on the brief).

Theodore J. Romankow, Union County Prosecutor, attorney for respondent (Sara B. Liebman, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

    Defendant Marvin Mathis appeals from a February 29, 2008

Law Division order denying his petition for post-conviction

relief (PCR).   On appeal, assigned counsel raises the following

claims:

> I. THE ORDER DENYING POST-CONVICTION RELIEF SHOULD BE REVERSED BECAUSE PCR COUNSEL DEPRIVED DEFENDANT OF HIS RIGHT TO A RUE "HEARING" BY FAILING TO PREPARE A BRIEF ON BEHALF OF THE DEFENDANT.
>
> II. THE ORDER DENYING POST-CONVICTION RELIEF SHOULD BE REVERSED BECAUSE THE COURT MISAPPLIED THE PROCEDURAL BARS OF R. 3:22-4 AND R. 3:22-5.
>
> III. THE COURT ERRED IN DENYING POST-CONVICTION RELIEF BECAUSE TRIAL COUNSEL'S FAILURE TO PRESENT EVIDENCE THAT THE DEFENDANT WAS DIAGNOSED WITH A PERSONALITY DISORDER AND COGNITIVE LIMITATIONS AND WAS FOUND TO BE FUNCTIONING AT THE BORDERLINE LEVEL OF RETARDATION DURING THE PRETRIAL MIRANDA HEARING, DURING THE TRIAL, AND AT SENTENCING SATISFIED BOTH PRONGS OF THE STRICKLAND/FRITZ TEST FOR INEFFECTIVE ASSISTANCE OF COUNSEL, AND APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THESE ISSUES ON APPEAL.
>
> IV. THE COURT'S RULING DENYING POST-CONVICTION RELIEF VIOLATED THE DEFENDANT'S RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL, APPELLATE, AND POST-CONVICTION RELIEF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, PARAGRAPH 10, OF THE NEW JERSEY CONSTITUTION.
>
> V. DEFENDANT REASSERTS ALL OTHER ISSUES RAISED IN HIS PRO SE PETITION AND BRIEFS IN SUPPORT OF POST-CONVICTION RELIEF.

In a pro se supplemental brief, defendant presents the

following additional arguments:

2

A-3695-07T4

Da 152

I. THE DEFENDANT['S] RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. I, PAR. 10 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY ASSIGNED PCR COUNSEL['S] FAILURE TO COMPLY WITH R. 3:22-6(D) BY NOT ADVANCING THE DEFENDANT'S ARGUMENTS SET FORTH IN HIS FEBRUARY 24, 2005 PRO SE MEMORANDUM OF LAW AND APPENDIX ON PCR.

A. PCR Counsel Failed to Investigate, Interview and Secure Affidavits from Three Expert Witnesses, Such Psychological Evidence was Crucial in Advancing Defendant's Competency Claim on PCR, Contrary to the Sixth and Fourteenth Amendment.

B. PCR Counsel Failed to Raise on PCR Ineffective Assistance of Appellate Counsel [who] Fail[ed] to Raise on Direct Appeal, Trial Counsel's Failure to Elicit the Aid of an Expert Witness to Illustrate Defendant's Limited Mental Ability and His Status as a Special Education Student, Contrary to the Sixth and Fourteenth Amendment.

We agree with defendant and assigned counsel that PCR counsel rendered ineffective assistance when he failed to prepare a brief on behalf of defendant, or, at a minimum, failed to certify that after reviewing the pro se petition and brief he was satisfied that no further argument or elaboration was required. We reverse the denial of PCR and remand for a new hearing.

3                                          A-3695-07T4

Da 153

I.

After being waived from the Family Part to the Law Division, defendant was tried as an adult on an indictment charging him with the murder of a shopkeeper in Elizabeth, for which he was sentenced upon conviction to a fifty-five year term of imprisonment with a thirty-year period of parole ineligibility.

On direct appeal, we rejected defendant's claim that: the Family Part's waiver of jurisdiction was error; the improper admission of hearsay evidence denied him a fair trial; the prosecutor's closing argument contained numerous instances of prosecutorial misconduct; and the sentence imposed was excessive. We affirmed defendant's conviction and sentence. State v. Mathis, No. A-3316-98 (App. Div. June 2, 2000) (slip op. at 2). The Supreme Court denied certification. State v. Mathis, 165 N.J. 603 (2000).

On September 25, 2003, defendant filed the PCR petition that is the subject of this appeal. In that pro se petition, defendant argued: perjured testimony had been used to secure his conviction; the petit jury and grand jury were not "made up from a fair cross-section of the community including blacks and Hispanics"; he should have been afforded proportionality review of the waiver decision because Caucasians are less likely to be

4                                         A-3695-07T4

DA 154

waived to adult court than African-Americans; the "egregious" and cumulative errors of trial counsel denied him effective assistance; and appellate counsel rendered ineffective assistance on a number of issues, including his failure to effectively challenge the admission in evidence of the statement defendant gave to police.

In his February 24, 2005 pro se memorandum of law in support of his PCR petition, defendant argued:

> I. Defendant's state constitutional right to indictment by grand jury was violated when the facts required to be found before defendant could be tried as an adult were not charged in the indictment. Furthermore, defendant's federal and state constitutional rights to trial by jury were violated when a judge made the findings that resulted in defendant being tried as an adult, and not as a juvenile.
>
> II. Defendant's federal and state constitutional right to a jury trial were violated when the trial judge found the aggravating factors used to increase defendant's sentence for murder beyond the prescribed maximum. Furthermore, defendant's (state constitutional) right to indictment by grand jury was violated when the aggravating factors used to increase the sentence for murder were not charged in the indictment.
>
> III. Defendant's waiver of his _Miranda_ rights was not knowing and intelligent because defendant was not informed that, although he was a juvenile, any statement made by him could be used against him in a prosecution as an adult.

5

A-3695-07T4

IV. Trial counsel was ineffective for failing to present evidence of defendant's low intellectual functioning in order to establish that defendant's waiver of his <u>Miranda</u> rights was not knowing and intelligent.

V. Trial counsel was ineffective for not presenting in mitigation of sentence the evidence of defendant's low intellectual functioning and personality disorder.

VI. The new rule proposed in Point III should be retroactively applied to defendant.

VII. The claims for relief are not barred by a procedural rule.

In a supplemental pro se letter brief filed in August 2007, defendant added the following additional issue:

I. Trial and appellate counsel were prejudicially ineffective by failing to discover and raise the issue of the defendant's lack of competence to stand trial. <u>N.J. Const.</u> (1947), Art. I, Par. 10; <u>U.S. Const.</u>, Amend V; VI; XIV.

At the February 29, 2008 PCR hearing, PCR counsel did not submit a brief in support of defendant's petition. Nor did he certify that he had conducted an independent review of the record and had determined that there were no additional claims that could be advanced on defendant's behalf. Instead, relying solely on defendant's submissions, PCR counsel's oral argument, in its entirety, was as follows:

I'm not going to go through all the details. You've read the briefs. The

6

A-3695-07T4

DA 156

essence here is that Mr. Mathis has had a long history of cognitive difficulties, inability to understand complex concepts, and problems with school. And these were well documented by [various psychological experts].

And this is not so much a direct challenge to the waiver, but rather a challenge to the effectiveness of the counsel that he had at the time who's now deceased. Inasmuch as trial counsel didn't perceive when he should have the difficulties that this man, Mr. Mathis, was going to have in understanding the charges against him, and understanding the questions asked of him, and understanding the plea offer, and understanding the proceedings in general.

And trial counsel should have basically put forth a defense of inability to stand trial for lack of competence, but this wasn't done, Your Honor. As such this was ineffective to the level of Strickland and the other cases. And we ask that post-conviction relief be granted on this basis, Your Honor.

As is evident from PCR counsel's remarks, he limited his argument to the contention that trial counsel rendered ineffective assistance by failing to retain an expert to evaluate defendant's competence to stand trial. PCR counsel noted that trial counsel did secure an expert who rendered an inconclusive report on defendant's competence to proceed, but when the expert recommended a follow-up psychological evaluation, trial counsel apparently never pursued it. Counsel stated:

A-3695-07T4

Da 157

Your Honor, Dr. Thompson in her own report stated that [defendant] should have a subsequent evaluation, a psychiatric evaluation, to determine his level of retardation and competence. That was not done.

Second of all, Mr. Mathis'[s] functioning level due to maturation and additional training and education now is certainly more than when he was 15 years and 10 months. And as a result saying well, he assisted in preparing these briefs now means that he was competent you know 12 years ago. And that's not necessarily the case, Your Honor.

Unlike PCR counsel, who confined his remarks to only one of the many issues defendant had raised in his memoranda of law, the judge addressed many of the claims defendant had presented. After considering defendant's memoranda of law and the argument of counsel, the trial court denied defendant's petition, finding no legal basis to disturb defendant's conviction and sentence.

## II.

As we recently held in State v. Hicks, 411 N.J. Super. 370, 375 (App. Div. 2010), Rule 3:22-6(d) prohibits PCR counsel from choosing to ignore the arguments advanced by a defendant in support of his petition. In particular, Rule 3:22-6(d) provides, in pertinent part, that PCR "[c]ounsel should advance any grounds insisted upon by defendant notwithstanding that counsel deems them without merit." In State v. Rue, which is

8

A-3695-07T4

DA 158

the seminal opinion addressing the obligations of PCR counsel, the Court pointedly noted:

> PCR is a defendant's last chance to raise constitutional error that may have affected the reliability of his or her criminal conviction. It is not a pro forma ritual.
>
> [State v. Rue, 175 N.J. 1, 18 (2002).]

To satisfy the requirements of Rule 3:22-6(d), PCR counsel must "communicate with his client and investigate the claims" and "then must fashion the most effective arguments possible." Ibid. (quotation and citation omitted).

PCR counsel's role does not end with simply presenting "the most effective arguments possible," ibid., based upon the arguments defendant has already advanced in his PCR petition. Instead, counsel has an affirmative obligation to "determine whether there are additional claims that should be brought forward." State v. Webster, 187 N.J. 254, 257 (2006). In Hicks, supra, elaborating on Webster, we established the following procedures to ensure that a defendant receives the benefit "of having his case independently reviewed by a trained legal professional." Hicks, 411 N.J. Super. at 377. We held:

> In order to give meaning to the requirements of Rule 3:22-6(d), a defendant's pro se presentation should be viewed by counsel as a mere starting point in the process leading to the actual prosecution of the PCR petition. If after reviewing the pro se petition and brief

9

A-3695-07T4

DA 159

> counsel is satisfied that no further
> argument or elaboration is required, counsel
> must so certify to the reviewing court.
> This will provide the court with a reliable
> indication that defendant has received the
> benefits of the attorney's expertise.   In
> the absence of such certification, a
> reviewing court must presume that counsel
> did not make a meaningful effort to comply
> with the requirements of Rule 3:22-6(d).

[Ibid. (emphasis added).]

Here, PCR counsel's performance was deficient in two respects.   First, counsel's oral presentation did not satisfy the standards established by Webster because counsel did not present all of defendant's PCR claims, instead confining his remarks to the issue of competency to proceed.   Even if counsel believed some of defendant's arguments were meritless, Webster obligated counsel, at a minimum, to either list defendant's arguments, or incorporate them by reference, so that the judge would be able to consider the defendant's additional arguments. Webster, supra, 187 N.J. at 257.   Counsel may not simply ignore the arguments he deems unconvincing.   Ibid.   Second, PCR counsel never certified to the court that he had thoroughly reviewed defendant's memoranda and determined that "no further argument or elaboration [was] required."   Hicks, supra, 411 N.J. Super. at 377.

From the record before us, we can have no confidence that defendant received the benefit of the independent review of his

A-3695-07T4

DA 160

claims required by <u>Hicks</u>.  PCR counsel's omissions constitute a structural defect in the proceedings, for which defendant need not demonstrate actual prejudice.  <u>Id.</u> at 376.  The remedy for counsel's failure to conduct an independent investigation of the entire trial record is a remand for a new hearing.  <u>Ibid.</u>

As in <u>Hicks</u>, <u>id.</u> at 377, our determination that the denial of PCR must be reversed and the matter remanded for a new hearing "in no way implies any criticism of the trial court's ruling here."  As is evident from the record, the judge addressed each of defendant's claims, even though PCR counsel made no reference to most of those claims.  Our reversal of the February 29, 2008 order is predicated solely upon PCR counsel's failure to comply with the requirements of <u>Rule</u> 3:22-6(d), <u>Rue</u> and <u>Webster</u>.  In light of this disposition, we need not address the balance of the claims advanced on appeal.  On remand, we recommend that defendant be represented by a different attorney.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

11

A-3695-07T4

RECEIVED AND FILED
SUPERIOR COURT
UNION COUNTY
Criminal Case-Management Office

OCT 11 2011

BERNADETTE A. FIORE, PhD.
Criminal Division Manager

STATE OF NEW JERSEY,

      Plaintiff,

      v.

