Marvin Mathis #304144/244859-C
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3222-11T1

STATE OF NEW JERSEY,          :

    Plaintiff-Respondent;     :

                         :

v.                            :

                         :

MARVIN MATHIS,                :

    Defendant-Appellant.      :

CRIMINAL ACTION

On Appeal from Denial
of Petition for Post-
Conviction Relief from
the Superior Court of
New Jersey Law Division,
Union County

Sat Below:

Hon. John F. Malone,

## APPENDIX ON BEHALF OF DEFENDANT-APPELLANT
## MARVIN MATHIS

### VOLUME III

### (Da 129 to Da 205)

## Appellant is Presently Confined

## INDEX TO APPENDIX

PAGE NOS.

Appellate Division Per Curiam Opinion,
State v. Marvin Mathis, Appellate
Division Docket No. A-3316-98T8 ......................... Da 1 to Da 40

Notice of Petition for Certification .....................      Da 41

Order of Petition for Certification ......................      Da 42

Pro Se Petition for Post- Conviction
Relief .................................................. Da 43 to Da 50

Pro Se Verified Petition for Post-
Conviction Relief ....................................... Da 51 to Da 58

Pro Se Memorandum of Law in Support
of Post-Conviction Relief ............................... Da 59 to Da 96

Pro Se Appendix to Memorandum of Law
        Psychological Assessment of Defendant
        By Dr. Cheryl L. Thompson ...................... Da 97 to Da 101

        Psychological Evaluation of Defendant
        By Dr. Martha H. Page .......................... Da 102 to Da 111

        Psychological Evaluation of Defendant
        By Dr. Louis B. Schlesinger ................... Da 112 to Da 127

Pro Se Letter-Brief in Support of
Post-Conviction Relief................................... Da 129 to Da 144

February 29, 2008 Order Denying Post-
Conviction Relief ......................................      Da 145

Appellate Division Per Curiam Opinion,
State v. Marvin Mathis, Appellate
Division Docket No. A-3695-07T4 ....................... Da 146 to Da 155

Pro Se Second Letter-Brief in Support
of Post-Conviction Relief and Appendix ............... Da 156 to Da 182

January 27, 2012 Order Denying Post-
Conviction Relief .......................................      Da 185

Statement of Facts, Direct Appeal Brief ............. Da 186 to Da 200

Trial transcript of Marvin Mathis, Morning
Session, June 11, 1998 .............................. Da 201 to Da 205

Marvin Mathis #304144/244859C   Hon. John F. Malone, J.S.C.
New Jersey State Prison
P. O. Box 861
Trenton, New Jersey 08625

PRESENTLY   CONFINED

           SUPERIOR COURT OF NEW JERSEY
           LAW DIVISION, UNION COUNTY
           UNION COUNTY IND. NO. 97-02-123

STATE OF NEW JERSEY,   :    CRIMINAL ACTION
   Plaintiff-Respondent, :
          :  LETTER-BRIEF IN SUPPORT OF
   v.      :  POST-CONVICTION RELIEF, PURSUANT
          :  TO N.J. RULE 3:22 et seq.
MARVIN MATHIS,    :
   Defendant-Petitioner. :
————————————————————:

HONORABLE JUDGE JOHN F. MALONE, J.S.C.
Union County Courthouse
2 Broad Street, 3rd Floor
Elizabeth, New Jersey 07207

     Re: On Petition for Post-conviction Relief
       State v. Marvin Mathis
       Union County Ind. No. 97-02-123

Dear Honorable Judge Malone:

   Pursuant to **N.J. Rule** 2:6-2(b), please accept this letter-brief and appendix in lieu of a more formal brief in support of defendant's petition for post-conviction relief.



Prepared by Inmate Legal Association (ILA)

# TABLE OF CONTENTS

PROCEDURAL HISTORY                    1

STATEMENT OF FACTS                  2

LEGAL ARGUMENT:

## POINT ONE

TRIAL AND APPELLATE COUNSEL WERE PREJUDICIALLY INEFFECTIVE BY
FAILING TO DISCOVER AND RAISE THE ISSUE OF THE DEFENDANT'S
LACK OF COMPETENCE TO STAND TRIAL. N.J. CONST. (1947) Art. 1,
Par. 1, Par. 10; U.S. CONST. AMEND. V; VI; XIV

. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## CONCLUSION

. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13



7

## INDEX TO APPENDIX

Ten-Page report of Martha H. Page, ED.D. ........................

Five-Page report of Cheryl L. Thompson, PH.D. ..................

Sixteen-Page report of Louis B. Schlesinger, PH.D. .............

¶ Petitioner will rely on his <u>pro</u> <u>se</u> appendix in his Memorandum pages 1 through 31, submitted February 24, 2005.

## TRANSCRIPT CITATIONS

"1MT" refers to the transcript of the juvenile waiver hearing on October 10, 1996.

"2MT" refers to the transcript of the juvenile waiver hearing on November 11, 1996.

"3MT" refers to the transcript of the Miranda hearing on June 9, 1998.

1T      refers to the trial transcript of June 10, 1998.

2T      refers to the trial transcript of June 11, 1998. (a.m.).

3T      refers to the trial transcript of June 11, 1998 (p.m.).

4T      refers to the trial transcript of June 16, 1998.

5T      refers to the trial transcript of June 17, 1998 (a.m.).

6T      refers to the trial transcript of June 17, 1998 (p.m.).

7T      refers to the trial transcript of June 18, 1998.

ST      refers to the sentencing transcript of August 14, 1998.

A 131

## PROCEDURAL HISTORY

Petitioner will rely on Procedural History set forth in PCR counsel's brief.

A 132

## STATEMENT OF FACTS

Petitioner will rely on Statement of Facts set forth in PCR counsel's brief.

A 133

POINT ONE

TRIAL AND APPELLATE COUNSEL WERE PREJUDICIALLY INEFFECTIVE BY
FAILING TO DISCOVER AND RAISE THE ISSUE OF THE DEFENDANT'S
LACK OF COMPETENCE TO STAND TRIAL. N.J. CONST. (1947) Art. 1,
Par. 1, Par. 10; U.S. CONST. AMEND. V; VI; XIV

The defendant argues that trial and appellate counsel
were prejudicially ineffective pursuant to the two prong standard
for claims of ineffective assistance of counsel. Strickland
v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984); State v.
Fritz, 105 N.J. 42, 58 (1987)(adopting two prong analysis
announced in Strickland for evaluating claims of ineffective
assistance of counsel); and also State v. Morrison, 215 N.J.
Super. 540 (App. Div. 1987)(adopting Strickland and Evitts v.
Lucey, 469 U.S. 387, 396, 105 S.Ct. 83 (1985), framework for
analyzing claims of ineffective assistance of appellate counsel).

The defendant urges that his counsel were deficient,
pursuant to the first prong of Strickland, supra, at 466 U.S.
687-88, 104 S.Ct. 2052 and pursuant to State v. Morrison/Evitts
v. Lucey, supra, by their failures to investigate, and failures
to make a reasonable decision not to investigate, the law
relevant to the facts known about the defendant's lack of
competence to stand trial. Both counsel were well aware of
abundant facts supporting a claim that the there was (at least)
a bona fide doubt that the defendant was not competent to stand
trial. Counsel had notice of the defendant's low level of
intellectual functioning from: facts presented at a juvenile
waiver hearing; from three expert reports; and from the

8

defendant's testimony during the trial.

At a juvenile waiver hearing on November 11, 1996 three psychologists' reports were stipulated into evidence (2MT 20-19)[+] and then summarized by counsel for the defendant (2MT 4-18 to 9-20) and by counsel for the State. (2MT 9-21 to 1910) Counsel knew at the time of the offense that the defendant was 15 years and ten months old (2MT 10-1); had over a decade of learning disabilities (2MT 6-13 to 17); was classified as communication handicapped in 1990 (2MT 6-15); was continuously placed in special education classes (2MT 8-1 to 3); and had limited intelligence (2MT 9-12 to 14). Counsel were also aware the defendant was diagnosed as being in the "early" stages of a personality disorder with impulsive and antisocial traits (2MT 18-3 to 5) and antisocial thinking. (2MT 18-22).

Further, counsel were plainly aware of the court's findings with respect to the defendant: there was no substantial history of delinquency (2MT 23-19); the defendant had not benefited from education (2MT 24-5 to 12); was a follower (2MT 24-2); was unable to make decisions on his own (2MT 25-25); defendant's mental acumen was borderline (2MT 26-24); and that defendant's lack of academic acumen was so severe as to be relevant to the defendant's rehabilitative potential. (2MT 27-4 to 15)

_____

+   "2MT" refers to the transcript of the juvenile waiver hearing
     that took place on November 11, 1996.



A 135

Both trial and appellate counsel read and were familiar with all three psychologists' reports and the facts and conclusions reached by each. Indeed, all reports were stipulated into evidence (2MT 2-13 to 3-7) and were included as exhibits by appellate counsel in the appendix on the defendant's direct appeal. Both counsel were then well aware of the dire need for a competency hearing, based on the findings in all three expert reports.

Martha Page, Ed.D., a defense expert, performed a comprehensive psychological evaluation encompassing numerous types of examinations, sources, and analytical methods. (See report of Martha Page, p. 1-2, hereafter referred to as "Page rpt.") Page cataloged the defendant's numerous cognitive, analytical and decision making deficiencies on practically every page of her report. She noted that defendant: repeated first and second grade, Page rpt. at p. 2; was communication handicapped, Id. at 2; was unable to retain details in a story, Id. at 2; had problems in retaining and processing information, Id. at 2; had difficulty remaining focused, Id. at 4; had a need for assistance with concepts and skills related to organization of ideas, Id. at 4; had difficulty completing sentences, Id. at 5; scored intellectually deficient on processing speed I.Q. and verbal scale I.Q., Id. at 5; had difficulty processing verbal material quickly, Id. at 5; had difficulty planning ahead, Id. at 6; lacked abstract thinking necessary to develop complex hypotheses in a novel situation,



JA 136

Id. at 7;  had difficulty in using perceptual cues to aid him in solving problems, Id. at 7; had difficulty seeing relationships in an unfamiliar situation, Id. at 8; had difficulty in seeing things through carefully when in an unfamiliar situation, Id. at 8; was slow to process information, Id. at 9; and lacked problem solving skills, Id. at 10.

Cheryl Thompson, Ph.D., a defense expert, performed a thorough psychological assessment of the defendant. (See report of Cheryl Thompson, hereafter referred to as "Thompson rpt.") She noted the defendant's low level of intellectual functioning throughout her report: the defendants' intelligence was borderline to low average, Thompson rpt. at p. 2; defendant's ability to think abstractly was poorly developed, Id. at 3; attention and concentration were impaired, Id. at 3; defendant "is not bright and is easily confused," Id. at 3; defendant was not capable of realizing incompatible career goals, Id. at 3; the defendant was quite confused about his involvement in a serious crime, Id. at 1 and 4; defendant's behavior was that of a person whose judgment was clouded," Id. at 5.   It is also significant, with respect to counsels' notice of facts materially relevant to the issue of defendant's competency, that Thompson explicitly found that the defendant "should have a complete diagnostic assessment as he may be functioning a[t] the level of retardation," Id. at 4.

