SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION - FAMILY PART
UNION COUNTY
DOCKET NO. FJ-20-1786-96
APP. DIV. NO. _____

|  |  |  |
|---|---|---|
| STATE OF NEW JERSEY in the | : | **TRANSCRIPT** |
| Interest of | : | OF |
| M. M. | : | WAIVER HEARING |
|  | : |  |

Place:   Union County Courthouse
2 Broad Street
Elizabeth, New Jersey

Date:    November 11, 1996
Volume 2 of 2

B E F O R E:

HONORABLE RUDOLPH N. HAWKINS, JR., J.S.C.

TRANSCRIPT ORDERED BY:

DEBORAH C. COLLINS, ESQ., (Public Defender)

A P P E A R A N C E S:

SUSAN M. MAC MULLAN, ESQ.,
Assistant Prosecutor
Attorney for the State

WALTER FLORCZAK, ESQ., (Walter Florczak, Esq.)
Attorney for the Juvenile

Audio Recorded By: G. Plummer

-----------------------------------------------------------

**TAPE REPORTERS, INC.**
**Dorothy A. Miragliotta**
P.O. Box 823
East Orange, Jersey 07019
(973) 674-8600

-----------------------------------------------------------

Colloquy                    2





1    THE COURT:  -- then what I think we should probably
2    move right to that, but first let me, let me set the record.
3    Let me have your appearances.
4         MS. MAC MULLAN:  Good afternoon, Your Honor, Susan
5    MacMullan for the State.
6         MR. FLORCZAK:  Walter Florczak appearing for the
7    juvenile who is present.
8         THE COURT:  All right, this matter is captioned the
9    State of New Jersey in the Interest of Marvin Mathis.  Marvin
10   lives in the City of Elizabeth at 538 Magnolia Avenue.  His
11   date of birth is March twenty third, 1980.  He is currently 16
12   years of age.
13        The matter is before this Court for purposes of
14   waiver on Motion made by the prosecutor's office to waive this
15   young man from the, from the Juvenile Court to the Adult Court
16   for disposition.
17        This case has been somewhat unique, and having given
18   it a lot of -- not a lot of, but giving some time to it, it's a
19   kind of approach I might recommend to my colleagues, because
20   this entire case was submitted to this Court by way of, by way
21   of stipulation.  I was provided with the, you know, police
22   reports, various other statements.  I was provided with reports
23   from the, from the psychologist and from other interested
24   parties, and I think it's a very expeditious way to kind of
25   deal with these, with these Waiver Hearings, especially if

Colloquy                    3

1   we're going to have them at the rate we've been having them.

2        So I just wanted to comment on that and place it on

3   the record, but before I decide the case, I'm going to give

4   both attorneys an opportunity to be heard with regard to their,

5   their, their assessment of this case as it relates to waiver.

6        Mr. Florczak.

7        MR. FLORCZAK:  Yes, two things.  First, Judge --

8        THE COURT:  You know, I wonder sometimes too Miss

9   MacMullan whether or not Mr. Florczak should go first because

10  the burden is on him, not on you.

11       MS. MAC MULLAN:  Well Judge, I --

12       THE COURT:  Usually the party that has the burden in

13  New Jersey goes last, don't they?

14       MS. MAC MULLAN:  Well I think the State has to prove

15  his age at the time of the offense --

16       THE COURT:  We've done that.

17       MS. MAC MULLAN:  -- as well as the probable -

18  THE COURT:  I think I've already found probable cause in this

19  case, haven't I?

20       MS. MAC MULLAN:  I don't believe so.

21       MR. FLORCZAK:  We didn't stipulate it, however,

22  Judge, I don't think there's real -- any issue.

23       THE COURT:  So in other words, I have to make a

24  finding as to probable cause as well?

25       MS. MAC MULLAN:  Yes.

Colloquy                    4

1          THE COURT:  See, I didn't know that I had -- I

2    thought that I had already done that.

3          MS. MAC MULLAN:  I'm sorry, Your Honor, I should have

4    pointed that out.

5          THE COURT:  No, okay, but I'll make it as -- well Mr.

6    Florczak, since you're up, no point in  me making you bend

7    down, sit down again.  Just stand up and let me hear what you

8    have to say.

9          MR. FLORCZAK:  Thank you very much, sir.

10          There's two issues I'd like to address first, Judge.

11   First, I did submit a report from Mrs. Garcia from --

12          THE COURT:  Which I've received.

13          MR. FLORCZAK:  Fine.  Okay, and the only other thing

14   is Judge, I've discussed with my client his right to testify at

15   this hearing if he so desired to.  And after our discussion, he

16   wishes not to testify.  I just want to put that on the record.

17          THE COURT:  Certainly.

18          MR. FLORCZAK:  Now if I may be heard briefly on

19   what's been submitted to the Court.

20          THE COURT:  You may.

21          MR. FLORCZAK:  Thank you.  Judge, as I indicated,

22   probable cause doesn't require much, it's just a reasonable

23   suspicion, one that the crime was committed and that two, that

24   the juvenile took part in it.

