3MT

2T

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION : UNION COUNTY
CRIMINAL    -   97-02-00123
                              :
STATE OF NEW JERSEY,          :   Stenographic Transcript
                              :         of
            vs.               :   Miranda Motion
                              :
MARVIN MATHIS,                :
                              :
            Defendant,        :
_____:

                    Place:   Union County Courthouse
                             2 Broad Street,
                             Elizabeth, New Jersey,

                    Date:    June 9, 1998.


B E F O R E:
        HON. JOHN F. MALONE, J.S.C.,

TRANSCRIPT ORDERED BY:
        OFFICE OF THE PUBLIC DEFENDER
             Appellate Section

A P P E A R A N C E S:


        WILLIAM KOLANO,  ESQ.
        Assistant Prosecutor, Union County,
        For the State,

        WALTER E. FLORCZAK, ESQ.
        (Florczak & Florczak)
        Attorney for the Defendant,



                    B. PETER SLUSAREK, C.S.R., XIO0291
                    Official Court Reporter
                    Union County Courthouse
                    Elizabeth, New Jersey, 07207

2

1          WITNESSES INDEX

2

3                                              PAGE

4    MICHAEL BROWN

5          Direct By Mr. Kolano              05

6          Cross By Mr. Florczak            10

7

8

9    THOMAS KOCZUR

10         Direct By Mr. Kolano              13

11         Cross By Mr. Florczak            42

12

13

14   LINDA MATHIS                            65

15

16   MARVIN MATHIS

17         Direct By Mr. Florczak           72

18         Cross By Mr. Kolano              83

19

20

21

22

23

24

25

3

1   JUNE 9, 1998.

2          MR. KOLANO:   S-36 is statement of Sharlama Brooks,

3   1-24-96.

4          S-37 is Marvin Mathis' Miranda, 5:45 p.m.

5          S-38 is Marvin Mathis' Miranda 12:07 p.m.

6          S-39 is consent to search, 538 Magnolia Avenue.

7          S-40 statement Marvin Mathis, 1-20-96, 6:50 p.m.

8          S-41 is statement Marvin Mathis 1-24-96 2:30 p.m.

9          S-36 statement Sharlama Brooks.

10         This is for the Miranda hearing only.

11         THE COURT:   Matter of State versus Marvin Mathis,

12   indictment 97-02-00123.

13         Counsel, appearances for the record.

14         MR. KOLANO:   William Kolano, assistant prosecutor, for

15   the state.

16         Your Honor, I will be assisted during this trial by

17   summer intern student at law school who will be at counsel

18   table, with court's permission.

19         THE COURT:   Yes, certainly.

20         MR. FLORCZAK:   Good morning.

21         Walter Florczak from Marvin Mathis, who is present.

22         THE COURT:   Based on my discussion with counsel, I

23   understand there is a need for a Miranda hearing in connection

24   with this matter.   So before we embark upon any jury selection

25   we can attend to that.

4

1          Mr. Kolano, are you ready to proceed on on that?

2          MR. KOLANO:  I am, your Honor.

3          State calls Michael Brown.

4    M I C H A E L    W.    B R O W N,    S R.

5    Sworn as a witness and testified as follows:

6    DIRECT EXAMINATION BY MR. KOLANO:

7          Q.   By whom are you employed?

8    A.   Elizabeth Police Department.

9          Q.   How long have you been employed with the Elizabeth

10   Police Department?

11   A.   Sixteen years.

12         Q.   Back in January of 1996 what assignment did you have?

13   A.   I was signed to Elizabeth High School.

14         Q.   Could you please give the court a general idea of what

15   your assignment was as a police officer assigned to the

16   Elizabeth High School?

17   A.   I was assigned in a plain clothes detail as a detective to

18   really like, how can I say, intermingle with the kids, you

19   know, not in uniform so they wouldn't be intimidated so if they

20   had a problem they would come to me.

21         Q.   Back January 24, 1996 how long had you been assigned

22   to the high school detail, approximately?

23   A.   About two years.

24         Q.   And was there another detective or another police

25   officer who was assigned there on a, quote, permanent basis?

BROWN -   DIRECT BY KOLANO                                    5

1    A.   Yes.

2         Q.   Who was that?

3    A.   Detective Garcia.

4         Q.   And as a result of your occupying that position did

5    you come to gain the trust of many of the students?

6    A.   Yes.

7         Q.   Was your position a traditional police officer versus

8    bad guy position or something different?

9    A.   It was more of a, to give the kids, you know, a reason to

10   come to the officers so that they wouldn't be intimidated, so

11   we weren't in uniform.   We just like basically dress and

12   participated, you know, with the kids.

13        Q.   Was this part of what we now come to refer to as

14   community policing type of activity?

15   A.   Yes.

16        Q.   On January 24, 1996, did you have occasion to come

17   into contact with a person by the name of Sharlama Brooks?

18   A.   Yes.

19        Q.   And did Sharlama Brooks --

20        Did you know Janice Sutton at that time?

21   A.   I had met her.   You know, dealing with all the different

22   schools, you know, we have, we passed.

23        Q.   Did Sharlama Brooks have some conversation that you

24   were privy to or present for on January 24, 1996?

25   A.   Partially.

BROWN -   DIRECT BY KOLANO                          6

1    Q.   As a result of that conversation or any direction you

2    got from superiors at police headquarters did you come to meet

3    a person by the name of Marvin Mathis?

4    A.   Yes.

5    Q.   Was Marvin a student at the school at the time?

6    A.   Yes.

7    Q.   Which particular school was he at at that time, if you

8    recall?

9    A.   Jefferson.

10   Q.   And there come a point in time where you actually met

11   Mathis January 24, 1996 in person?

12   A.   Yes.

13   Q.   And please tell us what happened when you met Mr.

14   Mathis and what happened thereafter?

15   A.   Okay.  We were called by Detective Koczur to see if Marvin

16   Mathis was in school.  So, you know we, it was common for us to

17   go around if one of the detectives or one of the officers

18   wanted to speak to anybody from the school to go over to Jeff

19   because that's where we looked at the schedule, and that's

20   where he was at.  So we went over to Jeff, and we met with him.

21   Q.   When you say we who do you mean?

22   A.   Detective Garcia and myself.

23   Q.   Were you both in plain clothes?

24   A.   Yes.

25   Q.   Did you dress similar to the way you dress today, suit




BROWN -  DIRECT BY KOLANO                               7

1   and the situation?

2   A.  No.  Jeans, sneakers, T-shirt, sweat shirts.

3       Q.   Did you have your gun displayed?

4   A.  No.

5       Q.   And when you met with Marvin Mathis what did you ask

6   him to do, if anything?

7   A.  Would he come over to police headquarters because one of

8   the detectives wanted to speak to him.

9       Q.   What was his response to that?

10  A.  Said okay.

11      Q.   Did you force him to go to police headquarters?

12  A.  No.

13      Q.   Did you or Officer Garcia, Detective Garcia threaten

14  him?

15  A.  No.

16      Q.   Was any force, coercion, or threats made on Mr. Mathis

17  by you or Officer Garcia?

18  A.  No.

19      Q.   Did he go voluntarily?

20  A.  Yes.

21      Q.   Was he placed under formal arrest by you?

22  A.  No.

23      Q.   Was he handcuffed?

24  A.  No.

25      Q.   Was his freedom of movement restrained in any way?

BROWN -   DIRECT BY KOLANO                                  8

1    A.   No.

2         Q.   How would you describe the exchange between you and

3    Mr. Mathis -- cordial, hostile, friendly, sociable?

4    A.   It was sociable.  It was, you know, we always go over, you

5    know, get the kids.  So we never, you know, had any like run in

6    or anything like that with him.

7         Q.   Did he express any misgivings or hesitation or balk at

8    the idea of going to meet with the detective?

9    A.   Not to my memory.

10        Q.   And was he actually brought to police headquarters?

11   A.   Yes.

12        Q.   By whom?

13   A.   Detective Garcia and myself.

14        Q.   In what type of car?

15   A.   One of the unmarked.

16        Q.   While he was transported was he handcuffed?

17   A.   No.

18        Q.   Was he searched prior to getting into the police car?

19   A.   I don't remember.  Because he wasn't under arrest, so --

20        Q.   And during the ride to headquarters did you threaten

21   him or force him or coerce him in any way?

22   A.   No.

23        Q.   Did he at that time express any, any reservations

24   about going?

25   A.   Not to my knowledge.

BROWN -   DIRECT BY KOLANO                                    9

1      Q.   In short, was it a voluntary trip that was made by him

2  as far as you could tell?

3  A.   Yes.

4      Q.   Once you got to headquarters what did you do with Mr.

5  Mathis?

6  A.   We brought him upstairs to Detective Koczur, and that was

7  it.

8      Q.   And then you left?

9  A.   Yes.

10     Q.   And did that end your involvement with Marvin Mathis?

11  A.   Yes.

12         MR. KOLANO:  Nothing further.

13         THE COURT:  Mr. Florczak.

14  CROSS EXAMINATION BY MR. FLORCZAK:

15     Q.   Detective -- Is it officer or detective?  I am sorry.

16  A.   Doesn't matter.

17     Q.   Doesn't matter.  Okay.

18  Detective, what time did you see Mr. Mathis that morning?

19  A.   I can't remember exact time.

20     Q.   Do you remember what period, whether it was first

21  period, second period, or anything else?

22  A.   No.

23     Q.   Did you go to his classroom?

24  A.   I think someone called and he came, you know, to the

25  guidance or something.  I can't remember a hundred percent, so

BROWN - CROSS BY FLORCZAK                                    10

1    I won't even --

2        Q.   So you don't remember who got him out of his classroom

3    and what room --

4        Whether he was brought to vice-principal's room or guidance

5    counselor or anything else, you don't remember?

6    A.   I don't remember who got him out of his classroom.

7        Q.   And you didn't write any report on this, did you?

8    A.   No.

9        Q.   So this is what, two and a half years ago.  Your

10   memory is not clear as to what was said when he was brought,

11   wherever you were?

12   A.   Right.

13       Q.   Detective Koczur informed you or your partner that

14   they wanted him down at the station, is that correct?

15   A.   Yes.

16       Q.   So that is it possible that when he came to wherever

17   you were you told him you have to come down the station with

18   us, isn't that true?

19   A.   Yes.

20       Q.   And he was taken down to the station?

21   A.   Yes.

22            MR. FLORCZAK:  I have nothing.

23   REDIRECT EXAMINATION BY MR. KOLANO:

24       Q.   That he had to go, or did he express willingness to

25   go?

BROWN - CROSS BY FLORCZAK                              11

1   A.   Well, like I said, there was nothing threatening manner.

2        We told him one of the detectives wanted to speak to him.

3        Q.   You asked him if he would go?

4   A.   Go to headquarters with us.

5        Q.   And he said Yes?

6   A.   Yes.

7             MR. FLORCZAK:  I object to the leading nature of the

8   question.

9             THE COURT:  Sustained.

10       Q.   What did he say when you said, Would you go to

11  headquarters?

12            MR. FLORCZAK:  Judge, assuming that's what the officer

13  asked him.

14            MR. KOLANO:  He already testified to that.

15            MR. FLORCZAK:  Prosecutor testified to that; the

16  officer didn't.

17            THE COURT:  I will sustain objection.  Rephrase the

18  question.

19            MR. KOLANO:  No further questions.

20            MR. FLORCZAK:  I have nothing further, judge.

21       Thank you.

22            THE COURT:  Officer, you may step down.  You are

23  excused.  Watch your step.  There is a step there.

24            MR. KOLANO:  Thomas Koczur.

25

KOCZUR - DIRECT BY KOLANO                                    12

1   T H O M A S        K O C Z U R

2   Sworn as a witness and testified as follows:

3   DIRECT EXAMINATION BY MR. KOLANO:

4        Q.   By whom are you employed?

5   A.   By the City of Elizabeth.

6        Q.   In what capacity?

7   A.   Presently I am detective assigned to the detective bureau.

8        Q.   How long with the detective bureau?

9   A.   Ten years.

10       Q.   And how long have you been a police officer?

11  A.   Twenty-one.

12       Q.   And on January 24th, 1996, did you continue your

13  involvement with the investigation into a death that occurred

14  of Antonio Saraiva?

15  A.   Yes, I did.

16       Q.   On that occasion, 24th of January, 1996, did you have

17  occasion to have some contact with Sharlama Brooks?

18  A.   Yes.

19       Q.   How was your first contact with the name of Sharlama

20  Brooks?

21  A.   I was informed by Detective Lieutenant Gary Lewis that

22  there might be a possible eyewitness involved in this case.

23       Q.   Do you recall what time it was that you learned this

24  information on the 24th of January, 1996?

25  A.   Approximately ten a.m.

KOCZUR -  DIRECT BY KOLANO                          13

1    Q.    And when you received this information at

2  approximately ten a.m. what was done to meet with Sharlama

3  Brooks?

4  A.   At that time I made arrangements to back then was Captain

5  Mark Kurdula's office, and I used his office to interview

6  Sharlama Brooks.

7    Q.    And did you come to also know a person by the name

8  Janice Sutton?

9  A.   Yes, I did.

10    Q.    Was she present during the interview of Miss Brooks?

11  A.   Yes, she was.

12    Q.    I am going to show you what has been marked for

13  Miranda purposes only S-36 for identification.  I ask you to

14  look at it.  Do you recognize that?

15  A.   Yes, I do.

16    Q.    What is that?

17  A.   This is the statement given by Sharlama Brooks on 1-24-96.

18    Q.    What is the start time of that actual written

19  statement?

20  A.   11:05 a.m.

21    Q.    And you were the person who took the statement?

22  A.   Yes, I was.

23    Q.    And who was the typist?

24  A.   Lydia Martinez.

25    Q.    Prior to your starting this statement at 11:05 a.m.,

KOCZUR -  DIRECT BY KOLANO                              14

1   did you conduct an oral interview of Miss Brooks?

2   A.  Yes, I did.

3      Q.  And without going into all of it, you are familiar

4   with this written statement?

5   A.  Yes.

6      Q.  Without going into all the details, did she, Miss

7   Brooks, tell you pretty much everything in the oral statement

8   that she told you in the, that was subsequently recorded in the

9   written statement?

10  A.  Yes, she did.

11     Q.  And this was all in the presence of Miss Janice

12  Sutton?

13  A.  Yes, it was.

14     Q.  After you learned about Miss Sutton -- about Miss

15  Brooks, did you make any phone calls or any arrangements

16  regarding Marvin Mathis?

17  A.  No, I did not.

18     Q.  Did somebody else?

19  A.  Yes, they did.

20     Q.  What was done?

21  A.  Marvin Mathis was transported from Elizabeth Hgh School to

22  the detect bureau.

23     Q.  Was that at your general request?

24  A.  No, it was not.  That was done even before, well, after, I

25  found out that Marvin Mathis was a possible suspect in this

KOCZUR -   DIRECT BY KOLANO                           15

1   case I requested Lieutenant Gary Lewis to take care of that.

2        Q.    Marvin Mathis became a suspect based on what

3   information?

4   A.   On information that Sharlama Brooks gave.

5        Q.    That was the information she gave you?

6   A.   Yes.

7        Q.    Now, again, showing you what is marked S-36, there is

8   some highlighted portion of the statement.  I am going to ask

9   you to read the highlighted portion into the record.

10  A.   The question was asked:

11            "Who was your boyfriend?"

