SUPERIOR COURT OF NEW JERSEY
LAW DIVISION : UNION COUNTY
CRIMINAL    —  97-02-00123

STATE OF NEW JERSEY,                    : Stenographic Transcript
                                        :            of
          vs.                           : Miranda Motion Cont'd
                                        : Trial Proceedings
MARVIN MATHIS,                          :
                                        :
              Defendant,                :
_____     :


                    Place:   Union County Courthouse
                             2 Broad Street,
                             Elizabeth, New Jersey,

                    Date:    June 10, 1998.


B E F O R E:
          HON. JOHN F. MALONE, J.S.C.,

TRANSCRIPT ORDERED BY:
          OFFICE OF THE PUBLIC DEFENDER
                 Appellate Section

A P P E A R A N C E S:


          WILLIAM KOLANO,   ESQ.
          Assistant Prosecutor, Union County,
          For the State,

          WALTER E. FLORCZAK, ESQ.
          (Florczak & Florczak)
          Attorney for the Defendant,



          B. PETER SLUSAREK, C.S.R., XIOO291
          Official Court Reporter
          Union County Courthouse
          Elizabeth, New Jersey, 07207

2

1

2

3          MIRANDA HEARING CONT'D                     05

4

5          STATE OPENING                              30

6

7          DEFENSE OPENING                            38

8

9

10

11                    WITNESSES INDEX

12

13   ANTONIA SARAIVA

14        Direct By Mr. Kolano                        41

15        Cross By Mr. Florczak                       46

16

17

18   GENE ANTONUCCI                                   48

19

20   ROCCO MALGIER                                    59

21

22   SHARLAMA BROOKS

23        Direct By Mr. Kolano                        65

24        Cross By Mr. Florczak                       82

25







3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4

1   JUNE 10, 1998.

2         THE COURT:  Remainder of the jurors seated in the jury

3   box, you are the jury that is going to hear and decide this

4   case.  I have some preliminary instructions for you with

5   respect to just how this, some outline as to how the case will

6   proceed and also some instructions with respect to some legal

7   principles.

8         But, as I mentioned yesterday, our normal lunch break

9   begins at 12:30, and we are fairly close to that at this time.

10   So rather than get started on something that we obviously

11   wouldn't have enough time to finish, my instructions, my

12   preliminary instructions, I am going to let you break for

13   lunch.

14         Let me just explain just a few things for you, some

15   instructions.  Remember that instruction that I gave during

16   other breaks that you not talk about the case, it is extremely

17   important that you remember that, and that you not discuss the

18   case among yourselves or with others, as I have said yesterday.

19   That's something I hope to be reminding you throughout these

20   proceedings every time we break.  If I should not mention it,

21   that doesn't mean that the rules have changed.  That's always

22   the rule:  Remember not to discuss the case.  And, as I said,

23   that's important, so that you keep completely, keep your mind

24   completely open with respect to this case until you reach the

25   point that the case is over and you go to the jury room and

5

1   begin your deliberations.

2        Also I think I did mention with respect to the persons

3   who are directly involved in the case, that is the lawyers, the

4   defendant, you may see witnesses as the case is proceeding, you

5   will see witnesses, you may actually bump into them outside.

6   Don't have any conversations with those people.  It's important

7   that we maintain that separation between the jurors and the

8   people connected to the case.

9        Those people know you are jurors, they know you are

10  not supposed to be talking to them.  They are not going to be

11  offended if you don't strike up a conversation.  And, as I

12  said, that's important, so that we maintain a separation

13  between you.

14       Now, you have not yet had the opportunity to assemble

15  inside the jury room.  But from now on when the, when we do

16  break for lunch or break at the end of the day you will be

17  excused normally to the jury room, and then one of the officers

18  will excuse you to go to lunch or to leave for the day.  When

19  you return from lunch or come back in the morning you come to

20  the courtroom and assemble in the jury room.

21       The jury room is a separate room located in the back

22  of the courtroom.  The door to the left says Jury Room on it.

23  In there is the room where your deliberations are going to take

24  place and where you assemble each day after lunch and when you

25  come in in the morning.  There is a table and chairs in there



6

1  for the jurors to use, there is also a place if you want to

2  hang up a coat or leave some personal belongings, you can leave

3  them there.   There is also rest room facility in there should

4  you need that.

5          Just one other thing with respect to creature

6  comforts.   It might be a good idea for those of you who may be

7  sensitive to the cold to have a sweater or a jacket available

8  to you.   We are having difficulty controlling the air

9  conditioning.   It seems that we can have air conditioning on or

10  we can have air conditioning off, but there doesn't seem to be

11  anything in between.   Hopefully that problem can get resolved.

12  But while it exists it does occasionally get a little chilly,

13  so you might feel comfortable putting on a jacket.

14          If it does become too cold or warm and stuffy, let me

15  know that.   Just put up your hand.   If you happen to be in the

16  jury room, knock on the door and when the officer answers the

17  door say too hot or too cold in here.   We will see if we can do

18  something to accommodate you.   Don't suffer with the cold or

19  suffer with the heat.   It may be that we can turn the air

20  conditioning on for a few minutes, at least cool the room

21  somewhat.   And before it gets too cold we can shut it off

22  again.   Anyway, it has been a bit of a problem.   I know the

23  jury that was here last week on their case had some problems

24  with that until we were able to sort of play around with things

25  and get it adjusted.   But there was a day that things were a



7

1  little uncomfortable.  So don't suffer with the, with any

2  discomfort.  Let us know.

3          For now I am going to excuse you for lunch.  You don't

4  have to go to the jury room at this point.  I am excusing you,

5  you can go directly out.

6          When you do return it will be at 1:30 this afternoon.

7  That's the normal end of a lunch hour.  Come directly back into

8  the courtroom.  You don't have to check in with anybody.  We

9  keep track of who is here and who is not direct in the

10 courtroom.

11         Remember not to discuss the case.

12         When you do come back, go into the jury room then at

13 1:30, and when we have everybody back we will get going.

14         All right.  You are excused now until 1:30.

15         (Jury withdrew from the courtroom.)

16         THE COURT:  All jurors have cleared the courtroom.

17         When we interrupted when we started jury selection

18 yesterday we had not completed the Miranda hearing.

19         I understand, Mr. Kolano, that you have completed your

20 cross examination of the defendant.

21         MR. KOLANO:  Yes, your Honor.

22         THE COURT:  And was there to have been any redirect?

23         MR. FLORCZAK:  No, judge.

24         THE COURT:  Any other witnesses?

25         MR. FLORCZAK:  No, judge.

- COLLOQUY -                                8

1       THE COURT:  If you want to --

2       MR. FLORCZAK:  You want the argument now, judge?

3       THE COURT:  If you are ready, go ahead.  If you want

4   to get yourself put together and do it at --

5       MR. KOLANO:  My preference would be to do it now.  I

6   anticipate being brief.  I will, of course, defer to Mr.

7   Florczak.

8       MR. FLORCZAK:  Judge, I think I can, if I can find my

9   notes, I think I can proceed.  Shouldn't take more than five or

10  six minutes, the argument.

11      Judge, if I may, my initial argument was that the

12  arrest was unlawful, that there was no probable cause to make

13  an arrest, and there was no arrest warrant.

14      Now, the officer on direct tried to indicate that my

15  client voluntarily went to the police station.  My client's

16  testimony denied that.  He said he was told he had to go.  Now,

17  the officer then on my cross examination really didn't remember

18  what was said.  He couldn't tell us what was said.

19      And I think the burden is on the state to show that he

20  voluntarily went down.

21      The fact that he wasn't handcuffed is irrelevant.

22  It's a custodial questioning.  If he is taken, told he has to

23  go to the station, and doesn't go voluntarily, then the arrest

24  is unlawful.

25      And I suggest, judge, that the law is -- there is no

- COLLOQUY -                                        9

1    statutory law as to arrest, really, in New Jersey.  Essentially

2    the common law.  And the Fourth Amendment of the United States

3    constitution requires same standards, standards for an arrest

4    warrant as it does for a search warrant.

5            There was no arrest warrant, so that there would have

6    to be some type of probable cause.  And I suggest, judge, that

7    there was none.  The fact that there was a statement from his

8    girlfriend -- If there was probable cause, they should have

9    gotten a warrant to arrest the young man.

10           Aside from that, judge, there is one case in New

11   Jersey, State versus Worlock, 117 New Jersey 596, 1990.  That

12   sets forth general rule that confession obtained through

13   custodial interrogation after an illegal arrest should be

14   excluded, unless the chain, chain of causation between the

15   illegal arrest and confession is sufficiently attenuated so

16   that the confession was sufficiently an act of free will.

17   Essentially it indicates there has to be -- in one case, State

18   versus Tucker, I believe, it was six hours between the illegal

19   arrest and the statement.  So the court felt that was

20   sufficient time.

21           I am suggesting here my client was arrested, and

22   interrogation started within an hour, hour and a half of him

23   being taken to the police station.

24           Aside from that issue, judge, I suggest to the court

25   that state failed to show that my client knowingly waived his

1   rights, that he was sufficiently Mirandized or informed of his

2   rights to be able to knowingly waive those rights.

3          The court has to take into consideration, number one,

4   that they are dealing with a juvenile.  The court cases also

5   indicate that in addition to considering that he is a juvenile,

6   consider his age, his lack of prior record is also a

7   consideration in determining whether questioning was proper.

8   In this case my client has no prior record.

9          Also, judge, I would argue that the nature of the

10  charges make a difference as well.  Here we have a juvenile

11  charged with murder, going to be questioned about a murder, and

12  the officer indicates that his entire understanding that my

13  client knowingly waived his rights occurred in the two minute

14  period between 12:07 and 12:09 p.m. when he read the form,

15  received the answers from both juvenile and mother, and had him

16  sign the form and begin the questioning.

17         I suggest to the court considering the nature of the

18  charges, the fact that you have a fifteen year old, fifteen

19  year ten month old juvenile at the time of the arrest, rather

20  docile mother, as the court had seen, I think the officer had

21  greater obligation to be sure that the juvenile knowingly

22  waived his rights.  I don't think in that two minute period

23  that those five questions could be read and initialed and

24  answered in two minutes and in a knowing manner, especially

25  since my client's own testimony indicated that he didn't

- COLLOQUY -                                    11

1   understand those rights at that time.

2        For those reasons, judge, I think that the statement

3   taken initially and subsequent statements and any oral

4   admissions should be suppressed.

5        Thank you.

6        THE COURT: Mr. Kolano.

7        MR. KOLANO: Your Honor, first preliminarily, as a

8   matter of law, Mr. Florczak indicates that his position is that

9   there was an illegal arrest. Obviously, that is a suppression

10  issue, therefore the state's burden is preponderance of the

11  evidence on an illegal arrest. Miranda, state's burden is

12  beyond a reasonable doubt. I am sure that's clear to everyone

13  here.

14       I respectfully submit that the state has met its

15  burden of beyond a reasonable doubt on both issues, even though

16  it's not required to on the arrest.

17       Simply stated, your Honor, Mr. Mathis was not, not

18  arrested at the high school. The state's best evidence has

19  come from the defendant himself. He was not handcuffed; he was

20  not told he was under arrest; he was not mistreated in any way.

21  It was plain clothes officers, officers that by his own

22  testimony he had some contact with, and he had no negative

23  connotation to. He had been to the vice-principal's office

24  before, and that was not in a negative context, as he

25  indicated.

1      Most importantly, his statement indicates, he said he

2  went willingly and voluntarily.  That was covered in the

3  subsequent statement.  That was also covered in the statement

4  from his mother.

5      While the defendant was fifteen years old, police did

6  basically a textbook situation here.  While it is the state's

7  position that the defendant went freely and voluntarily when he

8  went from the high school to police headquarters, and,

9  therefore, was not under arrest, I would also indicate in the

10 alternative, if this court were to even find remotely that he

11 was taken into custody at that point, based on State versus

12 Barry -- Interestingly enough also State versus Tucker and

13 State versus Worlock that defense counsel cites that there was

14 probable cause.  Barry is the leading case in New Jersey on

15 that.  That's 86 New Jersey 80, 1981.  And there the

16 intervening factor of -- the court found illegal arrest, and

17 intervening factor was probable cause developed in the interim.

18 Here based on the fact that Sharlama Brooks had given oral

19 statement to the police by ten, 10:15, before they actually

20 even requested Mr. Mathis, the police had objective probable

21 cause.  She was going to paper before this defendant was even

22 spoken to in any way shape or form.  So there was probable

23 cause.

24      The state still submits it wasn't an illegal arrest.

25 But even if the court finds there was custodial situation,




1    there was certainly clear probable cause.  And your Honor has

2    the documents themselves.  Your Honor has the documents that

3    are highlighted with the relevant portions where this defendant

4    and his mother constantly indicated that they received their

5    rights, they understood their rights, and they waived their

6    rights.  The mother's testimony and defendant's testimony also

7    bears this out.

8         The defendant now says that there was some words that

9    he didn't understand, although he says he didn't tell the

10   police that.

11        One of the interesting things, because counsel brought

12   it up through cross examination, was the mother leaving the

13   room.  And the defendant himself corroborates the police.  He

14   asked his mother leave the room because he didn't want her to

15   feel uncomfortable.

16        The police went over and above on this case.  They

17   gave two sets of Mirandas before each of the statements.  They

18   were not required to do that.  The mother was there.  The

19   defendant says he was not ill treated in any way shape or form.

