KOCZUR -  DIRECT BY KOLANO                      71

1        "Answer:  One twenty or one thirty.

2        "Question:  What was she wearing at the time of this

3   robbery and homicide?

4        "Answer:  Orange jacket and the scarf on her head,

5   and she had bluejeans on and pink Reebox.

6        "Question:  I am now going to show you an Elizabeth

7   Police Department photo array containing six black females.  I

8   am going to ask you if you recognize any one of those photos.

9        "Answer:  Number three.

10        "Question:  I am now going to ask you to sign the

11   back of the photo and place today's date.  Are you willing to

12   do so?

13        "Answer:  Yes.

14        "Question:  Can you describe Renee to me?

15        "Answer:  Light-skinned, about my height, big eyes,

16   about five ten, about one thirty or one forty.

17        "Question:  What was she wearing at the time of this

18   homicide.

19        "Answer:  Black jeans, Tomy Hilfiger, and she had it

20   turned outside in.  The color was black, red, and white.  And

21   she is twenty or twenty one.

22        "Question:  How long have you known her?

23        "Answer:  Not too long.

24        "Question:  To your knowledge, do you believe this

25   gun -- where do you believe this gun is at right now?

KOCZUR - DIRECT BY KOLANO                               72

1        "Answer:  I don't know.  Antwan might have it."

2    Q.   Let me stop you, detective.

3    You indicated that the names April and Renee Diggs came up

4    for the first time in the written statement?

5    A.  Yes, sir.

6        Q.  And you showed, according to the statement, a photo

7    array of each of the women?

8    A.  Yes.

9        Q.  How was that accomplished?

10   A.  As I was doing that Detective Keith White was also in our

11   office and he was assisting me during this investigation, and

12   he made one photo array of April Diggs from the juvenile bureau

13   and he made the second photo array of Renee Diggs and he got

14   that from the identification bureau.

15       Q.  And this was being done while you were continuing with

16   the statement by someone else?

17   A.  Yes, sir.

18       Q.  Then he came in and gave you the photo arrays?

19   A.  Yes, sir.

20       Q.   Please continue.

21   A.  "Question:  So the boy you told --

22           "Question:  So the boy you told us came from

23   Carteret had nothing to do with this robbery, is that correct?

24           "Answer:  Yes.

25           "Question:  And there is no boy from Carteret

KOCZUR - DIRECT BY KOLANO                                73

1    involved in this robbery, that you know of?

2              "Answer:  No.

3              "Question:  The only people involved in this robbery

4    are the four of you that night.

5              "Answer:  Yes.

6              "Question:  Before we complete this statement I want

7    to show you a Union County Sheriff's Office photo

8    identification folder containing the photos of six black males.

9    I am going to ask you if you recognize Antwan in these photos.

10             "Answer:  Yes.  Number four.

11             "Question:  Who is is that?

12             "Answer:  Antwan.

13             "Question:  I am going to ask you to place your

14   signature on the back of this photo you identified.

15             "Answer:  Same complies.

16             "Question:  I am also going to ask you to place your

17   initials on the remaining five photos.

18             "Same complies.

19             "Question:  I am now going to show you an Elizabeth

20   Police Department photo array containing the photos six black

21   females.  Do you recognize Antwan in these photos?

22             "Yes.  Number five.

23             "And who is that?"

24       Q.    Does it say recognize Antwan or anyone?

25   A.   I am sorry.  It's Anyone.

KOCZUR -  DIRECT BY KOLANO                          74

1             "And who is that?

2             "Answer:  Renee.

3             "Question:  I am going to ask you to place your

4     signature and date on the back of the photo you identified.

5             "Answer:  Same complies.

6             "Question:  Is there anything else you wish to add

7     to this statement?

8             "Answer:  No.

9             "Question:  From the time that you left your last

10    written statement to this time how were you treated by members

11    of the Elizabeth Police Department?

12            "Answer:  Okay.

13            "Question:  After you and your mother read the

14    statement over and find it to be true and correct are you

15    willing to sign it in your own handwriting?

16            "Answer:  Yes."

17      Q.    And at that point in time is Mr. Mathis given an

18    opportunity to read over that statement?

19    A.   Yes, he is.

20      Q.    And apparently he made the one change only where he

21    wrote in Yes and then initialed that?

22    A.   That is correct.

23      Q.    And was an oath administered to him prior to him

24    signing this statement?

25    A.   Yes, it was.

KOCZUR -  DIRECT BY KOLANO                        75

1        Q.   And that was by notary Lydia Martinez?

2   A.   Yes, it was.

3        Q.   Whose signature appears here?

4   A.   Marvin Mathis.

5        Q.   Whose signature appears here?

6   A.   Lydia Martinez.

7        Q.   Whose signature appears under Marvin Mathis'?

8   A.   Linda Mathis'.

9        Q.   Whose signature appears here?

10  A.   That's mine.

11       Q.   And was Miss Mathis there for that entire statement?

12  A.   Yes, she was.

13       Q.   Throughout any of your contact with Mr. Mathis, were

14  any force, threats or coercion used on him in any way, shape,

15  or form?

16  A.   No, sir.

17       Q.   Was everything voluntary, voluntarily done as far as

18  you are aware?

19  A.   Yes, sir.

20       Q.   Now, there was an indication there that Renee Mathis

21  had on a Tomy Hilfiger jacket that was red, white, and blue or

22  red white and black, and it was turned inside out?

23  A.   Yes, sir.

24       Q.   The next day, on January 25th, 1996, did you

25  participate in the arrest of April Diggs and Renee Diggs?

KOCZUR -   DIRECT BY KOLANO                              76

1   A.   Yes, I did.

2        Q.   And the basis for arresting of the women, April and

3   Renee Diggs, came from the statement of Marvin Mathis?

4   A.   That is correct.

5        Q.   And that was the only person who had provided any

6   information to the police up to that point as to the

7   involvement of each of these women?

8   A.   That is correct.

9        Q.   You had court authorized arrest warrant for Renee and

10  April Diggs?

11  A.   Yes, sir.

12       Q.   As well as Antwan Harvey?

13  A.   Yes, sir.

14       Q.   That was based on information provided by Marvin

15  Mathis in the statement that you read here?

16  A.   Yes, sir.

17       Q.   In that statement Marvin Mathis indicates that April

18  Diggs was wearing Reeboks?

19  A.   Yes, sir.

20       Q.   Were those subsequently found and located?

21  A.   Yes.

22       Q.   Did you take those to corroborate the statement to

23  show that they were Marvin's words?

24  A.   Yes, I did.

25       Q.   Did you know about the pink sneakers before Marvin

KOCZUR -   DIRECT BY KOLANO                          77

1   mentioned them?

2   A.   No, sir, I did not.

3        Q.   I am going to show you what has been previously marked

4   S-30 for identification.   I ask you to look at it.   Do you

5   recognize that?

6   A.   Yes.

7        Q.   What is that?

8   A.   These are the pink sneakers belonging to April Diggs which

9   came into my possession on 1/25/96.

10       Q.   Now I am going to show you what has been marked S-27

11  for identification.   I ask you to look at it.   Do you recognize

12  it?

13  A.   Yes, I do.

14       Q.   What is this item?

15  A.   This is the coat that was worn by Renee Diggs that came

16  into my possession 1/25/96.   This label was placed by me.

17  That's my handwriting with case number.

18       Q.   This was the one described by the defendant I think he

19  said red, white and black?

20  A.   Yes.

21       Q.   He said that it was turned inside out?

22  A.   That's correct.

23       Q.   And, again, turning this inside out would hide the

24  colors of red and white?

25  A.   Yes, sir.

KOCZUR -   DIRECT BY KOLANO                                78

1      Q.   And, again, prior to the defendant telling you that

2  this was what Renee Diggs was wearing at the time, did you or

3  the police have any information as to that?

4  A.   No, I did not.

5      Q.   So this would corroborate what the defendant said --

6  A.   Yes, sir.

7      Q.   -- in that regard.

8      Did you also receive or the police receive a court

9  authorized search warrant to go to 224 Third Street in

10 Elizabeth?

11 A.   Yes, sir.

12     Q.   And at that location was an item located that was of

13 evidentiary value?

14 A.   Yes, sir, it was.

15     Q.   And what was that item?

16 A.   Black ski mask.

17     Q.   And did you seize that?

18 A.   Yes, sir.

19     Q.   Showing you what is marked S-28 for identification, I

20 ask you to look at it.  Do you recognize that?

21 A.   Yes, sir.

22     Q.   What is that?

23 A.   That is the black ski mask that came into my possession

24 shortly after this homicide.

25     Q.   And why is it that you chose 224 Third Street to go

KOCZUR -   DIRECT BY KOLANO                        79

1   to?

2   A.  That is the apartment of Stephen Owens, and he is a very

3   close friend of all the defendants in this case.  And they were

4   there right after the shooting with the firearm.

