6T

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION : UNION COUNTY
CRIMINAL    —   97-02-00123
:
STATE OF NEW JERSEY,            :   Stenographic Transcript
                                :            of
            vs.                 :   Trial Proceedings
                                :
MARVIN MATHIS,                  :
                                :
            Defendant,          :
_____  :


            Place:  Union County Courthouse
                    2 Broad Street,
                    Elizabeth, New Jersey,

            Date:   JUNE 16, 1998.


B E F O R E: —
        HON. JOHN F. MALONE, J.S.C., & JURY

TRANSCRIPT ORDERED BY:
        OFFICE OF THE PUBLIC DEFENDER
            Appellate Section

A P P E A R A N C E S:

        WILLIAM KOLANO,  ESQ.
        Assistant Prosecutor, Union County,
        For the State,

        WALTER E. FLORCZAK, ESQ.
        (Florczak & Florczak)
        Attorney for the Defendant,



                    B. PETER SLUSAREK, C.S.R., XIOO291
                    Official Court Reporter
                    Union County Courthouse
                    Elizabeth, New Jersey, 07207

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION : UNION COUNTY
CRIMINAL    —   97-02-00123
                    :
STATE OF NEW JERSEY,            :   Stenographic Transcript
                                :            of
            vs.                 :      Trial Proceedings
                                :
MARVIN MATHIS,                  :
                                :
            Defendant,          :
_____:

                Place:   Union County Courthouse
                         2 Broad Street,
                         Elizabeth, New Jersey,

                Date:    JUNE 16, 1998.


B E F O R E:
        HON. JOHN F. MALONE, J.S.C., & JURY

TRANSCRIPT ORDERED BY:
        OFFICE OF THE PUBLIC DEFENDER
             Appellate Section

A P P E A R A N C E S:

        WILLIAM KOLANO,   ESQ.
        Assistant Prosecutor, Union County,
        For the State,

        WALTER E. FLORCZAK, ESQ.
        (Florczak & Florczak)
        Attorney for the Defendant,



             B. PETER SLUSAREK, C.S.R., XIOO291
             Official Court Reporter
             Union County Courthouse
             Elizabeth, New Jersey, 07207

2

WITNESSES INDEX

WITNESSES                                          PAGE

JANICE SUTTON
        Direct By Mr. Kolano                        03
        Cross By Mr. Florczak                       06
        Direct By Mr. Kolano                        18

GRACOE;A A;OMARES
        Direct By Mr. Kolano                        22
        Cross By Mr. Florczak                       33

RENEE DIGGS
        Direct By Mr. Kolano                        42
        Cross By Mr. Florczak                       58

                        _____

RONALD W. ORR
        Direct By Mr. Florczak                      91
        Cross By Mr. Kolano                         93

BELQUIS FERNANDEZ
        Direct By Mr. Florczak                      97
        Cross By  Mr. Kolano                       102

HERMINIA GARCIA
        Direct By Mr. Florczak                     109
        Cross By Mr. Kolano                        111

MARVIN MATHIS
        Direct By Mr. Florczak                     130
        Cross By Mr. Kolano                        157

