ORR - CROSS BY KOLANO                                    94

1        Q.    Where was that?

2   A.   On Court Street.

3        Q.    Did you know Antwan Harvey?

4   A.   No, I did not know Antwan Harvey.

5        Q.    Do you know any of the defendant's friends?

6   A.   I knew Terell I think was considered his best friend.

7        Q.    Other than Terell?

8   A.   No.

9        Q.    Did you know his girlfriend?

10  A.   I knew of her from seeing her in school.

11       Q.    That would be Sharlama Brooks?

12  A.   Yes.

13       Q.    Did the defendant ever talk to you about Sharlama,

14  without telling us what he said?

15  A.   No, he did not.

16       Q.    Did he ever confide in you in any way, shape, or form?

17  A.   No, he did not.

18       Q.    So basically you kind of remember him as one of the

19  students that you had --

20  A.   Right.

21       Q.    -- in your school?

22  A.   Um-hum.

23       Q.    And you were asked a question about your opinion as to

24  his truthfulness --

25  A.   Yes.

ORR - CROSS BY KOLANO                                95

1      Q.   -- by Mr. Florczak, and you basically said you had no

2   problem with him?

3   A.   I had no problem with him in school.

4      Q.   As far as you could tell you never caught him in a

5   lie?

6   A.   No, I never have caught him in a lie.

7      Q.   You were brought here as character witness to testify

8   as to his truthfulness?

9   A.   Yes.

10     Q.   And Mr. Florczak told you that?

11  A.   What?

12     Q.   Mr. Florczak told you that you were being brought

13  forth to testify as to defendant's truthfulness?

14  A.   He didn't mention anything like that to me.  Character, you

15  know, teacher, teacher student relationship.

16     Q.   But you did testify that in your limited contact he

17  was truthful with you?

18  A.   Yes, he was.

19     Q.   Would it surprise you if I told you this jury has

20  before it two statements signed by the defendant and the

21  defendant lied in those statements?

22         MR. FLORCZAK:  Objection.  That's a conclusion on the

23  part of the prosecutor, judge.

24         MR. KOLANO:  They speak for themselves.  The jury

25  heard both of them.  It's inconceivable that all of them can be

ORR - CROSS BY KOLANO                          96

1    true.

2         THE COURT:  It is for the jury to make a determination

3    as to what those, what those statements stand for and the truth

4    or lack of truth contained in the statements.

5         I will allow, however, the question to stand.

6         The jury must understand that what is contained in a

7    question is not evidence.  Evidence only comes from the

8    testimony of the witnesses and from the things in evidence, not

9    from the questions.

10        Mr. Kolano.

11   Q.   Let me rephrase it.

12   Mr. Orr, if you had a situation with the defendant where he

13   said something along the lines that somebody from Carteret was

14   involved, and then subsequently told you, no, I made up that

15   portion about somebody in Carteret, would you consider that a

16   lie, just in terms of definition?

17   A.   Depends on the circumstances and the situation, I guess.  I

18   really -- I really can't say.

19   Q.   You don't know, other than seeing the defendant a

20   couple of times on the street, you have no idea what his

21   involvement was, or you have no idea where he was or what he

22   was doing in January 22nd, 1996, do you?

23   A.   I have no idea.

24        MR. KOLANO:  Thank you.  Nothing further.

25   REDIRECT EXAMINATION BY MR. FLORCZAK:

ORR - CROSS BY KOLANO                                97

1    Q.   Mr. Orr, how many days a week did you have him in
2  class?
3  A.   Five days a week.
4    Q.   And that's for at least a year and a half you had him
5  in class five days a week?
6  A.   Yes, I did.
7        MR. FLORCZAK:  I have nothing further.  Thank you.
8        MR. KOLANO:  Nothing further.
9        THE COURT:  All right, Mr. Orr.  You may step down.
10  Watch your step as you step off.  And you are excused.
11        THE WITNESS:  Thank you.
12        THE COURT:  Mr. Florczak.
13        MR. FLORCZAK:  Yes.  I just want to make sure this one
14  witness is here.  Miss Fernandez.
15  B E L Q U I S     F E R N A N D E Z
16  Sworn as a witness and testified as follows:
17  DIRECT EXAMINATION BY MR. FLORCZAK:
18    Q.   Miss Fernandez, where do you live?
19  A.   In Edison.
20    Q.   Where do you work?
21  A.   In Elizabeth.
22    Q.   What do you do?
23  A.   I teach in Elizabeth High School.
24    Q.   And how long have you taught in Elizabeth High School?
25  A.   Approximately twenty-two years.

FERNANDEZ -   DIRECT BY FLORCZAK                    98

1        Q.    And were you teaching there in 1996?

2    A.   Yes.

3        Q.    Do you know Marvin Mathis?

4    A.   Yes.

5        Q.    And how do you know Marvin Mathis?

6    A.   I taught him in 9th and 10th grade.

7        Q.    School year I guess of '94 through '95 and '95 into

8    '96?

9    A.   Yes.

10       Q.    And what class did you have him?

11   A.   I had him second period, I had him for English, and then it

12   was combined English history class, the first year; and then

13   second year I had him for English.

14       Q.    Okay.  Your sole contact with him was in the

15   classroom, is that correct?

16   A.   Yes.

17       Q.    Have you ever heard any of the fellow students or

18   teachers express any negative comments about Marvin Mathis?

19            MR. KOLANO:  Objection.  Foundation.

20            THE COURT:  Sustained.

21       Q.    Have you ever heard any people whether students or

22   teachers discuss Marvin Mathis?

23   A.   Yes.

24       Q.    Have you heard anyone express any negative comments

25   regarding him?

1    MR. KOLANO:  Objection.  Mr. Florczak is well aware

2    this is inappropriate foundation.  He continues to ask improper

3    questions.  I object.

4         THE COURT:  I will sustain the objection.

5         MR. FLORCZAK:  Judge, may I have a side bar?

6         THE COURT:  Yes.

7    (PROCEEDINGS AT SIDE BAR).

8         MR. FLORCZAK:  I don't see the basis of the objection.

9    If she has heard other people discuss him, then --

10        MR. KOLANO:  Because, the objection, he is asking this

11   question:  Have you ever heard anybody talk about him in a

12   negative light?  He knows that's improper foundation and I

13   object.  Now it gives the impression to the jury that I am

14   trying to hide information from them.  And obviously the answer

15   would be nobody has ever said anything negative.  That's why I

16   made my first objection.  Now that it is being repeated, it's

17   obviously putting me on the defensive because of the nature of

18   the objection.

19        Mr. Florczak is well aware of how to establish

20   foundation for character evidence, and he has not established

21   that foundation.  And also not establishing it, he is putting

22   me in this defensive posture because I am objecting to these

23   questions.

24        I think that's inappropriate and without foundation.

25        Until character testimony comes in there shouldn't be

FERNANDEZ -   DIRECT BY FLORCZAK                    100

1   a character charge because as of now there is no character

2   testimony coming into this case.

3           THE COURT:  We will see what happens on that.  Little

4   premature on that.

5           Go ahead, Mr. Florczak.

6           MR. FLORCZAK:  Judge, if this witness has heard people

7   discuss my client she can testify as to whether they made

8   negative comments.

9           THE COURT:  It's knowledge of his reputation.  I don't

10  know whether she is going to say he was, he was a good athlete,

11  that she heard talk about how fast he could run.  Or they

12  talked about -- I don't know.  He memorized poems well in

13  English class.  I don't know what she is going to say.  That's

14  not relevant if she is going to talk about his athletic ability

15  or some particular ability that he had in class.

16          The question here is his reputation for truthfulness.

17  If she is aware of his reputation for truthfulness as a result

18  of her contacts with the school community, then that's

19  different.

20          MR. KOLANO:  And the school community also has to be

21  defined.  Can't just Have you heard about somebody in the

22  school community?  It may have been one off hand comment six

23  years down the road.  That's why foundation how many people are

24  in this community, hundred people, what kind of contact did

25  these people have, they saw him every day.



1        THE COURT:  Nail down the scope of her knowledge.

2        OFFICER:  Juror number one tried to get attention of

3    the officer she recognized last witness, tall black gentleman.

4        THE COURT:  She recognized him?  Okay.

5        All right.  We will address that.  Okay

6    (SIDE BAR TERMINATED).

7        THE COURT:  Mr. Florczak.

8    Q.   Your contact with Marvin Mathis essentially was in

9    teaching classes, is that correct?

10   A.   Yes.

11   Q.   And the other students in the same class, do you know

12   how long they had been together?

13   A.   I would guess a number of years, because they travelled

14   together.

15   Q.   In other words, from lower grades?

16   A.   Exactly.

17   Q.   Travelled up?

18   A.   Yes.

19   Q.   And would these students essentially have the same

20   group of teachers?

21   A.   Yes.

22   Q.   Now, have you heard these students, any of these

23   students, or any of these teachers discuss or express comments

24   about the truthfulness of Marvin Mathis?

25   Let me ask the issue of truthfulness.

FERNANDEZ -   DIRECT BY FLORCZAK                    102

1    A.   Truthfulness?   I don't understand.   Explain the question,

2    please.

3        Q.   Well, based on the conversations you heard from these

4    fellow students of his and from the teachers you know that had

5    him in class, have they ever made comment as to whether they

6    believed him to be truthful?

7    A.   Yes.

8        Q.   And based on what you heard them say, and based on

9    what you, your contact with him in class --

10       How often did you have him in class?

11   A.   First year I had him for approximately two hours and ten

12   minutes.

13       Q.   Each day?

14   A.   Each day.   Yes.

15       Q.   That's five days a week?

16   A.   Yes, sir.

17       Q.   And based on that contact and what you heard these

18   other students say did you form an opinion in regard to his

19   truthfulness?

20   A.   Yes.

21       Q.   As of around the date 1996?

22   A.   Yes.

23       Q.   What was that opinion?

24   A.   He was, he was truthful.

25            MR. FLORCZAK:   I have nothing further, your Honor.

FERNANDEZ -   DIRECT BY FLORCZAK                    103

1           THE COURT:  Mr. Kolano.

2    CROSS EXAMINATION BY MR. KOLANO:

3        Q.    You indicated that the students pretty much came up

4    together from the lower grades to the higher grades?

5    A.   Yes.

6        Q.    Did you receive his student file?

7    A.   Yes.

8        Q.    So you were familiar with his student file and what

9    had been written about him prior?

10   A.   Yes.

11       Q.    And you indicated that the nature of your

12   understanding as to the reputation of Mr. Mathis for

13   truthfulness is with the other friends and teachers.

