SUPERIOR COURT OF NEW JERSEY
LAW DIVISION : UNION COUNTY
CRIMINAL    —  97-02-00123

STATE OF NEW JERSEY,          :   Stenographic Transcript
                              :            of
        vs.                   :     Trial Proceedings
                              :
MARVIN MATHIS,                :
                              :
        Defendant,            :
_____     :


        Place:   Union County Courthouse
                 2 Broad Street,
                 Elizabeth, New Jersey,

        Date:   JUNE 17, 1998 — AFTERNOONSESSION


B E F O R E:
        HON. JOHN F. MALONE, J.S.C., & JURY

TRANSCRIPT ORDERED BY:
        OFFICE OF THE PUBLIC DEFENDER
                Appellate Section

A P P E A R A N C E S:

        WILLIAM KOLANO,  ESQ.
        Assistant Prosecutor, Union County,
        For the State,

        WALTER E. FLORCZAK, ESQ.
        (Florczak & Florczak)
        Attorney for the Defendant,




        B. PETER SLUSAREK, C.S.R., XIO0291
        Official Court Reporter
        Union County Courthouse
        Elizabeth, New Jersey, 07207

138

1                        WITNESSES INDEX

2                                               PAGE

MARVIN MATHIS
3         Cross By Mr. Kolano (Cont'd)          03
          Redirect By Mr. Florczak             123
4         Recross By Mr. Kolano                 128

5   DAMINA ALVARADO ARCOS                       140

6   LINDA MATHIS
          Direct By Mr. Florczak               145
7         Cross By Mr. Kolano                   153

8

9         DEFENSE SUMMATION                     174
          STATE SUMMATION                       192
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

- COLLOQUY -                                          139

1        THE COURT:  Good afternoon.  Be seated, please.

2    We need Mr. Florczak.

3        MR. KOLANO:  State has no objection to proceeding in

4    his absence.

5        THE COURT:  Your kindness and generosity is noted, Mr.

6    Kolano.

7        Good afternoon.

8        MR. FLORCZAK:  Judge, I would like to call Miss

9    Alvardo.  Right now an investigator is talking to her right at

10   this moment.  He has been talking to her for a while.

11       MR. KOLANO:  I would rather get going with the trial.

12       THE COURT:  Okay.  We will bring the jurors.

13       MR. FLORCZAK:  Problem I have, this witness'

14   apparently grandmother died, she has a wake to attend, and I

15   prefer to accommodate her.

16       MR. KOLANO:  I am agreeing.

17       MR. FLORCZAK:  I am sorry.

18       MR. KOLANO:  I am agreeing.

19       THE COURT:  Mr. Kolano is agreeing with you.

20       MR. FLORCZAK:  I am sorry.  She is still talking to --

21       MR. KOLANO:  Just ask sheriff's officer to tell my

22   detective to cease the questioning so we can begin.

23       THE COURT:  We will bring the jurors in.

24       MR. FLORCZAK:  I would like to just say something as I

25   walk her in, one question I didn't ask her.

- COLLOQUY -                                                    140

1        (Pause).

2        THE COURT:  Bring the jurors out, put them in the box,

3   then we will call the witness in.

4        MR. KOLANO:  Assuming we go right into summations, can

5   I request no matter what at least a five minute break before

6   Mr. Florczak sums up?

7        THE COURT:  Yes.

8        MR. FLORCZAK:  We are going to have a conference

9   right, right after the last witness, on the charge?

10        MR. KOLANO:  Oh.

11        MR. FLORCZAK:  I thought the court mentioned that on

12   the record.

13        THE COURT:  We will do that.  That may involve

14   excusing the jurors into the jury room, having our conference

15   and on timing.

16        (Jury seated in the jury box in the courtroom.)

17        THE COURT:  Good afternoon, ladies and gentlemen.

18        Mr. Florczak, next witness, please.

19        MR. FLORCZAK:  I call Miss Alvardo, please.

20   D A M I N A      A L V A R D O      A R C O S

21   Sworn as a witness and testified as follows:

22   DIRECT EXAMINATION BY MR. FLORCZAK:

23        Q.   Miss Arcos, where do you live?

24   A.   536 Livingston Street.

25        Q.   Back in November of 1997, were you in the Union County

- DAMINA ALVARDO ARCOS -                          141

1    jail?

2    A.   Yes.

3        Q.   At that time did you meet a Renee Diggs?

4    A.   Yes.

5        Q.   When you met Renee Diggs did she at any time discuss

6    her case?

7    A.   Yes.

8        Q.   And in discussing her case, did she tell you who shot

9    the liquor store owner?

10   A.   Yes.

11       Q.   Who did she tell you shot him?

12   A.   She mentioned Antwan.

13       Q.   Now, did she mention who else was involved with her,

14   do you recall?

15   A.   She just said that it was her cousin April and Antwan.   But

16   I never, you know, she never talked about --

17       Q.   Marvin -- ?

18   A.   Marvin.

19       Q.   Marvin Mathis.

20           MR. FLORCZAK:   I have no further question.

21           I do.   I am sorry.

22       Q.   How did this, do you know how this came to the

23   attention of the authorities?

24   A.   Because I -- I was asking what she got locked up for, and

25   she was telling me.

- DAMINA ALVARDO ARCOS -                                    142

1      Q.   I mean, the fact that you are here today.  Do you know

2   how this came to the attention of the police or whoever?

3   A.   Oh, because I went to talk to that detective.

4      Q.   Was that Detective Koczur, do you remember?

5   A.   Yes.

6      Q.   And this is on an unrelated matter?

7   A.   Yes.

8      Q.   And as a result of your discussions with him you

9   learned he was involved in this trial?

10  A.   Yes.

11     Q.   Were names mentioned of the people involved?

12  A.   Yes.  He told me he mentioned the two girls, and he

13  mentioned two guys, and he was talking to me about the trial he

14  was going to come that he had to come to court.

15     Q.   Okay.  And that's when you told him about -- ?

16  A.   Yes.  We was talking, he was talking.

17     Q.   And you are here because you received a subpoena to

18  appear, is that right?

19  A.   Yes.

20          MR. FLORCZAK:   I have nothing further.

21  CROSS EXAMINATION BY MR. KOLANO:

22     Q.   How long were you with Renee Diggs?

23  A.   I was like four and a half months.

24     Q.   And so you became friendly over that four and a half

25  months?

– DAMINA ALVARDO ARCOS –                           143

1   A.   No, we wasn't.  You know, I know her, you know, but we

2   wasn't, you know, close friends.

3        Q.   How many times did you talk to her in the four and a

4   half months?

5   A.   Like when I was a trustee, so when I used to come out.  Not

6   like all the time.  Like sometime we talked.  She used to talk

7   about what happened, you know.  So -- we didn't talk much.

8        Q.   Did you talk about your case to her?

9   A.   Yes.

10       Q.   And you were a victim of a crime, and that's how you

11  met detective Koczur last week?

12  A.   Yes.

13       Q.   He was interviewing you as a victim?

14  A.   Yes, me and my sister.

15       Q.   He told you that he wouldn't be able to do some follow

16  up because he was involved in this case?

17  A.   Yes.

18       Q.   And he would be in court and tied up for a little bit

19  of time?

20  A.   Yes.

21       Q.   That's how it came to be you told him this

22  information?

23  A.   Yes.

24       Q.   He told you he would tell the prosecutor that?

25  A.   Yes.  But I haven't talked to him; but, yes, because I

- DAMINA ALVARDO ARCOS -                            144

1   received a letter and I had to come to court.

2        Q.   And then the prosecutor would tell the defense

3   attorney that, and that's how you came to meet Mr. Florczak?

4   A.   Yes.

5        Q.   And other than you beeing locked up with Renee Diggs

6   did you have any contact with her on the outside?

7   A.   No.

8        Q.   Did she also indicate that they had gone, they had

9   gone to the scene in a car?

10  A.   Yes, that's what she said.

11       Q.   And you are sure of that?

12  A.   That's what she said.  She told me that they went over

13  there, and Antwan killed the guy, and they was in the car.

14  But, you know, I am not sure, you know.  But, you know, she

15  went over there, and that he was the one that shot the guy.

16  That's it.  And they didn't know he was going to do it.  That's

17  all she said.

18       Q.   Okay.  Where does the car come in then?

19  A.   I don't know.

20       Q.   But she told you about the car?

21  A.   Yes, she told me she was waiting, so they had to be in a

22  car, unless she was waiting in the front.  I don't know,

23  Because I wasn't there.  But I am telling you what I know she

24  said.

25            MR. KOLANO:  Okay.  Thank you.  Nothing further.

- DAMINA ALVARDO ARCOS -                                        145

1   REDIRECT EXAMINATION BY MR. FLORCZAK:

2       Q.   Just, did she tell you she was jut waiting and you

3   assumed it was for a car or that did she actually talk about a

4   car, do you remember?

5   A.   She said she was waiting in a car.  That's what she had

6   said, so I assumed it had to be in a car, because --

7           MR. FLORCZAK:  I have nothing further.

8           MR. KOLANO:  Nothing further.

9           THE COURT:  All right.  Thank you.  You may step down.

10  You are excused.

11          MR. FLORCZAK:  I would call Linda Mathis.

12  L I N D A     M A T H I S

13  Sworn as a witness and testified as follows:

14  DIRECT EXAMINATION BY MR. FLORCZAK:

15      Q.   Where do you live?

16  A.   538 Magnolia Avenue, Elizabeth.

17      Q.   And where did you live back in January of 1996?

18  A.   I live there, same place.

19      Q.   Okay.  And are you living --

20      Are you related to Marvin?

21  A.   Yes, my son.

22      Q.   And was he living with you back then in January 1996?

23  A.   Yes.

24      Q.   Now, on January 22nd, that's two days before he was

25  arrested --

LINDA MATHIS -   DIRECT BY FLORCZAK                146

1    A.   Yes.

2         Q.   -- do you recall him coming home sometime after

3    school?

4    A.   Yes, he came home after school.   Yes.

5         Q.   And what did he do or you do?

6    A.   I think around like five something we went to the

7    laundromat.   I did my laundry.

8         Q.   And was he with you?

9    A.   Yes.

10        Q.   After that was done, did there come a time he left, he

11   went out?

12   A.   When I did my laundry, no.   He stayed right with me.

13        Q.   After you did your laundry what did you do?

14   A.   When I finished I went back home.

15        Q.   What about him?

16   A.   Well, he stayed for a little while, and he left I think

17   before seven o'clock.

18        Q.   Okay.   And what time did he come home?

19   A.   Between 10:30 and eleven o'clock.

20        Q.   Now, I direct your attention to two days later.   Were

21   you contacted by the police on the 24th, January 24th?

22   A.   Yes.

23        Q.   Okay.   Where were you contacted by the police?

24   A.   On my job, Elizabeth General Medical Center.

25        Q.   And after they contacted you did they come and take

LINDA MATHIS -   DIRECT BY FLORCZAK                 147

1   you somewhere?

2   A.   Yes, they take me, they came and picked me up, took me to

3   the police station.

4        Q.   And who did you see at the police station?

5   A.   I talked to two detectives.  I don't remember their names.

6        Q.   You talked to two detectives, is that correct?

7   A.   Yes.

8        Q.   Was your son there?

9   A.   Yes, he was there.

10       Q.   Did there come a time that the police started

11   questioning him about anything?

12   A.   Yes.  They was questioning him, you know, what happened.

13       Q.   What happened with what, do you remember?

14   A.   Yes, with the shooting, stuff, you know.

15       Q.   Were you present during this?

16   A.   Yes, I was.  I was in the room with him, yes.

17       Q.   And did you have to sign any forms, do you recall, did

18   you sign any forms?

19   A.   Yes, I signed some forms.

20       Q.   Do you know, do you remember what the forms were?

21   A.   No.

22       Q.   Well, do you remember him being advised of his rights?

23   Do you remember signing a form where they said you have a right

24   to remain silent and things like that?

