HON. JOSE L. LINARES, U.S.D.J.

Marvin Mathis #304144/244859-C
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625-0861
**Petitioner <u>pro</u> <u>se</u>**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
Civil Action No. 15-2092 (JLL)**

| | | |
|---|---|---|
| **MARVIN MATHIS** | : | |
| Petitioner, | : | |
| | : | Civil Action |
| v. | : | **~~PETITIONER'S REPLY TO~~** |
| | | **RESPONDENT'S ANSWER TO** |
| **ATTORNEY GENERAL OF NEW** | : | **PETITION FOR WRIT OF** |
| **JERSEY, et al.** | : | **HABEAS CORPUS** |
| Respondents. | : | |
| | : | |

**PETITIONER'S ATTACHED APPENDIX
(EXHIBITS)**

## INDEX TO APPENDIX

Superior Court of New Jersey,
Appellate Division's Order of
March 15, 1999 Leave To File
Notice of Appeal Nunc Pro Tunc ................................. Ex 1

Superior Court of New Jersey
Appellate Division Notice of
Appeal ........................................................... Ex 2

Superior Court of New Jersey,
Law Division's Order of
February 29, 2008 Denial of Post-
Conviction Relief ................................................ Ex 3

Superior Court of New Jersey,
Appellate Division's Order of
May 08, 2008 Motion To Proceed
As An Indigent and For Free
Transcript........................................................ Ex 4

Superior Court of New Jersey,
Law Division's Order of
January 27, 2012 Denial of Post-
Conviction Relief ............................................... Ex 5

Psychological Evaluation of
Petitioner By Dr. Cheryl L.
Thompson .............................................. Ex 6 to Ex 11

Psychological Evaluation of
Petitioner By Dr. Martha H.
Page ................................................. Ex 12 to Ex 21
Psychological Evaluation of
Petitioner by Dr. Louis B.
Schlesinger .......................................... Ex 22 to Ex 37

A 3316-98 T4

## ORDER ON MOTION
----------------

| | |
|---|---|
| STATE OF NEW JERSEY | SUPERIOR COURT OF NEW JERSEY |
| VS | APPELLATE DIVISION |
| MARVIN MATHIS | DOCKET NO.   A -003316-98T4 |
| | MOTION NO.   M -003958-98 |
| | BEFORE PART: |
| | JUDGE(S):   PRESSLER |

MOTION FILED:       FEBRUARY 24, 1999    BY: MARVIN  MATHIS
ANSWER(S) FILED:

SUBMITTED TO COURT:  MARCH 15, 1999                    MAR 15

### O R D E R
---------

THIS MATTER HAVING BEEN DULY PRESENTED TO THE COURT, IT IS ON THIS

__15TH__  DAY OF  __MARCH_____ , 199__9__, HEREBY ORDERED AS FOLLOWS:

|  | GRANTED | DENIED | OTHER |
|---|---|---|---|
| MOTION BY APPELLANT | (XX) | ( ) | ( ) |
| - TO FILE NOTICE OF APPEAL NUNC PRO TUNC | | | |

SUPPLEMENTAL:    It appearing that the preconditions of the Supreme Court in
its "NOTICE TO APPELLATE BAR", 100 N.J.L.J. 1208 (1977),
identified and explained in State v. Altman, 181 N.J. Super.
539 (App. Div. 1981), have been met, the motion to file the
notice of appeal nunc pro tunc is granted.

UNN 97-02-00133    hereby certify that the
foregoing is a true copy of the  FOR THE COURT:
original on file in my office.

                    Clerk      SYLVIA B. PRESSLER   P.J.A.D.
JUDHD

8a

Pet. Reply App 1

IVELISSE TORRES
Public Defender
Office of the Public Defender
Appellate Section
31 Clinton Street, 9th Floor
Newark, New Jersey 07102
(973) 877-1200 - Fax (973) 877-1239

**ORIGINAL FILED**

FEB 24 1999

A-3316-98 T4

Emilie R. Cox, Esq.
Clerk

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
INDICTMENT NO(S.) 97-02-00123

STATE OF NEW JERSEY,            :            Criminal Action

    Plaintiff-Respondent, :            NOTICE OF APPEAL

         v.                          :

MARVIN MATHIS,                  :

    Defendant-Appellant.   :

     PLEASE TAKE NOTICE that the defendant confined at
New Jersey State Prison appeals to this Court from the final
judgment of conviction of murder, robbery, unlawful possession of
a weapon which was entered on August 18, 1998 in the Superior
Court, Law Division, Union County in which a sentence of 50 years
with a 30 year parole disqualifier, $250. VCCB penalty, $225. SNSF
penalty was imposed by the Honorable John F. Malone.

                  IVELISSE TORRES
                  Public Defender
                  Attorney for Defendant, Appellant

                  BY: _____
                    DEBORAH C. COLLINS
                  Assistant Deputy Public Defender

The undersigned certifies that the requirements of R. 2:5-3(a) have
been complied with by ordering the transcript(s) on 2/17/99 as
indicated on the accompanying transcript request form(s) and that
a copy of this Notice has been mailed to the tribunal designated
above.

                  _____
                  DEBORAH C. COLLINS
                  Assistant Deputy Public Defender

**9a**

Pet Reply App. 2

BY ORDER OF THE COURT

**FILED**

FEB 29 2008

JOHN F. MALONE
J.S.C.

STATE OF NEW JERSEY,  :

    Plaintiff-Respondent,

-v-  :

MARVIN MATHIS,  :

    Defendant-Petitioner.  :

SUPERIOR COURT OF NEW JERSEY

UNION COUNTY
CRIMINAL DIVISION

INDICTMENT NO.
97-02-123

ORDER

This matter having been opened to the court by defendant by Petition for

Post-Conviction Relief, Lewis D. Thompson, Esq., appearing for the defendant and

Sara B. Liebman, Assistant Prosecutor, appearing for the State and the court

having considered the pleadings submitted, the oral argument of counsel and for

good cause shown,

    It is on this 29th day of February, 2008, ORDERED

    That defendant's verified Petition for Post-Conviction Relief is hereby denied

for the reasons stated on the record on February 29, 2008.

_____
JOHN F. MALONE, P.J.Ch.

Da158
Pet. Reply App 3

ORDER ON MOTION
----------------

STATE OF NEW JERSEY                          SUPERIOR COURT OF NEW JERSEY
VS                                           APPELLATE DIVISION
MARVIN MATHIS                                DOCKET NO.   A -003695-07T4
                                             MOTION NO.   M -004522-07
                                             BEFORE PART: H
                                             JUDGE(S):    STERN


MOTION FILED:        MARCH 25, 2008      BY: MARVIN MATHIS
ANSWER(S) FILED:

**FILED**
**APPELLATE DIVISION**

**MAY 8 2008**

**RECEIVED**
**APPELLATE DIVISION**

SUBMITTED TO COURT:   MAY 05, 2008

**MAY 8 2008**

ORDER
---------

**SUPERIOR COURT**
**OF NEW JERSEY**

THIS MATTER HAVING BEEN DULY PRESENTED TO THE COURT, IT IS ON THIS
6th DAY OF _May_ , 2008, HEREBY ORDERED AS FOLLOWS:

                                        GRANTED    DENIED    OTHER
                                         (X)        ( )       (X)
MOTION BY APPELLANT
- TO PROCEED AS AN INDIGENT AND FOR FREE
  TRANSCRIPTS

SUPPLEMENTAL: The clerk advises that even though the application was filed in 2001, this is an appeal from the denial of defendant's first petition for post conviction relief. It is a timely appeal from a decision of February 29, 2008. The matter is referred to the

JNN 97-02-123                    FOR THE COURT: Public Defender for representation subject to any necessary or appropriate

JURLC4                     EDWIN H. STERN    P.J.A.D. investigation as to indigency.

Pet. Reply App 4

I hereby certify that the foregoing is a true copy of the original on file in my office.