MARVIN MATHIS,

      Defendant-Petitioner.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: UNION COUNTY

INDICTMENT NO: 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

Criminal Action

PETITION FOR POST-CONVICTION
RELIEF

## BRIEF ON BEHALF OF DEFENDANT-PETITIONER

JOSEPH E. KRAKORA
PUBLIC DEFENDER
ATTORNEY FOR DEFENDANT
31 CLINTON STREET
NEWARK, NJ 07101

CRAIG S. LEEDS
DESIGNATED COUNSEL
1205 ANDERSON AVENUE
SUITE 2
FORT LEE, NJ 07024

Of Counsel and on the Brief

Da162

# TABLE OF CONTENTS

PROCEDURAL HISTORY...........................................1

STATEMENT OF FACTS...........................................4

LEGAL ARGUMENT..............................................13

    POINT I

    DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF
    TRIAL COUNSEL IN VIOLATION OF THE UNITED STATES
    AND NEW JERSEY CONSTITUTIONS................................19

    POINT II

    THE ALLEGED VOLUNTARY STATEMENTS MADE BY DEFENDANT
    SHOULD HAVE BEEN SUPPRESSED.................................36

    POINT III

    THE DEFENDANT WAS DEPRIVED HIS CONSTITUTIONAL RIGHT TO
    PRESENT A DEFENSE..........................................50

    POINT IV

    THE SENTENCE IMPOSED BY THE TRIAL COURT WAS EXCESSIVE,
    IMPROPER AND/OR OTHERWISE UNCONSTITUTIONAL..................54

    POINT V

    THE CUMULATIVE EFFECT OF THE ERRORS COMPLAINED OF
    RENDERED THE TRIAL UNFAIR..................................66

    POINT VI

    DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF
    APPELLATE COUNSEL..........................................68

    POINT VII

    AN EVIDENTIARY HEARING IS REQUIRED WITH REGARD TO
    THE ALLEGATIONS OF HIS PETITION FOR POST CONVICTION
    RELIEF.....................................................71

i

Da163

POINT VIII

THE DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF
SHOULD NOT BE BARRED BY PROCEDURAL CONSIDERATION..........74

CONCLUSION...................................................81

## TABLE TO THE APPENDIX

Juvenile Complaint No. FJ-20-01786-96.......................Da 1

Union County Indictment No. 97-01-0123..............Da 2 to Da 5

Judgment of Conviction............................Da 6 to Da 7

Appellate Division Decision (6/2/00)...............Da 8 to Da 47

Notice of Petition for Certification.......................Da 48

Order Denying Petition for Certification...................Da 49

Pro Se Petition for Post-Conviction Relief.........Da 50 to Da 57

Pro Se Memorandum of Law in Support of PCR........Da 58 to Da 126

      Memorandum of Law..........................Da 58 to Da 95

      Appendix....................................Da 96 to Da 126

            Psychological Assessment of Defendant
            by Dr. Cheryl Thompson.................Da 96 to Da 100

            Psychological Evaluation of Defendant
            by Dr. Martha Page     ...............Da 101 to Da 110

            Psychological Evaluation of Defendant
            by Dr. Louis Schlesinger..............Da 111 to Da 126

Pro Se Letter Brief in Support of PCR...........Da 127 to Da 142

State's Brief in Opposition to PCR..............Da 143 to Da 149

Order Denying PCR.........................................Da 150

Appellate Division Decision (10/12/10)..........Da 151 to Da 161

Da 164

# CRAIG S. LEEDS
## ATTORNEY AT LAW

1205 ANDERSON AVENUE, SUITE 2
FORT LEE, NEW JERSEY 07024

TEL:(201)886-8200
FAX:(201)886-0801

MEMBER N.J. & N.Y. BARS

October 11, 2011

Honorable John F. Malone, J.S.C.
New Jersey Superior Court
Union County Court House
Elizabeth, New Jersey 07207

Re:  State v. Marvin Mathis
     Indictment No: 97-02-0123
     Petition for Post-Conviction Relief

Dear Judge Malone:

Please accept this letter brief in lieu of a more formal brief in further support of defendant's Petition for Post-Conviction Relief.  Defendant shall also rely upon the attached Appendix being file herewith and designated as Da 1 to Da 161.

## PROCEDURAL HISTORY

Marvin Mathis, a boy two months shy of his sixteenth birthday, was charged in Union County Juvenile Complaint No. FJ 20-1786-96 with acts which, if committed by an adult, would constitute armed robbery (N.J.S.A. 2C:15-1 and 2C:2-6) and felony murder (N.J.S.A. 2C:11-3 (a)(3)) (Da 1)

Following a juvenile waiver hearing, the Honorable Rudolph N. Hawkins, J.S.C., decided to waive juvenile jurisdiction. (1MT 19-15 to 29-21)[1]

---

[1]   1MT - transcript of 11/11/96 (Juvenile Waiver Hearing)
      2MT - transcript of 6/9/98 (Miranda Hearing)

1



On February 4, 1997, a Union County Grand Jury returned Indictment No. 97-01-001231 charging Mathis with first-degree murder (<u>N.J.S.A.</u> 2C:11-3a(1) and/or (2)), first-degree robbery (<u>N.J.S.A.</u> 2C:15-1), first-degree felony murder (<u>N.J.S.A.</u> 2C:11-3a(3)), second-degree possession of a firearm for an unlawful purpose (<u>N.J.S.A.</u> 2C:39-4a) and third degree possession of a weapon for an unlawful purpose (<u>N.J.S.A.</u> 2C:39-5b) (Da 2 to Da 5)

Following an unsuccessful <u>Miranda</u>[2] motion before the Honorable John F. Malone, J.S.C., on June 9 and 10, 1998, Mathis was tried before Judge Malone and a jury on June 10, 11, 16, 17, and 18, 1998. Mathis was found guilty of all charges. (7T 82-18 to 84-1)

On August 14, 1998, the court sentenced Mathis to an aggregate term of 50 years in prison, with a parole bar of 30 years. The appropriate statutory penalties were imposed, and Mathis was given credit of 934 days for time spent in custody. (Da 6 to Da 7; 8T 10-16 to 12-6)

A Notice of Appeal was filed on behalf of the defendant. On

---

```
1T - transcript of 6/10/98 (Miranda Hearing/Trial)
2T - transcript of 6/11/98 (Trial) (a.m.)
3T - transcript of 6/11/98 (Trial) (p.m.)
4T - transcript of 6/16/98 (Trial)
5T - transcript of 6/17/98 (Trial) (a.m.)
6T - transcript of 6/17/98 (Trial) (p.m.)
7T - transcript of 6/18/98
8T - transcript of 8/14/98 (Sentencing)
9T - transcript of 2/29/08 (PCR Hearing)
```

[2] <u>Miranda v. Arizona</u>, 384 U.S. 1034, 104 S.Ct. 1304 (1966).

Da166

A Notice of Appeal was filed on behalf of the defendant.   On June 2, 2000, in a *per curiam* opinion, the Appellate Division affirmed the defendant's convictions and sentences imposed. (Da 8 to Da 47)

On October 11, 2000, the New Jersey Supreme Court denied certification. (Da 48; Da 49)

On September 25, 2003, Defendant filed a Petition for Post-Conviction Relief.   (Da 50 to Da 57; Da 58 to Da 126; Da 127 to Da 142)   After presiding over a non-evidentiary hearing on February 29, 2008, Judge Malone denied defendant's application. (Da 150)

Defendant appealed from that denial.   On October 12, 2010, in a *per curiam* decision, the Appellate Division reversed and remanded the matter predicated "upon PCR counsel's failure to comply with the requirements of Rule 3:22-6(d), Rue and Webster."[1] (Da 151 to Da 161)   This brief is submitted in support of the Defendant's Petition for Post-Conviction Relief (on remand).

---

[1]   State v. Rue, 175 N.J. 1 (2002); State v. Webster, 187 N.J. 254 (2006)

Da167

## STATEMENT OF FACTS

This case arises from an incident which occurred on the night of January 22, 1996, wherein Antonio Saraiva was killed in front of his store by a gunshot wound to the head.  The following testimony was presented at trial:

Antonia Saraiva and her husband, Antonio, owned the Portuguese American Wine and Liquor store on East Jersey Street in Elizabeth, and lived in an apartment above the store. According to Mrs. Saraiva, on January 22, 1996, sometime after 10:00 p.m., Mr. Saraiva closed the store and carried the trash cans out to the street.  Mrs. Saraiva, who remained in the store, heard shots, ran out from the back of the store, and down an alleyway to the locked security gates.  She saw her husband on the ground.  A "dark man," a "Jamaican" who used to frequent their store, was calling her husband by name. (1T 41—9 to 44-1; 1T 47-2 to 9)  Mrs. Saraiva ran back into the house to get the keys for the security gates.  When she returned and opened the gates, her husband was alone and unconscious. (1T 44—2 to 16)

Union County Medical Examiner Graciela Linares found a single bullet wound to Mr. Saraiva's head; she estimated that the gun was shot from a distance of eighteen inches or less. (4T 23-1 to 5; 4T 25-3 to 28-18; 4T 34-7 to 12)  The wound would have caused death within a few minutes. (4T 31-15 to 18)

Elizabeth police officers Gene Antonucci and Rocco Malgieri

4

responded to the scene of the shooting. (1T 48-18 to 50-10; 1T 51-16 to 18)  Antonucci searched the area for bullets or bullet casings, but found none. (1T 52-12 to 17)  Malgieri found Saraiva's brown leather wallet on nearby South Park Street. (1T 59-14 to 63-13)

When Mathis's girlfriend, Sharlama Brooks, saw him in school the morning after the shooting, he asked her to tell anyone who asked that he was with her the night before between the hours of seven and 11.  Brooks, who was home alone during those hours, was not willing to say they had been together. (1T 65-1 to 66-18) When she questioned Mathis about his request, he turned away from her and said that if he told her, she would "black out," which she took to mean that she would "get mad at him." (1T 66-21 to 67-7)  Brooks told Mathis that on the previous night a man had confronted her and told her that Mathis had killed someone. At first, Mathis denied it, but he then told Brooks that "they was struggling I guess when the man was taking out the garbage and gun [sic] had went off, but it was by mistake." (1T 74-1 to 75-13)  In her statement to the police, Brooks stated that Mathis told her he was walking with some friends, and "Marvin went to grab the guy, and as soon as he grab [sic] the guy the gun went off." (1T 76-24 to 77-3)

After Mathis told Brooks about the shooting, she became upset and started to cry.  A school security guard who observed

5

her crying took her to Janice Sutton, a substance abuse counselor.  Brooks was still upset and crying when she related the story to Ms. Sutton. (1T 77-2 to 79-51)  The police were summoned, and Brooks was transported to the police station where she gave a statement. (1T 79-9 to 14)

Janice Sutton, the high-school counselor, testified about her meeting with Sharlama Brooks.  Brooks said her boyfriend had been involved in a shooting or a murder; Sutton could not remember the exact words used by Brooks.  Sutton also stated that Brooks may have indicated that her boyfriend's name was Marvin. (4T 19-1 to 21-3; 4T 22-9 to 17)  Sutton took Brooks to the principal's office.  She later accompanied her to the police station and was present when Brooks gave her statement. (4T 21-20 to 22-6)

Detective Thomas Koczur took Brooks's statement, after which he had Mathis transported to the police station. (2T 3-17 to 5-2; 2T 6-6 to 7-12)  When Koczur first encountered Mathis in a conference room, he was not under arrest and was not in handcuffs. (2T 8-1 to 15)  Koczur had another officer transport Mathis's mother to headquarters. (2T 8-19 to 9-10)

Koczur advised Mathis's mother that her son was a suspect in a homicide.  He explained the procedures they would be following and what their rights were. (2T 9-15 to 10-3)  Koczur also advised Mathis of his rights.  Mathis indicated that he

6

Da170

understood those rights and agreed to answer questions.  Mathis's mother added her consent. (2T 12-6 to 16-11)

At first, Mathis denied any involvement in the homicide, stating that he was either at a different location or with his girlfriend at the time.  When Koczur confronted him with Brooks's statement, Mathis called her a liar.  As he was confronted with further inconsistencies in his story, he asked that his mother leave the room, and he then gave a statement admitting his presence at the shooting.  He repeated the statement in his mother's presence. (2T 17-2 to 19-21)  In his oral statement, Mathis said that he, Antwan Harvey, and a man from Carteret called "Boz," were involved in the shooting.  At the conclusion of the oral interview, Koczur took what would be the first of two written statements. (2T 20-17 to 21-18; 2T 36-16 to 24)

In the first statement, Mathis indicated that he met Harvey and Boz sometime after 7:00 p.m. on January 22, 1996.  Harvey and Boz were looking for someone to rob, and they wanted Mathis to hold the gun.  Mathis refused. (2T 21-21 to 30-23)  Harvey came upon a man who owned a liquor store as he was taking out the garbage and told the man, later identified as Saraiva, to empty his pockets.  When Saraiva said no, Harvey tried to go through his pockets:

> Then they started fighting.  The man threw a
> punch at Antwan [Harvey], and then Antwan
> threw a punch back.  Then Antwan pushed him,
> then he shot him.  The man fell.  Antwan went

7

into his pockets.  He then told me to go into
his pockets.  I said no.  He then called me a
punk.  Then I was in shock. (2T 31-9 to 18)

Following the shooting, they ran off. (2T 31-19 to 22)
Before leaving, Harvey took the victim's wallet from his right
back pocket. (2T 34-12 to 16)

After they took the first statement, the police executed a
warrant at a residence in Carteret, where Detective John Furda of
the Union County Prosecutor's Office seized items of clothing
described by Mathis. (2T 43-23 to 44-23)  With the consent of
Mathis and his mother, Detective Furda searched their home and
seized pants fitting the description Mathis gave of the pants he
wore on the night of the robbery. (2T 47-19 to 49-25; 3T 158-3 to
159-25)

While Furda was searching Mathis's home, Koczur met with
other investigators.  He returned to question Mathis again,
telling Mathis he did not believe what he had said in his first
statement. (2T 50-13 to 51-12)

At his second interview, Mathis indicated that the gun went
off during a struggle between him and Harvey.  Mathis was trying
to stop Harvey from shooting the liquor store owner.  In his
second statement, Mathis indicated that at about eight o'clock on
the night of the offense, he met Harvey on a street corner in
Elizabeth, and they then met April and Renee Diggs at a nearby
Chinese restaurant.  Mathis, Harvey, and the Diggs cousins

8

intended to participate in a robbery. (2T 51-13 to 21; 2T 56-23 to 59-14; 2T 63-17)  While walking on Elizabeth Avenue, Harvey displayed a black revolver and asked Mathis to act as lookout during the robbery.  When Harvey suggested robbing a man standing nearby, Mathis told him not to.  Mathis also told Harvey he would not participate in the robbery of a nearby deli. (2T 59-15 to 61-5)  As they continued walking, the four of them came upon "two Spanish boys."  Harvey and April "started running after them real hard, and me and the other girl jogged after them."  The Spanish boys outran them. (2T 61-20 to 62-6)

The four continued walking.  By the time they came upon Saraiva, it was no longer Mathis's intention to take part in a robbery.  Mathis explained that Saraiva was shot while Harvey was attempting to rob him.  Harvey first tried to search Saraiva's pockets, prompting Saraiva to slap Harvey's hand.  Harvey grabbed Saraiva, who then grabbed Harvey.  They exchanged punches, and Harvey pulled out a gun, which Saraiva grabbed.  Mathis joined the struggle to prevent Harvey from shooting Saraiva.  During the three-way struggle, the gun went off twice.  The second shot struck the victim.  Mathis did not believe that Harvey intended to shoot anyone.  After the shooting, Harvey went through Saraiva's pockets.  Neither Mathis or the two women, who had been serving as lookouts, touched Saraiva. (2T 62-7 to 15; 2T 63-25 to 66-18)  During Mathis's statement, the detective asked him: "So

9

all four of you committed this robbery?"  Unlike Mathis's other answers, which were all typed, that question was answered with a handwritten "yes," followed by Mathis's initials.  Koczur believed that Mathis had written the answer when he read the completed statement. (2T 69-6 to 70-14; 2T 88-4 to 89-12)  During his testimony, defendant denied ever having written "yes" on the statement. (4T 155-9 to 24)

As a result of Mathis's statements, arrest warrants were authorized for April and Renee Diggs and Antwan Harvey, and the police seized clothing Mathis had said they wore during the robbery, including a black ski which was obtained pursuant to a warrant from the home of Stephen Owens, a close friend of all the defendants. (2T 76-2 to 79-4)

Migdalia Hernandez, who lived with Owens in Elizabeth, testified that Mathis, Harvey, and the Diggs were friends of hers, and regularly visited her apartment. (3T 166-5 to 167-24) They were all in her apartment on January 22, 1996.  As the four were leaving, Hernandez heard "one of them say they had a gun." She did not know who made the statement, nor did she ever see a gun. (3T 167-25 to 168-14; 3T 174-2 to 3)  When they left, Mathis and Harvey were carrying black face masks.  The four returned about an hour later, and the two males were still carrying the face masks.