Louis Schlesinger, Ph.D., the State's expert, conducted a thorough psychological assessment of the defendant. (See report



of Louis Schlesinger, hereafter referred to as "Schlesinger rpt.") Schlesinger noted the defendant's low level of intellectual functioning throughout his report: defendant had an I.Q. of 79, and had verbal skills at the low end of the dull-normal range, Schlesinger rpt. at p. 7; defendant had a weak "fund" of general information, suggesting that defendant has not profited a great deal from school or experience, Id. at 7-8; has some basic understanding of the world around him, but it is not that deep or extensive, Id. at 8; has difficulty drawing superordinate relations between objects and ideas, and "More complex abstractions, such as proverb interpretation, were too difficult," Id. at 8; has difficulty analyzing, synthesizing, and integrating parts into a whole concept, Id. at 8; defendant can learn new material, but is not really that quick, and "several repetitions are often necessary to transfer new knowledge into pre-existing structures, Id. at 9; defendant was displaying signs of personality disorder with impulse and antisocial traits, Id. at 10; and showed indications of suspiciousness and mistrust, Id. at 12.

It is significant that all three experts agreed that the defendant suffered from a weak fund of knowledge. (See Page rpt. at p. 6; Thompson rpt. at p. 2-3; Schlesinger rpt. at p. 7-8) Both counsel should have immediately recognized the materiality of this particular handicap in the context of the defendants overall lack of memory, analytical, and problem solving skills. The defendant simply had no ability to

A 138.

understand or appreciate the process of inferential reasoning that is essential to not only both the introduction of evidence, and to the jury's decision making as the trier of fact.

Defendant's admittedly weak fund of knowledge collapsed his ability to make sound inferences to practically zero. As one commentator noted, the reliability of inferences are influenced by the store of generalizations and assumptions which a person has absorbed for their intellectual, social, and cultural background. See The Principles Of Criminal Evidence, by A.A.S. Zuckerman, at pp. 19-20 (1989). Further, "While the great majority of generalizations are brought into the arena by the trier of fact, some will be introduced by the parties ... But whether an generalization is part of the adjudicator's background knowledge or whether it is brought to his attention along with the rest of the evidence, its function is exactly the same: to facilitate the drawing of inferences and assess their probability." Id. at 21. With such a limited store of information, and even less ability to make important decisions based on his own defective inferential reasoning ability, the defendant could not make sound and reliable decisions with regard to any aspect of his defense.

Like all attorneys, counsel can be constructively held to know, or have the means to know, that an inference is defined as "a deduction of an ultimate fact from other proved facts, by virtue of the common experience of man, will support but not compel such deductions." Comm. v. Whittman, 186 A.2d 632,

8

A 139

633 (PA. 1963)(citing In Re Dilios Will, 156 Me. 508, 167 A.2d 571, 578 (1960) Defendant, however, cannot. Nor could the defendant possibly begin to have understood the inferential reasoning process while he was undergoing a criminal trial, given his inherently weak fund of knowledge, his limited and special education background, or any of the diagnosed analytical deficits he suffered from.

Lastly, counsel were aware of defendant's testimony (4T, 5T) and his difficulties testifying, remembering, and describing facts and events: on direct examination (4T, 151-24 to 152-14; 153-2; 154-21 to 24; 156-3 to 157-5); on cross-examination (4T 158-23; 166-16; 5T, 21-1 to 20; 24-5 to 16; 27-10 to 14; 28-20; 35-1 to 35-16; 42-12 to 23; 43-8 to 21; 49-1 to 8; 51-2 to 17; 55-8 to 17; 56-10 to 16; 61-3 to 14; 63-2 to 12; 66-9 to 67-4; 71-2 to 24; and especially at 5T, 72-19 to 23; 77-16 to 19; 83-22 to 84-9; 92-7 to 11; 98-16 to 99-13; 108-1 to 20; 116-1 to 3; 116-4 to 116-20; 118-2 to 13); on redirect examination (5T, 125-23 to 126-4; 127-6 to 11) and on re-crossexamination (5T, 130-21 to 25). Given the defendant's acknowledged low level of intellectual functioning, his weak fund of knowledge, and his lack of ability to understand, appreciate, or learn the inferential reasoning process used pervasively in the legal system, it is simply not possible to categorize these numerous examples, occurring throughout the defendant's testimony, collectively, as anything other than the proverbial red flag warning of the defendant's incompetence,

From the facts found at the waiver hearing, in the expert reports, and from defendant's trial testimony, counsel had every reason to discover and raise the issue of the defendant's lack of competence to stand trial. Conversely, counsel had no conceivable reason, or strategic grounds, to avoid investigating the law on this issue. Moreover, counsel were in the best position to bring the issue of defendant's lack of competence into "focus." See generally Drope v. MO, 462 U.S. 162, 176-177, 95 S.Ct. 896, 906 (1975).

Counsel knew the defendant lacked the ability to understand the inferential process vital to the defense theory of the case, the State's theory of the case, and the jury's methods of fact finding. Since counsel knew the defendant could not understand or apply inferential reasoning, counsel also knew, or should have known, the defendant could not make decisions about his defense based on inferential reasoning. Therefore, the defendant could not make rational decisions about his defense nor rationally assist in his defense. Accordingly, the defendant met the standard for incompetence to stand trial. The defendant did not have the ability to consult with counsel to "a reasonable degree of rational understanding," nor did the defendant have a "rational as well as factual understanding of the proceedings against him." See Dusky v. U.S., 362 U.S. 402, 80 S.Ct. 788 (1960); and State v. Sinclair, 49 N.J. 525, 549 (1967).

Since counsel had notice of uncontradicted factual grounds and strong reason to believe the defendant was incompetent,

10

141

and since no strategic reasons could support an intentional decision by counsel to put an incompetent defendant on trial, see Bishop v. U.S., 350 U.S. 961, 76 S.Ct. 440 (1956), counsel had a duty to make an investigation into the law of competence pursuant to the first prong of Strickland v. Washington, supra. Counsel unreasonably failed to perform this duty, and therefore were deficient pursuant to Strickland v. Washington, supra.

To show "prejudice," the defendant need only show a reasonable probability that he was incompetent such that is "sufficient to undermine confidence in the outcome" such that the outcome was unreliable or fundamentally unfair. Strickland v. Washington, supra, at 466 U.S. 694, 104 S.Ct. 2068.

The abundant evidence of defendant's lack of competence satisfies not only the Dusky, supra, standard for incompetence, but also satifies the "bona fide doubt" standard of State v. Lambert, 275 N.J. Super. 125, 128 (App. Div. 1994) and Pate v. Robinson, 383 U.S. 375, 385, 86 S.Ct. 836, 842 (1966). Defendant's competence is subject to a bona fide doubt due to the facts above that counsel were aware of, and so there is a reasonable probability that a psychological evaluation would have revealed defendant's incompetence. There is then a reasonable probability that a competency hearing would have been decided in the defendant's favor. Since the trial of an incompetent defendant alleges a claim of a fundamentally unfair per se violation of due process, Bishop v. U.S., supra; State v. Lambert, supra at 128 (citing Drope v. MO, supra, at 420

14

Ja 142

U.S. 171-72, 95 S.Ct. 903-04 (1975) the defendant has shown there is a reasonable probability that he was incompetent, that is sufficient to undermine confidence that the trial resulted in a fundamentally fair outcome. Prejudice, pursuant to Strickland, supra, at 466 U.S. 694, 104 S.Ct. 2068, is then present.

In sum, the defendant submits that the failures of his trial and appellate counsel to raise and discover this claim resulted in fatal prejudice to the defendant's right to counsel, a fair trial, and a fair appeal. Accordingly, the defendant's convictions were obtained in violation of Article 1, Paragraphs 1 and 10 of the State Constitution, and in violation of the Fifth, Sixth, and Fourteenth Amendments to the Federal Constitutions and therefore must be reversed.

## CONCLUSION

Based on the foregoing, petitioner respectfully requests the Court to grant him post-conviction relief.

Dated: August 02, 2007                     Respectfully submitted,

                                           Marvin Mathis
                                           Marvin Mathis

JA 144

13

FILED

FEB 29 2008

JOHN F. MALONE
J.S.C.

BY ORDER OF THE COURT

STATE OF NEW JERSEY,          :          SUPERIOR COURT OF NEW JERSEY

    Plaintiff-Respondent,

  -v-                          :          UNION COUNTY
                                CRIMINAL DIVISION

MARVIN MATHIS,                :          INDICTMENT NO.
                                  97-02-123
    Defendant-Petitioner.   :
                                    ORDER

This matter having been opened to the court by defendant by Petition for

Post-Conviction Relief, Lewis D. Thompson, Esq., appearing for the defendant and

Sara B. Liebman, Assistant Prosecutor, appearing for the State and the court

having considered the pleadings submitted, the oral argument of counsel and for

good cause shown,

    It is on this 29th day of February, 2008, ORDERED

    That defendant's verified Petition for Post-Conviction Relief is hereby denied

for the reasons stated on the record on February 29, 2008.

                                 JOHN F. MALONE, P.J.Ch.

JA 145

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.   A-3695-07T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MARVIN MATHIS,

     Defendant-Appellant.

---

Submitted September 21, 2010 - Decided October 12, 2010

Before Judges Wefing, Baxter and Koblitz.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 97-02-0123.

Yvonne Smith Segars, Public Defender, attorney for appellant (Alan I. Smith, Designated Counsel, on the brief).

Theodore J. Romankow, Union County Prosecutor, attorney for respondent (Sara B. Liebman, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Marvin Mathis appeals from a February 29, 2008 Law Division order denying his petition for post-conviction

A 146

relief (PCR).  On appeal, assigned counsel raises the following

claims:

> I.  THE ORDER DENYING POST-CONVICTION RELIEF SHOULD BE REVERSED BECAUSE PCR COUNSEL DEPRIVED DEFENDANT OF HIS RIGHT TO A RUE "HEARING" BY FAILING TO PREPARE A BRIEF ON BEHALF OF THE DEFENDANT.

> II. THE ORDER DENYING POST-CONVICTION RELIEF SHOULD BE REVERSED BECAUSE THE COURT MISAPPLIED THE PROCEDURAL BARS OF R. 3:22-4 AND R. 3:22-5.

> III. THE COURT ERRED IN DENYING POST-CONVICTION RELIEF BECAUSE TRIAL COUNSEL'S FAILURE TO PRESENT EVIDENCE THAT THE DEFENDANT WAS DIAGNOSED WITH A PERSONALITY DISORDER AND COGNITIVE LIMITATIONS AND WAS FOUND TO BE FUNCTIONING AT THE BORDERLINE LEVEL OF RETARDATION DURING THE PRETRIAL MIRANDA HEARING, DURING THE TRIAL, AND AT SENTENCING SATISFIED BOTH PRONGS OF THE STRICKLAND/FRITZ TEST FOR INEFFECTIVE ASSISTANCE OF COUNSEL, AND APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THESE ISSUES ON APPEAL.

> IV. THE COURT'S RULING DENYING POST-CONVICTION RELIEF VIOLATED THE DEFENDANT'S RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL, APPELLATE, AND POST-CONVICTION RELIEF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, PARAGRAPH 10, OF THE NEW JERSEY CONSTITUTION.

> V. DEFENDANT REASSERTS ALL OTHER ISSUES RAISED IN HIS PRO SE PETITION AND BRIEFS IN SUPPORT OF POST-CONVICTION RELIEF.

In a pro se supplemental brief, defendant presents the

following additional arguments:

 a 147

A-3695-07T4

I. THE DEFENDANT['S] RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. I, PAR. 10 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY ASSIGNED PCR COUNSEL['S] FAILURE TO COMPLY WITH R. 3:22-6(D) BY NOT ADVANCING THE DEFENDANT'S ARGUMENTS SET FORTH IN HIS FEBRUARY 24, 2005 PRO SE MEMORANDUM OF LAW AND APPENDIX ON PCR.

A. PCR Counsel Failed to Investigate; Interview and Secure Affidavits from Three Expert Witnesses, Such Psychological Evidence was Crucial in Advancing Defendant's Competency Claim on PCR, Contrary to the Sixth and Fourteenth Amendment.