25          And I think the Court has police reports and can make

1   that determination for itself.

2           More important, Judge, is the issue of

3   rehabilitation.  Can my client be rehabilitated by age 19.  Now

4   the COurt has received two psychological evaluations, one from

5   the State and one from the defense.  It's not unusual, I think

6   in the Ferguson case where Norman Freedman was quoted as an

7   expert indicated it's not unusual for that to be a wash.  You

8   have one side saying he can be rehabilitated, the other side

9   saying he cannot.

10          However, what I'd like the Court to consider in

11  reviewing these two psychological evaluations is first, I think

12  the State's expert focuses too much on the juvenile's

13  involvement in the offense, and overly relies upon a lack of

14  admission of remorse.  I think the, the examiner was unable to

15  distinguish between the juvenile not believing he did anything

16  wrong and the juvenile not admitting to a stranger that he did

17  anything wrong.

18          I think the Court has to take into consideration when

19  evaluating this the stage that this proceeding is at.  My

20  client hasn't been convicted of anything, he's an accused, and

21  we're simply deciding at this point what Court he should be

22  heard in.

23          And I think that's why part of the reason Mr. Isert

24  (phonetic) made that Motion initially to not have the

25  psychologist for the State go into the facts of the case.





 1   Because quite frankly, Judge, he relies too much on the facts

 2   of the case or having this person who's accused of a crime who

 3   still has to go before a jury and a Judge or just a Judge and

 4   have his guilt determined, on what his admissions are to that

 5   individual.

 6          And I think that limits the value of that expert's

 7   report.

 8          In addition, he doesn't give enough weight to my

 9   client's -- for instance even lack of a prior record or his

10   degree of intelligence, or whether or not this was an isolated

11   incident.  And I think that's a big limitation on the report

12   from the State.

13          While Dr. Page in her evaluation does talk about

14   borderline intelligence with a long history of severe learning

15   disabilities, being classified communication handicapped in

16   1990 and she talks about him not displaying any cynicism or

17   opportunic -- opportunistic attitudes towards others.

18          And she talks about this being an isolated incident.

19          But in any case, Judge, when you look at the two

20   reports, whether the Court gives greater weight to one or the

21   other, the Court also has to look at the  corroboration or

22   surrounding testimony or evidence presented to the Court from

23   other areas.

24          For instance, Miss Garcia from the Juvenile Detention

25   Center, she's dealt if not on a daily basis, close to a daily

Colloquy                    7

1   basis with my client for the last nine months and the Court has

2   her evaluation that he certainly could be rehabilitated by the

3   age 19.

4            She talks about him being consistently polite,

5   respectful and cooperative, getting along well with his peers

6   and staff.  And this she is saying, despite the fact that he

7   may even have a new complaint or does have a new complaint

8   involving a simple assault.  So he did get in a fight in the

9   Youth House.  But for almost the entire time he was there, he

10  was in the gold shirt status.

11           They indicate excellent adjustment by him in the, in

12  the detention.

13           So the past nine months he has shown she says that he

14  can learn, distinguish between being a follower which he had

15  been in the past, and evaluating situations as they arise.

16           She talks about his ability to learn, and this isn't

17  simply her saying this from the nine months, then you have four

18  teachers that were submitted to you, Judge.  Some taught him as

19  long as for the last three years prior to his arrest.

20           Mr. Orr (phonetic), Ronald Orr, Evyonne  Alvarado

21  (phonetic), Mrs. Fernandez, Mr. Firestone, all very surprised

22  of my client being charged or this happening, even the one

23  teacher that was submitted that talks about his earlier years

24  where he had problems in school.  She was surprised that this

25  happened.

Colloquy                    8

1    But to a man, these four teachers, to a person,

2    indicate that he was a leader in the class in special education

3    class, that he was always respectful of authority, always had

4    the respect of his peers, helped -- if somebody acted up, he'd

5    tell them to stop it, I want to learn.

6    This is an indication of someone, Judge, who in fact

7    can be rehabilitated.  This is an indication that what happened

8    here very likely is an isolated incident.

9    Now I realize, Judge, that because this is such a

10   serious chart one offense that the chance or probability of

11   rehabilitation has to substantially outweigh when you weigh it

12   against the offense involved.  And I suggest this is one case

13   that it does.  I ask the Court to take judicial notice of for

14   instance as Ferguson, State versus Ferguson cites, a juvenile,

15   if he's found guilty of a knowing and willing homicide will

16   serve 80 to 120 months before being paroled.

17   And as that case cites, during which time he will be

18   exposed to rehabilitation services and constructive programs.

19   I think the Court should take that into

20   consideration.  I think this juvenile can be rehabilitated by

21   age 19 but he has the added benefit of eight to ten years

22   further in the system if he is in fact guilty of this offense.

23   The most serious of the offenses.

24   I ask the Court to also consider from its own

25   experience, take notice of what programs are available to a

1    juvenile in the system if he is kept as a juvenile.