12            Her answer was:  "Marvin Mathis.

13            "Question:  Where does Marvin live?

14            "Answer:  538 Magnolia Avenue, first floor.

15            "Question:  How long has he been your boyfriend?

16            "Answer:  About a year and three months.

17            "Question:  On 1/22/96, between the hours of eight

18  p.m. and midnight where were you?

19            "Answer:  I was in bed.

20            "Question:  Was your boyfriend with you?

21            "Answer:  No.

22            "Question:  As you were speaking to him at this time

23  did he ask you to do anything?

24            "Answer:  He told me if anybody asked you were I was

25  at on Monday tell them I was with you from seven to eleven and

KOCZUR -  DIRECT BY KOLANO                              16

1   I told him, no, no.

2               "Question:  Did you ask him?

3               "Answer:  I asked him why, but he wasn't straight

4   with me.

5               "Question:  What did he say?

6               "Answer:  If I tell you are going to black out, so I

7   just left it at that.

8               "Question:  Earlier in your interview you stated to

9   this detective that your boyfriend shot someone by accident, is

10  that correct?

11              "Answer:  Yes.

12              "Question:  When did he tell you this?

13              "Answer:  When we were alone by the guidance

14  office."

15      Q.    Let me stop you here.  When you say earlier in this

16  interview you are referring to oral interview?

17  A.   Yes.

18      Q.    That would have had to have happened before you

19  started written statement at 11:05 a.m.

20  A.   Yes.

21      Q.    Please continue with the next highlighted portion.

22  A.   "Question:  In your own words, can you tell me to the best

23  of your recollection the exact words that he used when he told

24  you about the shooting.

25              "Answer:  He told me him and his friend were

KOCZUR -   DIRECT BY KOLANO                    17




1   walking, and I guess they stopped, and the man was bringing out

2   his garbage, and I think they got into a little argument, and

3   Marvin told me he went to just grab the guy, and he said the

4   gun had went off.  I shook my head, I started crying, and I

5   went to my first class period.

6          "Question:  Besides this detective, members of the

7   Elizabeth Police Department, and members of the Board of

8   Education, did you discuss this incident with anyone else?

9          "Answer:  No."

10     Q.    Does Sharlama Brooks sign and swear to the

11  truthfulness of this statement?

12  A.   Yes, she does.

13     Q.    Once you started taking this statement did you have to

14  interrupt this statement early on to go meet with someone else?

15  A.   Yes.

16     Q.    And who did you meet with?

17  A.   I was informed that Marvin Mathis was presently seated

18  inside the detective bureau.

19     Q.    And do you recall where in the detective bureau he was

20  seated?

21  A.   That was a larger conference room.

22     Q.    And where did you --

23  What did you do when you received this information that

24  Marvin Mathis was at headquarters?

25  A.   I immediately left the interview room and walked down to

KOCZUR -   DIRECT BY KOLANO                    18

1    meet with Marvin Mathis.

2         Q.    And was he seated in the conference room?

3    A.   Yes, sir, he was.

4         Q.    Was he handcuffed?

5    A.   No, he was not.

6         Q.    Was he placed under formal arrest?

7    A.   No, he was not.

8         Q.    Was he restrained in any way, shape, or form?

9    A.   No, he was not.

10        Q.    Tell me what you said to Mr. Marvin Mathis when you

11   saw him seated in the conference room?

12   A.   At that time I informed Marvin Mathis that he is a strong

13   suspect in this case, and Marvin Mathis became very nervous and

14   started to ask me questions.  At that time I told him I don't

15   want him asking me anything.  I like to do this the right way.

16   And the right way is for me find a guardian or your mother,

17   someone of age.  I told him not to answer any questions until

18   his mother was present, not answer any questions if anybody

19   asked them until his mother was present.

20        Q.    What did you do or direct be done to make sure that

21   his mother or guardian would become present?

22   A.   Myself and Lieutenant Gary Lewis made several phone calls,

23   and we found out that his mother worked at the Elizabeth

24   General Medical Center.  At that time arrangements were made to

25   have her picked up from work and brought back to headquarters.

KOCZUR -   DIRECT BY KOLANO                    19

1    Q.   Did she -- You did not do the pick up, did you?

2    A.   No.   I continued my statement with Sharlama Brooks.

3    Q.   And did you come to learn that Mrs. Mathis, Mathis'

4    mother came to headquarters?

5    A.   Yes, she did.

6    Q.   And did you meet her?

7    A.   Yes, I did.

8    Q.   That was Linda Mathis?

9    A.   Yes, sir, it was.

10   Q.   Tell me about your conversation with Linda Mathis

11   after you learned she was at headquarters?

12   A.   I explained to Miss Mathis pretty much same thing I

13   mentioned to her son Marvin, that her son is a very strong

14   suspect in a case where a shooting homicide and robbery took

15   place in the seven hundred block of East Jersey Street.

16   Q.   What was her general reaction to hearing that?

17   A.   She seemed a little disappointed and a little upset.   But,

18   once again, she was starting to ask me a lot of questions.

19   Q.   And did you outline the procedure that was going to

20   take place?

21   A.   Yes, I did.

22   Q.   And tell me what happened then.

23   Well, did you then meet Marvin Mathis again?

24   A.   Yes, I did.

25   Q.   Where did this meeting take place?

KOCZUR −  DIRECT BY KOLANO                    20

1   A.  At that time, after I left him first time, he was placed in

2   interview room in the back.  Linda Mathis was brought inside

3   the conference room again, and Marvin Mathis was brought in

4   again.  So they were both seated together with myself,

5   Detective John Furda, and Detective Gary Lewis inside the

6   conference room.

7        Q.   At this point you had finished taking your written

8   statement that you identified from Sharlama Brooks?

9   A.  Yes.

10       Q.   And what is the first thing that you did regarding the

11  rights for Marvin Mathis?

12  A.  At that time I, I orally and handwritenly advised him of

13  his Miranda rights.

14       Q.   Was he under arrest at that time formally?

15  A.  No.

16       Q.   Was he handcuffed?

17  A.  No.

18       Q.   His mother was present at that time?

19  A.  Yes.

20       Q.   Showing you now what has been marked, for Miranda

21  purposes only, S-38 for identification, and I ask you to look

22  at it and indicate whether or not you recognize that?

23  A.  Yes, I do.

24       Q.   What is that?

25  A.  This is the advisement of constitutional rights form that I




KOCZUR -   DIRECT BY KOLANO                           21

1   used on 1/24/96 in regards to reading Marvin Mathis his Miranda

2   rights in the presence of his mother.

3        Q.   What time does that start?

4   A.   Starts at 12:07 p.m.

5        Q.   Do you recall which clock you used to note that it

6   started 12:07?

7   A.   No, I don't.

8        Q.   Do you wear a watch?

9   A.   No, I do not.

10       Q.   Back then were you wearing a watch?

11  A.   No, I did not.

12       Q.   Would you please demonstrate for the court exactly how

13  you advised Mr. Mathis in the presence of his mother of his

14  Miranda rights?

15  A.   I was seated at the head of the table, and Marvin Mathis

16  and his mother were seated to the right.  I read each right

17  aloud, and after reading each right aloud, with his mother and

18  both Marvin Mathis understood each right, I asked Marvin to

19  place his initial after each sentence.

20       Q.   Would you please demonstrate.

21  A.   You have a right to remain silent.  Do you understand this

22  right?  They indicated to me which they did.  If they

23  understood, then I moved rights form over to them, and they

24  placed their initials.

25       Q.   Did Marvin indicate that he understood that right?



KOCZUR -   DIRECT BY KOLANO                              22

1    A.   Yes, he did.

2         Q.   Did his mother indicate that she understood that

3    right?

4    A.   Yes, she did.

5         Q.   There is an initial after that right or after the line

6    that says Do you understand?  Whose initial is that?

7    A.   Marvin Mathis'.

8         Q.   Did you watch him initial that?

9    A.   Yes, I did.

10        Q.   And he initialed that after you advised him of the

11   right and after he indicated orally to you that he understood

12   the right?

13   A.   Yes, he did.

14        Q.   Did that procedure that you just detailed for us hold

15   true for each of the subsequent rights there?

16   A.   Yes, it did.

17        Q.   And does Marvin Mathis' initial appear after the line

18   Do you understand?  on each of the rights?

19   A.   Yes, it does.

20        Q.   Did he orally indicate following each right that he

21   did understand his rights?

22   A.   Yes, he did.

23        Q.   Did his mother Linda Mathis also indicate following

24   advisement of each of the rights that she understood each of

25   the rights?

KOCZUR -  DIRECT BY KOLANO                          23

1    A.  Yes, she did.

2        Q.    And please demonstrate for the court what you did when

3    you got to the waiver portion?

4    A.  At that time I read the waiver portion aloud.  That is, I

5    have read this statement of my rights and I understand what my

6    rights are.  I am willing to make a statement and answer

7    questions.  No promises or threats have been made to me nor

8    pressure nor coercion of any kind has been used against me.

9        After I read that to him I asked Marvin Mathis and his

10   mother if they fully understood this portion of the waiver of

11   rights form.  They said that they did.

12       At that time Marvin Mathis was asked to place his name,

13   sign the indicated waiver of rights form, and the previously

14   five read rights; and same true for Linda Mathis, his mother.

15       Q.    And there are some signatures here on this copy.

16       The first one, whose signature is that?  pointing to on the

17   top line?

18   A.  Marvin Mathis.

19       Linda Mathis.

20       Q.    And you personally witnessed Marvin Mathis sign this

21   form?

22   A.  Yes, I did.

23       Q.    You personally witnessed Linda Mathis, his mother,

24   sign this form?

25   A.  Yes.



KOCZUR -   DIRECT BY KOLANO                    24

1    Q.   And at what time is this completed?

2  A.  12:09.

3    Q.   Who signed as the advising officer?

4  A.  That is my signature.

5    Q.   Whose signature to the left bottom side of your

6  signature is that?

7  A.  Detective Lieutenant Gary Lewis.

8    Q.   Whose signature on the bottom right?

9  A.  Detective John Furda from Union County Prosecutor's office.

10    Q.   Could you give us the general dimensions of the

11  conference room?

12  A.  I would say they are approximately twelve by twenty.

13    Q.   And were all of the police personnel in plain clothes?

14  A.  Yes.

15    Q.   Did anyone have their gun displayed, to your

16  recollection?

17  A.  Not to my recollection.

18    Q.   Was any force, threats, or coercion used on Marvin

19  Mathis or his mother in advising him of these rights?

20  A.  No.

21    Q.   Did he or his mother at any time indicate that they

22  did not understand any of these rights?

23  A.  No, they did not.

24    Q.   Did either Marvin or his mother ask for an explanation

25  of any of the words or meaning of any of these rights?

KOCZUR - DIRECT BY KOLANO                                    25

1   A.   No, they did not.

2        Q.   At any time did Marvin Mathis or his mother exercise

3   any of his rights, specifically to remain silent, or asked for

4   an attorney?

5   A.   No.

6        Q.   Did the, other than the reference in the rights

7   themselves, did the word "attorney" come up, directly or

8   indirectly in any way shape or form?

9   A.   No.

10       Q.   Did Mr. Mathis talk freely?

11  A.   Yes, he did.

12       Q.   Subsequently, after this form is signed off on, do you

13  conduct an oral interview of Marvin Mathis?

14  A.   Yes, I did.

15       Q.   And was his mother present at the beginning of the

16  oral interview?

17  A.   Yes, she is.

18       Q.   Where does the oral interview take place?

19  A.   Inside the conference room.

20       Q.   At any time that evening up until very late was Marvin

21  Mathis placed under arrest formally?

22  A.   Can you repeat.

23       Q.   Well, this is at 12:09.  At this point is Marvin

24  placed under arrest formally?

25  A.   No.




KOCZUR -   DIRECT BY KOLANO                           26

1      Q.    Is he handcuffed at any time?

2   A.  No.

3      Q.    Any force, threats, or coercion used to get him to

4   talk?

5   A.  No.

6      Q.    Any force, threats, or coercion used on his mother?

7   A.  No.

8      Q.    And his mother was present when you began the oral

9   interview?

10  A.  Yes.

11     Q.    Who else was present when you began the oral

12  interview?

13  A.  Detective John Furda.

14     Q.    And did there come a point in time where --

15     In your report did you detail what Mr. Mathis said as part

16  of this oral interview?

17  A.  Not -- Little pieces, but not the very detailed report.

18  No.

19     Q.    You subsequently took a first statement from Marvin

20  Mathis?

21  A.  Yes.

22     Q.    Does that first statement pretty much cover the

23  substance of what Marvin Mathis told you in the oral interview?

24  A.  Yes.

25     Q.    Early in the early -- Early on in the oral interview

KOCZUR -   DIRECT BY KOLANO                                27

1    did he originally deny any involvement --

2    A.   Yes.

3        Q.   -- in this offense?

4        Did there come a point in time where Mr. Mathis made a

5    request of you as related to his mother Linda Mathis?

6    A.   Yes.

7        Q.   And what was that request?

8    A.   He wanted his mother to leave the room.

9        Q.   I guess, at this point do you see Marvin Mathis in the

10   courtroom?

11   A.   Yes.

12       Q.   Please identify him.

13   A.   Marvin Mathis seated to my left.  He has braids, white

14   shirt, a maroon tank top on, beige pants, and dark shoes.

15           THE COURT:  For the record, indicating the defendant.

16       Q.   What request did Mr. Mathis make of you?

17   A.   He wanted his mother to leave the room.

18       Q.   And his mother was present when he made this request?

19   A.   Yes.

20       Q.   And did his mother have any objection to leaving the

21   room?

22   A.   No.

23       Q.   Did his mother in fact leave the room?

24   A.   Yes, she did.

25       Q.   When his mother left the room what did Marvin Mathis

KOCZUR -   DIRECT BY KOLANO                                28

1    say?

2    A.   At that time he admitted that he was there present at the

3    shooting scene.

4        Q.   Was his mother brought back into the room?

5    A.   Yes.

6        Q.   Did Mr. Marvin Mathis repeat what he had told the

7    police in front of his mother?

8    A.   Yes.

9        Q.   And did the oral interview continue at that point

10   after he admitted his involvement?

11   A.   For a brief point, yes.

12       Q.   And then was there a subsequent written statement?

13   A.   Yes.

14       Q.   Now, I am going to show you what has been marked S-41

15   for identification.  I ask you to look at it, indicate whether

16   or not you recognize that.

17   A.   Yes, I do.

18       Q.   And what is that?

19   A.   This is the typewritten sworn statement provided by Marvin

20   Mathis 1/24/98 and --

21       Q.   '98?

22   A.   I am sorry.  '96.

23       Q.   And who is the typist for this statement?

24   A.   This is Arlene McDonough.

25       Q.   She is secretary at the Elizabeth Police Department?

KOCZUR -   DIRECT BY KOLANO                                29

1   A.   Yes, she is.

2        Q.    Statement taken by you?

3   A.   Yes, it is.

4        Q.    Now, prior to this statement being taken did you in

5   fact take a statement from Linda Mathis?

6   A.   Yes, I did.

7        Q.    And that was to basically cover the events leading up

8   to Marvin's being brought to the school and Miss Mathis being

9   transported to the school?

10  A.   That is correct.

11       Q.    And was Miss Linda Mathis, the defendant's mother,

12  present during this entire typewritten statement?

13  A.   Yes.

14       Q.    Okay.  Now, I have highlighted portions of this

15  statement.  Would you also please read highlighted portions of

16  that statement.