20        The state has clearly established beyond a reasonable

21   doubt that, one, the defendant was not arrested; two, that even

22   if he was, there was probable cause; three, that he received

23   his Miranda rights; four, that he knowingly, intelligently, and

24   voluntarily waived his rights; and, five, that he had his

25   mother there for all significant events.




- COLLOQUY -                                    14

1      Therefore, the state asks your Honor to permit it to

2   use both of the statements as well as the oral statements, as

3   the police did a textbook case of protecting the defendant's

4   rights in this case.

5      Thank you.

6      THE COURT:  Having had the opportunity to listen to

7   the witnesses in this matter and to observe them during the

8   course of their testimony, I conclude that the credible

9   evidence supports the following findings with respect to this

10  matter with respect to the issue of the defendant's arrest, as

11  raised by the defense:

12      I find that the defendant was not arrested at the high

13  school.  I think the facts as presented by the credible

14  evidence support the conclusion by preponderance of that

15  credible evidence that the defendant was not arrested.  He was

16  not cuffed, he was not told he was arrested.  He was simply

17  told that a detective at headquarters wanted to speak to him,

18  and he agreed to go to headquarters to speak to the detective.

19  I think, quite simply, that's what took place.

20      The circumstances were not such as to cause a belief

21  of arrest.  He was escorted from a classroom not solely by the

22  police but also by school representative, vice-principal of the

23  school with whom the defendant was familiar, knew the

24  vice-principal, had been in the vice-principal's office before.

25  He was questioned by plain clothes officers who were regularly




– COLLOQUY –                                    15

1    assigned to the high school with whom the defendant had had

2    previous contact and persons that he was aware were officers

3    assigned to the school.  And there is nothing in the manner in

4    which he was transported to headquarters to suggest that he was

5    arrested.  And, furthermore, his own statements that he went

6    from high school to the headquarters freely and voluntarily.

7           So I do not find that he was arrested at the high

8    school.

9           With respect, then, to the Miranda issues, I find that

10   the defendant was advised of his rights in the presence of his

11   mother by having those rights read to him by Detective Koczur,

12   and then the form shown to the defendant and his mother for

13   them to initial and then sign the waiver.

14          The court finds beyond a reasonable doubt that the

15   waiver of rights were knowingly and voluntarily and

16   intelligently -- defendant knowingly, voluntarily, and

17   intelligently read his, waived his rights after having been

18   advised of those rights.  There is no evidence that the

19   defendant was threatened, forced, or coerced into giving a

20   statement.  The defendant's rights were, as I indicated, read

21   to him by the officer.

22          During the course of the cross examination of

23   Detective Koczur, as Mr. Florczak was going through the form

24   reading off each of the rights that the defendant was read to

25   him, and then asking questions of Detective Koczur, is this

- COLLOQUY -                                          16

1    what you read, is this what he signed, is this what he had

2    initialed.   I was observing the clock during that conversation,

3    during that cross examination, with respect to the form, and it

4    took two minutes and ten seconds to cross examine the officer

5    on each of the points contained in the form.  Clearly, the form

6    can be read intelligently in a two minute period.

7         I do not find credible defendant's testimony that he

8    didn't understand what was being read to him.  On cross

9    examination, Mr. Kolano went through the form with him and

10   indicated phrase by phrase almost word by word what was

11   contained in the form, and there the answers given by the

12   defendant did not suggest that he was, that he did not

13   understand what was contained in the form.  Furthermore, he

14   didn't advise the police that he didn't understand anything.

15   Nor did his mother advise the police that things were not

16   understood.  And there was the example, cited even by the

17   defendant, that an officer came to the room where he was

18   waiting and he told the officer that he was instructed not to

19   say anything until his mother came, and no interrogation took

20   place.  Clearly, the defendant had some knowledge even in

21   advance of having rights read to him, just based on an oral

22   statement of an officer that he should wait for his mother,

23   that he was able to exercise some control over the process.

24        Accordingly, as I indicated, my findings are that the

25   statements were voluntarily given after rights having been

- COLLOQUY -                                17

1   read, and after defendant having been advised of his rights and

2   having intelligently, knowingly, and voluntarily waived them.

3          Miranda motion of the defense is denied.

4          The statements of the defendant will be admissible.

5          Thank you.

6          See you after lunch.

7          (LUNCHEON RECESS).

8          THE COURT:  I did discuss with counsel off the record

9   in chambers with respect to sequestration in connection with

10  this case.  Both sides are seeking sequestration order, which I

11  am granting.  Witnesses will be excluded from the courtroom,

12  with the following exceptions agreed upon by counsel:

13  Defendant's mother, Miss Mathis, is excluded from the courtroom

14  for tomorrow's testimony presented by the state.  I understand

15  Miss Mathis is not here at the moment.

16         The state's first witness, I understand is present,

17  ready to testify.  We, of course, have to do the openings

18  first, and sequestration order does not apply to that witness

19  during the course of openings.  Witness can be present in the

20  courtroom for opening statements.

21         MR. KOLANO:  Thereafter, having been the first

22  witness, pursuant to the victim's bill of rights, will be

23  permitted to sit in through the entire trial.

24         THE COURT:  Right.  Also, I think this is something we

25  discussed yesterday.  Victim's family is present.  And I think

- COLLOQUY -                                    18

1    it is only one member of the family who is anticipated to be

2    testifying.

3            MR. KOLANO:  One to testify.  There are three family

4    members in court.

5            THE COURT:  Okay.

6            MR. KOLANO:  Your Honor is not aware, but Mr. Florczak

7    and I went through some of the scene pictures, and there is no

8    objection to them being shown directly to the jury, assuming

9    there is a foundation, with one exception -- and I will bring

10   that one exception to the court's attention before showing it

11   to the jury.

12           THE COURT:  All right.  Fine.

13           Bring out the jurors, please.

14           (Jury seated in the jury box in the courtroom.)

15           THE COURT:  Members of the jury, I would ask that you

16   please stand and the clerk will administer the oath to you.

17                   - JURY SWORN -

18           THE COURT:  Members of the jury, as you know, you have

19   been selected as the persons who will hear and decide this

20   case.  It is a criminal case.  And to assist you in

21   understanding your functions and duties I have some preliminary

22   instructions and an outline as to how the case will proceed.

23           Let me remind you what I said yesterday, and that is

24   as jurors you are the judges, that is judges of the facts in

25   this case.  Your determination of the facts is to be based




1    solely on the evidence that is submitted during the course of

2    the trial.  When I use the term evidence I mean the testimony

3    from the witnesses who will be called to court to testify and

4    exhibits that may be marked into evidence during the course of

5    the trial.  Those exhibits, the items received in evidence,

6    will be available to you for your examination in the jury room

7    during your deliberations.

8              The first order of business in the trial will be the

9    opening statement of the prosecutor.  In the opening statement

10   the prosecutor will present the state's contentions and he will

11   outline what it is he expects to prove in this case.  Following

12   that the defendant's attorney has an opportunity, if he

13   chooses, to make an opening statement.

14             What is said in the opening statement is not evidence.

15   Remember that the evidence comes from the witnesses who testify

16   and from the things that are received into evidence.  As the

17   trial proceeds, the attorneys may make objections as evidence

18   is offered or they may direct a motion to the court.  It is the

19   right, in fact it is the duty of an attorney to make a motion

20   or objection when he believes that is the proper thing to do

21   so.

22             It is my responsibility to rule on any motion or

23   objection that is addressed to the court.  If I say that an

24   objection is overruled it means that I am ruling against the

25   attorney who made the objection; if I say that an objection is




- COLLOQUY -                                    20

1   sustained it means that I am ruling in favor of the attorney

2   who made the objection.  Anything that may be excluded by me is

3   not evidence and must not be considered by you in your

4   deliberations.  Often an objection or motion is made during the

5   course of the trial, it's addressed promptly, immediately,

6   court makes a ruling, and the trial simply continues without

7   interruption.  There are times, however, when an objection is

8   made or a motion is made, where I must discuss that in greater

9   detail with the attorneys, and in those instances we may have a

10  side bar discussion, and there are other times when even a

11  greater amount of time may be necessary to resolve the motion

12  or the objection, in which case you may be excused to wait in

13  the jury room while the attorneys and I resolve the legal

14  issue.  We will do the best we can to move things along so that

15  if you are excused to the jury room we can get you back out and

16  continue with the trial as promptly as possible.  But please do

17  understand that it is necessary that the legal issues that are

18  raised be resolved.  And be patient with us if there is a time

19  while we are attempting to resolve something and you must wait

20  until we are finished.

21          Also, it is important that you keep in mind that you

22  should not conclude that because I make a ruling one way or

23  another it means I have some feelings regarding the outcome of

24  the case.  I do not have any such feelings.  But even if I did,

25  you as judges of the facts must disregard what you believe my

- COLLOQUY -                                    21

1   feelings to be in exercising your responsibilities as jurors

2   and determining what the facts of the case are.  That is your

3   responsibility.

4        There will be recesses during the course of the trial.

5   Once again I want to remind you now, and hopefully every time

6   there is a break, do not discuss the case, not at all among

7   yourselves.  When we break for the evening do not discuss it

8   with other people at home.  You should not be having any

9   discussions at all while the trial is going on.  Obviously,

10  again, you must keep an open mind, you must not formulate any

11  opinions with respect to the case, you must not allow someone

12  else's views or opinions or thoughts to come into your mind

13  with respect to this case.  It is only after the case is over,

14  all the evidence is in, attorneys do their closing arguments,

15  and I give you my instructions regarding the law, only then

16  should you begin your discussions in the jury room with the

17  other jurors.

18       I mentioned to you that you should not have any

19  association, contact, discussion at all with anybody who is

20  connected with the case, and if anyone should attempt to

21  contact you or approach you to discuss the case you should let

22  one of the sheriff's officers be aware that that has taken

23  place so that it can be reported to me.

24       I did mention, I believe, the possibility of newspaper

25  coverage.  Once again, let me remind you, I have no way of

1  knowing if there is ever going to be anything in the newspaper

2  with regard to the case.   Sometimes there is, very often there

3  is not.   But my instruction to you, you are not to read

4  anything that appears in the newspaper.   If you happen to find

5  a paper that has an article in it regarding the case, please

6  put it aside, don't read it, save it for later.   When the case

7  is over you will have an opportunity to read the article.   I

8  think you can understand why that would be important.   What

9  appears in the article may not have any relationship to what

10  you hear as jurors coming from witnesses.   It may be based upon

11  somebody else's opinion or misinformation or anything may wind

12  up in the newspaper.   You must make your decision based only on

13  the evidence that's presented in the case, not on what somebody

14  happens to put in the newspaper.

15       Remember, it is your oath to follow these

16  instructions.   And I think I pointed out yesterday, I can't

17  monitor you on this, I must leave it to you and your good

18  judgment.

19       During the course of the trial, as I said, people may

20  be testifying, there may also be things displayed for you to

21  observe.   It is important that you hear and see what's going on

22  in the courtroom.   And if you are not able at any time to see

23  or hear, please let me know.   If someone is not speaking loudly

24  enough, or somebody standing in your way, or something is out

25  of your view that you are supposed to be seeing, don't assume

1   that you are going to be able to play catch up later and find

2   out what happened.  It is important that you see it and hear it

3   as it's taking place.  So put your hand up, just let me know:

4   I can't see, I can't hear.  We will move people around, get

5   people to talk louder, use microphones, whatever has to be done

6   so that you can see and hear.  That's important, because as

7   members of the jury when you go to deliberate you must bring

8   with you a recollection of the testimony that was given and

9   things that you saw in the courtroom.  If you can't see it, you

10  can't hear it, then you are not going to be able to recall it

11  and participate in the discussions.

12          During the course of testimony there is no doubt

13  persons are going to make reference to places, building

14  locations, street addresses, street names.  That sort of

15  testimony is likely to be given where people will make

16  reference to these various places.  It is not your

17  responsibility and you should not conduct any investigations.

18  So I don't want you using your lunch hour or your other free

19  time to try to find some location or track down an address that

20  somebody may have mentioned in their testimony.  You are not

21  investigators in this case, you are the jurors, you must only

22  base your decision on what takes place in the courtroom, not

23  private investigations that you might undertake.

24          You will also not be permitted to take notes.  It is

25  better that you rely upon your individual recollection and



- COLLOQUY -                          24

1   collective recollection of all of the jury as to what the facts

2   of the case are and not the note that one or another of you

3   might choose to write down at a particular time.

4        When all the testimony has been presented in the case,

5   all the evidence has been received, the attorneys will get

6   another opportunity to speak to you in final arguments.  Those

7   are also referred to as summations.  Once again, these are not,

8   these arguments are not evidence.  But it is the comments,

9   argument of the attorneys based upon their recollection of what

10  the evidence is.  It is, however, your recollection of the

11  evidence that is controlling.  So if the attorneys should say

12  something about the evidence or I should say something about

13  the evidence, and it doesn't match your recollection, it is

14  your recollection that must control.

15       Once the summations have been completed I will then

16  give you your instructions regarding the law, and then you will

17  begin your deliberations and decide the case.  Until that time

18  you should not form or express any opinions about the case.

19  You should keep an open mind until the case has been completed.

20       When you do begin your deliberations you should do

21  that calmly, and without any bias, passion, prejudice, or

22  sympathy.  You must simply decide the issues on the merits.

23       As jurors you will find the facts from the evidence

24  that is produced during the trial.  Evidence may be either

25  direct or circumstantial.  Direct evidence means evidence that







1   directly proves a fact without an inference, and which in

2   itself if true conclusively establishes that fact.   On the

3   other hand, circumstantial evidence means evidence that proves

4   a fact from which an inference of the existence of another fact

5   may be drawn.   An inference is a deduction of fact that may

6   logically and reasonably be drawn from another fact or group of

7   facts established by the evidence.