5       Q.   Was the firearm recovered at that location?

6   A.  No, sir, it was not.

7       Q.   Now, was a firearm recovered in this case?

8   A.  Yes, sir.

9       Q.   Was that recovered by you?

10  A.  No, sir, it was not.

11      Q.   As a detective and a police officer for twenty one

12  years, were there any bullets or casings found in this entire

13  investigation?

14  A.  No.

15      Q.   Was there a small fragment found at the autopsy?

16  A.  Yes, sir.

17      Q.   Was that suitable for any type of forensic or

18  ballistics testing?

19  A.  No, sir.

20      Q.   Without a bullet or casing can one ever determine that

21  a gun is the murder weapon?

22  A.  No.

23      Q.   Is there any way to know which gun was the murder

24  weapon in this case?

25  A.  No, sir.

KOCZUR - DIRECT BY KOLANO                                   80

1    Q.   Now, from your handling this investigation from the

2    inception to today did you receive from any source whatsoever

3    in any way, shape or form a permit for Marvin Mathis to own or

4    possess a handgun?

5    A.   No.

6    Q.   You indicated on the day following the statement by

7    Marvin Mathis that you participated in the court authorized

8    arrest of Renee and April Diggs?

9    A.   Yes, sir.

10   Q.   Did you participate in the taking of a statement from

11   Renee Diggs?

12   A.   Yes, sir.

13        MR. KOLANO:  If I may have two items marked.  First

14   statement Renee Diggs, second statement of April Diggs.

15   Q.   I am going to show you what has been marked S-45 for

16   identification.  I ask you to look at it.  Do you recognize

17   that?

18   A.   Yes, sir.

19   Q.   And what is that?

20   A.   This is the typewritten sworn statement provided by Renee

21   Diggs on 1/25/96.

22   Q.   What time does this typewritten statement begin?

23   A.   12:15 p.m.

24   Q.   And the statement was taken by which detective?

25   A.   By myself.

KOCZUR -   DIRECT BY KOLANO                    81

1       Q.    Who was the typist for this particular statement?

2   A.   Jean Butler.

3       Q.    Is she also a civilian secretary in the police

4   department?

5   A.   Yes, sir.

6       Q.    Did you conducted an oral interview of Renee Diggs

7   prior to going to the written statement?

8   A.   Yes, sir.

9       Q.    And at this point she was under arrest?

10  A.   Yes, she was.

11      Q.    Now, from the time that she was arrested --

12      Did she and April live in the same house or same apartment?

13  A.   No.

14      Q.    Did they live in the same housing complex?

15  A.   No.   Same housing complex.   Yes.

16      Q.    And were they brought in together or in separate cars?

17  A.   Separate cars.

18      Q.    From the time that the police arrested each of them

19  were they kept separate?

20  A.   Yes, they were.

21      Q.    And you indicated what time that that statement began?

22  A.   12:15 p.m.

23      Q.    Now, sir, I am going to ask you to look at what is

24  marked S-46 for identification.   Do you recognize that?

25  A.   Yes, sir, I do.

KOCZUR - DIRECT BY KOLANO                               82

1      Q.   What is that?

2   A.   This is the voluntary statement given by April Diggs.  This

3   was also done in the presence of her mother Darlene.  That was

4   on 1/25/96.  And this statement was given to Detective Keith

5   White.

6      Q.   What time did the statement begin?

7   A.   Twelve noon.

8      Q.   So these statements were taken, except for fifteen

9   minutes, start time, simultaneously?

10  A.   Yes, sir.

11     Q.   And while these women were in your presence did they

12  have any opportunity to get together to, quote, get their

13  stories straight?

14  A.   No, sir.

15     Q.   Did you subsequently go back to 224 Third Street in

16  Elizabeth with another search warrant?

17  A.   Yes, sir, I did.

18     Q.   And were you authorized to and did you receive a video

19  tape?

20  A.   Yes, I did.

21     Q.   And did you in fact seize many video tapes, but one in

22  particular?

23  A.   Yes, sir.

24     Q.   And did you receive court authorized authority to view

25  that video tape?

KOCZUR -  DIRECT BY KOLANO                          83

1    A.   Yes, sir.

2         Q.   And did you in fact view that video tape?

3    A.   Yes, I did.

4         Q.   Without telling us the details of anything on the

5    video tape, was Marvin Mathis on the tape?

6    A.   Yes.

7              MR. FLORCZAK:  I object, unless they show some kind of

8    relevancy.

9              MR. KOLANO:  It will show the togetherness of Antwan

10   Harvey and as well as Renee Diggs, and that they were not

11   strangers to one another.

12             THE COURT:  I will overrule the objection.

13        Q.   Was Antwan Harvey on the video tape?

14   A.   Yes.

15        Q.   Was Marvin Mathis on the video tape?

16   A.   Yes.

17        Q.   Was April Diggs on the video tape?

18   A.   Yes.

19        Q.   Was Renee Diggs on the video tape?

20   A.   Yes.

21        Q.   Now, detective, if I can have you step down, please.

22   Referring you to what has been marked S-42.  If you can just

23   grab that end so we can pull that out, please.

24        You have never seen this document, have you?

25   A.   No, I have not.

KOCZUR -   DIRECT BY KOLANO                              84

1        Q.    I want you to take a minute just to look, as a

2   detective who has worked in Elizabeth, to see if you recognize

3   generally what it represents?

4   A.   Downtown area of Elizabeth, New Jersey.

5        Q.    Here there is writing Portuguese American liquor store

6   709 East Jersey Street?

7   A.   That's correct.

8        Q.    And there is 658 South Park Street where the wallet

9   was found?

10  A.   Yes, sir.

11       Q.    Based on your being an officer in Elizabeth for twenty

12  one years, is this a fair and accurate depiction of the

13  relative locations?

14  A.   Yes, this is.

15       Q.    And here is an indication of 224 Third Street.   Is

16  that where you executed the two search warrants?

17  A.   Yes, sir, I did.

18       Q.    Is that also a fair and accurate depiction of the

19  locations?

20  A.   Yes, sir, it is.

21       Q.    Would you please point out -- and there is a pointer

22  here -- since there was reference made about Elizabeth Avenue,

23  where Elizabeth Avenue is.

24  A.   This is Elizabeth Avenue right here.

25       Q.    Okay.   And there was reference made to New Point Road.

KOCZUR -  DIRECT BY KOLANO                              85

1   A.  New Point Road is -- -- pause -- right here.

2       Q.   Now, --

3   A.  New Point Road, doesn't indicate, it does run up into

4   Elizabeth Avenue, to Union Square.

5       Q.   Seventh Street?

6   A.  Seventh Street is here.

7       Q.   Seventh is here, and this is East Jersey Street?

8   A.  Yes, sir.

9       Q.   Okay.  And is there in fact Chinese restaurant next to

10  Portuguese American liquor store?

11  A.  Yes, there is.

12      Q.   Alexian Brothers, is that actually a hospital?

13  A.  At that time it was old Alexian Brothers, but that was

14  taken over by Elizabeth General.

15      Q.   That was reference to Alexian Brothers?

16  A.  Yes, sir.

17      Q.   That's located?

18  A.  Right here.

19      Q.   Thank you.

20      THE COURT:  We will take the morning recess at this

21  point.  This will be a convenient place to break.

22      Ladies and gentlemen, I want to remind you not to

23  engage in any discussions among yourselves or with others

24  regarding the case.  We are going to take a fifteen minute

25  break.  You can leave the courtroom during that time.  When you

KOCZUR -  DIRECT BY KOLANO                         86

1   do return, assemble inside the jury room.

2           Thank you.

3           (Jury withdrew from the courtroom.)

4           (Short Recess).

5           THE COURT:  Please have the jurors brought out.

6           (Jury seated in the jury box in the courtroom.)

7           THE COURT:  Mr. Kolano, any additional direct

8   examination?

9           MR. KOLANO:  Very briefly.

10      Q.    Detective, just going back.

11      When you finished the second statement with the defendant,

12  in his mother's presence, what did you do with the statement

13  prior to him signing it?

14  A.  At that time I asked both him and his mother to read every

15  page of the statement.  If they understood each page of the

16  statement to place Marvin Mathis' initials at the bottom of

17  that.

18      If they see anything, any corrections, or anything they

19  felt uncomfortable with, they were to bring it to my attention.

20  If a change was to be made Marvin Mathis was to either add it,

21  change it, or place his initials alongside the correction.

22      Q.    Were there any changes?

23  A.  Yes, there were.

24      Q.    Which ones?

25  A.  On the bottom page of his second statement a question is

KOCZUR -  DIRECT BY KOLANO                              87

1    asked:  So all of four of you committed this robbery.  At the

2    end of this page the letter A was omitted so Marvin Mathis

3    added the word A into it.  He put the word Yes next to it, and

4    he placed his initials.