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
                    - COLLOQUY -                    3
```

1    JUNE 16, 1998.

2           THE COURT:  You may be seated.

3           Before we bring the jury out in this matter, there

4    will be a need for a hearing outside the presence of the jury

5    with respect to the proffered testimony of the next state's

6    witness, that witness being Janice Sutton.

7           It's a question with respect to a hearsay exception.

8           As I understand, Mr. Kolano, Miss Sutton it is

9    anticipated will testify in connection with a statement to her

10   from Miss Brooks, the girlfriend of the defendant, with respect

11   to what Miss Brooks was told by Mr. Mathis, is that correct?

12          MR. KOLANO:  That's correct, your Honor.

13          THE COURT:  All right.  Call in Miss Sutton.

14          (Jury not present in the courtroom.)

15   J A N I C E     S U T T O N

16   Sworn as a witness and testified as follows:

17   DIRECT EXAMINATION BY MR. KOLANO:

18       Q.   By whom are you employed?

19   A.   Elizabeth Board of Education.

20       Q.   In what capacity are you presently working there?

21   A.   Right now I am a guidance counselor.

22       Q.   Back in January, specifically January 24th of 1996,

23   what job did you have at that time?

24   A.   I was drug and alcohol counselor at the high school.

25       Q.   And did you come to know on that day, if not before, a

SUTTON -   DIRECT BY KOLANO                                4

1   Sharlama Brooks?

2   A.   Yes.

3      Q.    Would you please tell the court the circumstances

4   surrounding your meeting Sharlama Brooks on that particular

5   day?

6   A.   Our security guard had brought her to me because she was so

7   upset and crying.   And we came into my office, and I asked her

8   what was wrong.   She couldn't talk to me because of the way she

9   was crying.   It took a while.

10      And I asked her did it have to do with her family.   She

11   waid No.   I asked her about school.   She said No.

12      I said to her, Please tell me what's the matter, because

13   she was still sobbing so much.   When she seemed to calm down a

14   little bit she said her boyfriend.   And I asked her at that

15   point, or I told her that what she would tell me I might not be

16   able to keep to myself, because the way she was crying I was

17   actually afraid she had been raped, and I knew that I could not

18   keep that to myself.

19      And I said to her, What about your boyfriend?   And she

20   hesitated, and then she said, He told me he was involved in a

21   murder over the weekend.

22      With that, I called Mr. Walton, our principal.   I took her

23   down to Mr. Walton where she repeated the story.   He then

24   called Detective Garcia.   They were our walking policemen at

25   the main complex.   They came down.   She repeated the story

SUTTON -   DIRECT BY KOLANO                          5

1   again.  And then he asked me to accompany her to the police

2   station.

3        Q.   Did you accompany her?

4   A.   Yes.  She stayed with me the whole day until her father

5   came to school.

6        Q.   Do you know that she gave a statement to the police?

7   A.   Yes.  I was sitting right there.

8        Q.   And did you have an opportunity to read that statement

9   after that was given by Sharlama?

10  A.   No.

11       Q.   Do you remember about what time it was that you saw

12  Sharlama on that day?

13  A.   First thing in the morning.  It was between I would say

14  8:15 and 8:30.

15       Q.   What time the school generally start?

16  A.   At that time.

17       Q.   And in terms of her demeanor, she was crying at the

18  time she related this story?

19  A.   Yes, yes.

20       Q.   As best you can, other than crying, can you describe

21  her emotional state or her level of excitement?

22  A.   It was almost like an out of control crying.  It was a gut

23  wrenching crying.  She really couldn't stop from the crying.

24       Q.   What is it that made you believe in your own mind this

25  might have been a rape?

SUTTON -   DIRECT BY KOLANO                                6

1    A.   Just the way she was acting.   It was the type of crying

2    that she was doing, it was something to me that was very

3    serious.   And when she said her boyfriend, there were no

4    physical marks on her that he had hit her, so it was just

5    something that I thought of because of the way she was crying.

6         Q.   Do you know if she mentioned her boyfriend's name?

7    A.   If she said his name it was only Marvin.   But there was no

8    last name mentioned.

9         Q.   In your experience, how many other people have come to

10   your office in the context of a guidance counselor or drug and

11   alcohol counselor at the high school who exhibited similar

12   demeanor?

13   A.   None.   Not in the way she was crying.   The girls would come

14   to me crying, but not sobbing in that way.

15        Q.   Did you suggest any answers to her when you asked your

16   few questions of her?

17   A.   None.

18        MR. KOLANO:   Your Honor, I have nothing further.

19        THE COURT:   Mr. Florczak.

20   CROSS EXAMINATION BY MR. FLORCZAK:

21        Q.   Do you know whether she had told anyone else before

22   telling you?

23   A.   No, I don't.

24        Q.   Do you know whether she told --

25        Who was she brought to you by?

SUTTON - CROSS BY FLORCZAK:                                7

1   A.  Mrs. Pridgin, our security guard.

2        Q.   Do you know what she told the security guard?

3   A.  I don't believe she was talking to anyone.  At the time

4   when Mrs. Pridgin brought her to me we couldn't really get her

5   to talk, she was crying too much.

6        Q.   But what she told you was as a result of your

7   questioning of her, is that correct?

8   A.  Yes.

9        Q.   Do you recall whether she said that --

10       Did she say her boyfriend or Marvin, do you recall?

11  A.  First she said her boyfriend, and I believe she then

12  mentioned his first name, and she might have when we went to

13  Mr. Walton mentioned both his first and last name.

14       Q.   Now, did she say he was involved in a murder --

15       Did she say that he told her he was involved in a murder,

16  or in a shooting, do you recall?

17  A.  No.

18       Q.   You don't recall which words she used?

19  A.  No.

20       Q.   And once she told you that, then you called someone

21  else?

22  A.  Yes, I did.  As soon as she said that he was involved --

23  and I say, I don't remember if it was murder or shooting -- I

24  immediately called Mr. Walton and took her down to him.

25       Q.   And then apparently there she repeated what she said?

SUTTON - CROSS BY FLORCZAK:                                    8

1   A.   Yes.

2            MR. FLORCZAK:   I have nothing further, judge.

3            Thank you.

4   REDIRECT EXAMINATION BY MR. KOLANO:

5        Q.   Did Mrs. Pridgin --

6        Mr. Florczak asked you if you knew if she had told anything

7   to Mrs. Pridgin.   Do you recall him asking you that?

8   A.   Yes.

9        Q.   Did Mrs. Pridgin tell you anything about what she

10  said?

11  A.   No.

12           MR. KOLANO:   Thank you.   Nothing further.

13           THE COURT:   Anything else, Mr. Florczak?

14           MR. FLORCZAK:   No, judge.

15           THE COURT:   Miss Sutton, you may step down.   Please

16  watch your step.   You are not excused.   I ask you to wait in

17  the hall to be called back in.

18           THE COURT:   Mr. Kolano.

19           MR. KOLANO:   Your Honor, the state is seeking to

20  elicit the testimony that your Honor just heard from Miss

21  Sutton.   The state submits this falls into the excited

22  utterance exception, 803(c)(2), and actually in listening

23  probably falls into present sense impression exception to the

24  hearsay rule, also, that would be 803(c)(1).   803(c)(2) exited

25  utterance statement relating to a startling event or a

- COLLOQUY -                                    9

1    condition made while the declarant was under the stress of

2    excitement caused by the event or condition and without

3    opportunity to deliberate or fabricate.

4           Obviously, I am asking your Honor to take into account

5    the testimony of Sharlama Brooks as it relates to this, because

6    that is also essential to the foundation that was laid.

7    Because Miss Brooks indicated I think at most it was fifteen

8    minutes from the time she received this conversation to the

9    time that she made the statements.  She indicated she was

10   crying, she was so upset in class, they asked her to step out

11   of class.  And she related basically, that first link, that she

12   saw Mrs. Pridgin because she was in the halls, and because of

13   this Mrs. Pridgin took her to Miss Sutton.

14          Miss Sutton described in her years of experience she

15   has never seen anybody crying to this point, to the point where

16   she thought that this young girl was raped.  And while she was

17   asking questions -- and that is one of the factors the court

18   must consider, obviously -- they were not leading questions,

19   not something to suggest the answer, and all of the questions

20   were follow ups which, was, first one:  What's the matter?

21   What's wrong?

22          I submit that the startling event was the revelation

23   made by the defendant about what he had done during the weekend

24   to Sharlama Brooks.  Obviously, this had had an effect.

25          Unless your Honor is going to find Miss Sutton is a

- COLLOQUY -                                    10

1   liar or that Miss Brooks is a liar, this obviously had a very

2   traumatic effect on the witness.   There was minimal time for

3   her to fabricate or come up with a lie, and I would suggest

4   absolutely, positively no motive for her to come up with a lie.

5           Everything in this case has the earmarks of

6   reliability and, therefore, I would ask this statement be

7   admissible as an excited utterance.

8           As indicated, the present sense impression is a

9   statement of observation description or explanation of an event

10  or condition made while or immediately after the declarant was

11  perceiving the event or condition without opportunity to

12  deliberate or fabricate.   It's the same thing because she is

13  revealing what she was just told by Marvin.

14          The case law makes clear.   There are a number of

15  factors here.   But in one case specifically six hours was not

16  too long.   In one case the court had absolutely no problem with

17  fifteen minutes, thus delay of fifteen minutes between

18  occurrence of the event and statement sought to be introduced

19  is not necessarily too long a period to bar admission of the

20  statement under the rule.   That's Atamanik versus Real Estate

21  Management Inc. 21 New Jersey Super, 357, Appellate Division,

22  1952.   The lapse of six hours between the event and statement

23  caused the court no difficulty in State versus Bass, 221 New

24  Jersey Super, 466, 482 to 483, Appellate Division, 1987.

25          For those reasons, your Honor, I ask the statements,

1  that Miss Sutton be permitted to testify basically in effect to

2  the way she testified here today.

3        MR. FLORCZAK:  Judge, problem I have is that, as the

4  cases indicate, this was not just blurted out as an excited

5  utterance in the most common way you talk about excited

6  utterance.  This is after a series of questions being asked.

7  So it wasn't just a spontaneous blurting out of something.

8        Secondly, judge, this is double hearsay situation.

9  This is a situation where ordinarily just Miss Brooks

10  testifying she would be testifying, she did testify as to

11  hearsay, exception to the hearsay rule.  Now, ordinarily an

12  excited utterance is admitted to prove the truth of the matter

13  contained in the statement.  But you are asking, you are

14  suggesting it's the truth of what my client said rather than

15  what the utterer said.  And that's where I see the problem.

16  This isn't something this person observed herself.

17        Had she observed herself it may be a different

18  situation.  This is something she was told.  She didn't observe

19  herself.  This is something that came out after a series of

20  questions, rather than simply spontaneously speaking.

21        Further, judge, I think the court should take into

22  consideration rule 403 talking about unduly prejudicial.  And

23  also, judge, essentially cumulative in a sense that the fact

24  that this Miss Brooks went and told someone is not in issue.

25  No one is, the defense is not in a position to deny that she



– COLLOQUY –                                        12

1    went to someone and told someone, and as a result the police

2    were called, she went to police, and my client was in fact

3    picked up.  That's not an issue.

4          So for those reasons, judge, I would ask the court to

5    exclude the testimony.

6          THE COURT:  Anything else, Mr. Kolano?

7          MR. KOLANO:  Obviously, your Honor, the hearsay, there

8    is two exceptions:  One is admission, the other excited

9    utterance, present sense impression.

10         Prejudice doesn't even come into play as a practical

11   matter here, at least in terms of undue prejudice.  And lastly,

12   it's highly relevant, heart of this issue based on the

13   statement as to who the shooter was and his involvement in the

14   homicide.

15         And Mr. Florczak in his opening indicated that

16   basically police asked very leading questions and suggested

17   these answers, and that explains the admissions made by this

18   person.  This defendant made admissions before any police were

19   involved, before the police even knew his involvement to his

20   girlfriend.  It had this effect, this girlfriend said to the

21   guidance counselor.

22         This is not cumulative.  Highly relevant, highly

23   powerful evidence.  And because it's relevant there is no undue

24   prejudice.  And more importantly, since it fits on all fours

25   with the hearsay exception, it should be admitted.

– COLLOQUY –                                    13

1        Thank you.

2        MR. FLORCZAK:  Judge, I would only add, if admitted

3   this should be admitted to prove the fact that my, that my

4   client made the statement, not as to the truth of the statement

5   my client made.  Because that's where the double hearsay come

6   into play.

7        THE COURT:  I think this is relevant evidence on the

8   substantive issue of the defendant's involvement in the

9   offense.  It is a reporting of a statement that the defendant

10   made that he was involved.  The defense in this case, in

11   summary, is that he was not.  And for that reason, I believe it

12   is, it is relevant and relates specifically to the issue,

13   substantive issue before the jury as to the defendant's

14   involvement in the offense.

15        The question as to, as to double hearsay, it is, but

16   that does not automatically exclude it.  Here the question is

17   whether an excited utterance exception can be used to allow

18   testimony of an admission against interest.

19        In considering the excited utterance there is a number

20   of factors that the court must take into consideration.

21        One is the amount of time that elapsed.  Here a

22   relatively brief period of time, some fifteen minutes.  And the

23   testimony indicates that during that period of time the

24   speaker, Miss Brooks, was extremely upset, became upset upon

25   hearing the information, and was asked to leave class and was

- COLLOQUY -                                    14

1   taken then by a security guard to the counselor's office.

2       I think the amount of time is not so long as to

3   exclude this evidence.

4       The circumstances of the event.  Again, the speaker,