14   A.   Yes.

15       Q.    Did that take into account what the other teachers

16   wrote about him in his earlier days?

17   A.   When I received his IP, which is what we get, I don't

18   exactly recall what his previous teacher had said.  I am

19   talking about when he came to Jefferson.

20       Q.    Do you know Grace Cardel?

21   A.   No, I don't.

22       Q.    Do you know Malisa Gonzalez?

23   A.   No, I don't.

24       Q.    Do you know Judith Hudson?

25   A.   No, I don't.

FERNANDEZ - CROSS BY KOLANO                                    104

1     Q.   This opinion of Mr. Mathis being truthful, have you

2  ever caught him in a lie in one of your classes?

3  A.   No.

4     Q.   The nature of your class was history and English?

5  A.   Yes.

6     Q.   Would he understand words like "present"?

7  A.   Yes.

8     Q.   What were you teaching?

9  A.   In English we tried to do the parallel --

10    Q.   I am sorry.  Let me rephrase.  In history what

11 subjects?

12 A.   It was world history.

13    Q.   Would you give us an example of what world history

14 meant, what you were teaching?

15 A.   Early civilizations.

16    Q.   Give us an example of some early civilizations?

17 A.   We talked about the Romans, we talked about the difference

18 between Athens and Sparta, et cetera, et cetera, et cetera.

19    Q.   And in English what would you be covering?

20 A.   Grammar, writing skills, literature.

21    Q.   And he was an attentive student?

22 A.   Excuse me?

23    Q.   Attentive student?

24 A.   Yes.

25         MR. KOLANO:  May I have an item marked, if I may.

FERNANDEZ - CROSS BY KOLANO                    105

1          (S-51 marked for identification - one handwritten

2    sheet).

3          MR. FLORCZAK:  I am going to object.

4          Judge, may we have a side bar?

5          THE COURT:  Yes

6    (PROCEEDINGS AT SIDE BAR.)

7          MR. FLORCZAK:  Judge, this document state wishes to

8    utilize, I don't know whether I have seen it before, quite

9    honestly.  I have voluminous material as to his school records.

10   I may have seen it, but I certainly don't have it available.

11   But it's undated.  I don't know when it's from, how long ago.

12   And I think the rule talks about character evidence at a

13   specific period, specific time, not something that happened

14   years before.

15         MR. KOLANO:  First of all, in terms of the documents

16   these are all documents provided to the state by the defense.

17         MR. FLORCZAK:  Very well may be.

18         MR. KOLANO:  I just want to make that clear, just for

19   the record.  These are school records that came into the

20   state's possession part and parcel of the waiver hearing.  But

21   Mr. Florczak has now opened the door trying to establish a

22   foundation for character evidence that it was all these people

23   who had come with him all the way up.

24         What I was going to do is have the witness read to

25   herself and indicate whether or not that changes her opinion as




FERNANDEZ - CROSS BY KOLANO                               106

1   to the character.

2        There are records in here about how he was assaulting

3   teachers and basically what I recall statements Marvin should

4   be out of this class because I can't be responsible, he is

5   going to hurt somebody, and now I am putting on notice.  Here

6   is Marvin likes to dominate other students, physically also.

7   He will be quite aggressive at times.  He has hurt other

8   students by punching, kicking, throwing his head back suddenly.

9   Threatens them.  I was going to have -- just for flavor.  There

10  are some other documents that I was going to have the witness

11  just read to herself and say if that changes her opinion at

12  all.

13       MR. FLORCZAK:  Judge --

14       MR. KOLANO:  Since she indicated she received records

15  and file as it came up.

16       MR. FLORCZAK:  I would again object.  One, it's dated

17  material.  This is grammar school records rather than high

18  school records.

19       And in addition, judge, I don't know whether documents

20  used in waiver hearing can be used at the trial against,

21  certainly, what he said at the waiver hearing couldn't be used.

22  And I suggest any documents used to support argument of

23  rehabilitation in the waiver hearing cannot be used.

24       MR. KOLANO:  Normally they wouldn't.  But now this

25  person indicated she had this record, they all came up together

FERNANDEZ - CROSS BY KOLANO                                      107

1    and it was part and parcel of the basis of her opinion, opinion

2    of her fellow colleagues and other students as they came up

3    together.

4            THE COURT:  How do you propose to use this?

5            MR. KOLANO:  Give it to her, ask to read it to

6    herself, and ask her if that changes her opinion in any way.

7    Without going into the substance of it.

8            THE COURT:  Without putting before the jury what this,

9    what the contents of this document, just she should --

10           MR. KOLANO:  Read, identify as school record, school

11   record relating to Marvin Mathis, and then indicate whether or

12   not that changes her opinion.  I would like to get into the

13   contents.  I want to lay a foundation one step at a time.

14           MR. FLORCZAK:  Judge, I still have my same objection.

15   It's from a waiver hearing.  And, two --

16           THE COURT:  We don't know when this was, when this

17   record was prepared.  I see next page has his name followed by

18   age eleven.  Next page in the sequence of the documents.

19           MR. KOLANO:  This document, what was the cover sheet,

20   I assume cover sheet is 11/27/89.

21           MR. FLORCZAK:  There are other things, judge.

22           MR. KOLANO:  Implementation date 1/2/90.

23           MR. FLORCZAK:  The other thing, it's classification

24   conference records.  But the witness, the fact that it was,

25   when he was eleven or younger may make a difference as to

FERNANDEZ - CROSS BY KOLANO                                108

1   whether this would make a difference to her.  We are getting

2   into how many documents you should show.

3         THE COURT:  I am going to sustain the objection.  I

4   see it as more prejudicial than probative.  I am going to

5   exclude it.

6         While I have counsel present, let me just indicate to

7   you juror number one indicated to sheriff's officer I think

8   when we were bringing the witness in, and getting her sworn in,

9   that she recognized the previous witness, Mr. Orr.  I don't

10  know what that means.  I mean recognize simply as someone she

11  had seen before, somebody she knows.  I don't know the extent

12  of that.  But I think it is something we need to address with

13  juror number one before the jurors get into any kind of a break

14  where she might express that to others.

15        MR. FLORCZAK:  I agree.  I would ask when we break all

16  the other jurors be excused, and she stay here.

17        THE COURT:  We can just excuse all the other jurors

18  and ask number one to remain behind, and then I can ask her

19  some questions.  She simply said to the officer she recognized

20  him.  I don't know anything more than that.  Okay.

21  (SIDE BAR TERMINATED).

22        Q.   Miss Fernandez?

23  A.   Yes.

24        Q.   You weren't present with Marvin Mathis on January

25  22nd, 1996, in the evening hours, were you?

FERNANDEZ - CROSS BY KOLANO                                    109

1    A.   No.

2         Q.   Do you have any basis or any knowledge as to his after

3    school activities outside of your classroom?

4    A.   No.

5         Q.   Do you know who any of his friends are?

6    A.   No.   Just school friends.

7         Q.   And did you know or do you know Sharlama Brooks?

8    A.   Yes.

9         Q.   Was she in any of your classes?

10   A.   No.

11        Q.   Based on his reputation and opinion that you have

12   talked to in terms of truthfulness would he seem like the type

13   of person who would ask his girlfriend to lie for him and give

14   him a false alibi?

15   A.   No.

16             MR. KOLANO:  Nothing further.

17             MR. FLORCZAK:  I have nothing further.

18             THE COURT:  Miss Fernandez, you may step down.  You

19   are excused.  Watch your step.

20             THE COURT:  Florczak.

21             MR. FLORCZAK:  May we just approach side bar off the

22   record for a second?

23             THE COURT:  Off the record.

24             (Side bar off the record).

25             MR. FLORCZAK:  At this time I would like to call

FERNANDEZ - CROSS BY KOLANO                                      110

1   Herminia Garcia.

2   H E R M I N I A     G A R C I A

3   Sworn as a witness and testified as follows:

4   DIRECT EXAMINATION BY MR. FLORCZAK:

5          THE COURT:  Mr. Florczak.

6      Q.    Miss Garcia, who do you work for?

7   A.  At this time I work for Union County, I think it's

8   department of public health -- I am not sure what department it

9   falls into -- the county jail.

10     Q.    Back in 1996, where did you work?

11  A.  I was working for juvenile detention.

12     Q.    And what was your job there?

13  A.  I was social worker.

14     Q.    While working there did you come in contact with April

15  Diggs?

16  A.  Yes, I did.

17     Q.    What was your relationship with April Diggs?

18  A.  I was one of the social workers there at the time.  I

19  believe I was her social worker.  I also assigned all of the

20  incoming residents that came in to different social workers.

21     Q.    So you were her social worker when she came into the

22  youth detention center?

23  A.  Yes, I was working there.

24     Q.    Did April Diggs tell you about the incident of January

25  22nd, 1996, where someone was shot?

GARCIA -   DIRECT BY FLORCZAK                    111

1   A.  Yes, she did.

2        Q.   Did April Diggs tell you who she was with at the time

3   this incident occurred?

4   A.  Yes, she did.

5        Q.   Who did she tell you?

6   A.  She told me she was with her cousin, with herself, Marvin

7   Mathis, and another individual.  I don't recall at this time

8   whether she gave me that other individual's name, but I do

9   recall the two that I mentioned.

10       Q.   And this discussion occurred where?

11  A.  At the detention center.

12       Q.   And did April Diggs tell you who shot the individual?

13  A.  She said who didn't.

14       Q.   Well, who did she tell you didn't shoot the

15  individual?

16  A.  Okay.  What she said was that she was walking with her

17  cousin and with Marvin Mathis, that they were there when this

18  particular incident occurred at that time, and that none of

19  them had done anything and someone else had.

20       Q.   Did she indicate that the fourth person they were with

21  was the person who did the shooting?

22  A.  Yes, she did.

23            MR. FLORCZAK:  I have no further questions.

24            Thank you.

25            THE COURT:  Mr. Kolano.

GARCIA - CROSS BY KOLANO                                    112

1   CROSS EXAMINATION BY MR. KOLANO:

2           What date did this interview take place?

3   A.  I don't recall the date.

4           Q.  Do you remember the month?

5   A.  No.

6           Q.  Do you remember the year?

7   A.  No.

8           Q.  Do you remember -- What you remember is basically what

9   Mr. Florczak indicated?

10  A.  Yes.

11          Q.  How many people came through in a given month around

12  this time, whatever time it was?

13  A.  I would have to go back to the records at the detention

14  center to know.

15          Q.  Okay.  You indicated go to the records.  Did you make

16  a report of this incident?