25   A.   Yes.

LINDA MATHIS -   DIRECT BY FLORCZAK                    148

1      Q.    Now, did they ask him to initial that form, put his

2    initials?

3    A.   Did they ask my son to sign it?

4      Q.    Yes.   Yes.

5    A.   Not right then, not right then.

6      Q.    When, at what point did they ask him to sign it?

7    A.   He didn't sign it right then.   He signed it later on.

8      Q.    What were they questioning, do you recall whether,

9    what Marvin said at first?

10   A.   What happened.

11     Q.    About what happened?

12   A.   He told them that he was with them but he didn't do

13   anything.   And he didn't know, you know, what Antwan was up to.

14     Q.    Did he at first tell them that he wasn't even

15   involved?   Do you remember that at all?

16   A.   No, I don't remember that, no.

17     Q.    Did there come a point where -- strike that.

18     They took -- Were you there when they took a typewritten

19   statement from him?

20   A.   Yes.

21     Q.    Do you recall what time that occurred?

22   A.   It was kind of late.

23     Q.    How many typewritten statements do you remember?

24   A.   I don't remember.

25     Q.    Could it have been one or two, or you don't know?



LINDA MATHIS -   DIRECT BY FLORCZAK                    149

1   A.  Maybe two.  I am not sure.

2       Q.   Okay.  Well, after the statements were taken did you

3   read them?

4   A.  Yes, I read them.

5       Q.   Do you recall whether Marvin read them?

6   A.  Yes.  He let Marvin read them, yes.

7       Q.   He asked both of you to read them?

8   A.  Yes.

9       Q.   Do you remember signing them?

10  A.  Yes.

11      Q.   Do you remember in any of those statements Marvin

12  saying he was involved in the robberies?

13  A.  No.  He just said he didn't know.

14      Q.   If it's in the statement, you just didn't see it?

15  A.  I don't remember seeing it.  I remember when they were

16  asking him did he rob the man, he said No.

17      Q.   Did you ever -- You were there for almost all the

18  questioning, is that correct?

19  A.  I was in the room?

20      Q.   Yes.

21  A.  Yes.

22      Q.   Did you ever hear him say that he was involved either

23  as a lookout or some other way?

24  A.  No, he didn't say, he didn't say it, no.

25      Q.   Do you recall how long they questioned him?

LINDA MATHIS -   DIRECT BY FLORCZAK                    150

1    A.   From the time they picked me up from my job until midnight

2    that night.

3         Q.   Now, do you remember there came a time when things

4    stopped and you went back to your house to get some things?

5    A.   Right.

6         Q.   Okay.   Now, prior to that, did you hear any

7    questioning of Marvin about any guns or weapons or things?

8    A.   No.

9         Q.   Did you hear the officer ask him about weapons?

10   A.   He asked him he said, Whenever I go to your house would I

11   find any weapon?   And my son said No.

12        Q.   Did they ask you to consent to a search of your house?

13   A.   No, no, they didn't ask me.   No.

14            MR. KOLANO:   Should be in the evidence box.

15            I believe it's in the evidence box.

16        Q.   Miss Mathis, I show you what has been marked S-18 in

17   evidence.   Can you look at this.   Can you tell me what that is?

18   A.   Right to search premises, like search your house.

19        Q.   Does it have your signature?

20   A.   Yes.

21        Q.   And you did sign that, and Marvin signed it too,

22   didn't he?

23   A.   Yes.

24        Q.   Do you remember doing that?

25   A.   I don't remember, no, I don't remember.

LINDA MATHIS -   DIRECT BY FLORCZAK                    151

1        Q.   In any case, they wanted to go to your house, is that

2   true?

3   A.   Yes.

4        Q.   And you agreed to it?

5   A.   Yes.  I didn't say No.

6        Q.   And you went with them?

7   A.   Yes.

8        Q.   And what happened at your house?

9   A.  He wanted to see Marvin room, so I showed him the room.  He

10  look around, but he didn't find anything.

11  A.  He just got some phone numbers and stuff, and that was it.

12       Q.   What about phone numbers?

13  A.  He has phone numbers, his friend in his book bag.  And he

14  took them.

15            MR. KOLANO:  Do we have the statements?

16       Q.   Now I show you what has been marked S-1 in evidence.

17  Do you know what that is?

18       That's an explanation of your, his constitutional rights?

19  A.  Yes.

20       Q.   Did you sign that?

21  A.  Yes.

22       Q.   Did you understand what was in there?

23  A.  Yes, I understand.  Yes.

24       Q.   Now, this says it was started at 12:07 and finished at

25  12:09.  Is that approximately correct?

LINDA MATHIS -   DIRECT BY FLORCZAK                152

1   A.  Yes, about that.

2       Q.  Okay.  Then I show you what has been marked S-2 in

3   evidence.  Is this --

4       I am sorry.  Is this for identification, S-2?

5           MR. KOLANO:  What does it say?  Should be for

6   identification.

7           THE COURT:  S-2 is for identification.

8           MR. FLORCZAK:  Doesn't indicated.

9       Q.  I show you S-2 for identification.  Do you recognize

10  this?

11      Let me ask you, did you sign it?  Is that your signature on

12  the last page?

13  A.  Yes.

14      Q.  And is this a statement that Marvin gave?

15  A.  (Pause) Yeah.

16      Q.  Okay.  This statement says, started approximately 2:30

17  in the afternoon.  See?  Is that probably accurate?

18  A.  When they start asking questions?

19      Q.  When they started typing the questions?

20  A.  It was late in the day.

21      Q.  Well, there is another statement that was started at

22  ten to seven.  Do you remember that?

23  A.  Yes.

24      Q.  Now, between the time they say this rights form was

25  signed and the time that they started typing the statement did

LINDA MATHIS -   DIRECT BY FLORCZAK                    153

1    they ask him questions?

2    A.   No.

3        Q.   Well, was there any time you were there that they

4    weren't asking him questions?

5    A.   Yes, they was asking questions the whole while.

6        Q.   Do you recall what time you went home that night after

7    he was taken into, after police headquarters, do you know what

8    time you went home?

9    A.   Me?

10       Q.   Yes.

11   A.   I think it was after twelve.

12           MR. FLORCZAK:   I have no further questions.   Thank

13   you.

14           THE COURT:   Mr. Kolano.

15   CROSS EXAMINATION B YMR. KOLANO:

16       Q.   Miss Mathis, the police told you that they were

17   conducting an investigation, homicide investigation?

18   A.   Yes.

19       Q.   And they told you that your son was at police

20   headquarters?

21   A.   Yes.

22       Q.   And they asked you to come down because he was a

23   juvenile and wanted you there?

24   A.   Yes.

25       Q.   Did the police treat you respectfully?

LINDA MATHIS - CROSS BY KOLANO                    154

1   A.   Yes.

2        Q.   And they drove you there?

3   A.   Yes.

4        Q.   At that time did you have a car?

5   A.   I don't drive.

6        Q.   When you got there they brought you right in to see

7   your son?

8   A.   Yes.

9        Q.   And your son was treated well?

10  A.   Yes.

11       Q.   And the whole time that night the police treated your

12  son very well?

13  A.   Well --

14       Q.   Let me rephrase.  They treated him respectfully?

15  A.   Yes.

16       Q.   They didn't hit him or threaten him?

17  A.   No.

18       Q.   Or anything like that?

19  A.   No.

20       Q.   And is the same true of you, they treated you

21  respectfully?

22  A.   Yes.

23       Q.   And the police said that they couldn't question him

24  until you were present?

25  A.   Right.

LINDA MATHIS - CROSS BY KOLANO                    155

1    Q.   And then they, when you were there in the room they

2    did, they were questioning him?

3    A.   Yes.

4    Q.   There came a point in time where Marvin asked that you

5    step out of the room?

6    A.   Yes.

7    Q.   Because -- And then you did, when your son asked you

8    to step out of the room you did?

9    A.   Yes.

10   Q.   Then when you came back in the room did he basically

11   tell a different version of what happened?

12   A.   No.

13   Q.   He told the same thing?

14   A.   Yes.

15   Q.   And the same thing being that he wasn't involved at

16   all?

17   A.   Yes.  He said he wasn't involved.

18   Q.   Now, the police also took a statement from you?

19   A.   Yes.

20   Q.   Okay.  And would it be fair to say they pretty much

21   covered the questions that I asked you in that statement about

22   how you were treated?

23   A.   Yes.

24   Q.   And you told them Fine?

25   A.   Yes.

LINDA MATHIS - CROSS BY KOLANO                    156

1        Q.    And how Marvin was treated, and you told them Fine?

2    A.    Yes.

3        Q.    And that he received his rights the way he was

4    supposed to, right?

5    A.    Yes.

6        Q.    And just as you have told us here today, both he and

7    you understood his rights?

8    A.    Yes.

9        Q.    And that later I think you told us you did read the

10   statement?

11   A.    Yes.

12       Q.    Marvin read the statement?

13   A.    Yes.

14       Q.    And then the police gave it to you and said, you know,

15   after you read it if there is any changes you want to make make

16   your changes?

17   A.    Yes.

18       Q.    And then if you didn't want to make any changes you

19   should, or I think Marvin had to initial on the bottom?

20   A.    Yes.

21       Q.    And Marvin read that and then initialed on the bottom

22   of the pages?

23   A.    Yes.

24       Q.    And nobody forced Marvin to do that, did they?

25   A.    One of the detectives, he was putting words in his mouth.

LINDA MATHIS - CROSS BY KOLANO                    157

1     Q.    What words?

2   A.   He was, you know, he didn't believe my son, that he thought

3   he had did it, you know.

4     Q.    Miss Mathis, on direct examination --

5     Well, let's go back to the statement.   When you read it,

6   did it appear to be accurate?

7   A.   Yes.

8     Q.    Okay.   And that's why you signed it, because it was

9   accurate?

10  A.   Yes.

11    Q.    And you were present so you know the words that were

12  spoken were typed down that came from the detective and from

13  your son?

14  A.   Yes.

15    Q.    Okay.   And the same thing was true of your son?

16    I mean he read the statement, right, and he didn't say,

17  Boy, mom, they have this wrong, did he?

18  A.   No, he didn't say that.

19    Q.    He said it was accurate, and that's why he signed it

20  too?

21  A.   Yes.

22    Q.    Did he make, make the one change in the statement, do

23  you remember coming --

24    Would it be fair to say your memory of that day is not

25  really all that great?

LINDA MATHIS - CROSS BY KOLANO                                   158

1    A.   I forgot, really.

2         Q.   You forgot a lot of it?

3    A.   Yes.

4         Q.   If you don't remember, just please tell us.  I don't

5    want to --

6         Now, this is Marvin's initials?

7    A.   Yes.

8         Q.   And over here are his initials too, right?

9    A.   Um-hum.

10        Q.   Do you remember -- and, again, if you remember tell

11   us.  Do you remember as you and he were reading through this

12   statement there was a question here and no answer on the

13   bottom, and so the answer was filled in?

14   A.   I don't remember.

15        Q.   You don't remember that?

16   A.   No.

17        Q.   Okay.  Did you know Antwan Harvey?

18   A.   No.

19        Q.   Did you know your son was friendly with him?

20   A.   No.

21        Q.   Did you know April Diggs?

22   A.   No.

23        Q.   Did you know Renee Diggs?

24   A.   No.

25        Q.   Did you know Migdalia Hernandez?

LINDA MATHIS - CROSS BY KOLANO                    159

1   A.   No.

2        Q.   Who were your son's friends back then that you knew

3   of?

4   A.   (Pause) I can't think his name.  Anyway, he live in

5   Hillside.  He used to live in Elizabeth, he moved to Hillside.

6        Q.   Do you have any relatives who live -- back then did

7   you have any relatives who lived on Third Street?