Jonn M. Chocho
CLERK OF THE APPELLATE DIVISION

G-21   70/4   NEW JERSEY STATE PRISON   (Rev. 3/08)

Legal Mail/Accountable Non Legal Mail

Process and Delivery Receipt #_____

Mathis    304144  (1L)    5/19/0c
_____
Inmate Name      Number      Wing      Date

Sup Court Int NC   5/19/08
_____
Sender           Address          Date (Postmark)

_____    5/19/08
Processed by: (Print and Sign)         Date

_____
Traffic Control Officer (if relocated) (Print and Sign)      Date

L. Uhn         7R         5/19/05
_____
Issued by: (Officer Print and Sign)      Wing      Date

_____    7-R    5/19/08
_____
Inmate: (Print and Sign)             Date

_____
Item#    ___✓__ Legal Mail

_____ Non Legal Accountable

__✓__ Regular First Class (No special handling)

_____ Inter Office (Truck Mail)

_____ Registered/Certified

_____ Return Receipt

_____ Priority Mail

_____ Express Mail

_____ Common Carrier Overnight or Priority Delivery
      (FedEx, UPS, etc.) carrier:_____

Housing Officer:  If inmate has moved, hand deliver immediately to Traffic Control.
Traffic Officer:   Promptly locate inmate housing location in iTag and arrange for immediate delivery.

WHITE - Mailroom I/M file          YELLOW - Wing Officer
PINK - Inmate Receipt              GOLDENROD - Mailroom Operator files

Pet Reply App 5

STATE OF NEW JERSEY

v.

MARVIN MATHIS
_____
Defendant

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION — CRIMINAL
___UNION___ COUNTY

INDICTMENT #: _97-02-123_

CASE OR PROMIS #: _96004583_

## ORDER ON POST-CONVICTION APPLICATIONS
## ON INDICTABLE OFFENSES

This matter being opened on the application of defendant, _Marvin Mathis_, by:

☒ Petition for Post-Conviction Relief determined to be defendant's

     _✓_ first petition

     _____ second or subsequent petition

☐ Motion for Change or Reduction of Sentence pursuant to *Rule* 3:21-10

☐ Motion for _____ and the defendant having been represented by:

_____, Assistant Deputy Public Defender

_Craig S. Leeds, Esq_____, Retained or ⟨Designated Counsel⟩ *(circle one)* or

☐ The court having concluded that there was no good cause entitling the assignment of counsel on the application, and the State having been represented by:

_Sara Liebman_____ Assistant Prosecutor; and

☒ There having been proceedings conducted on the record on _Jan 27___, ~~200~~ _2012_ or

☐ The matter having been disposed of on the papers;

It is on this _27_ day of _Jan_, ~~200~~ _2012_ ORDERED THAT DEFENDANT'S APPLICATION IS HEREBY:

     _____ Granted
     _X_ Denied
     _____ Other

For the reasons:

☐ Expressed in the court's written opinion of   _____

☒ Expressed orally on the record on _1-27-12_   _____

_____, J. S.C.

JOHN F. MALONE, P.J.Ch.

ORIGINAL:  Office of the Public Defender
c:        Judge _____
          Criminal Division Manager's Office
          Prosecutor's Office
          Defendant

_Pet. Reply. App 6_

Da 248

1

Cheryl L. Thompson, Ph.D.
57 Maple Street
Millburn, New Jersey 07041
(201) 762-6475


Psychological Assessment

Marvin Mathis
Age: 15-11
DOB: 3/23/80                    Date Seen: February 10, 1996


Reason for Referral:   To assess the likelihood of successful rehabilitation within the Juvenile Justice System of the State of New Jersey prior to the achievement of age 19 years.

Referred by:  William B. Eisert, Attorney-at-Law

Procedures: Clinical Interview including mental status examination; Bender-Gestalt Test of Motor Perception; House-Tree-Person Test; review of available records; interview with Youth House social worker assigned to the case; and viewing of video tape made by the defendants prior to this incident.

Findings:  Marvin Mathis is a soon to be 16 year old African-American adolescent. He is a brown skinned, wide-eyed, short adolescent who looks somewhat older than his stated age. He has some adolescent acne. He was poorly groomed on the day of the visit with hair being particularly disheveled. He had been in the detention center for 15 days at the time of the interview (2/10/96) and was complaining about loss of appetite and homesickness.

Marvin was fully aware of my role in his judicial process but did not seem to have a full picture of the seriousness of his judicial position. This is a first arrest and detention for Marvin. He is charged with an armed robbery and homicide.

Marvin states that he was with another young man and two young women when they decided they would commit robbery, walked to a liquor store and tried to rob the man outside the store. The man was the store owner. The victim resisted the robbery and the older boy had the gun, the man grabbed at the gun. Marvin states that he then tried to come between his friend and the man at which point the gun went off, firing one shot into the man's chest, killing him. The group separated after the shooting. Marvin states that he knew a robbery would occur but the he did not know this specific robbery would transpire. After the shooting, the other boy and girl

2

ran away quickly and Marvin and the second girl ran more-slowly. Marvin states that all of the people involved in the incident are in detention. The other male and one of the females have been detained in the county jail. The second female is in the Youth Detention Center with Marvin.

Marvin states that he told the older male not to rob the man and that he tried to intervene in the shooting. He also reports that all of the other people involved are saying that he shot the man and that the robbery was entirely his idea.

After the robbery, Marvin states that he kept thinking about it. He knew the victim was shot but did not know he was dead. Marvin states that he did empty the victim's pockets. He did not tell his mother about the event but did tell his girlfriend. The girlfriend heard about the incident from another person before Marvin told her about it. Marvin was arrested at his school two days after the incident occurred.

Marvin is one of three children. He has one brother aged 25 years and one sister aged 12 years. Marvin does not get along with his 25 year old brother. That brother is incapacitated as a result of juvenile diabetes and lives apart from Marvin and the younger sister. His mother is described as 40-41 years old and a homemaker. She is also described as an asthmatic who has more trouble in winter than in summer. The father, age unknown is a truck driver. The parents are separated and Marvin is only in touch when there is business. He states that his parents separated a very long time ago. His family came to New Jersey from North Carolina when Marvin was four years old. His parents have spoken to him about his legal situation. Marvin states his mother told him not to hang out with the wrong crowd and his father told him is sad to be in trouble so young.

Marvin then responded that he never thought he would be in here, that he is a school person and that he didn't get into trouble. However, Marvin's school record reflects severe learning problems that became obvious in first grade. Marvin was retained in first and second grades. He was placed in a special education program because he was never able to learn basic reading, writing and computation.

On Mental Status: Marvin was oriented to time, place and person. He denied hallucinations (sensory experiences in the absence of a stimulus) and no delusional thinking was elicited (false fixed beliefs). Suicidal and/or homicidal ideation and gesture were denied. Marvin's speech was clear and goal directed. His intelligence is estimated as Borderline to Low Average. He did not His problem solving skills are very inconsistent, for example when *

Pet Reply App 8
Ha Pa90
(ex) Drz977

3

asked what he would do with a stamped, sealed and addressed letter, he responded, "take it to the post office. When asked what he would do if he were the first person in a movie to see real smoke and fire, he responded, "go back and get some popcorn." He was no able to understand that the fire was separate from the movie. His ability to think abstractly is also poorly developed. He is concrete, simplistic and referential. When asked about the similarity between beer and wine, he stated, "Guess dark beer, wine lighter, I don't know about beer and wine." Attention and concentration are impaired. He has no vegetative symptoms of depression except poor appetite. He denies all substance use/abuse.

In Sum: Marvin presents with a mental status that reflects no acute psychiatric disability.

Marvin presents as a cooperative young man, with a bright-eyed expression. However, he is not bright and is easily confused.

Marvin made two statements to the police. The first statement described three guys who were involved in the crime. The second statement reported that four people were involved in the crime, with two of the group members being female. He states that he changed that version of the story when his mother told him not to lie and when he realized that his male friend had told about the presence of the two females. Marvin acknowledged involvement in the incident but states that he served mostly as the lookout. He further states that he thinks he was in shock after he saw the man get shot. He shared that his girlfriend had asked him why he didn't stay at the crime scene and see to it that the victim received assistance. Marvin believes it was his disbelief, that allowed him to run away. He thinks that man became a victim because the other male was angry that the liquor store was closed. Marvin states that he knew the other male since he was 5 or 6 years old. He also knew that this boy had been in trouble and had been to Jamesburg.