Hernandez did not remember what time the four left or when

10

Dal 74

they returned. (3T 169-15 to 170-16)  Hernandez waited six months before giving this information to the police, claiming that although they were all close friends, and Harvey visited her virtually every day, she did not know that they had all been arrested in January.  She did not learn of the arrests until the police came to her house six months later. (3T 172-10 to 173-20)

In exchange for their pleas to armed robbery, April Diggs, who was 17 years old at the time of the shooting, and her cousin Renee, who was 22, both testified for the state.  As a condition of their plea agreements, they were to receive sentences of 15 years with five-year parole bars.  As part of the agreement, which would shield them from charges of murder, they had to testify against both Mathis and Harvey. (3T 177-3 to 16; 4T 51-14 to 51-23; 4T 74-1 to 10)  According to April, on January 22, she and her cousin Renee met Harvey and Mathis, not in the Hernandez apartment as Hernandez testified, but at a Chinese restaurant. When they left the restaurant, April believed they were headed toward a liquor store.  As they reached the pharmacy across the street from the Portuguese American Liquor store, Harvey announced that he "wanted to go rob somebody, and he wanted us to be the lookout." (3T 180-14 to 181-16; 3T 211-9 to 17)  April and Mathis continued walking, but said nothing.  Harvey said "something about busting somebody," and Mathis said he would, too.  April thought they meant to shoot someone.  At this point,

11

Da 175

Harvey gave Mathis a small black gun. (3T 181-17 to 182-15; 3T 183-9 to 15)   When the prosecutor showed April the gun taken from Harvey's house, she stated that this was not the gun Harvey had on the night of the shooting.   Harvey's gun had a different color handle. (3T 182-19 to 183-4)

As they walked, April observed a man, later identified as Saraiva, coming out of his house with the garbage.   Harvey ran toward Saraiva, with Mathis following.   April continued walking, but turned when she heard one or two gunshots.   She saw Saraiva fall and Mathis and Harvey run off.   April did not seen the shooting, but Renee told her that Mathis shot Saraiva. (3T 183-19 to 185-16; 3T 186-12 to 15; 3T 204-10 to 17)   Later that evening, at Hernandez's house, April asked Mathis why he shot Saraiva. Mathis said it was because the man grabbed him. (3T 187-5 to 16) In her statement to the police and at her guilty plea, April indicated that it was Mathis who fired the gun. (3T 188-4 to 10; 3T 196-19 to 25)   In her statement she also indicated that she did not participate in the robbery or serve as a lookout.   She pled guilty because the state agreed not to prosecute her for felony-murder. (3T 199-3 to 200-10)

According to April, they did not chase anyone before they assaulted Saraiva, and they did not discuss robbing a deli. (3T 201-16 to 202-6)   She did not remember seeing Mathis or Harvey wearing masks on the night of the shooting. (3T 206-2 to 12)

12

Da176

After the shooting, both April and Renee saw a man from the neighborhood, whom she knew as "Jamaica" going through the victim's pockets. (3T 204-21 to 205-15; 4T 72-15 to 73-3)  April denied that Harvey told her to place the blame on Mathis. (3T 203-8 to 12)

Herminia Garcia, a social worker at the Union County juvenile detention center, testified that April told her that neither she, her cousin Renee, nor Mathis had anything to do with the shooting, and that a fourth individual who was with them was responsible for the shooting. (4T 110-1 to 111-22)  Garcia could not remember the date April made that statement, nor did she make a written notation of the conversation.  She advised April to give the information to her attorney. (4T 112-2 to 115-23; 4T 123-19 to 22)

Renee Diggs testified that Harvey and Mathis asked her and her cousin to serve as lookouts for a robbery. (4T 45-6 to 47-8) Although April testified that they did not accost anyone else prior to the Saraiva robbery (3T 201-16 to 202-6), Renee stated that Harvey and Mathis had chased two "Spanish men." (4T 47-16 to 48-7)  At some point, Harvey pulled a gun from his pants and started "acting crazy with the gun."  According to Renee, Harvey was "just showing off," although he released the safety control and indicated that he was going to shoot some cops who were walking nearby. (4T 61-17 to 62-6; 4T 64-3 to 19)

Da177

When they came upon the man taking out the garbage, Renee heard Mathis say, "That one right there." (4T 49-19 to 50-1) Although she did not see the transaction, Renee assumed that Harvey gave his gun to Mathis, because she observed Harvey give something to Mathis and saw Mathis go up to the man taking out the garbage.   Renee saw the man grab Mathis by the jacket, saw a flash of light, and then saw the man fall.   Mathis and Harvey then ran from the scene together. (4T 50-3 to 51-8; 4T 63-11 to 25)

Renee also claimed that when she saw Harvey hand Mathis the gun, Mathis said, "Oh, yes, it's on." (4T 54-5 to 13)   On the day of her arrest, January 25, 1996, Renee gave a statement to the police identifying Mathis as the shooter. (4T 51-24 to 52-13) Contrary to April's testimony, Renee claimed they did not encounter Mathis on the stairs when they returned to Hernandez's apartment. (4T 65-3 to 23)

Renee admitted that she was afraid of Harvey and did not leave the group when there was talk of committing a robbery because Harvey physically prevented her from doing so.   She denied, however, that Harvey threatened her and told her to place blame on Mathis because Mathis was a juvenile. (4T 66-23 to 67-5)

Damina Arcos testified that she met Renee Diggs in jail.   In November of 1997, Renee told her that it was Harvey who shot the liquor store owner. (6T 140-20 to 41-19)   Arcos had learned about

14

Da178

the trial from Detective Koczur a week before the trial.   She told Koczur about Renee's statement, and he told her to bring the information the prosecutor. (6T 142-22 to 144-24)

Three days after the shooting, Detective Furda, accompanied by Carteret Police Detective-Sergeant McFadden, arrested Harvey at his home in Carteret.   McFadden retrieved an unloaded  .32 caliber revolver from a crawl space at the top of the stairs leading to the second floor.   The gun was dark blue and appeared to be almost black. (3T 160-1 to 161-23; 3T 164-11 to 165-22) According to Furda, without bullets or casings, there was no way to determine whether the firearm was the one used to shoot Saraiva. (3T 162-2 to 7)  Neither Mathis nor Harvey had a permit to purchase or carry a handgun. (4T 36-17 to 37-12)

Two of Mathis's teachers, Ronald Orr and Belquis Fernandez, testified on his behalf, indicating that they knew Mathis to be truthful. (4T 91-7 to 15; 4T 97-15 to 102-24)

Marvin Mathis denied that he possessed a gun, participated in a robbery, or shot anyone on January 22, 1996. (4T 157-8 to 18)  On the evening of January 22, he was walking in Elizabeth with Harvey and the Diggs cousins.   Harvey noticed a man waiting for a bus and asked the girls to see if the man was wearing any gold jewelry . When the girls reported that he was, and Mathis realized that Harvey wanted to rob him, Mathis told Harvey not to. (4T 130-20 to 133-17)  April then urged Harvey to rob the

Da179

owner of a deli they were passing.  Mathis refused to serve as a
lookout, and they continued walking. (4T 133-23 to 134-7; 5T 39-3
to 22)  Thereafter, Harvey and April ran after two "Spanish
boys," and Mathis and Renee jogged behind, but the boys outran
them. (4T 134-8 to 17; 5T 95-1 to 6)  Mathis did not know Harvey
had a gun until he pulled it out and started "acting crazy" and
"showing off."  At one point, Harvey said he wanted to shoot at
police officers who were walking nearby.  He took the safety
attachment off of the gun, but did not pull the trigger.  Mathis
was scared, but thought that if he tried to leave Harvey would
shoot him.  When Renee had tried to leave, Harvey grabbed her and
refused to let her leave. (4T 134-18 to 135-25; 5T 57-15 to 21)

When they reached the corner of Seventh and East Jersey,
Harvey noticed Saraiva taking out his garbage out and told the
girls to serve as lookouts.  Harvey asked Mathis to be a lookout,
but he refused. (4T 136-10 to 16)  Mathis was scared.  He walked
across the street and stood next to a Chinese restaurant.  Harvey
approached Saraiva and it sounded like he was telling Saraiva to
empty his pockets.  Harvey tried to reach into Saraiva's pockets,
and Saraiva slapped Harvey's hand down.  At that point, Harvey
grabbed Saraiva and the man grabbed Harvey, and they traded
punches.  Harvey pulled out his gun and Saraiva grabbed for it.
As the two struggled, Mathis grabbed Harvey's arm to prevent him
from shooting Saraiva.  The gun went off once, missing Saraiva,

16

Da180

and Harvey fired a second shot that struck him. (4T 136-17 to 25;
4T 139-1 to 140-10)  Mathis was shocked when Saraiva fell, and he
ran off with Harvey. (4T 140-13 to 17)

Mathis had not intended to participate in the robbery or
help Harvey in any way. (4T 141-2 to 5)  He did not leave Harvey
once he realized Harvey wanted to commit a robbery because he was
afraid Harvey would shoot him. (4T 152-19 to 21)  After the
shooting, Mathis ran home, refusing to take the gun from Harvey.
At no time did Mathis possess the gun. (4T 141-15 to 142-10)

Mathis denied asking his girlfriend Sharlama Brooks to say
that he was with her on the night of the shooting.  According to
Mathis, "I say if anyone ask if I was with her... that she don't
know." (4T 142-22 to 143-20)  He also denied ever telling her
that he had shot someone accidentally. (5T 69-23 to 25)  With
regard to the questioning at police headquarters, Mathis
indicated that he was not given a choice about going there, and
he lied to the police when he gave his first statement because he
was scared.  Moreover, although he signed the rights form, the
police were "rushing" him, and his understanding of his rights
was "not that good."  Although his first statement to the police
was not true, due to his being scared and confused, his second
statement was truthful. (4T 145-22 to 152-8; 4T 168-25 to 169-5;
5T 3-11 to 4-18)

On the morning of January 24, Mathis's mother, Linda Mathis,

was taken by the police from her job to police headquarters so that she could be present while they questioned her son.  Ms. Mathis did not recall much of what transpired, but she did remember that her son claimed he had not known what Harvey was up to and that he "didn't do anything"; "he said he wasn't involved." (6T 146-20 to 148-13; 6T 155-15 to 17)  Her son was questioned until midnight.  At one point she and her son signed a consent-to-search form, and she accompanied the police to her house where they conducted a search. (6T 149-2 to 151-14)  Ms. Mathis indicated that she signed and understood the form explaining Mathis's constitutional rights. (6T 151-16 to 23)  Although Mathis believed one of the detectives was "putting words" in her son's mouth (6T 156-24 to 25), she and her son both signed his statement. (6T 157-4 to 21)

18

Da 182

**LEGAL ARGUMENT**

**POINT IV**

**DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE
OF TRIAL COUNSEL IN VIOLATION OF THE UNITED
STATES AND NEW JERSEY CONSTITUTIONS**

A basic tenet of the system of justice in the United States is that every person being tried for criminal charges is entitled to the assistance of counsel.

In some instances, trial counsel has acted in a manner, either by choice or by virtue of the State's or court's actions, so contrary to the interests of his or her client that the courts will judge the performance constitutionally invalid without looking further to the consequences of counsel's actions.  More often, however, counsel's failing will be somewhat less blatant an, while still deficient, not present quite so clear a picture as to the constitutional adequacy of his or her performance.

Hence, the United States Supreme Court has developed a test for determining whether an attorney has provided effective assistance to his or her client in cases where that attorney has not acted in a way so egregious as to allow the court to make a per se finding that he or she has rendered ineffective assistance.  Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 673 (1984) reh. den. 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864;  United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984);  State v. Fritz, 105 N.J. 42

19

Da 183

(1987).  The New Jersey Supreme Court, relying upon the United States Supreme Court's formulation in Strickland, has articulated the standard as follows:

> We therefore hold that under Article I, paragraph 10 of the State Constitution a criminal defendant is entitled to the assistance of reasonably competent counsel, and that if counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated.

State v. Fritz, 105 N.J. 42, at 58 (1987)

New Jersey has uniformly held that the right to legal representation commands the right to effective assistance of counsel.  Powell v. Alabama, 287 U.S. 45, 71-72, 53 S.Ct. 55, 65, 77 L.Ed.2d. 158, 172 (1932), quoting Holden v. Hardy, 169 U.S. 366, 389, 18 S.Ct. 383, 387, 42 L.Ed. 780, 790 (1897); State v. Mingo, 77 N.J. 576, 581 (1981); State v. Land, 73 N.J. 24 (1977); State v. Bellucci, 81 N.J. 531, 538 (1980).

The failure of counsel to require adversarial testing of a cause is described in Strickland v. Washington, supra.

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  In making the determination, the court should keep in mind that counsel's function, as

20

Da 184

> elaborated in prevailing professional norms,
> is to make the adversarial testing process
> work in the particular case. [Id. at 690, 104
> S. Ct. at 2066, 80 L. Ed. 2d at 695]

It is beyond dispute that the Sixth Amendment not only provides defendants in criminal proceedings with the right to assistance of counsel, but also guarantees that such assistance be effective. Culver v. Sullivan, 446 U.S. 335, 344, 100 S.Ct. 1708 (1980). United States v. Swinehart, 617 F.2d 336, 340 (3rd Cir. 1980), State v. Pace, 171 N.J. Super. 240, 251 (App. Div. 1979), certif. den. 84 N.J. 384 (1980). Our own Supreme Court in State v. Fritz, has held that this right to assistance of counsel is also guaranteed by the New Jersey Constitution.

Counsel must be effective in both the preparation and trial of a case. State v. Ballucci, 81 N.J. 531 (1980), State v. Sugar, 84 N.J. 1, 17 (1980). Mere presence of an attorney at trial does not satisfy the Constitution.