B. PCR Counsel Failed to Raise on PCR Ineffective Assistance of Appellate Counsel [who] Fail[ed] to Raise on Direct Appeal, Trial Counsel's Failure to Elicit the Aid of an Expert Witness to Illustrate Defendant's Limited Mental Ability and His Status as a Special Education Student, Contrary to the Sixth and Fourteenth Amendment.

We agree with defendant and assigned counsel that PCR counsel rendered ineffective assistance when he failed to prepare a brief on behalf of defendant, or, at a minimum, failed to certify that after reviewing the pro se petition and brief he was satisfied that no further argument or elaboration was required. We reverse the denial of PCR and remand for a new hearing.



A-3695-07T4

I.

After being waived from the Family Part to the Law Division, defendant was tried as an adult on an indictment charging him with the murder of a shopkeeper in Elizabeth, for which he was sentenced upon conviction to a fifty-five year term of imprisonment with a thirty-year period of parole ineligibility.

On direct appeal, we rejected defendant's claim that: the Family Part's waiver of jurisdiction was error; the improper admission of hearsay evidence denied him a fair trial; the prosecutor's closing argument contained numerous instances of prosecutorial misconduct; and the sentence imposed was excessive. We affirmed defendant's conviction and sentence. State v. Mathis, No. A-3316-98 (App. Div. June 2, 2000) (slip op. at 2). The Supreme Court denied certification. State v. Mathis, 165 N.J. 603 (2000).

On September 25, 2003, defendant filed the PCR petition that is the subject of this appeal. In that pro se petition, defendant argued: perjured testimony had been used to secure his conviction; the petit jury and grand jury were not "made up from a fair cross-section of the community including blacks and Hispanics"; he should have been afforded proportionality review of the waiver decision because Caucasians are less likely to be



waived to adult court than African-Americans; the "egregious" and cumulative errors of trial counsel denied him effective assistance; and appellate counsel rendered ineffective assistance on a number of issues, including his failure to effectively challenge the admission in evidence of the statement defendant gave to police.

In his February 24, 2005 pro se memorandum of law in support of his PCR petition, defendant argued:

> I.  Defendant's state constitutional right to indictment by grand jury was violated when the facts required to be found before defendant could be tried as an adult were not charged in the indictment. Furthermore, defendant's federal and state constitutional rights to trial by jury were violated when a judge made the findings that resulted in defendant being tried as an adult, and not as a juvenile.

> II. Defendant's federal and state constitutional right to a jury trial were violated when the trial judge found the aggravating factors used to increase defendant's sentence for murder beyond the prescribed maximum. Furthermore, defendant's (state constitutional) right to indictment by grand jury was violated when the aggravating factors used to increase the sentence for murder were not charged in the indictment.

> III. Defendant's waiver of his <u>Miranda</u> rights was not knowing and intelligent because defendant was not informed that, although he was a juvenile, any statement made by him could be used against him in a prosecution as an adult.



A-3695-07T4

IV. Trial counsel was ineffective for failing to present evidence of defendant's low intellectual functioning in order to establish that defendant's waiver of his <u>Miranda</u> rights was not knowing and intelligent.

V. Trial counsel was ineffective for not presenting in mitigation of sentence the evidence of defendant's low intellectual functioning and personality disorder.

VI. The new rule proposed in Point III should be retroactively applied to defendant.

VII. The claims for relief are not barred by a procedural rule.

In a supplemental pro se letter brief filed in August 2007, defendant added the following additional issue:

I. Trial and appellate counsel were prejudicially ineffective by failing to discover and raise the issue of the defendant's lack of competence to stand trial. <u>N.J. Const.</u> (1947), Art. I, Par. 10; <u>U.S. Const.</u>, Amend V; VI; XIV.

At the February 29, 2008 PCR hearing, PCR counsel did not submit a brief in support of defendant's petition. Nor did he certify that he had conducted an independent review of the record and had determined that there were no additional claims that could be advanced on defendant's behalf. Instead, relying solely on defendant's submissions, PCR counsel's oral argument, in its entirety, was as follows:

I'm not going to go through all the details. You've read the briefs. The



essence here is that <u>Mr. Mathis has had a</u> <u>long history of cognitive difficulties,</u> <u>inability to understand complex concepts,</u> <u>and problems with school. And these were</u> <u>well documented by</u> [various psychological experts].

And this is not so much a direct challenge to the waiver, but rather a challenge to the effectiveness of the <u>counsel that he had at the time who's now</u> <u>deceased.</u> Inasmuch as trial counsel didn't perceive when he should have the difficulties that this man, Mr. Mathis, was going to have in understanding the charges against him, and understanding the questions asked of him, and understanding the plea offer, and understanding the proceedings in general.

And trial counsel should have basically put forth a defense of inability to stand trial for lack of competence, but this wasn't done, Your Honor. As such this was ineffective to the level of <u>Strickland</u> and the other cases. And we ask that post-conviction relief be granted on this basis, Your Honor.

As is evident from PCR counsel's remarks, he limited his argument to the contention that trial counsel rendered ineffective assistance by failing to retain an expert to evaluate defendant's competence to stand trial. PCR counsel noted that trial counsel did secure an expert who rendered an inconclusive report on defendant's competence to proceed, but when the expert recommended a follow-up psychological evaluation, trial counsel apparently never pursued it. Counsel stated:

 A 151

Your Honor, Dr. Thompson in her own report stated that [defendant] should have a subsequent evaluation, a psychiatric evaluation, to determine his level of retardation and competence. That was not done.

Second of all, Mr. Mathis'[s] functioning level due to maturation and additional training and education now is certainly more than when he was 15 years and 10 months. And as a result saying well, he assisted in preparing these briefs now means that he was competent you know 12 years ago. And that's not necessarily the case, Your Honor.

Unlike PCR counsel, who confined his remarks to only one of the many issues defendant had raised in his memoranda of law, the judge addressed many of the claims defendant had presented. After considering defendant's memoranda of law and the argument of counsel, the trial court denied defendant's petition, finding no legal basis to disturb defendant's conviction and sentence.

II.

As we recently held in State v. Hicks, 411 N.J. Super. 370, 375 (App. Div. 2010), Rule 3:22-6(d) prohibits PCR counsel from choosing to ignore the arguments advanced by a defendant in support of his petition. In particular, Rule 3:22-6(d) provides, in pertinent part, that PCR "[c]ounsel should advance any grounds insisted upon by defendant notwithstanding that counsel deems them without merit." In State v. Rue, which is



A-3695-07T4

the seminal opinion addressing the obligations of PCR counsel,

the Court pointedly noted:

> PCR is a defendant's last chance to raise
> constitutional error that may have affected
> the reliability of his or her criminal
> conviction. It is not a <u>pro forma</u> ritual.
>
> [<u>State v. Rue</u>, 175 <u>N.J.</u> 1, 18 (2002).]

To satisfy the requirements of <u>Rule</u> 3:22-6(d), PCR counsel must

"communicate with his client and investigate the claims" and

"then must fashion the most effective arguments possible."

<u>Ibid.</u> (quotation and citation omitted).

PCR counsel's role does not end with simply presenting "the

most effective arguments possible," <u>ibid.</u>, based upon the

arguments defendant has already advanced in his PCR petition.

Instead, counsel has an affirmative obligation to "determine

whether there are additional claims that should be brought

forward." <u>State v. Webster</u>, 187 <u>N.J.</u> 254, 257 (2006).   In

<u>Hicks</u>, <u>supra</u>, elaborating on <u>Webster</u>, we established the

following procedures to ensure that a defendant receives the

benefit "of having his case independently reviewed by a trained

legal professional." <u>Hicks</u>, 411 <u>N.J. Super.</u> at 377. We held:

> In order to give meaning to the
> requirements of <u>Rule</u> 3:22-6(d), a
> defendant's pro se presentation should be
> viewed by counsel as a mere starting point
> in the process leading to the actual
> prosecution of the PCR petition. <u>If after</u>
> <u>reviewing the pro se petition and brief</u>

> counsel is satisfied that no further
> argument or elaboration is required, counsel
> must so certify to the reviewing court.
> This will provide the court with a reliable
> indication that defendant has received the
> benefits of the attorney's expertise. In
> the absence of such certification, a
> reviewing court must presume that counsel
> did not make a meaningful effort to comply
> with the requirements of Rule 3:22-6(d).

[Ibid. (emphasis added).]

Here, PCR counsel's performance was deficient in two respects. First, counsel's oral presentation did not satisfy the standards established by Webster because counsel did not present all of defendant's PCR claims, instead confining his remarks to the issue of competency to proceed. Even if counsel believed some of defendant's arguments were meritless, Webster obligated counsel, at a minimum, to either list defendant's arguments, or incorporate them by reference, so that the judge would be able to consider the defendant's additional arguments. Webster, supra, 187 N.J. at 257. Counsel may not simply ignore the arguments he deems unconvincing. Ibid. Second, PCR counsel never certified to the court that he had thoroughly reviewed defendant's memoranda and determined that "no further argument or elaboration [was] required." Hicks, supra, 411 N.J. Super. at 377.

From the record before us, we can have no confidence that defendant received the benefit of the independent review of his



A-3695-07T4

claims required by <u>Hicks</u>.   PCR counsel's omissions constitute a structural defect in the proceedings, for which defendant need not demonstrate actual prejudice.   <u>Id.</u> at 376.   The remedy for counsel's failure to conduct an independent investigation of the entire trial record is a remand for a new hearing.   <u>Ibid.</u>

As in <u>Hicks</u>, <u>id.</u> at 377, our determination that the denial of PCR must be reversed and the matter remanded for a new hearing "in no way implies any criticism of the trial court's ruling here."   As is evident from the record, the judge addressed each of defendant's claims, even though PCR counsel made no reference to most of those claims.   Our reversal of the February 29, 2008 order is predicated solely upon PCR counsel's failure to comply with the requirements of <u>Rule</u> 3:22-6(d), <u>Rue</u> and <u>Webster</u>.   In light of this disposition, we need not address the balance of the claims advanced on appeal.   On remand, we recommend that defendant be represented by a different attorney.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3695-07T4

Marvin Mathis #304144/244859-C
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861


                    October 25, 2011


Bernadette A. Fiore, Ph.D.
Criminal Division Manager
Criminal Case Management Office
2 Broad Street
Elizabeth, New Jersey 07207

                Re: State v. Marvin Mathis
                    Indictment No. 97-02-0123
                    Petition for Post-Conviction Relief

Dear Miss Fiore:

    Enclosed please find a original and one copy of the follow-
ing documents for filing:

            1. Defendant's Second Pro se Letter-briefand
               Appendix in support of Petition for Post-
               Conviction Relief; and

            2. Certification of Stacey Faulcon.

    By copy of this letter to Sarah Liebman, Assistant
Prosecutor, I am hereby serving the State with the aforementioned.

    Enclosed please return the extra copy of this cover-letter
to me stamped "FILED" in the self-addresses stamped envelope
provided as proof of filing for my records.


Very truly yours,


Marvin Mathis

Enclosures

cc: Sarah Liebman, Assistant Prosecutor

    Craig S. Leeds, Designated Counsel

Marvin Mathis #304144/244859-C
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861


**PRESENTLY CONFINED**

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION – UNION COUNTY
Union County Ind. No.
97-02-0123

---

**STATE OF NEW JERSEY,**

     Plaintiff-Respondent,

    vs.

**MARVIN MATHIS,**

     Defendant-Petitioner.