2          Finally, Judge, and there's no question about the

3    seriousness of the offense.  But I think the Court has to

4    consider that this offense was not com -- committed in a

5    heinous manner in that apparently there was one shot fired.

6    Whether intentional, accidental there's no question it's still

7    an offense.

8          But the point is, Judge, this isn't a situation where

9    a man has been stabbed 21 times or is lying on the ground and

10   somebody is pumping bullets in him.  There was one shot fired

11   in this case.  I think the Court should take into consideration

12   when examining what papers have been presented, that my client

13   in his limited intelligence that he was not a leader in this

14   matter.  He wasn't the organizer of this grievance and if you

15   look at the records of these three other individuals involved,

16   I think it's clear that he wasn't.  And I want the Court to

17   weigh I think it's clear that we have shown that he can be

18   rehabilitated by age 19 and I think further that what we have

19   shown substantially outweighs this quite serious offense.

20          Thank you.

21          THE COURT:  Thank you, Mr. Florczak.  Miss MacMullan.

22          MS. MAC MULLAN:  Thank you, Your Honor.

23          On the issue of whether or not the State has proved

24   the age of the juvenile, I would submit, Your Honor, that the

25   date of the offense is January twenty second, 1996.  The

1   juvenile at the time was 15 years old and ten months.  His

2   birthday through exhibit G, his second written statement,

3   exhibit Q, the report of his own expert, exhibit T, the State's

4   report, all indicate, corroborate that in fact his date of

5   birth is March twenty third, 1980.

6        On that issue I submit we have met our burden.

7        On the issue of whether or not there's probable cause

8   to believe the juvenile committed the criminal homicide, I

9   submit that we have, Your Honor.  I will point out and put on

10  the record that all the statements of the witnesses that were

11  stipulated to were all sworn written statements as opposed to

12  oral statements.

13        I submit the crimes with which we have proved there's

14  probable cause are murder.  Knowing and purposeful murder,

15  felony murder, and first degree robbery.  Armed robbery.

16        If I could, Your Honor, and I don't mean to belabor

17  the point, I would like to just briefly discuss the facts of

18  the case if I could, Your Honor.  I realize you have all the

19  exhibits but it does bear on our expert's report.

20        On exhibit A, the report of the initial responding

21  Officer Antunucci (phonetic) and the statement of the daughter

22  of the deceased, Alice Cerieva (phonetic), they all indicate

23  that the victim was the owner of the liquor store on East

24  Jersey Avenue and he was taking out the trash by himself at

25  about ten p.m. at night.  And he was in front of his liquor

1   store.

2          The family members said they heard one gun shot, they

3   ran outside and they found him bleeding from the head.  He then

4   later was pronounced dead, a short time after.

5          Interestingly enough, as to the issue of the injury

6   sustained by the victim, pursuant to exhibit P, the autopsy

7   report, the victim was shot in the face and he was shot dead

8   on, straight on in the face.  The entrance wound was to the

9   left lower eyelid.  The exit wound was on the left side of the

10  head, indicating straight shot.

11         We all know that when a gun is struggled with, more

12  than likely the victim is resisting by pushing it away.  Here

13  what we have I submit, Your Honor, would be corroboration that

14  the, why this man was shot was not by an accident, but was shot

15  so he would let go of Marvin Mathis.  He was shot so Marvin

16  wouldn't have to be caught in this attempted robbery.  And I

17  think that's very telling in this case, the autopsy findings.

18         In also in exhibit A, Officer Antunucci's report,

19  there were three witnesses that gave statements.  Mr. Fisher,

20  Miss Halsey and Mr. Chan.  They all say the same thing; I heard

21  a gunshot, and they saw two black males make a left off East

22  Jersey onto I believe Seventh Street, running north across

23  Livingston towards South Park and one was wearing a black coat,

24  one was wearing a tan or yellow coat.  That clearly based on

25  the other statements would be Marvin in the black coat and



1    would be Antoine (phonetic) Harvey in the yellow or tan coat.

2          Victim's wallet was found right near where they were

3    running, 658 South Park Street.

4          Exhibit N is the eyewitness, the person that was

5    mute, Annabelle Negrand (phonetic) through an interpreter said

6    he was looking out his second story window, he sees two black

7    persons running from the left of the liquor store away.  He

8    doesn't know if they're men or women.  That throughout the

9    State's discovery and the other statements would indicate

10   that's the lookout women, Rene and April Digs (phonetic)

11   running in the opposite direction of Antoine and Marvin.

12         The case broke as the Court can see and the defense

13   will concede by the girlfriend of Marvin Mathis.  Her name is

14   Charlamay (phonetic) Brooks.  She voluntarily came into Court

15   because she was so upset about what Marvin told her.  She

16   admitted that she's been Marvin's girlfriend for a year and

17   three months.  She had a good relationship with him.  The

18   teachers when we interviewed them all said that yes, that was

19   Marvin's steady girlfriend and they did not detect any

20   animosity or bad blood between them at the time of the offense.