17  A.   "Question:  Earlier this day you were transported from your

18  school and brought to Elizabeth Police Department.

19            "Answer:  Yes.

20            "Question:  Did you come here upon your own free

21  will?

22            "Answer:  Yes.

23            "Question:  When you came to the police department

24  did I introduce myself to you and tell you the investigation

25  that I was conducting?

KOCZUR -   DIRECT BY KOLANO                    30

1        "Answer:  Yes.

2        "Question:  That was the shooting and robbery of a

3  store owner on East Jersey Street in Elizabeth, is that

4  correct?

5        "Answer:  Yes.

6        "Did I then ask you not to speak to this detective

7  until I had your mother present?

8        "Answer:  Yes.

9        "Question:  And you were not asked any questions in

10 regard to this case --" I am sorry.  Correction.

11      "And you were not asked any questions in regard to this,

12 is that correct?

13       "Answer:  Yes.

14       "Question:  A short time later you were brought from

15 an interview room and placed in a conference room of the

16 detective bureau, is that correct?

17       "Answer:  Yes.

18       "Question:  Who was in the room at that time?

19       "Answer:  My mother, you, and two other detectives.

20       "Question:  Did I again in the presence of your

21 mother inform you of the investigation that I was going to

22 conduct?

23       "Answer:  Yes.

24       "Question:  And I advised you of your constitutional

25 rights, is that correct?

KOCZUR -   DIRECT BY KOLANO                           31

1    "Answer:  Yes.

2    "Question:  And your mother witnessed this, is that

3  correct?

4    "Answer:  Yes.

5    "Question:  Did you understand your rights?

6    "Answer:  Yes.

7    "Question:  Do you still understand your rights?

8    "Answer:  Yes.

9    "Question:  Do you wish to proceed with this

10 investigation by giving a typewritten statement?

11   "Answer:  Yes."

12   MR. KOLANO:  If I can interrupt.  Is Miss Mathis in

13 the courtroom?  As long as she is outside.  I want to make

14 sure.

15   THE COURT:  I have a note she arrived, was outside the

16 courtroom.  I asked the officer to remain outside.

17   MR. KOLANO:  Thank you.  I apologize for the

18 interruption.  I apologize to you.

19   Q.   Would you please continue.

20 A.  On the highlighted portion of the page, next page, on

21 number three, at 2:45, between 2:45 and 2:50 p.m., we stopped

22 for a brief break in the statement.

23   "Question:  How were you treated by members of the

24 Elizabeth Police Department?

25   "Answer:  You treated me right.

KOCZUR -  DIRECT BY KOLANO                           32

1          "Question:  Were you abused by any members of the

2     Elizabeth Police Department?

3          "Answer:  No.

4          "Question:  Were you able to use the rest room?

5          "Answer:  Yes.

6          "Question:  When you were hungry did we stop this

7     interview and provide you with lunch?

8          "Answer:  Yes.

9          "Question:  Do you have any objection, keeping your

10    constitutional rights in mind, that this detective and members

11    of the Elizabeth Police Department recover pager number from

12    the plastic bag and recover the pants you were wearing at the

13    time of this homicide?

14         "Answer:  No objection.

15         "Question:  After you read this statement and find

16    it correct will you sign it as a true, free, voluntary

17    statement?

18       This statement was done in the presence of Marvin Mathis'

19    mother, Linda Mathis.

20         "Answer:  Yes."

21    Q.   Now, is this a verbatim statement of all the words

22    that Marvin Mathis spoke?

23    A.   Yes.

24    Q.   And at the bottom of each page of this nine page

25    statement there appear initials MM.  Who put those initials

KOCZUR -   DIRECT BY KOLANO                    33

1  there?

2  A.   That is Marvin Mathis.

3      Q.   They are on each of these nine pages?

4  A.   Yes.

5      Q.   And on the last page an oath is administered by Lydia

6  Martinez?

7  A.   Yes.

8      Q.   And she is a secretary and notary at the Elizabeth

9  Police Department?

10  A.   Yes.

11      Q.   And signature here, who put that there?

12  A.   Marvin Mathis.

13      Q.   Did you witness that?

14  A.   Yes, I did.

15      Q.   There is a signature, whose is that?

16  A.   That's my signature.

17      Q.   Is the signature just below your signature, who is

18  that?

19  A.   Linda Mathis.

20      Q.   Was she present during the taking of this entire

21  statement?

22  A.   Yes, she was.

23      Q.   Now, part of the highlighted portion that you read you

24  asked him keeping his constitutional rights in mind would he

25  have any objection to basically a search of his house being

KOCZUR -   DIRECT BY KOLANO                                34

1  made?

2  A.   That is correct.

3      Q.   And is that because in part of the substance that was

4  not read here he talked about a pager and having a certain pair

5  of pants on during the homicide?

6  A.   That is correct.

7      Q.   And just for the record, this statement S-41 starts at

8  2:30 p.m.?

9  A.   Yes, it does.

10     Q.   Now, I am going to show you what's marked S-39 for

11 identification for Miranda purposes only.   Do you recognize

12 that?

13 A.   Yes, I do.

14     Q.   What is that?

15 A.   This is the Elizabeth Police Department consent to search

16 form, and this is the one that I used with Marvin Mathis on

17 this day 1/24/96.

18     Q.   What time was that executed?

19 A.   It was signed at 4:15 p.m.

20     Q.   Who signed it?

21 A.   Marvin Mathis.

22     Q.   Who signed below?

23 A.   That's Linda Mathis.

24     Q.   That was the mother?

25 A.   Yes.

KOCZUR - DIRECT BY KOLANO                                      35

1    Q.    And both of them provided this consent form for the

2    police to go search their apartment?

3    A.   That is correct.

4    Q.    And was this consent form executed following this S-41

5    statement?

6    A.   Yes, it was.

7    Q.    And, again, was this done willingly and voluntarily?

8    A.   Yes, it was.

9    Q.    And in fact did Miss Mathis accompany one of the

10   detectives to her home and supply at least some of the items

11   that the police were looking for?

12   A.   That is correct.

13   Q.    Following the taking of this statement and the

14   execution of the consent to search was anything done with

15   Marvin Mathis regarding an identification?

16   A.   At that time photo array was made up.  Marvin Mathis --

17   Q.    Well, let me strike that.

18   You took subsequent statement from Marvin Mathis, correct?

19   A.   Yes.

20   Q.    Inbetween the first statement and the consent form and

21   the second statement, what was he doing while he was in the

22   conference room?

23   A.   At that time he was looking at books, photo identification

24   books containing black males.

25   Q.    Who was he looking for?

KOCZUR -   DIRECT BY KOLANO                          36

1    A.   For Antwan.

2         Q.   And at that point the first time you heard the name

3    Antwan was from Marvin Mathis?

4    A.   Yes.

5         Q.   And you didn't know which Antwan it was at that point

6    or did you?

7    A.   Sir, I have, I have to correct.  First time I heard name

8    Antwan was Sharlama Brooks.  The second time I heard the name

9    Antwan came from Marvin Mathis.

10        Q.   You left him in the room to look through basically all

11   the books of black males to see if he could identify Antwan?

12   A.   Yes, sir.

13        Q.   Now, did there come a point in time where you

14   conducted a second oral interview of Marvin Mathis?

15   A.   That is correct.

16        Q.   And prior to you beginning the second oral interview,

17   was he revised of his Miranda?

18   A.   Yes, he was.

19        Q.   And now showing you what has been marked S-37 for

20   identification, for Miranda purposes only.  I ask you to look

21   at it and indicate whether or not you recognize that?

22   A.   Yes, I do.  This is the Elizabeth Police Department

23   advisement of constitutional rights forms.  This is the form

24   that was used by me on 1/24/96 with Marvin Mathis.

25        Q.   And what time was the start?

KOCZUR -   DIRECT BY KOLANO                    37

1   A.   Starts at 5:45.

2        Q.   What time does it end?

3   A.   5:46.

4        Q.   And there are initials after each of the five rights.

5   Who put those initials there?

6   A.   Marvin Mathis.

7        Q.   And did you go through the procedure the same way with

8   this rights?

9   A.   Yes, I did.

10       Q.   And there is a signature here following the waiver.

11  Whose signature is that?

12  A.   Marvin Mathis.

13       Q.   Whose signature is below as the witness?

14  A.   Linda Mathis.

15       Q.   And whose signature is the advising officer?

16  A.   My signature.

17       Q.   The defendant's mother was present for the entire

18  advisement of these rights at 5:45 to 5:46?

19  A.   Yes.

20       Q.   Did the defendant up until this point in time in any

21  way shape or form exercise either his right to silence or his

22  right to have an attorney?

23  A.   No.

24       Q.   Was any force, threats, or coercion used on him at

25  this point?



1  A.  No.

2     Q.  He continued to be in the conference room

3  unhandcuffed?

4  A.  Yes.

5     Q.  And throughout this entire evening everyone was in

6  plain clothes as far as police personnel involvement?

7  A.  Yes.

8     Q.  Except for secretaries, whatever they were wearing.

9  A.  Yes.

10    Q.  Now, did you conduct an oral interview following the

11  second advisement of Miranda at 5:46?

12  A.  Yes.

13    Q.  And was Miss Mathis, Linda Mathis present for that

14  oral interview?

15  A.  Yes.

16    Q.  And did you take a subsequent written statement from

17  Marvin Mathis?

18  A.  Yes, I did.

19    Q.  Was Miss Linda Mathis present for that entire written

20  statement?

21  A.  Yes.

22    Q.  Showing you what is marked S-40 for identification, I

23  ask you to look at it and indicate whether or not you recognize

24  that?

25  A.  Yes.  This is the typewritten sworn statement given by

KOCZUR  -  DIRECT BY KOLANO                    39

1   Marvin Mathis on 1/24/96.

2        Q.   And what time does that statement begin?

3   A.  6:50 p.m.

4        Q.   And is this also in the conference room?

5   A.  It's at the typewriter outside the conference room.

6        Q.   That's the secretaries' general area?

7   A.  Yes.

8        Q.   Would it be fair to describe that as an open area?

9   A.  Yes, it is.

10       Q.   And at that point are there lot of police personnel

11  around at 6:50?

12  A.  No.  Very few.

13       Q.   Please, would you read highlighted portions of this

14  S-40 statement.

15  A.  "Question:  Marvin, I then advised you of your Miranda

16  rights, is that correct?

17            "Answer:  Yes.

18            "Question:  Did you understand your Miranda rights

19  at that time?

20            "Answer:  Yes.

21            "Question:  And with your constitutional rights in

22  mind, did you make statements regarding this homicide?

23            "Answer:  Yes.

24            "Question:  At this time do you wish to continue by

25  giving a typewritten sworn statement?

KOCZUR -   DIRECT BY KOLANO                          40

1        "Answer:  Yes.

2        "Question:  From the time you left your last written

3   statement to this time how were you treated by members of the

4   Elizabeth Police Department?

5        "Answer:  Okay."

6        Q.   And on each of those pages as you went through them

7   did there appear initials MM on each of them?

8   A.   Yes.

9        Q.   Did Marvin put those there?

10  A.   Yes.

11       Q.   And on this last page whose signature is that?

12  A.   Marvin Mathis.

13       Q.   Actually let me read the last question and answer.

14       "Question:  After you and your mother read the

15  statement over and find it to be true and correct, are you

16  willing to sign it in your own handwriting?

17       "Answer:  Yes."

18       Whose signature is this below Marvin Mathis'?

19  A.   Linda Mathis.

20       Q.   Whose signature at the bottom?

21  A.   My signature.

22       Q.   Who administered the oath?

23  A.   Lydia Martinez.

24       Q.   Any force, threats, or coercion used to get this

25  written statement?

KOCZUR -   DIRECT BY KOLANO                           41

1    A.  No.

2        Q.   Did he exercise any of his constitutional rights to

3    remain silent, for an attorney, or any constitutional rights

4    regarding this second statement?

5    A.  No.

6        Q.   Was Linda Mathis cooperative with you at this point?

7    A.  Yes.

8        Q.   And did there come a point in time in the interview of

9    Mr. Marvin Mathis that she also pointed out some

10   inconsistencies?

11   A.  Yes.

12       Q.   Detective, from being there did Mr. Marvin Mathis as

13   well as his mother in your opinion knowingly, voluntarily, and

14   intelligently waive all of his rights and cooperate and provide

15   the information that you have identified here today?

16   A.  Yes.

17           MR. KOLANO:  Thank you.  I have nothing further.

18   CROSS EXAMINATION BY MR. FLORCZAK:

19       Q.   Detective, at what time did you request the presence,

20   that Mr. Mathis be produced?

21   A.  A little after ten o'clock, sir.

22       Q.   Who did you speak to?

23   A.  Lieutenant Gary Lewis.

24       Q.   What did you tell him?

25   A.  At that time I informed him that Marvin Mathis, high school

KOCZUR - CROSS BY FLORCZAK                          42

1  student, was a possible suspect in this case.

2      Q.    Okay.  Was any arrest warrant requested for Mr.

3  Mathis?

4  A.  No.

5      Q.    And how much later was he in police headquarters?

6  A.  Say approximately an hour later.

7      Q.    Did you see him come in?

8  A.  No.

9      Q.    When was the first time you saw him?

10  A.  A little after eleven, sir.

11      Q.    Where was he at that time?

12  A.  In the conference room of the detective bureau.

13      Q.    Did you speak to him at that time?

14  A.  Yes, I did.

15      Q.    And what did you ask him at that time?

16  A.  At that time I didn't ask him anything.  I told him that he

17  was a suspect in this case.

18      Q.    And that's all you said to him?

19  A.  I explained to him -- He started asking me questions.  And

20  I says Marvin, I can't talk to you at all about this case.

21  This is a very serious case, a very serious charge, we have to

22  get either your mother or a guardian present.  And at that time

23  he provided me with the information of how his mother can be

24  reached.

25      Q.    So you asked him where his mother worked or where she




KOCZUR - CROSS BY FLORCZAK                                43

1   was and so forth?

2   A.  Yes.

3       Q.  Now, you took a statement from his mother, is that

4   correct?

5   A.  Yes.

6       Q.  And you put in your statement something -- let's see,

7   during the first, let's see, something about in the statement

8   about from time to time she left the room?

9   A.  That is correct.

10      Q.  How many times did she leave the room?

11  A.  I believe maybe two or three.

12      Q.  How many times at the request of her son?

13  A.  Just once.

14      Q.  And under what circumstances did she leave the other

15  times?

16  A.  As the truth of this case was coming out she appeared to be

17  upset, but I don't know what was inside Mrs. Mathis' mind.

18      Q.  After she was out of the room did you continue to

19  question Mr. Mathis?

20  A.  Yes.

21      Q.  And you are aware at the time he was fifteen years

22  old, is that correct?

23  A.  Yes.

24      Q.  And you were also aware at the time that he should

25  have a parent present at all times that he is questioned, isn't

KOCZUR - CROSS BY FLORCZAK                                    44

1   that true?

2   A.   That's not my understanding.

3        Q.   That isn't your understanding.   Okay.

4        You didn't put anything in her statement about him asking

5   that she leave, did you?

6   A.   Sir, I have to look over the statement again.

7        Q.   Fine.   Look it over.

8   A.   May I refer to my statement?

9        Q.   Surely.   Linda Mathis' statement?

10            MR. KOLANO:   I have a clean copy that can be marked.

11            THE COURT:   Perhaps we should do that.

12            For purposes of the Miranda we will mark this D-1.

13            (Statement marked D-1 for identification).