8          It is not necessary that facts be proved by direct

9   evidence; they may be proved by circumstantial evidence or by

10  combination of direct and circumstantial evidence.   Both direct

11  and circumstantial evidence are acceptable as a means of proof.

12  Indeed, in many cases circumstantial evidence may be more

13  certain, satisfying, and persuasive than direct evidence.   In

14  any event, both circumstantial and direct evidence should be

15  scrutinized and evaluated carefully.

16         A conviction may be based on circumstantial evidence

17  alone or in combination with direct evidence, provided, of

18  course, that it convinces you of a defendant's guilt beyond a

19  reasonable doubt.   Conversely, if circumstantial evidence gives

20  rise to a reasonable doubt in your minds as to the defendant's

21  guilt then the defendant must be found not guilty.

22         Perhaps an illustration or an example of direct and

23  circumstantial evidence may be helpful.

24         Let's assume that the problem is to prove that it

25  snowed during the night.   Well, direct evidence on this problem



1    would be the testimony of a witness who would come to court and

2    say Last night he looked out the window and he saw it snowing.

3    That testimony, if you accept it as being truthful, is direct

4    evidence.  It directly proves the fact that it snowed during

5    the night.

6         But let's assume that we are going to attempt to prove

7    the snow fall by circumstantial evidence.  The witness comes to

8    court and says he looked out the window last night, didn't see

9    any snow, there was no snow on the ground, it wasn't snowing.

10   He fell asleep.  He woke up in the morning, looked out the

11   window again and it wasn't snowing but the ground was covered

12   with snow.  That is circumstantial evidence that proves the

13   same point, it proves that the snow fell during the night.  And

14   that is because if you accept that testimony there are certain

15   other facts from which you can draw the inference as to when

16   the snow fell, that the snow fell during the night.

17        As judges of the facts you are to determine the

18   credibility of the witnesses.  And in determining whether a

19   witness is worthy of belief and therefore credible you may take

20   into consideration the appearance and demeanor of the witness;

21   the manner in which he or she may testify; the witness'

22   interest in the outcome of the trial, if any; his or her means

23   of obtaining knowledge of the facts; the witness' power of

24   discernment, meaning their judgment, their understanding, his

25   or her ability to reason, observe, recollect, and relate; the

1   possible bias, if any, in favor of the side for whom the

2   witness testifies; the extent to which, if at all, each witness

3   is either corroborated or contradicted, supported or

4   discredited by other evidence; whether the witness testified

5   with an intent to deceive you; reasonableness or

6   unreasonableness of the testimony the witness has given, and

7   any and all other matters in the evidence which serve to

8   support or discredit his or her testimony to you.  During your

9   deliberations you may ask what is the more reasonable, the more

10  probable, or the more logical version.

11          Inconsistencies or discrepancies in the testimony of a

12  witness or between the testimony of different witnesses may or

13  may not cause you to discredit such testimony.  Two or more

14  persons witnessing an incident may see or hear it differently.

15  An innocent misrecollection, like failure of recollection, is

16  not an uncommon experience.  In weighing the effect of a

17  discrepancy consider whether it pertains to a matter of

18  importance or an unimportant detail, and whether the

19  discrepancy results from innocent error or willful falsehood.

20          In this case the defendant, Marvin Mathis, stands

21  before you on an indictment found by the grand jury that

22  charges him with crimes of murder, robbery, felony murder,

23  possession of a firearm for an unlawful purpose, and unlawful

24  possession of a weapon.

25          The indictment is not evidence of the defendant's

- COLLOQUY -                                                    28

1    guilt on the charges.  An indictment is a step in the procedure

2    to bring the matter before the court and the jury for the

3    jury's ultimate determination as to whether the defendant is

4    guilty or not guilty on the charges stated in it.

5         The defendant has pleaded not guilty to the charges.

6    The defendant on trial is presumed to be innocent, and unless

7    each and every element of an offense charged is proved beyond a

8    reasonable doubt, the defendant must be found not guilty of

9    that charge.

10        The burden of proving each element of the charge

11   beyond a reasonable doubt rests upon the state, and that burden

12   never shifts to the defendant.  It is not the obligation or the

13   duty of the defendant in a criminal case to prove his innocence

14   or to offer any proof relating to his innocence.

15        The prosecution must prove its case by more than a

16   mere preponderance of the evidence, yet not necessarily to an

17   absolute certainty.  The state has the burden of proving the

18   defendant guilty beyond a reasonable doubt.

19        Some of you may have served as jurors in civil cases

20   where you were told that it is necessary to prove only that a

21   fact is more likely true than not true.  In criminal cases the

22   state's proof must be more powerful than that, it must be

23   beyond a reasonable doubt.

24        A reasonable doubt is an honest and reasonable

25   uncertainty in your minds about the guilt of the defendant




1  after you have given full and impartial consideration to all of

2  the evidence.  A reasonable doubt may arise from the evidence

3  itself or from a lack of evidence.  It is a doubt that a

4  reasonable person hearing the same evidence would have.  Proof

5  beyond a reasonable doubt is proof, for example, that leaves

6  you firmly convinced of the defendant's guilt.

7       In this world we know very few things with absolute

8  certainty.  In criminal cases the law does not require proof

9  that overcomes every possible doubt.  If based on your

10 consideration of the evidence you are firmly convinced that the

11 defendant is guilty of the crime charged, you must find him

12 guilty.  If, on the other hand, you are not firmly convinced of

13 defendant's guilt, you must give defendant the benefit of the

14 doubt and find him not guilty.

15      As I pointed out, we have selected fourteen persons as

16 jurors in this case.  That is to allow for alternates.  But as

17 I explained, we do not designate anyone as an alternate in the

18 trial until the very end of the case.  So that all fourteen of

19 you will hear all of the evidence presented, you will hear the

20 arguments of the attorneys, you will listen to my instructions

21 regarding the law in the case, and only at that point when all

22 that is completed we will randomly select two names.  Those

23 persons will become the alternates, and remaining twelve

24 persons will begin deliberations.  So it is important that you

25 pay close and careful attention.  Odds are that you are going





- COLLOQUY -                                    30

1   to be one of the people that, one of the twelve that will begin

2   the deliberations, and even if you aren't an alternate you

3   still may be called upon to take the place of one of the jurors

4   to continue the deliberations and to render a verdict in

5   connection with this case.

6           All right.  As I indicated to you a few moments ago,

7   before the testimony begins in the case the attorneys will be

8   addressing you in their opening statements.

9           Under our procedures, it is the state that has the

10  opportunity to address you first.  Therefore, I am going to

11  call upon Mr. Kolano for his opening statement.

12          MR. KOLANO:  Thank you, your Honor.

13          Good afternoon, ladies and gentlemen.

14          It is my opportunity to tell you a little bit of what

15  this case is about -- what this case is about factually, what

16  this case is about legally, and what I am going to prove to you

17  beyond a reasonable doubt by the time this case is through.

18          Let me start in reverse order.

19          I will prove to you beyond a reasonable doubt that

20  this defendant, Marvin Mathis, is guilty of murder; that Marvin

21  Mathis is guilty of robbery; that Marvin Mathis is guilty of

22  felony murder; that he is guilty of possessing a weapon for an

23  unlawful purpose; and that he is guilty of unlawful possession

24  of a weapon, a handgun, ladies and gentlemen.  I will prove to

25  you that he is guilty of all of the charges in the indictment.

1      As we sit here, ladies and gentlemen, and as the

2  defendant sits here, there is a great wall that surrounds him;

3  it's a big wall, and it's a strong wall, sturdy wall.  It's a

4  wall that has been founded on hundreds of years of

5  jurisprudence in our country.  And the judge spoke about it.

6  It's called the presumption of innocence.  And we live by the

7  law, the constitution of our land, with that concept.

8      But, ladies and gentlemen, this wall is not

9  impervious.  You see, it's susceptible, susceptible to

10  evidence.  And, ladies and gentlemen, in this case the evidence

11  is going to chip away at that wall, it's going to crack the

12  foundation of that wall that protects the defendant.  The

13  bricks are going to come out.  And then like a big wrecking

14  ball the evidence is going to crash into that wall that

15  protects the defendant, and, ladies and gentlemen, by the time

16  this trial is over, you will see the defendant's guilt exposed

17  to you.  That will happen, ladies and gentlemen.  It will

18  happen in a number of ways.

19      Factually, this is a straightforward case.  On January

20  22nd, 1996, Antonio Saraiva, little after ten at night, did

21  what he had done so many times before.  You see, he was the

22  proprietor of the Portuguese American Liquor Store on East

23  Jersey Street here in Elizabeth.  He owned that establishment

24  with his wife.  He lived above that establishment that was his

25  home, he lived there with his daughters.  They closed up the

1    shop that evening, they pulled down the grates, and he was

2    performing the simple act of taking out the garbage so that it

3    could be collected the next day.

4         And as he took out the garbage a little bit after ten

5    on that evening, that very simple humble act, it would be the

6    last time that his family would see him, the last time that he

7    would breathe the air of life.  While his wife was inside and

8    his children were inside, he was taking out that garbage, he

9    was approached, he was approached by a group of roaming

10   robbers, the defendant among them, with a gun and he was shot.

11   He was shot dead.  Shot in the face, shot in the eye, the

12   bullet going through his head.  There at the steps of the

13   business that he helped to build and to establish his

14   livelihood he lost his life, ladies and gentlemen.

15        And this defendant is one of the people responsible

16   for that, ladies and gentlemen.

17        See, ladies and gentlemen, you are going to hear that

18   the defendant and three other people were roaming around the

19   streets of Elizabeth that night looking for easy prey, looking

20   for people to rob.

21        Mr. Saraiva was the first one who was robbed, ladies

22   and gentlemen, but he wasn't the first one that they tried to

23   get -- he was the fourth; three other victims, potential

24   victims who were out there.  This defendant, two women, and

25   Antwan Harvey, they were walking around looking to rob someone.



1  And you are going to hear this defendant did it because he

2  wanted to know how it felt.  He wanted to know how it felt.

3  Three other times there was an attempt made that evening, and

4  unfortunately this was easy prey.  Mr. Antonio Saraiva was

5  there.  His wallet was taken, and no money was gotten or small

6  amount of money.  For that small amount of money he lost his

7  life, ladies and gentlemen.

8         Now, because the victim's wife and daughters were

9  there, they got out quickly, police were called quickly, police

10 and the ambulance got there quickly, but nothing could be done

11 to save him.

12        And the police started their investigation.

13 Originally the investigation led them to some other people, in

14 fact some other people were arrested.  But, you see, the police

15 had this obligation, it's an obligation I suggest we all have,

16 it is to seek out and search for the truth.  And these other

17 people were not involved, they were not responsible.

18        The truth came out, ladies and gentlemen, and the

19 truth will lead you to the guilt of Marvin Mathis in this case.

20        How did the truth come out?  Well, it came out through

21 the voice of a fifteen year old girl, Sharlama Brooks.  And you

22 are going to hear that the defendant, Marvin Mathis, sitting in

23 this courtroom at the time was fifteen years old himself.

24 Don't be fooled by that, ladies and gentlemen.  Sharlama Brooks

25 was the girlfriend of Marvin Mathis, and Marvin made the

1   mistake of going to her and asking her to be in effect a false

2   alibi:  If anybody asks where I was between seven and eleven on

3   the 22nd, tell them I was with you.  But he didn't count on

4   Sharlama being a different type of person.  She said No, I am

5   not going to do that.  And then he told Sharlama, his

6   girlfriend, he accidentally killed somebody, he accidentally

7   shot somebody.

8           Sharlama couldn't live with this.  And within an hour --

9   and this happened in high school -- within an hour she was in

10  tears.  And because she was in tears she was brought to the

11  counselor, to vice-principal, and she told what her boyfriend

12  at the time Marvin Mathis had told her.  And that's when the

13  police focused on Marvin Mathis.

14          Ladies and gentlemen, you are going to hear how he

15  came to police headquarters on the 24th, two days later,

16  January, and he talked to the police.  His mother was there.

17  He was not questioned until his mother was there.  His mother

18  was there for the entire time.

19          And I promise you this, ladies and gentlemen, even

20  though it's not an element of any of the offenses of the crime

21  that I have to prove to you beyond a reasonable doubt, another

22  thing that you will know by the time this case is over, that

23  Marvin Mathis is a liar, by his own words he is a liar.  When

24  he went to the police he denied involvement.  He said Sharlama

25  was a liar.  Then he said it was all Antwan and somebody else.

1  And then ultimately he talked about his own involvement.  And

2  you are going to hear his words, the words that he spoke, the

3  words that were written down, the pieces of paper that he and

4  his mother signed as to his involvement.  You are going to hear

5  that, ladies and gentlemen.

6      You are also going to hear a lot in this case about

7  Antwan Harvey.  Antwan Harvey is also charged with these

8  crimes.  Antwan Harvey is not on trial before you.  Antwan

9  Harvey's guilt will be determined by another jury at another

10  time.  But he will be part and parcel of this case, ladies and

11  gentlemen.  Because Antwan and Marvin Mathis were together that

12  night, and they were with April and Renee Diggs, and four of

13  them were friends.  All of them, you are going to hear, were

14  roaming the streets to do the robbery that night.  And Marvin

15  Mathis and Antwan Harvey are the two who approached Mr.

16  Saraiva.  Antwan originally had the gun, but Marvin also had

17  the gun when Antwan gave it to him.  And it's togetherness of

18  Antwan Harvey and Marvin Mathis that resulted in the death of

19  Mr. Saraiva.  In fact, when everything was said and done, they

20  even ran together.  They ended up at the same place together.