5         Q.   That was the only change made?

6    A.   Yes, sir.

7              MR. KOLANO:   Thank you.

8              Nothing further.

9    CROSS EXAMINATION BY MR. FLORCZAK:

10        Q.   Isn't it true, detective, that A and the answer Yes

11   were not omitted.   They just simply appeared on the next page?

12   A.   Yes, sir.

13        Q.   Okay.  Now, there are no corrections or additions to

14   the first statement he gave, is that correct?

15   A.   No, sir.

16        Q.   No, sir, there were no changes?

17   A.   In the first statement there were no changes, sir.

18        Q.   Thank you.

19   And on Tuesday, when we had the hearing you testified that

20   there were no changes in either statement.   Is that correct?

21   A.   That is correct.

22        Q.   Okay.  But today when you were reading it again, you

23   came across this Yes and this MM written in handwriting, is

24   that correct?

25   A.   Yes, sir.

KOCZUR - CROSS BY FLORCZAK                                    88

1    Q.   And that somehow refreshed your recollection?

2    A.   It was only when I realized pages were in disarray did I

3    realize that I missed this part of the statement on Tuesday.

4    Q.   When you said, when you testified on direct, when

5    asked about it by the prosecutor, you said, apparently Marvin

6    Mathis found this when he was reading it, and wrote in Yes and --

7    A.   Sir, it was obviously, I don't know if I used apparently,

8    but it's obvious that he did.

9    Q.   Isn't it true you used the word apparently and said

10   that he wrote it in because you assumed that's what happened

11   rather than actually remembering that's what happened?

12   A.   Sir, I don't remember exactly which word I used.

13   Q.   Well, do you actually remember this happening?

14   A.   No, sir, I don't.

15   Q.   Okay.  So you are assuming that he was the one who did

16   it from looking at it, not from actual memory of it happening,

17   is that correct?

18   A.   Sir, that's his answer, his initials.  He did it.  There is

19   no assumption there.  He did it.  He made that correction.

20   Q.   You are saying this is his handwriting, this Yes?

21   A.   Yes, it is.

22   Q.   Other than his signature, do you have any other

23   samples of his handwriting?

24   A.   Sir, right below where the word says Yes, through several

25   documents here, also his initials, and they are also his

KOCZUR - CROSS BY FLORCZAK                                89

1    initials.

2        Q.   I am not asking about the initials MM.

3        Do you have any other, other than his initials MM and his

4    signature at the end, do you have any other samples of his

5    handwriting?

6    A.   Sir, MM alongside the word Yes also indicates that he made

7    that correction.

8        Q.   My question -- Perhaps you didn't understand my

9    question.   My question is:

10       Aside from his signature and the MMs on these pages, do you

11   have any other sample of his handwriting?

12   A.   No, sir, I do not.

13       Q.   Now, the question deals with whether he intended to

14   rob people.   Is that correct?

15   A.   Yes, sir.

16       Q.   Now, your questioning started approximately 12:09 p.m.

17   on that day, is that correct?

18   A.   On the first statement, sir?

19       Q.   Your first questioning of this individual, Marvin

20   Mathis, when did you first start questioning him?

21   A.   About the details of this case?

22       Q.   Yes.

23   A.   That was shortly after twelve.   Yes, sir.

24       Q.   It was after he signed the waiver of his rights form,

25   is that correct?

KOCZUR - CROSS BY FLORCZAK                              90

1    A.   Yes, sir.

2         Q.   And that was signed approximately 12:09 p.m.?

3    A.   Yes, sir.

4         Q.   After that you started questioning him about this

5    incident, is that correct?

6    A.   Yes, sir.

7         Q.   Okay.  And you asked him whether he was involved in

8    any robbery attempt, among other questions?

9    A.   Yes, sir.

10        Q.   And he initially told you No, is that correct?

11   A.   That is correct.

12        Q.   And he told you No during the oral interview before

13   the first statement was taken, is that correct?

14   A.   Yes, sir.

15        Q.   And at 2:30 you started taking the first statement.

16   If I can find it.  Approximately 2:30 p.m. you started taking

17   the first statement from him, is that correct?

18   A.   Yes, sir.

19        Q.   And during that statement you asked him essentially

20   whether he was involved in robbery or knew, intended to rob

21   anyone, is that correct?

22   A.   That is correct.

23        Q.   And he denied it during that statement, is that

24   correct?

25   A.   Yes, sir.

KOCZUR - CROSS BY FLORCZAK                                    91

1      Q.   And finally, sometime around six p.m. he somehow

2  admitted being involved in the robbery, is that correct?

3  A.   Yes, sir.

4      Q.   So you questioned him.  How many times in almost six

5  hours of questioning him did you ask him whether he was

6  involved in a robbery before he finally said Yes?

7  A.   Several.

8      Q.   Excuse me?

9  A.   Several times, sir.

10     Q.   Were there more than ten, do you know?

11 A.   No, I don't know.

12     Q.   And in the statement where he finally admits it

13 nowhere in the statement does he say I was involved in the

14 robbery.

15     Rather, it's a question where you used the words.

16     For instance, on page two, part of the question is, in the

17 second interview after 5:45:  You stated to me in the presence

18 of your mother before the first attempted robbery and robbery

19 and homicide you intended to rob people with Antwan.  Is that

20 correct?

21     In other words, you used those words, and what he has is

22 Yes, is that correct?

23 A.   Yes, sir.

24     Q.   And any time he admits being involved in the robbery

25 in this statement, like was it your intention, intention of

KOCZUR – CROSS BY FLORCZAK                          92

1   Antwan, and intention of April Diggs and the other female to

2   rob anyone on Elizabeth Avenue, there was an answer Yes.   In

3   other words, you used the words Was it your intention, you said

4   everything, Were you intending to rob rim, he said Yes; is that

5   correct?

6   A.   That is correct.

7        Q.   There is nowhere in the statement where you ask him

8   Tell me what happened, he says I intended to rob someone?

9   A.   No, sir.

10       Q.   Now, all these answers where he says Yes, were those

11  in fact the word he used?

12  A.   Yes.

13       Q.   He never said Yep, he never said Sure?

14  A.   These were the words he used, sir.

15       Q.   He always said Yes?

16  A.   Yes, sir.

17       Q.   He ever just nod his head in answer to a question?

18  A.   No, sir.

19       Q.   So that what time did you first see Marvin Mathis on

20  the, on January 24th, 1996,?

21  A.   Approximately 11:15 a.m.

22       Q.   Was that at a time when you were already taking a

23  statement from Miss Brooks?

24  A.   Yes.

25       Q.   And you stopped taking the statement to go talk to

KOCZUR - CROSS BY FLORCZAK                    93

1   him, is that correct?

2   A.   Yes.

3       Q.   And you found out where his mother was and you sent

4   for her?

5   A.   Yes.

6       Q.   And she was brought to the police headquarters, is

7   that correct?

8   A.   Yes, sir.

9       Q.   And now, your testimony that you advised him of his,

10  his constitutional rights.

11          MR. FLORCZAK:  Do you have that?

12          MR. KOLANO:  It may be up there.

13      Q.   Do you have that form?

14  A.   This is the afternoon one, sir?

15      Q.   I show you what has been marked as S-1.  Can you

16  identify that?

17  A.   Yes.

18      Q.   And that's the form where you advised him of his

19  rights?

20  A.   Yes, sir.

21      Q.   Can I see that, please, for a second.

22  And your manner of doing this is in the presence of his

23  mother you read this form to him, is that correct?

24  A.   Both him and his mother, sir.

25      Q.   You read it to them.  Were you holding this when you

KOCZUR - CROSS BY FLORCZAK                    94

1  read it to them or was it just, do you know whether it was just
2  lying in front?
3  A.   Lying on the table.
4       Q.   It was on the table, and he was sitting there?
5  A.   Yes.
6       Q.   His mother was sitting there?
7  A.   Yes.
8       Q.   And were you sitting there?
9  A.   Yes.
10      Q.   Now, at that time you knew he was fifteen years old,
11 is that correct?
12 A.   Yes.
13      Q.   Were you aware that he had never been arrested before?
14 A.   No.
15      Q.   And you started to read this form.  You said Before we
16 ask you any questions you must understand your rights.
17      One, you have the right to remain silent.  Do you
18 understand this?
19      You read that to him?
20 A.   Yes.
21      Q.   And you waited for a response from him?
22 A.   Yes.  And his mother.
23      Q.   And his mother.
24      And then you had him put his initials there?
25 A.   Yes.

1     Q.   Then you then after he put his initials down you read

2  the second part?

3  A.   Yes.

4     Q.   Were you reading from a separate form or the same one

5  he was signing?

6  A.   Same one.

7     Q.   Okay.   Then, Anything you say can and will be used in

8  a court of law.  Do you understand this?  And he initialed it?

9  A.   Yes.

10     Q.   First indicating that he understood?

11  A.   Yes.

12     Q.   And his mother said she understood?

13  A.   Yes.

14     Q.   Then you asked, You have the right to talk to a lawyer

15  and have him present while you are being questioned.  Do you

16  understand this?