5   Miss Brooks hearing from her boyfriend, the defendant, that he

6   had been, that he had been a participant in a murder, is

7   certainly something, the unusual nature of that information

8   certainly is something that would cause the type of reaction

9   that apparently was caused on Miss Brooks.

10      Here we have high school guidance counselor indicating

11  that in her experience she has not come upon a student as upset

12  as Miss Brooks was.  She used phrases such as gut wrenching,

13  uncontrollable sobbing, unable to speak.  This clearly produced

14  shock in Miss Brooks -- which was the fourth element to be

15  considered.

16      The nature of the statements, which I have also

17  touched upon; the serious admission of participating in a crime

18  such as murder; and, finally, the voluntariness, whether or not

19  this statement was given voluntarily.

20      Given the testimony of Miss Brooks that her questions

21  were of a very general nature -- Tell me what happened; Was it

22  something about school, Something about family -- were not

23  leading questions, were not such that it was designed in any

24  way to suggest an answer to Miss Brooks.  They were only

25  efforts on the part of the counselor to elicit information from

- COLLOQUY -                                          15

1    a near uncontrollable person.

2            Under all of the circumstances, the trustworthiness of

3    this evidence is established, and I am going to allow this

4    witness to testify as to what she was told by Miss Brooks.

5            I have a concern, however, the testimony of Miss

6    Sutton going beyond that.  She indicated that Miss Brooks

7    repeated the story to others.  And without, without repeating

8    specifically what Miss Brooks said to others, she categorized

9    as saying she told the same thing to others, she repeated the

10   story to others, she told them what happened.  That's a

11   suggestion that to these other persons Miss Brooks gave the

12   same substantive statement.  And I am going to exclude that

13   testimony.

14           Miss Sutton will not be allowed to testify as to what

15   Miss Brooks may have said to others or suggest that she even

16   spoke to others and confirmed the story.

17           This is limited to the purpose, the purpose that was

18   offered by the state, and that is Miss Sutton to testify as to

19   what she heard from Miss Brooks directly, immediately upon Miss

20   Brooks being brought to her office, not what Miss Brooks said

21   even a matter of a few minutes later to others.

22           Mr. Kolano, that may need a little bit of steering of

23   Miss Sutton to keep her on focused on what she heard directly

24   from Miss Brooks when Miss Brooks was brought to her, as

25   opposed to what Miss Brooks may have related to others later.

- COLLOQUY -                                          16

1          I will give you a little bit of leeway on leading to

2   make sure we don't get into that.

3          MR. KOLANO:  Fine, your Honor.

4          THE COURT:  And we did discuss, maybe it's a little

5   premature, but I am reminded because I saw Mr. Kolano

6   organizing exhibits for I guess future witnesses.  We talked

7   about the photographs.  And I just, so that it is clear, there

8   are apparently six photographs that the state has obtained of

9   the victim in this matter, three of which are photos of the

10  entry wound depicting the face and eye of the victim.  Three

11  depict the exit wound showing the back of the head of the

12  victim.

13         I have indicated that in viewing the pictures that

14  there seems to me to be some cumulative effect.  There are two

15  closeups of the entry wound.  I think that only one is

16  necessary.  And there is two closeups of exit wound.  Again,

17  only one is necessary.

18         So I have indicated to the state that they will be

19  allowed to use two of each category of the photographs.  I

20  realize that the medical examiner may refer to all of the

21  photographs during the course of her testimony, without

22  displaying them to the jury, and it may depend upon her

23  testimony specifically which of the four photographs are

24  utilized.  But it will be limited to four.

25         MR. KOLANO:  Your Honor, if I can, S-12 and S-13 are

- COLLOQUY -                                                    17

1   the two entry photographs I will be utilizing directly in front

2   of the jury.  I will be utilizing S-14, one of the long shot

3   exit views directly in front of the jury.  And at issue based

4   on your Honor's ruling will be S-15 and 16, which I will show

5   just to the medical examiner without the jury seeing, ask her

6   which one is best for her, and then choosing that one.

7              THE COURT:  Okay.

8              I believe we can bring the jurors out at this point.

9              (Jury seated in the jury box in the courtroom.)

10             THE COURT:  Good morning, ladies and gentlemen.

11             There was a bit of a delay getting started this

12   morning.  We did have legal issues that I needed to address

13   with the attorneys.  We have resolved that, and we are about

14   ready to begin with the presentation of evidence in the case,

15   continuing the testimony.

16             Before I do that, let me just indicate there was an

17   inquiry from the jury with respect to some administrative type

18   matters, which I will address.

19             For those of you who do need any, anything to submit

20   to your employer to confirm your jury service, that is

21   available to you from the court clerk, Mr. Swingle, who is

22   seated to my left.  So at any time during the course of the day

23   you can either coming in in the morning returning from a break,

24   on the way out to a break, you can advise Mr. Swingle that you

25   need such, such a letter.  I know most jurors need, who need

- COLLOQUY -                                    18

1   something usually do it at the end of the case.  But I do know

2   there are some employers that are a little more finiky about

3   that and they want letters either every day or more often than

4   waiting until the end of the case.  So we can accommodate you

5   here in the courtroom on that.  Just let the court clerk know

6   that you need a letter, and he will have something prepared for

7   you.

8          Also, the other part of the inquiry from the juror had

9   to do with another administrative problem that really needs the

10  jury manager, Mr. Garthwait's attention.  Mr. Swingle called

11  Mr. Garthwait.  He is in today, he expects to be in his office

12  today, and any juror that does need his assistance in dealing

13  with any type of administrative problem other than an employer

14  letter can contact Mr. Garthwait at his office, just stop up

15  and see him.  He is expected, he is in today and expects to be

16  in the office today.  If that continues to be a problem, let

17  one of the officers know and perhaps we can be of some

18  assistance to you in communicating with Mr. Garthwait.  But he

19  did say he would be there today.  All right.

20         We are ready to resume.

21         Mr. Kolano, call your next witness.

22         MR. KOLANO:  Janice Sutton.

23  J A N I C E        S U T T O N

24  Sworn as a witness and testified as follows:

25  DIRECT EXAMINATION BY MR. KOLANO:




SUTTON - DIRECT BY KOLANO                                  19

1      Q.   By whom are you employed?

2  A.   Elizabeth Board of Education.

3      Q.   And in what capacity are you presently working for the

4  Elizabeth Board of Ed?

5  A.   Elementary guidance counselor.

6      Q.   Back on January 24th, 1996, what type of work were you

7  doing?

8  A.   Drug and alcohol counselor at the high school.

9      Q.   At the high school in Elizabeth?

10 A.   Yes.

11     Q.   Back on January 24th, 1996, did you have an occasion

12 to meet Sharlama Brooks?

13 A.   Yes.

14     Q.   Would you please tell the jury the circumstances that

15 led up to your meeting Sharlama Brooks on that day?

16 A.   Our security guard, Mrs. Pridgin, had brought her to me

17 because she was crying and she would not talk to Mrs. Pridgin.

18 As far as I know, and she came into my office with her, and she

19 was just crying hysterically.

20     It took a while.  And I started to ask her questions, and

21 she would not stop crying.  I asked her, Did it have to do with

22 her family?  School?  And she just shook her head and said,

23 like this, she did not answer me.

24     I then asked her what had happened, because she was still

25 crying so hysterically.  And eventually she said it had to do

SUTTON -   DIRECT BY KOLANO                          20

1   with her boyfriend.

2       I was afraid that she had been raped by her boyfriend,

3   because of this, this crying that she was doing.  And I had

4   told her that if she told me something I may not be able to

5   keep it to myself.  And she just shook her head to nod okay.

6   And then she said her boyfriend had been involved in a murder.

7       At which time I called Mr. Walton, who was our then

8   principal, and took her down to his office, where she repeated --

9       Q.   Let me stoop you there.

10      In your experience as a drug and alcohol counselor, as

11  guidance counselor, had you ever seen a, a young woman in such

12  a state before?

13  A.   No.

14      Q.   And why is it that you thought in your mind that she

15  may have been raped or sexually assaulted?

16  A.   Because of the way she was crying.  It was almost like a

17  painful cry.  There is a difference between just crying and the

18  way she was crying.

19      Q.   And about what time of day did this happen?

20  A.   Very early in the morning.  First thing I would say

21  somewhere between 8:15 and 8:30.

22      Q.   During this conversation, this initial conversation

23  that you had with Miss Brooks, did she mention her boyfriend's

24  name, either first, last, or both?

25  A.   When she said her boyfriend had been involved, she may have

SUTTON - DIRECT BY KOLANO                                21

1   said his first name.

2       Q.   Do you remember what that first name was?

3   A.   Marvin.

4       Q.   Did you suggest any answer?  Was this anything other

5   than her coming to you in this state, your asking her what was

6   causing this problem?

7   A.   Not at all.

8       Q.   Did you know Marvin Mathis --

9   A.   No.

10      Q.   -- prior to that time?

11      Did you know Sharlama Brooks prior to that time?

12  A.   I believe that Sharlama had come to me just to talk to me

13  about school and things, but that was all.

14      Q.   Other than that, did you have any other involvement in

15  this case?

16  A.   No.

17          MR. KOLANO:  Thank you.  Nothing further.

18          THE COURT:  Mr. Florczak.

19          MR. KOLANO:  I am sorry.  I do have some.

20      Q.   Without telling us anything that was said, where did

21  you take Miss Brooks?

22  A.   After we left my office, it was to Mr. Walton's office.

23      Q.   And from Mr. Walton's office did you accompany Miss

24  Brooks anywhere?

25  A.   To the police station.

SUTTON - DIRECT BY KOLANO                                    22

1      Q.   Were you with her the entire day?

2  A.   Yes.

3      Q.   Did she give a statement to the police?

4  A.   Yes, she did.

5      Q.   Were you present during the taking of that statement?

6  A.   Yes, I was.

7          MR. KOLANO:  Thank you.

8  CROSS EXAMINATION BY MR. FLORCZAK:

9      Q.   You did not read the statement she gave?

10 A.   No, I did not.

11     Q.   And when you say that she told you her boyfriend said

12 that he had been involved in a murder, did she say he was

13 involved -- he said he was involved in a murder or in a

14 shooting?

15 A.   I don't remember which.

16     Q.   It could have been either word?

17 A.   Yes.

18         MR. FLORCZAK:  I have nothing further.  Thank you.

19         THE COURT:  Anything else, Mr. Kolano?

20         MR. KOLANO:  No, your Honor.

21         THE COURT:  Miss Sutton, thank you.  You may step

22 down.  Watch your step.  You are excused.

23         MR. KOLANO:  I don't know if she arrived yet.

24         Dr. Linares.

25 G R A C I E L A     L I N A R E S

LINARES -   DIRECT BY KOLANO                    23

1   Sworn as a witness and testified as follows:

2   DIRECT EXAMINATION BY MR. KOLANO:

3       Q.   Doctor, you are the medical examiner for the County of

4   Union?

5   A.   Yes.

6       Q.   Would you please relate your experience, education,

7   and background as it relates to medicine, pathology, forensic

8   pathology and work of a medical examiner, please?

9   A.   All right.  I received my M.D. degree from Buenos Aires,

10  Argentina, in 1962.  I did a residency in internal medicine in

11  Argentina.

12      Then in 1966 I came to U.S.A.  I did a rotating internship

13  at Saint Vincent hospital in New York.  Then I went into

14  pathology at hospital in New York.  And then into the

15  subspecialty of forensic pathology at the office of chief

16  medical examiner in New York City.  And at the time the medical

17  examiner was Dr. Milton Alperson.  I work there as a junior

18  medical examiner, and then as an associate medical examiner.

19      Then I changed to New Jersey.  And I work in New Jersey

20  first at Essex County as assistant medical examiner, and then

21  for the State of New Jersey also as assistant medical examiner.

22  And since 1986 I am the chief medical examiner for the County

23  of Union.

24      Q.   You are a licensed medical doctor?

25  A.   Oh, yes, sure.  I have a license in New York and in New

LINARES -   DIRECT BY KOLANO                        24

1   Jersey.

2       Q.    Approximately how many autopsies or post mortem

3   examinations have you conducted in your career?

4   A.   Autopsies, probably five thousand.

5       Q.    And how many times have you been qualified and

6   testified as an expert in forensic pathology?

7   A.   Approximately 170, 180.

8       Q.    Would you please just generally related to the jury

9   what forensic pathologist is.

10  A.   Forensic pathology is a subspecialty of pathology.

11  Pathology is mainly laboratory medicine.

12      The forensic pathology is the one that really specializes

13  in determining the cause of death, in the cases that govern the

14  jurisdiction of medical examiner or corner.   And we do that by

15  doing an autopsy.   Of course, we have a history first.   And the

16  forensic autopsy comprises examination of the clothing, and

17  then the external examination of the body, and then we open the

18  body and remove all the visceras, and then we take some for

19  toxicology and for histology.   And then after that we determine

20  the cause of death.

21      MR. KOLANO:   At this time I offer Dr. Linares as

22  expert in forensic pathology.

23      MR. FLORCZAK:   I have no questions.

24      THE COURT:   All right.   Sufficient evidence has been

25  submitted before the court for this witness to testify as an




LINARES -   DIRECT BY KOLANO                           25

1   expert in the field of forensic pathology.

2          Mr. Kolano, you may proceed.

3     Q.   Doctor, did you perform an autopsy examination on

4   January 23rd, 1996 of an Antonio Saraiva?

5   A.   Yes.

6     Q.   And did you perform, did you prepare a report of your

7   findings of that autopsy.

8   A.   Yes.

9     Q.   And you are required by law to make such a report.

10  A.   Yes.

11    Q.   Do you have a copy of that report with you?

12  A.   Yes.

13    Q.   Will you need it to refer to it from time to time as

14  you give your testimony?

15  A.   Yes.

16    Q.   If you do, would you just please let us know when you

17  are referring to the report.

18  A.   Okay.

19    Q.   When you did your external examination of Mr. Saraiva,

20  would you please tell us his height and weight as noted in your

21  report?

22  A.   Yes.  I want to look.  Mr. Saraiva he measures sixty-three