17  A.  There was no need to.  No, I didn't.

18          Q.  Did you refer to any reports or any incident sheets or

19  any documentation prior to coming to court today?

20  A.  I read a letter or a statement that I had made the

21  prosecutor showed me to just refresh me on the details of what

22  I had stated when I was interviewed by Miss Simmons.

23          Q.  Other than that, you did not review any records?

24  A.  No, I did not.

25          Q.  I just want to make sure.  You were working in this

GARCIA - CROSS BY KOLANO                                    113

1   job as a social worker in intake office in detention?

2   A.   I was social worker, yes.

3       Q.   April Diggs come in to you?

4   A.   Yes.

5       Q.   And there is not one piece of paper generated when

6   this April Diggs came in?

7   A.   There was paperwork there.  Just wasn't anything, there was

8   no particular paperwork to generate for someone making a

9   statement.  But I did, I did an intake, made notes that I had

10  seen her, et cetera.

11      Q.   Do you have that report with you?

12  A.   No.

13      Q.   And you received a subpoena from my office --

14  A.   Yes.

15      Q.   -- in this case.  And you had previously received a

16  subpoena from the defense?

17  A.   Yes.

18      Q.   And they told you you were going to be a defense

19  witness?

20  A.   Yes.

21      Q.   And then you received a subpoena from my office, and

22  it was subpoena duces tecum.

23  A.   Yes.

24      Q.   You were told what that means you had to bring any of

25  these documents to support your verbal claims?

GARCIA - CROSS BY KOLANO                                      114

1   A.   No, I was not.  I was asked if I have records.

2        Q.   And you were told that the subpoena required you to

3   bring any and all records that you had relating to this?

4   A.   No, I was not told that.

5        Q.   Do you have any of these records?

6   A.   No, I do not.

7        Q.   Where are these records?

8   A.   Those records are kept in the office at Juvenile, and once

9   juveniles left those records are purged, they are shredded,

10  they are discarded in some way.

11       Q.   Somebody can come into the juvenile detention center,

12  records can be created, and then if they turn eighteen a month

13  later they just get all torn up and shredded?

14  A.   Yes, they do.

15       Q.   These records are never kept for anything permanent?

16  A.   No, they are not, as far as I know.

17       Q.   And you indicated that when April Diggs came to you,

18  whenever it was, you did not make any notations about her

19  conversation?

20  A.   About that particular part of it?

21       Q.   Yes.

22  A.   Not to the best of my knowledge.

23       Q.   And as I understand it, Miss Diggs came to you and she

24  started on her own talking about the offense?

25  A.   Yes, she did.

GARCIA - CROSS BY KOLANO                                    115

1    Q.   Did you ask her about the offense?

2  A.   No, I did not.

3    Q.   Is part of the rules of your job or your position

4  there not to ask people who come through about the offense

5  because of their constitutional right not to talk?

6  A.   In fact I cautioned her once she had started to please

7  refer any of this information to her attorney.

8    Q.   Okay.  And apparently she disregarded that and

9  continued to talk to you?

10  A.   After the statement she made, she stopped talking about it.

11    Q.   Okay.  So she made simply one statement?

12  A.   Yes.

13    Q.   Please demonstrate for us how this happened.

14  April Diggs come to you, and what does she say to you?

15  A.   Just in general, she comes in, I say Good Morning, How Are

16  You.  I am social worker.  We had -- she had been there.  And I

17  said sit down.  How are you doing?  And to paraphrase, because

18  I can't tell you exactly what the words were, she said she was

19  worried about what's going on.  My cousin and I and Marvin -- I

20  said Marvin?  She said Marvin Mathis.  And something happened,

21  and we didn't have anything to do with it.

22  I said, April, you know, if this is your case you need to

23  discuss this with your attorney.

24    Q.   That was the extent of the conversation?

25  A.   That was the extent.

GARCIA - CROSS BY KOLANO                              116

1    Q.   How many people have you seen since that time in the

2  context of social worker?

3  A.   Probably, whatever number, probably, I don't know,

4  hundreds, probably.

5    Q.   How many people would you see on a given day?

6  A.   Fifteen or twenty.

7    Q.   Five days a week?

8  A.   Five days a week.

9    Q.   Seventy-five?

10  A.   Um-hum.

11    Q.   A hundred a week come through?

12  A.   Um-hum.

13    Q.   And amount of time you spend I assume is not much?

14  A.   Depends on the person and what they need.  Some people want

15  to talk to you, some people don't.

16    Q.   And your recollection of April Diggs statement is

17  pretty clear in your mind as you related it here?

18  A.   Yes.

19    Q.   And you didn't refer to anything other than the one

20  report dictated by an Adrianne Simmons?

21  A.   Correct.

22    Q.   And Adrianne Simmons was investigator hired by the

23  defense?

24  A.   Correct.

25    Q.   That's how she identified herself?

GARCIA - CROSS BY KOLANO                                117

1   A.   Correct.

2        Q.   And she saw you when?

3   A.   I don't have the date.

4        Q.   I am just going to show you my copy.  This is a copy

5   of Adrianne Simmons' report that was generated about you?

6   A.   Yes.

7        Q.   And it says Miss Herminia Garcia was interviewed June

8   8, 1998?

9   A.   Okay.

10       Q.   Would that be?

11  A.   That would be.

12       Q.   Would that refresh your recollection?

13  A.   Yes.

14       Q.   First time anybody asked you anything about this case

15  was, basically, eight days ago?

16  A.   No.  She had spoken to me about this before, the original

17  report.

18       Q.   There was another report from Adrianne Simmons?

19  A.   Original investigation when they were coming in, and just

20  she was talking to people.  People identified themselves when

21  they come in to detention center.  What I am trying to say is

22  that I had met her before when she, when she had come in just

23  to do the report for I am assuming for Marvin to the

24  investigation.

25       Q.   Do you know if Miss Simmons generated a report about

GARCIA - CROSS BY KOLANO                              118

1   that meeting with you?

2   A.  I don't know.

3      Q.   Did she ever show -- Did you ever see any other report

4   other than this one?

5   A.  No.   That's the only one I saw.

6      Q.   When was the first time you saw Adrianne Simmons?

7   A.  I don't have a date.   Those would be her records.

8          MR. KOLANO:  Is there a second record?

9          MR. FLORCZAK:  No.

10     Q.   And do you know how long ago that was, when you first

11  saw her?

12  A.  That would be during the time I was working at the juvenile

13  detention center.   Several years ago.   '95, '96.

14     Q.   '95, '96.   Okay.

15  A.  '96.

16     Q.   Since that time?

17  A.  '96, yes.

18     Q.   You have seen all those other people, and yet you

19  still have this clear recollection as to what April told you?

20  A.  Yes, I do.

21     Q.   Even though it wasn't important enough at the time to

22  make any notes, right?

23  A.  Correct.

24     Q.   Now, what she told you is that she wasn't involved in

25  the crime, right?

GARCIA - CROSS BY KOLANO                                    119

1   A.   Correct.

2        Q.   Did you know at that time that she had given a

3   statement to the police?

4   A.   No, I did not.

5        Q.   And as part of your job there you ever receive copies

6   of what comes along with the juvenile -- statements or

7   complaints or police reports or anything like that?

8   A.   That's not part of our -- no.   That's not part of the paper

9   work that we work with.   No.

10       Q.   And she told you that Marvin was not involved --

11  A.   Correct.

12       Q.   -- either?

13  A.   Correct.

14       Q.   Now, did you assign Marvin to yourself for intake?

15  A.   At that -- I believe at that time that he was assigned to

16  me at intake.

17       Q.   You were not the person who did the assigning?

18  A.   I was person that assigned it.   It would depend how, how

19  many people we had, that were coming in, who had less people on

20  their case load, et cetera.

21       Q.   I am basically trying to get at your memory.   Do you

22  recall if you were the one who assigned Marvin to yourself or

23  somebody else?

24  A.   Yes, that was myself.

25       Q.   Let me ask you.   If you talked to April and April said

GARCIA - CROSS BY KOLANO                                    120

1  Marvin was not involved in something, and you had Marvin who

2  was assigned to you, you didn't think it important to tell

3  somebody that, say, maybe I have, you know, April saying that

4  he wasn't involved, and here he is, you didn't think that was

5  important enough to write down?

6  A.  That's not part of my, what I do.  This was an exceptional

7  situation, which is why it probably stuck in my mind.

8      Q.  I mean this is so exceptional that April Diggs telling

9  that you Marvin Mathis had nothing to do with it, you didn't

10  think you better bring that to somebody's attention?

11 A.  No, because they both have attorneys.  And that's what,

12  that's the legal part taken care of by the attorneys.  We take

13  care of case management and things of that sort.

14     Q.  And you didn't go offer up this information; you

15  waited basically until they found you?

16 A.  Correct.

17     Q.  Marvin wasn't present when you interviewed April?

18 A.  No, he was not.

19     Q.  So Marvin, as far as you know, Marvin would have no

20  way of saying, oh, by the way, Mr. or Miss Attorney, go, see

21  Miss Garcia because April said some stuff that's helpful to my

22  case?

23 A.  Correct.

24     Q.  So basically, but for sheer luck nobody would have

25  found out that you had this very important information?

1   A.   Correct.

2        Q.   Now, would it be fair to say that you see these people

3   as they are generally moving into detention before juvenile

4   prison?

5   A.   Yes.

6        Q.   And that people do not like to be known in juvenile

7   detention as snitchers or people who testified or ratted out or

8   gave up somebody's name?

9   A.   I don't understand what you are asking me.

10       Q.   When people are put into detention --

11  A.   Yes.

12       Q.   -- it would be, it could be injurious to their health

13  if word got out that one of them had implicated another one,

14  isn't that true?

15  A.   I really don't know how to answer that.  I mean, that's not

16  something that I would think about when I was intaking or

17  speaking with someone.

18       You are asking me this question in general, if this is

19  true?

20       Q.   Yes.

21  A.   If someone tells on someone, I really, I have never seen

22  anybody get hurt because of this where I was.  That I knew of.

23  So I don't know how to answer your question.  I don't know what

24  you are trying to get at.

25       Q.   Well, I am just trying to ask questions.  I apologize

GARCIA - CROSS BY KOLANO                              122

1    if I am not being clear.

2    A.   Okay.

3        Q.   Based on your job as a social worker in the detention --

4    A.   Yes.

5        Q.   -- is it not your experience that if somebody goes in

6    there and says I pointed the finger at him, that that person

7    would be labeled a rat, and that the other detainees might pick

8    on that person?

9    A.   I think if they are on the floor doing that, when they are

10   in there, where they are staying in their rooms, et cetera, it

11   might be a problem.