8   A.   His cousin.

9        Q.   And did Marvin go there a lot?

10  A.   Not too much.

11       Q.   Well, once a week or once a month, once a year?

12  A.   Maybe like twice out of a week.

13       Q.   Twice out of the week?

14  A.   Yes.

15       Q.   Do you remember what Marvin was wearing when he got

16  home on the 22nd of January?

17  A.   He had some black pants and I don't remember the shirt.

18       Q.   Did he have a jacket?

19  A.   A coat.

20       Q.   How was he acting?

21  A.   He acted like he always act.

22       Q.   He was normal when he got home?

23  A.   Yes.

24       Q.   And that you are pretty clear on?

25  A.   Yes, I am clear, yes.

LINDA MATHIS - CROSS BY KOLANO                    160

1    Q.   So it's not like you said to him What's the matter,

2    what's wrong with you?   Just another night?

3    A.   Yes.   No.

4    Q.   And he would go out pretty regularly even on school

5    nights?

6    A.   Not every night.

7    Q.   Okay.   But once or twice or three times a week?

8    A.   Maybe twice a week.

9    Q.   Twice a week?

10   A.   Yes.

11   Q.   So did he have a curfew?

12   A.   Huhh?

13   Q.   Did he have a curfew?

14   A.   No.

15   Q.   So he could basically come home when it was

16   appropriate, when he thought it was appropriate to come home?

17   A.   Yes.

18   Q.   You didn't watch the clock or anything like that, did

19   you?

20   A.   No.   But he didn't come home too late.   He had to go to

21   school.

22   Q.   On January 22nd, 1996, what is it that sticks out in

23   your mind as to how you remember what time he got home that

24   night?

25   A.   Because I was up.

LINDA MATHIS - CROSS BY KOLANO                    161

1     Q.   What time do you normally go to bed?

2  A.  Who, me?

3     Q.   Yes.

4  A.  It would be late, around say about twelve or one, between

5  twelve or one.

6     Q.   Between twelve and one in the morning?

7  A.  Yes.

8     Q.   On this particular night you were still up when he

9  came home?

10 A.  Yes.

11    Q.   You made note of the time?

12 A.  Yes.  I just know what time it was.  I just look at the

13 clock, I know what time it was.

14    Q.   Up until that point in your life this was just another

15 regular day, though, Marvin came home, it was uneventful.  He

16 didn't act different?

17 A.  No.

18    Q.   It was only later when you found out some events you

19 realized that might become important?

20 A.  I found in the middle of the week, when the detective

21 called at my job that's when I had found out.

22        MR. KOLANO:  Thank you.  Nothing further.

23        MR. FLORCZAK:  Did Marvin go to school every day?

24        THE WITNESS:  He stayed out some days, but most he

25 went every day.

- COLLOQUY -                                    162

1      MR. FLORCZAK:  I have nothing further.

2      MR. KOLANO:  Nothing further.

3      THE COURT:  Miss Mathis, you may step down.

4      THE COURT:  Mr. Florczak, any additional witnesses?

5      MR. FLORCZAK:  No, judge.

6      Just one or two issues I would like to address the

7  court on.

8      THE COURT:  All right.  Ladies and gentlemen, some

9  matters that I need to discuss with the attorneys.  We will

10 take a few moments.  I would ask you then to return to the jury

11 room while I address those items with the attorneys.  Remember

12 not to discuss the case.  We will get you back out as soon as

13 we can.

14     MR. KOLANO:  May we approach off the record?

15     (Jury withdrew from the courtroom.)

16     THE COURT:  My understanding is that the defense has

17 now completed and will rest; and that, Mr. Kolano, the state

18 has nothing further to offer.  Is that correct?

19     MR. KOLANO:  Correct, your Honor.

20     THE COURT:  While we have this opportunity, we should

21 address the charge.  Although it will obviously, given the

22 hour, not going to be, not going to be given until tomorrow

23 morning.  And that will be the game plan.

24     By the way, I have been relieved of my

25 responsibilities for tomorrow's conference, so we can go ahead

1   with the charge and let the jury begin deliberations tomorrow

2   morning.

3           I provided counsel with a draft of the, of a verdict

4   sheet, which to some extent forms an outline of the charge as

5   well.

6           But let me back up to some preliminary matters.  I

7   would propose to charge prior contradictory statement of

8   witnesses.  There is testimony that witnesses, namely April and

9   Renee Diggs have on other occasions said something

10  contradictory to that which they testify to in court.  There is

11  a model charge with respect to that.

12          There is also --

13          MR. KOLANO:  If your Honor is making any factual

14  reference, there is also prior inconsistent statements of the

15  defendant.  I mean I agree charge should be given, but if your

16  Honor gives factual basis as it relates to two witnesses it

17  should also be given as to the defendant.

18          THE COURT:  There is the model charge with respect to

19  statements of the defendant.  And in this case there are the

20  two written statements, S-2 and 4 in evidence.  There is also

21  the oral statement of the defendant made to Miss Brooks.  So we

22  will be referring to both oral statement and written statement.

23          MR. KOLANO:  Just factual.  Oral statement to

24  Detective Koczur before it gets into written, and oral

25  statement to April Brooks based on April's testimony that when

1   they get back to Migdalia's house Why you shoot that man?

2   Because he grabbed me.

3              MR. FLORCZAK:  April Diggs'?

4              THE COURT:  Miss Brooks, Miss Diggs, and the oral

5   interview with the officer.  So we have both oral and written

6   statements.

7              There is expert testimony, that charge with respect to

8   Doctor Linares.

9              I think as to the preliminary matters that's it,

10  before getting into the substantive charges.

11             I don't know, before we talk about substantive

12  charges, I don't know if there is any or --

13             MR. FLORCZAK:  Just a charge as to character.

14             THE COURT:  Character.  That's right.

15             MR. FLORCZAK:  And also as to co-defendants

16  testifying.  I think there is a charge indicating there should

17  be greater scrutiny given to the testimony of co-defendants.

18             MR. KOLANO:  I believe there is such a charge,

19  statement of co-defendants.  I believe it is part of the model

20  jury charges.

21             MR. FLORCZAK:  I thought it was, but I am not --

22             THE COURT:  Accomplice testimony is a charge that

23  actually is in the old charge book.  Under 2A.  I don't think

24  it in any form made it into the current model charges.  I made

25  a note.  It's charge 4.100, in the old charge book.  We should

- COLLOQUY -                                    165

1   perhaps look at that.  There is a notation on that that it's

2   only given when requested by the defense, by the way.  So I

3   should pull that whole charge and let you look at it before

4   doing the charge tomorrow morning.  But I have a note.  Called

5   accomplice testimony, I think what it's actual called 4.100 in

6   the old charge book.  Okay.

7           Then getting over to the verdict sheet, since at the

8   end I was planning to charge accomplice, what I would normally

9   do is -- it's not a formal charge.  Sort of heads up to the

10  jury, what I am doing is charging the substantive offenses set

11  forth in the indictment as they, as the defendant is charged,

12  and that is as the principal, that he in fact is the person who

13  committed the offense.  But let them know at the end they are

14  going to hear about accomplice liability, so that the

15  defendant's culpability could be that of an accomplice.  And

16  then but they should listen to the charges first as if, as if,

17  as the indictment charges, that the defendant is the principal

18  who committed the offense and be aware that they are going to

19  hear accomplice liability at the end.  I usually just do that

20  as kind of a warning.  And then getting into the specific

21  offenses.

22           Obviously, there is the murder charge, model charge

23  with respect to that.

24           And as it relates to the verdict sheet, I have

25  indicated in the verdict sheet the two what amount to the

– COLLOQUY –                                    166

1   factual determinations that the jury needs to make with respect

2   to a determination of murder, and that either or both of them

3   will substantiate a guilty finding of murder.

4        I think as I have indicated on the verdict sheet, and

5   as we have somewhat discussed here off the record, the lesser

6   included offenses.  There are I have indicated aggravated

7   manslaughter and reckless manslaughter as possible lesser

8   included offenses for the jury to consider, and I have

9   reflected them on the verdict sheet as questions One C and D to

10  be addressed if the jury is not satisfied beyond a reasonable

11  doubt of the defendant's guilt on murder.

12       That would then lead us to robbery.  And as I think

13  the state is asserting two factual basis upon which the robbery

14  could be that, in the first degree, that the defendant

15  purposely inflicted or attempted to inflict serious bodily

16  injury upon the victim, or that the defendant was armed with or

17  threatened the immediate use of a deadly weapon.  So I have

18  indicated those as factual determinations or special

19  interrogatories the jury would address if they find the

20  defendant guilty of robbery.

21       So really the way it's set up a guilty verdict on

22  question number two would really be guilty of second degree

23  robbery, and then they would have to make specific findings of

24  either or both Two A or Two B which would elevate the crime to

25  first degree robbery if they made those factual determinations.

- COLLOQUY -                                    167

1      I have listed felony murder.  And the state, the

2  state's allegation is that the defendant was the, I think in

3  the language of the charge, the slayer participant, person who

4  actually committed the murder during the course of the felony.

5      And I have included parenthetically on the verdict

6  sheet reminder that felony murder can only be considered if the

7  predicate crime in this case, the robbery, the defendant is

8  found guilty of the predicate crime, that that's a prerequisite

9  finding.

10     MR. KOLANO:  Your Honor, while it is the state's

11  position that he is the slayer participant, there is obviously

12  evidence in this case that he is not, so I would ask also

13  non-slayer participant portion.

14     THE COURT:  That's the way the indictment reads, but

15  the facts would suggest that, non-slayer participant.  I think

16  it's sort of the same facts aggravated manslaughter or reckless

17  manslaughter.  Same type of evidence about the death occurring

18  during a struggle over the weapon.  That kind of evidence seems

19  to suggest the non-slayer participant in the felony murder as

20  well as how it supports the reckless or aggravated

21  manslaughter.

22     Possession of a firearm for an unlawful purpose.  And

23  with that goes the definition of possession.  And in this case

24  it would include actual, constructive, and joint.

25     And the unlawful purpose was to threaten the defendant

1   in order to commit a robbery, threaten the victim in order to

2   commit a robbery of him.  And or to inflict serious bodily

3   injury upon the victim.

4        The defendant's position with respect to the unlawful

5   possession for unlawful purpose is that the weapon was not

6   possessed.

7        MR. FLORCZAK:  That's correct.

8        THE COURT:  And then finally unlawful possession of a

9   handgun, which is the possession without permit to carry is the

10  model charge with respect to that.  I don't think that really

11  needs any additions or embellishments.

12       And then there is accomplice.  And I think in this

13  case it is accomplice to both murder and robbery and both with

14  lesser includeds.  So it could be accomplice to a murder, but

15  not with the same requisite mental state as to a first degree

16  murder, but rather aggravated or reckless manslaughter; and

17  accomplice to a robbery, but not with the requisite mental

18  state to do a first degree robbery, but rather a second degree

19  robbery.

20       So it's going to be State versus Belkowitz charge,

21  which is model charge, charge number two, for accomplice.  But

22  it incorporates lesser included.

23       And in this case I think there are two charges upon

24  which the defendant could be an accomplice.

25       I don't think accomplice as it relates to the weapon





1    possession charges is appropriate because of the charge in the

2    concept of constructive and joint possession.  I don't think

3    you can constructively possess something and also then need to

4    consider accomplice possession.  Okay.

5            Anything else?

6            MR. KOLANO:  Yes, judge.

7            Conspiracy certainly in the case as lesser included

8    offense.  And the case law is clear, even though it's not

9    charged in the indictment, if the court is satisfied that there

10   is evidence of conspiracy it is certainly a lesser included

11   both homicide offenses, murder on down, and the robbery.

12           Therefore, the state is requesting, one, that there be

13   a substantive charge of conspiracy as lesser included to the

14   homicide charges and the robbery charge.  The basis of that is

15   obviously conspiracy and agreement to commit an illegal act.