Marvin appears to be a young man who was caught between his wishes for himself and the reality of his future. He states he would like to go to college to become and electrician. He hopes to go the Rutgers or to a school in Georgia. However, his special education classification because of his never having become literate makes a goal like that impossible. His profound sense of academic failure appears to have served as an impetus to engage in this anti-social behavior. Marvin reports that his girlfriend does well in school and is headed for college.

Marvin presents as a follower, someone who could be easily persuaded by more successful anti-social characters to become involved with them.

Pet Reply App 9
12a Da9/
(%) 12a 90

4

Marvin should have a complete diagnostic assessment as he may be functioning as the level of retardation. If so, he would do well if connected to some of the programs of the Department of Developmental Disability. He is cooperative, he seeks adult authority and if surrounded by people who foster pro-social behavior and leave Marvin with a sense of competence, his adaptation would be good.

This is a very serious crime. Marvin does not present as the initiator of such a crime. This is his first arrest. He has told at least two versions of the story, one version appeared to be his attempt at protecting the two females involved in the episode. None of the other participants appear to have tried to protect Marvin. He was the youngest member of the group and as such may have been implicated as having greater responsibility than he had in reality because of the wide-spread belief that juveniles are punished less harshly. In reviewing the video tape, it becomes apparent that the people were overstimulated in that they lived in constant noise, indulged in dangerous behavior, allowed substance abuse and encouraged the younger members of the group to mistreat women as well as promoting substance abuse for them. In the video tape, Marvin appears to play an insignificant role in the many interactions. His level of involvement at least indicates that he is not a leader of this group.

Marvin appears quite confused about his involvement in such a serious event. He acknowledges that he knew that a robbery would occur and he was fully prepared to participate in the robbery. He states that he did not want to see anybody hurt and that he and one of the women served essentially as look-outs while the event proceeded. However, he also states that he tried to intervene and protect the victim from the shooting. Marvin also shared that his girlfriend wanted to know why he left the man before help arrived for him. Marvin states that he ran from the crime because he was completely overwhelmed by the incident. He further states that he had no idea that the man had been killed.

Marvin presents as a pleasant cooperative young man whose behavior reflects a negative idealization of a group of people he had started to associate with. That is, Marvin does not appear to have the ability to judge the social appropriateness of the group he selected to involve himself with. One of the people shown on the video tape was a relative of Marvin's.

Marvin presents as a young man who does not have an anti-social identification. He describes himself as a school person and he was in the correct grade for his age. He states that he can't explain what allowed him to engage in such behavior. He is ashamed and sad that an innocent person lost his life as a result of the actions of ⸴

Pet Reply App 10
136 Da92
D a 99

5

the group. Marvin does believe that he would not have been in such behavior had his cousin not been involved with him.

Marvin's behavior is that of a person whose judgment was clouded, probably as a result of the overstimulation in the house, substance abuse and a desire to feel that he was a part of the group.

Marvin presents as an excellent candidate for successful rehabilitation within the juvenile justice system of the State of New Jersey prior to the achievement of age 19 years. He has no prior record, he is responsive to adult authority, his adjustment to youth house has been good, he is not a leader, he has had a good adjustment to school even though he probably has significant learning problems. Marvin has achievable career goals. He wants to become an electrician.

In Sum: Marvin Mathis with a chronological age of 15- presents as an excellent candidate for successful rehabilitation within the Juvenile Justice System of the State of New Jersey prior to the achievement of age 19 years. He is responsive to adult authority, has no prior criminal record and does not prevent as a leader in anti-social action. He would do extremely well in a structured setting that includes educational and vocational training. He would also benefit from personal counseling to help him learn to assess his involvement with others.

Cheryl L. Thompson, Ph.D.
New Jersey # 1729

Pet Reply App 11

# Martha H. Page, Ed.D.

Licensed Psychologist

185 PAULISON AVENUE
PASSAIC, NJ 07055-4809
201-773-7673

RECEIVE
... 1996
By

PSYCHOLOGICAL EVALUATION OF MARVIN MATHIS
DATE OF BIRTH:  3/23/80
TESTS ADMINISTERED:
5/14/96 (Two Hours):
1)   Interview
2)   Bender Gestalt
3)   House Tree Person Test
4)   Porteus Mazes
5)   WISC-III
6)   Kaufman Short Neuropsychological Assessment Procedure (K-SNAP)
5/30/96 (½ hour)·
Interview with Mrs. Mathis
6/14/96 (1¼ hour):
Interview with 4 Teachers at the High School:  Ms. Almaradel, Ms.
     Fernandez, Mr. Firestone, Mr. Orr
6/25/96 (1½ hours):
7.)  Wide Range Achievement Test-3
8)   Incomplete Sentences, High School Form
9)   Make A Picture Story Test (MAPS)
10)  Rorschach
11)  Test of Nonverbal Intelligence (TONI-2)
MATERIAL SUBMITTED:
Letter of Referral from William Eisert, Esq., 5/1/96
Complaint--Juvenile Delinquency, 1/25/96
Report of Medical Examiner, 1/23/96
Investigation Report, Police Department of Elizabeth, 1/22/96
Investigation Report, 1/22/96
Property Slip, 1/22/96
Investigation Report, 1/22/96
Voluntary Statements, Marvin Mathis, 1/24/96
Complaint against April Diggs, 1/25/96
Alpha Card, April Diggs
Alpha Card, Marvin Mathis
Voluntary Statement, April Diggs, 1/25/96
Voluntary Statement, Renee Diggs, 1/25/96
Statement of Antwan Lee Harvey, 1/25/96
Statement of Abdul Rodriguez, 1/23/96
statement of Bradley Harrell, 1/23/96
Statement of Khaled Murray, 1/23/96
Statement of Kashia Andrews, 1/23/96
Statement of Mrs. Linda Mathis, 1/24/96
Statement of Sharlama Brooks, 1/26/96
Supplementary Investigation Report
Video
SCHOOL REPORTS:
Child Study Team Reports, IEP, 11/12/92
Elementary School Records, 9/6/84-9/5/91
Speech and Language Report, 11/21/89
Educational Evaluation, 10/16/89

Pet Reply App 12
14a Day

Mathis, Marvin
-2-

Classification Conference Report and IEP, 11/22/89
Undated Report of Teacher of Communication Handicapped, Room 405A,
  1988-1989
Student Guidance Record, 1991-1992
Progress Report, Elizabeth High School
IEP, 11/27/89
Re-evaluation, 1992
Speech and Language Re-Evaluation Report, 10/8/92
Progress Reports
Letters to Mrs. Mathis, 2/1/91, 3/25/91, 3/17/92, 3/2/92
Request for Assistance, 4/89
IEP for Home Instruction
Classification Conference Report, IEPs, 1992, 1993, 1994

REASON FOR REFERRAL:

Marvin Mathis, 16-3 and in the 10th grade (Special Education,
Communication Handicapped) was referred by William Eisert, Esq., Office
of the Public Defender, Union County. Marvin was charged with felony
murder. He was alleged, either alone or with one or more persons, to
have been engaged in the commission or an attempt to commit or flight
after committing or attempting to commit the armed robbery of Antonio
Saraiva, and in the course of such crime in the immediate flight there-
caused the death of Mr. Saraiva on 1/22/96.

On 1/22/96 Mr. Saraivas apparently received a gun shot to the
head. He was pronounced dead at Elizabeth General Medical Center.
In Voluntary Statement of 1/24/96 Marvin Mathis said that he
was in the area of 34d and Broad St. on 1/22/96 at about 6 P. M.  He
met up with another boy, then with Antwan. He said that Antwan and the
person were walking. He said that Antwan and the other person were
looking to rob somebody. Antwan wanted Marvin to hold the gun. Marvin
denied that he handled the gun. He claimed that Antwan saw the man who
owned the liquor store and told him to empty his pockets. The man said
no. Marvin claimed that the man threw a punch at Antwan, and Antwan
threw a punch back. Antwan pushed the man, then shot him. He claimed
that Antwan wanted him to go through the victim's pockets, but Marvin
refused. They ran away. Marvin claimed that he was five feet away
from Antwan when the man was hot. He claimed that Antwan threatened
to kill him, if he said something. He admitted to telling his girl
friend that he shot a man by accident. He claimed that Antwan told
him to say it; that if he didn't say it, he would kill him.