A defendant is entitled to a standard of adequacy of legal services equal to the exercise of normal customary skill and knowledge. State v. Anderson, 117 N.J. Super 507, 519 (App. Div. 1971), modified 60 N.J. 437 (1972). As stated in Justice Black's dissent in Betts v. Brady, 316 U.S. 445, 476, 62 S.Ct. 1252 (1942), "Whether a man is innocent cannot be determined from a trial in which, as here, denial of counsel has made it impossible to conclude, with any satisfactory the degree of certainty that the defendant's case was adequately presented."

21

Da185

An accused rights to be represented by counsel is a fundamental component of our criminal justice system.  Lawyers in criminal cases "are necessities, not luxuries."  Their presence is essential because they are the means through which the other rights of the person on trial are secured.  Without counsel, the right to a trial itself would be "of no avail."  Of all of the rights an accused person has, the right to be represented by counsel is by far the most pervasive for its affects his ability to assert any other rights he may have.  United States v. Cronic, 464 U.S. 648, 653, 104 S.Ct. 2039 (1984).  The right to be effectively represented by counsel largely undergirds all other rights of criminal defendants.  State v. Sugar, supra, at 16.  "Without the guiding hand of counsel, an innocent defendant may lose his freedom because he doesn't know how to establish his innocence."  Powell v. Alabama, 287 U.S. 45, 69, 53 S.Ct. 55 (1932).  In discussing the importance of a defendant's right to effective assistance of counsel, the United States Supreme Court stated:

> The substance of the Constitution's guarantee of effective assistance of counsel is illuminated by reference to its underlying purpose.  "Truth...is best discovered by powerful statements on both sides of the questions.  This dictum describes the unique strength of our system of criminal justice."  The very premise of our adversary system of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.  Herring v. New York, 422 U.S. 853, 862, 95 S.Ct. 2550 (1975).

22

Da186

It is this very premise that underlies and gives meaning to the Sixth Amendment; it is meant to assure fairness in the adversary criminal process.  Unless the accused receives effective assistance of counsel, "a serious risk of injustice infects the trial itself." Cuyler v. Sullivan, 466 U.S. 335, 100 S.Ct. 1708 (1980).

The United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984) set forth the criteria to be utilized in determining when a defendant's conviction must be reversed because he did not receive the effective assistance of counsel guaranteed by the Sixth Amendment.  The benchmark for judging such a claim is whether "counsel's conduct so undermined the proper functioning of the adversarial process' that the defendant may have been unjustly convicted.  Id at 2065.  A defendant must prove there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id at 694.  In evaluating such a claim, a reviewing court must consider a two-pronged test: (1) was counsel's performance, viewed as of the time of counsel's action, objectively deficient or, stated differently,  were the acts and omissions of counsel not the result of reasonable professional judgment. State v. Childs, 204 N.J. Super. 639, 645-46 (App. Div. 1985) certif.

Da 187

den., 104 N.J. 430 (1986); (2) was there a "reasonable probability that, absent the errors, the factfinder would have a reasonable doubt respecting guilt." <u>Strickland v. Washington</u>, <u>supra</u> 104 S.Ct. 2069.  Thus, except in cases where there is a presumption of prejudice, i.e. "when there are circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified", as defined in <u>Cronic</u>, <u>supra</u>, at 658, a defendant must show a "reasonable probability that but for counsel's unprofessional error, the result of the proceeding would have been different." This standard was adopted by our own New Jersey Supreme Court in <u>State v. Fritz</u>, <u>supra</u> at 58, and reaffirmed in <u>State v. Savage</u>, 120 N.J. 594, 614 (1990) and <u>State v. Davis</u>, 116 N.J. 341 (1989).

In the instant case, Mr. Mathis contends that he was denied his constitutional rights to the effective assistance of counsel and to due process of law in contravention of the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Para. 10 of the New Jersey Constitution and respectfully submits that his petition for post conviction relief must be granted.

Post conviction relief [PCR] is "New Jersey's analogue to the federal writ of habeas corpus." <u>State v. Preciose</u>, 129 N.J. 451, 459 (1992). Under R. 3:22-2(d), an alleged ground for post conviction relief may be established based on collateral attack

24

Da 188

of a petitioner's sentence.   In addition, the "cumulative effect"
of the alleged grounds for post conviction relief can require the
authorization of "defendant's PCR petition and the reversal [or
vacation] of his conviction and sentence."   State v. Marshall,
148 N.J. 89, 266-67 (1997).

    As noted above, the legal standards applicable to the claim
of ineffective assistance of trial counsel are found in
Strickland v. Washington, 466 U.S. 668, 694 (1984) and United
States v. Cronic, 466 U.S. 648 (1984).   The Supreme Court
articulated the standards by which a court must evaluate a claim
of ineffective assistance of counsel, a claim that is grounded in
the Sixth and Fourteenth Amendments to the United States
Constitution and Art. I, Para. 10 of the New Jersey Constitution.
See State v. Fritz, 105 N.J. 42, 58 (1987); Preciose, 129 N.J. at
463-64.   The Court is to apply the Strickland test to claims
arising under Art. I, para. 10 of the New Jersey Constitution.
Fritz, 105 N.J. at 58.   The first question is whether counsel's
performance was "deficient", i.e., not reasonably competent.

    A court deciding an actual ineffectiveness claim must judge
the reasonableness of counsel's challenged conduct on the facts
of the particular case, viewed as of the time of counsel's
conduct." Strickland v. Washington, 466 U.S. at 689. "A convicted
defendant making a claim of ineffective assistance must identify
the acts or omissions of counsel that are alleged not to have

been the result of reasonable professional judgment." Id. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. Notably, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgement." Strickland v. Washington, 466 U.S. at 689; Marshall, 148 N.J. at 157.

Nonetheless, it is equally important that "the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." Id.

As aforementioned, the second prong of a meritorious Strickland claim, the prejudice component, requires defendant to demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. at 694.

Significantly, the Strickland prejudice standard is not as rigorous as it may seem. Before articulating the applicable prejudice standard, the Strickland court rejected a more rigorous "outcome determinative" prejudice test applied to motions for a new trial based upon newly discovered evidence. The Court said,

"We believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." <u>Strickland v. Washington</u>, 466 U.S. at 687, 694 (emphasis added). The Court further noted, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Id. (emphasis added).

Likewise, although a single serious error may support a claim of ineffectiveness, <u>Kimmelman v. Morrison</u>. 477 U.S. at 383, each of counsel's errors should not he viewed in isolation for it's prejudicial effect.  This is because the cumulative effect of counsel's errors or omissions may compromise the prejudice underlying a finding of counsel ineffectiveness. <u>Marshall</u>, 148 N.J. at 156 (analyzing whether defendant has shown "but for those alleged deficiencies, individually and cumulatively, there is a reasonable probability that the result of the trial would have been different") <u>Strickland v. Washington</u>, 466 U.S. at 594 (discussing whether counsel's errors prejudiced defendant).

In the instant case, trial counsel's performance was seriously deficient in ways that materially contributed to defendant's wrongful conviction(s).  Moreover, the Court should consider one failure of defense counsel as a <u>per se</u> violation of the right to effective counsel.  That is, trial counsel's failure

27

to effectively challenge the admissibility of his alleged voluntary statements.  See also Point II, infra.

Specifically, in his *pro se* papers, Mr. Mathis contends that because he was a juvenile (a boy just two months shy of his sixteenth birthday), he should have first been advised of the possibility of prosecution as an adult in order for the statements to be admissible.  Defendant further contends that law enforcement's failure to do so should have resulted in the suppression of his statements. (Da 58 to Da 126) See also Point II, infra.

While trial counsel did seek to suppress the defendant's statements, defendant's trial attorney did not raise this issue regarding law enforcement's failure to provide this additional warning concerning the possibility that Mr. Mathis would be prosecuted as a adult.  Based upon this failure alone, Mr. Mathis asserts that trial counsel's performance was clearly deficient.  See Point II, infra.; See also Defendant's *Pro Se* Memorandum of Law in Support this Petition for Post-Conviction Relief.  (Da 58 to Da 126)

Trial counsel for the defendant made other mistakes, however, that this Court should also consider in finding defendant's trial attorney's performance to have been deficient.  In support of the defendant's motion to suppress his statements, trial counsel not only failed to raise the issue regarding law

enforcement's failure to advise Mr. Mathis of the possibility that he would be prosecuted as an adult (as set forth above), but trial counsel also failed to present evidence of defendant's learning disability and special education status. Yet, this was documented in the Defendant's school records. In advance of the juvenile waiver hearing, the defendant was also evaluated by psychologists to assess the likelihood of successful rehabilitation within the juvenile justice system. These psychologists also determined that defendant functioned at a low intellectual level. See also <u>Point II</u>, infra.

Moreover, said failure can not be deemed to have been harmless. In denying the motion to suppress, the trial Judge noted that he did "not find credible defendant's testimony that he didn't understand what was being read to him." (1T 16-7 to 13)

Defendant respectfully submits, however, that had trial counsel presented evidence of the defendant's low intellectual functioning level, which would have corroborated defendant's insistence that he did not understand, the motion to suppress would have been granted. See also <u>Point II</u>, infra.

Defendant further submits that such evidence should have also been presented, and highlighted by counsel, at sentencing. Unfortunately, as trial counsel had done at the suppression hearing, he only referred to the Defendant as being "a special ed student" (8T 3-1 to 2), but did not explain, nor present



evidence, to establish the specifics thereof which defendant maintains would have helped to establish mitigating factors. Thus, defendant was not only denied the effective assistance of trial counsel, but that by virtue thereof, his sentence is improper, excessive and/or otherwise unconstitutional. See Point IV, infra.  See also Defendant's *Pro Se* Memorandum of Law in Support this Petition for Post-Conviction Relief.  (Da 58 to Da 126)

Defendant respectfully submits, however, that a sentencing hearing is undeniably a critical and crucial stage of a criminal proceeding at which he is entitled to the effective assistance of counsel.  United States Constitution, Sixth and Fourteenth Amendments; N.J.S.A. Const. 1947, Art. I, par. 10; See also Tully v. Scheu, 607 F.2d 31, on remand 487 F.Supp. 404, reversed 637 F.2d 917, certiorari denied 102 S.Ct. 301, 454 U.S. 854, 70 L.Ed.2d 148 (C.A.3, [N.J.) 1979); State v. Giorgianni, 459 A.2d 1189, 189 N.J.Super 220, certification denied 468 A.2d 212, 94 N.J. 569 (App. Div. 1983); See also State v. Jenkins, 160 A.2d 25, 32 N.J. 109 (1960)

Trial counsel also failed to raise those issues asserted herein regarding the deficiency of the Indictment and the grand jury proceedings.  See Defendant's *Pro Se* Petition for Post-Conviction Relief. (Da 50 to Da 57)

While the defendant concedes that defects in the indictment

30



are ordinarily deemed waived unless raised by motion under Court Rule 3:10-2 before trial [State in the Interest of R.W., 200 N.J. Super. 560 (App. Div. 1985), mod. 104 N.J. 14 (1986); State v. Spano, 128 N.J. Super. 90 (App. Div. 1973), aff'd 64 N.J. 566 (1974)], it is respectfully submitted that because of the ineffective nature of defendant's previous counsel, that fundamental justice now requires that the issues regarding the deficiency of the grand jury presentment be heard on this present petition for post-conviction relief taking into account the allegations of ineffective assistance of trial and appellate counsel.  See also Point VI, infra.

In his Pro Se papers, Mr. Mathis also contends that the grand jury which returned the indictment against him "Was Not Made Up From A Fair Cross-Section Of The Community." (Da 50 to Da 57)  Specifically, Mr. Mathis maintains that he was denied Equal Protection and Due Process of Law because of the "lack of Blacks and Hispanics" on the grand jury.  Yet, trial counsel failed to properly assert said constitutional deprivations on defendant's behalf.  See Defendant's Pro Se Petition for Post-Conviction Relief. (Da 50 to Da 57)

In his Pro Se Petition, Mr. Mathis further contends that, likewise, with regard to the petit jury, "[t]here was an under representation of Blacks and Hispanics in the pools that defendant's jury was selected from."  According to Mr. Mathis, he

31



"is Black and should have been afforded a jury of his peers selected from a cross-section of the community." Mr. Mathis maintains that trial counsel was wholly ineffective in this regard too. See Defendant's *Pro Se* Petition for Post-Conviction Relief. (Da 50 to Da 57)

It is respectfully submitted that a criminal defendant is entitled a fair trial by an impartial jury. In fact, the fundamental right to a fair trial and an impartial jury is guaranteed by the Sixth Amendment of the United States Constitution and Art. I, par. 10 of the New Jersey Constitution. This right has been termed a "fundamental tenet of our common law's Anglo-American heritage, and any act, purposeful or inadvertent, which impinges on that right must be subjected to the most searching of inquiries." <u>Osborne v. Duckworth</u>, 567 F.Supp. 427, 432 (D. Ind. 1983)  In this case, Defendant submits that by virtue of trial counsel's ineffective representation, he was denied these rights which are fundamental to our system of jurisprudence.

In his *Pro Se* Petition for Post-Conviction Relief, Mr. Mathis also contends that, with regard to the Juvenile Waiver Hearing, "Other Groups (Caucasians) Are Less Likely To Be Waived Up" and, therefore, as result of his race, Mr. Mathis was denied Equal Protection under the law. See Defendant's *Pro Se* Petition for Post-Conviction Relief. (Da 50 to Da 57)

32

Nonetheless, in the administration of criminal justice, no person should be subject to greater or different punishment for an offense than that to which others of the same class are subjected.  State v. Smith, 276 A.2d 369, 58 N.J. 202 (1971); See also United States Constitution, Fourteenth Amendment.  Defendant submits that by virtue of the inequality at Juvenile Waiver Hearings, as aforementioned, he was also exposed, and ultimately sentenced, to a much more lengthy term of incarceration.  See Point IV, infra.  See also Defendant's *Pro Se* Petition for Post-Conviction Relief (Da 50 to Da 57) and Defendant's *Pro Se* Memorandum of Law in Support this Petition for Post-Conviction Relief. (Da 58 to Da 126)

Finally, in his *Pro Se* Petition for Post-Conviction Relief, defendant maintains that his convictions were wrongly based upon perjured testimony.  Specifically, according to Mr. Mathis, "State's witness Migdalia Hernandez testified falsely about events at her apartment when the four persons allegedly involved in the incident returned to her apartment.  She also testified falsely about date of incident, masks and the person whom stated that someone had been shot." (Da 50 to Da 57) (3T 18O-14 to 181-16; 3T 211-9 to 17)

Notwithstanding the aforementioned, defendant asserts that his trial attorney did not adequately address the trial testimony of Hernandez or the inconsistencies between her testimony and

33

Da197

that of April Diggs. (3T 180-14 to 181-16; 3T 211-9 to 17)

Based upon the foregoing, the Defendant maintains that he was denied his constitutional right to the effective assistance of trial counsel; it is contended that trial counsel's performance was not reasonable and that counsel's deficient performance prejudiced the defendant Id. at 683.