---

     :
     :
     :
     :
     :
     :
     :
     :

<u>CRIMINAL ACTION</u>

**LETTER-BRIEF IN SUPPORT
OF POST-CONVICTION RELIEF
PURSUANT TO N.J. RULE 3:22
et seq.**

**HONORABLE JUDGE JOHN F. MALONE, J.S.C.**
Union County Courthouse
2 Broad Street, 3rd Floor
Elizabeth, New Jersey 07207


    Re: On Petition for Post-Conviction Relief
       State v. Marvin Mathis
       Union County Ind. No. 97-02-0123


Dear Honorable Judge Malone:
    Pursuant to <u>N.J. Rule</u> **2:6-2(b),** please accept this letter-

brief in lieu of a more formal brief in support of defendant's

petition for post-conviction relief.



Prepared by Inmate Legal Association (ILA)

## TABLE OF CONTENTS

PROCEDURAL HISTORY ........................................... 1

STATEMENT OF FACTS ........................................... 2

LEGAL ARGUMENT:

    **POINT I**

        TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING
        TO PRESENT EVIDENCE OF DEFENDANT'S
        COGNITIVE LIMITATIONS AND HIS STATUS AS
        A SPECIAL EDUCATION STUDENT AS A BASIS
        TO EXPLAIN THE REASONABLENESS OF
        DEFENDANT'S PERCEPTIONS DURING THE CHARGED
        CRIMES AND AS A BASIS FOR JURY TO
        EVALUATE DEFENDANT'S CREDIBILITY AND
        DEMEANOR AS A WITNESS AT TRIAL ........ 3

    **POINT II**

        APPELLATE COUNSEL WAS INEFFECTIVE FOR
        FAILING TO RAISE ON DIRECT APPEAL, THE
        GROSS INCOMPETENCE OF DEFENDANT'S TRIAL
        COUNSEL'S FAILURE TO PRESENT RELEVANT
        EVIDENCE OF DEFENDANT'S COGNITIVE
        LIMITATIONS AND HIS STATUS AS A
        AS A BASIS TO EXPLAIN THE
        REASONABLENESS OF DEFENDANT'S PERCEPTIONS
        DURING THE CHARGED CRIMES AND AS A
        BASIS FOR THE JURY TO EVALUATE
        DEFENDANT'S DEMEANOR AND CREDIBILITY AS
        A WITNESS AT TRIAL .................. **11**

    **POINT III**

        DEFENDANT'S CLAIMS FOR RELIEF ARE NOT
        BARRED PROCEDURALLY FROM BEING RAISED
        IN THIS PETITION FOR POST-CONVICTION
        RELIEF ............................... **14**

CONCLUSION ............................................ **17**



INDEX TO APPENDIX

Appellate counsel Paul Klein's letter
to the Defendant, Dated July 21, 1999 ... ........................   Da 1,2 & 3

Defendant's response letter to Appellate
Counsel Paul Klein via Certified Mail
Dated May 23, 2000 ........................................   Da 4 & 5

TRANSCRIPT CITATIONS

"3MT"   refers to the transcript of the Miranda hearing on June 9, 1998.

"1T"   refers to the trial transcript of June 10, 1998.

"2T"   refers to the trial transcript of June 11, 1998. (a.m.)

"3T"   refers to the trial transcript of June 11, 1998. (p.m.)

"4T"   refers to the trial transcript of June 16, 1998.

"5T"   refers to the trial transcript of June 17, 1998. (a.m.)

"6T"   refers to the trial transcript of June 17, 1998. (p.m.)

"7T"   refers to the trial transcript of June 18, 1998.

"ST"   refers to the sentencing transcript of August 14, 1998.

## PROCEDURAL HISTORY

Defendant will rely on Procedural History set forth in assigned PCR counsel's brief.

Ja 160

## STATEMENT OF FACTS

Defendant will rely on Statement of Facts set forth in assigned PCR counsel's brief.

A 161
2

## POINT I

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE OF DEFENDANT'S COGNITIVE LIMITATIONS AND HIS STATUS AS A SPECIAL EDUCATION STUDENT AS A BASIS TO EXPLAIN THE REASONABLENESS OF DEFENDANT'S PERCEPTIONS DURING CHARGED CRIMES AND AS A BASIS FOR THE JURY TO EVALUATE DEFENDANT'S DEMEANOR AND CREDIBILITY AS A WITNESS AT TRIAL.

Ineffective assistance of counsel claim are particularly well-suited for post-conviction relief. State v. Preciose, 129 N.J. 451, 460 (1990). A defendant alleging ineffective assistance of counsel must establish that his "counsel's conduct so under-mined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Srickland v. Washington, 466 U.S. 688, 686, 104 S.Ct. 2039, 2052, 80 L.Ed.2d. 657, 692-93 (1984). That standard has been adopted by New Jersey courts. State v. Fritz, 105 N.J. 42, 60-61 (1987).

In order to establish a prima facie claim of ineffective assistance of counsel, the defendant must first show that the actions of his trial counsel were deficient in performance and were not objectively reasonable. Second, the defendant must show that this deficient performance materially affected the outcome of his trial. Strickland v. Washington supra. 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d. at 698.

In the instant case, the evidence of defendant's cognitive limitations and his status as a special education student was[1] not only material to the issue of the volunariness of defendant's statement to the police[2] and the question of



mitigation of defendant's sentence, but was also material to

the jury's assessment of defendant's demeanor and credibility

as a witness, See State v. Sexton 311 N.J. Super. 70, 88 (App.

Div. 1998), Aff'd 160 N.J. 93 (1999). Counsel's failure to

present this evidence at trial, like his failure to present

this evidence at the Miranda hearing and at the sentencing

hearing, amounted to ineffective assistance of counsel.

Strickland v. Washington, supra. 466 U.S. at 668, 104 S.Ct.

at 2052.

Throughout the defendant's trial, trial counsel repeatedly

made references of the defendant's status as a special education

student at the Miranda hearing (3MT 48-15 to 21); in defense

opening statement (1T 39-12 to 15); during the testimony of

the investigating Detective Thomas Koczar (2T 97-8 to 10); and

in the defense summation (6T 188-18 to 19). Counsel even made

reference of the defendant's status during sentencing (ST 3-

1 to 3).

Defendant's status as a special education student became

the focus of significant attention at sidebar where a lengthy

---

1
See Defendant's Initial Pro se Memorandum of Law, dated February 24,
2005, at pp. 17 to 19, 21, 23 to 26 and Memorandum Appendix at 1 to 31.

2
See Point IV of Initial Memorandum, at pp. 15 to 22.

3
See Point V of Initial Memorandum, pp. 23 to 26.

4
Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).

A 163

discussion took place between trial counsel and the prosecutor. The prosecutor was troubled when trial counsel asked Detective Thomas Koczar if he was aware that the defendant was a special education student. The prosecutor immediately requested the trial judge to give a curative instruction to the jury. The prosecutor and trial counsel exchanged the following:

> **[Prosecutor]:** While there is some testimony of special education, you know, you should not assume what the meaning of that is. You can only make determinations based, based on the <u>evidence</u> and <u>testimony</u>. And that is something that requires expert testimony. Because that's a kind of reverse inflammatory.

> **[Trial counsel]:** I think the request is premature at this point.

> **[Prosecutor]:** <u>The jury is thinking this kid is too stupid to give a statement, and he is more likely to be malleable and be led into this.</u> Because I know I have thought about special education, <u>but I have never had any experience so I don't know what it actually is.</u>

> **[Trial Counsel]:** I asked the question based on the fact that he in fact is a special education student.

> **[Prosecutor]:** <u>So what is he -- advanced, middle level, low level?</u>

> **[Trial counsel]:** It goes to the voluntariness of the statement, whether the officer was aware at the time. (emphasis added).

(2T 115-4 to 22).

Trial counsel rightly focused on the fact to ask Detective Koczar if he was aware of defendant's status as a special education student because it was material to the issue of the volunariness of defendant's statement to the police. During interrogation by police, defendant gave an oral statement in

164

which he initially denied being present at the scene of the
charged crimes. (5T 14-9 to 15-10.) When the police told the
defendant that his statement was not believable. Defendant
admitted that the statement was a lie and stated he would tell
the truth. (5T 15-19 to 16-2.) Defendant then gave his written
statement. (5T 16-3 to 17-24.) At trial, defendant admitted
that this statement was "a collection of a whole bunch of
individual lies . . ." (5T 17-25 to 18-2.) More specifically,
defendant told police that (co-defendant) Antwan Harvey and
a fictitional person were looking to rob somebody, (5T 18-3
to 20-13), and that Antwan shot the victim. (5T 22-10 to 23-
23).

In response to questioning regarding why his first written
statement to police was largely a lie, defendant stated, "I
was confused, I was scared . . . . they was like putting words
in my mouth . . ." (5T 3-12 to 22.) "He [the police officer]
was pressuring me." (5T 21-8; See also 5T 21-9 to 20.)

In contrast to his first statement, in his second written
statement, defendant stated that he was standing nearby when
Antwan fired a shot that missed the victim. (5T 25-2 to 25.)
Defendant ran over to where Antwan and the victim were struggling
and that's when the second shot was fired. (5T 26-1 to 10.)
Defendant "tried to stop it, but it [the gun] went off again."
(5T 26-14.) "I just grabbed him [Antwan]. As soon as I grab
him it just went off." (5T 29-25 to 30-1.)

When asked, "why didn't you leave him? why didn't you say,
hey, I don't want any part of this robbery stuff?[,]" Defendant



answered, "I don't know it was going to be a robbery, plus I wasn't thinking." (5T 35-1 to 4; See also 5T 43-11 to 44-8, 45-12 to 13.) Defendant agreed that at one point prior to the robbery he could have left and went home, but he stated "I wasn't thinking." (5T 46-5 to 8.) Defendant also stated, "I was scared, so I stayed. I thought he [Antwan] was going to shoot me." (5T 47-20 to 21.) Defendant testified that when Antwan asked him to be a lookout, defendant refused. (5T 54-19 to 56-3.) Yet, in response to the question, "If you were brave enough to tell him no, you wouldn't participate, why didn't you just leave at that point?", Defendant answered, "I was--I wasn't thinking." (5T 56-10 to 12, 56-13 to 16.) When asked why he didn't tell anyone about the crimes, defendant responded, "I can't explain. i just kept it to myself." (5T 64-19 to 67-4.)

Evidence of defendant's cognitive limitations and his status as a special education student could have helped the jury understand why defendant lied to police, why defendant "wasn't thinking" when he had a chance to leave, why defendant would have rushed into the middle of the struggle between the victim and Antwan as opposed to calling out for help of to stop and why defendant kept it to himself.

Evidence of defendant's low IQ could also have helped the jury understand why defendant was confused by the prosecutor's cross-examination. (See example, 5T 35-10 to 12, 28-23 to 25, 99-11 to 13.) Why defendant was confused at the time of the

A 166

charged crimes. (5T 42-22 to 23.) Why defendant was confused
by the police. (5T 61-11 to 24.) And why defendant was "saying
anything just to over with." (5T 72-22 to 23.)

In determining whether the defendant met the first prong
of Strickland/Fritz test, it is well-understood that a post-
conviction relief court should not second-guess trial counsel's
decision that rest upon strategic or tactical considerations.
See Estelle v. Williams 425 U.S. 501, 96 S.Ct. 1691, 1697 (1976);
State v. Buonadonna, 122 N.J. 22, 38 (1991). Here, however,
trial counsel conduct is clearly distinguishable because it
did not involve any legitimate trial strategy. Trial counsel's
decision not to present evidence of defendant's status as a
special education student was not based on a reasonable
strategic decision but a total lack of decision. (2T 116-2 to
3.)