21         And pursuant to her voluntary statement to the

22   police, she said the next day after the January twenty second

23   murder, the day after the murder Marvin Mathis asks her to lie

24   for him.  Will you be my alibi, will you tell them that I was

25   with you between seven and eleven p.m.  She refused.  She was

Colloquy                        13

1   so upset with this she later spoke to Marvin, and on January

2   twenty second --

3                THE COURT:  Miss MacMullan --

4                MS. MAC MULLAN:  Yes, sir?

5                THE COURT:  You're right, I've read all this.  And

6   this is, you know, we're at the stage now where the Court has

7   to make a decision as to waiver.  These issues that you raise

8   are certainly, you know, great trial issues.  Waiver Hearing

9   will not concern itself with necessarily innocence or guilt,

10  but --

11               MS. MAC MULLAN:  Yes, sir.

12               THE COURT:  -- whether or not rehabilitation can

13  occur before age 19.

14               MS. MAC MULLAN:  Well I guess, Your Honor, I guess my

15  point in, in going into that and I won't go into that any

16  further --

17               THE COURT:  Well I know what your point is, but, but,

18  but feel somewhat secure in the fact that I, I've read the

19  facts of this case.

20               MS. MAC MULLAN:  Yes, sir.

21               THE COURT:  And I found in reading the facts of the

22  case the same thing that you're, that you're reiterating right

23  now for the record, and I, I'll make this a part of the record

24  if you want.  I'll make this entire --

25               MS. MAC MULLAN:  Yes, sir.

Colloquy                      14

1          THE COURT:  -- looseleaf a part of the record.  That

2    way it will be there for all to read.

3          MS. MAC MULLAN:  Yes, sir.

4          THE COURT:  But I'd like to deal with, I'd like to

5    get on with the rehabilitative aspect or --

6          MS. MAC MULLAN:  Yes, Your Honor.

7          THE COURT:  -- and the probable cause aspect which I

8    don't think there's going to be a whole lot of difficulty

9    establishing.

10         MS. MAC MULLAN:  Okay, Judge, just to wrap up then on

11   the -- I submit we have submitted probable cause.  Three co-

12   defendants all say Marvin was the shooter, we have an eye

13   witness that says Marvin was the shooter.

14         He also was quite callous in his after, in his

15   conduct after the offense.

16         On the prong of the first part of the, first prong of

17   the second portion of the hearing, Your Honor, the

18   rehabilitative phase, I submit that, Judge, that he has not

19   shown, he has not carried his burden that he can be

20   rehabilitated by the time he's 19.

21         Really what he hangs his hat on is Dr. Page's report

22   and what is glaringly missing from her report is that she has

23   absolutely no consideration or explanation of how serious this

24   crime was.  How callous, how they walked around for blocks

25   looking for somebody to rob.  Nothing in her report whatsoever

1   to discuss how deadly, how serious that is.

2            I submit, Your Honor, what the probable cause shows

3   is that this was premeditated, this was calculated and what's

4   scary about this, this was purposeful action.  And as our

5   expert who I'll get into has pointed out, this isn't where you

6   have a junkie who's acting under the influence of withdrawal or

7   even pressure to get more drugs and he needs money fast and he

8   holds up somebody.  That's a horrible situation in itself.

9            But in this case, Judge, there's no reason for this

10  robbery.  This kid had a mother that loved him, he had teachers

11  that cared about him, he went to school, he had people that

12  loved him at home.  There's no reason for this.  And I think if

13  anything, Judge, that's the most frightening part of this

14  juvenile is that when he tells the police I wanted to see what

15  it felt like, Judge, that is frightening.  And if ever there's

16  a case that cries out for waiver it's this case.

17           I also submit, Judge, in their expert's report, she

18  completely ignored Raymond Harris's statement who said he saw

19  Marvin pull the trigger.  Completely ignored Antoine Harvey's

20  statement and the other co-defendant's statement.  She

21  completely ignored Marvin Mathis's own statement and his

22  girlfriend's own statement, Judge.  She -- it's as if she only

23  considered those things that would help the juvenile as opposed

24  to giving a more objective conclusion.

25           I also submit, Judge, that Dr. Page, and I say this



Colloquy                16

1   with respect, I have a lot of admiration for her and her

2   philosophies, but unfortunately, Your Honor, I submit that she

3   clearly is against adult incarceration for any juvenile.   In

4   page ten of her report, Judge, she cites a, a journal article

5   where they question is it really a deterrent sending juveniles

6   to adult prison.

7          So clearly, Judge, she has a bias against that

8   remedy.  And also, Judge, I will point out Dr. Page always

9   testifies for the defense, she never says no, Judge.

10          THE COURT:  Never says what?

11          MS. MAC MULLAN:  I'm sorry, sir?

12          THE COURT:  She never says what?

13          MS. MAC MULLAN:  She never says no to whatever the

14   defense asks her.