14       Q.   I show you what has been marked D-1 for

15  identification.

16  A.   Yes, sir.

17       Q.   Can you identify that for us, please?

18  A.   This is a copy of the statement given by Linda Mathis.

19       Q.   And that contains her signature and your signature as

20  well?

21  A.   Yes, sir, it does.

22       Q.   Okay.   I asked you to look at it regarding whether it

23  mentions in there any place that my client, Marvin Mathis,

24  asked that she leave the room.

25  A.   That Marvin Mathis asked?

KOCZUR - CROSS BY FLORCZAK                              45

1      Q.    Yes.

2   A.   No.   But does indicate, and if I may read the question and

3   answer.

4      Q.    Go ahead.

5   A.   "During this interview from time to time you left the room

6   and your son was with detective Furda and Lieutenant Louis, is

7   that correct?

8            "Answer:   Yes."

9            "Question:   And you had no objection to that?

10           "Answer:   No."

11     Q.    Now, you indicated that you advised Mr. Mathis of his

12   rights at 12:07, is that correct?

13   A.   Yes, sir.

14     Q.    And that these rights were signed by him and his

15   mother at 12:09, is that correct?

16   A.   Yes, sir.

17     Q.    And that was after you would read each right to him,

18   is that correct?

19   A.   Yes, sir.

20     Q.    So that between 12:07 and 12:09 you read to him You

21   have the right to remine silent, do you understand this?

22   A.   Yes, sir.

23     Q.    He would respond, he would initial?

24   A.   After his mother also indicated that she understood it,

25   then he initialled, sir.

1  Q.  Then you asked him Anything you say can and will be

2  used against you in a court of law.  Do you understand this?

3  A.  That is correct.

4  Q.  And you asked for a response from both him and his

5  mother?

6  A.  Yes.

7  Q.  You received the response, and you asked him to sign

8  it.  Is that correct?

9  A.  Initial.  Yes.

10  Q.  Initial.  I am sorry.

11  Then you asked him third question:  You have the right to

12  talk to a lawyer and have him present while you are being

13  questioned.  Do you understand this?  That was asked, is that

14  correct?

15  A.  Yes, sir.  It was.

16  Q.  And you got a response to whether they understood it,

17  both from him and his mother?

18  A.  Yes.

19  Q.  Then you asked him If you cannot afford to lawyer, a

20  lawyer, one will be appointed to represent you before any

21  questioning, if you wish.  Do you understand this?

22  And you followed the same procedure again?

23  A.  Yes, sir.

24  Q.  And you received the same answers?

25  A.  Yes.




KOCZUR - CROSS BY FLORCZAK                          47

1    Q.   And you also asked, You can decide at any time to

2  exercise these rights and not answer any questions or make any

3  statements.  Do you understand this?

4    And, again, they each responded.  Is that correct?

5  A.   Yes.

6    Q.   And then you read -- Did you read it to them or have

7  them read -- I have read these, this statement of my rights and

8  I understand what my rights are.  I am willing to make a

9  statement and answer questions.  No promises or threats have

10 been made to me, and no pressure or coercion of any kind has

11 been used against me.  Did they read that, did you read that to

12 them?

13 A.   I read that to them.

14   Q.   And at that time you asked, simply, whether they

15 understood it, and they responded affirmatively?

16 A.   Yes.

17   Q.   And signed it.  So that in that two minutes all this

18 was done, and you decided that they understood, he understood

19 what his rights were, is that correct?

20 A.   Yes, sir.

21   Q.   Did you ask him at any time to explain what any of

22 these things meant?

23 A.   Did I ask him?

24   Q.   Yes.

25 A.   No.  After he indicated to me that he understood them I





KOCZUR - CROSS BY FLORCZAK                    48

1   didn't feel it was necessary.

2       Q.   And you didn't ask his mother to explain any of these

3   items that she said she understood, is that correct?

4   A.  No.

5       Q.   Did you ask them to read any of these items?

6   A.  No.

7       Q.   When you decided to get Mr. Mathis from the high

8   school did you have any idea of his background?

9   A.  No.

10      Q.   Were you aware he had no record of any kind?

11  A.  No.

12      Q.   So you were not aware that he had previously not been

13  arrested for anything?

14  A.  No.

15      Q.   And were you aware that he was a special education

16  student in the school?

17  A.  No.

18      Q.   So you weren't aware he may have had certain learning

19  disabilities that made it difficult for him to understand any

20  of these things?

21  A.  No.

22      Q.   So you just assumed in the two minutes that you read

23  this that he understood everything?

24  A.  Yes.

25      Q.   Now, the first statement -- I am sorry.

1     Do you recall what time you first saw him?  Was it eleven,

2  11:15?

3  A.  Approximately that time.

4     Q.  So that he was sitting there for how long before you

5  first started questioning him?

6  A.  I have no idea how long he was sitting there, sir.

7     Q.  Do you have any idea what time you started questioning

8  him?

9  A.  Myself?

10     Q.  Yes.

11  A.  After 12:07, sir.

12     Q.  Were you aware what anyone else questioned him prior

13  to 12:07?

14  A.  No one questioned him, sir.

15     Q.  Were you with him that entire time?

16  A.  No, sir.

17     Q.  So you are assuming that no one questioned him.  You

18  weren't present with him.

19  A.  I was not present, no, sir.

20     Q.  And that first statement took how long, can you tell

21  me?

22  A.  The oral statement, sir, written statement?  Which portion

23  are you talking about?

24     Q.  The written statement.  That started at, what, 2:30?

25  A.  I am not sure how long it took.  I would say approximately




KOCZUR - CROSS BY FLORCZAK                    50

1    half hour to forty-five minutes.

2        Q.    I notice some statements have a start and finish time,

3    other statements don't.  Is there any reason for that?

4    A.    I believe that's either a detective's preference or

5    typist's preference.

6        Q.    So you questioned Mr. Mathis from 12:09 until what

7    time, do you recall?

8    A.    In the oral interview or written?

9        Q.    Yes, oral interview.

10   A.    From about twelve to just about -- the typewritten

11   statement started.  We did take a short break for lunch.

12       Q.    How long was that break?

13   A.    That would be approximately hour and a half.

14       Q.    An hour and a half for lunch?

15   A.    No.  We only took about fifteen, twenty minutes lunch.

16       Q.    Maybe hour and a half for oral questioning of my

17   client.  Is that correct?

18   A.    Yes.

19       Q.    And during that time how many times did his mother

20   leave the room?

21   A.    Approximately two or three.

22       Q.    And for how long was she gone the first time, do you

23   recall?

24   A.    No.  It was very brief.

25       Q.    You don't recall exactly how long either the two or



KOCZUR - CROSS BY FLORCZAK                              51

1   three times she left the room?

2   A.   No.

3      Q.   But each time questioning continued, is that correct?

4   A.   Yes.

5      Q.   So it was your understanding that a juvenile had a

6   right to waive his mother's presence if he so chose?

7   A.   No.   Mother waived his rights along with him, sir.   Both.

8   His mother had no objection to leaving the room, and Marvin

9   didn't have any objection to his mother leaving the room.

10     Q.   Is there anything that -- was she ever informed she

11  had a right to be present when he was being questioned?

12  A.   Yes, sir.

13     Q.   Does that appear in any of your reports, that she was

14  told that she could, that she had a right to be present?

15  A.   By me, just asking her, that's when I told her you don't

16  have to leave the room.   However, if you feel free to, you can.

17     Q.   First statement is a ten page statement.   Is it ten

18  pages?   Nine page statement.   Is that correct?

19  A.   Yes, sir.

20     Q.   And after this statement was completed can you tell me

21  what did you do with the statement before he signed it.   What

22  did you do?

23  A.   At that time I took the entire statement, gave it to both

24  him and his mother, asked him if he understood each page to

25  place his initials at the end of that page.   If he sees any



1  corrections bring it to my attention, we will make the

2  appropriate changes, where him and his mother will place

3  initials alongside the correction.  After reviewing the entire

4  statement and find it to be correct I asked them to place their

5  signature on the back page.

6      Q.   How long did it take them to review the statement, do

7  you recall?

8  A.  No, I am sorry.  I would say approximately five to ten

9  minutes.

10     Q.   Did you watch him do it?

11  A.  Yes, I did.

12     Q.   He went to each page and put his initials on each

13  page?

14  A.  Yes.

15     Q.   Did you point to where you wanted the initials made?

16  A.  No.  He clearly understood where I told him to place it

17  after last letter on each page.

18     Q.   In this nine page statement is there any corrections

19  of any kind made by him?

20  A.  I would have to look over the, his statement, sir.  If I

21  can refer to my copy.

22     Q.   Sure.

23         MR. KOLANO:  You can use S-41, since it's marked.

24     Q.   I ask you to look at S-41 and identify it for us,

25  please.  (Pause).

KOCZUR - CROSS BY FLORCZAK                    53

1   A.   Neither he nor his mother made any corrections.

2        Q.   Did you at any time ask them to read any part of it

3   aloud?

4   A.   No.

5        Q.   So how did you determine my client could read?

6   A.   He told me he could read, sir.

7        Q.   You asked him if he could read?

8   A.   Yes, sir.

9        Q.   And he told you.  So you assumed that was true, is

10  that correct?

11  A.   He gave a sworn typewritten statement to that, sir.

12       Q.   Well, if he couldn't read it would he know he is

13  giving a sworn statement to it?

14  A.   Well, I asked him, sir, I asked him if he could read.  He

15  said yes.

16       Q.   But you didn't ask him to demonstrate that ability at

17  all?

18  A.   No.

19       Q.   So, do you recall approximately what time the

20  statement was completed?

21  A.   I would say approximately --

22            MR. KOLANO:  Is that second one or first one?

23       Q.   Statement you have in front of you, S-41.

24            MR. KOLANO:  That's the second one.

25  A.   I would say approximately forty-five minutes after start to



KOCZUR - CROSS BY FLORCZAK                           54

1    half hour.

2        Q.    2:30 statement I am asking about.

3            THE COURT:  I believe S-41 was the first statement,

4    S-40 is the second statement.

5            MR. KOLANO:  I apologize.

6        Q.    Statement started, now, is this the -- this is after

7    preliminary oral statement is taken.  Is that correct?

8    A.  Yes, sir.

9        Q.    So that most of the information you expected to get

10   you have already essentially heard, is that correct?

11   A.  This statement?  Yes, sir.

12       Q.    So that approximately 3:15 or so this statement was

13   completed?

14   A.  May have been longer.  I am not exactly sure.  I have to

15   refer back to some, the statement, when he signed the Miranda

16   and the written statement.

17       Q.    Now, at what point did Linda Mathis leave for

18   substantial part of the time?

19   A.  She never left for a substantial part, sir.

20       Q.    Didn't she go to recover items from her house?

21   A.  We are talking after the statement now, sir?

22       Q.    At any time from the point my client was in police

23   headquarters to the point of time he was locked up?

24   A.  During the oral and written statement she was never gone

25   for a substantial period of time.  After the statement was

KOCZUR - CROSS BY FLORCZAK                           55




1   taken, and consent to search was signed, she accompanied a

2   detective back to her son's house.

3       Q.   Was that between the two statements or after the

4   second statement?

5   A.  That was between the two statements.

6       Q.   So approximately 3:30, or whatever time this first

7   statement was completed, was the time that she left.  Is that

8   correct?

9   A.  It was after that.  Yes, sir.

10      Q.   And where was Marvin Mathis during this time?

11  A.  He was seated inside the conference room the last time I

12  saw him.

13      Q.   Did you remain there or did you go with the mother to

14  her home?

15  A.  No, sir.  I was, I went to Union County Prosecutor's office

16  at that time.

17      Q.   Did you at any time tell Marvin and or his mother that

18  as soon as he gave the statement he could go home?

19  A.  No.

20      Q.   There came a point in time that you decided to take a

21  second statement.  Is that correct?

22  A.  Yes.

23      Q.   This was not at behest of Mr. Mathis, then.  He didn't

24  request to give a second statement, did he?

25  A.  No.  Sorry.  Yes, sir, he did.  It was after he was



1   Mirandized he did give a statement voluntarily.

2       Q.   I understand.  Well, no.  I am not trying to confuse

3   you, officer.  I mean after he had been Mirandized before the

4   first statement?

5   A.   Yes.

6       Q.   You had a complete statement, you had his mother go to

7   her house and get whatever clothing you needed.  Shy came back?

8   A.   Yes.

9       Q.   Why was the second statement taken?

10  A.   After reviewing all the evidence that came forth during

11  this case, I didn't believe Marvin Mathis was totally telling

12  me the truth.  I mentioned that to his mother and I asked his

13  mother again I would like to talk to Marvin a little bit

14  longer.  And she agreed.  She did not believe Marvin was

15  totally telling the truth either.  And at that time I

16  re-Mirandized him and we began a second interview.

17      Q.   And what time did the second statement start?

18  A.   If I can refer to the statement, to be accurate, please.

19      Q.   Sure.  Do you have it here?  Okay.

20      I show you what has been marked S-40 for identification.

21  A.   That written statement started at 6:50 p.m.

22      Q.   And can you tell us how long that statement took?

23  A.   I would estimate about an hour.

24      Q.   After this statement was taken, what happened, where

25  did Marvin Mathis go?



KOCZUR - CROSS BY FLORCZAK                                    57

1   A.  At that time I called Union County Prosecutor's office, and

2   we were going to meet for complaint approval.  And Marvin

3   Mathis at that time, that point wasn't free to leave, so I

4   placed him in holding pen in cell block at Elizabeth

5   headquarters.

6       Q.  For how long was he there, if you know?

7   A.  Several hours.

8       Q.  Do you know what time he was finally taken to the

9   Union County youth detention center?

10  A.  No, I do not.

11      Q.  If I told you it was -- Let's see.  Did you take him

12  finally or did someone else take him?

13          MR. KOLANO:  I object.  These are all events that

14  happened after Miranda.  This is a limited hearing for limited

15  purpose.  What happened afterwards, state is not alleging any

16  statements made at that point, so it's beyond the scope of this

17  hearing.

18          MR. FLORCZAK:  May not be what the defense is

19  alleging, judge.  It is the period he was in police custody.

20          THE COURT:  I will allow the question.  Just close out

21  this area.

22      Q.  Did you take him to Union County juvenile detention

23  center?

24  A.  No.

25      Q.  If their report indicates that he was processed in at

KOCZUR - CROSS BY FLORCZAK                          58

1   says 1:24, 1:55 a.m. probably means 1:25, 1:55 a.m. Is that

2   within a reasonable time what you would estimate?

3   A.   Sir, the transportation of prisoners is done by patrol

4   division.   I don't know what the scheduling or procedures are.

5   I did not transfer Marvin Mathis to the Union County detention

6   center.

7        Q.   So that from the time Marvin Mathis was brought to

8   police headquarters, a little after eleven o'clock, he was

9   questioned over a period of time until approximately eight

10  o'clock.   Is that correct?

11  A.   I believe it was before eight o'clock, sir.   Right around,

12  you know, in that area.

13       Q.   Well, you did take a second statement, is that

14  correct?

15  A.   Yes.

16       Q.   And that's a nine page statement, is that correct?

17  A.   Yes.

18       Q.   And, again, after it was completed you had him and his

19  mother read it, is that correct?

20  A.   Yes.

21       Q.   And you asked him again if they read and understand

22  it?