21  Because they are intermingled.

22      And you are going to hear more charges when the judge

23  gives you the law at the end that are in the indictment,

24  because you don't hear about accomplice liability, and some

25  other stuff, and I will leave that to the end.  But, ladies and

– STATE OPENING –                              36

1   gentlemen, know that they are tied in together, and know that

2   Antwan Harvey's day is for another day, not for this jury, not

3   for this day.

4          There is also two women involved, actually one girl

5   and one woman, Renee Diggs and April Diggs, and you are going

6   to hear their testimony, ladies and gentlemen.  They were

7   charged with these crimes.  And they also gave statements to

8   the police.  And they, too, admitted their role in this.  They

9   were the lookouts, they were the lookouts for the robbery.  And

10  they pled guilty, and each is facing fifteen years in jail.

11         Part of the deal that was made between my office and

12  them is that they testify truthfully at both trials.  And they

13  are going to tell you how Marvin Mathis was the trigger man in

14  this case.

15         Now, at first blush it may offend you these girls are

16  getting away easy with fifteen years because of their role as

17  lookout in this robbery.  But I ask you, ladies and gentlemen,

18  as you hear this testimony, to consider, they were the people

19  who were out there.  They were the people who knew from the

20  inception the plan.  These are the people that we need to prove

21  against the two more culpable -- Marvin Mathis and Antwan

22  Harvey.  So you will hear their testimony.

23         You may, you may not like their lifestyle, you may not

24  like them.  But evaluate them.  And remember that these are the

25  people that the defendant was with, these were the people who

1   were there, and who saw it.  Keep it in that context, ladies

2   and gentlemen.

3          Lastly, ladies and gentlemen, I am going to ask you to

4   do something that you do every day in your life -- and it may

5   seem like an odd request.  But I am going to ask you to be

6   human, to apply common sense.  Sometimes we get on to a jury

7   and we think we have to be something we are not.  Our system

8   works.  There is a whole cross section of the community.  Our

9   system works because even though we are high tech these days,

10  and we have computers to do a lot for us, we don't try cases to

11  computers.  This is not television, this isn't Murder She

12  Wrote; can't wrap up this whole thing in an hour in a nice

13  little package.  In real world, in reality we still ask that we

14  be judged by a jury of our peers, by human beings.

15         None of us are perfect.  You are not going to hear

16  about a perfect crime, you are not going to hear about a

17  perfect investigation.  You are going to hear about a human

18  crime, the loss of a human life, and a human investigation.

19  And that means common sense, bringing to bear that common sense

20  and what we know as human beings.  And if you apply that common

21  sense, ladies and gentlemen, and you stay focused throughout

22  this trial, I suggest to you that you will do everything that

23  the state is asking, because then no matter what your verdict,

24  if you stay focused, you apply common sense and you trust,

25  trust in the law, and you trust in yourself, and you trust in

- STATE OPENING -                                    38

1   the evidence, you will do that which we request at the outset,

2   you will do justice.

3           Thank you very much, ladies and gentlemen.

4           THE COURT:  Mr. Florczak.

5           MR. FLORCZAK:  Yes, sir.

6           Your Honor, Mr. Kolano, ladies and gentlemen:

7           Again, my name is Walter Florczak, and I represent

8   Marvin Mathis, and only Marvin Mathis.  Because there are four

9   people charged in this matter.  There is at the time fifteen

10  year old Marvin Mathis, twenty year old Antwan Harvey,

11  twenty-two year old Renee Diggs, and seventeen year old April

12  Diggs.

13          Now, the opening statement is to give the attorneys an

14  opportunity to let you know what they intend to prove.  But my

15  client is not obligated to prove anything.  Right now he is

16  presumed to be innocent, and that presumption or assumption of

17  innocence stays with him throughout this entire trial.  In

18  fact, when you go into that room to deliberate he is still

19  presumed to be innocent.  The only time that presumption of

20  innocence is removed is if twelve of you vote guilty.

21  Otherwise, you are obligated to presume that he is innocent.

22          Now, my client doesn't have to prove anything.  The

23  state has to prove each and every element of each and every

24  charge beyond a reasonable doubt.  So if you have any single

25  solitary reasonable doubt as to any element of the charge, you

1    must acquit my client.

2              Now, while my client is not obligated to prove

3    anything, we will present evidence to show that he is not

4    guilty.  You will hear witnesses from the state, and you will

5    hear witnesses from the defense.

6              I will tell you about a fifteen year old young man who

7    met up with this twenty year old man, this twenty-two year old

8    woman, and this seventeen year old girl.  And they are walking

9    on the street -- whether they are going to deli, whether the

10   woman is going to buy beer at a bar, or tavern -- they are

11   walking.  And you will hear that there were possible other

12   attempts at robberies.  But you will hear Marvin Mathis is the

13   one who stopped the first robbery, fifteen year old, the one

14   they knew was a special education student at Jefferson High

15   School, the one they had along as their scapegoat.  He is the

16   one who stopped.  One of the young ladies will tell you he said

17   No, don't do it.

18             And you will find, ladies and gentlemen, that Antwan

19   Harvey had that gun throughout.  That when the deed was done,

20   and the gun found later, it's found in the same building they

21   find Antwan Harvey.  Antwan had the gun throughout.  You will

22   have testimony that Antwan Harvey wanted to shoot the police

23   when they came by.  This will come from state's witnesses, not

24   from defense witnesses.  You will hear testimony that Antwan

25   Harvey got, just went crazy, pulled out the gun.  And you will

- DEFENSE OPENING -                    40



1    find that, that liquor store owner was approached -- and you

2    will hear conflicting testimony.  But you will find that it was

3    Antwan Harvey that shot that man, and that my client in fact

4    tried to prevent him from shooting that man.

5              Now, will I be able to prove everything I just told

6    you?  I don't know, ladies and gentlemen.  Because I don't have

7    to prove anything.  But what I suggest to you, ladies and

8    gentlemen, when you hear, you have heard state's version of

9    what happened, when you hear all the testimony, you will find

10   that what I have just told you is the more logical and the more

11   believable.

12             My client asks that you use your common sense.

13             You will find that he was, he was there when it

14   happened.  You will find he was taken down police headquarters

15   in the morning on I believe the 24th.  You will find that he

16   was questioned from the morning of 24th until seven, eight

17   o'clock at night, and they finally got a statement that may

18   have had some admissions.  No admissions about him shooting

19   anyone.  But you will find that there may have been admissions

20   that he was involved.  But you will have to decide whether

21   these are his words or what was written down by police

22   officers.  You will have to decide whether he ever read these

23   statements before he signed them.  You will hear from him, you

24   will hear from his mother, and then you will decide.

25             All my client asks is that you keep an open mind and





- DEFENSE OPENING -                                      41

1   then you use your collective common sense, and he is confident

2   you will reach a verdict of not guilty.

3           Thank you.

4           THE COURT:  Mr. Kolano, your first witness.

5           MR. KOLANO:  Antonia Saraiva.

6           Your Honor, we will have the use of an interpreter for

7   this witness.

8   (REGANE FRANCO sworn as English - Portugese interpreter.)

9   A N T O N I A      S A R A I V A

10  Sworn as a witness and testified as follows:

11  DIRECT EXAMINATION BY MR. KOLANO:

12          THE COURT:  You may be seated.

13          Mr. Kolano.

14      Q.  Ma'am, where do you live?

15  A.  709 East Jersey Street, Elizabeth.

16      Q.  How long have you lived there?

17  A.  Eighteen years.

18      Q.  Who do you live there with?

19  A.  With my daughters.

20      Q.  How many daughters do you have?

21  A.  Two.

22      Q.  Prior to January 22nd, 1996, was there anyone else

23  that you lived there with?

24  A.  My husband.

25      Q.  What was his name?

ANTONIA SARAIVA -   DIRECT BY KOLANO                 42

1   A.   Antonio Saraiva.

2        Q.    Did the two of you own a business?

3   A.   A liquor store.

4        Q.    What was the name of that liquor store?

5   A.   Portuguese American Wine and Liquor.

6        Q.    Did the two of you operate the store?

7   A.   My husband, and I helped him.

8        Q.    And January 22nd, 1996, were you and your husband

9   working at the liquor store prior to ten o'clock that night?

10  A.   Yes.   Yes.

11       Q.    Where did you live in relation to the liquor store?

12  A.   Where do I live?

13       Q.    Where did you live in relation to the liquor store?

14  A.   I live upstairs.

15       Q.    There was an apartment upstairs and liquor store

16  downstairs?

17  A.   Yes, it's down, the liquor store is down.

18       Q.    At sometime after, at ten o'clock that evening, did

19  you and your husband close up the liquor store for business for

20  the day?

21  A.   My husband closed the door, he went outside, and I was

22  inside.

23       Q.    What type of security measures did you have at the

24  store and in the area?

25  A.   Rolls, grates, the front grates.

ANTONIA SARAIVA -   DIRECT BY KOLANO                    43

1        Q.    Rolling metal grates to protect the windows and doors?

2    A.    Yes.

3        Q.    Did you have any other gates to protect the apartment

4    from people entering the apartment or the area of the alley

5    ways?

6    A.    Two gates.

7        Q.    Did there come a point in time sometime after ten

8    o'clock that evening that your husband went outside of the

9    store to do something?

10   A.    He went out to put the garbage cans.

11       Q.    Where were your daughters at this time?

12   A.    Inside of the liquor store.

13       Q.    What did you hear when your husband went out to take

14   the garbage out?

15   A.    I heard shots.

16       Q.    When you heard the shots what did you do?

17   A.    I went from behind of the house and I got next to the

18   gates, and I saw my husband on the ground.

19       Q.    Were you able to go immediately to your husband?

20   A.    I had to go back inside to get the keys to open the gates.

21       Q.    Did you tell your daughters anything?

22   A.    I told my daughters to call the ambulance because their

23   father was on the ground full of blood.

24       Q.    Was there somebody out there that you saw when you

25   first saw your husband on the ground after the shots?

1   A.   There was a dark man talking to him saying Tony, Tony.

2        Q.    Did you, were you able to then get the key and go out

3   to your husband?

4   A.   I went back inside to get the keys, and I opened the gates.

5   When I got there the next time, the second time nobody was

6   there but my husband.

7        Q.    Did your daughter join you out by your husband?

8   A.   The youngest one, Suzana.

9        Q.    Was your husband conscious, did he speak?

10  A.   No.

11       Q.    What did you do then?

12  A.   I screamed Help.

13       Q.    Did the police come?

14  A.   After a while, I don't remember how long, they came.

15       Q.    Did the ambulance take your husband somewhere?

16  A.   To the hospital, general hospital.

17       Q.    I am going to show you what has been marked S-6 for

18  identification.  It's a photograph.  I am going to ask you to

19  look at that.  Do you recognize that?

20  A.   This is my house.

21       Q.    Is this the outside of the house?

22  A.   This is the sidewalk, with the garbage cans, the steps.

23       Q.    That picture that was taken that night?

24  A.   Yes.

25       Q.    Did your husband have a wallet prior to going out and

ANTONIA SARAIVA -   DIRECT BY KOLANO                45

1   taking the garbage out?

2   A.  Yes, he had.

3       Q.   I am going to show you what's marked S-23 for

4   identification.  I am going to take it out and ask you to look

5   at it.

6       I know this is tough.  Take your time.

7           MR. KOLANO:  Can we get water?

8           (Witness appears to be crying.  Tissues provided to

9   the witness).

10      Q.   Is this your husband's wallet?

11  A.  (Pause) can I touch it?

12      Q.   Yes.

13  A.  But there is nothing inside.  He had things inside.

14      Q.   I am going to show you what has been marked S-24.

15  Number of papers and documents that came from within this

16  wallet when the police found it.  I am going to put it here.

17  You can look through as many as you need to see if you

18  recognize any of those items.

19  A.  Yes.  Yes.  Yes, this is his handwriting.  And also the

20  numbers.  Names of properties that we have in Portugal.  Yes.

21      Q.   You don't have to go through everything.  I just want

22  to make sure that from the contents of the wallet you recognize

23  those as your husband's.

24      Do you recognize these things?

25  A.  Yes.  This is my father's name.

ANTONIA SARAIVA -   DIRECT BY KOLANO                    46

1       Q.   I will take these.

2    A.   And this is Portuguese money.  Brazilian.  Brazilian money.

3       Q.   Did your husband also have some American money?

4    A.   Yes.  He always had some money with him, but not a lot.

5       Q.   And there is no American money in that list of items

6    that were found in your husband's wallet?

7    A.   No.  No, there isn't.

8       Q.   Prior to that day, -- take your time. -- (pause)

9       Prior to that day did you know Marvin Mathis or Antwan

10   Harvey?

11   A.   No.

12      Q.   To your knowledge, did your husband know them?

13   A.   I don't know, because he was the one who was always at the

14   business.  I don't know.

15      Q.   Do you know of any reason why your husband would give

16   his wallet to Marvin Mathis or Antwan Harvey?

17   A.   No, he wouldn't give it.

18          MR. KOLANO:  Thank you.  I have nothing further.

19          THE COURT:  Mr. Florczak.

20          MR. FLORCZAK:  Thank you.

21   CROSS EXAMINATION BY MR. FLORCZAK:

22      Q.   Madam, you saw a man standing over your husband when

23   you first looked out after hearing a shot?