17     And, again, they both indicated they did?

18  A.   Yes.

19     Q.   Did they verbally indicate it or --

20  A.   Yes.

21     Q.   And he initialed it.

22     Then you said, You can decide at any time to exercise these

23  rights and not answer any questions or make any statements.  Do

24  you understand this?

25     Again, they said they understood, and they initialed it?

KOCZUR - CROSS BY FLORCZAK                           96

1   A.   Yes.

2        Q.   Then you read the waiver part?

3   A.   Yes.

4        Q.   And then you had him sign it and the mother signed it,

5   and you signed it, and then you put the time down, is that

6   correct?

7   A.   Yes.

8        Q.   So this entire advising him of the rights took between

9   12:07 and 12:09 p.m.?

10  A.   Yes.

11       Q.   Two minutes.  Did you ask him at any time or his

12  mother to, when they said they understood any rights to explain

13  what that right meant?

14  A.  Can you repeat that, sir.

15       Q.   Did you ask them to explain at any time what the right

16  was that they said they understood?

17  A.  We did not go on to each right until they totally

18  understood each right, sir.

19       Q.   My question is:  Did you ask them at any time to tell

20  you or explain what that right meant?

21  A.  Sir, I don't understand your question.

22       Q.   Okay.  When you asked them, You can decide at any time

23  to exercise these rights and not answer any questions or make

24  any statements, did they answer you, how?

25  A.  We understand.

KOCZUR - CROSS BY FLORCZAK                    97

1     Q.   All right.  Did you at any time say, Can you tell me

2  what that means --

3  A.   No.

4     Q.   -- what I just said to you?

5     So you just assumed when they said we understand or I

6  understand that they, they actually did understand?

7  A.   Yes, sir.

8     Q.   Were you aware at any time that when you were

9  questioning him that Marvin was a special education student?

10 A.   No.

11    Q.   Before you took the second statement, --

12    Do you have that form there?

13 A.   Yes, sir, I do.

14    Q.   Constitutional rights form.  Did you go through the

15 same process?

16 A.   Yes, sir.

17    Q.   You asked him the question, and they initialed it and

18 give the answer?

19 A.   Yes, sir.

20    Q.   How long did that take?

21 A.   Only about a minute.

22    Q.   So from 5:45 to 5:46 you were able to read all these

23 rights, get a response, get it initialed, and have it signed,

24 all within one minute?

25 A.   Yes, sir.

KOCZUR - CROSS BY FLORCZAK                           98

1        Q.   This wasn't a case where you just gave them and told

2   them to sign it?

3   A.   No, sir, not at all.

4        Q.   By the way, as a result of these statements you said

5   that April and Renee Diggs were arrested, is that correct?

6   A.   Yes, sir.

7        Q.   So they were arrested on the 25th?

8   A.   Yes, sir.

9        Q.   Almost three days after the incident occurred, is that

10  correct?

11  A.   Yes, sir.

12       Q.   So they had plenty of time to get any stories together

13  they wanted to, isn't that true?

14  A.   Yes, sir.

15       Q.   The first statement started at 2:30 p.m., the first

16  typewritten statement, is that correct?

17  A.   Yes, sir.

18       Q.   And do you recall how many pages it is?

19       Are the pages numbered?

20  A.   If I may look at the report.

21       It's a nine page statement, sir.

22       Q.   After the statement was completed you asked him and

23  his mother to go over the statement, is that correct?

24  A.   Yes, sir.

25       Q.   Did they go over the statement in your presence?

KOCZUR - CROSS BY FLORCZAK                          99

1    A.   Yes, they did.

2         Q.   Could you tell whether they were reading or whether

3    Marvin Mathis was in fact reading the statement?

4    A.   He appeared to have been reading it.

5         Q.   Did he make any corrections or additions to the

6    statement?

7    A.   No, sir.

8         Q.   Do you as a matter of practice ever intentionally put

9    mistakes in it so that they would be corrected?

10   A.   No, sir.

11        Q.   And at any time did you ask Marvin to read any portion

12   of it to see whether in fact he could even read the statement?

13   A.   No, sir.

14        Q.   Now, you said that Mr. Mathis was brought to police

15   headquarters because of the statement Miss Brooks gave, is that

16   correct?

17   A.   Yes, sir.

18        Q.   And you initially interviewed her before taking the

19   statement --

20   A.   Yes, sir.

21        Q.   -- from her?

22   Did she tell you in her statement that Sharlama Brooks was

23   approached in Miglore Manor by black male who informed her that

24   Marvin Mathis was involved in this homicide.   The next morning

25   at Elizabeth High School Marvin Mathis told Sharlama Brooks

KOCZUR - CROSS BY FLORCZAK                                    100

1    that he and a friend named Antwan were walking on East Jersey

2    Street and got into an argument with the man who was taking out

3    the garbage.  Marvin Mathis stated that an argument had broken

4    out, a gun was produced by Antwan, and during the struggle a

5    shot was fired.

6    A.   That is correct.

7         Q.   And that's what she told you?

8    A.   Yes, sir.

9         Q.   And Marvin told you in his first statement, in each

10   statement, that Antwan was the individual who shot the liquor

11   store owner, isn't that true?

12   A.   Second statement he says he has his hands on the gun when

13   the gun went off.

14        Q.   Did he say that Marvin, I am sorry, that Antwan had

15   pulled the gun?

16   A.   Yes, he did.

17        Q.   Pointing it at the man?

18   A.   Yes.

19        Q.   In fact he was trying to stop him from shooting the

20   man?

21   A.   Yes.

22        Q.   And then in fact in this statement after he admits,

23   says Yes to your question about being involved in intending to

24   rob people, he tells you that, number one, one robbery didn't

25   occur because he told Antwan not to do it.  Isn't that correct?

KOCZUR - CROSS BY FLORCZAK                                101

1   A.   Yes, it is.

2        Q.   And then he also tells you deli robbery didn't occur

3   because he said he wouldn't do it, isn't that true?

4   A.   That is correct.

5        Q.   And then after these incidents when they are

6   approaching the Chinese store he also told you -- you asked him

7   Was it your intention at this time to continue doing the

8   robbery, and his answer was No.

9        On page four toward the bottom of the page.

10  A.   That is his answer, correct.

11       Q.   And this, this is seven, 7:30, probably, statement

12  started 6:50?

13  A.   About that time, yes.

14       Q.   Approaching eight o'clock, this is eight hours after

15  you started questioning him.  Isn't that correct?

16  A.   Approximately.  Yes.

17       Q.   And you indicated in your statement taken from Miss

18  Mathis that from time to time during the questioning she left

19  the room, is that correct?

20  A.   Yes.

21       Q.   And you indicate that on one occasion that was because

22  Mr. Mathis wanted her out of the room, is that correct?

23  A.   Yes.

24       Q.   Can you tell us how long she was out of the room on

25  these occasions?

1   A.   No more than a minute or two on each occasion.

2        Q.   And the questioning continued on each of the

3   occasions?

4   A.   Yes.

5             MR. FLORCZAK:  If I may have a moment, your Honor.

6             THE COURT:  Yes.

7             (Pause).

8        Q.   You have a, you made an approximately fifteen page

9   report?

10  A.   Yes.

11       Q.   Can you tell us when that report was typed, if you

12  recall?

13  A.   I have to look to see what time the typist may have put a

14  date.  If I may refer to my report.

15       Q.   Then I withdraw the question.  When did --

16       In other words, you write it up for the the typist to type

17  it up?

18  A.   Yes.

19       Q.   Do you know when you wrote it up?  That's the

20  important -- ?

21  A.   I was writing it as we were investigating this case.

22       Q.   My main concern is the part about Sharlama Brooks

23  where you write in your report she told you that Marvin Mathis

24  stated an argument broke out, a gun was produced by Antwan, and

25  during the struggle a shot was fired.  Do you know whether that

KOCZUR - CROSS BY FLORCZAK                          103

1  was written in your report or written in your notes when it

2  occurred?

3  A.  Oh not, the report wasn't written as I was investigating

4  it.  I was writing notes, and short time after that then I

5  would write my report.

6      Q.   In this statement from Mr. Mathis each time he

7  indicated to you that Antwan, he met Antwan on the street, is

8  that correct?

9  A.  Yes, sir.

10     Q.   And this other person from Carteret, this Boz, as far

11 as you know, doesn't exist, is that correct?

12 A.  To my knowledge, he does not exist.

13     Q.   And in fact the only person connected to Carteret in

14 this case was Antwan Harvey.  That's where Mr. Harvey was

15 arrested, is that correct?

16 A.  Yes, sir.

17         MR. FLORCZAK:  I have nothing further.  Thank you.

18         THE COURT:  Mr. Kolano.

19 REDIRECT EXAMINATION BY MR. KOLANO:

20     Q.   Mr. Florczak asked you about some of your testimony of

21 Tuesday of this week.

22 A.  Yes, sir.

23     Q.   And that was for a very limited purpose that you were

24 testifying?