23  inches in height, and had scale weight of 192 pounds.

24    Q.   And when you received him did you conduct an external

25  examination?

LINARES -   DIRECT BY KOLANO                          26

1    A.   Sure.

2         Q.   And what did you discover when you conducted the

3    external examination?

4    A.   Well, Mr. Saraiva had bullet wounds in his head.  He had

5    entrance bullet wound and exit bullet wound.  And the entrance

6    bullet wound was just next to his eye, on the nasal aspect of

7    the left lower eyelid.  That was the entrance, the entrance

8    wound.  And that was the main finding.

9         The rest of the body was normal, but he had a bullet wound

10   there.  And unusual, not unusual, but characteristic of this

11   bullet wound was that there were specs of powder deposits also

12   in the skin.

13        So that means that the range from the muzzle to the target

14   is what we call intermediate range, because you still have

15   remnants of powder.  And what we call intermediate range would

16   be up to according to the weapon could be eighteen inches,

17   sometimes to two feet.  But beyond that we cannot determine any

18   distance.  But since we have in this case the powder deposit,

19   powder stippling, then we can say the distance was less than

20   eighteen inches or eighteen inches.

21        Q.   Doctor, you have given us a lot of information.  So if

22   I may come back.  Please explain for the jury how it is that

23   you are able to determine entrance wound versus exit wound.

24   What medical findings does one see on an entrance wound?

25   A.   Well, entrance wound what you find is that the borders of

LINARES -   DIRECT BY KOLANO                            27

1   the wound are abraded.   Because the entrance of the bullet

2   itself when it's going to penetrate the skin it has rotating

3   action, it stretches the skin, and scrape is on the borders.

4   And in this case also was very easy because you have powder

5   stippling, and only entrance wounds are going to have the

6   powder.

7        And the exit wound was in the back of the head.   And

8   usually the exit wounds tend to be larger, and the borders are

9   coming out or everted and they are not abraded.   So.

10       In this case, as I said, entrance was in the face and the

11  exit was on the back of the head.

12       Q.   Can you please explain to us the path or direction of

13  the bullet?

14  A.   Yes.   The path was from front to back and very, very

15  slightly upwards, and very, very slightly from left to right of

16  the body.

17       Now, if you want exact measurements I have to read them.

18       Q.   Well, no.

19       But when you say front to back, front being the face?

20  A.   Yes.   From the face.

21       Q.   Yes.

22  A.   From the face, from front of the body to the back of the

23  body.   So from the face to the back.   As I said, entrance was

24  on the lower eyelid and just next to the nose.

25       Q.   In terms of upward, you also indicated that the

LINARES -   DIRECT BY KOLANO                          28

1   direction was slightly upward?

2   A.   Very, very slightly upward.   Yes.

3        Q.   What does that mean in terms of the location of the

4   gun or the bullet as it enters the body?

5   A.   Well, what it means probably was the weapon was very

6   slightly, very slightly up, but very slightly.

7        Q.   Very slightly.   Just above parallel?

8   A.   Almost.   Yes.

9        Q.   And front to back how was that measured at an autopsy?

10  A.   Front to back?

11       Q.   I am sorry.   Left to right.   Is it as the body is

12  looking up or as you are looking at the body?

13  A.   As always, the left of the body and right of the body when

14  one describes.   But also was very slightly.   Because the

15  entrance was like one-fourth, no, one inch and one-fourth from

16  the vertical midline sagittal plane and the exit was on only

17  one-fourth.   So it was slightly, slightly from right to left of

18  deceased's body.

19       Q.   Were there any other bullet wounds other than the

20  entry wound into the eye and exit wound in the back of the head

21  that you observed?

22  A.   No.

23       Q.   Would you please, again, explain to us what stippling

24  is?

25  A.   Well, is deposition of powder when the, the weapon is fired

LINARES -   DIRECT BY KOLANO                          29

1    there is, there is powder coming through the muzzle.  Now,

2    according to the distance of that muzzle to the target, you are

3    going to find the deposits or not.  If it is really close you

4    find very dense deposit and you also find soot around.  When

5    the distance is beginning to increase, then you are only going

6    to find the powder specs.  And when the distance increases more

7    then you have no powder deposit whatsoever.  So after eighteen

8    and sometimes, according to the weapon probably two feet, then

9    you don't find any more powder deposits.  And that's what we

10   call a distance bullet wound.  When you find stippling is an

11   intermediate bullet wound.

12       Q.   Now, in this case if I were to indicate to you as an

13   expert that this jury has already heard two statements from the

14   defendant.  In each of the statements he indicates that the

15   distance was between one foot and two foot from the gun to the

16   victim, would that be consistent with your medical findings?

17   A.   Yes.   True.

18       Q.   Would you medically be able to corroborate those words

19   if he indicated that they were between one foot and two foot

20   away when the gun was discharged?

21   A.   Yes, because powder stippling was very sparse, so that

22   means that the distance is really on the, let's see, further

23   away possible.  Now, exact distance the only one that can tell

24   you that would be ballistics expert having the weapon and

25   firing the same weapon.

LINARES -   DIRECT BY KOLANO                    30

1    But, anyhow, approximation is just that.  Yes.

2        Q.   And it would have to be the same, the same weapon?

3    A.  Same weapon, and the same type of ammunition if you want

4    exactly how many inches and --

5        Q.   Doctor, as you performed your autopsy, did you find

6    anything actually inside the head that you took as evidence?

7    A.  There was a tiny piece of metal that we found next to the

8    exit wound.

9        Q.   I am now going to show you S-34 for identification.

10   Envelope, there is a label on that envelope.  I ask you to look

11   at it.  Do you know what the initials GL on that are?

12   A.  Those are my initials.  And the other one, initials of the

13   technician that was helping.

14       Q.   Okay.  And if you would, would you please open up that

15   envelope and indicate whether or not you recognize what is

16   inside of that?

17   A.  Hope I don't lose it.  Tiny fragment of metal.

18       Q.   Okay.  And based on it being in that envelope was that

19   the tiny fragment of metal that you took out of Mr. Saraiva?

20   A.  Yes.

21       Q.   Now, based on your experience, I realize you are not

22   ballistics expert, but based on your experience, was this large

23   enough to do any type of testing or for you to make any

24   conclusion on?

25   A.  For me?

LINARES -   DIRECT BY KOLANO                    31

1       Q.   Yes.

2   A.   No.   I only know it's a small piece of lead.   That's it.

3       Q.   This lead is not naturally occurring in the human

4   brain?

5   A.   No.   Of course not.

6       Q.   Now, doctor, did you also, did you note any injuries

7   to the hands of the victim?

8   A.   No.

9       Q.   Did you note any injuries to the face of the victim

10  other than the bullet wound to the eye?

11  A.   No.

12      Q.   Is there any medical evidence to suggest that he had

13  been punched or hit just prior to him being shot and killed?

14  A.   No.

15      Q.   Based on the nature of these wounds, how long would it

16  have taken for the victim to die?

17  A.   Really few minutes.   Because the brain swells, and then it

18  herniates.   So just a few minutes.

19      Q.   Doctor, was there a photographer there when you were

20  performing the autopsy examination?

21  A.   Yes.

22      Q.   Is that standard procedure?

23  A.   Yes.

24      Q.   Doctor, first I am going to show you two pictures,

25  what's marked S-16 and 15 for identification, just for your

1    purposes.  Would you please indicate to me which of these

2    pictures better details the nature of the exit wound, if you

3.   had to choose one.

4    A.   This one.

5        Q.   This one being S-15?

6    A.   Yes.

7        Q.   Okay.  Doctor, having done that, I am going to ask you

8    to please step down in front of the jury.  I am going do show

9    you what has been marked S-12 for identification.

10       I am showing it to the jury with the court's permission.

11       Would you please point out for the jury what it is that we

12   are seeing in that picture, and then repeat it down on this end

13   so the whole jury can see.

14   A.   This is the entrance wound on the lower eyelid and nasal

15   aspect.  Right there.  If you look very carefully you are going

16   to see very few specs of powder.

17       See, here.

18       Q.   Just so you know, there will be a closer picture.

19   A.   Right here.  Very few specs.

20       Q.   Now showing you what's marked S-13 for identification.

21   Is that closer?

22   A.   Yes.

23       Q.   Would you please explain what it is we are seeing.

24   And if you would describe what hematoma is.

25   A.   So this one is closer one.  And you can see the wound, and

LINARES -   DIRECT BY KOLANO                           33

1   you also see, yes, hematoma of the lower and upper eyelid.

2       Hematoma are secondary to the path of the bullet here and

3   is accumulation, localized accumulation of blood.  And he has

4   hematoma both upper and lower eyelids.

5       You have the entrance, and you see few specs here, here,

6   here.

7       Q.   Doctor, I am now going to show you what has been

8   marked S-14.  Would you please again show that to the jury and

9   indicate what it is that we are looking at.

10  A.   This is the back of the head, and this is the, the exit

11  wound.  And you see is larger and borders are coming out.

12      Q.   And these pictures do they fairly and accurately

13  depict the wounds and the condition of the body --

14  A.   Yes.

15      Q.   -- at the time it was photographed?

16      And lastly, S-15 is a close up.  Please explain to the jury

17  what it is we are seeing there?

18  A.   Yes.  This is the same exit wound.  Here is larger, and

19  closeup of it.

20      Q.   Okay.  You can return to your seat, doctor.  Thank

21  you.

22      Doctor, to a reasonable degree of medical certainty do you

23  have an opinion as to what caused the death of Mr. Saraiva?

24  A.   Yes.

25      Q.   Would you please tell us what?

LINARES -   DIRECT BY KOLANO                          34

1   A.   Sure.   It was just a bullet wound of the head and involving

2   the brain.

3              MR. KOLANO:   Thank you.   Nothing further.

4              THE COURT:   Mr. Florczak.

5              MR. FLORCZAK:   Yes.

6   CROSS EXAMINATION BY MR. FLORCZAK:

7        Q.   Doctor, your indication was that the entry wound was

8   slightly upward.   Is that correct?

9   A.   The path of the bullet is very slightly upward.   Yes.

10       Q.   So that whoever fired the shot had the gun just

11   slightly elevated?

12   A.   Very slightly.   Yes.

13             MR. FLORCZAK:   That's all I have.   Thank you very

14   much.

15             MR. KOLANO:   No redirect, your Honor.

16             THE COURT:   All right.   Doctor, you may step down.

17   Please watch your step --

18             THE WITNESS:   Yes.

19             THE COURT:   -- as you step off.   And you are excused.

20             MR. KOLANO:   Your Honor, may we approach?

21             THE COURT:   On the record?

22             MR. KOLANO:   Yes, please.

23   (PROCEEDINGS AT SIDE BAR)

24             MR. KOLANO:   I just did this.   We are at the breaking

25   point where we may have to get the next witness.   And I would

- COLLOQUY -                                              35





1    have to move evidence in.  If I decide not to call her, last

2    thing I was going to ask permission to read to the jury S-35,

3    which is a State Police affidavit saying that the defendant

4    doesn't have a right to carry a gun.

5            I am assuming there is no objection.

6            MR. FLORCZAK:  No objection.  I appreciate calling us

7    to side bar.

8            MR. KOLANO:  I don't know the status of Renee Diggs.

9    But after I read this, I don't know if we are going to take a

10   break.

11           THE COURT:  You decided to use Renee Diggs?

12           MR. FLORCZAK:  He doesn't know yet.

13           THE COURT:  I can take a break.  We can bring her

14   over.

15           MR. KOLANO:  What I am saying, if I don't use her then

16   I have to move evidence.  So we need to take a break for that

17   anyway.  If I do decide to use her I have to take a break, five

18   to ten minute break.

19           THE COURT:  I can just make it the morning break.  Let

20   them go out for coffee.  And once they clear the room, we can

21   discuss, I can tell the officers to get Miss Diggs, and we can

22   discuss the evidence.

23           MR. KOLANO:  Okay.  I am going to put her on.

24           THE COURT:  All right.  I will tell the officers to

25   get, that we need Miss Diggs, so they can make the call make

1    sure she is available.  And once the jury, have them clear the

2    room, then we can talk about the evidence.

3              But you want to read the affidavit first.

4         MR. KOLANO:  Yes.  Just logical breaking point.

5         THE COURT:  Okay.  We will do that, then I will give

6    them a break.

7         MR. KOLANO:  Okay.

8    (SIDE BAR TERMINATED).

9         THE COURT:  All right.  Mr. Kolano, your next item.

10        MR. KOLANO:  Yes, your Honor.

11        At this time I have in my hand S-35.  It is an

12   affidavit.  Pursuant to State versus Rogers and the case law in

13   our discussion I would like permission to read this for the

14   jury.  This will go into evidence.

15        THE COURT:  Yes, you may.

16        MR. KOLANO:  Thank you, your Honor.

17        Affidavit.  State of New Jersey, County of Union.

18        I, Robert J. Cardema, detective sergeant first class

19   in the, in New Jersey State Police, assigned to firearms

20   investigation unit, special and technical services section, and

21   being custodian of the records at firearms investigation unit

22   where a repository of the firearms applications and permits for

23   handguns are centrally maintained for the State of New Jersey,

24   being duly sworn upon my oath do state that on June 2nd, 1998,

25   pursuant to my assigned duty I thoroughly searched the indexed



- COLLOQUY -                                      37

1    records of the firearms investigation unit regarding one Antwan

2    Harvey, DOB 8/27/75 and one Marvin Mathis DOB 3/23/80.   The

3    search failed to reveal defendants making application for or

4    being issued a permit to carry a handgun, permit to purchase

5    handguns, or a firearms purchase identification card.

6    Additional information may be obtained from the municipal

7    police departments and or counties where these individuals have

8    resided.

9            And it is signed by Mr. Robert Cardema and sworn and

10   subscribed to.  And this comes under the authority of Carl

11   Williams, Superintendent of the State Police.

12           I would offer this document into evidence, your Honor.

13           THE COURT:  Ladies and gentlemen, we are going to take

14   a recess at this point.  Some matters I need to discuss with

15   the attorneys, and I can do that while you take a break, rather