12       Q.   And, therefore, people disavow knowledge and say even

13   though they gave a statement to the police, may later say,

14   well, no, I never said that?

15   A.   I really don't know, to be honest.

16           MR. KOLANO:  Thank you.  Nothing further.

17           THE COURT:  Mr. Florczak.

18   REDIRECT EXAMINATION BY MR. FLORCZAK:

19           MR. FLORCZAK:  May I have this marked for

20   identification.

21           (D-3 marked for identification)

22       Q.   I show you what has been marked D-3 for

23   identification.  Without telling me what's in the letter, can

24   you identify that?

25   A.   Yes.  This is the letter that I generated.

GARCIA - REDIRECT BY FLORCZAK                    123

1       Q.   And what date did you generate this letter?

2   A.  This letter was generated October 15, 1996.

3       Q.   And subject matter of the letter was Marvin Mathis, is

4   that correct?

5   A.  Yes.

6       Q.   Okay.  Now, prior, do you know who contacted you in

7   order to generate this letter?

8   A.  I don't recall.

9       Q.   Could it have been Adrianne Simmons?

10  A.  It could have been.  Yes.

11          MR. KOLANO:  She said she couldn't recall.

12          MR. FLORCZAK:  I am sorry.

13      Q.   Did you talk to Adrianne Simmons prior to sending this

14  letter, if you recall?

15  A.  Yes, I did.

16      Q.   And did you relate anything about the incident with

17  April Diggs to her prior to sending this letter, if you recall?

18  A.  I don't recall.

19      Q.   There is no doubt in your mind that April Diggs told

20  you that April, Marvin, and Renee didn't do it, and the fourth

21  person did do it?

22  A.  I remember it exactly that way.

23          MR. FLORCZAK:  Thank you very much.

24          I have no further questions.

25          THE COURT:  Mr. Kolano.

- COLLOQUY -                                                124

1          MR. KOLANO:  Nothing further.

2          THE COURT:  All right.  Miss Garcia, you may step

3    down.  Watch your step.

4          THE COURT:  Mr. Florczak.

5          MR. FLORCZAK:  Judge, I have no witnesses available at

6    this moment.  We can take a break.  It is almost three o'clock.

7          THE COURT:  Ladies and gentlemen, we are going to take

8    a break at this time.

9          I want to remind you not to engage in any discussions

10   regarding the case among yourselves.

11         I am going to ask the jurors if you would please go to

12   the jury room, and wait for a moment, until the officer

13   releases you to the break.  And when you are released you will

14   have fifteen minutes.

15         I would ask that juror number one, Miss Spencer

16   Franklin, just delay a moment before joining the other jurors.

17   The other thirteen jurors go to the jury room, wait for a few

18   moments until the officer releases you.

19         (Jury withdrew from the courtroom.  Juror number one

20   remaining in the courtroom.)

21         MR. KOLANO:  Your Honor, may we approach off the

22   record?

23         THE COURT:  Yes.

24         (Side bar off the record).

25         THE COURT:  Miss Spencer Franklin, I am going to ask

- COLLOQUY -                                    125

1  that you and the attorneys together with the court reporter

2  meet with me in my chambers.  I have some questions to ask

3  about the information you gave to one of the sheriff's officers

4  a moment ago.

5  (PROCEEDINGS IN CHAMBERS).

6          THE COURT:  Miss Spencer Franklin, you can sit up

7  front.

8          Get the door closed.

9          I understand from one of the sheriff's officers that

10  when the first witness this afternoon came in, Mr. Ronald Orr,

11  you recognized him.  Is that correct?

12          JUROR:  I recognized when they called his name.

13  Before I did that I didn't know who he was.  But when they said

14  his name, that's when I knew who he was.

15          THE COURT:  So you recognized the name when you heard

16  it.

17          JUROR:  Yes.

18          THE COURT:  Then when the person walked in, did you

19  see the face and know that it was a person that you recognized?

20          JUROR:  When I knew him he was a student in the high

21  school.  I have not known him since he has been adult.  Like

22  sixteen years ago.  That's how I knew him from.

23          THE COURT:  Was the person who came through the door

24  the same Ronald Orr that you knew from sixteen years ago?  Did

25  the face look familiar?




- COLLOQUY -                                      126

1      JUROR:  But he was younger, he was a kid.

2      THE COURT:  I am just -- I suppose it's not that

3    unusual a name.  I am just wondering if it's really the same

4    person or just turned out --

5      JUROR:  I don't know.  But I think I knew the teacher,

6    too.  But then I am not sure, because I worked with the Board

7    of Education.  So I am not sure if -- She didn't recognize me,

8    so I am not sure, I am not sure if it's the person.

9      THE COURT:  The teacher.  Miss Fernandez?

10     JUROR:  Yes.

11     THE COURT:  You did not recognize her?

12     JUROR:  No.

13     THE COURT:  But the name Ronald Orr was familiar to

14   you, because you knew him sixteen years ago?

15     JUROR:  A student.

16     THE COURT:  A student by the name of Ronald Orr?

17     JUROR:  Yes.

18     THE COURT:  The gentleman who came through the door in

19   response to that name did that look familiar, taking into

20   consideration sixteen years has passed, and people do change I

21   suppose.

22     JUROR:  Yes, he looks a lot different.  He looks

23   similar to the person, but I can't say definitely, all right.

24   Because it was, I think it was a large family of them, so I am

25   not sure which one of them it is.




- COLLOQUY -                                         127

1          THE COURT:  You are not a hundred percent sure that

2     this is the person.

3          JUROR:  No, I am not.  But I just wanted you to know.

4          THE COURT:  I appreciate the fact that you did let us

5     know this.

6          Would the fact, okay, that it might be the same Ronald

7     Orr, although you cannot be certain, would that in any way

8     affect your ability to be fair and impartial in considering the

9     evidence in this case?

10         JUROR:  No, sir.  I have no personal thing with him.

11    I have no relationship of any kind with him.

12         THE COURT:  Because you may know this Ronald Orr from

13    sixteen years ago, and or may know some members of his family

14    from some time ago, would that in any way cause you to consider

15    his, the testimony that he gave either more favorably or less

16    favorably simply because it was somebody that you might have

17    known?

18         JUROR:  It wouldn't have anything to do with what I

19    know.  I mean it wouldn't influence me in any way.

20         THE COURT:  I don't know if counsel have any

21    questions.

22         MR. FLORCZAK:  I have no questions.

23         MR. KOLANO:  Just a few.  I assume you have not

24    mentioned this to any of your fellow jurors since this all

25    occurred.





- COLLOQUY -                                          128

1        JUROR:  I didn't know until he walked in the door, I

2   didn't know anything.

3        THE COURT:  We haven't taken a break since then.

4        JUROR:  I just let the lady knew that I needed to tell

5   somebody something.

6        THE COURT:  By the lady you meant the sheriff's

7   officer.

8        JUROR:  Yes.

9        MR. KOLANO:  I just wanted that for the record and

10  perhaps an instruction.

11       THE COURT:  Miss Spencer Franklin, I would like you

12  not mention this to any of your fellow jurors, anything that we

13  have talked about here today.  This is completely confidential

14  and has to remain that way.  So don't talk to anybody else

15  about this.

16       JUROR:  Exactly.

17       THE COURT:  Don't tell anybody, you know, why you had

18  to come speak with me, or that you may recognize Mr. Orr, or

19  thought you recognized Mr. Orr, or that the name sounded

20  familiar, or anything at all with any of the fellow jurors.

21  And certainly that instruction continues all the way through,

22  not just this afternoon but any time when we come back

23  tomorrow, when the deliberations are taking place, you should

24  not discuss this with them at all.

25       JUROR:  Exactly.  Thank you.

- COLLOQUY -                                    129

1        THE COURT:  I appreciate that.  Thank you.

2        The officer will take you back.

3        JUROR:  Okay.

4        THE COURT:  Jurors can be excused for the break.

5        OFFICER:  Yes, sir.

6        MR. KOLANO:  Your Honor, I may have an application for

7    excusal of the juror.  Frankly, at this point, given the last

8    instruction, I am comfortable with this juror sitting.  I do

9    want to talk to some members of my office and basically I guess

10   what I am indicating I would like to preserve my right because

11   I do have some concerns that there is somebody that she

12   indicated that she may know.  And I don't know if these people

13   were on the witness list that was read to the jurors, and I do

14   want to follow up on that.  Just basically for clean record.

15       She appears to be a very attentive juror, and

16   everything else, but I don't want there to be an issue on

17   appeal that she disclosed she might know somebody.

18       MR. FLORCZAK:  Someone that she might have known

19   sixteen years ago, has no contact with since, not even sure if

20   she knows him, she says it won't affect her.

21       I see no basis for removing her.

22       THE COURT:  I think Mr. Kolano is just giving both of

23   us heads up to the fact that he may bring an application for

24   this juror.

25       But as to whether this person, Ronald Orr, was



- COLLOQUY -                                    130

1   identified as part of the original witness list, based upon my

2   review of my notes, because the question occurred to me, I

3   believe that he was.  I think he was on the original witness

4   list, just based on how my notes are set up.  It seems to me

5   that he was, although we all may want to double check that.

6   Okay.  But I believe he was mentioned.

7          MR. KOLANO:  I was concerned because she made other

8   reference to the other school teacher, and I gather this juror

9   works for the Board of Education.

10         THE COURT:  I don't remember her employment, either.

11  But she did say that she didn't recognize Miss Fernandez, and

12  for some reason Miss Fernandez didn't appear to recognize her.

13         (Short Recess).

14         THE COURT:  All right.  Please have the jurors brought

15  out.

16         (Jury seated in the jury box in the courtroom.)

17         THE COURT:  Mr. Florczak, your next witness.

18         MR. FLORCZAK:  At this time I would like to call

19  Marvin Mathis to the stand, your Honor.

20  M A R V I N      M A T H I S

21  Sworn as a witness and testified as follows:

22  DIRECT EXAMINATION BY MR. FLORCZAK:

23      Q.   Marvin, how old are you?

24  A.  Eighteen.

25      Q.   How old were you on January 22nd, 1996?

MARVIN MATHIS -  DIRECT BY FLORCZAK                131

1   A.   Fifteen.

2      Q.   Where were you living back then?

3   A.   I was at 538 Magnolia Avenue.

4      Q.   Who did you live there with?

5   A.   My mother.

6      Q.   I want to direct your attention to January 22nd, 1996.

7   Did you go to school that day?

8   A.   Yes.

9      Q.   After school where did you go?

10  A.   After school (pause) Oh, man, repeat that question again.

11     Q.   Okay.  After school did you go directly home or did

12  you go somewhere else?