16           Here we have the testimony of the girls about the

17   conversation of the robbery, we have the statement itself, we

18   have the oral statements that are made.  This case is replete

19   with the idea of some agreement ahead of time that there was

20   going to be a robbery of this man.

21           Therefore I think the court is obligated to charge the

22   conspiracy.  And that should probably also be included on the

23   verdict sheet, since it is a lesser included, and the jury will

24   have to get instructions to go there only if they find him not

25   guilty of the substantive offense.

– COLLOQUY –                                      170

1        THE COURT:  I have some concern about it, because of

2   this idea that it's a conspiracy on the fly, so to speak.

3   There is no evidence that there was any discussion of

4   committing any crime until after the four persons had gotten

5   together and were some way into the walk from the Chinese,

6   somewhere between Chinese restaurant and to the area of the

7   victim's store.  And then there was general talk about finding

8   somebody to rob.

9        My concern, by the way, the case that I did look at

10  with respect to State versus Neal, 1988, appellate division

11  case for which I don't have a cite.  That seems to suggest that

12  there needs to be something more than just a general discussion

13  about committing a robbery at some point.  There needs to be

14  some more specific intent to commit a robbery.  And my concern

15  here is the general nature of the discussion among the people.

16  Really until they got to the point of the victim's store there

17  was, there was this kind of hit or miss, you know, maybe we

18  will rob the person at the liquor store, maybe we will rob the

19  guy with the jewelry, maybe we will chase the Puerto Rican kids

20  to rob them.

21        I am having some difficulty with the conspiracy.

22        MR. KOLANO:  I will stay away from it in my summation.

23  I don't know what Mr. Florczak's position is.  But it is,

24  without having the benefit of State versus Neal, the state's

25  position that conspiracy need not be in existence for any

- COLLOQUY -                                        171

1  period of time.  Whether it is two minutes or two weeks, once

2  there is that agreement.  So even if that agreement comes and

3  takes on a more specific purpose, a more specific focus, even

4  at the last couple of minutes that would still be a conspiracy.

5  Again, I am speaking off the cuff at this point in time.  I

6  think this is something that we can probably address after

7  summations.  At least I am comfortable with that.

8            THE COURT:  I don't know if Mr. Florczak expressed

9  some reservation.

10           MR. FLORCZAK:  As long as the court has reservations,

11 I am not speaking.  If the court's reservations weaken, then I

12 am willing to speak about that.

13           THE COURT:  Mr. Kolano is prepared to sum up without

14 reference to conspiracy as lesser included.  I assume, Mr.

15 Florczak, you are prepared to sum up without reference to it.

16           MR. FLORCZAK:  If the prosecutor wishes to make

17 another stab in the morning, obviously the court can entertain

18 it.

19           THE COURT:  We can revisit this issue tomorrow.  But

20 we will go ahead with the summations now.

21           Mr. Florczak, you need couple of minutes.

22           MR. FLORCZAK:  Yes.  I don't know whether you want to

23 give them a break now.

24           THE COURT:  I don't want to put you on the clock.  I

25 am just trying to get an idea what kind of time.



- COLLOQUY -                                      172

1        MR. FLORCZAK:  I just need some, about six or seven

2   minutes.

3        THE COURT:  Now, and that will bring us getting close

4   to three o'clock.  I just want to know what kind of time for

5   summations, if you have any idea.

6        MR. FLORCZAK:  I haven't a clue, judge.  I assume I

7   will be less than half hour.  But I --

8        THE COURT:  I understand.  You've got to take all the

9   time you need.

10        MR. FLORCZAK:  I understand that, judge.  I have no

11   way of estimating.  I assume it wouldn't be.

12        THE COURT:  Mr. Kolano.

13        MR. KOLANO:  I anticipate being briefer than usual,

14   obviously will depend what Mr. Florczak says.

15        THE COURT:  What I would like to do is get both of the

16   summations in this afternoon.  That obviously is going to push

17   us beyond four o'clock.  But it sounds like, you know, we could

18   be done by 4:30 or so.  And that's a pretty reasonable amount.

19        What I will probably do is give a brief recess in

20   between your summations, maybe only about ten minutes, just to

21   give the jurors a chance to get up, stretch their legs, walk

22   around, and get right back in and get to it.  So there will be

23   a short break in between.

24        And, Mr. Florczak, you go ahead take five or six

25   minutes you need now.

- COLLOQUY -                                    173

1          MR. FLORCZAK:  I need to obviously organize the

2    documents so I don't have to be looking for them.

3          THE COURT:  Take the few minutes now.

4          (Short Recess).

5          THE COURT:  Please bring the jury out.

6          (Jury seated in the jury box in the courtroom.)

7          THE COURT:  Mr. Florczak, any additional witnesses?

8          MR. FLORCZAK:  Defense rests at this time, your Honor.

9          THE COURT:  Mr. Kolano?

10         MR. KOLANO:  No rebuttal, your Honor.

11         THE COURT:  Ladies and gentlemen, then, as you have

12   just heard, both the defense and state have rested in this

13   matter.  And what that means is that there will be no further

14   evidence presented in the case.  No one else is going to be

15   called to testify, no other documents or other things are going

16   to be submitted into evidence.

17         So that portion of the trial is over.  But as you will

18   recall my initial instructions in this case to you last week,

19   that does not mean the case is over, because there are yet

20   additional things to do until the trial is complete and the

21   time comes that you begin your deliberations.  Those things

22   which are left to do include the summations or the closing

23   arguments of the attorneys, and that's what we will be

24   attending to now.

25         As you will recall, the attorneys addressed you at the

1    beginning of the trial in their opening statements.  The state

2    had the opportunity to address you first and then the defense.

3    In closing statements the order is reversed.  It is the defense

4    that speaks first, followed by the state.

5         So I am going to call upon Mr. Florczak for his

6    summation at this time.

7         Mr. Florczak.

8         MR. FLORCZAK:  Yes.  Your Honor, Mr. Kolano, ladies

9    and gentlemen:

10        As I told you in the beginning, I represent Marvin

11   Mathis, and only Marvin Mathis.  He is the only one on trial

12   today, and it's his case you have to deal with.

13        We appreciate the attention you paid so far.  Just

14   continue a little longer.  Obviously, this is a very important

15   case to my client, and I am sure the state considers it a very

16   important case.

17        I will be commenting on the evidence.  If your

18   recollection of the evidence differs from mine, then you rely

19   on your recollection, not mine.  And don't think I have

20   intentionally tried to deceive you, because that wouldn't be

21   true.

22        The judge will tell you, you are the triers of the

23   facts, you decide what the facts are.  And this is important to

24   me.  Because I speak first, I don't get up to speak again after

25   the prosecutor.  So if the prosecutor gets up and comments on

1   the evidence and says something I disagree with, I am not going

2   to jump up and object, because the judge will simply say the

3   jury will rely on its recollection.   It's your recollection

4   that counts, ladies and gentlemen.

5          But there are few things I would like you to keep in

6   mind.   Number one, as I told you in the beginning, and as I

7   tell you now, my client is assumed or presumed to be innocent,

8   and that presumption of innocence continues right now and will

9   follow you into the jury room.   My client is presumed to be

10  innocent, and he is not obligated to prove his innocence.   My

11  client is not obligated to prove anything.

12         The state has to prove each charge, each element of

13  each charge beyond a reasonable doubt.   So if you have one

14  single solitary reasonable doubt as to any element of any

15  charge, you have to acquit my client.

16         And this is a case, ladies and gentlemen, that there

17  will be a lot of areas of reasonable doubt.   Just please use

18  your collective reasoning powers and please use your collective

19  memory of the testimony.

20         Now, the judge tells you what the law is.   I may very

21  briefly comment on what the law is, but the law comes from the

22  judge and no other source.

23         For instance, there is a murder charge; but there is

24  different murder charges:   There is murder knowing and

25  purposely, and then there is lesser included or aggravated

1   manslaughter, reckless manslaughter.  These are all charges

2   that judge will explain to you.  So you have to decide what

3   degree, if any, applies here.  Did the person who shot the

4   liquor store owner did he do it intentionally, was it an

5   accident, was it in a struggle.

6           Our position is that's Antwan Harvey's problem, not my

7   client's problem.  He didn't shoot anyone.

8           But these are the things you have to consider.  You

9   will be charged on robbery, you will receive charge as to the

10  weapons -- and the judge will tell you what the law is in those

11  areas.

12          What our position is, ladies and gentlemen, is that my

13  client did not intend to take part in any robbery, did not ever

14  in his life handle a gun, did not on this particular date shoot

15  anyone.

16          Now, as I told you, you must listen to the charge as

17  to certain things like reasonable doubt.  He will tell you what

18  it is.  Not the prosecutor, not I.  But reasonable doubt is not

19  simply a matter of whom do you believe.  I mean you can listen

20  to the state's witnesses and say that's logical, that's

21  reasonable.  You can listen to the defense witnesses and say

22  that's logical, that's believable.  I don't know who to

23  believe.  In which case you could have a reasonable doubt.  And

24  reasonable doubt not only comes from the evidence but it comes,

25  can come from a lack of evidence.  A lack of corroboration.

1      I mean there is lot of clothing involved in this case,

2  but there is no testimony of any blood stains or anything else

3  on any clothing belonging to my client.

4      These are things I am talking about.

5      Is there any corroboration of the testimony of the two

6  young Diggs ladies?  No, ladies and gentlemen, there isn't.

7      What we are dealing with here, ladies and gentlemen,

8  is you saw eighteen year old young man testify and tell you why

9  he is innocent.  But we are talking about something that

10  happened almost two and a half years ago.  So then we are

11  dealing with a fifteen plus a number of months old special

12  education student from Elizabeth High School who got himself

13  into a situation that he couldn't get out of and didn't know

14  how to get out of.  He is with a twenty two year old woman, a

15  twenty year old man, and then there is another seventeen year

16  old young lady whom he is along with.

17      And testimony is clear, ladies and gentlemen, he was

18  afraid of Antwan Harvey, he was afraid to leave.  Sure he had

19  opportunities to leave.  In the beginning he didn't have sense

20  enough to leave, and after the man is waving the gun around he

21  was too scared to leave.

22      But, ladies and gentlemen, you have to decide what

23  evidence, what credible evidence there is that he intended to

24  take part in any kind of robbery.

25      I suggest, ladies and gentlemen, there isn't any.

1   What I suggest, ladies and gentlemen, is that you have

2   testimony, you heard my client's statements.  Now, I suggest to

3   you actions speak a lot louder than words.  And what actions we

4   have testified to, ladies and gentlemen, by my client and

5   corroborated at least on one occasion by Renee Diggs who said

6   my client said Don't do it, is that my client before Antwan

7   pulled the gun stopped at least two robberies, one saying Don't

8   do it, one saying I am not taking part.  That is actions speak

9   louder than words as to what his intent was here.

10          And he is not charged with attempting to rob anyone

11   else.  The only robbery charge deals with the last incident.

12   Unfortunately, the man lost his life.  That's the only robbery

13   charge here, ladies and gentlemen.

14          But remember, actions speak louder than words.

15          And you have to evaluate all the witnesses.  You had

16   Miss Brooks testify.  And she comes in and I suggest, if you

17   remember her testimony, she gave a statement on the 24th of

18   January saying my client told her he was shot by accident.  She

19   came and testified she didn't remember, she read her statement

20   a couple of times and was able to testify to that.  But

21   essentially she allegedly ran to Miss Sutton, told her that's

22   what my client said, and then was taken to police headquarters.

23          But that isn't the way it happened, ladies and

24   gentlemen.  Because Miss Sutton came in to you and she recalled

25   what she said.  She said Marvin was involved, involved in a

1   murder, then on cross examination said could have said

2   shooting.  I said, asked her if he could have said killing, she

3   probably said that's possible.  In other words, all she was

4   told by Miss Brooks is that Marvin is involved.  She didn't

5   tell her that Marvin told her he shot someone.  She came in

6   here and told you, Miss Brooks never said that.