In his second statement he said that he met with Antwan and two
girls. He admitted to planning to rob some one with Antwan. Antwan
planned to rob, and Marvin was to be the lookout. One robbery was not
carried out because Marvin told Antwan not to do it. However, on the
next attempt he acted as lookout. He alleged that the man grabbed
Antwan, after Antwan grabbed him. The man punched Antwan, Antwan
punched back, pushed the man off him, took the gun and shot him.
Antwan then went through the man's pockets. He claimed that neither
he nor the girls touched the man.

In the Supplementary Investigation Report, at the beginning of

Pet Reply App 13
18a D=95          /2

Ex 300-307

Mathis, Marvin
-3-

the interview of 1/24/96 Marvin denied having any knowledge of the
hoimicide and stated that he had been with his girlfriend and a
friend.  He was described as very nervous, kept is hands folded in his
lap, and continually kept rocking back and forth.  When questioned
for details of where he was before and during the time of the homicide,
he became very inconsistent.  He became angry when confronted with
these inconsistencies, first by the detectives and then by his mother.
He said that Sharlama Brooks was a liar with respect to what he had
said to her.  He asked his mother to leave, then told of being with
Antwan and a third person.  He alleged that Antwan shot the owner
of the liquor store.  In the second statement he said that he became
involved in the struggle between Antwan and the victim, and the gun
went off.  He then mentioned that 2 females were involved in this.
April Diggs in her statement of 1/25/6 described Marvin and Antwan as
over to the man.  She said that Marvin said that he shot the man
because the man tried to grab him.  Renee Diggs in her statement of
1/25/96 claimed that Marvin was struggling with the man who had Marvin
by his coat.  She mentioned the video where they bragged about the
robberies that they committed.
    Marvin had no previous arrests or involvement with the juvenile
justice system.
    With respect to his school history, Marvin had been in Pre-K in
9/6/84.  He repeated first and second grades.  In 1/2/90 he was
classified Communication Handicapped, was on Home Instruction from 1/2/90
until 5/25/90.  He was awaiting special class placement.  He received
BSI in reading, language and math from 1986 until he was tested in
the fall of 1989.  A speech and language report of 11/21/89 indicated
that when he was in grade 3, he was evaluated by his Child Study Team.
He had difficulty with grade level work in reading and written language.
Behavior deteriorated when he did not meet with success.  He had
difficulties in expressive and receptive language.  He was unable to
retain details in a story.  He had difficulty with auditory compre-
hension and following multiple step directions.  Reading achievement
grade score fell within the severely deficit range of functioning.  He
had poor short term memory.  He experienced problems in retaining and
processing information.  The IEP of 11/27/89 found him to have a
language disorder related to language form and use.  He had been re-
ferred to his Child Study Team because he interfered with the other
students and liked to dominate them physically.  "He threatens and
intimidates them constantly."  The Social Assessment of 11/14/89
indicated that Mrs. Mathis had been married for nineteen years.  She
had separated from her husband, a truck driver, in 1984.  Both parents
had been born and raised in North Carolina.  His mother moved to
Elizabeth when he was  3.  He had a sister Patricia, then 6.  His
brother Dwayne, a diabetic, was 19.  There had been no history of
learning disabilities in the family.  There had been no DYFS contact.
Mrs. Mathis had a limited support system.  She said that Marvin walked
at 1 year and talked at 1½.  He had a positive attitude in preschool
and kindergarten, but became more negative as academics became increas-
ingly difficult for him.  He was described as a follower.  He was able

*Pet Reply App 14*

Mathis, Marvin
-4-

to develop and maintain positive peer relationships.  He never set
fires or hurt pets or small children.  He had become increasingly sad
about school.  He was very sensitive to criticism.
      Speech was re-evaluated in 10/92.  Language skills were signifi-
cantly discrepant from those of peers and from age-appropriate norms
as determined by observation and informal measures.  He had difficulty
with memory skills, formulating sentences and age-appropriate vocabulary.
The IEP of 11/12/92 indicated that Marvin had been on medication for
asthma.  There was a history of a pain in his eyes for the past five
years.  The Annual Review of 4/2 indicated that he related well to
others and had improved in all academic areas.  He continued to show a
significant deficit in Broad Reading, Broad Mathematics, Broad Written
Language, and Broad Knowledge and Skills.  He was seen as a "very
personable, cooperative youngster in a one to one setting."  Specific
remedial goals for subject matter and behavior were set out in the IEP.
Marvin was classificed on 1/2/90 as Communication Handicapped and
assigned to a Special Education Program.
      The IEP review of 11/12/92 indicated that Marvin continued to
function academically at levels which were significantly below his
age (13) and grade level.  He was described as a "polite young man
generally, although he has exhibited an impulsive and extremely hostile
tendency.  At most times he appears controlled and somewhat guarded
and tense.  He can be taskoriented in the classroom setting...He works
well in a structured setting, with positive verbal reinforcement."
The IEP review of 4/13/94 when he was 14 found him still functioning at
below his grade level.  He was "very motivated to push himself into
higher levels.  "Marvin can be very cooperative, and pleasant when he
is happy or when he wants something from you.  On the other hand,
Marvin can be very difficult at times.  He has been a leader in the
classroom, the other students will do almost anything to win his
approval.  Marvin needs to know that rules apply to him as well as
others."  The Speech/Language specialist found that his behavior in
the language therapy session was greatly improved in 1993-1994.  He was
better able to follow directions.
      The IEP Annual Review of 4/3/95 described him as being "extremely
aware of his educational needs and will push himself to perform higher
level tasks.  He tends to read haphazardly and look for answers."  He
was described as "a pleasant and outgoing young man.  Sometimes Marvin
finds it difficult to remain focused for an entire period.  He works
well in a small group as well as one-on-one."  He was seen as exhibiting
leadership qualities.  "He is respected and admired by his classmates."
He made slow but positive academic growth this year.  Presently Marvin
was functioning adequately in his classes exclusive of outside inter-
vention.  He continued classified Communication Handicapped.  He needed
assistance with concepts and skills related to the organization of ideas.
One of the IEP goals was to reduce class absenses for unacceptable
reasons.
      Marvin was referred for a psychological evaluation to assess his
current level of cognitive and emotional functioning and to assist the
court ion determining whether he was amenable to the rehabilitative

*Pet Reply App 15*
*17a Da 97*

Mathis, Marvin
-5-

processes afforded by the juvenile system by age 19, given the serious-
ness of the allegations and his level of maturity and sophistication.

BEHAVIOR AND ATTITUDE:
    When seen on 5/14/96 Marvin was subdued.  He was cooperative in
the testing session.  He spoke in a soft voice.  He expressed himself
relevantly and coherently with no pathology of affect or cognition.
He said that he lived with his mother.  He had a brother of 25 and a
sister of 12.  He denied any previous problems with the law.
    Asked about the events of 1/22/96, he said that he was with this
boy Antwan.  There were two girls with them.  Antwan wanted to rob a
liquor store.  "he told me he was going to get somebody.  He told me
watch out for him.  We started walking."  They tried one store, but the
door was locked.  They kept walking.  They saw two Puerto Rican boys,
who started running.  After that Antwan said, "He was going to get
somebody before the night was over."  Antwan allegedly went after this
man (the victim) and tried to reach in his pocket.  Antoine whipped out
the gun.  "I tried to stop him from shooting but by accident the gun
went off."
    Seen again on 6/25/96, Marvin was cooperative.  He said that he
was learning more in his classes.  It was noted that during Sentence
completion Marvin had difficulty in finding the words to complete the
sentences which were presented orally.