Alternatively, it is respectfully submitted, that given trial counsel's failures, as aforementioned, an evidentiary hearing is warranted with regard to the matter at bar. See Point VII, infra.

While it is certainly conceivable that the State will argue that the issues presented herein should have been raised to the Appellate Division on direct appeal, or were raised in part, it is respectfully submitted that because of the ineffective nature of trial counsel, that fundamental justice now requires that these issues be heard taking into account the allegations of ineffective assistance of trial counsel and appellate counsel. See also Point VI, infra.

In this case, Mr. Mathis maintains that he was denied his constitutional right to the effective assistance of counsel. In sum, it is contended that counsel's performance was not reasonable under the test set forth in Strickland v. Washington, and that counsel's deficient performance prejudiced the defendant. Id. at 683. Counsel did not bring to bear such skill

34

Pa198

and knowledge as would have rendered the proceeding a reliable adversarial testing process thereby requiring that the defendant's convictions be vacated.

Moreover, if any of the errors herein are not individually deemed sufficient to establish ineffective assistance of counsel, it is respectfully submitted that the cumulative effect of counsel's errors and/or omissions stated herein resulted in the denial of defendant's constitutional right to the effective assistance of counsel. State v. Orecchio, 16 N.J. 125, 129 See also Point V, infra.

35

Da199

## POINT II

**THE ALLEGED VOLUNTARY STATEMENTS MADE BY
DEFENDANT SHOULD HAVE BEEN SUPPRESSED**

The United States Supreme Court has developed a line of
cases protecting the rights of defendants in police custody
against interrogation in violation of <u>Miranda v. Arizona</u>, 384
U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The court in
<u>Miranda</u> held that interrogation in certain custodial
circumstances is inherently coercive and that statements made
under those circumstances are inadmissible unless the suspect is
specifically informed of his <u>Miranda</u> rights and freely decides to
forgo those rights.  Requiring <u>Miranda</u> warnings before custodial
interrogation provides reinforcement for the Fifth Amendment
right against compulsory self-incrimination.  <u>New York v.
Quarles</u>, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)
<u>citing</u> <u>Michingan v. Tucker</u>, 417 U.S. 433, 444, 94 S.Ct. 2357,
2364, 41 L.Ed.2d 182 (1974); <u>Edwards v. Arizona</u>, 451 U.S. 477,
492, 101 S.Ct. 1880, 1888, 68 L.Ed.2d 378 (1981) (Powell, J.,
concurring).

To be valid, a waiver of the Defendant's right to remain
silent, must be made "**<u>voluntarily, knowingly and intelligently</u>**."
[emphasis added] United States Constitution, Fifth Amendment,
<u>Miranda v. Arizona</u>, supra, at page 444.

Pursuant to the decision of the United States Supreme Court
in <u>Miranda v. Arizona</u>, 384 U.S. 436. 86 S. Ct. 1602. 1624-27

36



(1966), when, on its case-in-chief, the State seeks to introduce into evidence a statement that is the product of a custodial interrogation, it must show that the defendant was advised of his right to remain silent and his right to retained or appointed counsel.  Furthermore, a "heavy burden" rests on the government to demonstrate that the defendant knowingly and intelligently waived these rights. Id., 384 U.S. at 475.  In New Jersey, the State carries the burden of proof beyond a reasonable doubt. State v. Johnson, 116 N.J. 99 (1989); State v. Yough, 49 N.J. 587, 600 (1967).

The Fifth and Fourteenth Amendments of the Federal Constitution prohibit the State from forcing persons to disclose information that would tend to incriminate them in future proceedings.  Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489 (1964).

With regard to the case at bar, in his pro se papers, Mr. Mathis contends that because he was a juvenile (a boy just two months shy of his sixteenth birthday), he should have first been advised of the possibility of prosecution as an adult in order for the statements to be admissible.  Defendant further contends that law enforcement's failure to do so should have resulted in the suppression of his statements. (Da 58 to Da 126)

While defendant concedes that no such requirement presently exists in New Jersey, the requirement that a juvenile defendant be advised of the possibility that he may be prosecuted as an

37

adult does exist elsewhere in the United States. In New
Hampshire, a juvenile cannot be deemed to have knowingly waived
his rights, under any circumstances, unless he is advised of the
possibility of prosecution as an adult and the rights to be
waived must be explained in a simplified fashion. See State v.
Benoit, 126 N.H. 6, 490 A.2d 295 (1985); See also State v.
Farrell, 145 N.H. 773 (2001); In re Wesley B, 145 N.H. 428, 764
A.2d 888 (2000).

Defendant respectfully submits that because he was not
advised of the possibility that he would be prosecuted as an
adult, it can not be said that he knowingly and intelligently
waived his rights. As a result, the alleged voluntary statements
should have been suppressed.

In this case, while trial counsel did seek to suppress the
defendant's statements, defendant's trial attorney did not raise
this issue regarding law enforcement's failure to provide this
additional warning concerning the possibility that Mr. Mathis
would be prosecuted as a adult. See Point I, supra. Nonetheless,
Mr. Mathis maintains that because he was not so advised that he
might be prosecuted as an adult, he did not knowingly,
voluntarily, and intelligently waive his constitutional rights
thereby requiring that his statements be suppressed.

Unfortunately, in support of the defendant's motion to
suppress his statements, trial counsel not only failed to raise

38

Da 202

the issue regarding law enforcement's failure to advise Mr. Mathis of the possibility that he would be prosecuted as an adult, but trial counsel also failed to present evidence of defendant's learning disability and special education status. Yet, this was documented in the Defendant's school records.  In advance of the juvenile waiver hearing, the defendant was also evaluated by three psychologists to assess the likelihood of successful rehabilitation within the juvenile justice system. These psychologists also determined that defendant functioned at a low intellectual level.  See also Point I, supra.

Moreover, said failure can not be deemed to have been harmless.  In denying the motion to suppress, the trial Judge noted that he did "not find credible defendant's testimony that he didn't understand what was being read to him." (1T 16-7 to 13)

Defendant respectfully submits, however, that had trial counsel presented evidence of the defendant's low intellectual functioning level, which would have corroborated defendant's insistence that he did not understand, the motion to suppress would have otherwise been granted.  See also Point I, supra.

In determining whether or not a defendant gave a statement voluntarily, the Court must assess the totality of all the surrounding circumstances.  Columbre v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860 (1961); Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041 (1973); Withrow v. Williams, 507 U.S. 680, 113

39

Da 203

S.Ct. 1745 (1993); State v. Johnson, 116 N.J. 99(1989); State v.
Yough, 49 N.J. 587, 600 (1967).

Therefore, it is respectfully submitted that if a person
suffers from a mental or developmental condition that impairs
that person's ability to comprehend his or her choices, that
impairment must also be factored into the Court's determination
of voluntariness.  Unfortunately, due to the ineffective
assistance of trial counsel, this evidence was not properly
presented.

With regard to the case at bar, trial Court denied the
defendant's motion to suppress his statements.  In so doing, the
Judge stated, on the record, that he did "not find credible
defendant's testimony that he didn't understand what was being
read to him." (1T 16-7 to 13)

However, as previously noted herein, there was evidence that
could have been submitted to support defendant's assertion that
he did not understand.  Not only were there school records, but
as noted above, Mr. Mathis had also been evaluated by three
psychologists for the juvenile waiver hearing.  Dr. Thompson and
Dr. Page were retained by the defense; Dr. Schlesinger was
retained by the State.  It is respectfully submitted that the
school records and the three psychological assessment reports
support defendant's contention that he did not understand. (Da 96
to Da 126)

40

Pa204

Specifically, in arguing that Defendant did not voluntarily, knowingly, and intelligently waive his Miranda rights before making statements to police, trial counsel summarized his position as follows: "I don't think in that two minutes period that those five questions could be read and initialed and answered in two minutes and in a knowing manner, especially since my clients own testimony indicated that he didn't understood these rights at that time." (1T 10-22 to 11-1)

The portion of Defendant's testimony (at the Miranda hearing) counsel referred to was as follows:

> Q. Back then what didn't you understand?
> Let's go through it all over.
> You have a right to remain silent.  Did you understand that at that point in time?
> A. Yes.
> Q. I mean, that's as simple as it can be: You can keep your mouth shut.  You knew that, right?
> A. Yes.
> Q. And anything you say can and will be used against you in a court of law: And you understood that right, because that's also very simple?
> A. Yes.
> Q. If you say something police are going to use it against you, right?
> A. Yes.
> Q. You have a right to talk to a lawyer and have him present while you are being questioned?
> You knew what a lawyer was?
> A. Yes.  I, at that time I didn't know I could have had a lawyer present, you know, I didn't know that.
> Q. Did you think you could have a lawyer only later on?
> A. Like on in the future.  Yes.
> Q. But in terms of present, you didn't

41

Pa 205

understand that?
A. I didn't understand.
Q. Was it the word "present" that you  didn't
understand?
A. Sort of.
Q. All right. So when they read this to you:
You have a right to talk to a lawyer, you
understood that up to that point, right?
A. Yes.
Q. And have him present while you were being
questioned. Okay. You understand while you
are being questioned, right?
A. Yes.
Q. And have him, you understood?
A. Right.
Q. So 'present' was the only word you didn't
understand?
A. Yes.
          *      *      *      *      *
Q. If you cannot afford to hire a lawyer one
will be appointed to represent you before any
questioning if you wish: Did you
understand that back then?
A. No.
Q. What didn't you understand?
A. The part, 'if you wish,' I didn't
understand.
Q. 'If you wish' you did not understand?
A. Yes. [emphasis added] (2MT 114-14 to 117-3)

In denying the motion to suppress, the trial court stated:

> **I do not find credible defendant's testimony
> that he didn't understand what was being read
> to him.**  On cross examination, Mr. Kolano
> went through the form with him and indicated
> phrase by phrase almost word by word what was
> contained in the form, and there the answers
> given by the defendant did not suggest that
> he was, that he did not understand what was
> contained in the form. [emphasis added] (1T
> 16-7 to 13)

What the trial court did not know, however, was that

evidence of Defendant's severe learning disability would have

corroborated Defendant's testimony that he did not fully



understand the <u>Miranda</u> rights.  The only reference the Court

heard of this extensive evidence were contained in three

questions trial counsel posed to Detective Koczur at the <u>Miranda</u>

hearing:

> Q. And were you aware that he was a special
> education student in the school?
> A. No.
> Q. So you weren't aware he may have had
> certain learning disabilities that made it
> difficult for him to understand any of these
> things?
> A. No.
> Q. So you just assumed in the two  minutes
> that you read this that he understood
> everything?
> A. Yes. (2MT 48-15 to 24)

Notwithstanding this testimony, defendant's special

education status counsel referred to was documented in

Defendant's school records and by the three psychologists

aforementioned.  These psychologists also determined, through

testing, that Defendant functioned at a low intellectual level.

Specifically, Cheryl L. Thompson, PHD, who, among other

things, administered a mental status exam and reviewed

Defendant's school records, estimated Defendant's intelligence as

"Borderline to Low Average[,]" (Da 97)  Defendant described

himself to Dr. Thompson as "a school person[,]" but Defendant's

"school record reflects severe learning problems that became

obvious in first grade.  Marvin was retained in first and second

grades.  He was placed in a special education program because he

was never able to learn basic reading, writing and computation."

43

(Da 97)   Dr. Thompson described Defendant as "not bright and is easily confused."  (Da 98)   She concluded that the Defendant "should have a complete diagnostic assessment as he may be functioning as [sic] the level of retardation."  (Da 99)

Dr. Martha H. Page also administered several tests to Defendant and also reviewed his school records. (Da 101 to Da 110)   In her report, she recounts Defendant's school history, which documents years of learning disability, including that Defendant was classified as Special Education, Communication Handicap. (Da 107 to Da 109)   The results of the tests Dr. Page administered to Defendant showed him to be "functioning at the intellectually deficient to borderline range of intelligence[,]" though "[p]otential intellectual functioning was in the borderline to low average level of intelligence." (Da 106)

According to Dr. Page, Mr. Mathis "found it difficult to process verbally presented material rapidly" and his "[a]bility to define words was well below average".  "Certainly, the CST's classification of [Defendant] as Communication Handicapped was an appropriate one."  "[I]t was evident that [Defendant's] academic skills were still quite low and further impaired when he felt under pressure to achieve or was in a less than well-controlled and structured situation."  (Da 107)   Dr. Page concluded that Mr. Mathis " had considerable difficulty in thinking analytically and accurately especially when he felt under pressure."  (Da 109)

In his report, Dr. Louis B. Schlesinger wrote:

> [Defendant] is currently functioning within
> the high end of the borderline range of
> intelligence, gaining a Full Scale IQ of 79
> (Verbal IQ =80; Performance IQ = 83).
> Verbal skills within low end of dull-normal
> range. Fund of general information is weak,
> suggesting that Marvin has not profited a
> great deal from school or experience.  For
> example, he did not know the number of weeks
> in a year, the identity of Louis Armstrong,
> the direction travelled from Chicago to
> Panama, the location of Brazil, the author of
> Hamlet, the President during the Civil War,
> and other such simple facts.  Vocabulary is
> equally poor and far below average capacity
> as he was unable to define such words as
> fabric, assemble, conceal, consume, regulate,
> and the like...In general, verbal skills fall
> within low end of dull-normal range... (Da
> 118)

Trial counsel represented Defendant at the juvenile waiver

hearing and, therefore, was well aware of the evidence of

Defendant's low intellectual functioning.  In fact, it was trial

counsel that was the one who had referred Defendant to Dr.

Thompson and to Dr. Page.  Moreover, trial counsel undoubtedly

received through discovery a copy of the aforementioned report

prepared by Dr. Schlesinger (to whom Defendant was referred to

by the State).  Under these circumstances, Defendant contends

that trial counsel was ineffective for failing to present at the

Miranda hearing the extensive evidence of Defendant's low

intellectual functioning.

In order to sustain his claim of ineffective assistance of

counsel, Defendant must show "that counsel made errors so serious

45



that counsel was not functioning as the 'counsel' guaranteed defendant by the Sixth Amendment[,]" and that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[; a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"In determining whether a defendant in police custody has voluntarily, knowingly, and intelligently waived his Miranda rights, a trial court looks at several factors, including the defendant's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved..." State v. Presha, 163 N.J. 304, 313 (2000). "[A] suspect's previous encounters with the law has [also] been mentioned as [a] relevant factor." Ibid.