In determining whether trial counsel was ineffective under
the first prong of the Strickland/Fritz test, trial counsel's
conduct should be measured against what a " minimally competent
criminal defense attorney would have done under like circum-
stances." State v. Arther, 184 N.J. 307, 345 (2005) (Justice
Albin, dissent). In the instant case, such an attorney would
have presented evidence of defendant's cognitive limitations
and his status as a special education student during the Miranda
hearing, during trial, and at sentencing. Pursuant to the first
prong of Strickland v. Washington, supra. counsel unreasonably
failed to perform his duty, and therefore was deficient pursuant
to Strickland v. Washington, supra.



To show "prejudice," the defendant must show' "that there
is a reasonable probability that, but for counsel's unprofess-
ional errors, the result of the proceeding would have been
different." Strickland v. Washington, supra. 466 U.S. at 694,
104 S.Ct. 2068.

At the time relevent to defendant's trial, the Sexton court
had made it clear that "evidence of defendant's limited mental
ability and his status as a special education student was
relevant to the jury's evaluation of defendant's demeanor and
credibility as a witness at trial." 311 N.J. Super. at 88.

A reasonable probability exist that this highly relevant
evidence would have put some clarity before the prosecutor and
the jury to explain defendant's cognitive limitations and what
exactly his status as a "special education student" meant. (See
example, 2T 115-12 to 16 and 2T 116-4 to 7.) If defendant's
status as a "special education student" did not make any sense
to the prosecutor, how would it make any sense to the jury?
This relevant evidence would have also provided a basis for
explaining defendant's testimony and as a basis for the jury
to understand defendant's demeanor. Moreover, because defendant's
guilt or innocence hinged on the jury's assessment of defendant's
credibility and the believablity of his testimony as opposed
to the state's witnesses.

In State v. Sexton, supra. the court further explained
that "even where the defendant does not raise a diminished
capacity or insanity defense, defendant's mental condition maybe
relevant to mental state element of the crime of which he is
accused and he must therefore, have the opportunity to present

₤ ᵿᴀ 168

evidence about it." Id. 311 N.J. Super. at 88.

Here, in this case, defendant contends that this evidence would have established a reasonable doubt as to whether the defendant had the criminal meas rea to commit the crime of murder. There exists a reasonable probability that the outcome of the trial would have been different had the jury heard the evidence of defendant's cognitive deficits and his status as a special education student. Prejudice, pursuant to Strickland v. Washington, supra. 466 U.S. at 694, 104 S.Ct. at 2068, is then present.

In sum, the defendant has established a prima facie claim of ineffective assistance of trial counsel.

Ja 169

## POINT II

APPELLATE      COUNSEL      WAS      INEFFECTIVE      FOR
FAILING      TO      RAISE      ON      DIRECT      APPEAL,
THE      GROSS      INCOMPETENCE      OF      DEFENDANT'S
TRIAL      COUNSEL'S      FAILURE      TO      PRESENT
RELEVANT      EVIDENCE      OF      DEFENDANT'S
COGNITIVE      LIMITATIONS      AND      HIS      STATUS
AS      A      SPECIAL      EDUCATION      STUDENT      AS
A      BASIS      TO      EXPLAIN      THE
REASONABLENESS      OF      DEFENDANT'S      PERCEPTION
DURING      THE      CHARGED      CRIMES      AND
AS      A      BASIS      FOR      THE      JURY      TO
EVALUATE      DEFENDANT'S      DEMEANOR      AND
CREDIBILITY      AS      A      WITNESS      AT
TRIAL.

A criminal defendant's constitutional right to effective assistance of counsel applies to appellate counsel as well as trial counsel. Evitts v. Lucey, 469 U.S. 387, 105 S.Ct. 830 (1985); State v. Guzman, 313 N.J. Super. 363, 374 (App. Div. 1998), Certif. denied. 156 N.J. 424 (1998). The Strickland/ Fritz test to determine ineffective assistance of trial counsel also applies to appellate counsel. State v. Morrison 215 N.J. Super. 540 (App. Div. 1987), Certif. denied. 107 N.J. 642 (1987).

On July 21, 1999, the defendant received a letter from Appellate counsel Paul klein, informing the defendant that the "only issues that he can raise on appeal at this time are issues that can be found in the trial transcript" . . . . . "evidence of [defendant's] status as a special education student cannot be raised on direct appeal because there is nothing in the record to support the argument." (Da 2).

Defendant then wrote Appellate counsel and mailed it via certified mail dated May 23, 2000, bringing to counsel attention the extended discussion between the prosecutor and trial counsel

at sidebar regarding the need of expert testimony to illustrate defendant's status as a "special education student." (Da 3 and 4).

Defendant contends that under the circumstances in this case, an ineffective assistance of counsel claim was appropriate for appellate review. Because all the necessary information to raise trial counsel's ineffectiveness on direct appeal clearly lied inside the trial record. Appellate counsel's decision not to pursue the gross incompetence of defendant's trial counsel's failure to present evidence of defendant's cognitive limitations and his status as a special education student was objectively unreasonable because the omitted issue is obvious from the trial record. Strickland, supra. 466 U.S. at 688, 104 S.Ct. at 2052.

Accordingly, analysis of whether appellate counsel has rendered reasonably competent representation on appeal must take into consideration the nature of the issue which should have been argued on direct appeal. Since the deficiencies of trial counsel set forth in Point I would have resulted in defendant's convictions being reversed on direct appeal had this issue been raised on direct appeal, appellate counsel's performance was deficient.

Appellate counsel's error in failing to raise trial counsel's ineffective assistance on defendant's first direct appeal also prejudiced defendant. Evidence of defendant's cognitive limitations and his status as a special education student was extremely crucial in this case. There exist a reasonable probability that a competent trial attorney, aware



of defendant's special education background, would have introduced this evidence during the <u>Miranda</u> hearing, during trial and at sentencing. Such evidence was also material and highly relevant to the jury's assessment of defendant's demeanor and credibility as a witness at trial. <u>See</u> <u>Sexton</u>, <u>supra.</u>

Defendant also contends that this crucial evidence would have raised a reasonable doubt as to whether the defendant had the criminal <u>meas</u> <u>rea</u> to commit the crime of murder. <u>See</u> <u>Sexton</u>, <u>supra.</u> 311 <u>N.J. Super</u>. at 88. Furthermore, a reasonable probability exists that the outcome of the trial would have been different had the jury heard the evidence of defendant's special education background which documents years of learning disabilities, including being classified as "special education classes", with "communication handicap."

Had appellate counsel raised trial counsel's ineffectiveness on direct appeal defendant asserts that he would have prevailed relying on the instances in the trial record and <u>State</u> <u>v.</u> <u>Sexton</u>, <u>supra.</u>, which was handed down before defendant's trial and direct appeal. While defendant is cognizant that the Appellate Court generally does not review ineffective assistance of counsel claims on direct appeal because the facts lie outside of the record, defendant contends that the trial record in this case is sufficient to clearly demonstrate that defendant was prejudiced by trial counsel's incompetence and that a reasonable probability exists that defendant would have prevailed on appeal had this issue been examined and raised. The record strongly supports that this ineffective assistance on trial counsel would

 A 172

have had the magnitude for reversal of this conviction. Defendant has demonstrated that but for appellate counsel's deficient performance, the Appellate Court would have overturned defendant's convictions on direct appeal. See Strickland, supra. 466 U.S. at 692, 104 S.Ct. at 2067-2068; Fritz, supra. 105 N.J. at 58; Morrison, supra. 215 N.J. Super. at 551; and Guzman, supra. 313 N.J. Super. at 375.

<u>POINT III</u>

DEFENDANT'S CLAIMS FOR RELIEF ARE NOT BARRED PROCEDURALLY FROM BEING RAISED IN THIS PETITION FOR POST-CONVICTION RELIEF.

<u>R</u>. 3:22-4 provides a bar to raising issues on post-conviction relief if they are issues that were not raised in a prior proceding. However, the rule also lists exception to this bar. Specifically, the claims are not barred from assertion if the court find a) that the ground for relief could not reasonably have been raised in any prior proceeding; b) that enforcement of the bar would result in fundamental injustice; or c) that denial of relief would be contrary to the constitution of the United States on the State of New Jersey. <u>Id</u>.

In the instant case, defendant contends that his ineffective assistance of counsel claims argued in <u>Point I</u> and <u>Point II</u> involve violations of both the Federal and State Constitutions and therefore, fall under exception (b) and (c). In addition, because they are claims of ineffective assistance counsel, they could not possibly have been raised in a prior proceeding, thus failing under exception (a).

The New Jersey Supreme Court has interpreted exception (c) as to all courts to consider petitions for post-conviction relief when the defendant alleges that his constitutional rights were seriously infringed during the conviction proceedings. See <u>State v. Mitchell</u>, 126 <u>N.J.</u> 565, 586 (1992). Do to the nature of defendant's ineffective assistance of counsel claims argued

in Point I and Point II could not reasonably have been raised either at the trial level or on direct appeal.

Accordingly, defendant is not procedurally barred from raising the claim list above.

R. 3:22-5 provides that "a prior adjudication upon the merits of any grounds for relief is conclusive whether made in the proceeding resulting in the conviction or in any post-conviction proceeding brought pursuant the the rule . . . or in any appeal taken from such proceeding." Id. In other words, "a prior adjudication on the merits ordinary constitutes a procedural bar to the reassertion of the same ground as a basis for post-conviction relief." State v. Preciose, supra. 129 N.J. at 476.

In order for R. 3:22-5 to bar a PCR claim, the prior adjudication must be on the merits of the issue now urged. State v. Odum, 113 N.J. Super. 186, 189 (App. Div. 1971). Moreover, R. 3:22-5 only "bar a claim that is identical or substantially equivalent that adjudicated previously on direct appeal." State v. Bontempo, 170 N.J. Super. 220, 234 (Law. Div. 1979).

In this case, defendant contends that these claims for relief have not been adjudicated previously. These claims argued supra involve serious questions of ineffective assistance of counsel, therefore are properly before this court, without having been first considered on direct appeal.

A 175

<u>C O N C L U S I O N</u>

For the foregoing reasons, defendant respectfully requests his convictions should be reversed or in the alternative, this court should grant defendant s full evidentiary hearing on the issue of ineffective assistance of trial and appellate counsel.

Dated: July 19, 2011                    Respectfully submitted,

                                        _____
                                            Marvin Mathis

A 176

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - UNION COUNTY
Union County Ind. No.
97-02-0123

STATE OF NEW JERSEY,

        Plaintiff-Respondent;    :

                :

        vs.            :      CRIMINAL ACTION

                :      LETTER-BRIEF IN SUPPORT
                        OF POST-CONVICTION RELIEF
MARVIN MATHIS,                PURSUANT TO N.J. RULE 3:22
                :      et seq.

        Defendant-Movant.    :

ATTACHED APPENDIX

A 177



STATE OF NEW JERSEY
OFFICE OF THE PUBLIC DEFENDER
APPELLATE SECTION
P. O. BOX 46003
NEWARK NJ 07101

RE, REFUSED FOR:
____ STATE NUMBER DO NOT MATCH
____ NO INMATE STATE NUMBER
____ NO INMATE NAME
____ INMATE NO LONGER HERE
____ COURT REMAND
____ OTHER

insufficient address

A 178



# State of New Jersey

OFFICE OF THE PUBLIC DEFENDER
APPELLATE SECTION
31 CLINTON STREET, 9TH FLOOR
P.O. Box 46003
NEWARK NJ 07101

CHRISTINE TODD WHITMAN
*Governor*

IVELISSE TORRES
*Public Defender*

TEL: (973) 877-1200
FAX: (973) 877-1239

July 21, 1999

Mr. Marvin Mathis, #304144
New Jersey State Prison
Second & Cass Streets
P.O. Box 861
Trenton, New Jersey  08625-0861

Re: State v. Mathis
Docket No. A-3316-98

Dear Mr. Mathis:

I have received your letter dated July 12.  I have received almost all of the documents necessary for the appeal.  I am still waiting for copies of your statements and copies of the expert reports used at your waiver hearing.  I was told that I should expect them some time next week.  In the meantime, I have begun writing your brief, concentrating on the issues that do not relate to the missing documents.