15          THE COURT:  Well if she ever gets to testify, I mean

16   I do believe and I'll take judicial notice that she's been,

17   she's been contracted with before and she's -- hasn't, hasn't

18   always found rehabilitation and of course if you represent the

19   defendant and your expert can't find that they can't be

20   rehabilitated, if your expert cannot find rehabilitation by age

21   19, no point in putting him on.

22          MR. FLORCZAK:  No report is submitted.

23          THE COURT:  So you say thanks Dr. Page, but we'll

24   throw ourselves on the mercy of the system.

25          MS. MAC MULLAN:  I guess I'm just referring to the

1    fact that this wasn't the first expert that the defense went

2    to, that this was -- I know Mr. Eiser (phonetic) put on the

3    record he asked one expert and then they switched  to this

4    expert, Judge, so --

5              THE COURT:  Yeah, but we don't know the reasons --

6              MS. MAC MULLAN:  -- in that respect --

7              THE COURT:  -- we don't know the reason for that, do

8    we?

9              MS. MAC MULLAN:  No, we don't, Judge.

10             THE COURT:  Maybe they couldn't afford expert number

11   one.

12             MS. MAC MULLAN:  Perhaps.  Judge, I submit that in

13   comparison that this is not a wash of two experts, one for the

14   State and one for the defense.  I submit that our expert, Dr.

15   Schlessinger (phonetic), who has been an expert for the defense

16   in adult criminal homicide cases, I submit that based on his

17   background that he's extremely qualified for this.

18             In his interview of the defendant, Judge, I submit

19   that he is absolutely right in asking the juvenile what

20   happened.  And when you look at how the juvenile responded to

21   our expert, the juvenile is saying basically he was the only

22   one in the group that didn't want to harm this poor man.  He's

23   making quite a self-serving statement.  He basically says he

24   touched the top of the revolver in the struggle to get it away

25   from the victim.  No one has even, has even closely

Colloquy                    18

1   corroborated his version.

2           He also, the juvenile admitted to him, that he lied

3   to the police.  Our expert found that he's in the early stages

4   of developing a personality disorder with impulsive and

5   antisocial traits.  Our expert did find very telling that this

6   juvenile absolutely did not state that he had any

7   responsibility for his actions and that he did find that he had

8   only remorse for himself.

9           He asked him every which way about the victim and the

10  juvenile just kept thinking about his poor plight.  And I

11  submit that there is precedence for that in the case of <u>State</u>

12  <u>in the Interest of C.A.H. and B.A.R.</u>, a case cited numerous

13  times in waiver cases, 89 N.J. 326.  The defense experts in

14  that case were particularly impressed with the juvenile in his

15  feelings of guilt and remorse exhibited by the juvenile

16  defendant.  They said that feelings of remorse were of prime

17  importance.  Remorse is a positive indicator.

18          So there is certainly precedent for this expert in

19  relying upon the fact that there is absolutely no remorse by

20  Marvin Mathis nor is there respon -- taking responsibility for

21  his actions.

22          Our expert found that there was pronounced antisocial

23  thinking from the beginning of the episode and that in the face

24  of great tragedy, he showed very little responsibility.

25          They never did help the man after he was shot in the



```
 1  face.  They just ran.  They left him there to die, to bleed and
 2  if Marvin Mathis really was trying to help him, why didn't he
 3  stay by his side and offer some assistance?
 4          He has no explanation for that.
 5          I submit, Your Honor, that the defense has not
 6  sustained the burden and that he certainly cannot be
 7  rehabilitated by the age of 19 and the issue of deterrence
 8  versus the benefit of rehabilitation I submit that benefit does
 9  not substantially outweigh the need for deterrence and
10  protection of society.
11          THE COURT:  Thank you, Miss MacMullan.
12          Miss Berger, I know you have documents you want me to
13  sign.
14          (Discussion regarding another matter)
15          THE COURT:  Now, this is a, and I'm going to say it
16  again.  I've said it before, this is a Waiver Hearing.  And the
17  reason I reiterate that is for this purpose, is because  it's
18  not a trial.  Every once in awhile I think we sometimes confuse
19  these matters and introduce things that are really great trial
20  issues, they either go toward submitting a case or somehow,
21  sometimes mitigating in a, in a, various aspects of a case, but
22  this is a, a hearing in which I must decide whether or not this
23  juvenile can be rehabilitated by age 19 and if, and also
24  whether or not the fact active, or fact of rehabilitation
25  outweighs the, the substantial, outweighs substantially the
```



1  reasons for -- you lost me now.  You got me -- Court must find

2  the probability of rehabilitation substantially outweighs the

3  reasons for waiver.  That's what I wanted, that's what I wanted

4  to say.

5          I first must address of course the issue of probable

6  cause.  The State -- that's the State's burden.  State must

7  demonstrate probable cause.  Probable cause as has been

8  certainly pronounced in this Court on numerous occasions, is no

9  more than a well grounded suspicion or belief that an offense

10  has taken place and that the individual is a party to it.  That

11  of course is found in <u>State in the Interest of A.A.M.</u> found at

12  228 New Jersey Super page nine, it's a 1988 case.