23  A.   Yes.

24       Q.   Could you see whether they were reading it or not or

25  what they were doing?



KOCZUR - CROSS BY FLORCZAK                           59

1   A.  They were taking their time looking over each page, but I

2   couldn't see what they were reading.

3       Q.  You didn't ask him to demonstrate his ability to read

4   any of the questions or answers, is that correct?

5   A.  No, sir.

6           MR. FLORCZAK:  That's all.

7   REDIRECT EXAMINATION BY MR. KOLANO:

8       Q.  During the time between the consent form at 4:15 and

9   the second Miranda at 5:45 you indicated on cross examination

10  that you went to the prosecutor's office.

11  A.  Yes, sir.

12      Q.  And Detective Furda where did he go to your knowledge?

13  A.  He was with Mrs. Mathis, and they went to Magnolia Avenue.

14      Q.  During this large gap of time when Mrs. Mathis was not

15  there was anybody talking to Marvin Mathis?

16  A.  No.

17      Q.  And you weren't in the building?

18  A.  No.

19      Q.  And the other primary detective, Detective Furda, was

20  actually with Mrs. Mathis?

21  A.  Yes.

22      Q.  The statements that you identified were they taken

23  down verbatim as to the defendant's words?

24  A.  Yes.

25      Q.  In reference to the second statement, one that starts

- KOCZUR -                                                    60

1    at 6:50 p.m., does the defendant give you some information

2    while you are in the process of that written statement that he

3    did not give you in the oral statement?

4    A.   That is correct.

5         Q.   What?

6    A.   For the first time he indicates Renee and April Diggs are

7    co-defendants in this case.

8         Q.   And the first time you became aware of the existence

9    of April and Renee Diggs as related to this case was when?

10   A.   During the second written statement.

11        Q.   And that came from Marvin Mathis?

12   A.   Yes.

13        Q.   And I think reference was made --

14        Do you have Linda Mathis' statement that was marked as D-1

15   in front of you?

16   A.   Yes, I do.

17        Q.   Would you please on the first page read the question

18   that starts At approximately 12:07 p.m. and read remainder of

19   that page, please.

20   A.   "Question:  At approximately 12:07 p.m. your son was

21   advised of his constitutional rights, is that correct?

22             "Answer:  Yes.

23             "And you and your son understood his rights and you

24   wanted your son to cooperate with these detectives, is that

25   correct?



- KOCZUR -                                          61

1    "Answer:  Yes."

2    Q.   So you took a statement where even Linda Mathis

3    acknowledges in her own sworn written statement that her son

4    was advised of his rights, he waived his rights, and it was her

5    position that he would cooperate with the investigation?

6    A.   Yes.

7    Q.   Did Mr. Mathis at any time indicate to you that he

8    couldn't read the English language?

9    A.   No.

10   Q.   Was all of this done orally, except for the typewriter

11   or statement that was being taken by the typist?

12   A.   Yes.

13   Q.   Are these his words that were spoken, whether or not

14   he could read?

15   A.   Yes.

16   Q.   Was this edited or changed or basically did you lie,

17   did you put stuff in the statement to implicate him?

18   A.   No.

19   Q.   Could you have put in the information about, for

20   instance, Renee and April Diggs, if you wanted to?

21   A.   I didn't know.  It was impossible to.

22          MR. KOLANO:  Nothing further.

23          MR. FLORCZAK:  One or two questions.

24   RECROSS EXAMINATION BY MR. FLORCZAK:

25   Q.   Were there any changes or corrections in the second

- KOCZUR -                                          62

1    statement made by Marvin Mathis or his mother?

2    A.   If I may just look through it to be accurate.

3        Q.   Sure.

4    A.   No, sir.

5        Q.   Who was the third detective in the room most of the

6    time?  You said there were three detectives I believe.

7    A.   Detective Lieutenant Gary Lewis was in and out of the room,

8    sir.

9        Q.   And he remained at police headquarters when you went

10   to prosecutor's office, and the other detective accompanied

11   Linda Mathis to her apartment.  Is that correct?

12   A.   Yes.  He was also there with Detective Keith White.

13            MR. FLORCZAK:  Thank you.  I have nothing.

14            MR. KOLANO:  I do have one follow up.

15   REDIRECT EXAMINATION BY MR. KOLANO:

16       Q.   You indicated at one point in time Mrs. Mathis left

17   the room and that's when the defendant Marvin Mathis made his

18   first, quote, admission to involvement?

19   A.   Yes.

20       Q.   Based on your experience, was this an unusual

21   situation in dealing with juveniles when they ask their parents

22   to leave before they admit to being involved in homicide?

23   A.   No.

24            MR. KOLANO:  Nothing further.

25            THE COURT:  You may step down.

- KOCZUR -                                    63

1         THE WITNESS:  Thank you, your Honor.

2         THE COURT:  Watch your step as you step off.

3         MR. KOLANO:  If I may just approach to collect the

4    written documentation.

5         THE COURT:  Yes.

6         MR. KOLANO:  Your Honor, as it relates to Miranda

7    hearing I will have no more witnesses.  I would ask for the

8    limited purpose of the Miranda hearing to admit into evidence

9    S-40, S-36, S-39, S-38, S-37, and S-41.

10        THE COURT:  For purposes of the Miranda those items

11   will be received in evidence.

12        MR. KOLANO:  I have no further witnesses, your Honor.

13        THE COURT:  Mr. Florczak, any witnesses on Miranda?

14        MR. FLORCZAK:  Judge, I may have Miss Mathis.  I would

15   like to speak to her for a moment, if I could.

16        THE COURT:  All right.  We will take a short break at

17   this time.  Take a break for ten minutes.

18        MR. FLORCZAK:  Thank you, judge.

19        (Short recess).

20

21

22

23

24

25




- KOCZUR -                                              64

1          THE COURT:  Mr. Florczak, your witness, please.

2          MR. FLORCZAK:  Yes.  I call Linda Mathis to the stand,

3    your Honor.

4    L I N D A       M A T H I S

5    Sworn as a witness and testified as follows:

6    DIRECT EXAMINATION BY MR. FLORCZAK:

7          THE COURT:  Mr. Florczak.

8       Q.   Miss Mathis, are you related to Marvin?

9    A.  Yes.  He is my son.

10       Q.   I direct your attention back to January 24th, 1996,

11   the day Marvin was taken to police headquarters.  Do you

12   remember that?

13   A.  Yes.

14       Q.   When did you first learn that he was at police

15   headquarters?

16   A.  The detective they called to my job.

17       Q.   What did they tell you?

18   A.  They told me that they had my son at the police station,

19   and they wanted to come pick me up to question him.

20       Q.   And did they come and pick you up?

21   A.  Yes, they come to pick me up.

22       Q.   And they took to you police headquarters?

23   A.  Yes.

24       Q.   And you saw Marvin there?

25   A.  Yes.

LINDA MATHIS -   DIRECT BY FLORCZAK                65

1    Q.   When you first got there, can you tell us what

2  happened?

3  A.   When we first got there, they, they was questioning him.

4    Q.   When you -- Where was he when you first got there?

5  A.   He was in the room.

6    Q.   And who else was in the room?

7  A.   It was me and detective.

8    Q.   Do you recall how many detectives were in the room?

9  A.   I think it was four.  I am not quite sure.

10    Q.   Was there a typist or anyone typing?

11  A.   Not right then, no.

12    Q.   Right then, when you first got there.  When did they

13  start asking questions, first when you first got there, do you

14  recall what they said to you?

15  A.   I don't remember, but they was asking him, my son

16  questions.

17    Q.   Okay.  Do you recall what kind of questions they were

18  asking?

19  A.   They was asking him where he was at that night, and, you

20  know, was he with, you know, Antwan and the girl, two girls.

21    Q.   Okay.  I show you what has been marked S-38 in

22  evidence.  Do you recognize that?

23  A.   What, number one?

24    Q.   That paper there.  Do you recognize signing it?  Do

25  you remember signing that?

LINDA MATHIS -   DIRECT BY FLORCZAK                66

1    A.   It been two years.

2         Q.   Does it have your signature on it?

3    A.   Yes.

4         Q.   Okay.  Do you know what this paper is?  You can look

5    at it.  Do you know what that paper is?

6    A.   Your rights.

7         Q.   Did you read any of this at that time?

8    A.   I was reading a lot of papers.

9         Q.   Did they read that to you, perhaps?

10   A.   Yes, I think, yes they read that thing.  I am not quite

11   sure.  It been over two years.

12        Q.   I understand.  Do you remember whether they asked,

13   whether they told Marvin he had a right to remain silent?

14   A.   Yes, I remember that part.  Yes.

15        Q.   And they asked him if he understood that?

16   A.   Yes.  They asked if he understood.  Yes.

17        Q.   Did they ask if you understood?

18   A.   Yes.  I told them yes, I understood.  But I have, I have

19   never been in no trouble before and he been in no trouble

20   before either.  This is first time.

21        Q.   Do you know at what point you signed this.  You signed

22   this after they started questioning or before they started

23   questioning him?

24   A.   I think after.  I am not quite sure.

25        Q.   Well, while you were there, and they were asking him

LINDA MATHIS -   DIRECT BY FLORCZAK                    67




1   questions, how long were you there before they started typing

2   up these statements that he made?

3   A.  It was a good while.

4       Q.   And you remember him signing a statement and you

5   signed the statement, too, the first statement?

6   A.  Yes.

7       Q.   Now, did you sign that rights form I showed you before

8   or after or at the same time as you signed that first

9   statement?

10          MR. KOLANO:  Objection, your Honor.  Question asked

11  and answered.  This is direct examination.

12          THE COURT:  Overruled.  I will allow it.

13  A.  I don't, I don't really remember.  It been, like I said, it

14  been over two years.

15      Q.   Now, when you got this statement did they ask you to

16  read the statement before you signed it?

17  A.  Yes.  Yes.

18      Q.   And do you recall whether you read it or not?

19  A.  Yes, I read it.

20      Q.   Do you know whether Marvin read it or not?

21  A.  Yes, yes, he read it, too.

22      Q.   Okay.  Now, did they ask you whether there were any

23  corrections to make?

24  A.  No.

25      Q.   Did you make any corrections in the statement?

LINDA MATHIS -   DIRECT BY FLORCZAK                    68

1    A.   No.

2         Q.   Now, when you were there you heard what Marvin was

3    saying, is that correct?

4    A.   Yes.

5         Q.   And let me find the statement.

6         Did he ever while you were there admit being involved in

7    the homicide?

8    A.   No.  No.  No.

9         Q.   What did he admit, do you recall?

10   A.   He -- Detective asked him did he shoot the man, and he told

11   him no, he didn't get close to the man.

12        Q.   Did he say anything about being involved in a robbery?

13   A.   No.

14        Q.   Well, you were asked to sign a statement.  Right?

15   A.   Yes.

16        Q.   And did you read that statement, do you recall?

17        Let me show you.

18             MR. KOLANO:   D-1.

19        Q.   I show you what has been marked D-1 for

20   identification.  Look at both pages and tell me if you

21   recognize that?

22   A.   Yes.

23        Q.   Is that your statement?  Did you sign that statement?

24   A.   Yes.

25        Q.   On the second page, second question says Your son

LINDA MATHIS -   DIRECT BY FLORCZAK                    69

1   eventually admitted that he was present and involved in this

2   homicide, is that correct?  And the answer says Yes.

3       Is that what you told them?

4   A.  No.  I didn't say, I didn't say he was involved, that.

5       Q.  But did you read the statement before you signed it?

6   A.  Yes.

7       Q.  Do you recall saying that?

8   A.  No.

9       Q.  I am sorry.  I didn't hear your answer.

10  A.  No.

11      Q.  While you were there and while they were questioning

12  Marvin, did there come a time or more than one time that you

13  left the room?

14  A.  Yes, I left the room.

15      Q.  Okay.  Who asked you to leave the room?

16  A.  The detective.

17      Q.  Which detective?  Do you recall which one?

18  A.  I don't know which one.

19      Q.  Did he tell you why, or did you know why?

20  A.  He told me leave the room because they wanted to talk to

21  Marvin.

22      Q.  Did they ever tell you you had a right to stay in the

23  room?

24  A.  No.

25      Q.  Do you recall how many times you left the room?

LINDA MATHIS -   DIRECT BY FLORCZAK                    70

1   A.  I don't remember.  I don't remember.

2       Q.   Okay.  That time that you left, they asked you to

3   leave and you left, how long did you leave for, do you know?

4   A.  I didn't stay long.  Maybe about ten minutes.

5       Q.   At any point while you were there with Marvin did any

6   of the detectives tell you that he would have to stay or that

7   he could go home or anything else?

8   A.  One of the detectives told him that they might let him go.

9       Q.   Did they say under what circumstances or what he had

10  to do, or anything else?

11  A.  No.  No.

12      Q.   Your statement indicates how far in school you got.

13  Do you recall how far you went in school?

14  A.  I don't remember they asking me that.  I don't remember.

15      Q.   On the second page of your statement, maybe it will

16  refresh your recollection, next to the last question:  What is

17  the extent of your education?  And it says 11th.  Does that

18  mean, does that refresh your recollection?

19  A.  Yes, I finished, stopped at 11th.  Yes.

20          MR. FLORCZAK:  I have nothing further.  Thank you.

21          MR. KOLANO:  No questions, your Honor.

22          THE COURT:  All right.  Miss Mathis, thank you.  You

23  may step down.  Watch your step.

24
                    (THERE IS NO PAGE 71.)
25                  (Numbering error.)



72

1          MR. FLORCZAK:  Judge, at this time I would call Marvin

2   Mathis to the stand.

3   M A R V I N      M A T H I S

4   Sworn as a witness and testified as follows:

5   DIRECT EXAMINATION BY MR. FLORCZAK:

6          Q.   Mr. Mathis, how old are you?

7   A.   Eighteen.

8          Q.   How old were you on January 24th, 1998?

9   A.   '98?

10         Q.   '96.  I am sorry.

11  A.   Fifteen.

12         Q.   Marvin, do you recall being arrested back in January

13  24th of '96?

14  A.   Yes, sir.

15         Q.   Okay.  Where were you arrested?

16  A.   At Jefferson High School.  Jefferson High.

17         Q.   Thomas Jefferson High School?

18  A.   Yes.

19         Q.   Do you recall what time of day it was?

20  A.   It was in the morning.

21         Q.   Do you recall which class you were in, what period --

22  first, second, third, fourth?

23  A.   I believe I was in history class.

24         Q.   Which?  First?

25  A.   First period, like my first period.




M. MATHIS  -  DIRECT BY MR. FLORCZAK          73

1    Q.   Okay.  How did -- What happened in that first period

2  class?

3  A.  First period class, one detective and vice-principal came

4  to my classroom.  And vice-principal asked one of my teacher's

5  substitute -- my regular teacher wasn't there.  The

6  vice-principal asked substitute teacher was I in class, and

7  substitute teacher said yes.  That's when they say can they

8  speak to him for a minute.  That's when I left the classroom

9  and went to vice-principal's office.

10    Q.   Now, do you recall which detective this was?

11  A.  This was Detective Garcia.

12    Q.   From there you went to the vice-principal's office?

13  A.  Correct.

14    Q.   What happened there?

15  A.  Well, vice-principal started asking me some questions about

16  why I didn't play no sports that year.  Then detective cut

17  vice-principal off, he told him -- he introduce himself -- and

18  he said he was investigating the homicide that happened that

19  night.  He told me they need me to come to the police station

20  to question me.