24   A.   I saw a man.

25      Q.   And can you tell me approximately how old he was?

ANTONIA SARAIVA -   DIRECT BY KOLANO                    47

1    A.   Around thirty years.

2         Q.   And this man you had seen before?

3    A.   Yes.  He used to go a lot to the store.  He is from

4    Jamaica.

5         Q.   So it was not Antwan Harvey or Marvin Mathis, this man

6    standing over your husband?

7              INTERPRETER:  Excuse me.  Could you repeat the name.

8         Q.   Antwan Harvey or Marvin Mathis.

9    A.   No.

10        Q.   Did you hear one shot or more shots?

11   A.   I am not sure if it was one or two, but I heard shots.

12             MR. FLORCZAK:  Thank you very much.

13             I have no further questions, your Honor.

14             THE COURT:  Mr. Kolano, anything further?

15   REDIRECT EXAMINATION BY MR. KOLANO:

16        Q.   Man who was standing over your husband didn't run and

17   flee from your husband's body, did he?

18   A.   No.  He was trying to talk to him, but he didn't answer.

19        Q.   And you said on direct that you lived at 709 East

20   Jersey Street?

21   A.   Yes.

22        Q.   And you found out this person lives at 711, the next

23   house over on East Jersey Street.

24   A.   I don't know.

25             MR. KOLANO:  Thank you.  Nothing further.

48

1      MR. FLORCZAK:  I have nothing further, your Honor.

2      THE COURT:  Thank you.  You are excused.  You may step

3  down.  Please watch your step.

4      THE COURT:  Ladies and gentlemen, we will take the

5  afternoon recess at this point.  We will take a short break of

6  fifteen minutes.

7      I want to remind you not to engage in any discussions

8  regarding the case.  If you do choose to leave the courtroom,

9  when you do come back assemble inside the jury room.  If you

10  don't choose to leave the courtroom, you can wait in the jury

11  room.

12      You are excused for fifteen minutes.

13      (Short Recess).

14      THE COURT:  Bring the jury out, please.

15      (Jury seated in the jury box in the courtroom.)

16      THE COURT:  Mr. Kolano, next witness.

17      MR. KOLANO:  Gene Antonucci.

18  G E N E      A N T O N U C C I,    J R.

19  Sworn as a witness and testified as follows:

20  DIRECT EXAMINATION BY MR. KOLANO:

21      Q.   By whom are you employed?

22  A.   Elizabeth Police Department.

23      Q.   And how long have you been a member of the Elizabeth

24  Police Department?

25  A.   Approximately seven years now.

ANTONUCCI -   DIRECT BY KOLANO                    49

1        Q.    In what capacity?

2    A.   Patrolman.

3        Q.    Were you on duty January 22nd, 1996 at approximately

4    twelve minutes after ten o'clock in the evening?

5    A.   Yes, I was.

6        Q.    Were you in a car?

7    A.   Yes.

8        Q.    What type of car?

9    A.   Radio unit.

10       Q.    Were you driving with someone?

11   A.   Yes.

12       Q.    Who was that?

13   A.   Officer Andy Cox.

14       Q.    Was he your regular partner?

15   A.   No, he was not.

16       Q.    Did you receive a radio transmission at approximately

17   twelve minutes after ten?

18   A.   Yes, we did.

19       Q.    As a result of that radio transmission where did you

20   and Officer Cox go?

21   A.   We proceeded to 701 East Jersey Street.

22       Q.    And when you got to 701 East Jersey Street did you

23   have to go to another location?

24   A.   On our way there there was another transmission that a man

25   was down there, and so we just proceeded straight to that

ANTONUCCI -   DIRECT BY KOLANO                    50

1   location.

2        Q.   And when you got to the location what did you see?

3   A.   There was a man down on the ground, and two people

4   administering C.P.R.

5        Q.   Did you recognize any of the people?

6   A.   No.

7        Q.   When you saw the two people administering C.P.R. what

8   did you do?

9   A.   We made transmission to start ambulance and MIG unit to

10  that area.

11       Q.   Did you do anything in terms of C.P.R. yourself?

12  A.   No, we did not.

13       Q.   Did you learn the identity of --

14  Was one of the people administering CPR female?

15  A.   Yes.

16       Q.   Did you learn identity of that female?

17  A.   It was the daughter of the victim.

18       Q.   Did you learn the identity of the other person doing

19  C.P.R.?

20  A.   Yes, we did.

21       Q.   And who was that?

22  A.   If I could refer to my report.

23       Q.   You need that to refresh your recollection?

24  A.   Yes.

25            THE COURT:   You may refer to your report to refresh

ANTONUCCI -  DIRECT BY KOLANO                    51

1   your recollection and then answer the question.

2           THE WITNESS:  Thank you, your Honor.

3   A.  Andre Fisher.

4       Q.  And at that point in time did other police personnel

5   arrive?

6   A.  Yes, they started to arrive.

7       Q.  Did other -- Did ambulance personnel arrive?

8   A.  Yes, ambulance had already arrived at the time.

9       Q.  And after I assume the ambulance personnel took over

10  any medical attention?

11  A.  Yes, they did.

12      Q.  And did you have a duty regarding the finding of

13  evidence or anything else at that point?

14  A.  Yes.  We roped off the area and searching the area for any

15  evidence what happened to the victim.

16      Q.  Did you notice the nature of the injuries to the

17  victim?

18  A.  Yes.  He was bleeding from the head area.

19      Q.  What was the weather like, if you recall, or if it's

20  noted on the report?

21  A.  It was cold.  Other than that, it was clear night.

22      Q.  What were the lighting conditions like?

23  A.  Pretty good around the area there.

24      Q.  Was this your general beat or general area?

25  A.  No.  No, it was not.

ANTONUCCI -  DIRECT BY KOLANO                    52

1        Q.    Was there a liquor store there?

2    A.   Yes, there was.

3        Q.    Was there Chinese store there?

4    A.   Yes.

5        Q.    Do you recall if the grates were up or down on the

6    liquor store?

7    A.   Liquor store I believe they were down.

8        Q.    How about Chinese store's?

9    A.   Chinese store was open.

10       Q.    Light emanating from the Chinese store?

11   A.   Yes, there was.

12       Q.    Did you search the scene looking for any bullets or

13   casings?

14   A.   Yes, we did.

15       Q.    Did you locate, you or anybody, any police personnel

16   to your knowledge locate any bullets or bullet casings?

17   A.   No.

18       Q.    And did you have another obligation at some point

19   during that evening evidence wise?

20   A.   Yes.  I had to measure off the area from where the body was

21   and other objects on the ground.

22       Q.    Was anything done on the ground to denote the general

23   area of the body, since it was taken to the hospital?

24   A.   Marked off the body we, we marked off the body where the

25   feet would be.

ANTONUCCI -   DIRECT BY KOLANO                                    53

1      Q.   How did you mark it off?

2  A.  With chalk.

3      Q.   And what, how did you take your measurements, what

4  device did you use?

5  A.  Measure meter with the wheel.

6      Q.   Did you do a diagram?

7  A.  Yes, I did.

8      Q.   Was that submitted as part of your report?

9  A.  Yes, it was.

10     Q.   Did you record accurately the measurements as you were

11 taking them?

12 A.  Yes, I did.

13     Q.   And did you do the diagram to the best of your

14 ability?

15 A.  Yes, I did.

16     Q.   I am going to show --

17     Step down, if you would.

18     I am going to ask you to look at what has been marked S-17

19 for identification.

20         MR. KOLANO:  For the record, counsel and I have

21 discussed this.  There is no objection to the jury viewing this

22 object.

23         THE COURT:  All right.  Display that on the easel.

24     Q.   If you would just step around.  There is a pointer

25 there.  If you would, grab it.

ANTONUCCI -   DIRECT BY KOLANO                                54

1          MR. KOLANO:  And I am going to ask, through your

2    Honor, if any jurors can't see to please raise their hand.

3          THE COURT:  Any jurors unable to see the diagram, if

4    you please put your hand up.

5          I guess everyone --

6          JUROR:  I can't see the whole thing.

7    Q.   Sir, if you would, would you just point out generally

8    what we are looking at here.

9    A.   Okay.  This is where we found the victim.

10         We marked off number one here.  That's a hat.  It was

11   laying here.

12         Number two was a glove.  That was laying by the feet.

13         Number three is a manhole, which I used for my measurement.

14         Number four is the corner of building 709 on East Jersey.

15         Number five is the corner of 701 703 East Jersey.

16   Q.   If I can stop you.  Please explain triangulation, and

17   why you have three, four, and five, and what those lines mean?

18   A.   Yes.  I measured from the corner of building 709 to the

19   manhole cover.  Manhole cover to the hat.  And hat back to the

20   corner of building.  To get the triangle here to make it

21   easier, where the subject was also.

22   Q.   Did you use permanent structures so this could be

23   recreated if necessary?

24   A.   Yes.  That's why we used corner of the building or manhole,

25   which will always be there.

1       Q.   And was the body on the sidewalk?

2   A.   Yes.   It was right, right by the edge of the sidewalk.

3       Q.   And is this a true and accurate depiction of the scene

4   as you saw it?

5   A.   Yes.

6       Q.   Body was gone by the time you had done this diagram,

7   is that correct?

8   A.   Right.

9       Q.   How is it you were able to place the body?

10  A.   Okay.   Just from we had to start to outline the body.

11  Ambulance workers were there, so we just had partial with his

12  feet and what I remembered how the body was.

13      Q.   I am going to ask you to remain there, officer.

14  May I have this pointer.

15  I am going to show you some photographs.

16      MR. KOLANO:   Again, your Honor, counsel and I have

17  discussed this.   There is no objection to the jurors seeing.

18      Q.   Showing you what is marked S-6 for identification,

19  first to yourself.   Do you recognize that?

20  A.   Yes.

21      Q.   What is that?

22  A.   That's the scene of the incident.

23      Q.   I am going to ask you to turn around so the jury can

24  see it, and explain exactly what it is that we are looking at,

25  and then if you would just walk down so each member of the jury

ANTONUCCI -   DIRECT BY KOLANO                    56

1   can see.

2   A.   Over here is the liquor store.   Over here would be the

3   Chinese restaurant.   And the body was found over here.

4        Q.    Please repeat that at this end so this side of the

5   jurors can see.

6   A.   Over here this is the liquor store.   Over here would be

7   Chinese restaurant.   And over here is where the body was

8   located.

9        Q.    And this yellow tape here that's the tape that you put

10  up?

11  A.   Yes, we put that tape up to cordon off the area.

12       Q.    Is this a true and accurate depiction of the scene as

13  it was?

14  A.   Yes.

15       Q.    Is this true and accurate depiction of the lighting

16  conditions that night?

17  A.   Yes.

18       Q.    Again, from your memory, lighting conditions here are

19  appropriate and not from a flash, or are they from a flash?

20  A.   Looks pretty appropriate the way as I recall.

21       Q.    I am going to show you what's marked S-5 for

22  identification and ask you to look at it and indicate whether

23  or not you recognize that.

24  A.   Yes, I do.   This is the hat, which was marked on my

25  drawing.   And body was here.

ANTONUCCI -   DIRECT BY KOLANO                    57

1     Q.    There is some chalk marks.  Point out to the jury

2  where the chalk marks are on that?

3  A.  Chalk marks are over here.  That's where we started to mark

4  off.

5     Q.    Please, if you would, on this side just repeat

6  yourself so this side of the jury can see.

7  A.  Over here is where the hat was lying.  Over here is the

8  chalk marks that we agreed where his feet were.

9     Q.    Is this also a true and accurate depiction of the

10  scene as it was that night?

11  A.  Yes, it is.

12     Q.    I am going to show you one last picture, what's marked

13  S-8 for identification, and ask you to look at it and indicate

14  whether or not you recognize it.

15     If you do, then please explain what it is.

16  A.  Yes, I do.

17     Hole or chip mark in the bricks up on the wall.  That would

18  be the Chinese restaurant, 701-703.

19     Q.    Why was that picture taken?  What is that indicative

20  of?

21  A.  Because it may have been where the bullet had glanced off

22  the wall.

23     Q.    What's being pointed with flashlight by the officer?

24  A.  Yes.

25     Q.    And in your diagram did you also note the location of

ANTONUCCI -  DIRECT BY KOLANO                    58

1   this chip or deflection?

2   A.  Yes, I did.

3       Q.   Would you please just turn that briefly and point to

4   that with the pointer.

5   A.  That will be number six up here.

6       Q.   Okay.  You can return to your seat, officer.

7       After you completed the diagram did you secure the scene?

8   A.  Yes, we did.

9       Q.   And is that the extent of your involvement in this

10  case?

11  A.  Yes, it was.

12      Q.   To your knowledge, did any officers find any bullets

13  or casing at the scene?

14  A.  No.  Not that I know of.

15          MR. KOLANO:  Thank you.

16          Nothing further.

17          THE COURT:  Mr. Florczak.

18  CROSS EXAMINATION BY MR. FLORCZAK:

19      Q.   S-8, that's the chip missing.

20  A.  Yes.

21      Q.   You don't know when that chip was caused to disappear,

22  when this happened?

23  A.  No, we do not.

24      Q.   You don't know what caused it?

25  A.  No, we do not.

ANTONUCCI -   DIRECT BY KOLANO                                    59

1         Q.   And S-6, I would like to show you S-6, that photograph

2    showing the yellow tape.