25 A.  Yes, sir.

KOCZUR - REDIRECT BY KOLANO                    104

1      Q.   That did not involve going through the statement page

2  by page, line by line, did it?

3  A.   That's correct.

4      Q.   Speaking of that statement, did, did you do a

5  demonstration of the Miranda rights at that hearing on Tuesday?

6  A.   Yes, I did.

7      Q.   Came out to two minutes and ten seconds?

8          MR. FLORCZAK:  Objection.  That was not in evidence.

9          THE COURT:  Sustained.  That was not in evidence.

10     Q.   Do you know how long it took for you to give a

11  demonstration to us?

12  A.   Approximately two minutes.

13     Q.   And how much, how long did you say it took when you

14  did it that actual day?

15  A.   Approximately two minutes.

16     Q.   And now when you say on your time that it started at

17  12:07 and ended 12:09 correct?

18  A.   Yes, sir.

19     Q.   Do you know if that was 12:09 and one second or 12:07

20  and 58 seconds?

21  A.   All I was doing was approximately, sir.

22     Q.   If you wanted to doctor up the document, could you

23  have put 12:07 and 12:10, or 12:11 or 12:13?

24  A.   I could have?  No.

25     Q.   Who was there to stop you or deny you?

KOCZUR - REDIRECT BY KOLANO                                105

1   A.   Well, Mrs. Mathis and Marvin, if they wanted to.

2        Q.   So why did you put 12:07 and 12:09?

3   A.   Because that's the time it started and finished.

4        Q.   Along those lines, there was some questions by Mr.

5   Florczak as to whether or not you asked if the defendant could

6   read.  Do you recall that?

7   A.   Yes, sir.

8        Q.   And he indicated to you what as to his ability to

9   read?

10  A.   That he could read.

11       Q.   And the statements that are contained or words that

12  are contained on the statement were they spoken by the

13  defendant?

14  A.   Yes.

15       Q.   Were they typed accurately by a secretary, since you

16  were there?

17  A.   Yes.

18       Q.   Did his mother also have the opportunity to read the

19  statements?

20  A.   Yes, she did.

21       Q.   Did she appear to read the statement to herself?

22  A.   She did.

23       Q.   Did the defendant appear to read the statement?

24  A.   He did.

25       Q.   Let me ask you this.  If you were trying to pull the

KOCZUR - REDIRECT BY KOLANO                                   106

1   wool over his eyes or get some incriminating statement on him,

2   why didn't you do a better job on either of the statements?

3          MR. FLORCZAK:  Objection, your Honor.

4          THE COURT:  Sustained.

5      Q.   Why did you put in his denials in the first statement?

6   A.  Because that's what he told me.

7      Q.   Why did you put in the fact that he said Antwan was

8   the person who pulled the trigger in the second one?

9   A.  Because that's what he told me.

10     Q.   Why didn't you put that he did it?

11  A.  Because that's not what he told me.

12     Q.   Now, Mr., --

13     Do you have a copy of the second statement up there,

14  detective?

15  A.  Yes, sir, I do.

16     Q.   I am going to ask you to turn to page four.

17     Now, do you recall Mr. Florczak asking you some questions

18  about some prior robberies that were mentioned in the

19  statement?

20  A.  Yes, sir.

21     Q.   And Mr. Florczak brought out the point that the

22  defendant stopped or prevented Antwan from going forward on one

23  of the robberies?

24  A.  That is correct.

25     Q.   Did the defendant tell you why he stopped the robbery?

KOCZUR - REDIRECT BY KOLANO                     107

1   A.   If I can refer to the report, to be accurate.

2        Q.   If you need to.

3   A.   Yes, I do.

4        You want me to answer the question, It was still your

5   intention --

6        Q.   No.  I want to you know if there is anything in there

7   whether, where the defendant says I stopped the robbery of the

8   people because -- ?

9   A.   No.

10       Q.   So do you have any knowledge if he stopped it because

11  it was wrong to do the robbery or because the circumstances

12  weren't right to do the robbery?

13  A.   I have no way of knowing.

14       Q.   He just said, he said No, and that was the end of it --

15  A.   That's correct.

16       Q.   -- in terms of what he told you?

17  A.   That is correct.

18       Q.   Did he at any time ever say no robbery because it was

19  wrong?

20  A.   That's correct.

21       Q.   Did he say, he said because the robbery was wrong, or

22  did he say nothing?

23  A.   Nothing.

24       Q.   Now, Mr. Florczak asked you a number of questions, and

25  basically said all the defendant said was yes, yes, yes in his

KOCZUR - REDIRECT BY KOLANO                                    108

1   answers?

2   A.   That's correct.

3       Q.   Referring to page four, and since and this goes back

4   to the number of robberies -- am I reading accurately?

5               "Question:   What happened then?

6               "Answer:   Antwan saw two Spanish boys, and Antwan

7   and April started running after them real hard and me and the

8   other girl jogged after them."

9        Did I read that accurately.

10  A.   Yes, you did.

11      Q.   That's not a one word answer, is it?

12  A.   No.

13      Q.   And they ran after them.  Is that -- Did I read that

14  accurately?

15  A.   Yes.

16      Q.   Did he say he tried to stop the robbery of the Puerto

17  Rican boys?

18  A.   No.

19      Q.   Spanish boys?

20  A.   No.

21      Q.   And then do you ask the next question, Which way did

22  they run on Sixth Street?

23              "Answer:   We all went towards First Avenue, but they

24  outran us."

25          Did I read that accurately.

KOCZUR - REDIRECT BY KOLANO                    109

1  A.  Yes, you did.

2      Q.  Was that one word answer?

3  A.  No.

4      Q.  Are these accurate as to when I say We all went

5  towards them?

6  A.  Yes.

7      Q.  And they outran us?

8  A.  That's correct.

9      Q.  He didn't say they outran Antwan or the girls, did he?

10 A.  No.

11     Q.  Now, if I can ask you to turn to the next page, again,

12 you remember Mr. Florczak saying basically you only permitted

13 the defendant one word answers?

14     MR. FLORCZAK:  I object to the characterization.  It's

15 untrue.

16     THE COURT:  Sustained.

17     Q.  Do you remember Mr. Florczak asking a question where

18 basically the defendant's answers were yes, yes, yes?

19 A.  That is correct.

20     Q.  And am I reading this accurately:

21     "Question:  What happened between you Antwan and the man

22 that was shot?

23         "Answer:  We -- " Is that accurate, "We --

24 A.  Yes.

25     Q.  -- walked up to the guy.  Antwan grabbed him and tried

KOCZUR - REDIRECT BY KOLANO                        110

1    going into his pockets.  Then the man slapped Antwan's hand

2    from going into his pockets.  Then Antwan grabbed the man and

3    the man grabbed Antwan.  Then the man threw a punch at Antwan,

4    then Antwan threw a punch back at him, then Antwan pushed the

5    man off him and he took the gun and shot him."

6         Is that more than one word answer?

7    A.   Yes, it is.

8         Q.   Is that an answer further expounding than the word

9    Yes?

10   A.   Yes, it is.

11        Q.   Were these his own words?

12   A.   Yes, they were.

13        Q.   You asked him open ended question, and that's what he

14   said?

15   A.   That is correct.

16        Q.   Turn to the next page.

17        Am I reading this accurately:

18             "Question:  How did the gun go off?

19             "Answer:  When all three of us were struggling for

20   the gun."

21         Did I read that accurately?

22   A.   Yes.

23        Q.   Is that an answer that is something more than a simple

24   Yes?

25   A.   You are right.

KOCZUR - REDIRECT BY KOLANO                    111

1      Q.   Is that an open ended question, How did the gun go
2  off?
3  A.   No.
4      Q.   That's not?
5  A.   I am sorry.  It is open ended question.
6      Q.   This was the defendant's answer saying that when he,
7  Antwan, and the victim were struggling for the gun it went off?
8  A.   That's correct.
9           "Question:  Where did you go right after the
10 shooting?"
11          Is that an open ended question, Where did you go?
12 A.   No.
13     Q.   It's a closed question?
14 A.   Yes.
15     Q.   Why is it a closed question?
16 A.   Because I am allowing him to answer with either a yes or no
17 answer.
18     Q.   What does he say?
19 A.   Me and Antwan ran down Seventh Street, like I told you
20 before.
21     Q.   And those were Marvin's words?
22 A.   Yes.
23     Q.   And that's something more than just a yes or no, is it
24 not?
25 A.   Yes.

KOCZUR - REDIRECT BY KOLANO                                    112

1        Q.   And in the first statement he told you that after this

2   shooting robbery he and Antwan ran off together?

3   A.   That's correct.

4        Q.   And he is reconfirming that in this statement that he

5   ran off together?