16   than have you wait in the jury room.



17           I remind you not to have any discussions among

18   yourselves regarding the case.  We are going to make this a

19   fifteen minute break.

20           You are then excused from the courtroom during that,

21   during that time period.  I would ask that when the break is

22   over that you return and assemble inside the jury room.

23           So you are free to go on a break now.

24           (Jury withdrew from the courtroom.)

25           THE COURT:  All the jurors are out.






- COLLOQUY -                                          38

1      Mr. Kolano, your next witness, Renee Diggs, is

2  available.  She is ready to be transported over.  She is on the

3  bridge.  So as soon as the jurors have returned the officers

4  are going to pick her up.

5      I assume the requests is the same, that she be

6  escorted into the room outside the presence of the jury, placed

7  on the stand, and have the cuffs removed from her.  State is

8  requesting that?

9      MR. KOLANO:  Yes, your Honor, I am.

10     THE COURT:  Do you anticipate having Miss Diggs, as

11  April Diggs did, step off the witness stand and demonstrate

12  anything?

13     MR. KOLANO:  Yes, I do.

14     THE COURT:  Again, she will be uncuffed during the

15  time that she is off of the witness stand doing whatever

16  display or demonstration is necessary.  All right.

17     Mr. Kolano, you indicated in our side bar there were

18  items to move into evidence.  We can address that now.  See if

19  the defense has any objection.

20     MR. KOLANO:  Starting first with S-5, photo of the

21  scene and the fence.

22     MR. FLORCZAK:  Let me see it.

23     I have no objection to that photograph.

24     THE COURT:  S-5 in evidence.

25     MR. KOLANO:  S-6.

- COLLOQUY -                                          39

1        MR. FLORCZAK:  I have no objection, judge.

2        THE COURT:  In evidence, without objection.

3        MR. KOLANO:  S-8

4        MR. FLORCZAK:  Yes, I do object to S-8, judge.

5        If the court recalls, that's the picture of the wall

6    where there is a chip out of the wall.  The officer couldn't

7    say what caused it and when it occurred.  Implication was that

8    it was ricochet of a bullet.  There is no way of knowing

9    whether a bullet caused it or whatever.  So I would object.

10        THE COURT:  I think it's misleading.  There is no

11   evidence to tie that chip in the wall with anything in the

12   case.  I realize it's a photo of a wall near the scene.  But

13   the chip in the wall is not explained as it relates to this

14   case.  That's excluded.

15        MR. KOLANO:  S-9

16        THE COURT:  House on South Park Street.

17        MR. FLORCZAK:  I have no objection.

18        THE COURT:  All right.

19        MR. KOLANO:  S-10 and 11, particular pictures of the

20   wall.

21        MR. FLORCZAK:  Judge, my only objection is that it's a

22   duplication.  I don't see any point.

23        THE COURT:  I think it gives two different views of

24   the location of the wallet.  Over the defense objection, both

25   are in.

- COLLOQUY -                                           40

1          MR. KOLANO:  Next I will do collectively.

2          Autopsy pictures that we have just discussed this

3     morning would be S-12, 13, 14, and 15.

4          MR. FLORCZAK:  Judge --

5          THE COURT:  We have already discussed those.  Those

6     are in evidence.

7          MR. KOLANO:  S-17, blow up of the --

8          THE COURT:  Diagram of the scene.

9          MR. KOLANO:  Yes.

10         MR. FLORCZAK:  No objection.

11         THE COURT:  It's in evidence.

12         MR. KOLANO:  S-23, the wallet.

13         MR. FLORCZAK:  Judge, I have no objection.

14         THE COURT:  Without objection, the wallet is in

15     evidence.

16         MR. KOLANO:  S-25, First Down jacket.

17         THE COURT:  One of the items of clothing.

18         MR. FLORCZAK:  Whose clothing?

19         THE COURT:  That would be the defendant's.

20         S-25 is the black jacket.

21         MR. FLORCZAK:  I have no objection, judge.

22         MR. KOLANO:  S-26, blue gold Tommy Hilfiger jacket.

23         MR. FLORCZAK:  If I recall they were identified by

24     April Diggs.

25         MR. KOLANO:  April, Tom Koczur and John Furda.

- COLLOQUY -                                    41

1        MR. FLORCZAK:  Judge, I have no objection.

2        MR. KOLANO:  S-27, red, white and blue Tommy Hilfiger.

3        MR. FLORCZAK:  I have no objection judge.

4        MR. KOLANO:  S-28, ski mask identified by Tom Koczur,

5   Migdalia Hernandez, and April Diggs.

6        MR. FLORCZAK:  I have no objection, judge.

7        MR. KOLANO:  The black wool First Down hat identified

8   by Tom Koczur.  S-29.

9        MR. FLORCZAK:  I have no objection.

10       MR. KOLANO:  S-30 pink Reeboks by April Diggs and Tom

11  Koczur.

12       MR. FLORCZAK:  Since I have no objection to the

13  clothing --

14       THE COURT:  That would include black pants, black

15  Adida sneakers and black leather gloves S-31, 32 and 33.  Those

16  are the final items of clothing.

17       MR. KOLANO:  S-34, bullet fragment testified to this

18  morning.

19       MR. FLORCZAK:  I have no objection.

20       MR. KOLANO:  S-35, affidavit that I just read.

21       MR. FLORCZAK:  That's already in, I believe.

22       THE COURT:  I don't know that I formally said so, but

23  it's in.  I said it at side bar.

24       MR. KOLANO:  S-42, map of Elizabeth showing the three

25  locations.

- COLLOQUY -                                      42

1          MR. FLORCZAK:  No objection, judge.

2          MR. KOLANO:  That is it at this time.  I may make an

3    application as relates to the statements, depending on the last

4    witness' testimony.

5          THE COURT:  All right.  We will take a break while we

6    wait for the jury to return, and get Miss Diggs.

7          THE COURT:  May we have the jurors brought out,

8    please.

9          (Jury seated in the jury box in the courtroom.)

10          THE COURT:  Swear in the next witness, please.

11   R E N E E     D I G G S

12   Sworn as a witness and testified as follows:

13   DIRECT EXAMINATION BY MR. KOLANO:

14          THE COURT:  Mr. Kolano.

15     Q.   Miss Diggs, how old are you?

16   A.   Twenty-four.

17     Q.   And do you know Marvin Mathis?

18   A.   Yes, I do.

19     Q.   Do you see him in the courtroom today?

20   A.   Yes.

21     Q.   Would you please identify him by indicating where he

22   is sitting and what he is wearing?

23   A.   Next to the man right there with a white shirt and pants.

24          THE COURT:  Indicating, for the record, the defendant.

25     Q.   Back in January of 1996, did you know a Migdalia

R. DIGGS  -  DIRECT BY KOLANO                    43

1   Hernandez?

2   A.   Yes.

3        Q.   Did you ever frequent her apartment?

4   A.   Yes, I did.

5        Q.   And did you know where that apartment was?

6   A.   I don't remember address.   It was on Third Street.

7        Q.   And back then did you know Antwan Harvey?

8   A.   Yes, I did.

9        Q.   How long had you known Antwan Harvey up until January

10  22nd, 1996?

11  A.   Since November '95.

12       Q.   Basically about three months?

13  A.   Yes.

14       Q.   Did Antwan Harvey ever frequent Migdalia's apartment?

15  A.   Yes.

16       Q.   Do you know April Diggs?

17  A.   Yes.

18       Q.   What's your relationship to April?

19  A.   She is my cousin.

20       Q.   Did April frequent Migdalia's apartment?

21  A.   Yes.

22       Q.   Did Marvin frequent Migdalia's apartment?

23  A.   Yes.

24       Q.   On January 22nd, 1996, did you go to Migdalia's

25  apartment that day?

R. DIGGS  -  DIRECT BY KOLANO                    44

1   A.   Yes.

2        Q.   And did you see Antwan Harvey there?

3   A.   Yes.

4        Q.   Did you see April Diggs there?

5   A.   We came together.

6        Q.   And did you see Marvin Mathis there?

7   A.   Yes.

8        Q.   Did there come a point in time in the evening hours of

9   January 22nd, 1996, that you and April left to go someplace to

10  eat?

11  A.   Yes.

12       Q.   Where did you go?

13  A.   To Chinese store.

14       Q.   And where was that in relationship to Migdalia's

15  apartment?

16  A.   Right across the street.

17       Q.   While you were there were you joined by anyone?

18  A.   Yes.

19       Q.   Who were you joined by?

20  A.   Marvin Mathis and Antwan Harvey.

21       Q.   Did there come a point in time where you left the

22  Chinese store on Third Street near Migdalia's apartment?

23  A.   Yes.

24       Q.   Where did you go?

25  A.   We walked down Elizabeth Avenue.

R. DIGGS  -  DIRECT BY KOLANO                          45

1    We walked down Elizabeth Avenue.

2        Q.    And where did you think you were going when you

3    started out to walk?

4    A.  We were asked to be lookouts.

5        Q.    Let me back up a little.

6    Originally when you were walking did you know, what did you

7    think you were going to do originally?

8    A.  Just walking, buy beer.

9        Q.    There come a point in time where the plan had changed?

10   A.  Yes.

11       Q.    Tell me about that.

12   A.  I don't remember where exactly it was.

13       Q.    Okay.  Just tell us what was said and about changing

14   of the plans.

15   A.  They asked us to be lookout.

16       Q.    Who?

17   A.  Marvin and Antwan.

18       Q.    Lookouts for what?

19   A.  To a robbery.

20       Q.    Were a number of robberies discussed or attempted that

21   evening?

22   A.  No.

23           MR. FLORCZAK:  I am having trouble hearing.

24           THE COURT:  Miss Diggs, if you could just keep your

25   voice up, and perhaps sit a little closer to the microphone.

R. DIGGS  -  DIRECT BY KOLANO                    46

1    Q.    Back then where did you live?

2 A.    I lived 7F Pioneer Homes.

3    Q.    When you began walking do you remember what you were

4 wearing?

5 A.    I don't remember what I was wearing.   I remember my coat.

6    Q.    What coat?

7 A.    A red white and blue Tom Hilfiger.

8    Q.    Turned inside out or --

9 A.    Inside out.

10    Q.    Why was that?

11 A.    I didn't want anyone to see me.

12    Q.    Do you remember what color coat Marvin was wearing?

13 A.    Black.

14    Q.    And do you remember what kind of coat Antwan was

15 wearing?

16 A.    Antwan had on blue Tom Hilfiger turned inside out.   It was

17 gold.

18    Q.    Do you know why Antwan had that turned inside out?

19 A.    No.

20    Q.    Do you remember what kind of shoes April was wearing?

21 A.    Yes.

22    Q.    What kind of shoes was April wearing?

23 A.    Pink Reeboks.

24    Q.    Now, did there come a point in time where there was

25 some discussion about a movie and a robbery?

R. DIGGS  -  DIRECT BY KOLANO                    47

1   A.  Um-hum.  I don't remember.  About robbery, yes.  But I

2   don't remember the movie, I don't remember.

3       Q.   Okay.  Please tell us what you remember about the

4   robbery then?

5   A.  We was just basically asked to look out for the police when

6   they did the robbery.

7       Q.   When you say they went and did the robbery, who?

8   A.  Marvin and Antwan.

9       Q.   Do you remember --

10      Let me ask you to look at what has been marked previously

11  as S-45 for identification, ask you to look at it and indicate

12  whether or not you recognize that.

13  A.  Yes.

14      Q.   And what is that document?

15  A.  My statement.

16      Q.   And did something happen with some Spanish boys that

17  evening?

18  A.  Yes.

19      Q.   Would you please tell the jury what happened with

20  Spanish boys?

21  A.  It was two, I guess it was Spanish men walking, and Marvin

22  and Antwan started to chase them.

23      Q.   Why did Marvin and Antwan start to chase the Spanish

24  boys?

25  A.  I guess to rob them.  I don't know.

R. DIGGS  -  DIRECT BY KOLANO                    48

1      Q.   And did there come a point in time where there was a
2   man who had some jewelry or some gold?
3   A.   No.  I don't remember.
4      Q.   Was there any other situation?
5      Can you please tell us about the situation regarding a
6   deli?
7   A.   I don't remember deli.
8      Q.   Were there any, other than chasing the Puerto Rican
9   boys, and other than what ultimately led to the shooting, was
10  there other conversations or actions about robberies?
11  A.   They wanted to go to a MAC machine.
12     Q.   When you say they, who are you referring to about MAC
13  machine?
14  A.   I think Marvin brought it up.  I am not sure.
15     Q.   What was your response about MAC machine?
16  A.   No.
17     Q.   Why?
18  A.   I didn't want to go.
19     Q.   Was there a time where robbery was discussed and
20  Marvin said that it shouldn't be done, should not be done?
21  A.   That wasn't a robbery.
22     Q.   What was that about?
23  A.   Somebody confronted, was confronting me, and I guess Antwan
24  was intoxicated, but he went up.  It wasn't a robbery.
25  Somebody started to confront me.

R. DIGGS  -  DIRECT BY KOLANO                    49

1  And Marvin told Antwan no.

2      Q.   Did Marvin say why he told Antwan no?

3  A.  I guess, I guess.

4      Q.   Please look at page five of your statement.  I am

5  going to ask you to look at page five, and would you please

6  indicate, read that to yourself and see if that refreshes your

7  recollection.

8          MR. FLORCZAK:  What are you asking her to read?

9          MR. KOLANO:  Page five.

10     Q.   What does that refresh your recollection as to?

11  A.  That's where Spanish guys were.

12     Q.   And where did that actually take place?

13  A.  I think between 6th, 6th and Elizabeth Avenue.

14     Q.   Was it between 5th and 6th off of Elizabeth Avenue?

15  A.  Yes.  It was right on the corner of 6th.

16     Q.   Now, did there come a point in time where you came

17  upon a man who was taking out some garbage?

18  A.  Yes.

19     Q.   Please tell us about the conversation that happened

20  between Antwan and Marvin that you heard prior to your coming

21  upon this man?

22  A.  I didn't hear all the conversation.  I just heard them say

23  That one right there.

24     Q.   Tell us which one.  Jury hasn't heard any of this.

25  You tell us what happened.

R. DIGGS  -  DIRECT BY KOLANO                    50

1   A.  Marvin, Marvin started walking and he said That one right

2   there.  And me and April started walking away.

3       Q.   Was there a gun produced at some point?

4   A.  Yes.

5       Q.   Who had the gun?

6   A.  Antwan had the gun, and then he gave it to Marvin.

7       Q.   When did Antwan produce the gun?

8   A.  Before this, between Seventh --

9       Q.   When Antwan produced the gun what was said between

10  Antwan and Marvin?

11  A.  I don't know.

12      Q.   You indicated before that Antwan gave the gun to

13  Marvin.  Please tell us that.  How?

14  A.  I didn't see the transaction.

15      Q.   How do you know he gave the gun to Marvin.

16  A.  Because he had it first.

17      Q.   How do you know Marvin ended up with the gun?

18  A.  Because that's who shoot the man.

19      Q.   Did you see Marvin had the gun?

20  A.  Marvin went up to him, and when I seen the shot I knew

21  Marvin had the gun.

22      Q.   Please tell us from the time that Antwan gives the gun

23  to Marvin and the shooting happened, tell us in your own words

24  what happened?

25  A.  Marvin went over to the man, and I turned around, and I

R. DIGGS  -  DIRECT BY KOLANO                    51

1   seen the man grab Marvin by his jacket, I guess, and then I

2   just seen the fire, the light flash.  And the man fell.

3       Q.   What did Marvin do after he shot the man?

4   A.   Ran.

5       Q.   Which way did he run?

6   A.   Towards Seventh Street.

7       Q.   Which way did Antwan run?

8   A.   Seventh Street.

9       Q.   Which way did you and April go?

10  A.   We went the other pathway.