13  A.   Directly home.

14     Q.   What did you do at home?

15  A.   After school I went home, help my mother take clothes to

16  laundromat, wash her clothes or stuff.  And we came back.  That

17  was like around seven.

18     Q.   Before that, had you gone to Migdalia's house at all?

19  A.   That was early in the evening.

20     Q.   What time was that?

21  A.   This was like little after four.

22     Q.   Now, did there come a time that you met up with Antwan

23  Harvey?

24  A.   Yes, in the evening.

25     Q.   Where did you meet up with him?

MARVIN MATHIS - DIRECT BY FLORCZAK                    132

1    A.   I met up on Third, Third and Bond, just like quarter to

2    eight, eight o'clock.

3         Q.   Okay.  Did you two meet up with anyone else?

4    A.   Yes.  Two girls.

5         Q.   Who was that?

6    A.   April and Renee Diggs.

7         Q.   Did you know Antwan, Antwan Harvey at that time?

8    A.   Yes.

9         Q.   How long had you known him, do you recall?

10   A.   For a good little while.

11        Q.   What about April Diggs?

12   A.   I knew her for like two, two years.

13        Q.   What about Renee Diggs?

14   A.   Renee Diggs like couple, couple of months.

15        Q.   Okay.  When you and April and Renee and Antwan got

16   together, what did you do?  Where did you go?

17   A.   We went to Elizabeth Avenue.  Antwan, he wanted to go to

18   the liquor store.  Renee, she went in there for him, but they

19   wouldn't serve her because she had no ID.

20        Q.   Okay.  After she tried to get liquor and didn't have

21   ID, what happened then?

22   A.   Then Renee came out of liquor store, she told Antwan that,

23   you know, they needed ID, they wouldn't serve her.  That's when

24   Antwan noticed this guy on the corner, I guess he was waiting

25   for a bus.

MARVIN MATHIS -  DIRECT BY FLORCZAK                    133

1     Q.   What happened as to this guy?

2  A.   Antwan told both the girls walk over there see if he had

3  any gold or anything on.   And the girls went over there, and

4  they reported back to him.

5     Q.   I am sorry.   Go ahead.

6  A.   And he told them that, you know, if he has some gold on.

7     Q.   Did you understand why he was asking this?

8  A.   I was curious.

9     Q.   Did you know why, did you figure out why?

10  A.   No, not at that time.   No.

11     Q.   Then what happened?

12  A.   Then when he said that, then I know right then it came to

13  me, I told him Don't do it.

14     Q.   Don't do what?

15  A.   I thought he was going like to try to mug him or something.

16     Q.   Okay.   After you told him Don't do it, what happened?

17  A.   He is like look, gave me a look, he just continued walking.

18     Q.   Did you say anything to him:   Don't do it because the

19  guy is black, or anything else?

20  A.   No.

21     Q.   Was the guy black, do you remember?

22  A.   I don't remember.

23     Q.   What happened next?

24  A.   Then we started walking a little bit.   Then April, April

25  Diggs she noticed deli store.   And then a man was in it.   And

MARVIN MATHIS -   DIRECT BY FLORCZAK                    134

1  she told Antwan you should get this deli.  I looked at April, I

2  was like What's going on?  Then that's when Antwan, he was

3  about to go in, he told me to look out.  I told him I wasn't

4  going to do it.

5      Q.   So what happened then?

6  A.   Then we just continued walking.  Then we was walking down

7  the Avenue.

8      Q.   As you continued walking down the Avenue anything else

9  happened that was unusual?

10 A.   While we was walking down the Avenue he noticed these two

11 Spanish boys.  And, you know, he seen them, he just took off.

12 Then the other girl, April, she took off behind him.  And me

13 and the other girl started jogging to see what was going on.

14 Then we got by the corner of 6th and Elizabeth Avenue, they

15 outrun them.

16     Q.   So Antwan never caught up with these individuals?

17 A.   No.

18     Q.   All right.  As you are going on, did there come a time

19 when you realized Antwan had a gun?

20 A.   Yes.

21     Q.   When did this happen?

22 A.   This was like across the street on the same street,

23 Elizabeth Avenue, that's when he pull out the gun acting crazy.

24     Q.   Was there anybody else around at that time?

25 A.   No.

MARVIN MATHIS - DIRECT BY FLORCZAK                135

1    Q.   What do you mean he started acting crazy?

2  A.   He just acting crazy, like showing off.  Right then and

3  there I was scared.  I wanted to leave, but I was scared, I

4  thought he going to shoot me or something, so I stayed.

5    Q.   Anybody else try to leave?

6  A.   Yes.

7    Q.   Who?

8  A.   Renee Diggs.

9    Q.   And what happened?

10  A.   He told her, grabbed her, like wouldn't let her leave.

11    Q.   What did -- What happened then?  Where did you guys

12  head then?

13  A.   Then we was just walking.  And then we turned a few

14  corners, and stuff.  That's when we got to Seventh and East

15  Jersey.

16    Q.   Okay.  Now, prior to this, did you notice was there

17  anything with any cops coming by or anything like that?  Do you

18  recall that at all?

19  A.   Yes.

20    Q.   Anything happen with that?  Do you recall?

21  A.   That's when he wanted to shoot at them.

22    Q.   Who did he say this to, or how do you know?

23  A.   He told this to Renee.

24    Q.   And what did -- Did he do anything?

25  A.   No.  He pull out the gun, he took it off safety.

MARVIN MATHIS -  DIRECT BY FLORCZAK                    136

1        Q.    Now, any time during this walk did he give you the

2    gun?

3    A.   No.

4        Q.    Now, when you got to, did you say Seventh and East

5    Jersey?

6    A.   Correct.

7        Q.    Did he still have the gun?

8    A.   Yes.

9        Q.    Where was the gun?

10   A.   When we got by Seventh and East Jersey, there is a pharmacy

11   on the corner.  Then Harvey he noticed a man, you know, that

12   was taking out his garbage.  And he told the two girls go over

13   there, you know, be lookouts for him, both of them.  Then he

14   asked me to look out.

15       Q.    What did you say?

16   A.   I told him No.

17       Q.    And what happened then?

18   A.   Then that's when he just looked at me, just told me, you

19   know, just be a lookout.  That's when the two girls went across

20   the street.  Then I went across the street, stood by like

21   Chinese --

22       Q.    Were you being a lookout?

23   A.   No.  I was too scared.

24       Q.    Okay.  You went over to where?

25   A.   I went over, there is a Chinese store on the corner.  I

MARVIN MATHIS -  DIRECT BY FLORCZAK                137

1    went next to this building, brown building.

2            MR. FLORCZAK:  Do we have the photographs, the

3    evidence?

4            MR. KOLANO:  All the evidence is in the box.

5            MR. FLORCZAK:  Photographs as well.

6            MR. KOLANO:  They should be.  Yes, Mr. Florczak.

7            MR. FLORCZAK:  I appreciate it.  I don't want to make

8    a mess.

9        Q.   Now, the Chinese store was where in relationship to

10    the liquor store?

11    A.   It was on the corner down further.

12        Q.   Was there anything in between the Chinese store and

13    the liquor store, if you recall?

14    A.   Between Chinese store there is a building.  I think it's

15    apartment building, I am not for sure.

16            MR. FLORCZAK:  There must be more photographs.

17        Q.   Well, I ask you to look at what has been marked S-6 in

18    evidence.  Can you tell me whether you recognize this scene at

19    all?

20    A.   Yes.

21        Q.   What does that show you?

22    A.   That's where the man was taking out his garbage, around

23    here somewhere.

24        Q.   Can you tell me what building this is?

25    A.   This is I think that's the same, this is the same building,

MARVIN MATHIS -   DIRECT BY FLORCZAK                    138

1    but the doorway is like --

2         Q.    What building, Chinese store?

3    A.   Chinese store is on the corner.

4         Q.    And what is this building?

5    A.   This is the liquor store.

6         MR. FLORCZAK:   Can he go over there, your Honor, let

7    the jury, let him point so the jury can see what he is pointing

8    to?

9         THE COURT:   Certainly.

10        Q.    Will you show the jury where the man was taking out

11   his garbage?

12   A.   Somewhere around here, he was taking his garbage out.

13        Q.    You want to show these jurors back here?

14   Can you show these jurors where the man was taking out the

15   garbage?

16   A.   He was around here taking the garbage out.

17        Q.    Where were you?  Were you in this picture, or out of

18   the picture?

19   A.   Out of the picture.

20        Q.    Which side?  Show the jury.

21   A.   In here.

22        Q.    Okay.  Show them where you were.

23   A.   It's not like this the picture, but I was by the building.

24        Q.    Thank you.  Go ahead, sit down.

25   When you first got there, by the Chinese store, where was

MARVIN MATHIS -   DIRECT BY FLORCZAK                    139

1    Antwan Harvey?

2    A.   He was on by the man that got shot.  He was, you know, he

3    grabbed him, and that's when he started, the man, the man threw

4    a punch at Antwan, and Antwan threw a punch back at the man.

5         Q.   Did you see Antwan first approach the man?

6    A.   Yes.

7         Q.   Can you tell me what happened when he first approached

8    him?

9    A.   When he first approached him, he told the man, you know,

10   not exact words what he said, but sounded like he said empty

11   his pockets.  And man looked at him, and Antwan tried to go in

12   his pockets, tried to go in his pocket.  Then the man slapped

13   his hand down.  And that's when Antwan grabbed the man, and the

14   man grabbed Antwan, and the man threw a punch at Antwan, and

15   that's when Antwan threw a punch back the the man.

16        Then Antwan pulled out the gun.  When the man noticed the

17   gun he was like shocked, you know, seeing the gun.  And that's

18   when the man grabbed the gun, they was struggling, and that's

19   when I noticed they was struggling and I tried, went over there

20   tried to stop, you know, what was about to happen.  But it was

21   too late.

22        Q.   What did you -- You ran over to who?

23   A.   I ran over to where Antwan and the man when they were

24   struggling.

25        Q.   And what did you do?

MARVIN MATHIS - DIRECT BY FLORCZAK                    140

1   A.   I tried to stop it.

2        Q.   How?

3   A.   Like when they was strugling I told Antwan What you doing?

4   That's when the gun went off.

5        Q.   Did you do anything, did you grab anybody?

6   A.   No.   Grabbed like his arm, Antwan arm.

7        Q.   What was your purpose in grabbing Antwan's arm?

8   A.   I didn't want him to shoot the man.

9        Q.   Did the gun go off?

10  A.   Yes.

11       Q.   Do you know whether it was one or two shots fired?

12  A.   It was, it was two, but the first one missed him.

13       Q.   After the shots were fired, what happened?

14  A.   After the shots were fired the man fell down.   That's when

15  I was shocked.   Then Antwan like, you know, he was jumping up

16  and down telling Come on, he snatched me up.   I ran with him

17  because I was scared.