7           And then I questioned the Detective Koczur, and when

8   Miss Brooks went in to him, and I asked him specifically

9   whether he put it in his report.  He said yes he did.

10          And she came in and said that the next morning,

11  Elizabeth High School, Marvin Mathis told her that he and a

12  friend named Antwan were walking on the street, got into an

13  argument with the man taking out the garbage, a gun was

14  produced by Antwan, and during a struggle a shot was fired.

15  That's what she told officer, Detective Koczur initially what

16  happened.  That's what he put in his report.

17          So this thing about him telling her that he shot the

18  person didn't happen, didn't come until later statement, after

19  she told two different people two different things.  Then by

20  the third statement that I don't recall whether Detective

21  Koczur took the statement, whoever took the statement, then

22  that occurred.

23          But I suggest what happened, ladies and gentlemen,

24  this emotional young lady was approached the night before, on

25  the 23rd, 7:30 at night, by someone who claimed, told her that

1   Marvin shot someone and wrong people were arrested for him, and

2   they are out to get him.  That's who told her Marvin shot

3   someone, not Marvin.  The person the night before.

4          So next day in school she asks Marvin, you know,

5   what's going on.  She didn't tell him what she had been told,

6   but she asked what's going on, what happened.  Whatever.  And

7   he doesn't answer.  Are you in trouble?  He doesn't answer.  Or

8   she said he said something about it would make her faint.  He

9   says, no, I wouldn't answer her question, she got upset and

10  started crying.  That's all he told her, ladies and gentlemen,

11  that's the way it happened.  And she has got no reason to lie.

12         But she totally fouled it up, ladies and gentlemen,

13  based on what she told Detective Koczur before giving the

14  signed statement and what she told Miss Sutton.

15         And there are a lot of witnesses or testimony or facts

16  I may not comment on.  That doesn't mean they are not

17  important.  You decide what's important.  It may be something I

18  just overlooked.  I am sure when I sit down there will be two

19  or three things I will remember I should have said that I

20  didn't say.

21         Migdalia, I believe, Hernandez, I don't know whether

22  her, her testimony is even worth commenting on.  The fact is

23  she for some reason was questioned by the police six months, in

24  July, after this happened, end of July, six months later she is

25  questioned by the police.  Her testimony is not corroborated by

1    anyone else.  It really doesn't fit.  She talks about two guys

2    having masks.

3            Renee told you -- and the clothing is in evidence --

4    Marvin didn't have a mask, he had a cap on.  Just didn't

5    happen.

6            She talks about the four of them leaving and one of

7    the guys said something about having a gun.  But didn't happen.

8    The two girls met him out in the street.  Both young ladies,

9    Marvin says everyone says they met out in the street.  What she

10   testified to just didn't happen.

11           And then she comes in here and says Antwan is there

12   every day.  People got arrested, and she doesn't know.  How

13   could it be, ladies and gentlemen?

14           I don't know why her testimony occurred that way.  But

15   I suggest to you there is nothing she said that's worth even

16   considering.  Nothing at all.

17           I mean, April says when she returned after this all

18   happened she met Marvin coming down the stairs.  She didn't

19   even know which apartment he had been in.  Her testimony is

20   Marvin wasn't up in that apartment when she got there.  Which

21   is, of course, different than Renee's testimony.  But that I

22   will get into, ladies and gentlemen.  There are little things I

23   won't, I don't know whether I should even bother getting

24   involved with.

25           The wallet, the implication is because of the





– DEFENSE SUMMATION –                    182

1    statement that Antwan took it.  But I suggest, ladies and

2    gentlemen, there is also testimony from April, Renee, the wife

3    of Mr. Saraiva all indicating there is a man standing over the

4    victim after Marvin and Antwan are gone.  And Renee and April

5    tell you this man went through his pockets.  April or Renee one

6    of them told you when they got back into the apartment they got

7    nothing out of this.  Quite frankly, I don't know who took the

8    wallet.  I don't know if it even matters.

9           But I suggest to you when someone gets shot like

10   that-- My client's testimony was he was in shock.  Antwan shot

11   the man and said, grabbed him and said let's go, get out of

12   here.  As soon as that shot is fired, that man is down, they

13   are gone.  I don't think they hang around and go through

14   pockets.

15          This other man comes along.  He didn't fire any shots,

16   he got no guns.  He goes -- he has the nerve to go through the

17   victim's pockets.

18          But that's, as I said, that's not a major point,

19   ladies and gentlemen.

20          Now, I talked about what the defense would prove in my

21   opening.  And I told you I don't know whether we would.  I said

22   I would try to prove that Antwan Harvey was the shooter.  It's

23   for you to decide whether there is proof of that.

24          But what you should consider is that -- And this all

25   starts Who is the man with the gun?  Antwan Harvey.  Who is the

1    man with the mask?  Antwan Harvey.  Who is the man who everyone

2    says is suggesting robberies?  Antwan Harvey.  Who is the man

3    that the people are afraid of, Renee Diggs among them, I don't

4    recall whether April was asked about that.  But they are afraid

5    of Antwan Harvey.  Renee herself told you Antwan Harvey pulled

6    that gun and acted crazy.

7         Using your common sense, ladies and gentlemen, would

8    this twenty year old who has been waving this gun around,

9    looking to rob somebody, all of a sudden give, just give the

10   gun to a fifteen year old kid?  Here kid, you do it.  I don't

11   think he would give that gun up, ladies and gentlemen.  He is

12   the man that's running the show.  He is the one that won't let

13   anybody leave.  When Renee Diggs wanted to leave, he is not

14   letting her leave.  He is the man.

15        I don't have to prove, ladies and gentlemen, that he

16   is the man.  The prosecutor has to prove beyond a reasonable

17   doubted on that charge of murder that my client pulled the

18   trigger or, judge will give you instructions, whether he is an

19   accomplice in some way.  But I don't have to prove, ladies and

20   gentlemen.  All I have to do is show you that there is doubt.

21        Surely, in this case as to who had that gun and who

22   pulled that trigger there is doubt.

23        I mean when they arrest him a few days later in the

24   house they find -- I think April said it wasn't the gun, maybe

25   it was another gun.  It was the right color.  But she said it





1    was, the real gun that was used was smaller.

2          But, again, ladies and gentlemen, that's what you have

3    to consider.

4          Also, when I say Antwan Harvey is the shooter, my

5    client isn't the only one who says he was the shooter.  You

6    just heard a few minutes ago Miss Arcos come in and tell you

7    that Renee Diggs told her Antwan Harvey shot the man.  She

8    didn't want to be here.  There is no reason, absolutely no

9    reason for her to lie.  She doesn't know Marvin Mathis from

10   Adam.  There is no reason for her to lie.  The only reason why

11   she came and told you that Renee Diggs said Antwan Harvey shot

12   the man is because Antwan Harvey shot the man and that's what

13   Renee Diggs told her.  There is no reason for Renee Diggs to

14   lie to her.

15         And I suggest to you, ladies and gentlemen, that while

16   there is no direct evidence of why April and Renee told the

17   police that Marvin did it, I suggest that if you look at all

18   the evidence there is reason.  I suggest to you, ladies and

19   gentlemen, that after this happened my client was home before

20   eleven, somewhere between 10:30 and eleven.  Whether you

21   believe he went directly home scared, or whether you believe he

22   stopped there momentarily and was seen coming down the stairs

23   by April and Renee, but he went home.

24         But until 1:00 a.m., according to Renee, she was there

25   with Antwan.  And I suggest, at least one part of the statement

1   Antwan told them keep their mouth shut.  I think Antwan told

2   them more than that, I think Antwan told them blame it on the

3   juvenile.  Juvenile is the one who pulled the trigger.  Smart,

4   I don't know, am I under the mistaken belief they don't do

5   things in juvenile.  But they were afraid of Antwan Antwan, and

6   he told them blame it on the juvenile.

7           MR. KOLANO:  Objection.  That's pure speculation.

8   Nothing in the record as to anything Antwan said.

9           MR. FLORCZAK:  Judge, I concur.  There is no direct

10  testimony that that happened.

11          What I am saying to you, ladies and gentlemen, is that

12  that is an explanation of what happened.  As to why?  Because

13  my client was asked a dozen times, I mean, does April have

14  anything against you?  Does Renee have anything against you?

15  Why would they say that about you?  And I am giving you an

16  explanation what I think is a reason why.  Because they were

17  afraid of Antwan.  And there is ample testimony of Renee saying

18  Antwan pulled the gun and acted crazy.  She said that in

19  January when she gave a statement, and she said it again in

20  court.  He pulled the gun, waved it around.  I think there is

21  testimony both from her and my client that she, cops were just

22  going by and he cocked the gun and he was going to shoot at the

23  cops.  She had reason to be afraid, they all had reason to be

24  afraid of Antwan Harvey.

25          Ladies and gentlemen, not only they did.  There is



– DEFENSE SUMMATION –                              186

1   also April.  April also said to someone that Antwan Harvey

2   pulled the trigger.  Now, she came into court and said my

3   client did, but right after being arrested she goes to the

4   youth detention center.  Miss Garcia has no reason to make up

5   any stories.  She tells Miss Garcia that Antwan Harvey pulled

6   the trigger.  Antwan Harvey is the man with the gun.  She said

7   it, ladies and gentlemen.  Unless you think Miss Garcia is a

8   liar.

9           Antwan Harvey is the man with the gun.  Starts out

10  with the gun, he ends up with the gun.

11          Ladies and gentlemen, I said it before, I say it

12  again, my client was a fifteen and a half year old young man.

13  He gets involved with a couple of people in their twenties.

14  When they start talking or pushing towards robbery he tries to

15  talk them out of it.  He didn't stop trying to talk them out of

16  it until Antwan pulls a gun.  But even then, and that's one

17  thing in all these statements didn't change, ladies and

18  gentlemen:  He tried to stop Antwan.  They asked when he rushed

19  in whether he was going to help Antwan.  He tried to stop him.

20  Now, he may have been stupid for being there, certainly didn't

21  use the best judgment in the world.  But his actions are Stop

22  him from shooting.

23          I mean you will hear talk about weren't they

24  struggling, two men, victim and Antwan were struggling, and

25  then my client gets an arm in there try to stop Antwan.  Now,








1  maybe the prosecutor is suggest did he try to stop the robbery

2  beforehand?  No, he didn't.  Antwan had a gun, he knew it, and

3  he was afraid.  That's the one robbery he didn't try to stop,

4  that's the only robbery he is charged with, ladies and

5  gentlemen.  But despite what the Diggs ladies said, other than

6  what they say, there is no evidence whatsoever that he intended

7  to take part in this robbery.  We are dealing -- I will deal

8  with this statement in a moment.

9         And let's talk about the two young ladies.

10         Renee Diggs told you she gave a statement to the

11  police saying my client shot the man.  I think, you know,

12  enough evidence has been presented to show that he didn't.

13  However, once she gave that statement, then in August of '96,

14  not that long after, she pleads guilty.  And she told you to

15  get a deal.

16         And this is a great deal, ladies and gentlemen.  This

17  is a deal that says felony murder, you get life, thirty years

18  without parole.  However, you gave a statement saying this man,

19  Marvin shot him, Marvin Mathis.  The thing is, plea agreement

20  was to testify truthfully.

21         But she told you on the stand she understood if she

22  changed her story she could lose her deal.  So there is no way

23  on earth she was going to come into this court and admit that

24  it was Antwan Harvey who actually fired the shot.  No way on

25  earth.

- DEFENSE SUMMATION -                    188

1          And April Diggs is in the same position, she got the

2    shame deal.  Same situation, ladies and gentlemen.  And if you

3    listen to the testimony of April Diggs, when I was cross

4    examining her, toward the end I think she was saying yes to

5    virtually anything I said, whether or not it was the truth,

6    just to get it over with.  So I don't know how much value you

7    can give her testimony, if any at all.