TEST RESULTS:
    Intellectual Aspects
    On WISC-III Marvin received the following test results:

| | IQ/Index | Percentile | Classification |
|---|---|---|---|
| Verbal Scale | 69 | 2 | Intellectually Deficient |
| Performance Scale | 71 | 3 | Borderline |
| Full Scale | 68 | 2 | Intellectually Deficient |
| Verbal Comprehension | 72 | 3 | Borderline |
| Perceptual Organization | 75 | 5 | Borderline |
| Freedom from Distractibility | 72 | 3 | Borderline |
| Processing Speed | 61 | 0.5 | Intellectually Deficient |

    He received the following Scaled Scores (average - 10) and Test-
Age Equivalents C. A. = 16-1):

| Verbal Tests | Scaled Scores | Test-Age Equivalents |
|---|---|---|
| Information | 7 | 11:2 |
| Similarities | 7 | 11:8 |
| Arithmetic | 3 | 8:6 |
| Vocabulary | 1 | 7:10 |
| Comprehension | 4 | 10:6 |
| (Digit Span) | 7 | 9:10 |

Pet Reply App 16

18a

Mathis, Marvin
-6-

| Performance Tests | Scaled Scores | Test-Age Equivalents |
|---|---|---|
| Picture Completion | 5 | 9:6 |
| Coding | 4 | 10:10 |
| Picture Arrangement | 6 | 9:6 |
| Block Design | 6 | 10:10 |
| Object Assembly | 5 | 8:10 |
| (Symbol Search) | (1) | Below 8:2 |

Marvin was functioning at the intellectually deficient to border-line range of intelligence. Test results were affected negatively by the high noise level and frequent distractions during the testing session. Potential intellectual functioning was in the borderline to low average level of intelligence. Fund of knowledge and ability to think abstractly were at the low average level of intelligence, as was his auditory memory for numbers. However, he found it difficult to process verbally presented material rapidly. Ability to define words was well below average. This reflected not only processing problems, but also reflected his socio-cultural background. Certainly, the CST's classification of him as Communication Handicapped was an appropriate one. His handling of test tasks was quite variable with Scaled Scores of 1 on Vocabulary and Symbol Search and 7 on Information, Similarities, and Digit Span. He tended to be quite concrete in his approach to problems. He did not examine social situations in depth. However, a high level of anxiety interfered with his ability to respond with accuracy and rapidity. He was very concerned about doing well.

Bender Gestalt reproductions showed a number of perceptual-motor problems. He appeared to be somewhat depressed. However, he worked slowly and carefully. Rorschach responses reflected borderline to low average intelligence. He was capable of sensitivity and imaginativeness when he did not feel under pressure to succeed.

The Porteus Mazes provide a measure of planning ability in every-day life as well as the ability to follow the rules. A high Qualitative Score has been found to be characteristic of juvenile delinquents who tend to feel the end justifies the means. It also provides a measure of tension level and impulsivity. Performance is also affected by the individual's ability to visualize and plan ahead. Marvin received a Qualitative Score of 94 for 16 trials, well in excess of the cutoff score for delinquents of 40 to 50. Marvin's score was detrimentally affected by his difficulties in visualizing and planning ahead. He pre-traced, lifted his pencil from the paper repeatedly, even after being warned. It was very difficult for him to find his way out of the maze by visual cues alone. Between his perceptual-motor difficulties and desire to achieve, he found it very difficult to follow the rules. Even though his Quantitative Score of 90 placed him in the average range, under pressure he would have difficulty in utilizing his ability to plan ahead.

The Wide range Achievement Test-3 measures the codes which are needed to learn the basic skills of reading, spelling and arithmetic. Marvin received the following test results:

*Pet Reply App 17*

Mathis, Marvin
-7-

| | Standard Score | Percentile | Grade Score |
|---|---|---|---|
| Reading | 58 | .6 | 2 |
| Spelling | 71 | 2 | 3 |
| Arithmetic | 66 | 1 | 4 |

Marvin was functioning on the deficient level on a measure of written decoding (reading) and numerical computation (arithmetic) and on the borderline level on o measure of written encoding (spelling). Performance was detrimentally affected by less than ideal testing conditions.  However, it was evident that arvin's academic skills were still quite low and further impaired when he felt under pressure to achieve or was in a less than well-controlled and structured situation.

On K-SNAP, a short neuropsychological assessment procedure, his score on the Mental Status Subtest was below average.  He was below average on the Gestalt Closure Subtest, which provides a measure of simultaneous processing.  This test also measures broad visual intelligence, long-term memory, perceptual organization and visual perception and processing.  On the Number Recall Subtest he did quite well. Testing conditions were much better.  Attention span was good, and he was able to concentrate.  He performed in the moderately deficient classification on the Four-Letter Words Subtest, where he was required to develop strategies to figure out "secret" letters or words by generating and evaluating hypotheses.  He lacked the verbal fluency and the abstract thinking necessary to develop complex hypotheses in a novel situation.  He needed assistance and guided learning.

In an attempt to minimize linguistic, motoric, and cultural factors, the TONI-2, a language-free measure of abstract/figural problem solving, was administered.  The TONI-2 items require test subjects to solve problems by identifying relationships among abstract figures and then solving problems created by the manipulation of these relationships. Each item presents a stimulus pattern in which one or more of the figures comprising the pattern is missing.  The subject completes the pattern by selecting the correct response from among either four or six alternatives.  Marvin did very poorly on this test.  It was very difficult for him to use perceptual cues to aid him in problem-solving. Marvin had definite verbal and visual processing difficulties which made problem-solving in both verbal and nonverbal situations difficult for him, when he was left to his own devices.  It was hard for him to see relationships when he was confronted with an unfamiliar situation, unless he was given considerable help.

Affective Aspects

House Tree Person drawings were done with a great deal of detail, but reflected his intellectual limitations.  The house was somewhat carelessly done, while the fence was done with much detail.  Marvin was experiencing considerable anxiety.  His drawing of a person was of a man showing all of his teeth in a smile.  Marvin had problems in handling aggressive and hostile feelings.

Rorschach responses reflected adequate reality testing.  He was also able to see things as others saw them.  Marvin had a strong predilection for thrills and excitement at this point in his emotional

Mathis, Marvin
-8-

development.  Impulse control could be quite poor when he was in a
stressful situation.  He could act with poor judgment because he had
difficulty in thinking through carefully when he was in an un-
familiar situation, or when he felt challenged or thought that he had
to act as though he were cool and tough.  He did not see himself as
being that competent, in part as a result of his academic shortcomings.
Repeating first and second grade and still not mastering the skills
that other children were mastering would hardly make him feel positive
about himself.  However, he did not want that part of him to surface,
because it was too painful and humiliating.

On Make a Picture Story Test (MAPS) the subject is presented
with 67 figures and background pictures, one at a time.  The subject
selects from these figures and places them on the background picture
as they might be in real life, then tells a story about the situation
he has made.  Marvin's stories depicted pleasant family interactions
and helpful policemen.  People behaved in prosocial ways.  There were
strong desires to be treated as some one special.  He wanted very much
to be accepted.

Sentence Completion responses reflected his feelings of homesick-
ness.  When he was younger, "I used to mock other people."  His nerves
were not that good.  He suffered a lot of things in his life.  To "my
mind" he replied, "Is something that is not to be wasted."  What pained
him "is I got myself into a tight situation."  He saw himself as very
kind.  He wished he were a football player.

Interview with Mrs. Mathis, 5/30/96

Mrs. M shocked by what happened.  She had never been in any trouble.
However, she did not know all of his friends.  He watched TV, he had a
girl friend for about 2 years.  Her 26 year old son did not live with
her 12 year old daughter.  Her older son had been a diabetic since he
was 6.  He was now on dialysis.

Prior to being placed in Special Education Marvin used to get into
a lot of fights.  However, his behavior had improved since he was in
special classes.  Mrs. Mathis had been a volunteer in a hospital and
had been hired as a worker there.

Interviews with Teachers, 6/14/96

Mr. Firestone was Marvin's physical education teacher.  "In my
setting everything was fine."  He described Marvin as a low-keyed kid,
a very respectful kid.  He did not lose his temper.  "Basically he was
a good kid."  He was cooperative.  "He liked us, we liked him.  When we
heard what happened, we were very surprised."

Ms. Almaradel had him for Science.  She said that he had to do
everything step by step.  The plan had been to mainstream him.  She
described him as the "type you could talk to.  He was not an angry
kid, only if someone did something to him.  He was never disrespectful.
He was a leader, never a follower with peers his age."  She described
him as a good kid.  He was never one to start up fights, although he
would react when something was done to him.  She did not know about
his after-school activities.  He admired his mother and never said that
he had any problems at home.  He was definitely aware of his reading
problems.  When the teachers learned of the murder, "We all said, it
can't be.  It was not his typical behavior."  She said that Marvin

Pet Reply App 19
21a
Da101

Mathis, Marvin
–9–

would think before he did things. "He might have been threatened to
do it, if he did it." He would report to the teacher if he were being
hassled by others and would warn them. With respect to his school
work, "you could not overwhelm him with information." He worked very
hard, was very neat. His penmanship was "beautiful." He was admired
by the other children.