Here, trial counsel rightly focused on the fact that Defendant was a juvenile and on Defendant's lack of a prior record. (1T 9-24 to 10-8)  Counsel was remiss, however, in failing to present the evidence of Defendant's low intellectual functioning.  As a result, Defendant's testimony about his inability to understand simple words in the language of the rights read to him came off as incredible and appeared as a

46

transparent attempt to get a favorable ruling.

Yet, the aforementioned documented evidence of Defendant's verbal skills shortcomings amply supports, and is consistent with, Defendant's testimony at the Miranda hearing that he could not understand the warnings.  Moreover, trial counsel's failure to introduce this evidence at the Miranda hearing can only be characterized as unreasonable because the omitted evidence bore directly on the question whether Defendant voluntarily, knowingly, and intelligently waived his rights.

Counsel's failure to present this highly relevant evidence also prejudiced Defendant because a reasonable probability exists that the inclusion of this evidence, combined with Defendant's young age and lack of background in the criminal justice system, would have affected the outcome of the Miranda hearing.  Compare State v. Cook, 47 N.J. 402, 418 (1966) (defendant's low intelligence combined with other factors weighed against a finding that his confessions were the product of a free and unconstrained will) with State v. Flower, 224 N.J. Super. 208 (Law. Div. 1988) (confessions of adult defendant with mentality of a six or seven year old held involuntary).  Furthermore, a reasonable probability exists that suppression of Defendant's statement would have affected the outcome of his trial because Defendant's statements constituted a significant part of the State's case.

Pa 211

Yet, as can be seen from this overwhelming evidence, Mr. Mathis, an educationally impaired youth with a "borderline range of intelligence" (Da 106), was just two months shy of his sixteenth birthday.  The school records coupled with the psychological evaluations prepared for the juvenile waiver hearing, as illustrated above, clearly reflect that the defendant he had "severe learning problems that became obvious in first grade."  In fact, the defendant was even retained in first and second grades.  Moreover, Mr. Mathis was placed in a special education program "because he was never able to learn basic reading, writing and computation." (Da 97)

It is respectfully submitted that because trial counsel did not present this evidence to the Court during the suppression hearing, the Court was unable to properly weigh all of the relevant factors in assessing the voluntariness of the defendant's statements and whether Mr. Mathis truly knowingly and intelligently waived his rights.  See also Point I, supra.

Moreover, it is urged that in light of the foregoing, the defendant did not knowingly, voluntarily, and intelligently waive his constitutional rights thereby requiring that his statements be suppressed.

It is further submitted that the defendant received the ineffective assistance of trial counsel, and by virtue of that ineffective representation, defendant's motion to suppress the



statements was wrongfully denied by the Court. See also Point I, supra.

Finally, while it is certainly conceivable that the State will argue that the issues presented herein should have been raised, or were raised in part, to the Appellate Court on his direct appeal, it is respectfully submitted that because of the ineffective nature of defendant's trial and appellate counsel, that fundamental justice now requires that these issues be heard taking into account the allegations of ineffective assistance of Defendant's trial counsel and appellate counsel. Certainly, a criminal defendant is entitled effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 673 (1984) reh. den. 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864; United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); State v. Fritz, 105 N.J. 42 (1987); See also Evitts v. Lucey, 469 U.S. 387, 398 (1985). See also State v. Morrison, 215 N.J.Super 540 (App. Div.) certif. denied 107 N.J. 642 (1987)

For the foregoing reasons, it is respectfully submitted that the defendant was not afforded the effective assistance of prior counsel, and therefore, should not be barred from raising any of the issues herein. See also Point VIII, infra.

Pa213

## POINT III

### THE DEFENDANT WAS DEPRIVED HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE

Among the issues asserted herein, Defendant contends that received the ineffective assistance of trial counsel as a direct result of counsel's failure to present evidence on his behalf. Even more troublesome, it is clear that trial counsel was aware of such evidence.  See <u>Point I</u> and <u>Point II</u>, supra.

Relevant evidence need only have some tendency to prove a material fact.  <u>State v. Coruzzi</u>, 460 A.2d 120, 121; 189 N.J.Super. 273, certification denied 468 A.2d 185, 94 N.J. 531. (1983) <u>See</u> also, <u>Evid</u>. R. 401.  Furthermore, it is well established that all relevant evidence should generally be admitted.  <u>State v. Wilbely</u>, 300 A.2d 860, 861; 122 N.J.Super. 463, reversed 307 A.2d 608, 63 N.J. 420 (1973)  <u>See</u> also, <u>Evid</u>. R. 102.

The Sixth and Fourteenth Amendment right of confrontation is "a fundamental right essential to a fair trial in a criminal prosecution."  <u>Pointer v. Texas</u>, 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923, 926 (1965) Our State Constitution contains a similar guarantee. <u>N.J. Const.</u>, Art I, Paragraph 10. The right of confrontation "protects against improper restrictions on questions defense counsel may ask during cross-examination" and "encompasses the right to elicit favorable testimony" from those witnesses.  <u>State v. Budis</u>, 125 N.J. 519,

531 (1991)  Together with the rights to compulsory process and
due process, the right of confrontation guarantees criminal
defendants "a meaningful opportunity to present a complete
defense." <u>Crane v. Kentucky</u>, 476 U.S. 683, 690, 106 S.Ct. 2142,
2146, 90 L.Ed.2d 636, 645 (1986); <u>California v. Trombetta</u>, 467
U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413, 419 (1984).
It is respectfully submitted that those rights were
unquestionably denied in this case.  See also <u>Point III</u>, supra.

    With regard to the case at bar, defendant contends that
trial counsel was wholly ineffective because he did not present
evidence of his learning disability and special education status
at the suppression hearing.  See <u>Point I</u> and <u>Point II</u>, supra.
Yet, this was documented in the Defendant's school records.
Moreover, in advance of the juvenile waiver hearing, the
defendant was also evaluated by psychologists to assess the
likelihood of successful rehabilitation within the juvenile
justice system.  These psychologists also determined that
defendant functioned at a low intellectual level. (Da 96 to Da
100; Da 101 to Da 110; Da 111 to Da 126)

    Defendant further submits that such evidence should have
also been presented at trial.  In <u>State v. Sexton</u>, the Court
specifically stated that evidence of the defendant's mental
ability is potentially relevant to the reasonableness of his
perceptions.  It is also relevant to the jury's evaluation of the

51



defendant's demeanor and credibility as a witness at trial.
State v. Sexton, 311 N.J.Super 70 (App. Div. 1998), aff'd 160
N.J. 93 (1999)

Furthermore, even when the defendant does not raise a
diminished capacity or insanity defense, defendant's mental
condition may, nonetheless, be admitted as evidence at trial:

> We note that despite extensive psychological
> expert testimony at the waiver hearing, no
> expert testimony was offered at trial. Under
> those circumstances, it was within the trial
> judge's discretion either to admit or to
> exclude defendant's and his mother's
> testimony regarding his school placement. The
> trial judge found the proffer so vague as to
> be more prejudicial and confusing than
> relevant. See N.J.R.E. 403. **However, we think
> it only fair, in the event of a retrial, that
> defendant have the opportunity upon proper
> notice to the State, to offer relevant
> experts and/or appropriate school personnel,
> who may be able to fairly describe
> defendant's mental ability.**[emphasis added]

State v. Sexton, 311 N.J.Super 70, 88 (App. Div. 1998), aff'd 160
N.J. 93 (1999)

In this case, by virtue of trial counsel's ineffective
representation, the defendant was precluded from presenting such
evidence. As such, Mr. Mathis asserts that not only did he
receive the ineffective assistance of trial counsel as a result
of counsel's failure to properly present a defense, but that by
virtue of that ineffective assistance of counsel, he was further
deprived his constitutional right to present witnesses on his
behalf.

Da216

"Compulsory process", however, is guaranteed by the Federal and New Jersey constitutions and is a Defendant's right to compel the attendance of witnesses at trial and to elicit testimony on behalf of the defense. U.S. Constitution, Amends 6, 14; New Jersey Constitution, Art. 1, Par. 10; State v. Fort, 484 A.2d 323 (App. Div. 1984)

Moreover, a defendant's fundamental right to present witnesses in his own defense gains enhanced importance when evidence is critical to the defense. State vs. James, 677 A.2d 734, 144 N.J. 538 (1996).

In this case, because Mr. Mathis did testify on his own behalf at trial, counsel's failure to present such evidence was even was even more prejudicial. See State v. Sexton, 311 N.J.Super 70 (App. Div. 1998), aff'd 160 N.J. 93 (1999).

In any event, Defendant was denied a fair trial; counsel's failure to present such evidence, coupled with trial counsel's otherwise ineffective representation, resulted in the denial of defendant's Constitutional right to a fair trial by an impartial jury thereby necessitating a new trial. U.S. Constitution, Amends 6, 14; New Jersey Constitution, Art. 1, Par. 10; State v. Fort, 484 A.2d 323 (App. Div. 1984) See also State vs. James, 677 A.2d 734, 144 N.J. 538 (1996). See also Point I and Point II, supra.

## POINT IV

**THE SENTENCE IMPOSED BY THE TRIAL COURT WAS
EXCESSIVE, IMPROPER AND/OR OTHERWISE
UNCONSTITUTIONAL**

In reviewing a sentence imposed under the Code of Criminal
Justice, the Supreme Court will always require that any exercise
of discretion be based upon findings of fact that are grounded in
competent, reasonably credible evidence, and that the fact finder
apply correct legal principles in exercising its discretion, and
will modify a sentence when the application of the facts to the
law is such a clear error of judgment that is shocks the judicial
conscience.  State v. Roth, 95 N.J. 334, 353-366 (1984)

When reviewing a sentence, the court can determine if
legislative policies were violated, can consider aggravating and
mitigating factors found by the trial court to determine whether
those factors were based upon competent, credible evidence in the
record, and can determine whether, even though the court
sentenced in accordance with the guidelines, application of the
guidelines to the facts of the case makes the sentence clearly
unreasonable.  Id. at 358-366.

With regard to the case at bar, at the sentencing hearing,
considering the aggravating and mitigating factors, the Court
found two aggravating factors: Aggravating factor (2) , the
gravity and seriousness of harm inflicted on the victim,
including whether or not the defendant knew or reasonably should

54

Pa218

have known that the victim of the offense was particularly vulnerable or incapable of resistance; and factor (9), the need for deterring the defendant and others from violating the law. The Court found only one mitigating factor: Mitigating factor (7), the defendant has no history of prior delinquency or criminal activity or has led a law abiding life for a substantial period of time before the commission of present offense.  The Court concluded that the aggravating factors in this case "clearly and convincingly outweigh the mitigating factors that a sentence above the minimum for this crime must be imposed." (8T 10-12 to 10-15)

It is respectfully submitted, however, that the Court's findings as to the applicable aggravating and mitigating factors was fatally flawed.  Specifically, the aggravating factors applied by the Judge were enumerated without any effort to distinguish the instant case from other cases involving the same offense.  State v. Martinelli, 201 N.J. Super. 378 (App. Div. 1985) noted that the aggravating factors found by a sentencing judge should be those which distinguish the case at hand from other cases **involving the same offense**.  Id. at 386.  Otherwise, appellate review of the sentence is frustrated.  See, Id. at 385.

However, by definition, something cannot be an aggravating factor if it "always" applies in every case.  Here, as noted above, the judge failed to give any indication, whatsoever, as to

why the aggravating factors were more important considerations from other cases involving the same offense. See State v. Martinelli, 201 N.J. Super. 378, 385-86 (App. Div. 1985) [resentencing ordered in part because record does not disclose "what special need for deterrence or non-depreciation of the offense differentiates this case for other cases ..." it its class].

Additionally, while it is true that mitigating factors were not properly presented by trial counsel (See Point II, infra), it is, respectfully submitted that the sentencing Court, nonetheless, failed to properly apply mitigating factors that were clearly present in this case.

For instance, at the time of sentencing, Mr. Mathis expressed his since regret and remorse for what had occurred which resulted in the loss of a life:

> I would like to say I am sorry to the family [for] what happened. I tried to stop what happened, but it was too late. I am very sorry it happened.
> *   *   *   *   *
> I understand somebody got killed, you know. I am very sorry what happened.
> That's all I have to say. I am sorry to the family, and I just say I am sorry.
> You know, I tried to stop what happened that night, but it was too late.
> If there was anything to go back in time and stop what happened I would, but I can't. What's done

56

Da220

```
is done.
         And I just, you know, I hurt a
lot of people, I hurt my family,
friends, you know.
         Like I say, I am very sorry.
(8T 4-13 to 5-9)
```

As can be seen from the defendant's remarks, when given the chance to speak at sentencing, rather than seek leniency from the Court, the defendant took that opportunity solely to express his genuine remorse to the victim's family for what had happened.

The present offense represents his first indictable conviction. Given the defendant's lack of record, coupled with his remorse and regret, along with the realization of how he had hurt the one's closest to him, it is respectfully submitted that the Court should have also considered mitigating factor (8), the defendant's conduct was the result of circumstances unlikely to recur and mitigating factor (9), the character and attitude of the defendant indicate that he is unlikely to commit another offense.

Defendant further contends that the sentencing judge should have also given weight to the non-statutory mitigating factor of defendant's relative youth, as defendant was only a boy, two months shy of his sixteenth birthday, when this incident occurred. Although defendant concedes that age is not a statutory mitigating factor, New Jersey courts have held that it is a relevant factor that should be considered in sentencing. See State v. Dunbar, 108 N.J. 80, 96 (1987) (recognizing that

Pa221

defendant's relative youth "ordinarily would inure to his benefit"); State v. Tanksley, 245 N.J. Super. 390, 397 (App. Div. 1991) (holding that the youth of a defendant may be considered as a mitigating factor even if there is no evidence he was influenced by an older person).

In this case, defendant was also influenced by older persons. As pointed out by trial counsel at the sentencing hearing, "two of the three people he was involved with were older than him." (8T 3-1 to 3-3)

This is especially true given that the defendant was also a special education student with a learning disability. Yet, this was documented in the Defendant's school records. In advance of the juvenile waiver hearing, the defendant was also evaluated by psychologists to assess the likelihood of successful rehabilitation within the juvenile justice system. These psychologists also determined that defendant functioned at a low intellectual level. See also Point I, Point II and Point III, supra.