You set forth various issues in your letter that you would like to see raised on appeal.  The only issues that I can raise on appeal at this time are issues that can be found in the trial transcript.  In other words, if the judge made improper rulings by allowing prejudicial testimony to come in, or if the prosecutor made improper comments in front of the jury, these are things that can be seen by reading the transcripts and pointed out to the appellate judges.  However, if you want to argue that your trial attorneys were ineffective for not developing the case properly, either by failing to bring in character witnesses or evidence of your status as a special education student, these issues cannot be raised in this appeal because there is nothing in the record to support the arguments.  If we are unsuccessful on appeal, you can then go back to the court on a motion for post-conviction relief, asking for a hearing to establish the issues relating to ineffectiveness of counsel.



-page 2-

In the meantime, I will continue working on your brief. If you should still have questions or issues you wish to bring to my attention, please contact me again, either by letter or by phone. As I said in my last letter, I can be reached at the above number between the hours of 9:00 a.m. and 11:00 a.m. or from 2:00 p.m. to 5:00 p.m. on most weekdays.

Very truly yours,

Paul M. Klein
Deputy Public Defender II



A 180

Da 78

Marvin Mathis #304144
New Jersey State Prison
3rd & Federal Street
P.O. Box- 861
Trenton, New Jersey 08625-0861

May 23, 2000

Re: State V. Marvin Mathis
Dockey No. A-3316-98

Dear Mr. Klein

I have received the copies of the transcripts of my
co-defendant's case. Thank you very much. But I also requested
for his jury instructions. And you didn't send that to me.
I really appreciate it, if you could send that to me as soon
as possible.

Mr. Klein, I understand that you have mentioned in all
your previous letters to me that the only issues that you can
raise on appeal are issues that can be found in the trial
transcript. I would like for you to look into a issue in my
trial transcript, Morning Session June 11, 1998, 114-19 thru
117-9. evidence of my status as a special education student.
Here expert testimony was needed in my case. I really appreciate
it, if you would look into this

I thank you for your time & patience, I await for your
to reply back to my letter.

Respectfully yours,

Marvin Mathis #304144

CC;filed

A 181
Da 8

CO-30 A    NEW JERSEY STATE PRISON
**POSTAGE REMIT**

DATE: 5/24/00    LOCATION: 2-C

INMATE NAME: Marvin Mathis #304144

INMATE SIGNATURE: Marvin Mathis

TO: BUSINESS MANAGER        DATE MAILED:

(✓) Check Appropriate Box (s)

| | | |
|---|---|---|
| | Regu | DUP 5-25-00 Acnt - 304144 Mathis |
| | Legal | TR #11366 I - 11367 |
| ✓ | Certif | 0 1b 0.1 oz T - |
| ✓ | Return | MAN POST $2.65     3252 |
| | Postag | TOTAL=$2.65 |
| | Legal I | |
| | Other | |

SENT TO: Paul Klein
ADDRESS: PRINT 31 Clinton Street, P.o. Box 46003
Newark, New Jersey 07101

WITNESS: SCO R. Thorne    APPROVED BY:
SIGNATURE PRINT A Thorne

CHECK#        DATE:

---

7099 3220 0004 4651 3252

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
**(Domestic Mail Only; No Insurance Coverage Provided)**

Article Sent To:
Paul Klein

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Name (Please Print Clearly) (To be completed by mailer)
Marvin Mathis #304144
Street, Apt No.; or PO Box No.
Old 3 Federal Street
City, State, ZIP+4
Trenton New Jersey 08625

Postmark Here    5/24/00

PS Form 3800, July 1999        See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Paul Klein
Appellate Section
31 Clinton Street 9th floor
P.o. Box 46003
Newark, New Jersey
07101

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)    B. Date of Delivery

C. Signature
X                          ☐ Agent
                           ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:     ☑ No

3. Service Type
   ☑ Certified Mail      ☐ Express Mail
   ☐ Registered          ☑ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number (Copy from service label)
   7099 2220 0004 4651 3252

Return Receipt        102595-99-M-1789

A 182

Da_B

Marvin Mathis #304144/244859-C
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861

Superior Court of New Jersey
Law Division - Union County
Ind. No. 97-02-0123

State of New Jersey,                    :

      Plaintiff,                       :

      v.                               :        <u>Criminal Action</u>

Marvin Mathis,                          :        Certification of Stacey
                                                 Faulcon.
      Defendant.                       :

   . I Stacey Faulcon, hereby state the following:

1.     Since October of 1998, I have been a member and paralegal

with the Inmate Legal Association in New Jersey State Prison.

2.     In April of 2001, I assisted Mr. Mathis is preparing

his Notice of Motion and Petition for Post-Conviction Relief

for the above named Defendant.

3.     In September 2003, I was asked by the Defendant to assist

him with the preparation of his Verified Petition Post-Conviction

Relief, which I did.

4.     In February 2005, I assisted and prepared for Mr. Mathis

a <u>Pro Se</u> Memorandum of Law, with an attached Appendix in support

of his Petition for Post-Conviction Relief.

5.     In August of 2007, I prepared a <u>Pro Se</u> letter-brief in

support of Mr. Mathis Petition for Post-Conviction Relief.

6.     On July 14, 2011, I prepared a second <u>Pro Se</u> letter-brief

 A 183

on behalf of Mr. Mathis, in support of his Petition for Post-Conviction Relief.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated: July 19, 2011

Stacey Faulcon

$\int_A 184$

3

STATE OF NEW JERSEY

v.

MARVIN MATHIS
_____
Defendant

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION -- CRIMINAL
_UNION_ COUNTY

INDICTMENT #: _97-02-123_

CASE OR PROMIS #: _96 004593_

## ORDER ON POST-CONVICTION APPLICATIONS
## ON INDICTABLE OFFENSES

This matter being opened on the application of defendant, _Marvin Mathis_ , by:

☒ Petition for Post-Conviction Relief determined to be defendant's

　　✓ first petition

　　_____ second or subsequent petition

☐ Motion for Change or Reduction of Sentence pursuant to *Rule* 3:21-10

☐ Motion for _____ and the defendant having been represented by:

_____, Assistant Deputy Public Defender

_Craig S. Leeds, Esq_ , Retained or ⟨Designated Counsel⟩ *(circle one)* or

☐ The court having concluded that there was no good cause entitling the assignment of counsel on the application, and the State having been represented by:

_Sara Liebman_ Assistant Prosecutor; and

☒ There having been proceedings conducted on the record on _Jan 27_ , ~~200~~ _2012_ or

☐ The matter having been disposed of on the papers;

It is on this _27_ day of _Jan_ , ~~200~~ ~~2012~~ ORDERED THAT DEFENDANT'S APPLICATION IS HEREBY:

_____ Granted
_X_ Denied
_____ Other

For the reasons:

☐ Expressed in the court's written opinion of _____

☒ Expressed orally on the record on _1-27-12_

_____
JOHN F. MALONE, P.J.Ch.　　, J.S.C.

JA 185

ORIGINAL:　Office of the Public Defender
c:　　　　　Judge _____
　　　　　　Criminal Division Manager's Office
　　　　　　Prosecutor's Office
　　　　　　Defendant

Form Order Promulgated by Directive # 7-07, Published, 09/20/2007, CN: 11151-English

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3316-98T4

STATE OF NEW JERSEY,                 :        CRIMINAL ACTION

    Plaintiff-Respondent,        :     On Appeal from a Judgment
                                        of Conviction of the Superior
    v.                           :     Court of New Jersey, Law
                                        Division, Union County.
MARVIN MATHIS,                       :

    Defendant-Appellant.         :     Sat Below:

                                        Hon. Rudolph N. Hawkins, J.S.C.
                                 :     Hon. John F. Malone, J.S.C.,
                                        and a jury.

---

BRIEF AND APPENDIX ON BEHALF OF DEFENDANT-APPELLANT
STATEMENT OF FACTS ONLY

---

IVELISSE TORRES
Public Defender
Office of the Public Defender
Appellate Section
31 Clinton Street, 9th Floor
P.O. Box 46003
Newark, New Jersey 07101
(973) 877-1200

PAUL M. KLEIN
Deputy Public Defender II

Of Counsel and
On the Brief

DEFENDANT IS CONFINED

1/A 186

## STATEMENT OF FACTS

On the night of January 22, 1996, Antonio Saraiva was killed in front of his store by a gunshot wound to the head.  The issue at trial was whether Marvin Mathis, a 15-year-old special-education student, who was in the company of a 20-year-old man and two women: shot Mr. Saraiva by his own hand during a robbery; was assisting the 20-year-old codefendant in a robbery when that codefendant shot Saraiva; or whether the gun went off during a struggle while Mathis was trying to stop the codefendant from shooting Saraiva.

Antonia Saraiva and her husband, Antonio, owned the Portuguese American Wine and Liquor store on East Jersey Street in Elizabeth, and lived in an apartment above the store.  According to Mrs. Saraiva, on January 22, 1996, sometime after 10:00 p.m., Mr. Saraiva closed the store and carried the trash cans out to the street.  Mrs. Saraiva, who remained in the store, heard shots, ran out from the back of the store, and down an alleyway to the locked security gates.  She saw her husband on the ground.  A "dark man," a "Jamaican" who used to frequent their store, was calling her husband by name. (1T 41-9 to 44-1; 1T 47-2 to 9)  Mrs. Saraiva ran back into the house to get the keys for the security gates.  When she returned and opened the gates, her husband was alone and unconscious. (1T 44-2 to 16)

Union County Medical Examiner Graciela Linares found a single bullet wound to Mr. Saraiva's head; she estimated that the gun was shot from a distance of eighteen inches or less. (4T 23-1 to 5; 4T 25-3 to 28-18; 4T 34-7 to 12)  The wound would have caused death



within a few minutes. (4T 31-15 to 18)

Elizabeth police officers Gene Antonucci and Rocco Malgieri responded to the scene of the shooting. (1T 48-18 to 50-10; 1T 51-16 to 18)  Antonucci searched the area for bullets or bullet casings, but found none. (1T 52-12 to 17)  Malgieri found Saraiva's brown leather wallet on nearby South Park Street. (1T 59-14 to 63-13)

When Mathis's girlfriend, Sharlama Brooks, saw him in school the morning after the shooting, he asked her to tell anyone who asked that he was with her the night before between the hours of seven and 11.  Brooks, who was home alone during those hours, was not willing to say they had been together. (1T 65-1 to 66-18)  When she questioned Mathis about his request, he turned away from her and said that if he told her, she would "black out," which she took to mean that she would "get mad at him." (1T 66-21 to 67-7)  Brooks told Mathis that on the previous night a man had confronted her and told her that Mathis had killed someone.  At first, Mathis denied it, but he then told Brooks that "they was struggling I guess when the man was taking out the garbage and gun [sic] had went off, but it was by mistake." (1T 74-1 to 75-13)  In her statement to the police, Brooks stated that Mathis told her he was walking with some friends, and "Marvin went to grab the guy, and as soon as he grab [sic] the guy the gun went off." (1T 76-24 to 77-3)

After Mathis told Brooks about the shooting, she became upset and started to cry.  A school security guard who observed her crying took her to Janice Sutton, a substance abuse counselor.