13          The State must also demonstrate that the juvenile was

14  14 years of age or older at the time of the offense, and must

15  also demonstrate that the offense charged is one of those

16  enumerated in the statute, which permits waiver.

17          I don't think I need to say an awful lot about that.

18  We have this, we have this document here in front of us which

19  was provided me by the attorneys in their stipulation.  I'm

20  satisfied that the juvenile was 14 years of age or older at the

21  time of the commission of the crime.  I'm satisfied that murder

22  is certainly one of those, one of those offenses enumerated in

23  the statute which permits waiver, and I'm satisfied also that

24  there is sufficient evidence before this Court to send it on

25  for trial.

1    And pretty much that's what probable cause is all

2    about, whether it's here before a Grand Jury, you make a

3    finding as to whether or not there's sufficient  information

4    that the matter should go on to be, to be heard.

5         So therefore, I am, I am satisfied and convinced that

6    the State has met its burden of, of probable cause.

7         Now once that occurs, once the prosecutor has

8    established probable cause, then there arises a presumption

9    rebuttable though it may be, of waiver.  And in our case, our

10   cases now stand for that proposition, because there's been a

11   tremendous evolution in the law of, of waiver over the, over

12   the last few years.  As juvenile offenses became a lot more

13   severe, the legislature and the Courts have kind of dealt with

14   waiver in a very different, in a very different fashion and

15   form.  And probably, and probably correctly so.

16        So now, once the State has met the burden of probable

17   cause, there's a rebuttable presumption that waiver will occur.

18        What that means now is that the juvenile has the, has

19   the burden of demonstrating that he can be rehabilitated prior

20   to his nineteenth birthday, and also that he must demonstrate

21   that there, that rehabilitation substantially outweighs -- you

22   see, that's an added ingredient.  Once it was separate

23   rehabilitation, be rehabilitated, fine.  Stays here.  Can't

24   rehabilitate, goes to the adult Court.

25        Now even if the fact finder finds that the



1    rehabilitation is within the realm of possibility or

2    probability, before age 19, the juvenile must then demonstrate

3    that that substantially, and I underscore the word

4    substantially outweighs the reasons for waiver.  And what are

5    the reasons for waiver?  Deterrence.

6            And deterrence has become a relevant factor as cited

7    in one of our cases.  I think you'll find that in R.G.D.

8    Deterrence is a relevant factor in preventing future criminal

9    conduct, not only in the juvenile but in others.  And that's

10   how it is perceived, that it is very important now that not

11   only does this juvenile in other words get a message that this

12   kind of behavior will not be tolerated but the message should

13   be sent to others that they also should be forewarned that this

14   type of behavior would result in a, a, a treatment that is not

15   necessarily, not, not commonly used with regard to, to juvenile

16   offenders.

17           So against that backdrop I have to measure not only

18   what occurred, but what, whether or not this young man can be

19   rehabilitated.

20           Well first thing I sat down and I did, I decided let

21   me find out how much time we have, because that, that's, that's

22   a very important element, time.  If he were 18 and a half, that

23   means you don't have a whole lot of time to, to work in this

24   area of rehabilitation.

25           So knowing the juvenile's birthday being March of



Colloquy                           23

1   1980, we have until March of 1999 to rehabilitate him.  Now on
2   first blush, that seems like wow, that's forever, that's almost
3   the turn of the century.  But in reality, March of 1999 is two
4   years, five months away.  That's the kind, that's the kind of
5   timeframe in which we have to work.
6           Now one might say well that's a very substantial,
7   that's a very substantial period of time to, to, to re -- to
8   remold and fashion this young man to a different kind of, a
9   different kind of individual.
10          Well let's take a -- let's take a good hard look at
11  it.   And I think one thing, Miss MacMullan, you kind of, you
12  kind of dwelled on to the point where I, I, you know, I
13  interrupted you, but the facts in the case are extremely
14  important because it gives us some flavor, some idea of what
15  kind of person we were dealing -- we are dealing with,
16  especially as that person appeared on that, on that given
17  occasion.
18          Now in this instance, as Mr. Florczak has pointed
19  out, this kid does not have any substantial history of
20  delinquency.  So therefore, we're dealing in a very narrow area
21  with regard to, to, to his behavior.
22          But not only do we look at the behavior, we look at
23  some other things.  We, we look at, we look at him, at him the
24  person, and we look at him through the eyes of the, of the
25  experts, the psychologists, when they tell us a little bit

1   about the kind of person we're dealing with.

2         Well we know we're dealing with a person who in their

3   judgment is a follower.  This is what, this is what led him to

4   this particular activity of the date, on the date in question.