21    Q.   Okay.  Now, did you go to the police station

22  voluntarily?

23  A.  No.  They told me I have to.

24    Q.   Who told you?

25  A.  Detective Garcia.



M. MATHIS  -  DIRECT BY MR. FLORCZAK                74

1    Q.    You saw this first detective who testified?

2  A.  Correct, yes.

3    Q.    Was he there?

4  A.  When we was in vice-principal's office, no.

5    Q.    Where did you meet him?

6  A.  First floor when we was leaving out the door.

7    Q.    You were leaving out the door with whom?

8  A.  With Detective Garcia.

9    Q.    Okay.  And you went in the police car?

10  A.  Regular car.

11    Q.    Who was in the car with you?

12  A.  Detective Garcia and Detective Brown.

13    Q.    Did they at any time tell you you didn't have to go

14  with them?

15  A.  At that time, no.

16    Q.    At any time?

17  A.  In the car?

18    Q.    Anywhere.

19  A.  No.

20    Q.    When you got to police headquarters, what happened?

21  A.  When I got to police headquarters, that's when two

22  detectives dropped me off, they put me in the questioning room

23  or whatever.

24    Q.    Okay.  Where did you go in the police headquarters?

25  A.  Police headquarters, I went to the -- I don't know the room -

M. MATHIS  -  DIRECT BY MR. FLORCZAK                    75

1   but I went, they put me in this room.

2        Q.    Was there anybody else in the room when they put you

3   there?

4   A.   Not that minute, no.  I was by myself.

5        Q.    Okay.  What happened then?

6   A.   Then five minutes later one of the detectives came in told

7   me, he asked me what was my name.  I told him my name.  He

8   introduce his self, then he told me --

9        Q.    Who was he, do you recall?

10  A.   I don't remember his name.

11       Q.    Go ahead?

12  A.   He told me they investigating homicide that happened that

13  night, they don't ask nothing further until my parent, whoever

14  come in.

15       Q.    What happened then?

16  A.   Then he left out.

17       Q.    All right.

18  A.   Then another detective came in, introduce his self.  Then

19  he asked me what's my name.  I told him my name.  That's when

20  detective started like, like pull some questions out of me.  I

21  told him, he don't ask me all the questions until my mother

22  come.  That's when he shook his head and left out.

23       Q.    Do you recall what his name was?

24  A.   I forgot his name.

25       Q.    In any case, you didn't answer any questions for him?



M. MATHIS  -  DIRECT BY MR. FLORCZAK                    76

1   A.  No.

2        Q.  Did there come a point where they got your mother's

3   name from you and where she worked and so forth?

4   A.  Yes.

5        Q.  Did there come a point in time that your mother got

6   there?

7   A.  Yes.

8        Q.  How long were you there before your mother got there,

9   do you recall?

10  A.  I can't recall.  It was a while ago.

11       Q.  What happened when your mother got there?

12  A.  When my mother arrived they put me -- My mother she was in

13  the conference room already.  That's when they brought me in

14  the conference room.  And they start asking my mother questions

15  then, like, started asking questions.

16       Q.  Who was in the conference room besides your mother and

17  you?

18  A.  Three detectives.

19       Q.  Okay.  Now, they asked your mother questions first?

20  A.  Yes.

21       Q.  Do you recall what they were asking her about?

22  A.  I can't recall.

23       Q.  Then what happened after they asked her some

24  questions?

25  A.  Then he start asking me questions:  Do I know what

M. MATHIS  -  DIRECT BY MR. FLORCZAK                77

1  happened?

2      Q.   And do you recall signing a form telling you what your

3  rights are?

4  A.  Yes.

5      Q.   Can you tell us at what point you signed that?

6  A.  This was like after I made the first statement.

7      Q.   I show you what has been marked S-38 for

8  identification.  Do you recognize that?

9  A.  Yes, I do.

10     Q.   What is that?

11  A.  This the sheet that detective gave me, told me I have to

12  put my initials and stuff on.

13     Q.   All right.  Did you -- Did he read that sheet to you,

14  do you recall?

15  A.  Yes, he did.  He read it to me.

16     Q.   And did he ask you questions after -- Did he read each

17  one and ask you that you understand?

18  A.  Yes, he did.

19     Q.   And did you understand it?

20  A.  Not that good, no.

21     Q.   Did you tell him that?

22  A.  No.

23     Q.   And you signed it?

24  A.  Yes.

25     Q.   Did you put the time there or did the detective put




M. MATHIS  -  DIRECT BY MR. FLORCZAK                    78

1   the time there?

2   A.   The detective put the time.

3        Q.   Do you recall whether that was the time, correct time

4   or not?

5   A.   I can't recall.

6        Q.   I show you what has been marked S-41 for

7   identification.  Look at that.  Can you tell me what that is?

8   A.   This is a statement, I guess.

9        Q.   Do you know which statement it is, first statement,

10  second statement, or --?

11  A.   I am not sure.  I think it's the first statement.

12       Q.   All right.  Now, do you recall them asking you

13  questions and typing up this statement?

14  A.   Yes.

15       Q.   After they finished the statement, what happened after

16  they finished typing it?

17  A.   After they finished typing it, detective stepped out the

18  room with the statement; then ten, fifteen minutes he came back

19  to me, he was like This statement is not correct.

20       Q.   Well, prior to him stepping out of the room with the

21  statement, did you sign the statement?

22  A.   At that time, no.

23       Q.   At some point did he ask you to sign the statement?

24  A.   I can't recall.

25       Q.   Did you sign the statement?

M. MATHIS  -  DIRECT BY MR. FLORCZAK                    79

1   A.   Yes, I did sign the statement.

2        Q.   Did you initial each page?

3        Look at the pages and tell me if they have your initials.

4   A.   Yes.

5        Q.   And last page have your signature?

6   A.   Yes.

7        Q.   So they asked you to sign and initial it?

8   A.   Yes.

9        Q.   They asked to you read it first?

10  A.   Yes.

11       Q.   Did you read it?

12  A.   Well, I was reading, but he was rushing me, so he told me

13  just go over it real quick and give it back to him.

14       Q.   Did you read entire document?

15  A.   Not entire one, no.

16       Q.   Let me see.  Was your mother with you when you read

17  this, when you looked at it?

18  A.   Yes.

19       Q.   Do you know whether she looked at it?

20  A.   I am not for sure, but I think she did.

21       Q.   After you signed this statement what happened?

22  A.   Then detective, like I am not cooperating with him, he was

23  like, I am not telling the truth.  He was like, If you know

24  something please tell us, whatever.

25       Q.   How long after this statement was that?

M. MATHIS  -  DIRECT BY MR. FLORCZAK                    80

1   A.  I can't recall.

2       Q.   Do you recall how long you were at police

3   headquarters?  Do you recall what time you got there?

4   A.  I got there had to be like quarter to ten, something like

5   that.

6       Q.   Do you know what time you left?

7   A.  It was pretty late.

8       Q.   Was it midnight, after midnight?

9   A.  After midnight.

10      Q.   There came a time when you gave a second statement, is

11  that correct?

12  A.  Yes.

13      Q.   Do you know what time they took that statement?

14  A.  I can't recall.

15      Q.   Marvin, can you tell me how many weeks there are in a

16  year?

17  A.  How many weeks in a year?

18      Q.   Yes.

19  A.  Thirty.

20      Q.   Look at this, what has been marked S-40 in evidence.

21  Can you tell me whether you can identify that?

22  A.  That's my initial.

23      Q.   Is this the statement you gave?

24  A.  Yes.

25      Q.   And has your signature on the last page?

M. MATHIS  -  DIRECT BY MR. FLORCZAK                    81

1   A.  Yes.

2       Q.  Now, do you remember giving a second statement?

3   A.  Yes.

4       Q.  Do you remember whether he advised you of your rights

5   again?

6   A.  No, he didn't.

7       Q.  Before they took this written part did they question

8   you again?

9   A.  Yes.

10      Q.  Okay.  Do you remember being asked in the second

11  interview after 5:45:  You stated to me in the presence of your

12  mother before the first attempted rubbery and robbery and

13  homicide you intended to rob people with Antwan, is that

14  correct?

15  A.  No.

16      Q.  And, well, do you recall answering Yes?

17  A.  I don't remember.  No.

18      Q.  Is that true?

19  A.  That's not true at all.

20      Q.  Did you read this statement before you signed it?

21  A.  I can't recall.

22      Q.  Do you remember signing that, if you did read it?

23  A.  I am not for sure.

24      Q.  Can you tell us why you signed this paper?

25  A.  They told me to sign, detectives, two detectives.

M. MATHIS  -  DIRECT BY MR. FLORCZAK                82

1   Q.   Anybody ask you, tell you you wouldn't be able to go

2   home or you would be able to go home, or anything like that?

3   A.   One detective told me if I made the statement that he would

4   release me to my mother.

5   Q.   Do you recall which statement?

6   A.   I believe it was the first statement.

7   Q.   While you were answering these questions, did you know

8   that you had the right to stop at any time and ask for a

9   lawyer?

10  A.   No.

11  Q.   When you signed that form of your rights, you heard

12  the detective say that it took two minutes to read this and

13  have you and your mother respond to each question, is that

14  about right?

15  A.   I think so.

16  Q.   Did he ask you to read any part of that statement or

17  any part of this?

18  A.   That part, no.

19  Q.   Did he ask you to read out loud any part of the

20  statement?

21  A.   No, he didn't.

22  Q.   Are there any parts of this statement that you would

23  have trouble reading, do you recall?

24  A.   Few, at that time.

25  Q.   I am talking back in 1996 when you were fifteen.




M. MATHIS  -  DIRECT BY MR. FLORCZAK                    83

1   A.  Yes, it was, you know, it was a few.

2      Q.   I show you what has been marked S-40 in evidence, --

3      I withdraw the question.

4         MR. FLORCZAK:  I have no further questions, your

5   Honor, thank you.

6         THE COURT:  Mr. Kolano.

7   CROSS EXAMINATION BY MR. KOLANO:

8      Q.   Mr. Mathis, you said you went to the vice-principal's

9   office?

10  A.  That's correct.

11     Q.   Okay.  And was this the first time you had been to the

12  vice-principal's office?

13  A.  I been there twice.

14     Q.   And on the other occasions were you reprimanded?

15  A.  No.

16     Q.   So in and of itself going to vice-principal's office

17  was not a big deal?

18  A.  It was no big deal.

19     Q.   And when you got there there was Detective Garcia?

20  A.  Yes.

21     Q.   How many times had you met Detective Garcia prior to

22  that day?

23  A.  I met him once.

24     Q.   How long before that day had you met Detective Garcia?

25  A.  I can't remember.

M. MATHIS - CROSS BY MR. KOLANO                    84

1     Q.   Do you recall where you met Detective Garcia prior to

2  that day?

3  A.   Prior to that day, him and my vice-principal came to my

4  class.

5     Q.   Which class?

6  A.   History.

7     Q.   No.   I am talking about prior to that day?

8  A.   Oh, no.   I can't remember.

9     Q.   Can you describe Detective Garcia, what he looks like?

10 A.   I can't.

11    Q.   Did you see him in the courtroom today?

12 A.   I didn't.

13    Q.   When you were first brought here, and before they

14 cleared all the people out, do you know if he was here or not?

15 A.   I am not for sure.

16    Q.   And this other incident before January 24th, 1996,

17 what was the nature of your contact with Detective Garcia?

18 A.   Told me he was investigating the homicide that happened.

19    Q.   Prior to the 24th, first time in your life that you

20 ever saw Detective Garcia?

21 A.   I can't remember.

22    Q.   Can't remember?

23 A.   No.

24    Q.   Had you ever met Detective Brown prior to January

25 24th, 1996?

M. MATHIS - CROSS BY MR. KOLANO                          85

1   A.   Yes.

2        Q.   How many times had you met Detective Brown?

3   A.   Once.

4        Q.   And what were the circumstances of that meeting before

5   January 24th, 1996?

6   A.   I can't remember.

7        Q.   Do you remember how much before the 24th of 1996 that

8   it was that you met Detective Brown?

9   A.   I can't remember.

10       Q.   On either of these occasions that you can't remember,

11  do you recall if Detective Garcia or Detective Brown mistreated

12  you in any way prior to January 24th, 1996?

13  A.   No.

14       Q.   You don't remember or they didn't mistreat you?

15  A.   They didn't mistreat me.

16       Q.   Would it be fair to say that it was a, was a social

17  connection, if you remember, when I say social, they were just

18  passing breeze, shooting the stuff?

19  A.   They didn't really say too much to me.

20       Q.   And you knew that these were police officers assigned

21  to the high schools, right?

22  A.   Not at first.

23       Q.   You didn't know that?

24  A.   No.

25       Q.   You knew that before the 24th because you had at least

M. MATHIS - CROSS BY MR. KOLANO                    86

1    one social meeting with Detective Garcia?

2    A.   Yes.

3         Q.   And they were -- they weren't in uniform, right?

4    A.   No.

5         Q.   Did you know about their reputation in the school?

6    A.   No.

7         Q.   So whatever contact you had was based on your own one

8    time meeting and whatever happened on the 24th of January,

9    1996, right?

10   A.   Yes.

11        Q.   And Detective Garcia asked you if you would go to the

12   police headquarters because there was a homicide investigation?

13   A.   He told me that I have to go, he said, because somebody

14   called in and said I was a suspect, or whatever.

15        Q.   Did he tell you who had called in?

16   A.   No, he didn't.

17        Q.   And at that time were you placed in handcuffs in the

18   vice-principal's office?

19   A.   No.

20        Q.   When they took you through the hall did they put you

21   in handcuffs then?

22   A.   No.

23        Q.   When they put you in the car did they put you in

24   handcuffs?

25   A.   No.

M. MATHIS - CROSS BY MR. KOLANO                    87

1      Q.    When they transported you from the car to
2  headquarters, did they put you in handcuffs?
3  A.   No.
4      Q.    When you got to headquarters and they walked you up
5  the stairs did they put you in handcuffs?
6  A.   No.
7      Q.    When they put you in the room did they put you in
8  handcuffs?
9  A.   No.
10      Q.    So that basically this entire night you were not in
11  handcuffs?
12  A.   When I made a second statement that's when they put the
13  handcuffs on me.
14      Q.    After the second statement?
15  A.   Yes, after the second statement.
16      Q.    And did Detective Garcia tell you that you were placed
17  under arrest and you were being charged with murder?
18  A.   No.
19      Q.    Did Detective Brown tell you that?
20  A.   No.
21      Q.    Did anybody at the high school tell you that you were
22  under arrest?
23  A.   No.
24      Q.    And did they search you?
25  A.   No.

M. MATHIS - CROSS BY MR. KOLANO                    88

1     Q.    Not even a pat down?

2  A.  No.

3     Q.    Do you know what a pat down is?

4  A.  Yes.

5     Q.    What's a pat down?

6  A.  When they check real good to see if you have anything on

7  you, whatever.

8     Q.    How do you know what a pat down is?

9  A.  When officer check you.

10    Q.    How do you know?  Did it ever happen to you before?

11 A.  No.

12    Q.    Did you have friends that had it happen to them and

13 they explained the process to you?

14 A.  Yes.

15    Q.    How many, just give us an idea, how many?  A lot of

16 your friends have been patted down before?

17 A.  No.

18    Q.    Okay.  Do you remember who had been patted down and

19 told you this is what a pat down is?