3    A.   Yes.

4         Q.   I assume that garbage can was put in the street to

5    hold the tape.  It wasn't found there at the time?

6    A.   That's correct.  It was.

7              MR. FLORCZAK:  That's all I have, your Honor.

8              Thank you.

9              MR. KOLANO:  No redirect, your Honor.

10             THE COURT:  Officer, you may step down.  You are

11   excused.  Watch your step as you step off.

12             THE WITNESS:  Thank you.

13             MR. KOLANO:  Rocco Malgieri.

14   R O C C O     M A L G I E R I

15   Sworn as a witness and testified as follows:

16   DIRECT EXAMINATION BY MR. KOLANO:

17        Q.   By whom are you employed?

18   A.   Elizabeth Police Department.

19        Q.   And in what capacity?

20   A.   Police officer.

21        Q.   How long have you been a police officer with the

22   Elizabeth Police Department?

23   A.   Going on six years.

24        Q.   And on January 22nd, 1996, at about, well, between ten

25   o'clock and eleven o'clock that evening were you working as a

MALGIERI -   DIRECT BY KOLANO                    60

1  police officer?

2  A.   Yes, I was.

3       Q.   Were you in uniform?

4  A.   Yes.

5       Q.   Were you in a marked radio vehicle?

6  A.   Yes.

7       Q.   Who were you working with?

8  A.   My old partner, Officer Jackson.

9       Q.   And did there come a point in time when you got

10 involved in assisting the detectives and other police personnel

11 in conducting a search of a crime scene area?

12 A.   Yes.

13      Q.   And what were you looking for as you conducted your

14 search?

15 A.   We were looking for suspects, weapons, casings involved in

16 the shooting.

17      Q.   Did you find any bullets?

18 A.   No.

19      Q.   Did you find any bullet casings?

20 A.   No.

21      Q.   Did you find any items that turned out to be

22 evidential in this case?

23 A.   Yes.

24      Q.   What did you fine?

25 A.   Brown leather wallet.

1      Q.   Where did you find that brown leather wallet?

2   A.   I believe it was in front of 658 South Park Street.

3      Q.   Was this your general patrol area?

4   A.   No, it isn't.

5      Q.   Why were you in this general area?

6   A.   We were assisting other units.

7      Q.   And did you seize that wallet that you found?

8   A.   Yes.

9      Q.   I am going to now show you what has been marked S-23

10   for identification.  I ask you to open it up, take it out, and

11   indicate whether or not you recognize what that is?

12   A.   Yes.

13      Q.   What is that?

14   A.   The wallet that I found in front of --

15      Q.   Were the papers in there?

16   A.   Yes.

17      Q.   Did you look in that wallet to determine the identity

18   of the owner of that wallet?

19   A.   Yes.

20      Q.   Now, showing you what has been marked S-24 for

21   identification.  If you would just very generally, take as much

22   time as you need to look through it to indicate whether or not

23   you recognize those documents as coming from the wallet that

24   you found at 658 South Park Street?

25   A.   Yes, they were all in the wallet.

MALGIERI -  DIRECT BY KOLANO                          62

1      Q.   Just put them back there, please.

2      And did you take this wallet into evidence?

3  A.   Yes, I did.

4      Q.   Prior to the wallet being moved was anything done

5  regarding photography?

6  A.   No.

7      Q.   Was any pictures taken?

8  A.   Yes.

9      Q.   If you would, sir, just step down.

10     Actually, while you are there, let me show you what has

11  been marked S-11 for identification.  I ask you to look at it.

12  Do you recognize that?

13  A.   Yes.

14     Q.   What is that?

15  A.   The wallet that I found.

16     Q.   Is that the condition the wallet was in when you found

17  it?

18  A.   Yes, it was.

19     Q.   Showing you what has been marked S-10 for

20  identification, and ask you to look at it.

21     Do you recognize that?

22  A.   Yes.

23     Q.   And is that another view of the wallet?

24  A.   Yes, it is.

25     Q.   And is that also the position that it was found in?

MALGIERI -   DIRECT BY KOLANO                    63

1   A.   Yes, it was.

2       Q.   Showing you what's marked S-9 for identification, I

3   ask you to look at it.

4       Do you recognize that?

5   A.   Yes, I do.

6       Q.   And what is that?

7   A.   658 South Park Street, front of the house.

8       Q.   Now if you would, sir, just please step down so you

9   can indicate to the jury, show them the pictures, and indicate

10  where the wallet was found.

11  A.   This is the porch of 658 South Park Street.   As you walk

12  down the steps there is brown grassy area, that's where the

13  wallet was.

14      Q.   Just bring it down so that jurors on this end can also

15  see that.

16      Will you step to the side, officer.

17          MR. KOLANO:   Your Honor, I need to have an item

18  marked.   I believe we are up to S-42.

19          (S-42 marked for identification.)

20      Q.   I am just going to hold it up.

21      Do you recognize generally what this represents, officer?

22  A.   Yes.

23      Q.   And there is some writing on this.

24      Did you actually go in response to 709 East Jersey Street?

25  A.   Yes.

MALGIERI -  DIRECT BY KOLANO                               64

1      Q.   And from there you were detailed to conduct your

2   search?

3   A.   Yes, I was.

4      Q.   And that was at the Portuguese American liquor store?

5   A.   Yes.

6      Q.   There is indication here 658 South Park Street.  Is

7   that where the wallet was found?

8   A.   Yes, it was.

9      Q.   Based on your experience and being a police officer in

10   Elizabeth, and you actually being out there that night, is this

11   a true and accurate or fair depiction of the streets of

12   Elizabeth and relative location where the wallet was found in

13   relation to the liquor store?

14   A.   Yes, it is.

15      Q.   Okay.  Officer, you can return to the seat.

16   Thank you.

17          MR. KOLANO:  I have no further questions of Officer

18   Malgieri.

19          MR. FLORCZAK:  Could I see the diagram just for a

20   moment.

21          I have no questions.  Thank you.

22          THE COURT:  All right.

23          Officer, you may step down.  You are excused.

24          Watch your step as you step down.

25          MR. KOLANO:  State calls Sharlama Brooks.

S. BROOKS  -  DIRECT BY KOLANO                          65

1  S H A R L A M A       B R O O K S

2  Sworn as a witness and testified as follows:

3  DIRECT EXAMINATION BY MR. KOLANO:

4      Q.   How old are you today?

5  A.   Eighteen.

6      Q.   And back on January 22nd, 23rd, 24th of 1996 how old

7  were you?

8  A.   Fifteen, I believe.

9      Q.   Did you know Marvin Mathis?

10 A.   Yes, I did.

11     Q.   What was your relationship with Marvin Mathis back in

12 January of 1996?

13 A.   He was my boyfriend for a year, about year and three

14 months.

15     Q.   Do you see him in the courtroom today?

16 A.   Yes, I do.

17     Q.   Would you please identify him and indicate where he is

18 sitting and what he is wearing?

19 A.   He is sitting right there, next to the guy.

20         THE COURT:  For the record, indicating the defendant.

21     Q.   And on January 22nd, Monday, 1996, between seven and

22 eleven in the evening where were you?

23 A.   I was in bed.

24     Q.   Were you with anyone?

25 A.   No, I wasn't.

S. BROOKS  -  DIRECT BY KOLANO                    66

1      Q.   And where did you live then?

2   A.   17E Pioneer Homes.

3      Q.   Did there come a point in time when you saw Marvin the

4   following day on Tuesday, January 23rd, 1996?

5   A.   Yes, I did.

6      Q.   And did he ask you to do something for him?

7   A.   23rd?  I believe not on the morning.

8      Q.   Later on on the 23rd?

9   A.   Yes.

10      Q.   What did he ask you to do?

11   A.   He told me if anyone approached me to tell them that he was

12   with me during, between seven and eleven o'clock on Monday.

13      Q.   Was that true?  Was he with you?

14   A.   No, he was not with me on that Monday.

15      Q.   Okay.  When he asked you to say that he was with you

16   between seven and eleven on the Monday night before what did

17   you tell him?

18   A.   I told him No, because I didn't know what, you know, I was,

19   you know, I was lying for him for, I didn't know what was going

20   on.

21      Q.   And did you ask him any questions as a result of him

22   asking to you lie for him?

23   A.   Yes, I did.

24      Q.   What did you ask him?

25   A.   I asked him why, you know.  He like, like turned away from

S. BROOKS  -  DIRECT BY KOLANO                    67

1    me, you know.

2         Q.    Is there a phrase, do you remember, is there a phrase

3    that he used that he said you would do if he told you?

4    A.   Yes.  He said if he tell me I will black out.  So I just

5    left it at that.

6         Q.    What did you understand black out to mean?

7    A.   I guess I will get mad at him.

8         Q.    And did there come a point in time that evening that

9    you went to a chicken store?

10   A.   Fish market.

11        Q.    Fish market.  When you were coming home from the fish

12   market did something happen?

13   A.   Yes.

14        Q.    What happened?

15   A.   I was approached by four or five guys, and one of them put

16   me to the side into a hallway and he told me --

17             MR. FLORCZAK:  Objection to what she was told.

18             MR. KOLANO:  Your Honor, we can go to side bar?

19             It's not being offered for the truth, but as state of

20   mind.

21             I will make a record at side bar, if necessary.

22             THE COURT:  All right.  Come to side bar.

23   (PROCEEDINGS AT SIDE BAR).

24             MR. KOLANO:  What she is going to say is one of the

25   guys said that Your boyfriend Marvin did a murder, and one of

S. BROOKS  -  DIRECT BY KOLANO                    68

1   my friends or one of my relatives got locked up for the murder.

2   And we will indicate there were other people who were arrested.

3   And your boyfriend better come clean.  And we are looking for

4   him.

5        Why this becomes relevant is because then she uses the

6   same words to Marvin, is what I was told this, what's going on.

7   Marvin does not deny it.  Later on he admits it.

8        So it becomes adoptive admission because she says

9   someone is calling you a murderer, and that's something someone

10  normally would deny.  If you said, you know, Bill Kolano, you

11  are a murderer, if it's not true I say I am not.

12       Admissible as adoptive admission.

13       I am offering it for her state of mind, and because

14  these words -- not whether they are true or not -- are actually

15  said to this defendant, and it's for his state of mind.

16  Actually not so much -- The fact she repeats the words to this

17  defendant, and he does not react by denying, it's adoptive

18  admission.  And flowing from there is the actual admission that

19  he makes.

20       MR. FLORCZAK:  Judge, talking about two different

21  things.  Talking about what she said to him.  Right now we are

22  talking about what was told to her.  It is hearsay.  I didn't

23  hear under what exception to hearsay it comes in.

24       MR. KOLANO:  Not hearsay.  It's not being offered for

25  the truth, so it's not hearsay.

S. BROOKS - DIRECT BY KOLANO                    69

1    MR. FLORCZAK:  Still hearsay.  Any out of court

2    statement would be hearsay.

3        MR. KOLANO:  Only if it's offered for the truth of the

4    matter asserted.

5        MR. FLORCZAK:  Judge, prejudicial.  Saying someone

6    told her.  In addition, this is first time I am hearing this.

7    I read the statement.  Doesn't say that, doesn't read that.

8        MR. KOLANO:  It's in the statement.

9        THE COURT:  This she was told by another person,

10   persons who accosted her upon her return from the fish shore,

11   and that person said to her, essentially, Your boyfriend did

12   the murder, and someone else is charged, he better come clean.

13   Something along those lines?

14       MR. KOLANO:  Right.

15       THE COURT:  And your reasoning for that hearsay to

16   come in is because it's not being offered for the truth that --

17       MR. KOLANO:  It's not being offered to prove that

18   Marvin is a murderer.

19       THE COURT:  Is it being offered for the truth that

20   someone else was arrested for the murder.

21       MR. KOLANO:  It's being offered to show where Sharlama

22   gets the information, that she then talks to Marvin and says,

23   Marvin, I was told that you were a murderer.  Is this true?

24   And he does not deny it.  That is an adoptive admission.  It's

25   the step, building stone foundation for where I am going.




S. BROOKS  -  DIRECT BY KOLANO                    70

1        MR. FLORCZAK:  Judge, can I get the statements?  I

2   want to address that.

3        THE COURT:  Okay.

4        MR. FLORCZAK:  Judge, as far as I can see, it can be

5   gotten in that somebody approached her about the murder, and

6   that's why she addressed my client about it.  But content of

7   what was said I think is prejudicial, and I don't think it's

8   admissible.

9        THE COURT:  So your objection is to her repeating the

10  words of this third person.

11       MR. FLORCZAK:  Right.

12       THE COURT:  But you are not objecting to her saying

13  that she, that this third person said something to her, without

14  saying what that something was.  And then Mr. Kolano asking her

15  what her conversation with the defendant was, where she could,

16  she would relay I told the defendant that somebody told me,

17  whatever, whatever, whatever.

18       MR. FLORCZAK:  I will go as far as to say As a result

19  of what that person said --

20       THE COURT:  -- did you have a conversation with

21  Marvin?

22       MR. FLORCZAK:  He suggested Marvin's involvement in

23  this.

24       THE COURT:  As a result of your conversation with this

25  third person did she then say something to Marvin?  What did




Case 2:15-cv-02092-JLL   Document 10-29   Filed 08/07/15   Page 71 of 95 PageID: 1599

1   you say to Marvin?

2          MR. KOLANO:  But ultimately going -- This just goes to

3   support foundation, strength of what it is she is repeating.  I

4   mean whether they hear it once or twice, just makes more sense.