6   A.   Yes, he is.

7        Q.   And it was down Seventh Street?

8   A.   Yes, sir.

9        Q.   So at no time did he try to distance himself from

10  Antwan Harvey, did he?

11  A.   No, sir.

12       Q.   Even after this robbery and shooting that he said

13  Antwan was the trigger man for he didn't get away from Antwan?

14  A.   No, sir.

15       Q.   And you indicated before that they all ended up at 224

16  Third Street, is that correct?

17  A.   That is correct.

18       Q.   So even after the shooting -- ?

19            MR. FLORCZAK:  I object.  I don't know where that,

20  that comes from.

21            MR. KOLANO:  He testified before.  That's when we got

22  to the chart.

23            MR. FLORCZAK:  He testified as to --

24            This individual didn't testify as to any facts as to

25  where they ended up.

KOCZUR - REDIRECT BY KOLANO                                113

1          MR. KOLANO:  When I asked why he did the search

2    warrant.

3          THE COURT:  There was testimony as to information this

4    witness received.

5          MR. FLORCZAK:  I want to be heard later.

6          I don't think there is --

7          THE COURT:  You want to address that now?

8          MR. FLORCZAK:  Yes, I will address it now.

9    (PROCEEDINGS AT SIDE BAR).

10          MR. FLORCZAK:  There is no testimony from any witness

11   that my client went to that address.  What he does have is that

12   they executed a warrant based on some information at that

13   address.  But there is no testimony my client went to that

14   address.

15          THE COURT:  All right.  He did testify that he had

16   received information that people were at that address.

17          MR. KOLANO:  That they had all gone back to that

18   address.

19          Why did you execute the search warrant?

20          Because that's where they went after the shooting.

21   That's where the gun was.

22          MR. FLORCZAK:  They didn't specify my client, I don't

23   think, in your question.  And I suggest that it is our position

24   he never went back there.

25          THE COURT:  I think there is a fair inference from

KOCZUR - REDIRECT BY KOLANO                           114

1   what he said they, he was referring to all of the people.  But

2   you are right, there was no testimony.  He was relying upon

3   information provided by others and used that information to

4   obtain a search warrant.  So there is no testimony at this

5   proceeding, any direct evidence, first hand testimony, that

6   they were there, that any of them, the four persons allegedly

7   involved here, went to that address.  This witness testified

8   that he had received information to that effect.  So I think

9   perhaps the way the question was phrased could be, could be

10  misleading.

11       I am going to ask you -- I am going to strike the

12  question and ask you to rephrase it to confirm what he said

13  earlier, that he had received information about them being

14  there.

15       MR. KOLANO:  Along those lines, I didn't make an

16  objection because it was already out.  It was inappropriate to

17  bring up lack of prior record.  Goes back to State versus Rays,

18  50 New Jersey.  It's already out.

19       But what I do have a problem is, Mr. Florczak asked

20  the detective if he was aware that Marvin Mathis was a special

21  education student.  That may very well be he is a special

22  education student, and that may be coming out based on promise

23  that he is going to testify.  But that has a connotation, and

24  connotation for me might be different than they are for

25  everyone else.  That requires expert testimony:  Because he

KOCZUR - REDIRECT BY KOLANO                                 115

1    can't even understand simplest of words.

2          Unless there is going to be expert testimony, I am

3    going to ask your Honor to give a curative instruction and say

4    While there is some testimony of special education, you know,

5    you should not assume what the meaning of that is.  You can

6    only make determinations based, based on the evidence and

7    testimony.  And that is something that requires expert

8    testimony.

9          Because that's a kind of reverse inflammatory.

10         MR. FLORCZAK:  I think the request is premature at

11   this point.

12         MR. KOLANO:  The jury thinking this kid is too stupid

13   to give a statement, and he is more likely to be malleable and

14   be led into this.  Because I know I have thoughts about special

15   education, but I have never had any experience so I don't know

16   what it actually is.

17         MR. FLORCZAK:  I asked the question based on the fact

18   that he in fact is a special education student.

19         MR. KOLANO:  So what is he -- advanced, middle level,

20   low level?

21         MR. FLORCZAK:  It goes to the voluntariness of the

22   statement, whether the officer was aware at the time.

23         MR. KOLANO:  But that's like saying someone is

24   schizophrenic without putting a doctor that he is

25   schizophrenic.

1   MR. FLORCZAK:  I wouldn't say it's the same thing.
2  But I can bring evidence that he is classified as special ed.
3  That's no problem.
4   MR. KOLANO:  I think it should, I think that ought to
5  come from an expert as to what special ed means.  What gets you
6  into special ed, what gets you out.  What his abilities are.
7  That's got to come from an expert.  That can't come from his
8  mom or from him.
9   MR. FLORCZAK:  Can't come from school?  School can
10  come in, and they classified.
11   MR. KOLANO:  That's expert testimony.  I am entitled
12  to CV and other stuff.
13   MR. FLORCZAK:  I won't call an expert.  All I am
14  saying school administrator, custodian of that record saying he
15  is classified as special ed.  As to the basis of it, you
16  already have that discovery.
17   MR. KOLANO:  But the person who is going to say the
18  classification needs to be an expert, because it has to mean
19  something to be special ed.  Otherwise, otherwise can I ask the
20  detective has been qualified as expert in criminal
21  investigation, and he says yes, and then he can give his
22  opinion your guy is guilty?  Of course not.  That's basically
23  what you are doing.  You are getting in through categories and
24  classifications things that are, need to be supported
25  substantively by experts.

KOCZUR - REDIRECT BY KOLANO                          117

1      THE COURT:  You are asking for curative instruction at

2  this point or awaiting what it is that the defense presents?

3      I am not sure what the defense is going to present at

4  this point.

5      MR. KOLANO:  I am going, I am asking for curative

6  instruction before the defense ends up putting anything on.

7  But not at this point, because I think we need to sit down,

8  figure out what curative instruction should be.  Probably after

9  lunch.

10      MR. FLORCZAK:  There is no objection made at the time.

11      THE COURT:  This is an issue we will, we don't need to

12  address at this point.  At this moment my concern is with

13  reference to the Third Street address.  I forgot.

14      MR. KOLANO:  Third Street?

15      THE COURT:  224 Third.

16      And I think I am going to sustain the objection to the

17  question on the basis the way it was phrased, because I don't

18  think it is exactly the way the original testimony was.  I

19  think it needs -- The original testimony of this witness was

20  that he had received information, not that he knew that they

21  were there.  I think the way the question was asked implies

22  that he knows who was at 224 Third Street, as opposed to he

23  received some information that people were at 224.  I think

24  that was the original testimony.  It was not objected to then.

25  I think this question gives the, certainly allows the

KOCZUR - REDIRECT BY KOLANO                                    118

1    implication or the inference that he knows who was there.  He

2    didn't say he knew it.  He said he received information.

3             MR. KOLANO:  Okay.

4    (SIDE BAR TERMINATED).

5             THE COURT:  Last question, as posed objection to the

6    last question posed is sustained as to the form of the

7    question.

8             Mr. Kolano, if you would rephrase the question.

9        Q.  Detective, you learned based on information provided

10   to others that the defendant and Antwan Harvey and the girls

11   had gone back to 224 Third Street?

12   A.  That is correct.

13       Q.  You don't know that from personal knowledge, you

14   weren't there to see them get there; is that correct?

15   A.  That is correct.

16       Q.  And that was the basis for your later seeking a search

17   warrant?

18   A.  Yes, sir.

19       Q.  Now, did Mr. Mathis when he originally spoke to you

20   deny any involvement in anything relating to even being a

21   witness to the killing of Mr. Saraiva?

22   A.  Yes.

23       Q.  Did he later basically tell you that that was a lie?

24   A.  Yes.

25       Q.  Did he originally indicate to you that he did not make

KOCZUR - REDIRECT BY KOLANO                        119

1   an admission to Sharlama Brooks?

2   A.   Yes.

3        Q.   Did he later indicate to you that that was a lie?

4   A.   Yes.

5        Q.   Did he in the statements that you read indicate and

6   confirm that he had told Sharlama Brooks that he was involved?

7   A.   No.

8        Q.   Did he call Sharlama Brooks a liar initially?

9   A.   Yes.

10       Q.   Did he originally tell you about somebody from

11  Carteret other than Antwan being involved?

12  A.   Yes.

13       Q.   Did he later tell you that was a lie?

14  A.   Yes.

15       Q.   Did you ever take the time to count up how many lies

16  he told you that day?

17  A.   No.

18       Q.   And in the first statement there was some talk about,

19  well, Mr. Florczak cross examined about him stopping some

20  robberies or stopping a robbery?

21  A.   Yes.

22       Q.   Do you recall that.  Do you recall in the first

23  statement he indicated that after a robbery was planned and did

24  not go through he walked right by his house?

25  A.   Yes.

KOCZUR – REDIRECT BY KOLANO                            120

1      Q.   And did you talk to him about why he then didn't go

2    into his house if he was so concerned about these robberies?