11      Q.   You indicated that you were going to be the lookout

12  for this robbery?

13  A.   Yes.

14      Q.   Did you plead guilty to a charge of armed robbery?

15  A.   Yes.

16      Q.   And anticipated receiving a sentence of fifteen years

17  in prison with a five year parole disqualifier?

18  A.   Yes.

19      Q.   And you have not been sentenced on that yet?

20  A.   No.

21      Q.   And you also were obligated to testify next week or in

22  the next two weeks against Antwan Harvey?

23  A.   Yes.

24      Q.   Do you recall being arrested on January 25th, 1996?

25  A.   Yes.

R. DIGGS  -  DIRECT BY KOLANO                      52

1    Q.    And did you give a statement to the police?

2  A.   Yes.

3    Q.    In fact did you give three statements to the police?

4  A.   Yes.

5    Q.    Showing you the one identified -- that's the first

6  statement you gave to the police?

7  A.   Yes.

8    Q.    And who did you identify as the shooter in that

9  statement on talking to the police on the 21st?

10  A.   Marvin Mathis.

11    Q.    Is it true Marvin was the person who shoot Mr.

12  Saraiva?

13  A.   Yes.

14    Q.    Was any money gotten?

15  A.   No.  I don't think so.

16    Q.    Did you return to Migdalia's?

17  A.   Yes.

18    Q.    Did Marvin return to Migdalia's?

19  A.   Yes.

20    Q.    Did Antwan return to Migdalia's?

21  A.   Yes.

22    Q.    Did April return to Migdalia's?

23  A.   Yes.

24    Q.    Was there any discussion that you were part of with

25  Marvin at Migdalia's?

R. DIGGS  -  DIRECT BY KOLANO                    53

1    A.  Not with Marvin.  They told us not to say anything.  And

2    April says she was going to tell and I, I said I wasn't in it.

3    And April said she was going to tell.

4        Q.   When was the last time there was a discussion about

5    the gun as it relates to Migdalia's apartment on Third Street?

6    A.  Just that night.

7        Q.   Please tell us what the discussion was and who

8    participated in it.

9    A.  It wasn't really discussion, just somebody stated they

10   still had it.  I don't remember --

11       Q.   Can you describe the gun?

12   A.  All I know is black.

13       Q.   Did you see where the gun went after Marvin shot the

14   man?

15   A.  No.

16       Q.   Prior to that time did you have any animosity or have

17   any reason to dislike Marvin Mathis?

18   A.  No.

19       Q.   Did you lie about his involvement?

20   A.  No.

21       Q.   Do you remember what Marvin said when Antwan handed

22   him the gun?

23   A.  I think he said to him Here, or something like that.

24       Q.   Please look at page five, the second question from the

25   bottom.  Read that to yourself and see if that refreshes your

1   recollection?

2   A.  Oh, yes.

3       Q.   What did Marvin say when he got the gun?

4   A.  Yeah, oh, yes.

5       Q.   Now, turn to page six.  Please find the fourth

6   question down and read that to yourself and see if that

7   refreshes your recollection as to the conversation between

8   Antwan and Marvin.

9   A.  Um-hum.  Yes.

10      Q.   What did Marvin say when Antwan gave him the gun?

11  A.  Oh, yeah.  It's on.

12      Q.   Did you know what it meant when Marvin said Oh, Yes,

13  it's on?

14  A.  I guess to go rob that man.

15      Q.   And what did you say or do at that point in time?

16  A.  Me and my cousin start to walk away.

17      Q.   Did you say something?  Well, let me ask you this.

18  Did you know who the man was?

19  A.  Yes.

20      Q.   Did you say anything to anybody about knowing who the

21  man was?

22  A.  After, after, I told him I know him.

23      Q.   How did you know the man?

24  A.  I grew up around that neighborhood.

25      Q.   I am going to show you what's now marked in evidence

R. DIGGS  -  DIRECT BY KOLANO                    55

1   S-25 for identification.   Do you recognize this?

2   A.   Yes.

3        Q.    And what is this?

4   A.   Marvin's coat.

5        Q.    And this is the coat he was wearing that night?

6   A.   I guess, yes.

7        Q.    Showing you what has been marked S-27 in evidence.   Do

8   you recognize this?

9   A.   Yes.

10        Q.    And what is that?

11   A.   My coat.

12        Q.    This is the coat you had turned inside out?

13   A.   Yes.

14        Q.    Showing you what has been marked S-28 in evidence.   I

15   ask you to look at it.   Do you recognize that?

16   A.   Yes.

17        Q.    What is this?

18   A.   Mask Antwan had.

19        Q.    And your initials appear on here?

20   A.   Yes.

21        Q.    You identified this previously as the mask Antwan had

22   that night?

23   A.   Yes.

24        Q.    And S-26, now in evidence, I ask you to look at it.

25   Do you recognize that?

R. DIGGS  -  DIRECT BY KOLANO                    56

1   A.  Yes.

2        Q.   And what is that?

3   A.  Antwan coat.

4        Q.   And this is the one he was wearing inside out so gold

5   was showing?

6   A.  Yes.

7        Q.   You received the discovery in this case?

8   A.  Yes.

9        Q.   When you say discovery, you got a copy of everything

10  that's in my files?

11  A.  Yes, my statement.

12       Q.   And you had an attorney in this case when you pled

13  guilty?

14  A.  Um-hum, yes.

15       Q.   Miss Shelley Logan?

16  A.  Yes.

17       Q.   And you entered a plea of guilty in front of a judge?

18  A.  Yes.

19       Q.   And did you indicate to the judge at that time who the

20  shooter was?

21  A.  Yes.

22       Q.   And who did you tell the judge the shooter was?

23  A.  Marvin Mathis.

24       Q.   Did you indicate you were also responsible in terms of

25  being a lookout for the robbery?

R. DIGGS  -  DIRECT BY KOLANO                    57

1    A.   Yes.

2         Q.   Were you aware that a robbery was going to happen?

3    A.   Yes.

4         Q.   In fact all four of you were involved in that robbery?

5    A.   Yes.

6         Q.   And you knew a gun would be involved in the robbery?

7    A.   Yes.

8         Q.   There was also a third statement that you gave that

9    related to a video tape?

10   A.   Yes.

11        Q.   And did you have an opportunity to look at that video

12   tape sometime before today?

13   A.   No.

14        Q.   Had you ever seen that video tape before?

15   A.   Yes.

16        Q.   And were you on that video tape?

17   A.   Yes.

18        Q.   Was April Diggs on that video tape?

19   A.   Yes.

20        Q.   Was Marvin Mathis?

21        MR. FLORCZAK:  Judge, I object.  I don't see

22   relevancy.

23        MR. KOLANO:  Same questions as I asked April.

24        I am not going to go into details what is on it, but

25   it relates to connection among the four people.

R. DIGGS  -  DIRECT BY KOLANO                    58

1        THE COURT:  I will allow the question.  Objection

2   overruled.

3        Q.   Marvin Mathis on the video tape?

4   A.   I don't remember.

5        Q.   And was Antwan Harvey on the video tape?

6   A.   Yes.

7        MR. KOLANO:  Nothing further.

8        THE COURT:  Mr. Florczak.

9   CROSS EXAMINATION BY MR. FLORCZAK:

10       Q.   Miss Diggs, at the time of this shooting you were

11   walking away, isn't that true?

12   A.   Yes.

13       Q.   And you had -- you wanted no part of it?

14   A.   Yes.

15       Q.   So you weren't acting as a lookout, isn't that true?

16   A.   No.   I just wanted do leave.

17       Q.   And when they asked you, when you were asked to be a

18   lookout you didn't agree to it, did you?

19   A.   Yes, I did.

20       Q.   You did.   What did you say?

21   A.   I said okay.

22       Q.   But did you look out?  Or did you just walk away?

23   A.   At that particular time I started to walk away.

24       Q.   And you met up with Marvin and Antwan at Third and

25   Seventh.  Do you recall where you -- let me rephrase that.

R. DIGGS - CROSS BY FLORCZAK                              59

1      Where did you meet up with them when you started walking?

2  A.   Third, Third and Bond.

3     Q.   Third and Bond?

4  A.   Yes.

5     Q.   So you met up with them in the street?

6  A.  Yes.

7     Q.   And you had already gone and had something to eat, is

8  that correct?

9  A.   Yes.

10     Q.   And how long had you been out of this Migdalia's

11  house?

12  A.   I don't remember.

13     Q.   You had left there earlier, just two of you, April and

14  you?

15  A.   Yes.

16     Q.   You two -- four of you were walking.

17     You were walking to get beer, isn't that true?

18  A.   Yes.

19     Q.   Now, Marvin had on a cap, black wool cap, or some

20  cotton cap, is that true?

21  A.   Yes.

22     Q.   And it was Antwan who had the mask, isn't that true?

23  A.   Yes.

24     Q.   Now, at some point while walking was there any talk

25  about a movie, seeing something about a robbery in a movie; do

R. DIGGS - CROSS BY FLORCZAK                           60

1   you remember that at all?

2   A.   The robbery, when they asked us to be a lookout.

3        Q.   My question is, Was there any talk about a movie?

4   A.   I don't remember.

5        Q.   I ask you --

6        MR. FLORCZAK:  Has this been marked?

7        MR. KOLANO:  First statement, up there, marked S-45.

8        Q.   I ask you to look at your statement, S-45, page four.

9   Specifically, one, two, three, four, five -- about the 10th

10  question.  You are talking about -- and you had been standing

11  outside the liquor store and, why -- do you see the part about

12  your answer?

13  A.   Yes.

14       Q.   What was your answer?

15  A.   We stood outside liquor store.

16       Q.   Next question you were asked Why, is that correct?

17  A.   Yes.

18       Q.   And did you say, We were talking about the movie we

19  watched?

20  A.   Yes.

21       Q.   They were going to do a robbery.  Was that in the

22  movie?

23  A.   I guess -- I don't remember.

24       Q.   You don't recall the incident, then.

25       And it's your testimony that Antwan and Harvey started

R. DIGGS - CROSS BY FLORCZAK                          61

1    chasing couple of guys?

2            MR. KOLANO:   Antwan and Harvey?

3       Q.   Antwan Harvey and Marvin Mathis?

4    A.   Yes.

5       Q.   Do you recall why they were chasing these people?

6    A.   Yes.

7       Q.   And saying I guess to beat them up?

8    A.   Yes.  I didn't know, so I just said I guess to beat them

9    up, I don't know.

10      Q.   You also said Why were they going to beat them up, and

11   you think they were going to rob them?

12   A.   Yes.

13      Q.   You didn't know at that point?

14   A.   I didn't know.

15      Q.   There was no discussion of robbery at that point?

16   A.   That particular point, no.

17      Q.   Now, at some point did Antwan pull out this gun, pull

18   out a gun?

19   A.   Yes.

20      Q.   And before that were you aware he had a gun with him?

21   A.   No.

22      Q.   Okay.  So when he pulled out this gun did he start

23   acting crazy?

24   A.   Yeah.

25      Q.   In fact that's the statement you gave to the police:

R. DIGGS - CROSS BY FLORCZAK                    62

1   Antwan started acting crazy and he pulled out a gun out of his

2   pants?

3   A.   Yes.

4       Q.   And at that point was he going to rob or attack

5   someone?

6   A.   He was just showing off.

7       Q.   Well, at that point Marvin told him Don't do it, isn't

8   that true?

9   A.   That's between, that wasn't over here.   That was --

10      Q.   Okay.   I refer you to page five of your statement.

11          MR. KOLANO:   If she can finish her question, finish

12  her answer.

13  A.   That's when they went up to the other guy.   Marvin said no.

14  They was black.

15      Q.   Okay.

16  A.   And guy started to say something --

17      Q.   Right.   So your answer there What happened at the

18  intersection of Seventh and Elizabeth Avenue.   Is that the

19  question?

20  A.   Yes.

21      Q.   And you said someone started to say something to me.

22  Antwan started acting crazy and he pulled out a gun out of his

23  pants, and Marvin said don't do it, they are black.   Then he

24  said go by the bank where the MAC machine is, and I said No.

25      Q.   And Antwan stuck the gun back in his pants?

R. DIGGS - CROSS BY FLORCZAK                     63

1    A.   I guess.

2         Q.   Well, that same page five, weren't you asked Did

3    Antwan put the gun back in his pocket?  And did you answer Yes,

4    in his pants?

5    A.   Yes.

6         Q.   So is that what happened?

7    A.   Yes.

8         Q.   And you guys never went to any MAC machine, isn't that

9    true?

10   A.   No.

11        Q.   Now, you then say that while you are walking Antwan

12   gave Marvin the gun, is that true?

13   A.   Yes.

14        Q.   Did you see him give him the gun?

15   A.   I seen the transaction.  I don't know what he did, but I

16   seen the transaction of him giving something to him.  Antwan

17   had the gun, and when I seen the transaction I assume he gave

18   him the gun.

19        Q.   Did you see him hand him the gun?

20   A.   No, I did not.

21        Q.   You didn't see the gun go from Antwan to Marvin, you

22   saw some kind of movement between the two?

23   A.   Yes.

24        Q.   And you assumed that's what it was?

25   A.   Yes.

R. DIGGS - CROSS BY FLORCZAK                64

1     Q.   But you didn't actually see it?

2   A.   No.

3     Q.   Now, do you recall as you guys were walking any cops

4   come by?

5   A.   Yes.

6     Q.   And is that when Antwan asked you to watch out for the

7   cops?

8   A.   Yes.

9     Q.   That had nothing to do with the robbery at that point,

10   did it?

11   A.   That's when we were told to be lookouts.

12     Q.   Did he take the safety off the gun and threaten to

13   shoot at the cops?

14   A.   He started acting crazy with the gun.

15     Q.   My question is, Did he kick the gun off safety and he

16   was going to shoot at the cops?

17   A.   Yes.

18     Q.   That did happen?

19   A.   Yes.

20     Q.   That's when Antwan had the gun?

21   A.   Yes.

22     Q.   Antwan at that time was twenty years old?

23   A.   Yes.

24     Q.   And Marvin was fifteen?

25   A.   Yes.

R. DIGGS - CROSS BY FLORCZAK                              65

1        Q.   And you believe that Antwan gave Marvin the gun?

2   A.   Yes.

3        Q.   And did you meet -- You saw Antwan back at Migdalia's,

4   is that correct?

5   A.   Yes.

6        Q.   Was Marvin there?

7   A.   Yes, he was.

8        Q.   Didn't you see when you got --

9        You got there with April?

10  A.   Yes.

11       Q.   You both arrived together?

12  A.   Yes.

13       Q.   You didn't arrive with Marvin and Antwan?

14  A.   No, I did not.

15       Q.   And wasn't Marvin coming down the stairs as you were

16  going up with April?

17  A.   I don't remember.

18       Q.   So it might have been.  You don't remember?

19  A.   No, I didn't see him coming down the stairs.  When we came

20  up we knocked on the door and he was in the house.

21       Q.   So you never saw him coming down the stairs as you

22  were entering?

23  A.   No.

24       Q.   And how long were you there?

25  A.   How long?

R. DIGGS - CROSS BY FLORCZAK                         66

1      Q.    Yes.

2   A.   I don't remember.

3      Q.    Do you remember saying something about being there

4   1:00 a.m.?

5   A.   It was late when I left.

6      Q.    Who was there at 1:00 a.m.?

7   A.   I don't remember everybody.  I don't remember everybody.

8      Q.    Do you know whether Antwan was there?

9   A.   Yes, he was.

10     Q.    Was Steve there?

11  A.   Yes, he answered the door.

12     Q.    April?

13  A.   Yes.

14     Q.    Marvin?

15  A.   Yes.

16     Q.    He was there at 1:00 a.m.?

17  A.   At 1:00 a.m.?  No.  He had left.

18     Q.    How early had he left?

19  A.   I don't remember.

20     Q.    At that time did Antwan tell you to keep quiet about

21  it?

22  A.   They asked would we, yes.

23     Q.    And didn't he also tell you to say that Marvin did it

24  because Marvin was a juvenile?