18       Q.   What do you mean he snatched you up?

19  A.   He like grabbed by my jacket and was pulling me telling me

20  Come on.

21       Q.   Did anybody go through the man's pockets at that

22  point?

23  A.   No.

24       Q.   So when Antwan went to him and said, told the man to

25  run his pockets he was trying to rob him?

MARVIN MATHIS -   DIRECT BY FLORCZAK                141

1   A.   Yes.

2        Q.   Were you going to help him any way?

3   A.   No.

4        Q.   Did you intend to help him in any way?

5   A.   No.

6        Q.   When you ran, which way did you run?

7   A.   Towards Seventh.  We made a right.  I mean a left.  Excuse

8   me.

9        Q.   And where were April and Renee?

10  A.   They went the opposite way.

11       Q.   They went which way, toward where?

12  A.   They went towards straight up East Jersey.

13       Q.   Where did you go?

14  A.   I ran towards Seventh.

15       Q.   Okay.  When you stopped running, where did you end up?

16  A.   I ran home.

17       Q.   Was Antwan with you?

18  A.   No.  No.  I ran home.  That's when my mother she noticed,

19  she looked at me like What happened?  And I was so scared I

20  didn't say nothing I just, you know, I didn't discuss with her.

21       Q.   Do you know what time you got home?

22  A.   Quarter of eleven.

23       Q.   When you were running with Antwan did he say anything

24  to you?

25  A.   When we was running he told me to take the gun, you know.

MARVIN MATHIS -  DIRECT BY FLORCZAK                    142

1    He wanted me to hold the gun, put it in my pocket.  I told him

2    No.

3         Q.    Did you ever hold that gun?

4    A.   No.

5         Q.    Did you ever put that gun in your pocket?

6    A.   No.

7         Q.    Anybody else put it in your pockets or anything else?

8    A.   No.

9         Q.    Did you ever have possession of that gun?

10   A.   No.

11        Q.    After you ran home, did you ever see Antwan Harvey

12   gain?

13   A.   No.

14        Q.    Did you ever see April and Renee Diggs again?

15   A.   No.

16        Q.    After, on the 23rd did you go to school?

17   A.   Yes.

18        Q.    And you also went to school on the 24th?

19   A.   Yes.

20   .    Q.    Did you see your girlfriend on the 23rd?

21   A.   23rd?  Yes.

22        Q.    Did you ever tell your -- I assume you spoke to your

23   girlfriend on the 23rd and on the 24th, is that correct?

24   A.   Yes.

25        Q.    Did you ever ask your girlfriend to lie for you, to

MARVIN MATHIS -  DIRECT BY FLORCZAK                143

1   say that you were with her when this happened?

2   A.  No.  Only thing I told her, you know, if anyone asks where

3   I was at tell them you don't know.

4       Q.   Did there come a time on the 24th when you spoke to

5   your girlfriend in the morning?

6   A.  Yes.

7       Q.   What was your girlfriend's name?

8   A.  Sharlama Brooks.

9       Q.   When you spoke to her in the morning what did you talk

10  about in relation to this incident, anything?

11      Let me rephrase the question.

12      Did she ask you anything?

13  A.  Yes.

14      Q.   What did she ask you?

15  A.  She asked me, you know, what was going on, you know.  At

16  that point she started like, you know, asking me lot of

17  questions.

18      Q.   What kind of questions?

19  A.  Questions like, you know, why, she ask me.  I say if anyone

20  ask if I was with her, you know, that she don't know.  She was

21  like, you know, What happened?  I wouldn't tell her.

22      Q.   Now, were you aware at that time that she had been

23  approached by someone, outside of the fish store or some kind

24  of store, and that person had told her that you, you had been

25  involved in a shooting, and that you, they were out to get you,

MARVIN MATHIS -  DIRECT BY FLORCZAK                144

1   or something like that?  Were you aware that she had heard that

2   at that time?

3   A.  At that time.  No.

4       Q.    That morning, this was the 24th, the morning you were

5   arrested?

6   A.  Yes.

7       Q.·   Okay.  Now, while she was, after she is asking you

8   these questions, what happened?

9   A.  You know, then she started, you know, she started crying.

10  Then she ran upstairs.

11      Q.    Had you answered these questions?

12  A.  She asked me was I involved.  And I didn't say nothing, you

13  know.  Then she asked me, you know, Something bad happen?  No.

14  She could tell something was wrong.  That's when she run

15  upstairs crying.  I didn't answer her, either.  That's when she

16  ran upstairs creating.

17      Q.    Do you remember what class this was around or what

18  time this was about?

19  A.  This was like around first period, so like before, before

20  first period, something like that.

21      Q.    Did you then go on to your class?

22  A.  Yes.

23      Q.    Did there come a time when someone came to your class

24  to get you?

25  A.  Yes.  Vice-principal and detective.

MARVIN MATHIS - DIRECT BY FLORCZAK                    145

1    Q.   Do you recall the vice principal's name offhand?

2  A.  Mr. Ward, or something, Walton, or something like that.

3    Q.   They come into your classroom?

4  A.  Yes.

5    Q.   Do you recall which class you were in?  If you

6  remember.

7  A.  I don't remember exact, you know, what, you know, subject

8  was it, but it was like around first period.

9    Q.   Do you remember whose class it was, who your teacher

10  was?

11  A.  Teacher she wasn't there, so it was substitute there.

12    Q.   When they came to get you where did you go?

13  A.  We went to the vice-principal's office.

14    Q.   And what happened at the vice-principal's office?

15  A.  Vice-principal started words with me asking why I didn't

16  play sports that year, stuff like that.  Then detective,

17  detective I believe Ralph Garcia, he cut the vice-principal

18  off, and he told, introduce his self and said he was

19  investigating homicide that happened that night.  They say they

20  need me to come to police station so they could question me.

21    Q.   And what happened then?

22  A.  Then we went to the police station.

23    Q.   And did you go to the police station voluntarily, or

24  did they tell you you had to go, or what were the

25  circumstances?

MARVIN MATHIS -   DIRECT BY FLORCZAK                146

1    A.   Detective told me I have to go.

2        Q.   What happened at the police station?

3    A.   At the police station, when they put me in this little

4    room, and detective that, you know, that came and got me at

5    school told me stay in this room, and that another detective

6    come in the room.

7        Q.   You weren't handcuffed at this point, were you?

8    A.   No.

9        Q.   What happened then?

10   A.   Then that's when, I don't know his name, but detective, one

11   of the detectives came in the room asked my name, he asked my

12   age, and stuff.  Then, you know, that was that.

13       Q.   Okay.  Anything else?  What happened after that?

14   A.   Then other detective came, came in the room.   Detective

15   Thomas Koczur.

16       Q.   Okay.

17   A.   He started, you know, asking me my name, he introduce his

18   self to me, investigating homicide that happened he said.   He

19   was asking, trying to pull questions out of me.   Then he asked

20   me, you know, do I know where my mother work at.   I told him.

21       Q.   And what happened then?

22   A.   Then after I told him that, he was trying like pull more

23   questions out of me.   Then I told him the other detective told

24   me he is not going to ask me no more questions until a guardian

25   or my parents arrive.

MARVIN MATHIS -   DIRECT BY FLORCZAK                    147

1       Q.   So he didn't ask you any more questions?

2   A.  No.

3       Q.   Okay.   Did there come a time that your mother arrived?

4   A.  Yes.

5       Q.   And was she brought in your presence, or how did --

6       What happened when she got there?

7   A.  Well, it took her like, like hour forty-five, thirty-five

8   minutes.  And that's when detective came in the room and told

9   me that my mother is here.   That's when they brought me to the

10  conference room.

11      Q.   All right.  And what happened?  Who was in the

12  conference room?

13  A.  Me, my mother, Detective Koczur, two other detectives.

14      Q.   At this point what happened in that conference room?

15  A.  There was -- first they was asking like questions stuff

16  like what grade I am, you known, do I play any sports.  Asking

17  like questions, little questions.

18      Q.   Did there come a time they started asking more serious

19  questions?

20  A.  Yes.

21      Q.   What were they asking?

22  A.  They asked me did I know anything about homicide that

23  happened.

24      Q.   And what did you tell them?

25  A.  At first I told them I don't know what they are talking

MARVIN MATHIS -  DIRECT BY FLORCZAK                    148

1    about.

2         Q.   So you lied to them?

3    A.   Yes.

4         Q.   Why did you lie to them?

5    A.   Because I was scared.

6         Q.   And did they keep on asking you questions?

7    A.   Yes.

8         Q.   There come a time when they told you -- or did they

9    show you a statement from Miss Brooks?

10   A.   Yes.

11        Q.   What did they show you, do you recall?

12   A.   They showed me a statement that Sharlama Brooks made.

13        Q.   And what did you tell them at that point?

14   A.   That's when I, you know, I told them -- like I didn't

15   exactly tell them what happened and stuff.  I just -- They told

16   me that, you know, you know something, tell them, that I have

17   to make a statement.

18        Q.   At what point, if you know, did they advise you of

19   your rights?  Do you remember being advised of your rights?

20   A.   When I, when I made that first statement.

21        Q.   Was that before or after they typed it or what point,

22   while they were typing it, do you recall?

23   A.   This was before.  Before, yes, before.

24        Q.   Before what?

25   A.   Before, first I made the statement.  That's when they gave

MARVIN MATHIS - DIRECT BY FLORCZAK                149

1    me a sheet tell me I have to put my initials and stuff on.

2        Q.   Do you recall what they advised you, what the sheet

3    said?

4    A.   They read it to me.

5        Q.   Do you remember?

6    A.   They read it to me and stuff.

7        Q.   When they read it to you did you understand it?

8    A.   Not that good.

9        Q.   But you put your initials and signed it anyway, right?

10   A.   Yes.

11       Q.   Your mother put her, sign it too?

12   A.   Yes.

13       Q.   Was that before they asked you the preliminary, the

14   earlier questions about what Miss Brooks said in her statement,

15   or was that before or after, do you recall?

16   A.   This was before.

17       Q.   Then you gave them a statement.  Is that correct?

18   A.   Yes.

19       Q.   They typed up a statement?

20   A.   Yes.

21       Q.   Was that statement --

22       Do you recall what time that occurred?

23   A.   No.

24           MR. FLORCZAK:  One moment, your Honor, if I may.

25           (Pause.)