8          But we know, ladies and gentlemen, when that evening

9    started with those four people, Antwan Harvey with his mask and

10   gun was ready to do business.  My client with his cap, no

11   indication he was ready to do anything except walk down the

12   street.  All Renee Diggs wanted to do was walk for some beer.

13   Antwan Harvey is the one who was interested in doing something.

14         And I suggest that my client turned out to be an

15   excellent scapegoat for Antwan Harvey.

16         Now, you heard my client's statements read.  And I

17   want to talk about these statements a little bit, ladies and

18   gentlemen.  My client, you know, I am going to be talking about

19   my client being a fifteen year old special ed student.  My

20   client is not looking for sympathy, he is not entitled to any

21   sympathy.  Three ladies in this courtroom who are really

22   entitled to sympathy.  You don't decide this case on sympathy.

23   I am bringing up his age to explain and ask you to understand

24   what happened when these statements were given.  That's the

25   reason.

1          He is brought in -- surprise, surprise -- he says I

2     don't know what you are talking about, I don't know anything

3     about it.  Prosecutor will be talking about how all the lies he

4     told, ladies and gentlemen.

5          Well, there isn't anyone I have ever met who can say

6     they have never told a lie.  People do lie, ladies and

7     gentlemen; they lie to protect themselves, they lie because

8     they are scared, they don't want to get in trouble.

9          And then he told lies, and then when he is told about

10    Miss Brooks saying he is involved, he starts to open up and

11    talk about Antwan and the shooting.  But the police say, no,

12    there has got to be more people involved.  Who else?  Do they

13    have a nickname, do they have any names?

14         See, ladies and gentlemen, this statement is taken at

15    2:30, the first statement, but questioning starts at 12:09.  So

16    they got a couple of hours of questioning before they get to

17    taking of the statement.  Statement wasn't just taken

18    immediately.  They work on him, they ask the same questions

19    over and over again.  And finally, they want somebody who will

20    give a nickname, so he comes up with Boz, friend of Antwan, and

21    implicates Boz.  Nobody he can hurt because the person doesn't

22    exist.

23         And I don't know whether chivalry or why he left the

24    young ladies out of it, but he left the young ladies out of it

25    at that point.

– DEFENSE SUMMATION –                              190

1      Then after they finish all that questioning they go
2   way into the afternoon, go over into his house, get the
3   clothes.  They find nothing to corroborate their claim against
4   him.  Then they are talking about quarter to six or so.

5      And if you look, you heard supposedly they read each
6   and every warning, I think you heard it earlier.  Each time
7   both him and his mother had to answer whether they understood,
8   he had to give initials, and then go on to the next one.  And
9   then he had to sign it.  According to the form it was done in a
10  minute.  I suggest, ladies and gentlemen, couldn't be done in a
11  minute, if it was done right.  They just rushed through it as
12  they rushed through everything else.  But then again for a long
13  time, well, 5:45 to 6:50 at least, if these times are correct
14  that they put on them.

15     And you know Detective Koczur did make mistakes in the
16  statements.  Renee Diggs gave three statements, and they each
17  contained a different birth date.  When she read it over she
18  didn't notice it.  I suggest she read it over the way lot of
19  defendants read it over, yes, that's mine.  Sign it.  But he
20  makes mistakes, too.

21     What I am suggesting, ladies and gentlemen, you saw
22  Marvin on the stand.  If you keep on asking a question long
23  enough you will get the answer you want.  Officer wanted a yes,
24  eventually he heard a yes, and typed up a yes.  That's when
25  Marvin was talking about words being put in his mouth.  And I

1   asked Detective Koczur when he testified:  Every single answer

2   where he implicated himself as being involved in a robbery,

3   agreeing to be a lookout, they are all Yes answers.  In other

4   words the words belong to the detective, the supposed Yes

5   answer belongs to Marvin.  Any answer where he says Yes.  There

6   are few No answers.  But for the most part where he says he

7   tried to stop him he wasn't down with it.  The answers that he

8   agreed that were his words were answers that said he didn't,

9   wasn't involved.  You have to use your memory to remember these

10  statements, especially that second statement.  You will see

11  every time he supposedly admitted something it was because it's

12  a yes answer.  And you heard him on, by the end of his first

13  examination he was almost ready to say Yes to a question after

14  you shot somebody or something lying, even though that never

15  occurred.

16          But you have an officer of a lot of years experience.

17  He doesn't beat anyone up.  He doesn't have to beat anyone up.

18  He doesn't threaten anyone.  He believes this person is guilty

19  and he asks questions in a manner, in a manner he gets the

20  answer he wants.

21          What I suggest to you, ladies and gentlemen, from the

22  way my client acted, what he did, what he didn't do for a

23  fifteen year old was proper.  May not have been smart.  But the

24  state has to prove he intended to take part in the robbery, he

25  intended to aid and abet in these actions, that's what he

1  intended, shared the intent as the other person.

2          And he didn't, ladies and gentlemen.

3          All my client is asking is to use your common sense

4  and reasoning power, go over everything together, and he is

5  confident you will reach a fair and just verdict.

6          Now, as I stated before, there may be a dozen things I

7  think I should have gone over.  But rely on your recollection,

8  ladies and gentlemen.  Not mine, not anyone else's.

9          Thank you.

10         THE COURT:  All right.  Ladies and gentlemen, we will

11 be getting into the summation of Mr. Kolano in a few minutes.

12 But I do want to give you a short break to have an opportunity

13 to stretch your legs, get a drink of water if you wish, before

14 we go into that summation.  So we are going to, we are going to

15 break now for ten minutes.

16         Remember do not discuss the case among yourselves or

17 with any other persons.

18         I will excuse you for a few minutes break, and then

19 assemble in the jury room.

20         (Jury withdrew from the courtroom.)

21         (Short Recess).

22         THE COURT:  Have the jurors brought out, please.

23         (Jury seated in the jury box in the courtroom.)

24         THE COURT:  Mr. Kolano.

25         MR. KOLANO:  Thank you, your Honor.

1        Ladies and gentlemen, on behalf of the state I want to

2   thank you for your time and for your attention in this case.   I

3   am mindful that it's couple of minutes before four, and I will

4   try to go as quickly as possible with my comments.

5        I do, however, represent the State of New Jersey, and

6   I do want to make sure that the State of New Jersey gets the

7   best representation I know how to give it.

8        On January 22nd, 1996, Antonio Saraiva lost his life.

9   There are four people responsible for that, ladies and

10  gentlemen, make no mistake about that, four people:  Marvin

11  Mathis, Antwan Harvey, April Diggs, Renee Diggs.  They went

12  there to rob him.  They shot him.  They killed him.

13       I made my opening comments about there was one man on

14  trial before you.  You are going to hear lot about Antwan

15  Harvey.  You heard about a lot throughout Mr. Florczak's cross

16  examination questions and even summation he kept talking Antwan

17  Harvey, Antwan Harvey.  Ladies and gentlemen, I could have

18  saved everybody a lot of time, because the state agrees 100

19  percent, Antwan Harvey is the murderer, Antwan Harvey is a

20  robber; Antwan Harvey was the moving force that started these

21  events that night.  Of that there is no doubt.  And you know

22  through the questioning of the witnesses that come next week

23  Antwan Harvey will stand trial for his role.  That will be with

24  another jury to decide his role, and they will hear their

25  evidence and that jury will make the decision.  But for the

1   purposes of this trial, we agree 100 percent with the defense

2   that Antwan Harvey is a murderer.

3         But you know what, ladies and gentlemen, I suggest to

4   you, so is Marvin Mathis.  Because I told you in my opening you

5   are going to hear some other law at the end that you don't hear

6   in the indictment.  You are going to hear about an accomplice

7   liability.  And the state's position was, is, and will always

8   be that these people are tied together, they are accomplices,

9   they are responsible for their actions, they are responsible

10  for the actions of their co-defendant.  The judge is going to

11  explain that to you.

12        So even if you were to find that Antwan Harvey was the

13  shooter, Marvin Mathis is still guilty under the law that you

14  are going to get, ladies and gentlemen.

15        Certainly, he was engaged in the robbery.  And you are

16  going to hear about felony murder, about how even if someone

17  dies unintentionally or accidentally it's felony murder.  It's

18  different from knowing purposeful murder.  But if you are

19  engaged in a robbery and someone dies, then you are

20  responsible.

21        And right from the outset I will tell you April Diggs

22  and Renee Diggs are also responsible for that felony murder.

23  They are, ladies and gentlemen.  You heard that they pled

24  guilty, and they get sentences of fifteen years in state

25  prison.  They pled guilty to armed robbery.  They were

1   responsible, even though they never touched the gun.   Even

2   though they never had the gun in their possession, even though

3   they didn't take a thing.   They were legally responsible for

4   armed robbery because they shared in that intention that they

5   had that day to rob.   They knew that there was going to be a

6   gun involved, and as they both told you they were lookouts.

7   Legally they were responsible for armed robbery, legally they

8   were responsible for felony murder.   And that's why I brought

9   out they had attorneys, I read portions to you of what they

10  told the judge.

11         Do you think their attorney was going to say, Oh, you

12  are innocent, but just plead guilty, do this fifteen years in

13  prison?   No, ladies and gentlemen.

14         I am going to leave the law for the judge.   But please

15  understand it's not the state's position that April and Renee

16  Diggs are not responsible for felony murder.   They are.   And I

17  told you at the beginning, the state had to get the people who

18  were there.

19         Now, there was some character witnesses, some

20  teachers.   Do I wish they were hanging out on the corner that

21  night?   That they were there to be my witnesses, people with

22  maybe some higher moral character?   Yes.   But that's not the

23  people that Marvin Mathis and Antwan Harvey chose to associate

24  with that night.

25         Why?   Why did the Diggs cousins plead guilty?   Why did

1    the state allow that?  Because witnesses were needed.   Who was

2    the least culpable?  The two women.  The two lookouts.   The

3    state committed all of its resources to the two main players,

4    Marvin Mathis and Antwan Harvey.

5           This is not a contest between Antwan and Marvin.   You

6    can find that you dislike Antwan Harvey, you can find him

7    guilty as sin in your own minds.  But in this case don't think

8    that it's one or the other.  Because it's both, ladies and

9    gentlemen.  And the evidence clearly establishes that.

10          I am not going to go into great detail as to the

11   defendant's testimony, and everything, because we had it ad

12   nauseam today.  I told you at the openings he was a liar, and

13   he was a liar.  I had to go through it very slow and very

14   tediously today because each one was a particular lie.

15          Now, the defense has this excuse for everything.  Just

16   think about the number of coincidences that Mr. Florczak asks

17   you to accept as it relates to this defendant.  First he is

18   walking around, he doesn't know what's going on.  Now some

19   robberies are going on.  Well, he doesn't know what to do.  So

20   he just keeps going on, he doesn't know what to do.  Now there

21   is another robbery, he doesn't know what to do.  Now there is

22   another one.  He doesn't know what to do.  All of a sudden gun

23   is produced.  Now he is afraid, now he is too afraid.  Okay.

24   There is his excuse for that.  Then he comes to police

25   headquarters and he starts telling lies.  Well, why does he

1    tells lies?  Well, because he is afraid, because he is

2    confused.

3          Isn't it interesting that on every part of that

4    statement that is inculpatory towards him he is confused, he

5    doesn't understand.  Everything that helps him, oh, he

6    understood that, those were his answers, those were the

7    questions that were asked.

8          If Detective Koczur were going to set up Marvin Mathis

9    don't you think he would have done a better job?  Don't you

10   think he would have edited out all of those things that helped?

11         The defendant himself said police treated him fine.

12   No problems at all.  Defendant's mother, police treated him

13   fine, no problems at all.

14         Do you think the police needed Marvin Mathis?  Why

15   didn't they just run after Antwan?  Marvin would have been a

16   great witness against Antwan.  They could have gone after him

17   alone.  But that wasn't the truth, ladies and gentlemen.  That

18   wasn't the truth.