Ms. Fernandez had Marvin in her class for two years. "When we
found out he was in prison, it was the biggest shock." He never had
been rude. The other children respected him. There were never any
problems with him. He had improved academically. He was very loyal to
his friends. It took him a long time to process information. He had
enough sense to know where to find information. There were no problems
socially. He had a girl friend for a couple of years. She was in a
regular class. Marvin kept in touch with Ms. Fernandez. He would call
her every two weeks. In the classroom and in the school he knew the
rules, and he followed them. He knew what was expected of him. "I
miss him in class. He made a difference in the class."

Mr. Orr was also quite positive in his comments about Marvin.
He found it hard to believe that Marvin had murdered anyone.

DIAGNOSIS:
    Axis I.    309.4  Adjustment Disorder with Mixed Disturbance of
                      Emotions and Conduct
    Axis II.   315.00  Reading Disorder
               315.1   Mathematics Disorder
               315.2   Disorder of Written Expression
    Axis III.  History of Asthma
    Axis IV.   Educational Problems, Problems Related to Interaction
               with the Legal System/Crime
    Global Assessment of Functioning––55

SUMMARY AND RECOMMENDATIONS:
    Marvin was functioning on the borderline level of intelligence.
He had a long history of severe learning disabilities. He had repeated
first and second grade and began to display problem behaviors in school.
He was classified as Communication Handicapped in 1990 and, after a
period of home instruction, was placed in a classroom geared to his
needs. There were some problems with respect to behavior in 1991 and
1992, but, for the most part his behavior was acceptable in the High
School. His teachers had many positive things to say about his behavior
in 1995. He showed no anti-social behavior trends and had not been
involved with the Division of Youth and Family Services nor with the
juvenile justice system. The family was headed by the mother, who had
progressed from volunteer to paid worker in a hospital. This was not
the typical unstable, chaotic and/or abusive family often associated
with delinquency. Marvin had considerable difficulty in thinking
analytically and accurately especially when he felt under pressure.
He also tended to be somewhat impulsive, crave excitement and to be
accepted. Although he had had problems in dealing with angry behavior
in the past, his current teachers did not see this as a problem. He

*Pet Reply App 20*
*22a*

Mathis, Marvin
-10-

was seen as a good kid.  Marvin became involved with a group of young
people who displayed little prosocial behavior and poor impulse control.
Marvin, craving excitement as part of his growing up, was very naive.
He also did not think very deeply or causally.  He probably saw this
behavior as cool and the way to behave if you wanted to be accepted
by this group.

Marvin had no history of anti-social behavior.  He was not a
sophisticated delinquent who had been the recipient of various inter-
vention techniques and not benefitted from them.  If he were to be
tried as an adult and sentenced as an adult, would that act as a
deterrent for him and for others.  In an article on the Transfer of
Juveniles to Criminal Court:  Does It Make a Difference?, it appeared
that the tough approach did not reduce recidivism.  Marvin had been
able to modify his aggressive behavior when placed in the appropriate
educational setting.  He could definitely profit from a rehabilitative,
reparative approach where he would be taught to understand and deal with
violence; be given training in problem-solving, especially in stressful
situations; be given vocational training; and given help in dealing
with his learning problems.  Marvin did not display cynical or oppor-
tunistic attitudes toward others.  The events of 1/22/96 appeared to
be an isolated incident.  He became involved with an older group of
young people whom he, with his simplistic thinking saw as role models.
He was influenced negatively by them.  However, his past history would
indicate that he could be positively influenced by the rehabilitative
processes afforded by the juvenile system by age 19 and could effect
prosocial changes in his behavior.  Corrections has an intensive serious
offender program which might be considered.  If he were placed with
adults, he would continue to be exposed to negative influences.
Because of his poor problem-solving abilities resulting from his
poor analytical skills, he would have a difficult time, without
very specific help, in dealing with the negative role models and
input in an adult prison.

Martha H. Page, Ed.D.
7/13/96

Pet Reply App 21

MARTHA H PAGE            Ø.ZOL 117 2696       08:22    01/15/96

# LOUIS B. SCHLESINGER, PH.D

Psychologist. NJ Lic. No. 1162

12 TOWER DRIVE
MAPLEWOOD, N.J. 07040-1008

(201) 762-6431

Octob⋅ 2, 1996

Susan M. MacMullan, Esq..

Office of the Prosecutor

Union County Administration Building

Elizabeth, New Jersey 07207

Re: State in the Interest of Marvin Mathis

Dear Mrs. MacMullan,

At your request, I conducted a psychological evaluation of the above named juvenile on September 26 and September 29, 1996. The focus of the evaluation was to assess Marvin's capacity to be rehabilitated by the time he reaches 19 years (he is now 16 years, 6 mont　ɔ.i) as the State has filed a motion to refer the juvenile defendant to adult court. Marvin has been charged with felony murder and aiding and abetting an armed robbery which occurred on January 22, 1996, when Marvin was approximately 15 years 10 months old. In addition to a clinical interview and review of volumes of discovery material that were supplied (over one hundred specific different items), I administered the following psychological tests: Rorschach, TAT, Bender-Gestalt, Projective Figure Drawings, MMPI-A and the Wechsler Adult Intelligence Scale (Revised). The time spent with Marvin was approximately 5 hours.

Pet Reply App 22
24a Da104
DQ 111

PRESENTING PROBLEM:

Marvin described his involvement with the homicide as follows: "We were at my cousin's house, Steven Owens, with Antwan Harvey, April Diggs, and Renee Diggs. I was on my way to go home, In the living room. Antwan and Steven Owens were talking about going to a liquor store to get beer. I was about to go out. Antwan said to wait for him. I walked with Antwan to the liquor store and bumped into Renee and April Diggs downstairs".

"Antwan said to everyone, 'walk with us to the liquor store'". Antwan and Renee were "poking along", while Marvin and April were apparently ahead. They found the liquor store closed and Antwan said let' go to the liquor store at Elizabeth Avenue! We were walking and got on Elizabeth Avenue. April walked around to the liquor store to see how many people were it. She was p    . into it. Then Antwan said he is about to rob this man waiting for a bus. I told him don't do that. He wanted me to watch out for him. I shook my head. He didn't rob him: nothing happened".

According to Marvin, April then walked up to a deli store and "was peeking in it; April and Renee. Renee told Antwan he should rob this store. I didn't say nothing". "Antwan went to open the door at the deli store; the door was locked. We started walking up this Avenue. They wanted to rob the deli store; they wanted me to watch out".

"The four of us were walking up Elizabeth Avenue. We saw two Puerto Rican guys. Antwan said Marvin, 'let's get these guys'. I was poking along walking slow. He said 'you're not going to help

Tel Reply App 23
25a Date
@ Berth

~e?'.  I shook my head, no.  He was walking fast, pulled his mask over his face".

"He took off to chase the two guys.  The Puerto Ricans.  April tried to see what happened.  Me and Renee started jogging to see what happened.  He was mad; he said 'I am going to get somebody before the night is over'.  I just looked at him.  I was just watching".

The defendant stated that they were then walking up Elizabeth Avenue and turned onto East Jersey Street when "Antwan saw a man taking out his garbage.  Antwan stopped all three of us.  He asked me, 'Marvin are you going to watch out?'  I didn't answer him.  Then I said 'yeah, I'll watch out for you'.  I met April and Renee.  We walked across the street.  I crossed the street to watc.  t for Antwan.  He pulled his mask down.  He told the man to 'un his pockets" (the defendant explained that meant to give him money).  "The man looked at Antwan.  Then Antwan pulled out a gun to show the man the gun.  I guess to get his attention or something.  Antwan grabbed the man; tried to yoke him up, tried to throw him against the wall.  The man grabbed Antwan.  The man pushed Antwan in the face.  Then Antwan pushed the man.  He had one hand on the gun and the other he was pushing the man.  Then Antwan raised the gun up.  The man grabbed the gun.  They were struggling".