With regard to the defendant's low intellectual functioning level, defendant respectfully submits that the Court should have also found mitigating factor number (4), there were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense.

The Court should have also found mitigating factor (11), the

Pa 222

imprisonment of the defendant would entail excessive hardship to himself or his dependants.  Again, defendant, having been evaluated by experts, was found to be "not bright" and "easily confused." (Da 98)  One expert even opined that Mr. Mathis "may be functioning as the level of retardation." (Da 99)

In any event, it is further submitted that the defendant's limited intellectual abilities should have also been considered by the Court in assessing and weighing the other aforementioned mitigating factors.

Inexplicably, not a single witness was proffered by trial counsel at the sentencing hearing even though counsel was obviously aware that such witnesses were available.  Incredibly, nonetheless, trial counsel sought to have the Court consider such evidence without actually proffering same:

> The court recalls the trial.  **I think** two **teachers tried or attempted to testify as to his good character.  There were other teachers present who weren't called.**  In any case there were at least half dozen teachers that had him in class that were willing to come forward because he was such an excellent student.  Even the primary witness I feel against him was his girlfriend, and she indicated that she was stunned.  Counselor who she went to was stunned, everyone was stunned; they couldn't believe that Marvin could get involved in something like this.
>
> \*   \*   \*   \*   \*
>
> There was also Miss Garcia who testified in the case about what she was told by one of the Diggs sisters.
>
> In any case, prior to that she had written a letter indicating her strong support for Marvin, and she felt that he

59

> could be rehabilitated and he was basically a
> good person. [emphasis added](8T 3-4 to 3-24)

Notwithstanding trial counsel's failure to call any
witnesses at the sentencing hearing, as can be seen from trial
counsel's remarks, there were obviously witnesses that could
have, and should have, been called by counsel in support of the
mitigating factors. Certainly witnesses would have been more
persuasive than simply relying on counsel's argument. In fact,
as can be seen from counsel's comments, he could not even
remember how many witnesses were presented at trial, nor did he
articulate well their assertions regarding the defendant's good
character:

> I think two teachers tried or attempted to
> testify as to his good character.

It is respectfully submitted that counsel's remarks were not
very persuasive, and in fact, actually served to undermine the
efforts to have the Court find mitigating factors that were
clearly applicable.

Notwithstanding trial counsel's shortcomings, it is
submitted that the sentencing Court does not have discretion to
reject, altogether, a mitigating factor that is supported by the
record. To the contrary, where mitigating factors are amply
based in the record before the sentencing judge, they must be
found. To be sure, they may be accorded such weight as the Court
determines is appropriate. "That is a far cry, however, from

suggesting that a judge may simply decline to take into account a
mitigating factor that is fully supported by the evidence.  Such
a reading of the statute flies in the face of our sentencing
scheme and the well-established rule that aggravating and
mitigating factors must be supported by the credible evidence."
State v. Dalziel, 182 N.J. 494 (2005) citing State v. Roth, 95
N.J. 334, 356-64, 471 A.2d 370 (1984).

Based upon the foregoing, it is submitted that the sentence
is improper in that the Court did not apply all the appropriate
mitigating factors that were present.  It is further submitted
that the weight given by the Judge to the aggravating and
mitigating factors were inappropriate.

The defendant also maintains that he received the
ineffective assistance of trial counsel at the sentencing hearing
thereby making the defendant's sentence further constitutionally
deficient.  It is respectfully submitted that trial counsel was
wholly ineffective for not specifically setting forth the
mitigating factors which were present in this case that should
have been considered and applied by the Court at the time of
sentencing.  Trial counsel also failed to object to the Court's
improper consideration of, and/or weight given to, the
aggravating factors as noted above.  See also Point I, supra.

Trial counsel inexplicably failed to proffer witnesses at
sentencing that could have further substantiated the



aforementioned mitigating factors. See also Point I, supra.

In his *pro se* Petition, Mr. Mathis also contends that the sentencing Judge "exceeded his proper authority" when a sentence of fifty years was imposed; defendant asserts that he should have received only thirty years because the findings to enhance the sentence were not found by a jury.  (Da ) Mr. Mathis relies upon Blakely v. Washington, 124 S.Ct. 2531 (2004) and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000).  See also State v. Natale, 373 N.J. Super. 226 (App. Div. 2004)(ruling that New Jersey's sentencing guidelines pursuant to N.J.S.A. 2C:44-1a runs afounl of Blakely).

Blakely holds that, under Apprendi, a "standard" sentence may only be exceeded if a jury, not a judge, finds additional circumstances to exist. "In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings.  When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' Bishop, supra, Section 87 at 55, and the judge exceeds his proper authority". Id. at 2537 (emphasis in text).

"[T]he Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power.  It limits judicial power only to the extent that the claimed judicial power

62

Pa226

infringes on the province of the jury." <u>Blakely</u>, supra at 2540.

As such, petitioner submits that the enhanced sentence imposed upon the him violates his state and federal constitutional rights to trial by jury and due process of law, and must be vacated. <u>U.S. Const</u>. amends. VI, XIV; <u>N.J. Const</u>. Art. I, Par. 1, 9 and 10.

In an earlier opinion, the Supreme Court held that "under the Dupe Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." <u>Jones v. United States</u>, 526 U.S. 227, 243, n.6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). More recently, in <u>Ring v. Arizona</u>, the Court answered in the affirmative the question of whether Apprendi required that a jury, and not a judge, find the facts necessary for imposition of capital punishment.

Defendant now takes this argument further. In his pro se Memorandum of Law in support of the Petition for Post-Conviction Relief, "Defendant contends that a logical extension of <u>Apprendi</u>, <u>Jones</u>, and <u>Ring</u> requires that a jury, not a judge, find facts at a transfer of jurisdiction hearing pursuant to R. 5:22-2 that result in the decision to prosecute and sentence a juvenile as an adult, because the finding of those facts results in the juvenile

receiving a sentence in excess of the maximum term authorized for juveniles." (Da 58 to Da 126)

For the same reason, it is urged that the defendant was denied equal protection under the law. Specifically, in his *Pro Se* Petition, Mr. Mathis contends that he was denied equal protection because of his race. According to Mr. Mathis, "Other Groups (Caucasions) Are Less Likely To Be Waived Up To Adult Court, And Are Often Not." (Da 50 to Da 57)

Based upon the foregoing, it is submitted that Mr. Mathis did not receive equal protection under the law. Yet, in the administration of criminal justice, no person should be subject to greater or different punishment for an offense than that to which others of the same class are subjected. State v. Smith, 276 A.2d 369, 58 N.J. 202 (1971); See also United States Constitution, Fourteenth Amendment.

It is respectfully submitted, therefore, that the defendant's sentence must be reduced. Alternatively, it is respectfully submitted, that given trial counsel's failures, as aforementioned, an evidentiary hearing is warranted with regard to the matter at bar. See Point VII, infra.

While it is certainly conceivable that the State will argue that the issues presented herein should have been previously raised, or were raised in part, it is respectfully submitted that because of the ineffective nature of defendant's prior counsel,

Pa228

that fundamental justice now requires that these issues be heard taking into account the allegations of ineffective assistance of Defendant's trial counsel and appellate counsel.  Certainly,  Mr. Mathis was entitled to effective assistance of counsel.  See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 673 (1984) reh. den. 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864;  United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984);  State v. Fritz, 105 N.J. 42 (1987); See also  Evitts v. Lucey, 469 U.S. 387, 398 (1985).  See also State v. Morrison, 215 N.J.Super 540 (App.Div.) certif. denied 107 N.J. 642 (1987)

For the foregoing reasons, it is respectfully submitted that Mr. Mathis was not afforded the effective assistance of previous counsel and therefore should not be barred from raising any of the issues herein.  See also Point I, supra. and Point VIII, infra.

Pa 229

## POINT V

### THE CUMULATIVE EFFECT OF THE ERRORS COMPLAINED OF RENDERED THE TRIAL UNFAIR

It has been noted that, inevitably, legal errors must creep into the trial which will not ordinarily require reversal, if they do not prejudice the defendant.  State v. Sachs, 69 N.J.Super. 566, 577 (App. Div. 1961).  But, in that opinion, the court went on to point out:

> "On the other hand, where the legal errors complained of are of such magnitude as to prejudice the defendant's rights or, in their aggregate, have rendered the trial unfair, our fundamental constitutional concepts require the granting of a new trial.  State v. Orecchio, supra.  In such case, we cannot look at the proofs resolve conflicting evidence, and reach the conclusion that the error was harmless because we think the defendant was guilty.'  State v. Wolak, 26 N.J. 464 (1958).  No matter how seemingly evident the guilt of the accused, he is entitled to a fair trial surrounded by all of the substantive and procedural safeguards our legal heritage has provided."  Id. at 578.

Defendant urges that even if any of the errors herein are not individually deemed sufficient to warrant reversal, the cumulative effect of all the trial errors stated herein is such as to deny defendant his constitutional right to a fair trial.  State v. Orecchio, 16 N.J. 125, 129 (1951).

The cumulative effect of errors can violate "the due process guarantee of fundamental fairness".  Taylor v. Ky., 436 U.S. 473, 488 n. 15 (1978). See also U.S. v. Rivera, 900 F.2d 1462, 1469

Pa230

(10th Cir. 1990)("The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error"); State v. Reddish, 131 N.J. 553, 616 (2004); Feldman v. Lederle Labs, 132 N.J. 339, 352 (1993).

With regard to the case at bar, it is respectfully submitted that the cumulative effect of the errors noted herein made Defendant's conviction inevitable.  Mr. Mathis is serving a fifty year term of incarceration with a substantial period of parole ineligibility.  This Court should not permit such errors to stand.

Pa231

## POINT VI

### DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

It is submitted that Mr. Mathis did not receive effective assistance of counsel on his direct appeal.  Specifically, Appellate counsel failed to properly raise those issues that could have been raised on direct appeal.

In analyzing an ineffective assistance of appellate counsel claim, New Jersey Courts apply the standard for assessing ineffective assistance of counsel claims established in Strickland v. Washington, 466 U.S. 668; 80 L. Ed. 2d 674 (1984), and adopted by the Supreme Court of New Jersey in State v. Fritz, 105 N.J. 42 (1987).  Therefore, the Strickland standard directly and expressly applies to the defendant's claim that he was rendered ineffective assistance of appellate counsel.  State v. Morrison, 215 N.J. Super. 540 (App. Div.), certif. den., 107 N.J. 642 (1987).  Consequently, [I]n applying the Strickland standard to assess a claim of ineffective assistance of appellate counsel, a defendant must show not only that his attorney's representation fell below an objective standard, but also that he was prejudiced, i.e., but for counsel's unprofessional errors, the result would have been different."  Id. at 546 (citing Tsirizotaki v. Lefevre, 736 F. 2d 57, 65 (2d Cir. 1987), cert. denied, 469 U.S. 869; 83 L. Ed 2d 146 (1984)).

It is true that an appellate attorney does not have to raise

68

Pa.232

issues which he considers frivolous on appeal. <u>Jones v. Barnes</u>, 463 U.S. 745,749; 77 L. Ed. 2d 987, 991 (1983). Nevertheless, an attorney must raise the meritorious issues on appeal which are likely to lead to a defendant's conviction being reversed on appeal. Otherwise such an attorney is rendering ineffective assistance of counsel. <u>See Evitts v. Lucey</u>, 469 U.S. at 389; 83 L. Ed. 2d at 823. Mr. Mathis respectfully submits that the record demonstrates that he may well have received a reversal of his conviction(s) on appeal if his appellate counsel had raised the appropriate issues asserted herein.

The failure by the defendant's appellate attorney to subject the prosecution's case to meaningful adversarial testing meant that the adversary process itself became presumptively unreliable. <u>See Davis v. Alaska</u>, 415 U.S. 308; 39 L. Ed. 2d 347 (1974). In failing to raise these obvious issues, the defendant's appellate counsel failed in the role of expert assistant to the defendant. <u>See Evitts v. Lucey</u>, 469 U.S. at 394; 83 L. Ed. 2d at 828 n. 6.

Finally, while it is certainly conceivable that the State will argue that the issues presented herein should have been raised to the Appellate Court on his direct appeal, or were raised in part, it is respectfully submitted that because of the ineffective nature of defendant's appellate counsel, that fundamental justice now requires that these issues be heard

taking into account the allegations of ineffective assistance of Defendant's trial counsel and appellate counsel. (See also Point I, supra.) Certainly, Mr. Mathis is entitled to effective assistance of counsel on direct appeal. Evitts v. Lucey, 469 U.S. 387, 398 (1985). See also State v. Morrison, 215 N.J.Super 540 (App.Div.) certif. denied 107 N.J. 642 (1987)

For the foregoing reasons, it is respectfully submitted that Mr. Mathis was not afforded the effective assistance of appellate counsel and therefore should not be barred from raising any of the issues herein.  See also Point VIII, infra.

## POINT VII

### AN EVIDENTIARY HEARING IS REQUIRED WITH REGARD TO THE ALLEGATIONS OF DEFENDANT'S PETITION FOR POST-CONVICTION RELIEF

As noted above, among the issues asserted herein, Mr. Mathis is seeking post-conviction relief on the basis of allegations of ineffectiveness of counsel. (See <u>Point I</u> and <u>Point VI</u>, supra.) It is respectfully submitted that counsel acted in a manner that was so contrary to the interests of justice, that the Court should judge counsels' performance constitutionally deficient and/or invalid without looking further to the consequences of counsels' actions. Alternatively, certainly these claims present a prima facie case of ineffective assistance of trial and appellate counsel so as to require an evidentiary hearing. <u>See</u> <u>State v. Preciose</u>, 129 N.J. at 462.

The right to post-conviction relief must be established by the petitioner by a preponderance of the credible evidence. <u>State v. Preciose</u>, 129 N.J. at 459. While not all post-conviction claims require an evidentiary hearing for their resolution, <u>See</u> <u>State v. Flores</u>, 228 N.J. Super. 586, 589-90 (App. Div. 1988), certif. denied, 115 N.J. 78 (1989), many ineffective assistance of counsel claims do. Therefore, "[ineffective assistance of counsel claims are particularly suited for post-conviction review," and the development and resolution of such claims usually require an evidentiary hearing.

Pa235

State v. Preciose, 129 N.J. at 460-462 (See cases cited at 460-461); See State v. Sparano, 249 N.J. Super. 411, 419 (App. Div. 1991); Smith v. United States, 608 A.2d 129 (D.C. App. 1992); Randall v. State, 609 A.2d 949 (R.I. 1992); Blanco v. Wainwright, 507 So.2d 1377, 1384 (Fla. 1987).