Brooks was still upset and crying when she related the story to Ms. Sutton. (1T 77-2 to 79-51)  The police were summoned, and Brooks was transported to the police station where she gave a statement. (1T 79-9 to 14)

Janice Sutton, the high-school counselor, testified about her meeting with Sharlama Brooks.  Brooks said her boyfriend had been involved in a shooting or a murder; Sutton could not remember the exact words used by Brooks.  Sutton also stated that Brooks may have indicated that her boyfriend's name was Marvin. (4T 19-1 to 21-3; 4T 22-9 to 17)  Sutton took Brooks to the principal's office. She later accompanied her to the police station and was present when Brooks gave her statement. (4T 21-20 to 22-6)

Detective Thomas Koczur took Brooks's statement, after which he had Mathis transported to the police station. (2T 3-17 to 5-2; 2T 6-6 to 7-12)  When Koczur first encountered Mathis in a conference room, he was not under arrest and was not in handcuffs. (2T 8-1 to 15)  Koczur had another officer transport Mathis's mother to headquarters. (2T 8-19 to 9-10)

Koczur advised Mathis's mother that her son was a suspect in a homicide.  He explained the procedures they would be following and what their rights were. (2T 9-15 to 10-3)  Koczur also advised Mathis of his rights.  Mathis indicated that he understood those rights and agreed to answer questions.  Mathis's mother added her consent. (2T 12-6 to 16-11)

At first, Mathis denied any involvement in the homicide, stating that he was either at a different location or with his



girlfriend at the time. When Koczur confronted him with Brooks's statement, Mathis called her a liar. As he was confronted with further inconsistencies in his story, he asked that his mother leave the room, and he then gave a statement admitting his presence at the shooting. He repeated the statement in his mother's presence. (2T 17-2 to 19-21) In his oral statement, Mathis said that he, Antwan Harvey, and a man from Carteret called "Boz," were involved in the shooting. At the conclusion of the oral interview, Koczur took what would be the first of two written statements. (2T 20-17 to 21-18; 2T 36-16 to 24)

In the first statement, Mathis indicated that he met Harvey and Boz sometime after 7:00 p.m. on January 22, 1996. Harvey and Boz were looking for someone to rob, and they wanted Mathis to hold the gun. Mathis refused. (2T 21-21 to 30-23) Harvey came upon a man who owned a liquor store as he was taking out the garbage and told the man, later identified as Saraiva, to empty his pockets. When Saraiva said no, Harvey tried to go through his pockets:

> Then they started fighting. The man threw a punch at Antwan [Harvey], and then Antwan threw a punch back. Then Antwan pushed him, then he shot him. The man fell. Antwan went into his pockets. He then told me to go into his pockets. I said no. He then called me a punk. Then I was in shock.

(2T 31-9 to 18) Following the shooting, they ran off. (2T 31-19 to 22) Before leaving, Harvey took the victim's wallet from his right back pocket. (2T 34-12 to 16)

After they took the first statement, the police executed a warrant at a residence in Carteret, where Detective John Furda of

the Union County Prosecutor's Office seized items of clothing described by Mathis. (2T 43-23 to 44-23)   With the consent of Mathis and his mother, Detective Furda searched their home and seized pants fitting the description Mathis gave of the pants he wore on the night of the robbery.  (2T 47-19 to 49-25; 3T 158-3 to 159-25)

While Furda was searching Mathis's home, Koczur met with other investigators.  He returned to question Mathis again, telling Mathis he did not believe what he had said in his first statement. (2T 50-13 to 51-12)

At his second interview, Mathis indicated that the gun went off during a struggle between him and Harvey.  Mathis was trying to stop Harvey from shooting the liquor store owner.  In his second statement, Mathis indicated that at about eight o'clock on the night of the offense, he met Harvey on a street corner in Elizabeth, and they then met April and Renee Diggs at a nearby Chinese restaurant.  Mathis, Harvey, and the Diggs cousins intended to participate in a robbery. (2T 51-13 to 21; 2T 56-23 to 59-14; 2T 63-17)  While walking on Elizabeth Avenue, Harvey displayed a black revolver and asked Mathis to act as lookout during the robbery. When Harvey suggested robbing a man standing nearby, Mathis told him not to.  Mathis also told Harvey he would not participate in the robbery of a nearby deli. (2T 59-15 to 61-5)  As they continued walking, the four of them came upon "two Spanish boys."  Harvey and April "started running after them real hard, and me and the other girl jogged after them."  The Spanish boys outran them. (2T 61-20



Ja 191

to 62-6)

The four continued walking. By the time they came upon Saraiva, it was no longer Mathis's intention to take part in a robbery. Mathis explained that Saraiva was shot while Harvey was attempting to rob him. Harvey first tried to search Saraiva's pockets, prompting Saraiva to slap Harvey's hand. Harvey grabbed Saraiva, who then grabbed Harvey. They exchanged punches, and Harvey pulled out a gun, which Saraiva grabbed. Mathis joined the struggle to prevent Harvey from shooting Saraiva. During the three-way struggle, the gun went off twice. The second shot struck the victim. Mathis did not believe that Harvey intended to shoot anyone. After the shooting, Harvey went through Saraiva's pockets. Neither Mathis or the two women, who had been serving as lookouts, touched Saraiva. (2T 62-7 to 15; 2T 63-25 to 66-18) During Mathis's statement, the detective asked him: "So all four of you committed this robbery?" Unlike Mathis's other answers, which were all typed, that question was answered with a handwritten "yes," followed by Mathis's initials. Koczur believed that Mathis had written the answer when he read the completed statement. (2T 69-6 to 70-14; 2T 88-4 to 89-12) During his testimony, defendant denied ever having written "yes" on the statement. (4T 155-9 to 24)

As a result of Mathis's statements, arrest warrants were authorized for April and Renee Diggs and Antwan Harvey, and the police seized clothing Mathis had said they wore during the robbery, including a black ski which was obtained pursuant to a warrant from the home of Stephen Owens, a close friend of all the

A 192

defendants. (2T 76-2 to 79-4)

Migdalia Hernandez, who lived with Owens in Elizabeth, testified that Mathis, Harvey, and the Diggs were friends of hers, and regularly visited her apartment. (3T 166-5 to 167-24) They were all in her apartment on January 22, 1996. As the four were leaving, Hernandez heard "one of them say they had a gun." She did not know who made the statement, nor did she ever see a gun. (3T 167-25 to 168-14; 3T 174-2 to 3) When they left, Mathis and Harvey were carrying black face masks. The four returned about an hour later, and the two males were still carrying the face masks.

Hernandez did not remember what time the four left or when they returned. (3T 169-15 to 170-16) Hernandez waited six months before giving this information to the police, claiming that although they were all close friends, and Harvey visited her virtually every day, she did not know that they had all been arrested in January. She did not learn of the arrests until the police came to her house six months later. (3T 172-10 to 173-20)

In exchange for their pleas to armed robbery, April Diggs, who was 17 years old at the time of the shooting, and her cousin Renee, who was 22, both testified for the state. As a condition of their plea agreements, they were to receive sentences of 15 years with five-year parole bars. As part of the agreement, which would shield them  from charges of murder, they had to testify against both Mathis and Harvey. (3T 177-3 to 16; 4T 51-14 to 51-23; 4T 74-1 to 10) According to April, on January 22, she and her cousin Renee met Harvey and Mathis, not in the Hernandez apartment as Hernandez


A 193

testified, but at a Chinese restaurant.    When they left the restaurant, April believed they were headed toward a liquor store. As they reached the pharmacy across the street from the Portuguese American Liquor store, Harvey announced that he "wanted to go rob somebody, and he wanted us to be the lookout." (3T 180-14 to 181-16; 3T 211-9 to 17)  April and Mathis continued walking, but said nothing.   Harvey said "something about busting somebody," and Mathis said he would, too.   April thought they meant to shoot someone.  At this point, Harvey gave Mathis a small black gun. (3T 181-17 to 182-15; 3T 183-9 to 15)  When the prosecutor showed April the gun taken from Harvey's house, she stated that this was not the gun Harvey had on the night of the shooting.  Harvey's gun had a different color handle. (3T 182-19 to 183-4)

As they walked, April observed a man, later identified as Saraiva, coming out of his house with the garbage.   Harvey ran toward Saraiva, with Mathis following.   April continued walking, but turned when she heard one or two gunshots.   She saw Saraiva fall and Mathis and Harvey run off.   April did not seen the shooting, but Renee told her that Mathis shot Saraiva. (3T 183-19 to 185-16; 3T 186-12 to 15; 3T 204-10 to 17)   Later that evening, at Hernandez's house, April asked Mathis why he shot Saraiva. Mathis said it was because the man grabbed him. (3T 187-5 to 16) In her statement to the police and at her guilty plea, April indicated that it was Mathis who fired the gun. (3T 188-4 to 10; 3T 196-19 to 25)  In her statement she also indicated that she did not participate in the robbery or serve as a lookout.   She pled guilty

because the state agreed not to prosecute her for felony-murder. (3T 199-3 to 200-10)

According to April, they did not chase anyone before they assaulted Saraiva, and they did not discuss robbing a deli. (3T 201-16 to 202-6)  She did not remember seeing Mathis or Harvey wearing masks on the night of the shooting. (3T 206-2 to 12)  After the shooting, both April and Renee saw a man from the neighborhood, whom she knew as "Jamaica" going through the victim's pockets. (3T 204-21 to 205-15; 4T 72-15 to 73-3)  April denied that Harvey told her to place the blame on Mathis. (3T 203-8 to 12)

Herminia Garcia, a social worker at the Union County juvenile detention center, testified that April told her that neither she, her cousin Renee, nor Mathis had anything to do with the shooting, and that a fourth individual who was with them was responsible for the shooting. (4T 110-1 to 111-22)  Garcia could not remember the date April made that statement, nor did she make a written notation of the conversation.  She advised April to give the information to her attorney.[3] (4T 112-2 to 115-23; 4T 123-19 to 22)

Renee Diggs testified that Harvey and Mathis asked her and her cousin to serve as lookouts for a robbery. (4T 45-6 to 47-8)  Although April testified that they did not accost anyone else prior to the Saraiva robbery (3T 201-16 to 202-6), Renee stated that Harvey and Mathis had chased two "Spanish men." (4T 47-16 to 48-7)

---

[3]April Diggs admitted that after her arrest she was taken to the Union County Detention Center and met with social worker Garcia.  She did not recall, however, telling Garcia that it was Harvey, and not Mathis, who did the shooting: "I doubt if I said that." (3T 206-23 to 207-4)



At some point, Harvey pulled a gun from his pants and started "acting crazy with the gun."   According to Renee, Harvey was "just showing off," although he released the safety control and indicated that he was going to shoot some cops who were walking nearby. (4T 61-17 to 62-6; 4T 64-3 to 19)

When they came upon the man taking out the garbage, Renee heard Mathis say, "That one right there."   (4T 49-19 to 50-1) Although she did not see the transaction, Renee assumed that Harvey gave his gun to Mathis, because she observed Harvey give something to Mathis and saw Mathis go up to the man taking out the garbage. Renee saw the man grab Mathis by the jacket, saw a flash of light, and then saw the man fall.   Mathis and Harvey then ran from the scene together. (4T 50-3 to 51-8; 4T 63-11 to 25)

Renee also claimed that when she saw Harvey hand Mathis the gun, Mathis said, "Oh, yes, it's on." (4T 54-5 to 13)   On the day of her arrest, January 25, 1996, Renee gave a statement to the police identifying Mathis as the shooter. (4T 51-24 to 52-13) Contrary to April's testimony, Renee claimed they did not encounter Mathis on the stairs when they returned to Hernandez's apartment. (4T 65-3 to 23)