5   And we know we're also dealing with a person who is not

6   necessarily or has not been the benefactor of academic

7   achievement.  See, and I, I'm always a little careful in this

8   area because when we start talking about intelligence as

9   opposed to the lack thereof, sometimes I wonder whether or not

10  it has to do so much with the fact a person isn't intelligent

11  or they, it hasn't been honed or formalized through, through

12  education, through culture, et cetera, et cetera.

13        But we do know this, that -- and I think everything

14  would indicate based on the facts of this case that, that

15  Marvin is a follower.  And he followed some of his, his

16  confreres to, to do what they had set out to do and that was to

17  commit a robbery.  There's no question about that.  They were

18  going to commit a robbery.  And that could have been against

19  anyone.  They didn't, they didn't pick a, a soul, they said

20  let's go out and find somebody to rob.  And that could have

21  been you, Miss MacMullan, it could have been you, Mr. Florczak,

22  it could have been me had they, you know, come upon us.

23        But unfortunately, they came upon this, this, this, t

24  his shop owner, this liquor store owner who was going about his

25  daily duties of going out and putting, going out to put out the



1  trash, and to lock his gates for the night, and this, this pour

2  soul unexpectedly, you know, full of life, had a family, met up

3  with them and also met with his destiny.

4        Because Marvin Mathis, based on the, based on the

5  evidence presented -- I'm not finding innocence or guilt,

6  understand that, but based on the evidence presented, Marvin

7  Mathis took a gun and blew his brains out.  That's what

8  happened, he took a gun and shot him right through the face as

9  you point out, blew his brains out.

10        And then concocted or tried to concoct a story with

11  his girlfriend to, to establish an alibi, an alibi for him.

12        Well that's the kind of individual that we're dealing

13  with.  Now since you've seen and I think we should also note

14  that I don't think they got anything.  The wallet was evidently

15  taken by someone else who came, who was, who was equally

16  lacking in conscience and decided to relive this, this, this

17  individual who was dying on the sidewalk in the snow, of his,

18  of his wallet.

19        So in other words, if we want to talk about a crime

20  that, that made, that is completely without sense, this is it.

21  A man's life has been lost and there was no nothing that they

22  achieved or got for it.  They just took his life for no reason.

23  If there can ever be a reason for taking one's life.

24        So we look at that and we look at this young man's

25  inability to, to make decisions on his own and, and be a

1    follower, and we contrast that with, with what potential he

2    has.  We have to look at his potential.  Well we know that his,

3    that his, that his mental acumen is borderline.  He's -- and

4    it's true, he seems to have done well in environments that are

5    extremely structured.  While in detention he's done, he's done

6    well but that's a very structured environment, and what does a

7    very structured environment provide?  It provides some form of

8    leadership, something to follow.

9            What is he good at?  He's very good at following.

10   Does that mean once you pull down the structure he can continue

11   to, to survive on his own?  Not necessarily.  We found that

12   about the German army the first World War.  If you got, if you

13   shot the commanders, those who were underneath or supervised

14   by, they didn't know what to do.  They would surrender.  Unlike

15   the American army which I understand was felt to be somewhat

16   ragtag, they do whatever they want to do, but one thing about

17   it, you got the lieutenant?  Guess what, the sergeant could

18   take over.  You got the sergeant, then the buck private could

19   take over.  They kind of were able to do that.

20           Some folks can't.  You get, you get rid of the head

21   and the body dies.  Marvin sort of exemplifies this kind of

22   individual.  If there's nobody there to lead him whether it's

23   in the right way or the wrong way, he doesn't seem to have any

24   ability to, to seize the moment and make good decisions because

25   he's already made a poor decision in this, in this instance.

1          Don't get the impression anybody told him to shoot

2   this man, it was just the circumstances presented themselves

3   and he did it.

4          The question is based on his academic acumen or lack

5   thereof, I think maybe we're talking about the lack of it, can

6   he be introduced into an environment that can bring him to

7   rehabilitation in two years and five months?  That's a long

8   time.  You go to law school for three years.  And then

9   sometimes you can't pass the bar exam.  Go to college for four

10  years.  Doesn't necessarily make you a brain surgeon.

11         So two years and five months is not forever.  There's

12  a lot that has to be undone.  You see, when you have 16 years

13  now of things that have been done, now you have two years five

14  months to undo a lot of that, to bring this young man into sort

15  of the mainstream.

16         Then of course arguendo, let's assume that we can

17  make it, that after two years and five months or after two

18  years and four and four months, two weeks we can achieve

19  rehabilitation, let's assume, let's assume we can put that into

20  some kind of a computer.  Seems you can put a lot of things

21  into a computer today.  Punch it in and it says based on given

22  an A, B, C, and D, in two years, four months, two weeks, he'll

23  be rehabilitated.

24         See, I wish I could do that.  Then I could say well

25  fine, we'll keep him here.  We can't do that, but assume that

1   we could, then I have to ask myself the very next question.