20         MR. FLORCZAK:  Judge, I would object.  Irrelevant.

21         MR. KOLANO:  I would like to be heard at side bar, if

22 I need to, not to put my reasons in front of the witness, your

23 Honor.

24         THE COURT:  I am going to sustain the objection.

25    Q.    Were you frisked?

M. MATHIS - CROSS BY MR. KOLANO                    89

1   A.   No.

2        Q.   When you went to headquarters you indicated that you

3   were put in a room and you were by yourself?

4   A.   Yes.

5        Q.   And I think you indicated that a detective came in and

6   told you basically you were a suspect, he couldn't talk to you

7   now, if you wanted to talk to your mother?

8   A.   Yes.

9        Q.   And do you know now that was Detective Koczur?

10  A.   Yes.

11       Q.   Person who testified, one of the people who testified

12  here today?

13  A.   Yes.

14       Q.   And you heard him basically testify to the same thing

15  that you said?

16  A.   Yes.

17       Q.   So you would agree with him on that point that he came

18  in and said, Can't talk to you now, want to wait until your

19  mother gets here?

20  A.   No, not really.  He is the one like trying to get questions

21  out of me.

22       Q.   Koczur?

23  A.   Yes.

24       Q.   Well, who were you referring to early on when you said

25  that a person came in, told you that we wanted to wait until we

M. MATHIS - CROSS BY MR. KOLANO                    90

1   can get your mom, and not say anything?

2   A.   That other detective.   I can't remember his name.

3        Q.   And Detective Koczur you are saying is the one tried

4   to get information out of you?

5   A.   Correct.

6        Q.   But you said No, I am not going to talk because other

7   detective said you have to wait until mom was here?

8   A.   I told him other detective say don't ask me no other

9   questions until my mother come.

10       Q.   And you told, you told Detective Koczur?

11  A.   Yes.

12       Q.   And he stopped at that point?

13  A.   He just looked at me and shook his head.

14       Q.   He did stop?

15  A.   He did stop.

16       Q.   So you understood you had a right to basically stop

17  him.  All you had to do was Stop, and in fact you did, and he

18  did stop, right?

19  A.   Correct.

20       Q.   Now, at that point in time were you under the

21  influence of drugs or alcohol?

22  A.   No.

23       Q.   So your mind was clear?

24  A.   Yes.

25       Q.   And when you were in this room, how long were you in



M. MATHIS - CROSS BY MR. KOLANO                    91

1   this room before the detectives brought you out of the room

2   that you were in?

3   A.   Can't recall.

4        Q.   And they brought you into a conference room?

5   A.   Yes.

6        Q.   Bigger room?

7   A.   Biger room.

8        Q.   Your mom was already there?

9   A.   Yes.

10       Q.   And when you saw your mom, she was sitting down?

11  A.   Yes.

12       Q.   And there was some other detectives in the room also?

13  A.   Yes.

14       Q.   And they were all kind of dressed in plain clothes, no

15  uniforms?

16  A.   No.   They had suits on, you know, regular clothes.

17       Q.   Okay.   Now, I assume since neither you nor your mom

18  testified to it, nobody put a gun to your head that day or hit

19  you or physically hurt you?

20  A.   No.

21       Q.   And nobody did anything to threaten your mom or hurt

22  your mom that you saw, right?

23  A.   No.

24       Q.   And when your mom was there, that's when they went

25  over the rights form with you?

M. MATHIS - CROSS BY MR. KOLANO                          92

1   A.   No.

2        Q.   They talked to you first without going over the rights

3   form?

4   A.   Yes.

5        Q.   How long did they talk to you before they gave you the

6   rights form?

7   A.   Say like fifteen, fifteen minutes.

8        Q.   Did you think that was strange because they said they

9   wanted to have your mother there before they talked to you?

10  A.   Yes.

11       Q.   Did you tell them the truth in this, the early

12  statement while your mom was there?

13  A.   First statement?  No.

14       Q.   First oral statement, first things you are telling the

15  police, did you tell them the truth?

16  A.   Not really, no.

17       Q.   Did you lie to them?

18  A.   Yes.

19       Q.   Okay.  What did you lie about in the first oral

20  statement?

21  A.   I think I said three other guys two or three other guys

22  from Carteret.

23       Q.   So basically you said there were other people who

24  really weren't involved?

25  A.   Correct.

M. MATHIS - CROSS BY MR. KOLANO                    93

1    Q.    That was a lie?

2  A.   Yes.

3    Q.    And why did you lie to them?

4  A.   I was scared, I was nervous.

5    Q.    What were you scared and nervous about?

6  A.   Can't remember.

7    Q.    At that point did you tell them that Antwan was the

8  person responsible?

9  A.   Yes.

10    Q.    Okay.  Right from the beginning you were telling them

11  Antwan, Antwan, Antwan?

12  A.   Yes.

13    Q.    Did you first deny knowing anything even about the

14  crime?

15  A.   Yes.

16    Q.    Was that a lie?

17  A.   Yes.

18    Q.    Why did you lie?

19  A.   I was scared.

20    Q.    How long was it that you told them the lie about not

21  knowing anything until you finally said yes, I do know

22  something, but it was some guys from Carteret and Antwan?

23  A.   I don't remember.

24    Q.    Was it, if you can, was it closer to five minutes, ten

25  minutes, or was it more like ten hours?

M. MATHIS - CROSS BY MR. KOLANO                    94

1    A.   It was like five, five minutes, something like that.

2         Q.   And the police pretty much right from the beginning

3    said, Your story is not making sense, and you realized that and

4    you told them about the boys from Carteret?

5    A.   Yes.

6         Q.   And your mom was there?

7    A.   I think, yes, she was.

8         Q.   Did there come a point in time when you wanted your

9    mom to leave?

10   A.   Yes.

11        Q.   Why did you want your mom to leave?

12   A.   I didn't want to get her upset.  That's when I was telling

13   detective, you know, what really happened at that time, that it

14   wasn't two boys from Carteret.

15        Q.   And did you do that to basically protect your mom so

16   your mom didn't have to hear you tell the details of this?

17   A.   Yes.

18        Q.   After you told the detectives that, the details, did

19   your mom come back and then did you repeat them in front of

20   your mom?

21   A.   Yes.

22        Q.   Did the detectives kind of ease your fears and say,

23   Okay, you got it off your chest, now you can say it in front of

24   your mom?

25   A.   Yes.




M. MATHIS - CROSS BY MR. KOLANO                    95

1     Q.   Did the detectives tell you they had told your mom to

2   kind of break it to her gently while she was outside the room

3   that you were, you were talking about some involvement, if you

4   know?

5   A.   I don't know.

6     Q.   When your mom came back you told the story about

7   Antwan being involved and guy from Carteret?

8   A.   Yes.

9     Q.   And then at some point in time they take a written

10  statement from you about all of that, right?

11  A.   Yes.

12    Q.   And Mr. Florczak showed you the written statement, I

13  think, S-41?

14  A.   Yes.

15    Q.   And just turning to page three, it says:

16    How old is Antwan?   Twenty.

17    How tall is he?  About five, ten.

18    How heavy is he?   170.

19    What type of hair?  Braids.

20    Does he have any facial hair?  Beard.

21    When you met him was he with anyone else?  Yes, but I don't

22  know his name.  He is from Carteret.

23    Is that true, that Antwan was about five, ten?

24  A.   I really didn't know how tall he was.  They were just

25  telling me How tall do you think he is?

M. MATHIS - CROSS BY MR. KOLANO                    96

1      I was -- they was just saying heights.  Five, ten.  I am

2  not for sure.  I just told them.

3      Q.   How tall were you at the time?

4  A.  Five, six.

5      Q.   And the height, the weight, hundred seventy pounds,

6  was that also a guess or an estimate on your behalf?

7  A.  Estimate.  Yes.

8      Q.   Okay.  But he did have braids at the time, right?

9  A.  Yes.

10      Q.   And he did have a beard?

11  A.  Yes.

12      Q.   And here it says:  Yes.  But I don't know his name.

13  He is from Carteret.  Talking about the other person who was

14  there.

15      When you met, when you met him was he with anyone else?

16      Answer:  Yes.  But I don't know his name.  He is from

17  Carteret.

18      Is that accurate?

19  A.  Yes.

20      Q.   Okay.  Now that you have already told us in the oral

21  statement that was kind of a little bit of a lie?

22  A.  Yes.

23      Q.   And then you basically repeated that in this first

24  written statement?

25  A.  Yes.

1      Q.    And in, in this statement your initials appear on the

2    bottom of each of the pages, right?

3    A.    Yes.

4      Q.    And then your signature is at the end, right there?

5    A.    Yes.

6      Q.    Okay.   That's your mother's signature also?

7    A.    Yes.

8      Q.    First statement that's pretty much what you told the

9    police, right?

10   A.    Yes.

11     Q.    And now, now we know that at least parts of it are a

12   lie, right?

13   A.    Yes.

14     Q.    And then there came a point in time after this first

15   statement that you told the police that you were wearing, in

16   the statement that you were wearing some black pants?

17   A.    Yes.

18     Q.    And police asked you where the black pants were.

19   A.    Yes.

20     Q.    And in fact you told them jacket you had on was the

21   jacket you had on when this happened?

22   A.    Correct.

23     Q.    And police took the jacket from you that night?

24   A.    Yes.

25     Q.    And they took I think your sneakers?

M. MATHIS - CROSS BY MR. KOLANO                    98

1    A.   Yes.

2         Q.   Black sneakers?

3    A.   Black sneakers, Adidas.

4         Q.   But black pants that you had on at the time of the

5    killing were at home, right?

6    A.   Correct.

7         Q.   And the police said that they wanted to go to your

8    house to get those, right?

9    A.   Yes.

10        Q.   And that's when they gave you another piece of paper

11   to sign, and your mother signed, so they could get your black

12   pants?

13   A.   No.

14        Q.   You don't remember that?

15   A.   No.

16        Q.   Showing you what is marked S-39.  Do you recognize

17   that as being your signature?

18   A.   That's my signature, but I don't remember signing it.

19        Q.   Okay.  But that is your signature?

20   A.   Yes.

21        Q.   Now, afterwards, did the police leave you in that room

22   and ask you to look through some books to see if you could

23   identify Antwan?

24   A.   Yes.

25        Q.   Gave you whole bunch of mug books?

M. MATHIS - CROSS BY MR. KOLANO                    99

1   A.   Yes.

2        Q.   Were you able to find a picture of Antwan?

3   A.   Not that moment.   No.

4        Q.   And that's when your mother went to your house?

5   A.   Correct.

6        Q.   Okay.   And then your mother came back?

7   A.   Yes.

8        Q.   And I think you said on direct at that time the police

9   pretty much said, You know, we don't think you are telling us

10  the whole truth; you have some information, would you please

11  tell us?

12  A.   Yes.

13       Q.   And that's when the police, that's when you told the

14  police a different version of what happened?

15  A.   Yes.

16       Q.   And you told the police that there was nobody from

17  Carteret, right?

18  A.   Yes, I told them.

19       Q.   And the other thing that you told them is that you

20  were with Antwan, and that you were with April Diggs?

21  A.   Yes.

22       Q.   And Renee Diggs?

23  A.   Yes.

24       Q.   And in fact it was during the written statement that

25  you mentioned April and Renee.   Up until then were you kind of

M. MATHIS - CROSS BY MR. KOLANO                    100

1   keeping their name out of it?

2   A.   Yes.

3        Q.   That's because were you being a gentleman and they

4   were girls?

5   A.   I can't really say.

6        Q.   Well, was there a reason why you were keeping April's

7   name and Renee's name out of it?

8   A.   No.

9        Q.   But then when they came to you during the written

10  statement you said they were walking around and they were

11  pretty much lookout for Antwan?

12  A.   Yes.

13       Q.   Did you tell the police what your involvement was?

14  A.   Yes.

15       Q.   What did you tell the police in the second statement

16  what your involvement was?

17  A.   I told the detective, he asked me a question, Did I look

18  out for cops.  I told him, no.  I was too scared.  Then he told

19  me --

20       Q.   I am sorry.  You have to speak up.

21  A.   At that time detective asked, asked me what Antwan did.  I

22  told him that he told, he told me to run across the street,

23  look out for cops, and told the other two girls go up the

24  street, ask the man something.  Then they just kept on walking.

25  So at that time the two girls, they asked the man a question,



1   the man didn't respond to them.  Then that's when I stood by,

2   almost close to the Chinese store.  That's when Antwan ran

3   across the street and told the man to empty his pocket.  Man

4   just looked at him.  Then Antwan grabbed the man, the man just

5   slapped his hand down, threw a punch.  Then the man -- no.  Man

6   threw a punch at Antwan.  Antwan threw a punch at the man.

7   Then that's when Antwan pull out the gun, out of his pants, and

8   he was about to shoot him -- they was struggling, they was

9   struggling like for good two minutes, then that's when I

10  realized they were struggling, that's when I went try to stop

11  the struggle, and gun went off.

12       Q.   Where were you when the gun went off?

13  A.   I was close by the Chinese, almost near the Chinese store.

14       Q.   You said you just went there to stop the struggle and

15  gun went off.  Were you basically also struggling?

16  A.   No.

17       Q.   Exactly where were you in relationship to Antwan when

18  the gun went off?

19  A.   I can't remember.

20       Q.   Do you remember saying at some point in time that you

21  had, your hand hit the gun, that's when it went off?

22  A.   No.

23       Q.   You don't remember saying that?

24  A.   No.

25       Q.   Is that true?

M. MATHIS - CROSS BY MR. KOLANO                    102

1    A.   No.

2         Q.   Did you -- At that point you ran?

3    A.   Excuse me?

4         Q.   At that point you ran?

5    A.   I ran?

6         Q.   Yes.

7    A.   Yes.

8         Q.   Did you run in the same direction as Antwan?

9    A.   Yes.

10        Q.   Did Antwan ask you to go into the man's pockets?

11   A.   Can't remember.

12        Q.   Do you remember Antwan called you a punk?

13   A.   Yes, yes.

14        Q.   Why did Antwan call you a punk?

15   A.   I forgot.  I don't remember.

16        Q.   Was it at about the time or just right after the man

17   got shot he called you a punk?

18   A.   Yes, I think so.

19        Q.   Would it refresh your recollection if he called you

20   punk because he told you to go into the man's pockets and you

21   said no, he say Ah, you are just a punk?

22   A.   I don't remember.

23        Q.   Did the girls run in the same direction as you?

24   A.   No.

25        Q.   They ran in opposite direction?

M. MATHIS - CROSS BY MR. KOLANO                    103

1   A.  Yes.

2       Q.   And is that pretty much the version that you told the

3   police in the second written statement?

4   A.  Excuse me?

5       Q.   Is that pretty much what you told the police in the

6   second written version, that Antwan did it and you were just

7   there?

8   A.  Yes.

9       Q.   Now, did you know Antwan was going to rob the guy?

10  A.  Tell you the truth, I didn't know what he was going to do.

11      Q.   Did you know he had a gun?

12  A.  At that time, yes.

13      Q.   Did he try to rob anybody else that night?

14  A.  Yes, he did.

15      Q.   Who did he try to rob?

16  A.  First he tried to rob this, this man, he was waiting for a

17  bus.  And that's when he told the girls walk up to see if the

18  man had any gold on.  And I told him Don't do it, so he didn't

19  do it.

20      Q.   At that point you knew he had the gun and that's what

21  he was going to use for the robbery of the man?