5   She is repeating what she heard, that's exactly what her

6   statement says.  I can read it into the record.

7          "Question:  Who spoke to you?

8          "Some guy approached me, pulled me into the hallway,

9   and he said to me Do you realize what your boyfriend did?  And

10  I said No.  And he said he shot and killed somebody, and I was

11  like okay, finish what you say.  And he said My cousin was at

12  the scene at the wrong time, and you know he is the wrong

13  suspect.  Do you know where your boyfriend is?  And I said No.

14  And he said we want to talk with him, and if we can't speak to

15  him then when I see him tell him to watch his back, they are

16  out to get him."

17         And then going forward, it says, What did your

18  boyfriend Mathis say after you told him --

19         THE COURT:  So this is only to explain why she would

20  have then had a conversation with Marvin at a later point.

21         MR. KOLANO:  What she said to him, and he did not deny

22  his involvement -- which would be offered as adoptive

23  admission.

24         MR. FLORCZAK:  The statement doesn't say what she

25  said.

S. BROOKS  -  DIRECT BY KOLANO                    72

1        MR. KOLANO:  Yes.  New quote.

2        "Let me ask you again.  This morning in the cafeteria

3   did you tell Matthews about the gentleman who came to see you

4   last night in regards to him?

5        "Yes.

6        "What did your boyfriend Matthews say after you told

7   him?

8        "What the guys and I described them as I just

9   described him to you.

10        "What did he say then?

11        "He just said, what guys, what guys?

12        "What did your boyfriend say at that time?

13        "He didn't say nothing.

14        "What was he like after you told him?

15        "He was scared."

16        The fact that he didn't say anything, normal rational

17   person would deny.

18        THE COURT:  I think, I think the second part I don't

19   have any problem with.  Adoptive admission.

20        MR. FLORCZAK:  I have a problem with the first part.

21        THE COURT:  I am going to have to give a limiting

22   instruction which, of course, could be confusing I suppose.

23   Let me just think this through.  What's being repeated now is

24   not for the truth of it, but only to explain her conduct

25   following hearing this.



S. BROOKS  -  DIRECT BY KOLANO                          73

1        MR. KOLANO:  And then when she gives the second one,

2   then you can consider this for the truth and give it whatever

3   weight you deem it appropriate.

4        THE COURT:  I can do it that way.  Limiting

5   instruction, and then non-limiting instruction, I guess.  Okay.

6   Do it that way.

7   (SIDE BAR TERMINATED).

8        THE COURT:  Ladies and gentlemen, as a result of the

9   discussion with counsel, I am overruling the objection that has

10  been made with respect to the question posed by Mr. Kolano.

11       However, I am going to instruct you as to a limitation

12  with respect to the anticipated information that is going to

13  come as a result of that particular question.  This question is

14  going to be posed by the prosecutor as he did.  I am going to

15  ask him to restate the question.

16       The answer that is being given by this witness is not

17  to be considered by you for the truth of that answer.  So you

18  are not to consider that what her answer is contains

19  information that is truthful, only that the information that

20  she is about to relay in response to this question is to be

21  used by you to, as an explanation as to what it is that she did

22  as a result of receiving the information.  So it explains her

23  motivation for what she did next.  So only this, this answer to

24  this question is to be limited to the use as an explanation of

25  what the witness did next.





S. BROOKS  -  DIRECT BY KOLANO                    74

1      Q.   You had a conversation, you indicated you had a

2   conversation in the hallway of your house after you were

3   returning from the fish market?

4   A.   Yes.

5      Q.   What did the persons tell you that Marvin had done?

6   A.   The man approached me -- I was on my way up to my house --

7   and he said, You know, do you know such and such?  I said yes,

8   I know Marvin.  And he said you know he killed someone.  I was

9   like, okay, Go further on, what you were telling me.  He was

10  like, Well, my cousin was there at the wrong time, and they got

11  him.  And if you see your boyfriend again tell him they are out

12  to get him.

13     Q.   And did you see Marvin the next day, on the 24th?

14  A.   Yes, I did.

15     Q.   Were you in school at that time?

16  A.   Yes, I was.

17     Q.   When you saw him in the morning, did you tell him what

18  the man had said about him?

19  A.   No.  I just said, Marvin, some guys approached me last

20  night.  He says What guys, what guys?  You know, I was like, I

21  described the guys, -- I described them to the detective in my

22  statement -- and, you know, he left for that day.

23     Q.   Did you tell him the guys said that he had killed

24  somebody?

25  A.   Yes, I did.

S. BROOKS  -  DIRECT BY KOLANO                              75

1      Q.   And what was his reaction to that?

2    A.   He then, we had left out the cafeteria and we stopped by

3    guidance office.  And he confessed to me, he said that they was

4    struggling I guess when the man was taking out the garbage and

5    gun had went off, but it was by mistake.

6      Q.   At the initial time when he told you, when you told

7    him that some guy approached you and said that Marvin had

8    killed somebody, did he deny that at that point?

9    A.   Yes, Marvin did, he denied at first, then he confessed by

10   guidance office.

11     Q.   Who was there when Marvin confessed to you by the

12   guidance office?

13   A.   It was just him and I alone.

14     Q.   Okay.  Do you remember what he said to you when he

15   confessed to you?

16   A.   If I recall -- I don't, I can't recall, I don't remember.

17     Q.   Okay.  Do you recall giving a statement to the police?

18   A.   Yes, I do.

19     Q.   Okay.  If I showed you a copy of that statement would

20   that refresh your recollection as to what Marvin said to you in

21   his, quote, confession to you?

22   A.   Yes, probably would.

23             MR. KOLANO:  If I can have marked S-43.

24             (S-43 marked for identification).

25     Q.   I am going to show you what's marked S-43 for

S. BROOKS  -  DIRECT BY KOLANO                    76

1    identification.  Do you recognize this as copy of your

2    statement?

3    A.   Yes.

4        Q.   If you would, please turn to page five.

5        Now, there is a question here that starts with So?

6    A.   Yes.

7        Q.   I want you to read that and the rest of that page to

8    yourself.

9    A.   (Pause).

10       Q.   Does that refresh your recollection?

11   A.   Yes, it does.

12       Q.   Okay.  Would you please tell us what he told you?

13   A.   Okay.  He told me that --

14            MR. FLORCZAK:  Judge, I object if she is reading.

15            THE COURT:  All right.  Miss Brooks, if you need to

16   read the statement again to refresh your recollection, then

17   when you are sure that you then remember what it was, then you

18   put the statement aside and then answer the question then from

19   memory.

20   A.   (Pause).  Okay.

21       Q.   Okay?

22   A.   All right.

23       Q.   What did he tell you?

24   A.   He told me him and his friends were walking, and that he,

25   he was -- they were walking, him and his friends -- Marvin, I

S. BROOKS  -  DIRECT BY KOLANO                    77

1    am saying, he went to grab the guy, and as soon as he grab the

2    guy the gun went off.  And I started crying.  Then I went to my

3    first period class.

4        Q.   And when you --

5        Did you leave your first period class?

6    A.   Yes, I did, because I was very upset.

7        Q.   And who did you come in contact with after you left

8    your first period class?

9    A.   The security guard, Mrs. Pridgin.

10       Q.   Were you still crying at that time?

11   A.   Yes.

12       Q.   Why were you crying.

13   A.   Because I was upset because him, I never thought he would

14   do that.

15       Q.   And what did you tell or do with Miss Pridgin?  Where

16   did you go from there?

17   A.   She took me to substance abuse counselor in the library.

18       Q.   Who was that?

19   A.   Janice Sutton.

20       Q.   Did you talk to Janice Sutton?

21   A.   Yes, I did.

22       Q.   Were you still crying?

23   A.   Yes, I was.

24       Q.   What was the cause of your excitement?

25   A.   The cause of my excitement was I was scared, because I

S. BROOKS  -  DIRECT BY KOLANO                    78

1   didn't know; you know, that never happened to me before, and I

2   was nervous.

3       Q.   Nervous based on what Marvin had just confessed to

4   you?

5   A.   Yes.

6       Q.   How long after he confessed to you about his

7   involvement in the shooting did you see Miss Sutton?

8   A.   You mean like the time?

9       Q.   Ten minutes later, half hour?

10  A.   I believe it was at least like fifteen, twenty minutes

11  later.

12      Q.   And did you tell Miss Sutton what Marvin had told you?

13  A.   I told Miss Sutton, because the security guard was

14  consoling me, and I told Miss Sutton.  They ask me questions

15  like, Marvin do anything to you?  I says No.  Like Marvin do

16  anything to anyone?  I like Yes.  Is that person okay?  I was

17  like, No.  Then she acted, then she acted with Oh, my God.

18      Q.   What made her react Oh my God, if you know?

19          MR. FLORCZAK:  Judge, I object.

20          THE COURT:  Sustained.

21      Q.   What did you say immediately preceding her saying Oh

22  my God?

23  A.   She said to me that, me being so young, you know, she

24  never, you know, knew that he would do something like that --

25  because she knew him also.

S. BROOKS  -  DIRECT BY KOLANO                        79

1      Q.   Did you tell her what Marvin had told you, directly or

2  indirectly?

3  A.   No.  After I told, they say was the person all right.  I

4  said No.  She asked me where was Marvin now, and I told her he

5  was in class.

6      Q.   Did she ask, after you said person was not all right?

7  A.   No.

8      Q.   And where did you go from there?

9  A.   I stayed in the substance counselor's office.  They called

10  Detective Brown, I think.  We had two undercovers in the main

11  complex of Elizabeth High School.  They called him over.  They

12  brought, you know, they talked to me first, and they brought

13  him in, and then they came back to school and got me, took me

14  to the police department, and that's when I made my statement.

15      Q.   And you gave the statement that you identified to the

16  police at that point in time?

17  A.   Yes, I did.

18      Q.   As Marvin Mathis' girlfriend I guess you saw him in

19  couple of different situations?

20  A.   Yes, I did.

21      Q.   Was he different in school than outside of school?

22  A.   Yes, he was.

23      Q.   Please tell us how.

24      MR. FLORCZAK:  Judge, I object.  I don't see the

25  relevance to the charge of my client.  Some kind of character

S. BROOKS   -   DIRECT BY KOLANO                    80

1   reference?

2          MR. KOLANO:  No, I am not getting character evidence.

3   I will be heard at side bar.

4          THE COURT:  Approach side bar.

5   (PROCEEDINGS AT SIDE BAR).

6          MR. KOLANO:  This is not being offered as character

7   testimony.  What she is going to say at school he went to

8   school, I guess he was a good student, he had one type of

9   personality.  But when he got around his friends that he wanted

10   to be tough guy, he talked tough.

11          Mr. Florczak opened about how he was a special ed

12   student, and that there are teachers that are going to come in.

13   And it's not character to say when he was with these other

14   people he was talking tough and acting tough.  Because Mr.

15   Florczak in his opening said he was fifteen year old, special

16   ed student being led by all these adults.  She is going to

17   discount what he said in opening.  He was part and parcel of

18   these people.  Whether he wanted to be one of them, and that's

19   why he was acting and talking tough, or whether he was in fact

20   one of them will end up being a jury question.  But that's why

21   it's relevant.  Not character.

22          MR. FLORCZAK:  Judge, I didn't mention anything about

23   teachers in my opening, I don't think, or calling any teachers

24   as witnesses or anything else.

25          My point is, What he did on any other night, except



S. BROOKS  -  DIRECT BY KOLANO                    81

1   for that night, is totally irrelevant, whether he acted like an

2   idiot or like a maniac any other night is totally irrelevant.

3           MR. KOLANO:  Tying in how he reacts and interacts with

4   Antwan.  I will ask the question about Antwan, and that will

5   make it very relevant to this case, since Antwan is certainly a

6   player.

7           MR. FLORCZAK:  How him and Antwan act on different

8   night I don't think is relevant.

9           THE COURT:  I am going to sustain the objection.

10          This may become relevant rebuttal.  But at this point

11  I think it's premature.  Objection sustained.

12  (SIDE BAR TERMINATED).

13      Q.   Did you know Antwan Harvey?

14  A.  Yes, I did.

15      Q.   How long had you known Antwan Harvey up until January

16  22nd, 23rd, 24th, 1996?

17  A.  I believe about four, about three months.

18      Q.   How did you know Antwan Harvey?

19  A.  Oh, he lived across the court from me.  He lived in eleven,

20  I lived in seventeen.

21      Q.   Seventeen and eleven?

22  A.  They are across the court from one another.

23      Q.   Most of us here don't know -- ?

24  A.  Pioneer Homes.

25      Q.   That's in Elizabeth?

S. BROOKS  -  DIRECT BY KOLANO                    82

1   A.  Yes, it is.

2       Q.   And without going into any details, did, to your

3   knowledge did Marvin know Antwan?

4   A.  Yes, Marvin did.

5       Q.   Were they friends?

6   A.  They, yes, they were close, but I don't believe like

7   friends.  But, you know, they associated with each other.

8            MR. KOLANO:  Thank you.

9            Nothing further.

10           THE COURT:  Mr. Florchak.

11  CROSS EXAMINATION BY MR. FLORCZAK:

12       Q.   When you went to the police station, you gave a

13  statement, did you talk to Detective Koczur?

14  A.  Yes, I did.

15       Q.   He is the one who took the statement?

16  A.  Yes, he did.

17       Q.   Did you tell him that Marvin told you he was with

18  Antwan?

19  A.  Yes.

20       Q.   And did you also tell him that he and a friend named

21  Antwan were walking on East Jersey Street and got into an

22  argument with a man who was taking out the garbage?