3    A.   Yes.

4      Q.   And what did he indicate?

5    A.   That he wanted to keep walking with them.

6          MR. KOLANO:  Thank you.  Nothing further.

7          THE COURT:  Mr. Florczak.

8    RECROSS EXAMINATION BY MR. FLORCZAK:

9      Q.   Which statement was that in, do you recall?

10   A.   The first one, I believe, sir.

11     Q.   Can you find it for me, please?

12         MR. FLORCZAK:  Page seven, first statement, 10th

13   question down.

14         MR. KOLANO:  Actually 9th question down.

15         THE WITNESS:  Page seven, sir?

16         MR. KOLANO:  Yes.

17   A.   This is the first statement?

18     Q.   Yes.  I want to know where he said that he wanted to

19   keep on walking?

20   A.   Give me a second, sir.  (Pause).

21     "Question:  Why didn't you go home?

22         "Answer:  He said let's take a walk and he will drop

23   me off back home.

24         "Question:  Did you walk past your house?

25         "Yes.

KOCZUR - RECROSS BY FLORCZAK                                    121

1          "Question:  Why didn't you go home?

2          "Answer:  Because he told me come to the Chinese

3    store, and he dropped me back off."

4      Q.   So he went because Antwan told him, right?

5  A.   Yes.

6      Q.   He didn't say it's because he wanted to walk.  It's

7  because Antwan told him to come along to the Chinese store?

8  A.   Yes.

9      Q.   Now, when I asked you all those questions about yes

10  answers, didn't I ask you where he admitted being involved in

11  the robbery or guilty knowledge of a robbery.  Isn't that the

12  questions I asked were the yes answers?

13  A.   Sir, I don't --

14      Q.   Were any questions he answered regarding being guilty

15  of knowing, being part of a robbery, all yes answers?  Were any

16  an explanation by him?

17  A.   Yes.

18      Q.   Which ones?

19  A.   First or second statement?

20      Q.   Any statement?

21  A.   Sir, just the sentences that assistant prosecutor Kolano

22  read.  He read numerous occasions.

23      Q.   In any of those statements did he admit some kind of

24  guilt?

25  A.   Yes.

KOCZUR - RECROSS BY FLORCZAK                    122

1       Q.    Read me one, any one.

2   A.   "Question:  What happened between you, Antwan, and the man

3   that was shot?"

4       Q.    Can you tell me where you are reading?

5   A.   That's the second statement, page five.

6       Q.    Go ahead.

7   A.   "Answer:  We walked up to the guy, Antwan grabbed him and

8   tried going into his pockets.  The man then slapped Antwan's

9   hand from going into his pocket.  Antwan grabbed the man and

10  the man grabbed Antwan.  Then the man threw a punch at Antwan,

11  and Antwan threw a punch back.  Then Antwan pushed the man off

12  of him and took the gun and shot him."

13      Q.    Okay.  What guilt did he admit in that statement?

14  A.   Sir, with the context of the whole statement.

15      Q.    No.  In that answer I want to know what guilt did he

16  admit?

17  A.   Sir, I can't answer that question.

18          MR. KOLANO:  Context of the hole statement.  Otherwise

19  it's misleading.

20          THE COURT:  I will allow the witness to answer the

21  question.

22  A.   Sir, I can't answer that question just based on one answer.

23  Context of the whole statement that leads me to believe that

24  Marvin Mathis is guilty.

25      Q.    In other words, this is your interpretation of the

KOCZUR - RECROSS BY FLORCZAK                        123

1   answer?

2   A.   No, sir.  Everything from what happened in the morning to

3   this statement until that answer is not just one sentence, that

4   he, that he answered, sir.

5        Q.   So when you say he is making a guilty admission you

6   are also including the other question that the prosecutor read

7   about how did the gun go off, when all three of us were

8   struggling for the gun.  You include that?

9   A.   That's just one mart of the entire days proceedings, sir.

10       Q.   Did the prosecutor read that to you?

11  A.   Yes, he did.

12       Q.   Okay.  And do you consider that some kind of an

13  admission of guilt?

14  A.   Yes, I do.

15       Q.   Okay.  Even though he says, before that, And you

16  attempted to help Antwan, is that correct?  And the answer was

17  No.  I didn't want him to shoot that man.  Immediately

18  following that he talks about struggling for the gun.  You

19  interpret that as some kind of guilty intent?

20  A.   Yes, I do.

21            MR. FLORCZAK:  Okay.

22       Q.   And in fact your intention in taking the statement,

23  especially the second statement, is to get Marvin Mathis to

24  admit his guilt in this, in this some way, isn't that true?

25  A.   Sir, I was always trying to get Marvin Mathis to admit his

KOCZUR - RECROSS BY FLORCZAK                    124

1   guilt to this.

2        Q.   So you entered questioning of Marvin Mathis with the

3   opinion that he was guilty, is that true?

4   A.   Sir, I believed he was guilty.

5        Q.   When you started questioning him?

6   A.   Yes, sir.

7        Q.   That's why you questioned him for six, over a period

8   of six or seven hours, not continuously, but over a period of

9   six or seven hours?

10  A.   Yes, sir.

11       Q.   That's why when he continued to deny his guilt you

12  still kept on questioning him, isn't that true?

13  A.   Yes, sir.

14       Q.   Did you at any time think that him being fifteen years

15  old he might just say Yes to get it over with?

16  A.   Absolutely not.   Absolutely not.

17       Q.   Did you at any time tell him or his mother that if he

18  answered the questions and signed a statement he could go home?

19  A.   That's not true.

20       Q.   So you never said that?

21  A.   I never said that.

22            MR. FLORCZAK:   Thank you.   I have nothing further.

23            MR. KOLANO:   I do.

24  REDIRECT EXAMINATION BY MR. KOLANO:

25       Q.   Did you want him to falsely admit his guilt?

1   A.  No.

2       Q.  Was it based on the evidence that you had in the

3   investigation that you reached this conclusion when you answer

4   in response to counsel's question that you always wanted him to

5   admit his guilt?

6   A.  Yes.

7       Q.  Was it your idea to come up with the fictitious Boz

8   from Carteret or someone else's?

9   A.  No.

10      Q.  Who came up with the fictitious Boz from Carteret?

11  A.  Marvin Mathis.

12      Q.  And this was very early on in the oral statement, and

13  then first written statement?

14  A.  Yes.

15      Q.  He was lying to you that early?

16  A.  Yes, sir.

17      Q.  That wasn't as a result of hours of questioning, then,

18  was it?

19  A.  No, sir.

20      Q.  And he started out by lying about being even present,

21  is that correct?

22  A.  Yes, sir.

23      Q.  That was at the very beginning before hours of

24  questioning?

25  A.  That is correct.

- KOCZUR -                                        126

1        Q.    Mr. Florczak made reference to six or seven hours of

2   questioning.   Was that constant?

3   A.   No.

4        Q.    Were there actually long periods of breaks?

5   A.   Yes, sir.

6        Q.    In fact did you testify that one point you left, you

7   went to the prosecutor's office, Detective Furda and Miss

8   Mathis went to go do the consent to search?

9   A.   Yes.

10       Q.    Lunch break?

11  A.   Yes, sir.

12       Q.    And did you continue questioning him because of

13  inconsistencies and what you had learned and developed in the

14  investigation?

15            MR. FLORCZAK:   I object to the leading nature of the

16  question.

17            THE COURT:   Stained.

18       Q.    Why did you continue to question him?

19  A.   Because Marvin Mathis lied to me in the first statement and

20  other investigators, he continued lying, I believed that he was

21  guilty, and I was trying to catch him in as many lies and

22  trying to get the truth out of him as best I could.

23       Q.    Now, if you would refer to page five of the second

24  statement.   Mr. Florczak asked you about inculpatory

25  statements, do you recall that, or at least limited, standing

```
                        - KOCZUR -                     127
```

1   on their own, inculpatory statements?

2   A.   Yes.

3        Q.   Am I reading accurately:

4             "Question:  What did Antwan tell you at this time?

5             "Answer:  He was going to rob this guy and asked me

6   to watch out."

7        Now is that more than one word answer.

8   A.   Yes, it is.

9        Q.   "Who did he want you to watch out for?

10            "Answer:  For the cops."

11       Is that more than one word answer?

12  A.   Yes, it is.

13       Q.   Putting this in context, can you think as a twenty-one

14  year police officer, why someone would watch out for the cops

15  if not to avoid them?

16  A.   That's correct.

17       Q.   Did you do that for him?

18       Now he gives one ward answer, Yes.

19       Is that correct?

20  A.   Yes, it is.

21       Q.   That question lend itself to yes or no answer?

22  A.   Yes, it does.

23       Q.   Did Mr. Mathis indicate prior to this time in the

24  writing and in the oral that he knew that he could either, that

25  he had the opportunity to tell a lie if he wanted to?

```
                    - KOCZUR -                           128
```

1    A.   Yes.

2         Q.   And he knew that he could say No when he wanted to?

3    A.   That's correct.

4         Q.   And in fact Mr. Florczak pointed out couple of times

5    he said No, he wasn't involved in that, correct?