25  A.   No.

R. DIGGS - CROSS BY FLORCZAK                        67

1       Q.   And they wouldn't do anything to him?

2   A.   No.

3       Q.   Didn't he threaten you and tell you to say that Marvin

4   was the shooter?

5   A.   No.

6       Q.   Do you know a Miss Arcos?

7   A.   No, I do not.

8       Q.   Did you ever tell anyone that in fact Marvin wasn't

9   the shooter?

10  A.   No, I did not.

11      Q.   You told no one that?

12  A.   No, I didn't.

13      Q.   You saw, besides seeing Antwan that night you saw him

14  the next day during the day, isn't that true?

15  A.   Yes, I did.

16      Q.   Did he tell you to do anything at that point?

17  A.   No.

18      Q.   When there was first this talk of robberies is there

19  any reason why you didn't leave?

20  A.   Antwan wouldn't let me.

21      Q.   Were you afraid of Antwan?

22  A.   Somewhat.

23      Q.   So the only reason why you were still with him is

24  because he wouldn't let you leave, is that true?

25  A.   Yes.

R. DIGGS - CROSS BY FLORCZAK                     68

1      Q.   In your statement when you gave the statement on

2   January 25th you said that you tried to leave, he would grab

3   you back.

4   A.   Yes.

5      Q.   Were the other people with you?  Could you tell

6   whether they were afraid of Antwan too?

7   A.   No, I couldn't.

8      Q.   Now, when this happened back in January 22nd, 23rd,

9   end of January, you were not particularly close friends with

10  Marvin, were you?

11  A.   Just Hi and Bye.  We wasn't close.

12     Q.   Like an acquainteance, someone you saw occasionally?

13  A.   Yes.

14     Q.   Whereas Antwan you knew about the same amount of time,

15  right?

16  A.   Yes.

17     Q.   But you saw him a lot more often?

18  A.   Yes.

19     Q.   Wasn't he at Migdalia's house almost every day?

20  A.   Yes.

21        MR. FLORCZAK:  Are the other statements marked?

22        MR. KOLANO:  No.  Here is a clean copy.

23        MR. FLORCZAK:  And is there a third one?

24        I would like these two documents marked for

25  identification.

R. DIGGS - CROSS BY FLORCZAK                         69

1          THE COURT:  D-1 and two for identification.

2          (D-1 and D-2 for identification).

3     Q.   I show you what has been marked first D-1 for

4    identification.  Do you know what that is?

5    A.  Yes.

6     Q.   What is that?

7    A.  My statement.

8     Q.   That's the statement that indicates it was given 2:30

9    p.m, is that correct?

10   A.  Yes.

11    Q.   On January 25th?

12   A.  Yes.

13    Q.   Now I show you what has been marked D-2 for

14   identification.  Can you identify that?

15   A.  My next statement.

16    Q.   And that was January 26th, 10:10 a.m. right?

17   A.  Yes.

18    Q.   And this S-45 for identification is a statement you

19   gave on January 25th at 12:15 p.m?

20   A.  Yes.

21    Q.   All three of these statements show your age as

22   twenty-two, is that correct?

23   A.  Yes.  Some of them are wrong, wrong dates.

24    Q.   Well, birth date on the statement S-45 shows 11/3/73?

25   A.  Yes.

R. DIGGS - CROSS BY FLORCZAK                    70

1      Q.   That's correct?

2   A.   Yes.

3      Q.   The statement taken couple of hours later, D-1 for

4   identification, shows birth date of 11/3/70?

5   A.   Incorrect.

6      Q.   You didn't notice that when you signed the statement?

7   A.   No, I didn't.

8      Q.   They asked you to read the statement before you signed

9   it.  Do you recall?

10  A.   I looked over it.

11     Q.   You didn't notice that.

12     And I show you D-2 for identification.   Shows birth date

13  11/3/74?

14  A.   Incorrect.

15     Q.   That's wrong as well.

16     Now, when you went walking with Antwan and Marvin, did you

17  know there was possibility of Antwan might want to do

18  robberies?

19  A.   In the beginning?

20     Q.   Yes.

21  A.   No, I didn't.

22     Q.   You knew in the past that Antwan and Stephen Owens had

23  done -- ?

24          MR. KOLANO:   I ask to be heard at side bar.

25          THE COURT:   Yes.

R. DIGGS - CROSS BY FLORCZAK                    71

1    (PROCEEDINGS AT SIDE BAR).

2         MR. KOLANO:  That's outrageous.

3         Just because they are in the statement where she

4    indicates she thought that Antwan and Stephen Owens had done

5    robberies in the past.  This should have been done outside of

6    the presence of the jury before we start talking about hearsay

7    information.  That's Rule 404(b), which is sufficient.  And

8    it's hearsay.  Certainly should have been done before it was

9    mentioned in front of the jury.  Totally inappropriate.

10        I would ask for very harsh curative instruction.

11        MR. FLORCZAK:  Judge, she admitted in her statement

12   that she had knowledge that he had done robberies before.

13        THE COURT:  Well, is that the same she is aware that

14   he had done robberies before?  Statement says she had heard he

15   had done robbery before.

16        MR. FLORCZAK:  I will read the question:

17        Just prior to transporting you back to the cell block

18   you told them that Stephen Owens and Antwan did several

19   robberies and possible homicide in the City of Elizabeth within

20   last year.

21        Answer was:  Yes.

22        And, further, you also stated that these individuals

23   video taped themselves.

24        You also stated these individuals video taped

25   themselves, all with you being naked, bragging about these




R. DIGGS - CROSS BY FLORCZAK                          72

1    robberies, is that correct?

2          Yes.  They made rap songs.

3          In a sense admitted knowledge that he had done

4    robberies.

5          THE COURT:  No.  I don't think that that says she has

6    knowledge of any crimes, other crimes that they may have

7    committed.  She has, she is repeating what she heard them say.

8    But that doesn't indicate that she knows that they committed

9    robberies.  It would be hearsay.

10         I am going to sustain the objection to the question

11   and direct the jury to disregard it.

12   (SIDE BAR TERMINATED).

13         THE COURT:  Objection to the last question is

14   sustained.  Jury will disregard it.

15   Q.   After the shooting occurred you looked back, and did

16   you see a man standing over the person that was shot?

17   A.   Yes.

18   Q.   Did you see that man go through the wounded person's

19   pockets?

20   A.   His pants pockets, yes.

21   Q.   Did you notice whether he took the wallet out or not?

22   A.   No, I did not.

23   Q.   This man you saw standing over going through the

24   pockets was not Marvin Mathis or Antwan, is that correct?

25   A.   No, it was not.

R. DIGGS - CROSS BY FLORCZAK                    73

1    Q.   Did you know who this man was?

2  A.  I didn't know who it was.  My cousin said it may have been

3  someone named, homosexual named Jamaica.

4        MR. FLORCZAK:  One minute, your Honor.

5    Q.   Did at some point the next day Marvin's girlfriend

6  come to the house and say that Marvin had turned himself in?

7  A.  It wasn't the next day.

8    Q.   When was it?

9  A.  I believe it was on 24th.

10   Q.   Then on the 24th of January Marvin's girlfriend,

11  person you knew as Marvin's girlfriend came and told you that

12  he had turned himself in?

13  A.  Yes.

14   Q.   Do you recall her name?

15  A.  All I know is Sha.

16   Q.   And as far as you know, when you got back to

17  Migdalia's house, nothing was taken by Marvin or Antwan, you or

18  April, from the man that was shot, is that true?

19  A.  Yes.

20   Q.   Now, in any of your statements did you admit being a

21  lookout?

22  A.  No, I don't think so.

23   Q.   So you denied being involved at all, isn't that true,

24  as a lookout or helping in any way?

25  A.  Yes.

R. DIGGS - CROSS BY FLORCZAK                    74

1      Q.   And when you pled guilty you realized that they were

2  dismissing a felony murder charge against you, isn't that true?

3  A.   Yes.

4      Q.   You knew if you were convicted of felony murder you

5  could do thirty years in prison, isn't that true?

6  A.   Yes.

7      Q.   And that's one of the reasons why you pled guilty?

8  A.   Yes.

9      Q.   Rather than risk getting convicted of felony murder?

10 A.   Yes.

11     Q.   So today can you tell us, did you really help in any

12 way?

13 A.   Yes.  I was a lookout.

14     Q.   You were.  Okay.

15     Also part of the agreement was that you would not be, you

16 would not be sentenced until after you testified in this case

17 and possibly another case?

18 A.   Yes.

19          MR. FLORCZAK:  I have nothing further.

20          THE COURT:  Mr. Kolano.

21 REDIRECT EXAMINATION BY MR. KOLANO:

22     Q.   When you pled guilty you had the advice of your

23 attorney?

24 A.   Yes.

25     Q.   And your attorney I assume went over your various

R. DIGGS - REDIRECT BY KOLANO                           75

1   statements and explained to you your criminal liability?

2   A.   Yes.

3        Q.   And you indicated, I assume, to your attorney that you

4   did know that there was going to be a robbery and that you were

5   going to be a lookout?

6   A.   Yes.

7        Q.   And your attorney explained to you that she couldn't

8   let you plead guilty unless you were in fact guilty?

9   A.   Yes.

10            MR. FLORCZAK:   I object to what she was told by her

11   attorney.   I don't see how that's admissible.

12            THE COURT:   Question has been asked and answered.

13            MR. KOLANO:   Certainly, well, more directly, if I can

14   have marked transcript of proceedings, plea.

15            Next number, S-50.

16            (Transcript marked S-50 for identification.).

17        Q.   I am going to show you what has been marked S-50.

18   Would you please turn to page eight.

19        Now, on August 6th, 1996 you went before another judge,

20   Judge Barisonek, and you told him what your involvement was?

21   A.   Yes.

22        Q.   And you had your attorney there at that time?

23   A.   Yes.

24        Q.   And am I reading accurately?  This is the judge asking

25   the question.  Actually, starting on page seven.

R. DIGGS - REDIRECT BY KOLANO                          76

1        The Court:  What did they --

2        "The Court:  And what were they going to do when you

3   were the lookout?

4        Miss Diggs:  Robbery.

5        The Court.  Rob who?  Somebody on the street?"

6        MR. FLORCZAK:  Judge, I object.  I don't see how this

7   is proper redirect.

8        MR. KOLANO:  Proper.  There has been allegation of

9   recent fabrication.  Prior consistent statement.

10        MR. FLORCZAK:  Still, she is being led, judge.

11        MR. KOLANO:  Transcript speaks for itself.  I would

12   ask latitude ask leading questions, since this is a court

13   document, transcript of a plea.  Court proceeding the court can

14   take judicial notice.  Therefore I would ask for the leading

15   nature.  If I misread it, Mr. Florczak can certainly point that

16   out.

17        THE COURT:  I will allow you to lead with respect to

18   the items, the information or the statements contained in the

19   document.

20        Q.   The Court:  Rob who?  Somebody on the street?

21        Miss Diggs:  Yes.

22   Did I read that accurately?

23   A.   Yes.

24        Q.   Are those the words you told the judge?

25   A.   Yes.

1  that you gave him?

2  A.  Yes.

3      Q.   In fact when you gave your statement to the police on

4  the 25th did you ever say that anyone other than Marvin Mathis

5  was the shooter?

6  A.  No.

7      Q.   Reading on page, line fourteen of page eight:

8          TheCourt:  And you knew that he was going to use the

9  gun during the course of the robbery; if anything, at least to

10  rob the person of their monies?

11         Miss Diggs:  Yes.

12         Did I read that accurately?

13 A.  Yes.

14     Q.   Going down to line twenty.

15         The Court:  But you knew he had -- You knew he had the

16 gun, the other two knew he had the gun, and that he was going

17 to use the gun to rob the person?

18         Miss Diggs:  Yes.

19         Did I read that accurately?

20 A.  Yes.

21     Q.   On page nine.

22         The Court:  Well, what happened that he shot him?

23         Miss Diggs:  They had a struggle.

24         The Court:  There was a struggle?

25         Miss Diggs:  Yes.

R. DIGGS - REDIRECT BY KOLANO                    77

1    Q.   The Court:  What did they physically do?  Did they go
2    up to the person?
3         Miss Diggs:  Yes.
4         The Court:  And what did they do when they got up to
5    the person?
6         Miss Diggs:  Shot him.
7         The Court:  They had a gun?
8         Miss Diggs.  Yes.
9         The Court.  Who had the gun?
10        Marvin Mathis.
11        Did I read that accurately?
12   A.   Yes.
13        Q.   The Court:  And Marvin Mathis shot --
14        Miss Diggs:  Shot.
15        The Court.  All of you knew Marvin Mathis had the gun?
16        Yes.  Miss Diggs:  Yes.
17        Did I read that accurately?
18   A.   Yes.
19        Q.   Did you tell the judge that it was Marvin Mathis who
20   shot back in 1996 when you entered your plea of guilty?
21   A.   Yes.
22        Q.   Were you being honest when the judge asked you those
23   questions?
24   A.   Yes.
25        Q.   Were you being honest when you gave him the answers

R. DIGGS - REDIRECT BY KOLANO                    79

1          Did I read that accurately?

2  A.   Yes.

3     Q.   Is that what you testified here today about person

4  grabbing Mathis' jacket?

5  A.   Yes.

6     Q.   Is that what you mean by struggle?

7  A.   Yes.

8     Q.   Line twenty one:  And before Marvin Mathis had the gun

9  to do this armed robbery and shooting of the victim who had the

10 gun before Marvin?

11          Answer:  Antwan Harvey.

12     Did I read that accurately?

13 A.   Yes.

14     Q.   Next page.  Question:  Was it five minutes before --

15     I am sorry.  Going back.

16         "Question:  When did Antwan Harvey give Marvin

17 Mathis the gun prior to this armed robbery, do you recall?

18         "No.

19         Question:  Was it five minutes before, ten minutes

20 before?

21         "Answer:  Five or ten minutes before.

22         "Question:  Five or ten minutes before?

23         "Answer:  Yes."

24     Is that accurate?

25 A.   Yes.

R. DIGGS - REDIRECT BY KOLANO                          80

1        Q.    That what you told the judge?

2    A.    Yes.

3        Q.    Were you being honest when you were talking to the

4    judge?

5    A.    Yes.

6        Q.    Did your attorney explain to you the importance of you

7    having to be totally honest with the judge?

8    A.    Yes.

9        Q.    And that if you lied to the judge that any deal that

10   you made could get thrown out the window?

11   A.    Yes.

12       Q.    And in fact the things that you told the judge is that

13   what you previously told the police in your statements the day

14   you were arrested?

15   A.    Yes.

16       Q.    Now, you indicated before that you saw a flash go off?

17   A.    Yes.

18       Q.    Where was the flash in relationship to Marvin Mathis'

19   hand?

20   A.    I couldn't see.  I just seen a flash, and the man fell.

21       Q.    And was Marvin Mathis by the man when you saw the

22   flash?

23   A.    Yes.

24       Q.    Marvin shoot the man?

25   A.    Yes.

R. DIGGS - REDIRECT BY KOLANO                          81

1      Q.   How do you know?

2   A.   That's who went up to the man.

3           MR. FLORCZAK:  I am sorry.  Can't hear.

4   A.   That's who went up to the man.

5      Q.   Is that who the man was grabbing at the time you saw

6   the flash?

7   A.   Yes.

8      Q.   Any doubt in your mind about that?

9   A.   No.

10     Q.   Did you see or hear Antwan Harvey threaten Marvin

11  Mathis that night?

12  A.   No, I did not.

13          MR. KOLANO:  Thank you.  Nothing further.

14  RECROSS EXAMINATION BY MR. FLORCZAK:

15     Q.   So your first story back in January of '96 was that

16  Marvin shot him, is that correct?

17          MR. KOLANO:  Objection to the phraseology of story.

18  First statement or first testimony.

19          THE COURT:  Rephrase the question to include

20  statement.

21     Q.   Okay.  Your first statement was that Marvin shot him.

22  Is that correct?

23  A.   Yes.

24     Q.   And when you finally pled in August '96, did your

25  attorney tell you you had to stay with the same story to get

- R. DIGGS -                                              82

1  the deal, the same statement?

2  A.  Yes.

3      Q.   You couldn't change your version of what happened?

4  A.  No, I couldn't change it.

5      Q.   So even if that was untrue if you wanted to get this

6  deal and get away from felony murder you had to stay with the

7  story or statement that Marvin shot him, is that true?

8  A.  Yes.

9      Q.   And of the two men involved in this who are you more

10 afraid of, Antwan or Marvin?

11 A.  I didn't even know Marvin, not like I knew Antwan.

12     Q.   Excuse me.  What was the last?

13 A.  Not like I knew Antwan.

14     Q.   But when Antwan told you to do something, like not

15 leave, that's what you did, isn't that true?

16 A.  Yes.

17         MR. FLORCZAK:  I have nothing further.  Thank you.

18 REDIRECT EXAMINATION BY MR. KOLANO:

19     Q.   Let me ask you point blank.  Mr. Florczak asked you

20 questions about you having to stay with the story.

21     Did Marvin, was Marvin the shooter or not?

22 A.  Yes, he was.

23         MR. FLORCZAK:  Judge, has been asked and answered.

24         THE COURT:  I will allow it.  Just briefly.

25     Q.   Are you telling us that your attorney would have told

1   you to lie?

2   A.  No, she wouldn't.

3        Q.   And did you give your attorney or anyone any reason to

4   believe that anyone other than Marvin Mathis was the shooter?

5   A.  No, I didn't.

6        Q.   Are you telling us -- Let me ask you.  Is Antwan

7   actually the shooter and you are lying because you said that in

8   the first statement and you want the deal?

9   A.  No.

10       Q.   Did you have any reason back then to implicate Marvin

11  Mathis if he wasn't the shooter?

12  A.  No.

13       Q.   Did he ever do anything to hurt you or harm you in any

14  way?

15  A.  No?

16       Q.   Did Antwan Harvey ever do anything to hurt you or harm

17  you prior to that?

18  A.  No.

19            MR. KOLANO:  Thank you.  Nothing further.

20            MR. FLORCZAK:  I have nothing further, judge.

21            THE COURT:  All right.

22            May I see counsel at side bar.

23  (PROCEEDINGS AT SIDE BAR)

24            THE COURT:  This is just to discuss scheduling.

25            We have to get Miss Diggs out, which will take a few

- COLLOQUY -                                    84

1    minutes.  I want to do that outside the presence of the jury.

2              Is there going to be another state's witness.

3              MR. KOLANO:  In light of that last couple of questions

4    and answers, Miss Logan is in the courtroom, I am going to want

5    to talk to her because I think implication is that she is going

6    with the story whether it's the truth or not.  And I can't

7    believe that Shelley Logan would condone such a thing.

8              I may have to put her on the stand, even though this

9    was not anticipated, because I am assuming Shelley as an

10   officer of the court is going to say this is not the first that

11   she said, she always said this version.  I wouldn't let her

12   plead guilty if I knew that she would be committing fraud on

13   the court.

14             MR. FLORCZAK:  Judge, in other words, he is asking the

15   attorney for Renee Diggs to waive her privilege.  Privileged

16   communications.

17             MR. KOLANO:  But it's Renee's privilege.  And Renee is

18   talking about this privilege, about this conversation.

19             I am going to talk to Shelley about it.

20             You can't put the person on the stand, and then you

21   exercise this privilege.  You have absolutely no standing or

22   basis in that.

23             MR. FLORCZAK:  However, her testimony of what she

24   testified to doesn't necessarily mean that she communicated

25   whatever she communicated with her attorney.

- COLLOQUY -                                      85

1      MR. KOLANO:  You asked the questions about Miss Logan,

2  your attorney, told you that you had to stick with the story in

3  order to get the deal.  And she said yes.  Obviously you wanted

4  her to say she was going to stay with it.

5      THE COURT:  I understand she testified that she, her

6  attorney told her to tell the truth and what she said in all of

7  her statements was the truth.

8      MR. KOLANO:  Miss Logan would basically be

9  corroboration of otherwise significant impeachment by Mr.

10 Florczak.

11     MR. FLORCZAK:  Wouldn't change the fact what has

12 already been testified to by the witness.

13     MR. KOLANO:  So if I have two witnesses, same thing as

14 if I have three eye witnesses, just because I have one doesn't

15 mean I can't put second and third.

16      I realize something like that gets limited, but this

17 is a very crucial area.  This is a very crucial witness.  This

18 was a very crucial point that you seemed to make on the record.

19 And I am suggesting that's lack of sophistication of the

20 witness, which is what I need to clarify.

21      I have to talk to Mis Logan.  It may be moot.  But

22 while we have her here, and there are issues of privilege, I

23 would suggest --

24      I don't know if you can send the jury out now.  Five

25 to twelve.



– COLLOQUY –                                                      86

1       MR. FLORCZAK:  See you are opening.  Judge, I suggest

2   that Shelley Logan as a witness would open the door to me

3   questioning her about whether it's usual or unusual for clients

4   to lie to her in this type of situation.

5       THE COURT:  I think this has already been adequately

6   addressed.  The questions, the redirect examination, in terms

7   of the point was clarified.  She said that she told the truth.

8   She told what happened.  I think the questions were very direct

9   on that point and answers were very direct.  I think the

10  testimony of this witness is on that point.

11      I don't know that it is necessary to get Miss Logan in

12  here and go through what may very well turn out to be a lot of

13  extraneous material.

14      So I am not going to allow that.

15      Other than Miss Logan, do you have anyone else?

16      MR. KOLANO:  No, your Honor.

17      THE COURT:  So your intention is to rest once we

18  have -- I am just trying to think in terms of scheduling here.

19  Do you have some witnesses to call?

20      MR. FLORCZAK:  I called the investigator to get the

21  witnesses here.  Since they are local I should be able to get

22  them.

23      MR. KOLANO:  Anybody sitting outside now?

24      MR. FLORCZAK:  I have no idea.

25      THE COURT:  Maybe we can check with one of the

- COLLOQUY -                                                87

1    officers.

2             Are there any witnesses hanging around outside?

3             OFFICER:  I don't believe so.

4             MR. KOLANO:  Defense witnesses perhaps?

5             OFFICER:  As far as maybe Mrs. Mathis.

6             THE COURT:  Just Mrs. Mathis?

7             OFFICER:  I believe so.

8             MR. FLORCZAK:  She was outside before.

9             THE COURT:  Okay.  If you would check for us.

10            (Pause).

11            THE COURT:  By the time I have the jury in, have Miss

12   Diggs removed, we are going to be getting close to lunch break

13   anyway.  Maybe we should just call it the morning.  Have the

14   jury wait in the jury room.  We will get Miss Diggs and Mr.

15   Mathis transported out, and then release the jury for lunch.

16            MR. FLORCZAK:  Do you have the items of evidence in

17   before the jury?

18            THE COURT:  You can do that, or I can.

19            MR. FLORCZAK:  Doesn't matter.

20            THE COURT:  I will indicate to the jury outside of

21   their presence the following items were received.  If you want

22   to do it that way.  I will just read off what's in evidence.

23   But I can do that after lunch too before I ask you to rest.

24            MR. KOLANO:  That's fine.

25            THE COURT:  We will do that at 1:30.  All right.  I

- COLLOQUY -                                          88

1    will explain to the jury what we are doing.

2    (SIDE BAR TERMINATED).

3         THE COURT:  Ladies and gentlemen, I am going to excuse

4    you a little early today for lunch.  We have some matters to

5    attend to.  You may as well begin your lunch now.

6         Let me remind you not to engage in any discussions

7    regarding the case among yourselves or with others.

8         And, as is our usual procedure, I am going to excuse

9    you to the jury room, collect your personal belongings, and

10   await there until one of the officers comes to release you,

11   when you are released then to lunch.

12        You are to return here by 1:30.  It will be the normal

13   starting time this afternoon.  And we will continue with the

14   testimony at that time.

15        So you are excused to the jury room.  Please wait for

16   the officer to release you for lunch.

17        (Jury withdrew from the courtroom.)

18        THE COURT:  All right.  The jurors have cleared the

19   courtroom.  They are now in the jury room.  We will have Miss

20   Diggs escorted from the courtroom and then Mr. Mathis.  Once

21   they are both out of the courtroom, then the jury can be

22   released for lunch.

23        (Luncheon Recess.)

24        THE COURT:  Good afternoon.  Be seated, please.

25        Just before we bring the jury out, I did indicate

- COLLOQUY -                                    89

1    before the lunch break that I would advise the jurors on the

2    record as to those items which were moved and received into

3    evidence one of the times that they were out of the courtroom.

4          Anything else to be addressed before the jury is

5    brought out?

6          MR. KOLANO:  Yes.  Another item I am going to seek to

7    move in S-18.  Consent to search.

8          MR. FLORCZAK:  I have no objection, judge.

9          THE COURT:  Beg pardon?

10         MR. FLORCZAK:  No objection.

11         THE COURT:  No objection.  S-18 is also received in

12   evidence.

13         With that, then, Mr. Kolano you will be resting.

14         MR. KOLANO:  I will be, your Honor.

15         THE COURT:  Mr. Florczak, you will be ready to go with

16   the witnesses?

17         MR. FLORCZAK:  Yes, judge.

18         THE COURT:  Let's bring the jurors out.

19         (Jury seated in the jury box in the courtroom.)

20         THE COURT:  Ladies and gentlemen, during one of the

21   periods of time that you were out of the courtroom while we

22   attended to some legal matters various items were received into

23   evidence.

24         As I had advised you in the preliminary instructions,

25   those things that are received into evidence as exhibits by the

- COLLOQUY -                                    90

1   court are available to you during the course of your

2   deliberations.  They will be with you in the jury room for you

3   to examine and consider as part of your deliberations in the

4   case.  These items are evidence for your consideration.  And

5   the items that were moved and received into evidence are as

6   follows:

7            S-5 a photo of the scene.

8            S-6, photo of the liquor store.

9            S-7 -- strike that.

10           S-8 -- strike that.

11           It's S-9 photo of the house at 658 South Park Street.

12           S-10 and 11 are both photographs of a wallet.

13           S-12, 13, 14, and 15 are autopsy photographs.

14           S-17 is a diagram of the scene.

15           S-18 is a consent form for the search of 538 Magnolia

16  Avenue.

17           S-23 a wallet.

18           Articles of clothing S-25 through S-33.   A black Down

19  jacket; blue and gold jacket; red white and blue jacket; ski

20  mask; Down black wool hat; pink sneakers; black pants; black

21  sneakers, and black leather gloves.

22           The affidavit -- let me back up.

23           S-34, bullet fragment.

24           S-35 certification regarding gun permit.

25           S-42, map of Elizabeth.

- COLLOQUY -                                          91

1        Those items have been received into evidence.

2        Mr. Kolano, any further witnesses for the state?

3        MR. KOLANO:  Your Honor, with that the state rests.

4        THE COURT:  Mr. Florczak.

5        MR. FLORCZAK:  Yes, at this time, your Honor, we would

6   call Ronald Orr.

7   R O N A L D    W.    O R R

8   Sworn as a witness and testified as follows:

9   DIRECT EXAMINATION BY MR. FLORCZAK:

10        THE COURT:  Mr. Florczak.

11     Q.   Mr. Orr, where do you live?

12   A.  I live on Bond Street, Elizabeth, New Jersey.

13     Q.   How long have you lived there?

14   A.  I lived there for about ten years.

15     Q.   And where do you work?

16   A.  I work at Elizabeth High School, Jefferson.

17     Q.   What is your occupation?

18   A.  Special education teacher.

19     Q.   And how long have you been working at the Elizabeth

20   High School?

21   A.  Six years.

22     Q.   And your duties there are as a teacher, is that

23   correct?

24   A.  Yes, sir.

25     Q.   And do you know Marvin Mathis?

1   A.  Yes, I do.

2       Q.   And how long have you known Marvin Mathis?

3   A.  For about couple of years.  From being at school and I see

4   him in the neighborhood.

5       Q.   Okay.  Was he in any of your classes?

6   A.  Yes.  He was in my reading classes.

7       Q.   And essentially he lived in your neighborhood, in that

8   area?

9   A.  No, he didn't live in my neighborhood.  He lived around the

10  neighborhood, he lived downtown I believe it was, and I lived

11  uptown.

12      Q.   And how often -- strike that.

13      Do you recall whether he was in your class 1996 and '95,

14  year of '95, '96?

15  A.  I believe he was in my classes, reading.  It's been a long --

16      Q.   How many years did you have him?

17  A.  About a year and a half.

18      Q.   What subjects did you teach him?

19  A.  I had one year for reading, another year for science.

20      Q.   Have you ever heard his reputation or character

21  discussed by other students or teachers?

22  A.  No.

23      Q.   All right.  Did you ever hear anyone express any

24  negative comments about Marvin Mathis?

25          MR. KOLANO:  Objection.  Foundation has not been laid.

ORR -   DIRECT BY FLORCZAK                                    93

1        THE COURT:  Sustained.

2    Q.   Can you tell us something about Marvin's conduct in

3    the classroom?

4        MR. KOLANO:  Objection, your Honor.  These are

5    specific instances.

6        The question is for reputation or opinion.

7        THE COURT:  I sustain the objection.

8    Q.   From your contact with Mr. Mathis, were you able, were

9    you able to form an opinion as to his truthfulness and law

10   abiding nature as of around January 1996?

11       MR. KOLANO:  Your Honor, no objection to the

12   truthfulness aspect.  Law abiding nature is outside the rule.

13   Q.   As to his truthfulness?

14   A.  Marvin was okay, he was all right.  I didn't have any

15   problems with him in class.

16       MR. FLORCZAK:  I have no further questions.

17       THE COURT:  Mr. Kolano.

18   CROSS EXAMINATION BY MR. KOLANO:

19   Q.   You had minimal contact with Marvin in the scheme of

20   your life, is that correct?

21   A.  Yes.

22   Q.   When you say he was in your neighborhood, or you were

23   in his neighborhood, you saw him on the streets?

24   A.  He knew a kid that -- Where I lived he knew a kid.  His

25   friend didn't live far from where my mother lived there.