MARVIN MATHIS -  DIRECT BY FLORCZAK                150

1      Q.    The first statement you gave was that in the

2   afternoon, if you recall, was it before lunch, after lunch,

3   afternoon, or before noon?

4   A.  I am not for sure.  I think it was after lunch.

5      Q.    At that point had you, did you have anything to eat or

6   anything at that point; do you recall?

7   A.  Yes.

8      Q.    What did you have, do you recall?

9   A.  They gave me hamburger, hamburger, no, cheese burger and

10  some fries and soft drink.

11     Q.    Nobody mistreated you in any way?

12  A.  No.

13     Q.    So when you gave them a statement did you talk about

14  somebody named Boz?

15  A.  Yes.

16     Q.    Was there a Boz?

17  A.  No.

18     Q.    Somebody you made up?

19  A.  Yes.

20     Q.    Somebody you made up?

21  A.  Yes.

22     Q.    Any reason for that?

23  A.  Well, detective -- You know, I was scared and confused.

24  Detective was telling me Was anybody there you know from out of

25  town?  Did they have a nickname?  You know, Do you know the

MARVIN MATHIS -   DIRECT BY FLORCZAK                    151

1   real name, whatever.

2       Q.   What else were they asking you?

3   A.   Then they was asking me was more people involved in this

4   incident.

5       Q.   At that point when you gave that first statement you

6   didn't mention anything about April or April Diggs or Renee

7   Diggs, had you?

8   A.   No.

9       Q.   So you were keeping them out of it at that point.  Was

10  there a reason why were you keeping them out of it?

11  A.   No.

12      Q.   In that statement they asked you if you were a

13  lookout, and you said No; isn't that correct?

14  A.   Yes.

15      Q.   How many times did they ask you if you were a lookout?

16  A.   Few times.

17      Q.   How many times is a few times?

18  A.   Four, four or six.

19      Q.   So after they took that statement you signed that

20  statement, right?

21  A.   Yes.

22      Q.   And you put your initials on the bottom of each page?

23  A.   Yes.

24      Q.   Did you read the statement before you signed it?

25  A.   I didn't really read it.  I just like, I was glancing

MARVIN MATHIS -  DIRECT BY FLORCZAK                152

1   through it.

2        Q.   Well, glancing through it.  What do you mean glancing

3   through it?  Did you read any of the words or any parts of it,

4   or do you recall?

5   A.  No, I didn't really read exactly, you know, the whole

6   statement.  They was rushing me.

7        Q.   How much of it did you read, do you know?

8   A.  I can't say.

9        Q.   Did you tell them that Antwan -- Did you tell them

10  that you told Sharlama you shot the man by accident because

11  Antwan told you to say it, and if you didn't say it he could

12  kill you; did you tell him that?  Do you recall whether you

13  told him that?

14  A.  I don't remember.

15       Q.   Well, did Antwan threaten you that evening?

16  A.  Did he threaten me?

17       Q.   Did he threaten you?

18  A.  No.

19       Q.   Well, when you knew he was, he wanted to do a robbery

20  after those incidents why didn't you leave?

21  A.  I was scared.

22       Q.   What do you mean you were scared?

23  A.  I was scared that he was going to shoot me or something.

24       Q.   Well, when he was running after those two Hispanic men

25  and you and Renee Diggs were trotting behind, why didn't you

MARVIN MATHIS -  DIRECT BY FLORCZAK                153

1   and Renee leave at that point?  Was there any reason?

2   A.   No.  I wasn't thinking.

3        Q.   Would you see him the next day?

4        I withdraw the question.

5        How often did you see him at that time?

6   A.   Probably almost every day, every other day.

7        Q.   So you would expect to see him if not on the 23rd you

8   would expect to see him on the 24th?

9   A.   Yes.

10       Q.   And you saw Antwan on a regular basis then?

11  A.   Yes.

12       Q.   Now, after you gave that second statement did there

13  come a time when they asked you what clothes you were wearing

14  and if they could have the clothes?

15  A.   Yes.

16       Q.   Do you remember when that was?

17  A.   That was in second statement, that's when they asked me.

18       Q.   Was it before they took the second statement or after

19  or do you recall?

20  A.   I think it was like in the middle.  I am not for sure.

21       Q.   I show you what has been marked S-18 in evidence.  Do

22  you know what this is?

23  A.   (Pause) Search warrant?

24       Q.   Well, does it have your signature?

25  A.   Yes.

MARVIN MATHIS -  DIRECT BY FLORCZAK                    154

1      Q.    Okay.  Can you read what it says on the top there,

2  under Elizabeth Police Department?

3  A.   Consent search.

4          MR. FLORCZAK:   It's a poor copy.  I don't want to

5  indicate that he can't read it.  Is there any other copy?

6          MR. KOLANO:   That's the copy that's in evidence.

7      Q.    It says consent to search?

8  A.   Right.

9      Q.    Some of the letters are a little blotted out because

10  it's a poor copy.

11      Do you recall what that was about?

12  A.   This was for consent to check my house to see if, you know,

13  do I have the weapon at my house, and they checked pants that I

14  had on.

15      Q.    So you consented them, for them to go look to see if

16  there is a weapon at your house and get whatever clothes?

17  A.   Yes.

18      Q.    Okay.  Now, they took a second statement from you, is

19  that correct?

20  A.   Yes.

21      Q.    And statement here says it started at 6:50 p.m. is

22  that about right, close to seven o'clock at night?

23  A.   I wasn't keeping track of time.  Plus at the time there was

24  no clock or nothing.  So I can't, you know, really say.

25      Q.    When you gave that statement you told them about April

MARVIN MATHIS -  DIRECT BY FLORCZAK                    155

1    and Renee, is that correct?

2    A.   Yes.

3        Q.   When they questioned you did you ever, any time, ever

4    tell them that you helped in any way in this robbery?

5    A.   No.

6        Q.   Did you ever tell them that you agreed to be a lookout

7    in this robbery?

8    A.   No.

9        Q.   I show you what has been marked S-4 for

10   identification.  And can you identify that.  Do you know what

11   that is?

12   A.   This is the statement, second statement.

13       Q.   Okay.  I direct your attention to page -- I believe

14   page six.  I believe there is some writing at the bottom.  I

15   would like you to look at.  I ask you to look at the bottom of

16   page six.  Do you see the A and the Yes and MM?

17   A.   Yes.

18       Q.   Did you write that?

19   A.   No.

20       Q.   Any of it --

21       Did you write the MM?

22   A.   I wrote the MM.

23       Q.   What about A or the Yes?

24   A.   No.

25       Q.   The second time when they took the second statement

MARVIN MATHIS -   DIRECT BY FLORCZAK                    156

1    they advised you of your rights again, do you recall?

2    A.   Yes.

3        Q.   And this form says at 5:45.  Was that about an hour,

4    did they do it about an hour before they took the second

5    statement, do you recall?

6    A.   I can't recall.

7        Q.   Okay.  Well, I ask you to look at what has been marked

8    S-3.

9             MR. FLORCZAK:  I don't know if it's in evidence or --

10            THE COURT:  Identification.

11            MR. FLORCZAK:  For identification.

12       Q.   Do you recognize that?

13   A.   Yes.

14       Q.   Does that have your signature on it?

15   A.   Yes.

16       Q.   And your mother's?

17   A.   Yes.

18       Q.   Do you know what that is?

19   A.   Another sheet about my rights.

20       Q.   Says they started filling out this form at 5:45 and

21   finished at 5:46, do you remember that?

22   A.   I don't remember exact time.  No.

23       Q.   Do you remember how they did it?

24   A.   They was like they would read, the same procedure they did

25   before, they read it to me.

MARVIN MATHIS -  DIRECT BY FLORCZAK                157

1      Q.   And what happened then?

2  A.   Then they was telling me put my initials after each one

3  that he read to me.

4      Q.   Did he ask you whether you understood it or not?

5  A.   No.

6      Q.   Did you ever indicate to them that you understood it?

7  A.   No.

8      Q.   Marvin, on January 22nd, 1996, that night, did you

9  ever have a gun in your possession?

10  A.   No.

11      Q.   Did you ever shoot anyone?

12  A.   No.

13      Q.   Did you help anyone, Antwan Harvey or anyone else to

14  rob anyone?

15  A.   No.

16      Q.   Did you ever intend to be a lookout or anything else

17  for Antwan Harvey or anyone else?

18  A.   No.

19          MR. FLORCZAK:  I have nothing further, your Honor.

20          THE COURT:  Mr. Kolano.

21          MR. KOLANO:  Thank you, your Honor.  Although, I will

22  be probably lengthy.

23          THE COURT:  Well, --

24          MR. KOLANO:  I have no problem starting.

25          THE COURT:  We will get started, and then at an

1  appropriate point we will break for the day.

2  CROSS EXAMINATION BY MR. KOLANO:

3      Q.   Mr. Mathis, you were in school on the 24th, is that

4  correct?

5  A.   Yes.

6      Q.   And you indicated that you went to the

7  vice-principal's office?

8  A.   Yes.

9      Q.   And that was not a big deal in terms of your life,

10 right?

11 A.   Excuse me?

12     Q.   That was not a big deal, that did not cause you any

13 concern?

14 A.   No.

15     Q.   Correct?

16 A.   No.

17     Q.   And there a detective told you that there was an

18 investigation, and that they wanted you to go to police

19 headquarters?

20 A.   That they needed me to come to the police station.

21     Q.   And this was Detective Ralph Garcia?

22 A.   Yes.

23     Q.   And Ralph Garcia was detective assigned to the high

24 school basically full time?

25 A.   I don't know that.  No.

MARVIN MATHIS - CROSS BY KOLANO                159

1      Q.    You had met Detective Garcia once before that day?

2   A.   Yes.

3      Q.    And on that prior occasion you don't recall anything

4   about that prior meeting, right?

5   A.   No.

6      Q.    Now, Detective Garcia had never mistreated you in any

7   way?

8   A.   No.

9      Q.    You didn't feel threatened by Detective Garcia when he

10  met with you on the 24th of January, did you?

11  A.   No.

12     Q.    And in fact he did not handcuff you, did he?

13  A.   No.

14     Q.    And he did not pat you down?

15  A.   No.

16     Q.    When I say pat down, see if you had any weapons or

17  anything like that?

18  A.   No.

19     Q.    He didn't do that?

20  A.   No.

21     Q.    He didn't frisk you?

22  A.   No.

23     Q.    And they brought you out of the school and put you in

24  an unmarked police car?