19         Keep in mind, ladies and gentlemen, that before the

20   police ever knew about April Diggs, before the police even knew

21   about Renee Diggs, before the police had any hard evidence

22   about Antwan Harvey, Marvin Mathis was arrested and charged

23   with his involvement, with the felony murder and robbery in

24   this case.  He was the first one.

25         So even if you were to take out all the testimony of

1   the witness and everything else, his statement and the

2   statement of Sharlama Brooks establishes his guilt, ladies and

3   gentlemen.   Everything else I suggest to you is literally icing'

4   on the cake.

5        Factually, I ask you to apply common sense.  And if

6   you apply common sense you are going to see why it is that

7   Marvin did the shooting.  Think about it, ladies and gentlemen.

8   The statements that the girls gave and defendant gave.

9   Everybody says Marvin -- or Antwan was the guy who had the gun.

10  State agrees Antwan is the one who had the gun initially, he

11  has this gun.  Everybody knows he has this gun.  If you accept

12  some of his testimony that he starts acting crazy, he is

13  waiving this gun, he is going to shot at cops, okay.  Now he

14  got this gun, right.  It's out, he is waiving at cops.  They

15  are going to do a robbery.

16       And what does Antwan do, if you believe the defendant.

17  Puts it back into his pants.  Why would Antwan do that?  Antwan

18  is wearing this big bulky coat, turned inside out.  Because

19  there is a robbery.  And now he puts the gun in his pants.  But

20  at this point, if you believe the defendant, he is acting

21  crazy.  He is acting crazy, he wants to get Mr. Saraiva.  So

22  why doesn't he just go up to him with the gun?  If you are

23  going to get somebody, you are going to do a robbery.  He has

24  got his mask on.  He is all covered, he has got lookouts.  He

25  puts the gun there, Just give me the money.  But if you believe



1     the defendant, that doesn't happen.  That doesn't make sense.

2     Why would he do the robbery with the gun in his belt buckle?

3          Well, now, you think maybe because he doesn't want

4     them to know that it's an armed robbery?  He figures, well,

5     because he is thinking ahead just in case I get caught I would

6     rather not go down for armed robbery.

7          But that's pretty rational thinking for a man who is

8     as crazy as they say he was, man who was out of control, he was

9     going to get that, he was going to do the robbery.  But he puts

10    the gun away?  That's stupid.  Not only is it stupid, it's in

11    the pants pocket so it's covered.  This is January, there is

12    snow on the ground, coats are closed up.  Why put it in the

13    pocket where he can't get to it?  Now he is going to approach

14    Mr. Saraiva, says run your pockets, and it's going to be a

15    fist, going to literally be a struggle?  That doesn't make

16    sense.  Certainly doesn't make sense for a crazy person.  Why?

17    Because he is losing the best insurance he has, he is losing

18    the big advantage he has by having a gun there.  And that's not

19    something a man who is willing to shoot at cops, a man who is

20    waiving that gun around, a man who is so crazy the defendant

21    said that he was going to leave.  If he had that gun at that

22    point he would have used it and approached Mr. Saraiva where

23    there wouldn't have been the punch, there wouldn't have been

24    the struggle.

25          And I suggest to you when the defendant talks about

1   that punch between Mr. Saraiva, the victim, that he is telling

2   the truth.  Why is he telling the truth?  Because it was a two

3   man operation.  See, Antwan wasn't going to give up the benefit

4   of the gun.  What he did, he gave up the gun to Marvin.  Why do

5   you know that?  Because April told us that, Renee told us that,

6   common sense tells us that.

7         There was going to be a robbery.  And it was going to

8   be the one, take the money from the guy.  He is going to

9   approach him and he is going to go through his pockets, and

10   standing there with the gun is Marvin.

11         Think about it.  Why does Marvin have the gun?  Why do

12   we know?  April Diggs says they are walking, and the gun was

13   given over to Marvin by the pharmacy.  She said that in her

14   statement.  Very important.  From day one on the 25th of

15   January, before any of this came to be, that is what she said.

16   Renee Diggs tells the same story:  That the gun was handed

17   over.  And in court she says, well, she didn't actually see the

18   gun handed over, there was an exchange.  She said that Marvin

19   was the shooter.  Why does she know Marvin is the shooter?

20   Because she sees the flash.  She doesn't actually see the hand

21   and the gun, but she sees the flash as it's going on.

22         There was just a little point in the trial, and I hope

23   you didn't miss it, but that's what I am going to comment on,

24   where you get this little kernel of truth, this little

25   insignificant fact at the time that tells you where the truth

1  lies.  And it came from April Diggs, and it was on cross

2  examination.  And that's really why it was the truth.

3          Mr. Florczak says, well, April, how did you know that

4  it was Marvin who shot?  Because Renee was up closer, and when

5  she turned around she said Marvin shot the man.  Marvin shot

6  the man.  Renee is saying that as it is happening, right then

7  and there.  And there was no further follow up on that.

8  Because there was that little kernel of truth, there could be

9  no allegation that that was fabricated, that was put together,

10 that somebody suggested it.  Because that's what happened.

11 Marvin was the guy who shot the man.

12         Now Mr. Florczak says why would this crazy man give up

13 the gun?  I tell you why he would give up the gun.  Very

14 simple.  Because, as Marvin said in his statement that was read

15 to you, earlier before this written statement do you recall

16 telling this detective and your mother that you and Antwan were

17 looking to rob someone because you wanted to know how it felt.

18 That's what he said.  He wanted to know how it felt.  And this

19 gun was given up to Marvin Mathis because Marvin was going to

20 make his bones, so to speak, he wanted to know how it felt.

21 And they came upon in man, and what happens.  Antwan is talking

22 tough.  And you heard from April, and defense brought this out.

23 If he gives me any resistance, I am going to bust him.  That's

24 what Antwan said when he got the gun.  Marvin says I will bust

25 him too.  Well, now, Marvin is getting into this.  You want the

1    gun, says Antwan?   Yeah.   And Marvin takes the gun.   Why does

2    he give it up?   Because his friend wants to know how it felt.

3    He wants to know how it feels to do the robbery, that's why he

4    gives him the gun.   And it becomes a two man operation, because

5    it would be stupid for Antwan to put the gun into his pants and

6    lose that advantage that he has.

7            So Marvin is going to be the gunman.   How do we know

8    Marvin is the shooter?   April tells us -- that little kernel of

9    truth -- because April tells us, Sharlama Brooks tells us,

10   because Miss Sutton tells us, and because if you read in the

11   defendant's statement the defendant tells us.   Why does he tell

12   Sharlama Brooks that he shot the person by accident?

13           And for Mr. Florczak to suggest that Sharlama Brooks

14   is lying or got it wrong, that just is beyond comprehension,

15   ladies and gentlemen, absolutely beyond comprehension.   And I

16   will talk to you a little bit about that.

17           Isn't it more believable, isn't it closer to your

18   common sense, the truth and reality that the struggle is going

19   on between Antwan and the victim.   And now Marvin has the gun,

20   and in panic or to save his friend, that gun goes off.   That's

21   why he later tells Sharlama Brooks that it was an accident.

22   Because he didn't go there saying Don't shoot this man.   They

23   didn't walk all the way around the street looking for Mr.

24   Saraiva to shoot him.   They had the gun, and when push came to

25   shove and he had to protect his friend, there was that

– STATE SUMMATION –                    203

1   struggle, he shot him.  And I suggest to you, why, because

2   during the struggle the defendant is so close that the victim

3   gets his hand on the jacket.  And now he got his hand on the

4   jacket, he got the gun, and he pulls the trigger.  And we know

5   that the shot comes from less than two feet away from the

6   medical examiner.  One shot through the eye.  And where do we

7   hear about this jacket? April Diggs.  Back when they go to the

8   house, I talked to Marvin, Marvin, why did you shoot that man?

9   Because he grabbed my coat.

10          And all of that when you look at those little details,

11  that's what paints the picture, that's how you get at the

12  truth.  There is the big picture, but there is these little

13  things that you look at, you focus, and that's, that makes

14  sense.  That's common sense.  Same common sense I asked you to

15  have early on that Marvin would have shot -- that's why he

16  makes that admission.  That's why he tells Sharlama about that.

17          Now, the defense says that Marvin Mathis being fifteen

18  years old was the perfect patsy, the perfect patsy.  Well,

19  think about it.  There are four people responsible for this.

20  One is on trial here, one is on trial next week that you have

21  heard about, and the other two pled guilty.  So to accept the

22  defendant's version you would have to believe these three

23  people just happen to have this defendant, they are walking

24  around, they are doing all these things, and he is just

25  oblivious, he is just oblivious, he doesn't know what's going

- STATE SUMMATION -                    204

1   on.  He is the only innocent one in the group.

2           Ludicrous, ladies and gentlemen, absolutely ludicrous.

3   That defies common sense for you to accept that, I suggest.

4           Why pin it on Marvin?  Well, the defense says because

5   they were scared of Antwan.  The only one who made any

6   reference of being afraid of Antwan was Renee:  Yes, I was a

7   little afraid of him.  April Diggs never mentioned anything

8   about it.  The defendant says he was afraid, but not because

9   Antwan threatened him but because he had a gun and in his mind

10  he was going to shoot him.

11          Well, think about this.  If he is going to be the

12  perfect patsy, how much did we hear about Antwan Harvey?  That

13  was all over this case, it was all over those statements.

14  Renee Diggs talks about Antwan Harvey being crazy, cock the

15  gun, with the cops about doing these other robberies, about

16  being one of the two people who approached Mr. Saraiva.  Does

17  that sound like they are afraid of Antwan?  They are giving

18  Antwan up right from the beginning.  They are going to the

19  police and saying Antwan is part and parcel of this.  If he is

20  going to be the patsy, there has got to be a benefit, if you

21  are going to put Marvin in you got to take Antwan out:  No,

22  Antwan had nothing to do with it, it was all Marvin.  They gave

23  up Antwan right from the beginning.  That's not somebody who is

24  afraid of Antwan.  That's not somebody who is looking for a

25  patsy.  That was someone saying, hey, those are the two more

1    culpable.  Those are the two who approached, those are the two

2    who were responsible for the shooting.  Those are the two who

3    wanted to do the robbery.  We were just a lookout.  That

4    doesn't make him a patsy.  April same exact thing, she gives

5    her statement, she gives up Antwan like that.  How afraid could

6    she be?  Oh, yes, Antwan was, was the leader that night.  He

7    started out wanting to talk about the robberies.  April can't

8    be so afraid.

9          Now, the defense suggested, and I objected, during the

10   summation that afterwards Antwan Harvey and the girls got

11   together and Mr. Florczak suggested that what Antwan said is,

12   put had it on Marvin, put it on Marvin.  That doesn't make

13   sense.  Antwan is going to say put it on Marvin?  He is going

14   to say keep me out of it.  I wasn't there.  Do you think if he

15   was going to cover his backside he was going to tell these

16   girls to go and say oh, yes, I was just down on the robbery.  I

17   was just there struggling with the guy, I was just there

18   planning to do these other robberies, I am the one who brought

19   the gun to the game, I am the one who was going to shoot the

20   cops?  You think that's what Antwan told the girls to say?  No.

21   That's why it doesn't make sense that Antwan would have said

22   put it on Marvin because he is the juvenile.  It just doesn't

23   make sense, ladies and gentlemen.

24         Sharlama Brooks, she really is in large respect key to

25   this case.  She is the one who breaks this case.  At this point

- STATE SUMMATION -                    206

1   the police don't know what they have.  You heard that there was

2   some other people thought to be involved.  And Sharlama on her

3   own sets in motion the wheels that result in this, I suggest to

4   you.  Why?  Because on the 23rd her boyfriend, the defendant,

5   comes:  If anybody asks you where I was between seven and

6   eleven, tell them I was with you.  No, I am not going to do

7   that, I am not going to do that.