"That's when I ran over there.  I put my hand on the top of the gun.  The man had his hand on Antwan.  Antwan was holding the gun.  I touched the top of it, the gun, and it went off.  The man

Pet Reply App 24

84  FLORCZAK

State in the Interest of Marvin Mathis                                     4

got shot.    The man fell; his eyes were still open.    Antwan was
checking his pockets and stuff. He said,'Marvin help me get some
money out of his pockets'.   I didn't touch the man's pockets".

Marvin went on to explain that "Antwan got up; he was on one
knee. He snatched me up; we started running up Seventh Street. He
was yelling.   He was trying to give me the gun.   I wouldn't take
it.   Antwan had the gun.   I ran home".

When questioned as to whether or not he ran home or to some
other location, Marvin then responded "we went to Steven Owen's
house with Antwan, not the girls.   Steven Owens asked me what
happened. Antwan said he shot somebody. He said he shot some man.
He said Marvin was there when I shot the man.   Steven Owens told me
to go home. Then I went home.   Then I bumped into April and Renee
on Third Street. They were asking me who shot the man.   I didn't
say nothing. I was in shock. Then I went home, went into my room.
I was sitting on my bed thinking about what happened.    Thinking
about the man, that he got shot.   Antwan shot him.   I went to
sleep".

Marvin stated that the next morning "I went to school.    I
don't remember what happened in the house. It was Wednesday when
I got locked up. The Director of the School got me. The detective
wanted to talk to me.   I was taken to the police station and my
mother arrived.   At first I didn't cooperate with them; I don't
know why. I wasn't truthful at first; I don't know why.   They made
me make statements.   The first statement was untrue.   I told them

Pet Reply App 25

Case 2:15-cv-02092-JLL   Document 12-2   Filed 09/18/15   Page 28 of 39 PageID: 2452

about some guys from Carteret.  Then I told them the truth".

        When questioned as to his handling of the gun, Marvin denied
having the gun, even when asked several times.  He denied seeing
the gun at Steven Owen's apartment or at any other time.  He stated
that the first time he saw the gun was on Elizabeth Avenue when
"Antwan showed it to me.  I looked at him and said to myself he is
crazy".

        When questioned as to whether or not he h d planned to commit
an armed robbery with his three co-defendants, he denied planning
an armed robbery and denied knowing about any gun.  He stated he
did not know there was going to be a robbery.  "I th_nk I had
something to do with it; I was watching out.  I never touched the
gun.  I didn't know he had a weapon.  He showed me the gun, half
way out, on Elizabeth Avenue.  I shook my head and said, he is
crazy".

        The day after the homicide, when Marvin was at school, he
stated "I told this girl, Sharlama Brooks, my girlfriend.  I told
her what happened.  She asked me who shot the man; I didn't say
nothing.  I said I don't remember.  When Marvin was questioned as
to whether or not he asked Sharlama to lie for him and state that
he was with her at the time of the homicide, he responded "if
anybody asked you, tell them I was at your house.  She said no".
When asked why he wanted Sharlama to lie, he responded "don't
know".  He also stated "I don't remember telling her I did it".

        Marvin was questioned as to the truthfulness of his statement



since it is in complete contrast to the statements given by his three co-defendants, as well as eyewitnesses, all of whom say that Marvin alone had the gun and shot the victim.   Marvin's response was that everyone is lying, but him.

When questioned specifically, as to whether he wore a mask, Marvin completely denied wearing a mask.   When it was pointed out that others made statements indicating he was wearing a mask, he said that they were being untruthful.  Specifically with regard to the statement given by Migdalia Hernandez, who stated that prior to the armed robbery, Marvin and Antwan were discussing the gun in the room of one of her children, and that both men had masks in their hands, Marvin stated that these statements were "lies".

When Marvin was questioned regarding his own statement about seeing the gun and how Antwan wanted him to hold it  · respond·· "I don't remember".

When questioned, specifically, regarding Marvin's prior statement that he wanted to see how it "felt" to rob someone, he was unable to explain this and stated "I just wanted to see how it felt".   He still denied planning to rob anyone and kept repeating "to see how it felt", offering no explanation, just continuing to repeat the phrase.

When questioned regarding April's statement that the robbery was planned and Marvin had the gun, his response was "it's untrue". When questioned about the statement of Steven Owen's that also implicated Marvin as the shooter, he stated that it was untrue

Pet Reply App 27

also.  He also stated that Antwan Harvey's statement was untrue, "all untrue; I didn't have no gun".  He again denied having a ski mask.  When questioned as to eye witness testimony that it was Marvin alone who shot the victim, his response was "it's wrong".

Eventually Marvin stated that he knew Antwan wanted to rob someone.  When asked why he did not leave, he stated "can't explain".

## PSYCHOLOGICAL TEST RESULTS

Marvin was alert, oriented, in good contact with his surroundings, pleasant and generally cooperative.  He did not really seem depressed but his affect and emotions were somewhat flat.  He was not friendly, but he was not really hostile or oppositional either.  He completed all that was asked of him and showed only some difficulty in concentration.  His attention span was adequate.  There was no evidence of any bizarre or grossly inappropriate behavior or thought content.  The most outstanding clinical feature wa. Marvin's emotional flatness and lack of expression.  Overall test-taking behavior and attitude were adequate.

## INTELLECTUAL FUNCTIONING:

Marvin is currently functioning within the high ad of the borderline range of intelligence, gaining a Full Scale IQ of 79 (Verbal IQ = 80; Performance IQ = 83).  Verbal skills ' .1 within low end of dull-normal range.  Fund of general information is weak, suggesting that Marvin has not profited a great deal from school or

Pet Reply App 28
30a Da 10
(1) Da 117

experience.  For example, he did not know the number of weeks in a year, the identity of Louis Armstrong, the direction travelled from Chicago to Panama, the location of Brazil, the author of Hamlet, the President during the Civil War, and other such simple facts. Vocabulary is equally poor and far below average capacity as he was unable to define such words as fabric, assemble, conceal, consume, regulate, and the like.  Arithmetic skills were quite poor.  Marvin can add and subtract but he did not memorize his multiplication tables; therefore, he had trouble with multiplication and division (although he could multiply and divide some very simple numbers). Poor concentration also negatively affected his performance on several of the arithmetic tasks.  Social comprehension is at a comparable level below average range.  Marvin has some basic understanding of the world around him, but it is not that deep or extensive.  Verbal abstract tasks proved to be a relative strength, but he functions still below average limits, within dull-normal range.  His thinking is somewhat concrete and he has some difficulty drawing superordinate relations between objects and ideas.  More complex abstractions, such as proverb interpretation, were oo difficult for him.  In general, verbal skills fall within low end of dull-normal range, which seems to be a fa        ccurate assessment of his current and potential capacity.

      Nonverbal subtests fall within the dull-normal ra      Marvin is quite alert to details of a problems, and he can easily differentiate what is important from what is irrelevant.  His

Pet Reply App 29
31a

performance on the picture completion subtest was his highest and falls within average limits.  Marvin could also solve problems utilizing familiar material (such as puzzles) at a level falling just below average limits.  The other nonverbal subtests fall within dull-normal range in an even manner.  The defendant has some difficulty analyzing, synthesizing and integrating parts into a whole concept (block design), although he does somewhat better in recognizing logical and sequential relationships with various types of social stimuli.  He can learn new material, but he is really not that quick, and several repetitions are often necessary in order to transfer new knowledge into pre-existing structures.  Throughout all of the structured objective tasks, there were no signs of associative looseness or of paralogical reasoning.  Marvin processes information in a mildly scattered fashion, and he does better when structure is provided.