The New Jersey Supreme Court ruled that ineffective assistance of counsel claims are particularly suited for post-conviction relief review because they often cannot be raised in a prior proceedings. State v. Preciose, 129 N.J. 451 (1992). Often times a defendant will not know that he had received ineffective counsel until long after the damage was done. Therefore, if the Court does not find that counsels actions were per se ineffective, a hearing should be held and counsel be required to testify and explain their failures. See also State v. Sparano, 249 N.J. Super. 411 (App. Div. 1991); State v. Dixon, 125 N.J. 223 (1991); United States v. Gambino, 788 F.2d 938 (3rd Cir. 1986).

"[T]he mere presence of an attorney at a trial does not satisfy the Constitution." State v. Fritz, 105 N.J. 42, 57 (1987). On the contrary, "[t]he circumstances under which a lawyer provides counsel must not preclude the giving of effective aid in the preparation and trial of the case." State v. Sugar, 84 N.J. 1, 17 (1980) [quoting Powell v. Alabama, 287 U.S. 45, 71 (1932)].

72

Pa 236

In <u>United States v. Cronic</u>, 466 U.S. 648 (1984), the United States Supreme Court identified a narrow category of cases in which prejudice is presumed.  One of those types is where there is an actual or constructive denial of counsel altogether. When a lawyer fails to subject the State's case to meaningful adversarial testing, then there has been a denial of the Sixth Amendment that makes the adversarial process itself presumptively unreliable. <u>Cronic</u> at 660.

It is respectfully submitted, therefore, that given counsels' failures, as aforementioned, Mr. Mathis received the ineffective assistance of trial and appellate counsel; counsel clearly failed to subject the Defendant's case to meaningful adversarial testing.  Defendant further submits, therefore, that an evidentiary hearing is warranted with regard to the matter at bar.

Pa 237

### POINT VIII

**THE DEFENDANT'S MOTION FOR POST-CONVICTION RELIEF SHOULD NOT BE BARRED BY PROCEDURAL CONSIDERATION**

Pursuant to Rule 3:22-12, a Petition for Post-Conviction Relief, other than to correct an illegal sentence, must generally be filed within five years of the judgment being challenged. With regard to the case at bar, Mr. Colon was sentenced on August 14, 1998. The defendant filed his *pro se* Petition for Post-Conviction Relief on September 23, 2003. (Da 50 to Da 57) As such, Petitioner is beyond the five years time limit on this application. However, it is respectfully submitted that the procedural history of this case, the reason for the delay, and the importance of the legal issues defendant has raised herein should result in consideration of the merits of his present petition. Additionally, Defendant is raising issues herein regarding the legality of his sentence. See Point IV, supra.

The five-year rule of Rule 3:22-12 may also be relaxed if the defendant shows some "excusable neglect," or if the "interests of justice" demand it. Rule 1:1-2. The meaning of these terms has been provided by the New Jersey Supreme Court in State v. Mitchell, 126 N.J. 565 (1992). Generally, the time bar should be relaxed "only under exceptional circumstances." Id. at 580. The longer the time delay, the heavier the burden becomes on the petitioner. Id. at 580. One panel of the Appellate

74

Division has affirmed a lower-court finding that "New Jersey's attitude with respect to compliance with procedural rules is consistent with federal decisions holding that post-conviction rules will not be so construed as to make them inadequate," and that as "a general rule, attempts to appeal within time by convicted defendants, particularly when incarcerated and not having advice or assistance of counsel, will be liberally appraised so as to have the right of review where reasonably possible as against objections of untimeliness." State v. Hale, 116 N.J. Super. 106, 110-111 (Law Div. 1971), aff'd, 120 N.J. Super. 469 (App. Div. 1972); accord Brown v. New Jersey, 395 F.2d 917 (3d Cir. 1968); contra State v. Dillard, 208 N.J. Super. 722 (App. Div. 1986).

The Mitchell Court also held that the reasons for the failure to abide by the time limits must be alleged in the petitioner's moving papers. Mitchell, 126 N.J. at 576-577. Cases where no "excusable neglect" has even been offered have been unsuccessful in relaxing this time bar. See State v. Culley, 250 N.J. Super. 558 (App. Div. 1991); State v. Jenkins, 221 N.J. Super. 286 (App. Div.), certif. den. 113 N.J. 343 (1988), cert. den. 109 S.Ct. 843 (1989). The reasons for the delay in Mr. Mathis raising the issues asserted herein are contained within this Petition for Post-Conviction Relief.

In addition, the underlying merits of defendant's claims

75

Da239

auger in favor of a decision on the substance of the motion.   As

our Supreme Court has noted:

> Where meritorious issues are presented, our
> interest in affording defendants access to
> both state post-conviction and federal habeas
> review outweighs our interest in finality
> through an unnecessarily-rigid enforcement of
> state procedural rules.   Simply put,
> considerations of finality and procedural
> enforcement count for little when a
> defendant's life or liberty hangs in the
> balance.

State v. Preciose, 129 N.J. 451, 475-76 (1992).

Defendant submits that Court rules are not ends in

themselves, but are a means to achieve justice.   Viviano v. CBS,

101 N.J. 538, 550 (1986).   Defendant further submits that the

interests of justice demand that his claims be considered on the

merits and the five-year time limit be relaxed.

It is also certainly conceivable that the State will argue

that the issues raised herein could have been previously raised,

or were raised in part.   It is respectfully submitted, however,

that because of the ineffective nature of prior counsel (see

Point I, and Point VI, supra), that fundamental justice now

requires that these issues be heard in the form of post-

conviction relief.   Certainly, a criminal defendant is entitled

effective assistance of counsel.   Strickland v. Washington, 466

U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 673 (1984) reh. den. 467

U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864;   United States v.

Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984);

<u>State v. Fritz</u>, 105 N.J. 42 (1987).

It is asserted that the procedural bars contained in <u>R</u>.3:22-4 and <u>R</u>. 3:22-5, should not be applicable in this case. <u>R</u>. 3:22-4 sets forth a general bar to raising issues on post-conviction relief which were not raised in prior proceedings and then delineates exceptions to that general bar. Specifically, <u>Rule 3:22-4</u> provides:

> Any ground for relief not raised in a prior
> proceeding under this rule, or in the
> proceedings resulting in the conviction, or
> in a post-conviction proceeding brought and
> decided prior to the adoption of this rule,
> or in any appeal taken in any such
> proceedings is barred from assertion in a
> proceeding under this rule unless the court
> on motion or at the hearing finds (a) that
> the ground for relief not previously asserted
> could not reasonably have been raised in any
> prior proceeding; or (b) that enforcement of
> the bar would result in fundamental
> injustice; or (c) that denial of relief would
> be contrary to the Constitution of the United
> States or the State of New Jersey.

It is respectfully submitted that Petitioner's claims of ineffective assistance of counsel are cognizable under all three of the rule's exceptions. First, Mr. Mathis satisfies exception (a), for example, that the ground for relief could not reasonably have been raised in any prior proceeding, since he could not have raised all of his ineffective assistance of counsel claims on direct appeal since many of these facts required for the argument were not on the record. See also <u>Point I</u>, <u>Point II</u>, and <u>Point III</u>, supra.

Pa241

While it is well-settled that "post conviction proceedings are not a substitute for direct appeal," State v. Cerbo, 78 N.J. 595, 605 (1979), it is also clear that a defendant is in no position to challenge the effectiveness of his trial counsel where key information regarding counsel's performance is not in the record. Mitchell, 126 N.J. at 584-85. Accordingly, the matter at bar falls precisely within the exception of Rule 3:22-4(a), and the reasoning of Mitchell.

Further, as to this and other issues raised, the denial of relief in this case would result in the violation of the Petitioner's federal and state constitutional right to counsel, and a fair trial and due process, and therefore, the exceptions contained in subsections (b) and (c) also apply. Indeed, the Supreme Court has interpreted this exception "to allow courts to consider petitions for post-conviction relief when the defendant alleges that his constitutional rights were seriously infringed during the conviction proceedings." Mitchell, 126 N.J. at 586. Hence, because the right to effective counsel, and the right to a fair trial, are fundamental constitutional rights, the Petitioner's arguments fall within exception (c) to the bar against grounds not raised in prior proceedings. State v. Sloan, 226 N.J. Super. 605, 612 (App. Div.), certif. denied, 113 N.J. 647 (1988).

The Petitioner further argues that the bar of Rule 3:22-5

Pa242

should not apply in his case since, since the issues raised were not previously adjudicated. Furthermore, the Petitioner asserts that the arguments raised of substantial import, and the rule should be relaxed. (See State v. Johns 111 N.J. Super. 574, 576 (A.D. 1970)

Lastly, the New Jersey Supreme Court has indicated in Preciose that when push comes to shove, claims should be considered on the merits:

> From our state perspective, finality is achieved when our courts grant or deny post-conviction relief. Any state court judgment later overturned by federal habeas review presumably will have been undeserving of finality. We are not so convinced of our infallibility, or so jealous of our sovereignty, as to deem federal habeas review an undesirable intrusion on our adjudications. As Justice Harlan observed, "the threats of habeas serves as a necessary additional incentive for trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards. Desist v. United States, 394 U.S. 244, 262-63, 89 S.Ct. 1030, 1041, 22 L.Ed.2d 248, 263 (1969) (Harlan, J., dissenting); see also Teague v. Lane, 489 U.S. 288, 306, 109 S.Ct. 1060, 1073, 103 L.Ed. 2d 334, 353 (1989) (quoting Justice Harlan's observation approvingly); State v. Lark, 117 N.J. 331, 342, 567 A.2d 197 (1989) (same). Where meritorious issues are presented, our interest in affording defendants access to both state post-conviction and federal habeas review outweighs our interest in finality through an unnecessarily-rigid enforcement of state procedural rules. Simply, put, considerations of finality and procedural enforcement count for little when a defendant's life or liberty hangs in the

Pa243

balance

\*         \*         \*

New Jersey's system of post-conviction review apparently affords criminal defendants a broader opportunity to raise constitutional claims than does federal habeas review.  It would be a bitter irony indeed if our courts, in an attempt to accommodate the Supreme Court's retrenchment of federal habeas review, were artificially to elevate procedural rulings over substantive adjudications in post-conviction review, at a time when the Court's curtailment of habeas review forces state prisoners to rely increasingly on state post-conviction proceedings as their last resort for vindicating their state and federal constitutional rights.  When appropriate, the procedural bars imposed by Rules 3:22-4, 3:22-5 [previously adjudicated on the merits] and 3:22-12 [five-year limitation] may be asserted to preclude post-conviction relief, but their use should not be shaped or influences in the slightest by the federal courts' restrictive standards for allowing or disallowing habeas review.  In such instances, an abbreviated reference to underlying meritorious issues may be useful in demonstrating that reliance on the procedural bar has caused no injustice.  However, when meritorious issues are raised that require analysis and explanation, our tradition of comprehensive justice will be served by decisions that reflect thoughtful and thorough consideration and disposition of substantive contentions.

State v. Preciose, 129 N.J. 451, 475-476, 477-478 (1992)

Therefore, in the interest of justice, and for all the above-mentioned reasons, Mr. Mathis respectfully submits that he should not be barred from raising any of the issues asserted herein.

Pa244

## CONCLUSION

For the foregoing reasons, it is respectfully requested that this Court grant defendant's Petition for Post-Conviction Relief and grant a new trial; it is further urged that defendant's sentence is excessive, improper and/or otherwise unconstitutional.  In the alternative, it is respectfully requested that the Court conduct an evidentiary hearing.

Respectfully submitted,

BY: _____
    CRAIG S. LEEDS
    Designated Counsel

cc:  Criminal Division Manager
     Sara Liebman, Asst. Pros.
     Marvin Mathis

81

Da 244.5

STATE OF NEW JERSEY

v.

MARVIN MATHIS
_____
Defendant

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION — CRIMINAL
___UNION___ COUNTY

INDICTMENT #: _97-02-123_

CASE OR PROMIS #: _96004583_

## ORDER ON POST-CONVICTION APPLICATIONS
## ON INDICTABLE OFFENSES

This matter being opened on the application of defendant, _Marvin Mathis_, by:

[X] Petition for Post-Conviction Relief determined to be defendant's

    __✓__ first petition

    _____ second or subsequent petition

[ ] Motion for Change or Reduction of Sentence pursuant to *Rule* 3:21-10

[ ] Motion for _____ and the defendant having been represented by:

_____, Assistant Deputy Public Defender

_Craig S. Leeds, Esq_, Retained or (Designated Counsel) *(circle one)* or

[ ] The court having concluded that there was no good cause entitling the assignment of counsel on the
application, and the State having been represented by:

_Sara Liebman_ Assistant Prosecutor; and

[X] There having been proceedings conducted on the record on _Jan 27_, 2~~00~~ _2012_ or

[ ] The matter having been disposed of on the papers;

It is on this __27__ day of _Jan_, 2~~00~~ ~~2012~~ ORDERED THAT DEFENDANT'S APPLICATION IS HEREBY:

    _____ Granted

    __X__ Denied

    _____ Other

For the reasons:

[ ] Expressed in the court's written opinion of _____

[X] Expressed orally on the record on _1·27·12_

_____, J.S.C.
JOHN F. MALONE, P.J.Ch.

ORIGINAL:    Office of the Public Defender
c:           Judge _____
              Criminal Division Manager's Office
              Prosecutor's Office
              Defendant

JOSEPH E. KRAKORA
Public Defender
Office of the Public Defender
Appellate Section
31 Clinton Street, 9th Floor
P.O. Box 46003
Newark, New Jersey 07101
(973) 877-1200

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
IND/ACC. NO(S). 97-02-0123

STATE OF NEW JERSEY,                :          CRIMINAL ACTION

   Plaintiff-Respondent,       :          NOTICE OF APPEAL

   v.                          :

MARVIN MATHIS,                      :

   Defendant-Appellant.        :
:::::::::::::::::::::::::::::::::

    PLEASE TAKE NOTICE that the defendant, Marvin Mathis, confined

at New Jersey State Prison, appeals to this Court from the final

order denying defendant's petition for post-conviction relief

entered on January 27, 2012 in the Superior Court, Law Division,

Union County, by the Honorable John F. Malone, J.S.C.

JOSEPH E. KRAKORA
Public Defender
Attorney for Defendant-Appellant

BY: _____
      HELEN C. GODBY
   Assistant Deputy Public Defender
        Intake Unit

The undersigned certifies that the requirements of R. 2:5-3(a) have
been complied with by ordering the transcript(s) on August 15, 2012
indicated on the accompanying transcript request form(s) and that a
copy of this Notice has been mailed to the tribunal designated
above.

_____

Da 246