Renee admitted that she was afraid of Harvey and did not leave the group when there was talk of committing a robbery because Harvey physically prevented her from doing so.   She denied, however, that Harvey threatened her and told her to place blame on Mathis because Mathis was a juvenile. (4T 66-23 to 67-5)

Damina Arcos testified that she met Renee Diggs in jail.   In


-12- A 196

November of 1997, Renee told her that it was Harvey who shot the liquor store owner. (6 140-20 to 141-19) Arcos had learned about the trial from Detective Koczur a week before the trial. She told Koczur about Renee's statement, and he told her to bring the information the prosecutor.[4] (6T 142-22 to 144-24)

Three days after the shooting, Detective Furda, accompanied by Carteret Police Detective-Sergeant McFadden, arrested Harvey at his home in Carteret. McFadden retrieved an unloaded .32 caliber revolver from a crawl space at the top of the stairs leading to the second floor. The gun was dark blue and appeared to be almost black. (3T 160-1 to 161-23; 3T 164-11 to 165-22) According to Furda, without bullets or casings, there was no way to determine whether the firearm was the one used to shoot Saraiva. (3T 162-2 to 7) Neither Mathis nor Harvey had a permit to purchase or carry a handgun. (4T 36-17 to 37-12)

Two of Mathis's teachers, Ronald Orr and Belquis Fernandez, testified on his behalf, indicating that they knew Mathis to be truthful. (4T 91-7 to 15; 4T 97-15 to 102-24)

Marvin Mathis denied that he possessed a gun, participated in a robbery, or shot anyone on January 22, 1996. (4T 157-8 to 18) On the evening of January 22, he was walking in Elizabeth with Harvey and the Diggs cousins. Harvey noticed a man waiting for a bus and asked the girls to see if the man was wearing any gold jewelry. When the girls reported that he was, and Mathis realized that

---

[4]During her testimony, Renee Diggs denied knowing Arcos and that she had ever admitted defendant was not the shooter. (4T 67-5 to 68-4)



Harvey wanted to rob him, Mathis told Harvey not to. (4T 130-20 to
133-17)  April then urged Harvey to rob the owner of a deli they
were passing.  Mathis refused to serve as a lookout, and they
continued walking. (4T 133-23 to 134-7; 5T 39-3 to 22)  Thereafter,
Harvey and April ran after two "Spanish boys," and Mathis and Renee
jogged behind, but the boys outran them. (4T 134-8 to 17; 5T 95-1
to 6)  Mathis did not know Harvey had a gun until he pulled it out
and started "acting crazy" and "showing off."  At one point, Harvey
said he wanted to shoot at police officers who were walking nearby.
He took the safety attachment off of the gun, but did not pull the
trigger.  Mathis was scared, but thought that if he tried to leave
Harvey would shoot him.  When Renee had tried to leave, Harvey
grabbed her and refused to let her leave. (4T 134-18 to 135-25; 5T
57-15 to 21)

When they reached the corner of Seventh and East Jersey,
Harvey noticed Saraiva taking out his garbage out and told the
girls to serve as lookouts.  Harvey asked Mathis to be a lookout,
but he refused. (4T 136-10 to 16)  Mathis was scared.  He walked
across the street and stood next to a Chinese restaurant.  Harvey
approached Saraiva and it sounded like he was telling Saraiva to
empty his pockets.  Harvey tried to reach into Saraiva's pockets,
and Saraiva slapped Harvey's hand down.  At that point, Harvey
grabbed Saraiva and the man grabbed Harvey, and they traded
punches.  Harvey pulled out his gun and Saraiva grabbed for it.  As
the two struggled, Mathis grabbed Harvey's arm to prevent him from
shooting Saraiva.  The gun went off once, missing Saraiva, and



A 198

Harvey fired a second shot that struck him. (4T 136-17 to 25; 4T 139-1 to 140-10)  Mathis was shocked when Saraiva fell, and he ran off with Harvey. (4T 140-13 to 17)

Mathis had not intended to participate in the robbery or help Harvey in any way. (4T 141-2 to 5)  He did not leave Harvey once he realized Harvey wanted to commit a robbery because he was afraid Harvey would shoot him. (4T 152-19 to 21)   After the shooting, Mathis ran home, refusing to take the gun from Harvey.  At no time did Mathis possess the gun. (4T 141-15 to 142-10)

Mathis denied asking his girlfriend Sharlama Brooks to say that he was with her on the night of the shooting.  According to Mathis, "I say if anyone ask if I was with her...that she don't know." (4T 142-22 to 143-20)  He also denied ever telling her that he had shot someone accidentally. (5T 69-23 to 25)  With regard to the questioning at police headquarters, Mathis indicated that he was not given a choice about going there, and he lied to the police when he gave his first statement because he was scared.  Moreover, although he signed the rights form, the police were "rushing" him, and his understanding of his rights was "not that good."  Although his first statement to the police was not true, due to his being scared and confused, his second statement was truthful. (4T 145-22 to 152-8; 4T 168-25 to 169-5; 5T 3-11 to 4-18)

On the morning of January 24, Mathis's mother, Linda Mathis, was taken by the police from her job to police headquarters so that she could be present while they questioned her son.  Ms. Mathis did not recall much of what transpired, but she did remember that her


-18-  Ja 199
Davis

son claimed he had not known what Harvey was up to and that he "didn't do anything"; "he said he wasn't involved." (6T 146-20 to 148-13; 6T 155-15 to 17)  Her son was questioned until midnight. At one point she and her son signed a consent-to-search form, and she accompanied the police to her house where they conducted a search. (6T 149-2 to 151-14)  Ms. Mathis indicated that she signed and understood the form explaining Mathis's constitutional rights. (6T 151-16 to 23)  Although Mathis believed one of the detectives was "putting words" in her son's mouth (6T 156-24 to 25), she and her son both signed his statement. (6T 157-4 to 21)

Ja 200

P-19

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION : UNION COUNTY
CRIMINAL    -   97-02-00123
                        :
STATE OF NEW JERSEY,            :   Stenographic Transcript
                        :              of
            vs.             :      Trial Proceedings
                        :
MARVIN MATHIS,                  :
                        :
            Defendant,          :
_____      :

                Place:   Union County Courthouse
                         2 Broad Street,
                         Elizabeth, New Jersey,

            Date:    JUNE 11, 1998 - MORNING SESSION

B E F O R E:
            HON. JOHN F. MALONE, J.S.C., & JURY

TRANSCRIPT ORDERED BY:
            OFFICE OF THE PUBLIC DEFENDER
                 Appellate Section

A P P E A R A N C E S:

            WILLIAM KOLANO,  ESQ.
            Assistant Prosecutor, Union County,
            For the State,

            WALTER E. FLORCZAK, ESQ.
            (Florczak & Florczak)
            Attorney for the Defendant,


            B. PETER SLUSAREK, C.S.R., XIOO291
            Official Court Reporter
            Union County Courthouse
            Elizabeth, New Jersey, 07207

JA 201

KOCZUR - REDIRECT BY KOLANO                                    114

1   what he said they, he was referring to all of the people.  But

2   you are right, there was no testimony.  He was relying upon

3   information provided by others and used that information to

4   obtain a search warrant.  So there is no testimony at this

5   proceeding, any direct evidence, first hand testimony, that

6   they were there, that any of them, the four persons allegedly

7   involved here, went to that address.  This witness testified

8   that he had received information to that effect.  So I think

9   perhaps the way the question was phrased could be, could be

10  misleading.

11          I am going to ask you -- I am going to strike the

12  question and ask you to rephrase it to confirm what he said

13  earlier, that he had received information about them being

14  there.

15          MR. KOLANO:  Along those lines, I didn't make an

16  objection because it was already out.  It was inappropriate to

17  bring up lack of prior record.  Goes back to State versus Rays,

18  50 New Jersey.  It's already out.

19          But what I do have a problem is, Mr. Florczak asked

20  the detective if he was aware that Marvin Mathis was a special

21  education student.  That may very well be he is a special

22  education student, and that may be coming out based on promise

23  that he is going to testify.  But that has a connotation, and

24  connotation for me might be different than they are for

25  everyone else.  That requires expert testimony.  Because he

JA 202

Trial transcript, Morning Session, June 11, 1998

(2T)

1   can't even understand simplest of words.

2          Unless there is going to be expert testimony, I am

3   going to ask your Honor to give a curative instruction and say

4   while there is some testimony of special education, you know,

5   you should not assume what the meaning of that is.  You can

6   only make determinations based, based on the evidence and

7   testimony.  And that is something that requires expert

8   testimony.

9          Because that's a kind of reverse inflammatory.

10         MR. FLORCZAK:  I think the request is premature at

11  this point.

12         MR. KOLANO:  The jury thinking this kid is too stupid

13  to give a statement, and he is more likely to be malleable and

14  be led into this.  Because I know I have thoughts about special

15  education, but I have never had any experience so I don't know

16  what it actually is.

17         MR. FLORCZAK:  I asked the question based on the fact

18  that he in fact is a special education student.

19         MR. KOLANO:  So what is he -- advanced, middle level,

20  low level?

21         MR. FLORCZAK:  It goes to the voluntariness of the

22  statement, whether the officer was aware at the time.

23         MR. KOLANO:  But that's like saying someone is

24  schizophrenic without putting a doctor that he is

25  schizophrenic.



KOCZUR - REDIRECT BY KOLANO                    116

1       MR. FLORCZAK:  I wouldn't say it's the same thing.

2  But I can bring evidence that he is classified as special ed.

3  That's no problem.

4       MR. KOLANO:  I think it should, I think that ought to

5  come from an expert as to what special ed means.  What gets you

6  into special ed, what gets you out.  What his abilities are.

7  That's got to come from an expert.  That can't come from his

8  mom or from him.

9       MR. FLORCZAK:  Can't come from school?  School can

10  come in, and they classified.

11       MR. KOLANO:  That's expert testimony.  I am entitled

12  to CV and other stuff.

13       MR. FLORCZAK:  I won't call an expert.  All I am

14  saying school administrator, custodian of that record saying he

15  is classified as special ed.  As to the basis of it, you

16  already have that discovery.

17       MR. KOLANO:  But the person who is going to say the

18  classification needs to be an expert, because it has to mean

19  something to be special ed.  Otherwise, otherwise can I ask the

20  detective has been qualified as expert in criminal

21  investigation, and he says yes, and then he can give his

22  opinion your guy is guilty?  Of course not.  That's basically

23  what you are doing.  You are getting in through categories and

24  classifications things that are, need to be supported

25  substantively by experts.



KOCZUR - REDIRECT BY KOLANO                                    117

1        THE COURT:  You are asking for curative instruction at

2   this point or awaiting what it is that the defense presents?

3        I am not sure what the defense is going to present at

4   this point.

5        MR. KOLANO:  I am going, I am asking for curative

6   instruction before the defense ends up putting anything on.

7   But not at this point, because I think we need to sit down,

8   figure out what curative instruction should be.  Probably after

9   lunch.

10       MR. FLORCZAK:  There is no objection made at the time.

11       THE COURT:  This is an issue we will, we don't need to

12  address at this point.  At this moment my concern is with

13  reference to the Third Street address.  I forgot.

14       MR. KOLANO:  Third Street?

15       THE COURT:  224 Third.

16       And I think I am going to sustain the objection to the

17  question on the basis the way it was phrased, because I don't

18  think it is exactly the way the original testimony was.  I

19  think it needs -- The original testimony of this witness was

20  that he had received information, not that he knew that they

21  were there.  I think the way the question was asked implies

22  that he knows who was at 224 Third Street, as opposed to he

23  received some information that people were at 224.  I think

24  that was the original testimony.  It was not objected to then.

25  I think this question gives the, certainly allows the