2   Does the fact of rehabilitation in two years four months two

3   weeks outweigh -- strike that.  Substantially, because we can't

4   leave that word out.  Courts use it.  Does it outweigh

5   substantially the fact of rehabilitation?  Or does it

6   substantially outweigh -- I keep saying rehabilitation.  Does

7   it substantially outweigh the reasons for waiver.  And as we

8   know, the reason for waiver is deterrence.

9           And that concerns me a great deal as well.  Because

10  in this case, not unlike some, but unlike a great many, we do

11  have some other juveniles that were, that were involved.  And

12  you have to wonder what, you know, what influence they had on

13  one another in terms of this deed.  And I don't mind telling

14  you, this is in my judgment a dastardly deed that had they, you

15  know may not been following one another might this man still be

16  alive.  And whether or not a message needs to be sent that this

17  kind of behavior will not be tolerated even if you can be

18  rehabilitated by 19 years, that you still have to know that you

19  can't do this.

20          And that by you knowing that you can't do this and

21  maybe others will reap the benefit and say well wait a minute,

22  remember Marvin Mathis, he did this and even though he could be

23  rehabilitated by 19, the Judge still sent him on to be tried as

24  an adult because the message is to us that we can't conduct

25  ourselves in this way.

Colloquy                    29

1          I looked at Dr. Page's report, Dr. Page in my

2     judgment I think is, is a good psychologist.  I think she's a -

3     - she's testified before me in, on many occasions.  I looked at

4     the report submitted by, submitted by the State.  As I've

5     indicated, I've looked at this entire package.  This is, this

6     is a good package, and I would recommend it for all Waiver

7     Hearings to be quite honest with you.   Whether or not, whether

8     or not that will be followed, of course I don't know.

9          But in weighing everything, in weighing the experts'

10    reports, in weighing the offense charged and the circumstances

11    surrounding that offense, I am of this belief.  I don't believe

12    that Marvin Mathis can be rehabilitated by age 19.  And

13    therefore, I don't have to decide whether or not rehabilitation

14    outweighs the reasons for waiver.  But I do think that there is

15    a need in this case for deterrence.  Not only from him, but

16    from others.  Because in my mind, this was the most wanton

17    inexcusable act that I, that I've seen in my eleven years

18    sitting here on the bench.  There is just no rhyme or reason

19    for this, for this kind of behavior.

20          And therefore, I'm, I rule that this juvenile should

21    be waived to the adult Court for trial.

22          MS. MAC MULLAN:  Thank you, Your Honor.

23          THE COURT:  I want to make a record.  This, this

24    notebook though should become a part of the, of the record just

25    in case there is a, an appeal or something of that nature.

Colloquy                          30

1              Now the next question of course is where does he

2     remain.  And we don't have to necessarily decide that today.  I

3     will, I will certainly, you know, reserve on the issue of

4     remaining in detention or, or going to the, to the adult jail.

5     But of course you have to have a hearing for that, Miss

6     MacMullan, you know that.

7              MS. MAC MULLAN:  Yes, sir.

8              THE COURT:  And please be, you know, read the rules

9     over before you come over here with that if you wanted to go

10    over it because most of those Motions have not been too

11    successful with me simply because of circumstances that were

12    existent at the time.  They may not today.

13             MS. MAC MULLAN:  If I could have some time on that

14    issue then, Your Honor.

15             THE COURT:  Yeah, but not too much time.  I'll give

16    you some time, but not --

17             MS. MAC MULLAN:  Yes, sir.

18             THE COURT:  I'd like to have this done before you

19    leave.

20             MS. MAC MULLAN:  Yes, sir.

21             THE COURT:  Which probably will be in what, another

22    couple of weeks now?

23             MS. MAC MULLAN:  About four weeks.

24             THE COURT:  That much time?

25             MS. MAC MULLAN:  End of the month.



Colloquy                              31

1          THE COURT:  If you say so.  I'll take your word for

2     it.

3          All right, the juvenile will be remanded at this time

4     to the jail, to the detention.  Now of course, since he is --

5     he's sort of beyond my jurisdiction now and Mr. Florczak, you

6     understand too there are other Motions that can be made like

7     bail, et cetera. I want you to know that.

8          MR. FLORCZAK:  I understand that, Judge.

9          THE COURT:  All right.

10          MR. FLORCZAK:  Thank you.

11          THE COURT:  Thank you both.

12          MS. MAC MULLAN:  Thank you, Judge.

13          THE COURT:  Thank you all.

14                    *          *          *

15

16

32



1                    **CERTIFICATION**

2         I, DOROTHY A. MIRAGLIOTTA, the assigned transcriber,

3 do hereby certify that the foregoing transcript of proceedings

4 in Union County Superior Court, Family Part, on November 1,

5 1996, on Tape Number 1, Index 1286 - 3170, is prepared in full

6 compliance with the current Transcript Format for Judicial

7 Proceedings and is a true and accurate non-compressed

8 transcript of the proceedings as recorded to the best of my

9 knowledge and ability.

10

11 _Dorothy A. Miragliotta_      A.O.C. No. 295

12 TAPE REPORTERS, INC.        Dated: 4/14/95

13