22  A.  Yes.

23      Q.   Why did you tell him not to do it?

24  A.  I just, something told me to tell him.

25      Q.   Didn't seem right?

M. MATHIS - CROSS BY MR. KOLANO                                    104

1    A.   Didn't seem right.   No.

2         Q.   Did the girls actually go and approach the man to see

3    if he had gold?

4    A.   Yes.

5         Q.   Did they come back and report back?

6    A.   Yes.

7         Q.   And did they say the man had gold?

8    A.   Yes.

9         Q.   And then Antwan was going to move towards the man, and

10   you told him No?

11   A.   Yes.

12        Q.   He honored your request and stopped?

13   A.   Correct.

14        Q.   Now, was there also some, some Spanish boys or some

15   Puerto Rican boys that Antwan was going to rob?

16   A.   Yes.

17        Q.   Where does that happen?

18   A.   This happened farther down, down the street.

19        Q.   After the man with the gold chain or before?

20   A.   This was after.

21        Q.   And what did Antwan say he was going to do about

22   robbing them?

23   A.   He just seen them, you know, they started -- no, first he

24   seen them.   Right.   Then he told April, April and cousin, he

25   said I am going to get this guy.   He told me, too.   That's when

M. MATHIS - CROSS BY MR. KOLANO                    105

1   he just kept walking fast, and we start walking fast.  Then he

2   start running real fast, chased the two Puerto Rican guys.

3        Q.   Did he catch them?

4   A.   No.

5        Q.   When he said he was going to get this guy what did you

6   understand that to mean?

7   A.   What did I understand?

8        Q.   Yes.  Well, did he seem to know the Puerto Rican guys?

9   A.   I don't know.

10       Q.   Did he seem to know the guy with the gold chain?

11  A.   I don't know.

12       Q.   So when he said he was going to get them that was

13  pretty clear he was going to rob them?

14  A.   I didn't know what he was going to do.  I thought he was

15  going to beat them up, or something.

16       Q.   For no reason?

17  A.   I don't know.

18       Q.   At that time, when he said he was going to get them

19  you just assumed he was going to beat them up, and you didn't

20  know why?

21  A.   That's what I thought.  Yes.

22       Q.   Did you, were you curious then as to why it was

23  important whether or not the man had on gold or had chains on,

24  if he was just going to beat him up?

25  A.   No.

M. MATHIS - CROSS BY MR. KOLANO                  106

1      Q.    Did it make more sense to you, obviously, it was going

2   to be a robbery.  That's why if he didn't have gold or chains

3   there would be no reason to hurt him.

4   A.  No.

5      Q.    There is at least these two people before the liquor

6   store owner.  Was there anybody else that was going to be

7   approached that night?

8   A.  Excuse me?

9      Q.    Was there anybody else that Antwan tried to hurt or

10  rob before the liquor store owner?

11  A.  No.

12     Q.    Was there anything about a deli?

13  A.  Yes.

14     Q.    Please tell us about that.

15  A.  Well, we approached the deli, and April she noticed the

16  deli.  And she told Antwan that, you know, he should rob the

17  deli store.  And he told her to peek in in the deli see how

18  many people up in there.  So she came back, you know, reported

19  back and told him how many people was there.  And he was about

20  to go do it.  I told him Don't do it.

21     Q.    What was he going to do?

22  A.  I think he was going to go up there and try to rob the

23  place or something.

24     Q.    And why did you tell him not to do it?

25  A.  It wasn't right.

M. MATHIS - CROSS BY MR. KOLANO                    107

1    Q.   Now, that's at least two occasions you told him not to

2  do it and he honored your request right?

3  A.   Correct.

4    Q.   And the ones with the Puerto Rican boys he just

5  started running before you even knew what was happening?

6  A.   Yes.

7    Q.   When you get to 709 East Jersey Street, and where the

8  man from the Portugese liquor store is, why didn't you try to

9  stop him then?

10  A.   I was, I was scared, I was -- I don't know.  I was too

11  paranoid.

12    Q.   What were you paranoid about?

13  A.   The way he just, he was, he was too hyper.

14    Q.   You think he got hyper because twice you had to

15  basically rein him in and say Stop, don't do it; it was kind of

16  building up in him?

17  A.   Maybe.

18    Q.   Was he, was he on any drugs that night?

19  A.   I don't remember.

20    Q.   Were you on any drugs that night?

21  A.   No.

22    Q.   When I say drugs any marijuana, pot?

23  A.   No.

24    Q.   How about liquor?  Was Antwan drunk?

25    Let me -- Was he drinking?

1    A.   I think he had like two, two or three beers, whatever.

2         Q.   How about you, were you drinking?

3    A.   No.

4         Q.   So you were sober?

5    A.   Yes.

6         Q.   Did you come from Crazy's apartment before that?

7    A.   What?  Excuse me?

8         Q.   Prior to your getting together with April Diggs and

9    Renee Diggs and Antwan Harvey were you at Crazy's apartment?

10   A.   I don't remember going to Crazy's apartment.

11        Q.   224 Third Street?

12   A.   I don't remember going there.

13        Q.   Okay.  I am just asking you, that's where Crazy's

14   apartment is, kind of by Third and Bond?

15   A.   Yes.

16        Q.   In fact, there is a chicken store there or Chinese

17   store?

18   A.   Chinese restaurant.

19             MR. FLORCZAK:  At this time I would object.  This is

20   far afield, I would think.

21             THE COURT:  I will sustain it.  This is beyond the

22   scope of this hearing.

23             MR. KOLANO:  I will move to another area.

24        Q.   Did you know Sharlama Brooks?

25   A.   Yes.

M. MATHIS - CROSS BY MR. KOLANO                    109

1    Q.  What was your relationship with her at that time?

2  A.  That was my girlfriend.

3    Q.  And did you tell her that you might have been involved

4  in something or at least you were present at something?

5  A.  I told her I was present.  Yes.

6    Q.  When did you tell Sharlama that?

7  A.  Just by Jefferson High.

8    Q.  And that was when you were in school?

9  A.  Yes.

10   Q.  And that was in school before the police came and

11 brought you down to principal's office or vice-principal's

12 office?

13 A.  I don't remember.

14   Q.  Well, let me ask you this.  Did you see Sharlama after

15 the police saw you that day?

16 A.  I think.  Yes.  Yes.

17   Q.  Okay.  If I have this straight, police take you to the

18 vice-principal's office, right?

19 A.  Um-hum.  No.  This is before.

20   Q.  So when you talked to Sharlama it was before the

21 police, obviously, because you have been locked up since then?

22 A.  Yes.  Yes.

23   Q.  Do you remember how soon before it was that you talked

24 to Sharlama?

25 A.  Can't remember, to tell you the truth.



M. MATHIS - CROSS BY MR. KOLANO                    110

1    Q.   Well, the shooting happened on the 22nd of January.

2  You agree with that, right?  And it was 24th that you go to

3  police headquarters?

4  A.   23rd, something like that.

5    Q.   Because the shooting happens about ten o'clock at

6  night, and you don't see Sharlama that night, right?

7  A.   No.

8    Q.   And it's not the 24th, well on the 23rd.  You go to

9  school, that would be Tuesday?

10  A.   Yes.

11    Q.   Okay.  And is it that time you tell Sharlama you were

12  present when the man got killed?

13  A.   Yes.

14    Q.   Did you ask her to say that you were with her?

15  A.   No.

16    Q.   You never said to Sharlama:  If anybody asks, I was

17  with you between seven and eleven on Monday night?

18  A.   No.  I told her if anyone asks where I was at, tell she

19  don't know.

20    Q.   Is there a reason why you approached her out of the

21  blue to say, If anybody asks, just tell them you don't know?

22  A.   She approached me.

23    Q.   Did she say she knew about the, the killing?

24  A.   She said she heard some crazy thing happened that night.

25    Q.   And she heard you were involved?



M. MATHIS - CROSS BY MR. KOLANO                    111

1    A.   Yes.

2         Q.   And she approached you and told you, Hey, I heard you

3    were involved?

4    A.   Yes.   She pulled me to the side.

5         Q.   Okay.   And then, and then you just told her, Well, if

6    anybody asks, you just tell them you don't know where I was?

7    A.   Correct.

8         Q.   Did you -- Why did you feel it was important to tell

9    her to basically tell the truth?

10   A.   I have no idea.

11        Q.   What's your -- What's your relationship with Sharlama

12   now?

13   A.   Right now?   I haven't heard from her in a while.

14        Q.   Do you have any animosity towards her?

15   A.   No.

16        Q.   Did you ever do anything to hurt her, that you know

17   of?

18   A.   Well, I think so.   Yeah.

19        Q.   Well, was that before this conversation or since this

20   conversation?

21   A.   Before.

22        Q.   So basically whatever did you to hurt her, everything

23   was back and okay because you were still together?

24   A.   I think so.   Yes.

25        Q.   Do you know why Sharlama would basically lie and say

1  that you said that you wanted her to be your, quote, false

2  alibi?

3  A.  I don't know.

4      Q.   As far as you know, you didn't give any reason for

5  Sharlama to lie on you, right?

6  A.  I don't know if it matter, but I think, you know, she did

7  that because, you know, I kind of cheated on her when I was

8  home.  I don't think it matters, or whatever.  But, you know.

9      Q.   So basically you think because you cheated on her she

10  would lie about you to the police?

11  A.  Yes.

12     Q.   And the same thing -- You have read the discovery,

13  right?

14  A.  Yes.

15     Q.   And you know that she, in fact from this hearing and

16  early discovery you know she told the police that you admitted

17  some involvement in this killing, right?

18  A.  No.

19     Q.   You didn't read that in Sharlama's statement?

20  A.  Oh, in her statement, yes, yes.

21     Q.   And basically you are saying that's a lie?

22  A.  Yes.

23     Q.   And, again, same reason she would tell that lie as far

24  as you know is because you cheated on her?

25  A.  Yes.

1          MR. FLORCZAK:  Judge, I am going to object.  This is

2    going far afield.

3          MR. KOLANO:  I will tie it together right now, judge.

4          THE COURT:  Go ahead.

5     Q.    You knew Sharlama was at police headquarters just

6    before you were there, right?

7    A.    One of the detectives told me.  Yes.

8     Q.    And the detectives told you that whatever you were

9    telling the police wasn't squaring with what Sharlama had said?

10   A.    I don't remember.

11    Q.    At some point in time did the detectives tell you that

12   Sharlama said that you admitted your involvement in the crime?

13   A.    I don't remember.

14    Q.    Now, showing you what is marked S-37, this Miranda,

15   that is your signature, right?

16   A.    Correct.

17    Q.    And that is your mother's signature?

18   A.    Correct.

19    Q.    And these are your initials after each of the rights?

20   A.    Yes.

21    Q.    You have the right to remain silent:  Do you

22   understand what that means?

23   A.    Yes.

24    Q.    Okay.  Anything you say can and will be used against

25   you in court of law:  Do you understand what that means?

M. MATHIS - CROSS BY MR. KOLANO                    114

1    A.   Yes, now I do, yes.

2         Q.   You have a right to talk to a lawyer and have him

3    present while you are being questioned:  Do you understand what

4    that means?

5    A.   Yes.

6         Q.   And you cannot afford -- If you cannot afford a

7    lawyer, a lawyer, one will be appointed to represent you before

8    any questioning, if you wish:  Do you understand this?

9    A.   Yes, now I do.

10        Q.   And you can decide at any time to exercise these

11   rights and not answer any questions or make any statements:  Do

12   you understand that?

13   A.   Yes, now I do.

14        Q.   Back then what didn't you understand?

15        Let's go through it all over.

16        You have a right to remain silent.  Did you understand that

17   at that point in time?

18   A.   Yes.

19        Q.   I mean, that's as simple as it can be:  You can keep

20   your mouth shut.  You knew that, right?

21   A.   Yes.

22        Q.   And anything you say can and will be used against you

23   in a court of law:  And you understood that right, because

24   that's also very simple?

25   A.   Yes.



M. MATHIS - CROSS BY MR. KOLANO                    115

1      Q.   If you say something police are going to use it

2   against you, right?

3   A.   Yes.

4      Q.   You have a right to talk to a lawyer and have him

5   present while you are being questioned.

6      You knew what a lawyer was?

7   A.   Yes.  I, at that time I didn't know I could have had a

8   lawyer present, you know, I didn't know that.

9      Q.   Did you think you could have a lawyer only later on?

10  A.   Like on in the future.  Yes.

11     Q.   But in terms of present, you didn't understand that?

12  A.   I didn't understand.

13     Q.   Was it the word "present" that you didn't understand?

14  A.   Sort of.

15     Q.   All right.  So when they read this to you:  You have a

16  right to talk to a lawyer, you understood that up to that

17  point, right?

18  A.   Yes.

19     Q.   And have him present while you were being questioned.

20  Okay.  You understand while you are being questioned, right?

21  A.   Yes.

22     Q.   And have him, you understood?

23  A.   Right.

24     Q.   So "present" was the only word you didn't understand?

25  A.   Yes.

M. MATHIS - CROSS BY MR. KOLANO                          116

1      Q.   And your mother was there at this time?

2  A.   Yes.

3      Q.   And she, she understood what "present" means, right?

4  A.   Yes.

5           MR. FLORCZAK:   Objection.

6           THE COURT:   Sustained.

7           MR. FLORCZAK:   He can't testify.

8      Q.   Did your mother ever use the word "present" to you?

9  A.   Can't recall.

10     Q.   Never Are you present, Are you present?

11 A.   No, I can't recall.

12     Q.   Let me ask you this.   When you went to school did the

13 teacher ever say, Please raise your hand if you are present.

14 A.   I don't remember.   I don't know.

15     Q.   Never heard the phrase "All present and accounted

16 for"?

17 A.   Yes, I heard of it.   Yes.

18     Q.   Did you know what it meant, all here; present; all

19 here?

20 A.   Uh-hum.

21     Q.   If you cannot afford to hire a lawyer one will be

22 appointed to represent you before any questioning if you wish:

23 Did you understand that back then?

24 A.   No.

25     Q.   What didn't you understand?

1    A.   The part, "if you wish," I didn't understand.

2         Q.   "If you wish" you didn't understand?

3    A.   Yes.

4         Q.   Did you ever make a wish prior to that time?

5    A.   I don't remember.

6         Q.   You didn't know what the word "wish" means?

7    A.   I know what it mean, but, you know, -- (pause).

8         Q.   Did you tell the detectives that you didn't understand

9    any of these words?

10   A.   No.

11        Q.   Did you ask them to explain anything to you?

12   A.   No.

13             THE COURT:  Mr. Kolano, I am going to interrupt at

14   this time.  We have come to the time for lunch recess.  So we

15   will resume this hearing.

16             As I indicated, we will be commencing jury selection

17   this afternoon using Judge Triarsi's courtroom.  So when we

18   return, when we resume at 1:30, it will be over there at Judge

19   Triarsi's.

20                  (Luncheon Recess).

21

22

23

24

25

118

C E R T I F I C A T E

I, B. PETER SLUSAREK, C.S.R., License No.  XI00291,
an Official Court Reporter of the State of New Jersey, do
hereby certify the foregoing to be prepared in full compliance
with the current Transcript Format for Judicial Proceedings and
is a true and accurate non-compressed transcript to the best of
my knowledge and ability.

_____   Date: March 15, 1999.

B. PETER SLUSAREK, C.S.R., XIO0291

Official Court Reporter

Union County Courthouse,

Elizabeth, New Jersey,