23  A.  He only described him, he said him and his friends, he

24  didn't mention names.

25       Q.   Do you have the statement there in front of you?

1   A.   Yes, I do.

2        MR. KOLANO:  If I can have a page reference, please,

3   counsel.

4        MR. FLORCZAK:  As soon as I find it I will give it to

5   you.

6        MR. KOLANO:  Thank you.

7        MR. FLORCZAK:  Page six, top of the page six.  Second

8   question.

9     Q.   Do you recall being asked, Did he say who he was with?

10  A.   Yes.

11     Q.   And your answer was Yes.

12     And next question was, And who was that?

13     And your answer was Antoine?

14  A.   Yes.

15     Q.   So he did tell you he was with Antwan?

16  A.   Yes, he did tell me he was with Antwan.

17     Q.   Didn't you also tell Detective Koczur that Marvin

18  Mathis stated that an argument had broken out, a gun was

19  produced by Antwan, and during the struggle a shot was fired?

20  A.   I can't recall that.

21     Q.   Was it possible you told him that?

22  A.   I didn't tell him anything.

23     Q.   You gave Detective Koczur a statement?

24  A.   Yes, I gave him a statement.

25     Q.   And before he started to type up this statement he

S. BROOKS - CROSS BY FLORCZAK                              84

1   would ask you questions, didn't he?

2   A.   Yes.   He started out What was my name.

3        Q.   Didn't he ask you about what Marvin told you?

4   A.   Yes, he did.

5        Q.   And that's before he started taking the statement?

6   A.   No.

7        Q.   Before they started to, he didn't ask you anything at

8   all before they started to type the statement except what your

9   name was?

10  A.   He didn't ask me anything until he started this statement.

11  Like when he got further into it that's when he start asking me

12  questions about Marvin Mathis.

13       Q.   So do you recall at any time whether you told him that

14  Marvin told you that Antwan produced the gun and struggle

15  ensued?

16  A.   He told me he did, and it was by mistake.

17       Q.   You never said that to officer, Detective Koczur?

18  A.   No, I did not.

19       Q.   When he first asked you to say that he was with you

20  between seven and eleven or was it eight -- seven and eleven,

21  you told him no, is that correct?

22  A.   Yes, I told him no.

23       Q.   And he wasn't mad about that, was he?

24  A.   No.   I asked him why.   And he --

25       Q.   My question is, Was he angry or mad about it?

S. BROOKS - CROSS BY FLORCZAK                                85

1    A.   Oh, no.

2         Q.   Did these four or five people who approached you scare

3    you?

4    A.   Sort of, when I came back from fish market, from my older

5    sister.

6         Q.   And they are the ones that told you that Marvin did

7    this, is that correct?

8    A.   The one that pulled me into my hallway.

9         Q.   Now, what else did Marvin tell you at that time?  Tell

10   you anything else?

11        MR. KOLANO:  If you can be more specific as to which

12   time.

13        Q.   At the time you say he admitted to shooting this man?

14   A.   No, he didn't.  I started crying and went to my first

15   period class.

16        Q.   Well, he did tell you he was with Antwan, did he?

17   A.   Yes, did he.

18        Q.   Tell you about being with anyone else?

19   A.   No.   From what I was hearing on the street I heard there

20   was two --

21        Q.   I don't want to know what you heard on the street.  I

22   am just asking what Marvin told you.

23   A.   He told me that he was with Antwan.

24        Q.   Okay.  Tell me, can you tell the difference between

25   what Marvin told you and what you heard on the streets?

S. BROOKS - CROSS BY FLORCZAK                          86

1  A.  Yes, I could.

2      Q.   Did you tell anyone that Marvin turned himself in?

3  A.  No.  He, he came to me.

4      Q.   That's my only question.  You didn't tell -- tell

5  anyone that Marvin turned himself in?

6  A.  No.

7      Q.   Okay.  You didn't tell Renee Diggs that Marvin turned

8  himself in?

9  A.  No.

10     Q.   Do you know Renee Diggs?

11  A.  Yes, I do.

12     Q.   So if she says that you told her --

13         MR. KOLANO:  Objection.

14         THE COURT:  Sustain the objection.

15         MR. FLORCZAK:  I withdraw the question.  I have

16  nothing further of this witness.

17  REDIRECT EXAMINATION BY MR. KOLANO:

18     Q.   You wanted to finish one of your answers before and

19  you were stopped.

20     Did Marvin say anything about turning himself in?

21  A.  No.

22     Q.   Did he indicate any plans to do that?

23  A.  Yes.  He told me to do it for him.

24     Q.   And please tell us about how that came about.

25  A.  I was, I believe I was going upstairs to one of my classes

- S. BROOKS -                                              87

1   and he approached me and he like, Oh, I am scared, I want you

2   to turn me in, you know.  Because I was like, okay.

3       Q.   And is that why you --

4       Well, have you ever heard the phrase sucked his teeth?

5   A.  Yes.

6       Q.   What does that mean?

7   A.  I believe when he told me if anyone approached me and ask

8   was he with me between seven and eleven I told him no.  And --

9       Q.   Okay.

10  A.  I told him no.  And he sucked his teeth.

11      Q.   What does that mean?

12  A.  Like, turned away from me.

13      Q.   What's your feelings about Marvin as you sit here

14  today?

15  A.  My feelings towards him?  You know --

16      Q.   Let me rephrase that.  Do you have any motive to lie?

17  A.  No.

18      Q.   Do you like him?

19  A.  Not any more.

20      Q.   Did you like him at the time?

21  A.  Yes.

22      Q.   When you told the police, gave your statement on the

23  24th of January, did you have a motive to lie?

24  A.  No.

25      Q.   Why did you tell the police things that you did back

1  then?

2  A.  Because I didn't want to, you know, get myself in trouble.

3      Q.  Did you tell them the truth as best you could?

4  A.  Yes, I did.

5      Q.  Are you in high school still?

6  A.  Yes, I am.

7      Q.  Did you take final exam today?

8  A.  Yes, I did.

9      Q.  Did you -- Do you have another big final exam

10  tomorrow?

11  A.  Yes, I do.  Major.

12          MR. KOLANO:  Thank you.  Nothing further.

13          THE WITNESS:  All right.

14          THE COURT:  Mr. Florczak.

15          MR. FLORCZAK:  Yes, judge.

16  RECROSS EXAMINATION BY MR. FLORCZAK:

17      Q.  How much of what you testified to could you remember

18  without this statement?

19  A.  I was fifteen, so --

20      Q.  I am not blaming you.  I am just asking you, how much

21  of it could you remember without this statement?

22  A.  Say about, about 85 percent.

23      Q.  You weren't able to remember what Marvin said to you

24  without reading it in the statement, could you?

25          Didn't you have to read the statement before you -- ?

- S. BROOKS -                                    89

1  A.  Yes.

2      Q.  So you didn't remember what he told you until you read

3  the statement?

4  A.  I remember when he told me, but I didn't know exactly, for

5  exact word after word.

6      Q.  Now, is there anywhere in that statement where he says

7  anything asking you to, to turn him in?

8  A.  No.

9      Q.  Well, did you write it down anywhere?

10 A.  No.

11     Q.  But that's something you remember?

12 A.  Yes.

13     Q.  Just today?

14 A.  Yes, it is, because that's when he told me, when he told me

15 that's when I was, I was, you know, that's like in the morning,

16 like I was going upstairs to my biology class, I believe.

17     Q.  When did he tell you that he, he was involved in this

18 thing about the shooting?

19 A.  He told me 24th.

20     Q.  What time?

21 A.  In the morning.

22     Q.  Now, this turn yourself thing in when did that occur?

23 A.  I was -- I believe I was, I was with my best friend, I was

24 going up the stairs, I remember that.  It was him and his

25 cousin, and they approached me.

- S. BROOKS -                                    90

1      Q.   I am sorry.  When did this occur?

2   A.  It was on the day of the 24th.

3      Q.   Was it before he told you about the shooting, after?

4   A.  After the shooting, after he told me about the incident.

5      Q.   How long after?

6   A.  I can't recall.  I had a better memory back then.

7      Q.   Well, he told you early in the morning, is that

8   correct?

9   A.  Yes, he did.

10      Q.   And because within five or ten minutes you, well,

11   immediately after he told you you were crying, isn't that true?

12   A.   Yes.  And he -- I believe I might have, I think I was

13   coming from my biology class, and he approached me with his

14   cousin, his cousin Terrell, and he says Oh, I am scared, could

15   you turn me in?  I was like Okay.

16      Q.   My question is, he told you about the shooting, you

17   got upset and started crying?

18   A.  Yes.

19      Q.   And you almost immediately went to the security

20   officer?

21   A.  No, I didn't.  Because my --

22      Q.   Go ahead, finish.

23   A.  No, I didn't, because my best friend Towana was consoling

24   me.

25      Q.   For how long did she console you?

- S. BROOKS -                                        91

1   A.   It was for a while.  Because the teacher told her to take

2   me out in the hall because I was upset.

3        Q.   Was it five minutes, half hour?

4   A.   I can't recall.  I had better memory back then.

5        Q.   After she consoled you, you at least reported it

6   before ten o'clock in the morning, didn't you?

7   A.   Say that again.

8        Q.   Did you report this to whomever you told about it

9   before ten o'clock that morning?

10  A.   It was in the morning, but I don't know the hour exactly.

11       Q.   You were at the station, police station by 11:05.

12  That's when they started to take your statement, is that

13  correct?

14  A.   I wasn't paying attention to the hour.

15       Q.   If you look at your statement -- Do you have it in

16  front of you?

17  A.   Yes, I do.

18       Q.   And on the top first page gives the time, 11:05 a.m.

19  A.   Okay.

20       Q.   Is that approximate time they started to take your

21  statement?

22  A.   I guess.  I believe so.

23       Q.   So that how long were you at the school before they

24  even took you to the police station?

25  A.   I was there the whole morning.

- S. BROOKS -                                    92

1      Q.   And did they take Marvin before they took you?

2   A.   Yes, they did.

3      Q.   Were you there when they took Marvin?

4   A.   I was in school, but I wasn't in his presence when they

5   escorted him out the building.

6           MR. FLORCZAK:   I have nothing further.   Thank you.

7   REDIRECT EXAMINATION BY MR. KOLANO:

8      Q.   Janice Sutton was in with you when you gave your

9   statement to the police?

10  A.   Yes, she was.

11     Q.   And Mr. Florczak asked you some questions about you

12  said you remembered about 85 percent without using your

13  statement, and the other 15 percent you needed the statement?

14  A.   Yes.

15     Q.   And that statement was given on January 24th, 1996?

16  A.   Yes, it was.

17     Q.   And that was the same day, I think you have already

18  testified, that Marvin admitted his involvement?

19  A.   Yes.

20     Q.   Was your recollection then, a couple of hours

21  afterwards, much better then than it is today?

22  A.   Can you explain that.

23     Q.   When you gave the statement to the police --

24  A.   Yes.

25     Q.   -- it was the same day that you actually heard the

1  confession from Marvin.

2  A.  Yes.

3      Q.   And it wasn't your fault that this case took two and a

4  half years to come to trial, was it?

5  A.  No.

6      Q.   When you gave the police the statement that day, hours

7  after you heard it, was your, were you being accurate to the

8  police?

9  A.  Yes, I was.

10     Q.   And was your memory good?

11 A.  Yes.

12     Q.   Since events were only an hour or day old at most?

13 A.  Yes.

14          MR. KOLANO:  Nothing further.

15          MR. FLORCZAK:  Just one.

16 RECROSS EXAMINATION BY MR. FLORCZAK:

17     Q.   Was there some reason why you couldn't remember on

18 January 24th that he asked you to turn him in but you remember

19 it here two and a half years later?

20 A.  I remembered that quote from him.

21          MR. FLORCZAK:  Okay.  Thank you.

22          I have nothing further.

23          MR. KOLANO:  Your Honor, based on the side bar, Miss

24 Brooks may be subject do recall.

25          THE COURT:  Miss Brooks, you may step down, but you

94

1    remain under subpoena as a witness in this matter.   You may be
2    called again.

3            THE WITNESS:   Oh, okay.

4            THE COURT:   Are you all right?

5            THE WITNESS:   Yes, I am okay.

6            THE COURT:   Fine.

7            I think we are at the end of day.   We are going to
8    recess for the evening.

9            I want to remind you, members of the jury, not to
10   engage in any discussions regarding the case, not among
11   yourselves not with anyone else.

12           Tomorrow morning report directly to this courtroom.
13   Once again, door should be open by 8:30 so that you can come in
14   any time between 8:30, but please be here by nine and assemble
15   inside the jury room.

16           I am going to ask you to retire to the jury room now,
17   collect any personal belongings you may have there.   Wait in
18   the jury room until the officer then releases you for the
19   evening.

20           (Jury withdrew from the courtroom.)

21           THE COURT:   Jury is in the jury room.   Mr. Mathis is
22   going to be escorted from the courtroom.

23           (PROCEEDINGS TERMINATED FOR THE DAY)

24

25

95

C E R T I F I C A T E

      I, B. PETER SLUSAREK, C.S.R., License No. XI00291, an Official Court Reporter of the State of New Jersey, do hereby certify the foregoing to be prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript to the best of my knowledge and ability.


_____    Date: March _15_ 1999.

B. PETER SLUSAREK, C.S.R., XI00291

Official Court Reporter

Union County Courthouse,

Elizabeth, New Jersey,