6    A.   That's correct.

7         Q.   So were you putting those words in his mouth?

8    A.   No, I was not.

9         Q.   Even though it was your opinion that he was guilty,

10   based on your investigation, you still allowed him to deny his

11   involvement?

12   A.   Yes.

13        Q.   Why?

14   A.   The more lies he was telling the guiltier he was looking to

15   me.

16        Q.   Were they his words or yours?

17   A.   His words.

18             MR. KOLANO:   Nothing further.

19   RECROSS EXAMINATION BY MR. FLORCZAK:

20        Q.   Detective, you said you were convinced when you

21   started questioning him based on your investigation, is that

22   true?

23   A.   Yes, sir.

24        Q.   What did the investigation consist of to that point as

25   to Marvin Mathis, except for the statement of Miss Brooks?

- KOCZUR -                                                          129

1   A.   His own words, sir.

2        Q.   Well, no.   You said you were convinced before you

3   started questioning him.

4   A.   No, sir.   As we were questioning him.

5        Q.   How long?   In five minutes?

6   A.   Very short.   Within five minutes.   Yes.

7        Q.   But you had nothing prior to questioning him in the

8   form of an investigation involving him other than Miss Brooks'

9   statement, is that correct?

10  A.   Just Sharlama Brooks at that time, sir.

11       Q.   You hadn't even completed her statement at that point.

12  A.   Her statement was completed before I started questioning

13  Marvin Mathis, sir.

14            MR. FLORCZAK:   Okay.   That's right.

15            Thank you.   That's all I have.

16            MR. KOLANO:   Nothing further.

17            THE COURT:   Officer, you may step down.

18            THE WITNESS:   Thank you.

19            THE COURT:   Watch your step as you step off.

20            Ladies and gentlemen, we are going to break now for

21  lunch.   I want to remind you not to engage in any discussions

22  regarding the case among yourselves or with others.   I will ask

23  that you retire to the jury room, collect whatever personal

24  belongings you have, and wait for the officer to release you

25  for lunch.   And then return in one hour.

- COLLOQUY -                                    130

1          (Jury withdrew from the courtroom.)

2          MR. KOLANO:  Your Honor, before we break for lunch can

3    we have five minutes for legal argument?

4          Perhaps if I can approach first off the record.

5          (Side bar off the record).

6          THE COURT:  The jurors can be released.

7          All the jurors are clear from the courtroom.

8          Mr. Kolano.

9          MR. KOLANO:  Your Honor, it's my intention to call

10   Janice Sutton.  Obviously, from the testimony of Sharlama

11   Brooks it will be on its face hearsay testimony.  It is my

12   position that Sharlama Brooks has already satisfied the

13   foundational requirements for an excited utterance.  The

14   exciting events was admission by this defendant that he was

15   involved in a killing of, although not by name, of Mr. Saraiva

16   and she indicated she reacted to this by crying, she was very

17   upset.  She had been crying with her friends so much to the

18   point where she was told to get out of the classroom.  And

19   that's where she sees Mrs. Pridgin who is a security officer.

20   Still she is in the state of crying.  She gets to the point,

21   fifteen minutes I think was her testimony, where she sees Miss

22   Sutton, a counselor, and there she talks to Miss Sutton.  She

23   is also in the state of excitement by her own testimony, and

24   she is crying when she indicates what is going on.

25          The exciting event is being told that.  That is a

- COLLOQUY -                                    131

1    legitimate exciting event.

2           This is not a question and answer interrogation that

3    counsel may suggest that it is.  It's Miss Sutton simply saying

4    What's bothering you?  Why are you crying?

5           I have spoken to Miss Sutton very briefly.  I have

6    never met her in person.  But basically what she told me is

7    she, she, that Sharlama Brooks was so upset she thought she had

8    been raped or something like that.

9           I am simply saying before I bring Miss Sutton and pull

10   her out of the high school during these very important days of

11   the last days of school, I am asking the court for a ruling

12   based on Sharlama Brooks' testimony alone as to the foundation

13   for having Miss Sutton come in to testify as to what Sharlama

14   Brooks told her about what the defendant said.

15          Obviously, it's a double hearsay, and obviously a

16   double hearsay exception.  An admission as it comes out of the

17   mouth of Marvin Mathis and an excited utterance as it comes out

18   of the mouth of Sharlama Brooks.

19          MR. FLORCZAK:  Judge, I would like more time to

20   address this issue.  I would note in several of the cases cited

21   whether the statement was made voluntarily or in response to a

22   question is a factor to be considered.  And this is not

23   something that was just voluntarily stated.  This I believe

24   will come out that it was as a result of a question.

25          I think it makes a difference whether the shock is a




- COLLOQUY -                                    132

1    result of observing the particular event or as a result of

2    being told of something.

3            Now, I understand the rule has been amended.  Prior to

4    the amendment to the rule being told of an event was

5    insufficient to qualify as an excited utterance.  Now it may.

6    Still the strict requirements of the initial rule haven't

7    changed.

8            I would like to look into what the present perception

9    requirement of the rule is, judge.  They say it's the same now

10   as it was before.  Despite the fact that now being told

11   something would make a difference.  And I simply haven't had

12   time to look into it, judge.

13           THE COURT:  I will give you an opportunity to do that.

14   I am not going to rush into this.  It's just the rule does now

15   read a statement relating to a startling event, which certainly

16   seems to leave open an interpretation that a person need not

17   actually experience the startling event but rather somehow

18   receive information relating to the startling event.

19           MR. FLORCZAK:  That's correct, judge.

20           THE COURT:  So I think, I will give you an opportunity

21   to take a look at that.

22           Mr. Kolano, we are not going to be able to resolve

23   this prior to the lunch break.  So it may, may involve some

24   rescheduling or shuffling of witnesses.  I don't know how

25   that's going to impact on the schedule.

- COLLOQUY -                                            133

1          While we are talking about scheduling, are either

2    April or Renee Diggs anticipated to be reached today?

3          MR. KOLANO:  Both.  April Diggs will be first.

4          Actually, I am going to have one witness before April,

5    and that may also involve a legal determination by the court.

6          As I indicated in my letter, there are some adoptive

7    admissions issues, and this next witness Migdalia Rodriguez

8    will fall into that category.

9          MR. FLORCZAK:  I don't know, Rodriguez?

10          MR. KOLANO:  Stephen Owens, the woman at 224.

11          MR. FLORCZAK:  I obviously will object to her

12    testifying about somebody else talking about doing the robbery.

13    Judge, I think that's what the testimony will be.

14          MR. KOLANO:  The basic issue, she is going to say that

15    one of the -- both Marvin and Antwan had the gun when they came

16    back afterwards.  Which is something that she witnessed.

17          Adoptive admission will come in that the four of them

18    came back together, and that one of the guys said we had to

19    shoot him, but it was in the presence of all four of them, and

20    then in addition to the four of them Migdalia overheard it.

21          So I would say that's a statement in furtherance of

22    the conspiracy and, two, it's an adoptive admission.  Because

23    they are all here, We had to shoot him, and one of the women

24    said We didn't get any money.  That's a statement attributal to

25    all of the conspirators because I would argue conspiracy is

- COLLOQUY -                                                    134

1    still going on because it's flight afterwards or getting away

2    or concealing themselves from the crime by going indoors.

3             And, two, that it is adoptive admission because one is

4    speaking for all of them and nobody else -- and we have had

5    this argument at side bar in another context -- nobody is

6    saying, No, No, what are you talking about, We had to shoot

7    him?  We didn't have to shoot anybody.  What do you mean we

8    didn't get any money?  We didn't do robbery, why would we be

9    concerned about money?

10            That's my legal basis for getting what Migdalia would

11   say.  And obviously first hand after they come in the house

12   afterwards together and the gun.

13            That just puts everyone on notice for the lunch break.

14            THE COURT:  All right.  We will address that after the

15   lunch break also.  All right.

16                        (Luncheon recess).

17            (CONTINUED ON AFTERNOON SESSION VOLUME)

18

19

20

21

22

23

24

25

- COLLOQUY -                                                       135

1

2

3                        C E R T I F I C A T E

4

5

6            I, B. PETER SLUSAREK, C.S.R., License No.  XI00291,

7    an Official Court Reporter of the State of New Jersey, do

8    hereby certify the foregoing to be prepared in full compliance

9    with the current Transcript Format for Judicial Proceedings and

10   is a true and accurate non-compressed transcript to the best of

11   my knowledge and ability.

12

13

14

15   _____     Date: March _15_ 1999.

16   B. PETER SLUSAREK, C.S.R., XIOO291

17   Official Court Reporter

18   Union County Courthouse,

19   Elizabeth, New Jersey,

20

21

22

23

24

25