25  A.   Yes.

MARVIN MATHIS - CROSS BY KOLANO                    160

1      Q.    And even at that time they never cuffed you or patted

2   you down, correct?

3   A.   No.

4      Q.    They never told you you were under arrest?

5   A.   No.

6      Q.    They didn't mistreat you in any way?

7   A.   No.

8      Q.    Were they respectful to you?

9   A.   Yes.

10      Q.    And then you were brought to police headquarters in

11   the unmarked car?

12   A.   Yes.

13      Q.    And they put you in a room in the detective bureau?

14   A.   Yes.

15      Q.    And these police detectives who transported you they

16   worked in plain clothes?

17   A.   Yes.

18      Q.    Casual clothes?

19   A.   Yes.

20      Q.    Like jeans and sneakers and T-shirt or flannel shirts

21   or something like that?

22   A.   Yes.

23      Q.    And when they put you in that room they didn't

24   handcuff you, did they?

25   A.   No.

MARVIN MATHIS - CROSS BY KOLANO                    161

1    Q.   And they told you just sit there and some other people

2  would talk to you?

3  A.   Yes.

4    Q.   Now, I think you indicated on direct examination that

5  a police officer or detective came into the room and told you

6  that since you were a juvenile nobody would talk to you until

7  your parent was located?

8  A.   Before my parent or guardian was located.

9    Q.   And at that time you were just pretty much sitting in

10  a room unhandcuffed, correct?

11  A.   Yes.

12    Q.   And you understood that when they told you that they

13  weren't going to talk to you until they could locate a parent,

14  right?

15  A.   Yes.

16    Q.   And then you were asked some questions so they could

17  identify your parent and have your parent there?

18  A.   That's when detective came in.

19    Q.   And you told the other detective your mom was Linda

20  Mathis?

21  A.   Yes.

22    Q.   And you told the other detective that she volunteered

23  at an Elizabeth General Hospital?

24  A.   Yes.

25    Q.   Did you give him the phone number?

1   A.   No.

2        Q.   And they told you, Fine, we are going to try to get

3   your mother?

4   A.   Yes.

5        Q.   You didn't give any formal statements or anything

6   until your mother got there, right?

7   A.   Yes.

8        Q.   You did?

9   A.   Excuse me?

10       Q.   Did you give any formal statements until your mother

11  got there?

12  A.   Well, when my mother got there?

13       Q.   Up until the time your mother got there did you tell

14  the police anything about what had happened on the 22nd?

15  A.   Oh, no.

16       Q.   And so they pretty much --

17       Well, when your mother got there you and your mother were

18  put in the same room?

19  A.   Yes.

20       Q.   And when you were in that room your mother was

21  permitted to stay there and listen, is that correct?

22  A.   Yes.

23       Q.   And you understood that that was the appropriate

24  procedure because the police told you that there was a homicide

25  investigation, right?

MARVIN MATHIS - CROSS BY KOLANO                    163

1    A.   Yes.

2         Q.   And the police told you you were a suspect?

3    A.   Yes.

4         Q.   And the police told you that now that your mother was

5    there they wanted to talk to you about what had happened and

6    your involvement?

7    A.   Yes.

8         Q.   And all of this was in the conference room, fairly big

9    room?

10   A.   Yes.

11        Q.   And at that time you weren't handcuffed or arrested or

12   anything like that, right?

13   A.   No.

14        Q.   Okay.  And just so we are clear, you are not saying

15   that the police mistreated you in any way, shape or form, are

16   you?

17   A.   No, they didn't mistreat me at all.

18        Q.   Nobody put a gun to your head?

19   A.   No.

20        Q.   Nobody hit you?

21   A.   No.

22        Q.   Nobody threatened you?

23   A.   No.

24        Q.   Nobody, from what you could see nobody threatened your

25   mom or hurt your mom?

1  A.  No.

2      Q.   Basically they kind of did it by the book; they told

3  you what they were going to do, and that's what they did?

4  A.  Yes.

5      Q.   As far as you were concerned they were straight up

6  with you?

7  A.  Yes.

8      Q.   Now, Mr. Florczak asked you about some Miranda rights.

9  I am going to show you what has been marked S-1 for

10 identification.  And this is your signature here?

11 A.  Yes.

12     Q.   Okay.  And that's your mother's signature right below

13 it?

14 A.  Yes.

15     Q.   These are your initials after each of the rights.

16 A.  Yes.

17     Q.   And it says, just going from the top:

18     You have a right to remain silent.  Do you understand this?

19     And then those are your initials MM?

20 A.  Yes.

21     Q.   And you put those there, right?

22 A.  Yes.

23     Q.   And nobody forced you or threatened you to put those

24 initials there?

25 A.  No.

MARVIN MATHIS - CROSS BY KOLANO                          165

1       Q.   So that was done voluntarily?

2   A.   Yes.

3       Q.   And that was true of all of them, is that correct?

4   A.   What?  Excuse me?

5       Q.   You put your initials there on each of these rights

6   that I am pointing to?

7   A.   Each question they read to me, told me put my initials.

8       Q.   Detective Koczur read it aloud to you?

9   A.   Yes.

10      Q.   Up to this point you were present when Detective

11  Koczur testified.

12  A.   Yes.

13      Q.   In the courtroom?

14  A.   Yes.

15      Q.   And you heard Detective Koczur say that he read this

16  form to you out loud?

17  A.   When he was here?

18      Q.   Yes.

19  A.   Yes.

20      Q.   You would agree with that?

21  A.   Yes.

22      Q.   And in fact he said that you put each of your initials

23  there.  You would agree with that, right?

24  A.   Yes.

25      Q.   And you heard him testify that one of the first things

MARVIN MATHIS - CROSS BY KOLANO                    166

1   you were advised is not to say anything until your mother got

2   here, right?

3   A.   Yes.

4        Q.   And would you agree with that?

5   A.   Yes.

6        Q.   So basically up until this point you are not at odds

7   with the detective, with the testimony so far, that you sat

8   through as it relates to Detective Koczur, right?

9   A.   Repeat that.

10       Q.   Let me rephrase that.   That's awkward question.

11       When Detective Koczur testified that you came there, you

12   were put in a room, nobody questioned you until your mother got

13   there, and that you were read your rights and you signed your

14   rights; you agree with all of that?

15   A.   Not really.

16       Q.   Okay.   What do you disagree with?

17   A.   When Detective Koczur was trying to pull questions out of

18   me.

19       Q.   And you said what to him when he was trying to draw

20   questions out of you?

21   A.   I told him other detective said he don't ask me no

22   questions until my mother come.

23       Q.   You basically stood up for your rights, right?

24   A.   At that -- you can say that.

25       Q.   Because detective said you don't have to say anything

MARVIN MATHIS - CROSS BY KOLANO                    167

1   until your mom gets here?

2   A.   He told me don't say nothing until my mother come.

3        Q.   When somebody else tried to question you according to

4   your testimony you said no, they told me not to say anything

5   until my mom gets here?

6   A.   I told him I said other detective said don't ask me no

7   questions until my mother come.

8        Q.   You understood that, and you told the detective that?

9   A.   That's what I told detective.  Yes.

10        Q.   Now, at that point in time, the detectives begin to

11   conduct an oral interview of your rights?

12   A.   Yes.

13        Q.   And you are there and your mom is there, correct?

14   A.   Yes.

15        Q.   Now, can you tell us if you had an opportunity to read

16   over your two statements prior to getting on the witness stand

17   today?

18   A.   Do I have a chance to read both of them?

19        Q.   Yes.

20   A.   They was like I didn't ask you to read them.  They was

21   like, I was like glancing over them.

22        Q.   No.  I am sorry.  Prior to you getting -- Last night,

23   did you read them last night or today?

24   A.   Did I read?

25        Q.   Your statements?

MARVIN MATHIS - CROSS BY KOLANO                    168

1   A.   Yes.

2        Q.   When was the last time that you read your statements?

3   A.   The entire statement?

4        Q.   Yes.

5   A.   I can't recall.

6        Q.   Was it last week?

7   A.   I can't say.

8        Q.   Well, in preparation of your coming to testify today

9   you didn't look over your statements or discuss with your

10  attorney?

11  A.   Yes, I discussed.

12       MR. FLORCZAK:   Judge, anything discussed between

13  attorneys --

14       THE COURT:   Sustained as to discussion.

15       If you confine it to the documents he reviewed.

16       Q.   I am sorry.  I didn't hear your last answer.

17  Did you review the documents prior to testifying today,

18  your statements?

19  A.   I discussed with my attorney.  Yes.

20       Q.   Now, did you ever count up how many lies you told in

21  your two statements?

22  A.   My two statements?

23       Q.   Yes.

24  A.   Talking about second statement?

25       Q.   Your first statement and your second statement.  How

MARVIN MATHIS - CROSS BY KOLANO                    169

1  many lies did you tell in all of them?

2  A.   First one is not the whole detail.   Second one, that's, you

3  know, that's the truth, that's what happened.

4      Q.   Second one is the truth?

5  A.   Yes.

6          THE COURT:  Mr. Kolano, will you be addressing the

7  second statement at this point?

8          MR. KOLANO:  No, your Honor.   There was some other

9  things that I was going to go through first.

10         THE COURT:  Okay.  We want to break.  Perhaps this

11 would be a good time.

12         MR. KOLANO:  That would be fine, your Honor.

13         THE COURT:  All right.  Ladies and gentlemen, we are

14 going to break, then, for the evening.

15         Let me remind you not to engage in any discussions

16 regarding the case among yourselves or with others.

17         We will follow this usual procedure.  You are to be

18 excused to the jury room.  Collect your personal belongings,

19 await the officer to excuse you for the day.

20         And tomorrow we will be beginning at the regular time.

21 So come in at 8:30.  Report to the courtroom and assemble in

22 the jury room.

23         Have a pleasant evening.  See you tomorrow.   (Jury

24 withdrew from the courtroom.)

25         THE COURT:  Mr. Mathis can be escorted out.

MARVIN MATHIS - CROSS BY KOLANO                    170

C E R T I F I C A T E

        I, B. PETER SLUSAREK, C.S.R., License No.  XI00291,

an Official Court Reporter of the State of New Jersey, do

hereby certify the foregoing to be prepared in full compliance

with the current Transcript Format for Judicial Proceedings and

is a true and accurate non-compressed transcript to the best of

my knowledge and ability.


_____        Date: March  15   1999.

B. PETER SLUSAREK, C.S.R., XIO0291

Official Court Reporter

Union County Courthouse,

Elizabeth, New Jersey,