8            Sharlama has got no motive.  Why would she come and

9   lie about that?  Why would she bring that to the attention of a

10  counselor?  Why would she bring that to the attention of the

11  police?  Because it happened.  But that's what gets it going.

12  She asked What's going on?  I can't tell you, you will black

13  out.  Again, why would she lie about that?  The next day the

14  defendant says I accidentally killed a man.  There was a

15  struggle and I accidentally killed a man.  And that's what

16  causes Sharlama to become hysterical.

17            Do you think she would have become hysterical if he

18  said I was there, I witnessed it, I didn't participate, Antwan

19  did it?  Do you think that would have driven her to tears, to

20  the state of hysteria that was described?  No.  This was her

21  boyfriend saying I killed somebody.  I killed somebody.  I am

22  your boyfriend.  That's why she was crying.  That's why she had

23  to be brought out of class, that's why she was brought to the

24  guidance counselor.

25            And in that emotional state of crying what does she

1  repeat?  She repeats to the guidance counselor My boyfriend

2  Marvin killed somebody.  And I suggest to you that he said

3  accidentally.  That's why she repeats it, because that's what

4  he told her.

5          The defendant says that Sharlama is a liar.

6          Well, that's what he originally told the police when

7  the police said even your girlfriend said this.  She is a liar.

8  And then in his statement, No, I really did tell her that.  Now

9  the defendant says, oh, that was police putting words in my

10  mouth.  They putting words in my mouth I suggest to you is just

11  absolutely positively bogus, ladies and gentlemen, based on his

12  testimony and his mother's testimony and this statement.

13          Sharlama is worthy I suggest to you of 100 percent

14  credibility.  Mr. Florczak says her memory wasn't so good.  And

15  that's why we brought out the statement.  She gave a statement

16  that day within hours of this statement being made, and I read

17  to you exactly what was told.

18          And that gets corroborated by Miss Sutton.  Miss

19  Sutton doesn't have anything to do with anything, other than

20  she is sitting there as counselor in the school and some, some

21  young girl, Sharlama Brooks, hysterical and she thinks she is

22  hysterical she thinks she has been raped.  What?  My boyfriend

23  was involved in killing.  Cross examination, my boyfriend was

24  involved in the shooting.  Was this a witness, or did the

25  defendant tell Sharlama and said that he accidentally, his

1   words, accidentally killed, that he was involved.

2        You cannot undermine the credibility of Sharlama

3   Brooks in this case.  Nor can you undermine the credibility of

4   Miss Sutton in this case.

5        Ladies and gentlemen, when you talk about April and

6   Renee Diggs, and we talk about their motive to lie, they put

7   themselves in it right from get-go.  Mr. Florczak says they did

8   it because of a deal.  But they gave a statement before any

9   attorneys were involved, before there were any deals, when they

10  just said what happened, and they said that Marvin was the

11  shooter.  They could have said Antwan was the shooter.  You

12  know that they are required to testify next week against Antwan

13  Harvey.  So it's not like they are saying, okay, we have to

14  keep going with this story on Marvin Mathis, we have to

15  continue, continue this, this line.  It's not, I suggest to

16  you, because Marvin was the shooter.  Antwan was certainly the

17  driving force at that point.

18       But when they reached the final destination, the

19  defendant wanted to know how it felt to rob somebody, he got

20  the gun, and the gun went off, and the victim struggling

21  grabbed him.

22       You see, what the defendant and Antwan didn't count on

23  is Mr. Saraiva struggling and putting up a fight.  They figured

24  two of them, they have a gun, he is just going to back down.

25  But this was a man, this was -- you heard from Mrs. Saraiva --

1   this was his business, this was his livelihood, he lived

2   upstairs, this was his neighborhood.  This was a man basically

3   protecting his castle.  A man who resented being approached by

4   a couple of thugs and being told to run his pockets.  And if we

5   were teaching courses we would say better to submit and fight

6   it out another day.  He didn't do that, because he was insulted

7   by the fact these thugs could come and just walk up, point a

8   gun at him, and take his money.  Unfortunately, because of

9   that, because he struggled he lost his life.

10          And he lost his life at the hands of Marvin Mathis.

11          And, ladies and gentlemen, if you find that Antwan

12   Harvey was the shooter, which I suggest to you when you really

13   look at this case, they were in it together, this was a

14   robbery, this was a felony murder.  That, I suggest to you,

15   really isn't even an issue.  The issue that we are fighting

16   about is who was the shooter.  There is no doubt both of them

17   are involved in the robbery.  No doubt that both were guilty of

18   felony murder, even the Diggs sisters were guilty of felony

19   murder.  But they had to testify against the defendant because

20   they were the people who were out there.

21          Motive.  April Diggs knew Marvin Mathis for two years.

22   She only knew Antwan Harvey for couple of months.  Why would

23   she give up Marvin, unless Marvin was the shooter?  Renee, why

24   would she give up Marvin, unless Marvin was the shooter?

25          I suggest to you kind of like that, when you listen to

1    their testimony it's kind of like that example judge gave you

2    about circumstantial evidence.  You know, if you look out the

3    window at night you see it snowing you know that it's snowing.

4    But if you look out the window at night, it didn't snow, and

5    next morning you wake up and you see snow on the ground, you

6    assume that it snowed during the night.

7         Well, think about that.  You go you look out the

8    window and there is no snow, and then you wake up next morning

9    there is snow on the ground.  Then you get a call from your

10   family member or friend in Florida, How is the whether?  It

11   snowed last night.  You don't say, well, I assumed it snowed

12   last night because when I went to bed last night there was

13   nothing on the ground, when I woke up this morning there was

14   snow.  We talk in colloquial language.

15        And that's what happened with Renee Diggs.  She sees

16   that gun in Marvin's hand, she sees him go there, there is the

17   flash, and that's why she says she sees Marvin shoot.  And

18   that's what gives it that other little bit of credibility.

19   Because if she really wanted to do him in improperly she could

20   have said Oh, yes, I saw him shot.

21        April could have said, I saw him shot.  But she

22   didn't.

23        How do we know they are together?  The defendant and

24   Antwan Harvey were friends for six years.  They socialized,

25   they hang out together at the Migdalia's apartment.  They walk

1   that entire area that night, where all these robberies, where

2   everything was done -- they ran together.  And I suggest to you

3   the defendant is lying because he did go back to Migdalia's

4   apartment.  Migdalia said it, Renee said it, April said it.

5   And it was even on cross examination when they asked, when Mr.

6   Florczak asked Renee What time were you there?  We were there

7   until one o'clock.  How about Marvin?  No, he left earlier.  A

8   little bit of truth.  Mr. Florczak hoping to say he was going

9   to be there real late because he knows mom would say he got

10  home early.  But no.  He said no, he had left early.  He was

11  just there long enough, as April told us, to say Why did you

12  shoot that man?  I shot that man because he grabbed me.

13         The defendant says he gets home, and he is so quiet

14  his mom even comments about it.  You saw mom today.  He was his

15  normal self.  Think about it.  Think about what atrocious act

16  this man did.  Even if you accept for a second the atrocious

17  act that he witnessed.  He goes home that night, doesn't faze

18  him, he sees his mom.  Like water off of duck's back, he gets

19  up, goes to school next day, if you believe him, like nothing

20  is wrong, nothing in the entire world.

21         No, ladies and gentlemen.

22         Two last points, ladies and gentlemen.

23         Sentencing is for the judge.  He is the judge of the

24  law; you are the judge of the facts to determine the guilt or

25  innocence.  That is something that the judge will deal with.




- STATE SUMMATION -                         212

1   You follow the law as it relates to the facts.

2           Secondly, ladies and gentlemen, when you apply your

3   common sense to this case you will see clearly, and you have to

4   trust, you have to trust in the evidence, in these little

5   kernels of evidence, that this defendant Marvin Mathis was part

6   of the felony murder, part of the robbery, was part of the

7   possession of the gun, and part of the murder, that he pulled

8   the trigger, ladies and gentlemen.

9           Trust in that evidence, ladies and gentlemen, trust in

10  your common sense.  Trust in what you saw here today with the

11  defendant and his convenient excuses for everything.  His

12  statement speaks for itself.  That he conveniently discounts

13  everything.  He says police put words in his mouth.  But we

14  know, ladies and gentlemen, that positively didn't happen

15  because of what his mother said, because of what he said about

16  the way police treated him.  Because we know police could have

17  done much better job.  If they wanted Antwan Harvey, they got

18  him anyway.  They didn't need to bring an innocent man into it.

19  They ended up with Marvin Mathis because the evidence they had

20  led to Marvin Mathis.

21          And, ladies and gentlemen, Marvin Mathis' guilt, I

22  suggest to you, has been demonstrated beyond a reasonable

23  doubt.

24          And I ask you when you go back to deliberate that you

25  apply that common sense to these facts, and I suggest to you

1   and urge you, ladies and gentlemen, trust in evidence to

2   convict Marvin Mathis of the charges.

3          Thank you.

4          THE COURT:  Members of the jury, now that the closing

5   statements of the attorneys have been completed, there is only

6   left my instructions to you before you will begin your

7   deliberations to decide this case.  Those instructions will

8   take place tomorrow morning at nine o'clock.  So that in a

9   moment I am going to excuse you for the evening.

10         While it has always been important that you remember

11  the instructions that you not discuss the case among yourselves

12  or with others, let me just point out that now that you know

13  that you have heard all of the evidence, and you heard the

14  instruction, the summations of the attorneys, there may be some

15  temptation to perhaps let down your guard on that instruction

16  thinking, well, what would be the harm to talk about it now?

17  We have heard everything.  Why not start talking about it.

18         The reasoning is still the same.  The case is not

19  over.  It is not appropriate for you to begin discussing this

20  case.  It is important that you keep an open mind, since my

21  instructions are an important part of what you must consider as

22  jurors in determining this case.  So it is important that you

23  not discuss the case.

24         Also, I have reminded you throughout the trial to be

25  cautious with respect to reading newspapers and staying away

214

1    from anything that may be in the paper about the case, so that

2    you are not influenced by what might appear from another

3    source.

4            And that instruction continues to remain important.

5    Don't let your guard down on that one.  Be vigilant.  If you do

6    happen upon something in the paper tomorrow before you come to

7    court, put it aside and read it when the case is over.

8            So normal procedure tomorrow.  You are to report to

9    the courtroom between 8:30 and nine, assemble in the jury room,

10   and we will have the instructions then beginning at

11   approximately nine o'clock tomorrow, as soon as we have

12   everybody ready to go.

13           And after that we will select the two alternates, and

14   remaining twelve jurors will begin their deliberations.

15           So I want to excuse you now to the jury room.  Collect

16   your personal belongings, and as is the usual procedure, wait

17   for the officer to excuse you for the evening.

18           (Jury withdrew from the courtroom.)

19           THE COURT:  All the jurors have cleared the courtroom.

20   They are in the juror room.  Mr. Mathis will be escorted from

21   the courtroom.

22           MR. MATHIS:  Your Honor, can I talk to my attorney for

23   a minute?  Can I talk to my attorney for a minute, please?

24           THE COURT:  Mr. Florczak,.

25           MR. FLORCZAK:  Yes, just about one minute, judge.  I

215

1    appreciate it.

2              (PROCEEDINGS TERMINATED FOR THE DAY).

3

4                    C E R T I F I C A T E

5

6              I, B. PETER SLUSAREK, C.S.R., License No.  XI00291,

7    an Official Court Reporter of the State of New Jersey, do

8    hereby certify the foregoing to be prepared in full compliance

9    with the current Transcript Format for Judicial Proceedings and

10   is a true and accurate non-compressed transcript to the best of

11   my knowledge and ability.

12

13

14

15   _____        Date: March  15  1999.

16   B. PETER SLUSAREK, C.S.R., XIO0291

17   Official Court Reporter

18   Union County Courthouse,

19   Elizabeth, New Jersey,

20

21

22

23

24

25