Focus for organic pathology is positive and extends within the mild range.  There is mild impairment in perceptual motor coordination, as seen on the various copying tasks such as the Bender-Gestalt.  On the latter, major signs of organicity were not noted, but some distinct mild or soft signs are found.  Short-term memory for graphic forms falls above average range, as Marvin was able to correctly recall 6 out of a possible 9 geomet.  ... as ( an indication that his intellectual potential is prob  y higher than his current scores suggest, as 4 or 5 is average recall).  Long-term memory is difficult to assess due to such a poor fund of

Pet Reply App 30

basic knowledge, but it is probably generally intact.    Verbal-
performance IQ disparity is not significant, but examination of
some subtests typically sensitive to organicity, suggests the
likelihood of mild involvement.    This type of mild organicity is
very common in individuals with long-standing learning disabilities
and even in some cases of attention deficit disorder.    Marvin has
a history of special education placement; however, in this
examiner's judgment, Marvin's potential is higher than his current
scores and school performance suggest.

## PERSONALITY FUNCTIONING

Results of the projective and personality tests are consistent
with clinical impression showing a late adolescent (16 years 6
months of age) displaying the early signs of a developing
personality disorder with impulsive and antisocial traits.    The
Rorschach shows a young man with the early signs of developing mild
to moderate characterological disturbance, but without evidence of
severe psychopathology such as schizophrenia, psychosis, or marked
borderline traits.    There was one regressive : aggressive
Rorschach perception typical of developing personality disturbance
illustrated by his perception of "two bulls wrestling; looks like
his blood on something; the red; it's just splattered".    The
remainder of the responses given were of adequate form quality and
fairy well elaborated, even with some degree of  ?      Marvin
responds to the outside world as well as to his internal processes.
With regard to the former, he often over-reacts in loose and poorly

Pet Reply App 31
33a

controlled ways. His inner life is dominated somewhat by impulsive tendencies, making the likelihood of acting-out rather high. Marvin's reality testing is good and his thinking is relatively clear and follows logical lines.

Projective figure drawings were done in a somewhat immature fashion, but not really that remarkable for an adolescent. TAT stories involved themes of unfaithfulness ("the lady's telling this man she loves him, and he is not paying her no mind; he thinks she is fooling around with someone else. His expression on his face; he might leave her; he might forget her"), with one aggressive theme triggered by unfaithfulness and rejection: "...He stabbed her; killed her. He found her in bed with another man; he is crying; he gets caught by the police; they questioned him; the cops arrest him, he gets incarcerated, that's it. She is dead; he'll start a new life over. He goes to jail for five to six years". There was also a TAT story involving a theme of peer ridicule, as he stated "she is crying or something. Somebody hurt her feelings; somebody said something stupid to her. Someone pi~ked on her; someone did it just to be funny. She feels sad; s·      ·idn't mean to hurt her feelings; the girl took it out of proportion· There was one other brief reference to an individual who "cou~~ be depressed" and another reference to an individual who "f~·     ~od about himself". There were no suicidal themes   ··~r themes of deeply depressive ideation, guil    ~~~crse

The MMPI-A showed a profile of an individual without serious

Pet Reply App 32

psychopathology in terms of symptom expression; although, there are some indications of slight somatic preoccupation, suspiciousness and mistrust.   The validity scales are illuminating since his highest overall score was on the Lie scale, which shows an attempt to present himself in a socially desirable way, to the extent that Marvin might even lie to achieve this impression. The elevation on the Lie scale was by far his highest scale elevation.   There was a borderline elevation on the K scale, showing defensiveness and guardedness.

Test   results   are   generally   consistent   with   clinical presentation, where Marvin denied all symptoms and traits of significant psychopathology and disturbance. He completely denied ever  having  any  suicidal  thoughts,  and  he  also  denied impulsiveness,  feelings  of  inadequacy,  narcissistic  traits, substance abuse, sleep or appetite disturbance, depression, or even anxiety.

## EXAMINATION OF DEFENDANT'S SENSE OF RESPONSIBILITY AND ' "LINGS OF REMORSE:

Marvin was questioned regarding whether or not he fe.. . . anything wrong, notwithstanding his denial of shooting the victim. He responded "I was just there; I was watching out; when I put my hand on top of the gun it went off.  No, I didn't dc wrong; I should have went home in the first place".

When   questioned   regarding   any   feeli.... responded "that man got his life taken away and I got myself in

Pet Reply App 33
358 Da.115
Da 122

this predicament. I feel bad about a lot of stuff. Not in school
no more, I am not being home for my mother; that's all. I see
myself up here; it's my first time being locked up, I can't go to
college or whatever". When asked if there was anything else he
felt bad about, he responded "that's all I can think of". When
asked if he knew the name of the victim, he did not and responded
"I know he owned a liquor store". When questioned again if he had
any feelings regarding the death of the victim, he responded "I
just feel sorry, can't explain it". When asked if he was curious
or ever asked anyone about the victim, he responded "no, only thing
I know is he owned a liquor store". When asked if he ever thought
about the victim, his response was "I just don't know". When asked
again, in a different way, if he could think of anything that he
took responsibility for or did wrong, he responded "I just did
something wrong for being there". When asked if he felt he did
anything wrong associating with Antwan and April, since he admitted
that he knew they had been in a lot of legal trouble before, he
responded "I heard he has been incarcerated; I know April's been
locked up", but apparently this did not bother or concern Marvin
very much. When asked if he felt that there was anything
with him, he responded "nothing, I am perfectly fine; I
trouble learning; that's the only thing that's wrong wit
Marvin explained that he had never been in difficulty bef
when questioned as to his repetitive aggressive behavior in
elementary school, he completely denied this an  stated that he was

*Pet Reply App 34*

the victim "they picked on me"     en he was shown numerous teacher
reports of his aggressi·  beha·     as a chi·         ·esponded "they
were picking on me; I try to a·... violence".

## FORMULATION:

In sum, we are dealing w·th a 16 year 6 ·onth old male who
stands charged with felcny murder and aiding and abetting an armed
robbery. The question to ·e addressed is whether or not Marvin can
be rehab·litated in less than three years.    Test results and
clinical    evaluation    did    not    show    evidence    of    severe
psychopathology; although, there is evidence of the early signs of
a developing personality disorder with impulsive and antisocial
traits.    There is no evidence of significant depression and
apparently no history of substance abuse and certainly nothing
suggestive of schizophrenia, psychosis or any type of major mental
illness.  His level of intelligence falls within the high end of
borderline to dull-normal range with evidence of mild organi    ¡.
He had evidenced a lot of aggressive conduct in elementary school
but he seems to have settled down in high scho·  .  Notwithstanding
Marvin's  denial  of  guilt,  we  have  an  individual  who  g·ve
inconsistent stories, attempting to create an alibi with his
girlfriend, blamed others, an· offers no speci·ic explanation for
his alleged initial intention to "see how it felt" to c · ·t an
· ·med robbery.  This is not a homicide ·ich is a direct ·
of a mental illness such as psychosis, or a depression, nor ·· ·ris
any type of compulsive pathological murder with sexual dynamics.

Pet Reply App 35

It also does not seem to be an explosive homicide, but rather an impulsive offense within the context of antisocial goals. As far as this examiner can determine there was really no purpose to the original idea of committing an armed robbery, except to just commit an armed robbery, "to see how it felt". The idea was not to get money for any specific purpose such as drugs or alcohol, but just to do something excessively antisocial.

The first step in rehabilitation has to be an acknowledgement on the part of the offender (or the patient) that there is a problem.   Marvin does not recognize that there is a problem. Notwithstanding his right to deny guilt, he still believes that he did nothing wrong, except being at the wrong place at the wrong time. He showed almost no remorse for the victim, not even knowing his name, and implied that Marvin is actually the victim by being lured into this whole event by others. He feels bad that he is not in school and not at home, but very little responsibility for his own actions was detected. Where does rehabilitation begin with an individual who does not believe he did all that much wrong? Marvin displayed pronounced antisocial thinking from the beginning of this episode and, in face of a tragedy that resulted, little responsibility is taken. Since the first step of rehabilitation has not been met, it is this examiner's professional judgment, to a reasonable degree of psychological certainty, that Marvin cannot be rehabilitated by the t    he reaches 19 years of age in approximately two and a half years.

Pet Reply App 36

38a

(15)

I hope these findings are of help to you in your further understanding of this case. If I may be of any further assistance, please do not hesitate to contact me.

Very truly yours,

Louis B. Schlesinger, Ph.D.
Diplomate in Forensic Psychol.
American   Board   of   Profes....
Psychology

Dictated but not proofread

Pet Reply App 37