**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MARVIN MATHIS, | : | |
| | : | |
| Petitioner, | : | Civil Action No. 15-2092 (JLL) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ATTORNEY GENERAL OF | : | |
| NEW JERSEY, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |

**LINARES**, District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Marvin Mathis ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging Petitioner's state court conviction (ECF No. 1).   Following an extension granted by this Court, Respondents filed a response to the petition (ECF No. 10), to which Petitioner has replied (ECF No. 12).   Also before this Court is Petitioner's motion for an evidentiary hearing (ECF No. 13), to which Respondents have filed a response (ECF No. 15).   For the following reasons, this Court will deny both the motion for an evidentiary hearing and the petition for a writ of habeas corpus, and no certificate of appealability shall issue.

## I.  BACKGROUND

In the opinion affirming Petitioner's conviction on direct appeal, the Superior Court of New Jersey – Appellate Division provided the following summary of the facts underlying

Petitioner's conviction:

> On January 22, 1996[,] [Petitioner], age 15, and his friend Antwan Harvey, age 20, visited Migdalia Hernandez and her "live-in" boyfriend, Stephen Owens, at 224 Third Street, Apartment 6, in Elizabeth. April Diggs, age 17, and her cousin Renee Diggs, age 22, also visited [that apartment] at the same time. April and Renee decided to get something to eat at the Chinese restaurant across the street. [Petitioner] and Harvey agreed to join them. As the four were leaving the apartment, Hernandez observed [Petitioner] and Harvey carrying a ski mask and overheard one of the four say he had a gun. Both Renee and Harvey had their coats on inside out to camouflage their appearance. April was wearing pink Reeboks.
>
> After leaving the restaurant, the four walked towards Elizabeth Avenue. According to April Diggs, when they reached Seventh Street, Harvey announced that he wanted to rob someone and he wanted April, Renee, and [Petitioner] to act as "lookouts." Initially, none of the three responded. According to April, when they encountered two "Spanish guys," Harvey and [Petitioner] chased them, intending to rob them; the "Spanish guys" outran them, however.
>
> According to April, as the group proceeded to East Jersey Street, Harvey said "something about busting somebody," meaning that he was going to shoot somebody. [Petitioner] said he "would do it too" and Harvey handed [Petitioner] the gun. About two or three minutes later, the group observed a man taking out the trash. Antonio Saraiva, owner of a Portugese American Wine and Liquor Store at 709 East Jersey Street, had just closed up his shop at 10 p.m. and was taking out trash. His wife and two daughters were inside the store. Harvey ran toward Saraiva first [and Petitioner] followed. Saraiva grabbed [Petitioner] by his jacket, shots were fired, and Saraiva fell to the ground. April and Renee Diggs both identified [Petitioner] as the shooter.
>
> After the shots were fired, April asked Renee whether [Petitioner] shot Saraiva because she did not actually see the shots fired. Renee responded "[y]eah." April then asked where [Petitioner] shot Saraiva and Renee responded "in the chest"; however, April said that based on the way Saraiva fell it appeared he was shot in the head. The four fled the scene. Harvey and [Petitioner] ran toward Seventh Street; April and Renee ran in the

2

opposite direction.   All four returned to Hernandez's apartment. While at the Hernandez's, April asked [Petitioner] why he shot [Saraiva].   According to April, [Petitioner] responded "because the man grabbed him."   April gave a statement to police on January 25, 1996.

Meanwhile, Saraiva's wife heard the shots, ran outside from the back of the store, and down an alleyway to the locked security gates.   When she saw her husband lying on the ground, she told her daughters to call an ambulance as their father was on the ground "full of blood."   Mrs. Saraiva ran back into the house to get the keys for the security gates.   When she returned and opened the gates her husband was alone and unconscious.   The ambulance arrived and took Saraiva to the hospital.

[The Court then recounted that Saraiva was pronounced dead upon arriving at Elizabeth General Hospital, and that the Union County Medical Examiner determined that the cause of death was a single bullet wound to the head fired from a distance of eighteen inches or less.]

Later that day, Detective Kozcur arrested [another individual] for the murder.   [Petitioner]'s girlfriend, Sharlama Brooks, then age fifteen, saw him at school the day after the shooting, January 23, 1996.   According to Brooks, [Petitioner] told her that if anyone approached her to tell them that he was with her between 7 p.m. and 11 p.m. on Monday January 22, the night of the murder.   Brooks refused.   Brooks testified that when she questioned [Petitioner] about his request he turned away from her and said if he told her [what he had done] . . . she would be upset with him.   Brooks said that on her way home from the fish market, she was approached by four or five young men.   One of them pulled her aside and told her [Petitioner] killed someone.

According to Brooks, [Petitioner] initially denied the accusation.   After reviewing her statement to police, Brooks said that [Petitioner] told her that "they were walking, him and his friends, - Marvin, I am saying, he went to grab the guy and as soon as he grab[bed] the guy[,] the gun went off."

Brooks said that she began to cry when defendant told her this.   Brooks then went to her first period class but left because she was too upset.   As she was leaving class, she came in contact with

3

the security guard who escorted her to Janice Sutton, the substance-abuse counselor. Brooks told Sutton what [Petitioner] had told her. Janice Sutton testified about her meeting with Sharlama Brooks. She said that Brooks came into her office hysterically crying. When Sutton asked Brooks what was wrong, according to Sutton, Brooks said that her boyfriend had been involved in a murder. Detective Brown was summoned and Brooks was transported to the police station where she gave a statement.

Detective Koczur took [Brooks's] statement. As a result of her statement, the focus of the investigation shifted to [Petitioner]. [Petitioner] was brought to the police station at about 11:15 a.m. on January 24. He was not handcuffed and he was not placed under arrest. Once in the conference room, Koczur told [Petitioner] that he was the principal suspect in this case and told him he should not say anything until he had a parent or guardian present. Mrs. Mathis, [Petitioner]'s mother, then was escorted to the police station. She was advised that [Petitioner] was a potential suspect in the homicide that occurred at 709 East Jersey Street. Mrs. Mathis was very cooperative with the detective. She and Koczur entered the conference room where [Petitioner], Detective Lieutenant Gary Lewis, and Detective John Furda of the Union County Prosecutor's office were waiting. At 12:07 p.m. Koczur also advised [Petitioner] of his rights. Both [Petitioner] and Mrs. Mathis said they understood their rights.

After he was advised of [and waived] his rights, [Petitioner] first gave an oral statement to the police. He denied any involvement in the homicide, stating at the time of the homicide he was in the area of Third Street in Elizabeth or with his girlfriend. About halfway through the interview, Koczur advised [Petitioner] that Brooks had given the police a statement indicating that he was not with her at the time of the homicide. Confronted with this information, [Petitioner] became very angry and called her a liar. After Koczur advised [Petitioner] of certain inconsistencies in his statement, [Petitioner] requested that his mother leave the room. At that time, he admitted he was present at the scene of the homicide, "and that he was walking with a man named Antwan, a scuffle broke out, and a man was shot." Koczur then brought Mrs. Mathis back into the room. When his mother returned, [Petitioner] repeated his involvement in the offense. He made no mention of April Diggs' or Renee Diggs' involvement in the crime; he identified two

4

individuals, Antwan Harvey and a man named "Boz," as participants in the shooting.

[Petitioner] then gave the first of two written and signed statements on January 24, 1996[,] at 2:30 p.m. He said that he met Harvey on Second Street at about 7 p.m. Harvey and a third-person "were looking to rob someone," but he was not. Harvey wanted him to hold the gun but he refused; he said he never handled the gun; [Petitioner went on to assert that Harvey attempted to rob Saraiva and ultimately Harvey shot Saraiva when the two scuffled.] Following the shooting, they fled the scene. According to [Petitioner]'s first statement, before leaving, Harvey took the victim's wallet from his right back pocket. [Petitioner] claimed he did not believe Harvey was going to rob anyone and when he spoke to Harvey after the shooting, he warned [Petitioner] not to tell anyone about it or he would kill him.

After [Petitioner] gave his first signed statement, the police executed a warrant at a residence in Carteret, where Detective John Furda seized items of clothing described by [Petitioner]. With the consent of [Petitioner] and his mother, Detective Furda searched their home and seized pants fitting the description [Petitioner] gave of the pants he wore on the night of the robbery.

While detective Furda searched [Petitioner]'s house, Koczur met with other investigators. At 5:40 p.m. he returned to question [Petitioner] again, advising [Petitioner] that he did not believe what he had said in his first statement. After being readvised of his rights and waiving them, [Petitioner] gave a second written and signed statement. [Petitioner] stated he met Harvey at 8 p.m. on the night of the offense at the corner of Third and Bond streets. He said he and Harvey met April and Renee Diggs at a nearby Chinese restaurant. This was the first time [Petitioner] mentioned the Diggs cousins. [Petitioner] stated that all four intended to commit a robbery. While walking up Elizabeth Avenue, Harvey displayed a black revolver and asked [Petitioner] to act as the lookout during the robbery. Harvey asked the girls "to see if that man had any gold on him." When Harvey suggested robbing a man standing nearby, [Petitioner] told him not to rob the man. [Petitioner] also told Harvey he would not participate in the robbery of a small delicatessen nearby. [Petitioner] admitted that he and Harvey were looking for someone to rob because he wanted "to know how it felt." As the four continued walking, they encountered two "Spanish

5

boys." Harvey and April "started running after them real hard, and me and the other girl jogged after them." The "Spanish boys" outran them.

The four continued walking toward East Jersey Street. [Petitioner] said at this time, it was no longer his intention to participate in a robbery. According to [Petitioner], when the four reached East Jersey Street, Harvey told [Petitioner] that he was going to rob the man there and he wanted [Petitioner] and the Diggs' to act as "lookouts." [Petitioner] said ["w]e walked up to the guy. [Harvey] grabbed him, and he tried going into his pockets. [Harvey] grabbed the man and the man grabbed [Harvey]. The man threw a punch at [Harvey]. Then [Harvey] threw a punch back at him. Then [Harvey] pushed the man off him and he took the gun and shot him.["]

[Petitioner] explained that Harvey went through the victim's pockets but he, [Petitioner], did not touch the man. After the struggle ensued between Harvey and Saraiva, [Petitioner] denied helping Harvey. He said, however, the gun went off "[w]hen all three were struggling for the gun" and that the gun was pointed one to two feet from the victim's forehead. [Petitioner] stated that there were two shots fired, but one missed. He did not believe it was Harvey's intention to shoot Saraiva. After the shooting, [Petitioner] and Harvey ran down Seventh Street. The Detective asked [Petitioner] the following question: "So all four of you committed this robbery?" Unlike [Petitioner]'s other answers, which were all typed, that questioned was answered with a handwritten "yes." Koczur believed that when [Petitioner] reviewed his statement, "he realized that the word A was the answer and the answer 'Yes' wasn't there. [Petitioner] obviously placed his name, he obviously added the answer and placed the word 'Yes' next to it." During his testimony [Petitioner] denied ever having written "yes" on the statement.

After giving the second written statement, [Petitioner] identified the other three participants from a photographic lineup. He also confirmed that during the robbery April was wearing pink Reeboks and that Renee wore her jacket inside out. [Petitioner] signed this second statement.

The following day, on January 25, 1996, Harvey, April Diggs, and Renee Diggs were arrested and each gave statements to

6

> the police.    Police also seized the black ski mask from Hernandez's apartment.    April Diggs, who was age 17 at the time of the incident, was charged as a juvenile for robbery and murder.    Her case was waived to adult court where she pled guilty to armed robbery.    She agreed to testify truthfully against [Petitioner] and Harvey in exchange for a sentence recommendation of fifteen years with a five-year parole ineligibility period.    Renee Diggs, who was age 22 at the time of the incident, pled guilty to armed robbery with a recommended sentence of at fifteen-year term with a five-year parole ineligibility period if she testified against [Petitioner] and Harvey.

(Document 4 attached to ECF No. 10 at 4-12).

On January 25, 1996, Petitioner was charged by way of a Juvenile Delinquency complaint with crimes that, if committed by an adult, would constitute armed robbery and felony murder. (*Id.* at 2).    On October 10 and November 11, 1996, the family court held a hearing and ultimately determined that Petitioner's case should be waived to the Law Division and Petitioner should be tried as an adult because it was not likely that Petitioner could be rehabilitated by the time he reached nineteen years of age and there was probable cause that Petitioner had committed the charged crimes.    (*Id.* at 2-3).    As part of those waiver hearings, three experts prepared reports designed to aid the Court in determining whether Petitioner could be rehabilitated by the time he reached nineteen.

Cheryl L. Thompson, a psychologist hired by Petitioner's counsel, provided one such report.    (Document 2 attached to ECF No. 12 at 9-13).    In support of her assertion that Petitioner could be rehabilitated through juvenile proceedings, Dr. Thompson made the following comments on Petitioner's mental functioning and educational difficulties:

> [Petitioner]'s school record reflects severe learning problems that became obvious in the first grade.    [Petitioner] was retained in first and second grades.    He was placed in a special education program

7

because he was never able to learn basic reading, writing and computation.

On Mental Status: [Petitioner] was oriented to time, place and person. He denied hallucinations . . . and no delusional thinking was elicited . . . . [Petitioner]'s speech was clear and goal directed. His intelligence is estimated as Borderline to Low Average. . . . His problem solving skills are very inconsistent, for example when asked what he would do with a stamped, sealed and addressed letter, he responded, "take it to the post office.["] When asked what he would do if he were the first person in a movie to see real smoke and fire, he responded, "go back and get some popcorn." He was no[t] able to understand that the fire was separate from the movie. His ability to think abstractly is also poorly developed. He is concrete, simplistic and referential. When asked about the similarity between beer and wine, he stated "Guess dark beer, wine lighter, I don't know about beer and wine." Attention and concentration are impaired. He has no vegetative symptoms of depression except poor appetite. He denies all substance use/abuse.

In sum: Marvin presents with a mental status that reflects no acute psychiatric disability.

Marvin presents as a cooperative young man, with a bright-eyed expression. However, he is not bright and is easily confused.

(*Id.* at 10-11).

Martha H. Page, a Doctor of Education, also evaluated Petitioner following a referral by defense counsel. In her report, Dr. Page concluded that Petitioner

was functioning on the borderline level of intelligence. He had a long history of severe learning disabilities. He had repeated first and second grade and began to display problem behaviors in school. He was classified as Communication Handicapped in 1990 and, after a period of home instruction, was placed in a classroom geared to his needs. There were some problems with respect to behavior in 1991 and 1992, but, for the most part his behavior was acceptable in the High School. His teachers had many positive things to say about his behavior in 1995. He showed no anti-social behavior trends and had not been involved with the Division of Youth and Family Services nor the juvenile justice system. The family was

8

> headed by the mother, who had progressed from volunteer to paid
> worker in a hospital. This was not the typical unstable, chaotic
> and/or abusive family often associated with delinquency.
> [Petitioner] had considerable difficulty in thinking analytically and
> accurately especially when he felt under pressure. He also tended
> to be somewhat impulsive, crave excitement and to be accepted.

(Document 2 attached to ECF No. 12 at 22). In addition to the results of various tests conducted

on Petitioner, Dr. Page made the following statements regarding Petitioner's mental faculties:

> [Petitioner] was functioning at the intellectually deficient to
> borderline range of intelligence. Test results were affected
> negatively by the high noise level and frequent distractions during
> the testing session. Potential intellectual functioning was in the
> borderline to low average level of intelligence. Fund of knowledge
> and ability to think abstractly were at the low average level of
> intelligence, as was his auditory memory for numbers. However,
> he found it difficult to process verbally presented material rapidly.
> Ability to define words was well below average. This reflected not
> only processing problems, but also reflected his socio-cultural
> background. Certainly . . . [his] classification . . . as
> Communication Handicapped was an appropriate one. His
> handling of test tasks was quite variable. . . . He tended to be quite
> concrete in his approach to problems. He did not examine social
> situations in depth. However, a high level of anxiety interfered
> with his ability to respond with accuracy and rapidity. He was very
> concerned about doing well.

(*Id.* at 19).

The final expert report provided during the waiver proceedings was the report of Dr. Louis

B. Schlesinger, a psychologist hired by the State to evaluate Petitioner. (*See* Document 2 attached

to ECF No. 12 at 24-39). In that report, Dr. Schlesinger provided the following evaluation of

Petitioner's mental functioning:

> [Petitioner] is currently functioning within the high end of the
> borderline range of intelligence, gaining a Full Scale IQ of 79
> (Verbal IQ = 80; Performance IQ = 83). Verbal Skills fall within
> [the] low end of dull-normal range. Fund of general information is

9

weak, suggesting that [Petitioner] has not profited a great deal from school or experience. For example, he did not know the number of weeks in a year, the identity of Louis Armstrong, the direction travelled from Chicago to Panama, the location of Brazil, the author of Hamlet, the President during the Civil War, and other such simple facts. Vocabulary is poor and far below average capacity as he was unable to define such words as fabric, assemble, conceal, consume, regulate, and the like. Arithmetic skills were quite poor. [Petitioner] can add and subtract but he did not memorize his multiplication tables; therefore he had trouble with multiplication and division (although he could multiply and divide some very simple numbers). Poor concentration also negatively affected his performance on several of the arithmetic tasks. Social comprehension is at a comparable level below average range. [Petitioner] has some basic understanding of the world around him, but it is not that deep or extensive. Verbal abstract tasks proved to be a relative strength, but he functions still below average limits, within dull-normal range. His thinking is somewhat concrete and he has some difficulty drawing subordinate relations between objects and ideas. More complex abstractions, such as proverb interpretation fall within [the] low end of dull-normal range, which seems to be a fairly accurate assessment of his current and potential capacity.

Nonverbal subtests fall with the dull-normal range. [Petitioner] is quite alert to details of a problem, and he can easily differentiate what is important from what is irrelevant. His performance on the picture completion subtest was his highest and falls within average limits. [Petitioner] could also solve problems utilizing familiar material (such as puzzles) at a level falling just below average limits. The other nonverbal subtests fall within dull-normal range in an even manner. [Petitioner] has some difficulty analyzing, synthesizing and integrating parts into a whole concept (block design), although he does somewhat better in recognizing logical and sequential relationships with various types of social stimuli. He can learn new material, but he is really not that quick, and several repetitions are often necessary in order to transfer new knowledge into pre-existing structures. Throughout all of the structured objective tasks, there were no signs of associative looseness or of paralogical reasoning. [Petitioner] processes information in a mildly scattered fashion, and he does better when structure is provided.

> . . . [Petitioner] has a history of special education placement; however, in this examiner's judgment, [Petitioner]'s potential is higher than his current scores and school performance suggest.

(*Id.* at 31-33). Dr. Schlesinger thus concluded that Petitioner's "level of intelligence falls within the high end of borderline to dull-normal range." (*Id.* at 37).

Following the Family Court's decision to waive Petitioner to the Law Division, Petitioner was indicted on February 4, 1997 with the following charges: first degree murder in violation of N.J. Stat. Ann. § 2C:11-3a(1) or § 2C:11-3a(2), first degree armed robbery in violation of N.J. Stat. Ann. § 2C:15-1, first degree felony murder in violation of N.J. Stat. Ann. § 2C:11-3a(3), second degree possession of a firearm for an unlawful purpose in violation of N.J. Stat. Ann. § 2C:39-4a, and third degree possession of a weapon for an unlawful purpose in violation of N.J. Stat. Ann. § 2C:39-5(b). (Document 4 attached to ECF No. 10 at 3). Petitioner's charges thereafter proceeded to trial in June of 1998. (*Id.*).

Prior to the onset of trial, the trial court held a hearing on Petitioner's motion to suppress his statements to the police on the ground that he did not knowingly and intelligently waive his *Miranda* rights on June 9 and 10, 1998. (Documents 28 and 29 attached to ECF No. 10). At that hearing, Detective Brown testified that he and Detective Garcia asked Petitioner to come from his school with them to the station, which Petitioner willingly agreed to do. (Document 28 attached to ECF No. 10 at 7). The detective testified that no force or coercion was used to get Petitioner to go to the station, that he was not handcuffed or arrested at that time, and that Petitioner chose to go with them to the station. (*Id.*).

Following Detective Garcia's testimony, Detective Koczur testified regarding the statements Petitioner made to police. He testified that, after speaking with Sharlama Brooks, he

asked that Petitioner be brought to the station from his school as Brooks had told Koczur that Petitioner had shot someone. (*Id.* at 14-15). The detective then stated that, once Petitioner was brought to the station, he informed Petitioner that he was a strong suspect in the shooting of Saraiva, but the police would not question Petitioner without his mother being present, and that Petitioner should wait until his mother arrived to speak with the police. (*Id.* at 17-18). Petitioner's mother was then brought to the station, where she, too, was informed that Petitioner was a suspect in a murder. (*Id.* at 19). The detective further testified that once Petitioner and his mother were placed in an interrogation room, both were advised orally and in writing of Petitioner's *Miranda* rights and asked whether they understood each right individually. (*Id.* at 20-21). After being informed of Petitioner's rights and stating that they understood, both Petitioner and his mother chose to waive those rights and both signed a waiver form after it was read to them by Koczur. (*Id.* at 21-23).

Detective Koczur further testified that no force or threats were used against Petitioner, that Petitioner spoke freely with the detectives, and that Petitioner never requested an attorney. (*Id.* at 23-26). The detective stated that Petitioner initially denied his involvement as summarized above but ultimately asked that his mother briefly leave the room, at which point he first provided the information contained in his first statement discussed above. (*Id.* at 27). The detective stated that Petitioner was the one who asked her to leave, and Mrs. Mathis did not object, and that she was then brought back in and Petitioner immediately repeated his story. (*Id.* at 27-28). Petitioner thereafter gave his first written statement in the presence of his mother, reviewed it, and signed it. (*Id.* at 30-33). The detective then testified that, following the search of Petitioner's home by Petitioner and his mother's consent, Petitioner was brought back, re-mirandized, and once again

waived his rights by agreeing to and signing a *Miranda* waiver form.  (*Id.* at 36-37).  Petitioner was told that the police did not believe his story, and Petitioner ultimately provided the second written statement discussed above.  (*Id.* at 37-41).  On cross examination, the detective admitted he knew Petitioner was fifteen at the time, but denied being told that Petitioner was a special education student or that Petitioner did not understand any of his rights, and that Petitioner ultimately appeared to understand his rights.  (*Id.* at 43-53).

Petitioner's mother also testified at the *Miranda* hearing.  Although Petitioner's mother initially stated that the police were questioning her son upon her arrival, when asked when police started questioning him, she stated that she didn't remember.  (*Id.* at 65).  She then testified that she remembered the police reading her and her son the *Miranda* waiver form, and that she and her son waived those rights the first time the police questioned Petitioner.  (*Id.* at 66).  Even when faced with her own signed statement, Mrs. Mathis claimed that her son never admitted any involvement in the crime, despite signing a statement to that effect.  (*Id.* at 66-69).  She also stated that it was the detective, and not her son, who asked her to leave the room during his interrogation.  (*Id.* at 69).

Petitioner was the final witness to testify at the *Miranda* hearing.  Petitioner asserted that he only went to the police station because the detectives told him that he had to go.  (*Id.* at 73-74).  Petitioner testified that upon arriving, he was placed in an interrogation room, told the police were investigating him in relation to a homicide, and that he should not respond to any questions until his mother arrived.  (*Id.* at 75).  Petitioner then testified that another officer entered and tried to interrogate him, but he insisted that he shouldn't talk until his mother arrived per the previous detective's statement as to Petitioner's rights, and that officer stopped asking questions and left.

13

(*Id.* at 75-76).   Petitioner then testified that he did answer questions once his mother arrived, but claimed that he was not read his *Miranda* rights until after he gave his first statement, at which point he was read his rights, read it himself, and signed the waiver.   (*Id.* at 76).   Petitioner asserted, however, that he didn't understand the rights that were read, although he did not tell officers that.   (*Id.*).   Petitioner further stated that although he signed and initialed his statement, he didn't read it in its entirety because the detectives "rush[ed]" him.   (*Id.* at 78).

Petitioner also testified that he ultimately gave a second statement, but insisted that he was not read his *Miranda* rights a second time.   (*Id.* at 80-81).   Petitioner testified that he could not recall whether he read this second statement before signing it, and further testified that he only signed it because he was told to do so by the police.   (*Id.*).   Petitioner also stated that he never read the statement out loud despite having issues with reading.   (*Id.* at 82).

On cross examination, Petitioner admitted that he was not handcuffed until after the second statement, that he was not mistreated by the police, and that he was not otherwise subject to force or coercion by police.   (*Id.* at 85-88).   Petitioner also reiterated on cross that, after being told he didn't have to speak with the police until his mother arrived, that he told a detective not to talk to him without his mother when he attempted to question Petitioner and thus stopped premature questioning.   (*Id.* at 90).   Petitioner further admitted that he lied in his first statement, and that it was he, and not the detectives, who asked his mother to leave before he first admitted involvement in the crime.   (*Id.* at 92-94).   Petitioner also stated that he repeated that statement once his mother returned to the room.   (*Id.* at 94).   Petitioner also admitted that he eventually gave a second statement in which he gave further details after the police told him they did not believe his first statement.   (*Id.* at 99-100).

14

The final series of questions on cross examination dealt with Petitioner's ability to understand the *Miranda* rights he waived during questioning. Petitioner admitted that he understood his right to remain silent, and that anything he said could be used against him. (*Id.* at 112-13). Petitioner also stated that he understood that he had a right to an attorney, and that he could have one appointed for him, but claimed that he did not understand what it meant that he had a right to have a lawyer "present" during questioning. (*Id.* at 114-16). Petitioner also testified that he understood that he could decide to exercise his rights at any time and end the questioning. (*Id.*). Petitioner did assert that although he knew he could have a lawyer appointed for him, he didn't understand what the *Miranda* form meant by saying that he could have a lawyer appointed before questioning if he wished. (*Id.*). Ultimately, Petitioner testified that the only phrases in all of the *Miranda* warnings that he did not understand were the word "present" and the phrase "if you wish," and that he otherwise understood his rights at the time he was questioned. (*Id.*). Petitioner thus asserted that what he did not understand was that he could have a lawyer appointed prior to questioning, as opposed to at some later point. (*Id.*). Petitioner admitted, however, that his mother was present at the time of the *Miranda* waiver, and that she, too, agreed to waive his rights. (*Id.* at 115-16).

The trial court ultimately denied Petitioner's *Miranda* motion, making the following findings:

> Having had the opportunity to listen to the witnesses in this matter and to observe them during the course of their testimony, I conclude that the credible evidence supports the following with respect to this matter with respect to the issue of [Petitioner]'s arrest, as raised by the defense:

15

I find that [Petitioner] was not arrested at the high school.  I think the facts as presented by the credible evidence support the conclusion by [a] preponderance of that credible evidence that [Petitioner] was not arrested.  He was not cuffed, he was not told [that] he was arrested.  He was told that a detective at headquarters wanted to speak to him, and he agreed to go to headquarters to speak to the detective.  I think, quite simply, that's what took place.

The circumstances were not such as to cause a belief of arrest.  He was escorted from a classroom not solely by the police but also by a school representative, vice-principal of the school with whom [Petitioner] was familiar[.]  [Petitioner] was questioned by plain clothes officers who were regularly assigned to the school with whom [Petitioner] had had previous contact and persons that he was aware were officers assigned to the school.   And there is nothing in the manner in which he was transported to headquarters to suggest that he was arrested.   And, furthermore, his own statements [show] that he went from [the] high school to the headquarters freely and voluntarily.

So I do not find that he was arrested at the high school.

With respect, then, to the *Miranda* issue, I find that [Petitioner] was advised of his rights in the presence of his mother by having those rights read to him by Detective Koczur, and then the form shown to [Petitioner] and his mother for them to initial and sign the waiver.

The Court finds beyond a reasonable doubt that . . . [Petitioner] knowingly, voluntarily, and intelligently read [and] waived his rights after having been [orally] advised of those rights.  There is no evidence that [Petitioner] was threatened, forced, or coerced into giving a statement. [Petitioner]'s rights were, as I indicated, read to him by the officers.

During the course of the cross examination of Detective Koczur, as [defense counsel] was going through the form reading off each of the rights that [Petitioner] was read . . . and then asking questions of Detective Koczur, is this what you read, is this what he signed, is this what he had initialed.  I was observing the clock during that conversation during that cross examination with respect to the form, and it took two minutes and ten seconds to cross examine the officer on each of the points contained in the form.

16

Clearly, the form can be read intelligently in [the] two minute period [during which Petitioner was able to read the form after having his rights read to him].

I do not find credible [Petitioner]'s testimony that he didn't understand what was being read to him. On cross examination, [the State] went through the form with him and indicated phrase by phrase almost word by word what was contained in the form, and there the answers given by [Petitioner] did not suggest that he . . . did not understand what was contained in the form. Furthermore, [Petitioner] didn't advise the police that he didn't understand anything. Nor did his mother advise the police that things were not understood. And there was the example, cited by [Petitioner], that an officer came to the room where he was waiting and he told the officer that he was instructed not to say anything until his mother came, and no interrogation took place. Clearly, [Petitioner] had some knowledge even in advance of having [his] rights read to him, just based on an oral statement of an officer that he should wait for his mother, that he was able to exercise some control over the process.

Accordingly, as I indicated, my findings are that the statements were voluntarily given after [Petitioner's] rights [were] read, and after [Petitioner had been] advised of his rights and [that Petitioner] intelligently, knowingly, and voluntarily waived [his rights]. [The] *Miranda* motion of the defense is denied.

(Document 29 attached to ECF No. 10 at 14-17).

Petitioner's case then proceeded to trial, where the various witnesses testified as recounted above. The defense, however, called several additional witnesses:

In [Petitioner's] case, two of [his] teachers, Ronald Orr and Belquis Fernandez testified on his behalf. They considered him a truthful person. Herminia Garcia, a social worker at the Union County juvenile detention center, testified that April [Diggs] had told her that Renee [Diggs] and [Petitioner] were present at the shooting but that neither had done anything. Rather April indicated that a fourth individual was responsible for the shooting. April Diggs admitted that after her arrest she was taken to the Union County Detention Center and met with Garcia. She did not recall, however, telling Garcia that it was Harvey, and not [Petitioner], who shot Saraiva: "I

17

doubt if I said that."  Garcia did not make a written report of her
discussion with April Diggs.  She admitted that although she
assigned herself as [Petitioner's] intake worker, she never bothered
to mention this exculpatory statement to him.

Damina Arcos testified that she met Renee Diggs in the
Union County jail.  In November 1997 April had also mentioned
that Renee was involved in the murder but never mentioned
[Petitioner].    [Petitioner's] mother testified and denied that
[Petitioner] admitted his involvement in the robbery when giving his
statement to police.

[Petitioner] also testified at trial.  [Petitioner] denied that he
possessed a gun, participated in a robbery, or shot anyone on January
22, 1996.  He admitted his first statement was a lie.  He testified
that on January 22, 1996, he and the Diggs cousins were walking on
Elizabeth Avenue.  As they were walking Harvey noticed a man
waiting for a bus and asked the girls to see if the man was wearing
any gold jewelry.  When the girls reported that he was wearing gold
jewelry, and [Petitioner] realized Harvey wanted to rob the man,
[Petitioner] urged Harvey not to do it.  April urged Harvey to rob
the owner of a delicatessen nearby.  [Petitioner] refused to act as a
lookout.  As the four continued walking, Harvey and April ran after
two "Spanish boys," while [Petitioner] and Renee jogged behind;
the boys outran them.  [Petitioner] said he realized Harvey had a
gun when they crossed Elizabeth Avenue.  He said Harvey
"pull[ed] out the gun acting crazy" and began "showing off."
[Petitioner] testified he was frightened, wanted to leave, and
"thought [Harvey] was going to shoot me or something."  When
Renee attempted to leave, Harvey grabbed her and refused to let her
leave.

When they reached the corner of Seventh and East Jersey
Street, Harvey noticed a man taking out his trash.  Harvey asked the
Diggs cousins and [Petitioner] to act as lookouts.  [Petitioner]
refused because he was "too scared."  He said he walked across the
street and stood next to a Chinese restaurant.  Harvey approached
Saraiva and it "sounded like he said empty his pockets."
[Petitioner] testified

And [the] man looked at him and [Harvey]
tried to go in his pockets, tried to go in his pocket.

18

Then the man slapped his had down. And that's when [Harvey] grabbed the man, and the man grabbed [Harvey], and the man threw a punch at [Harvey], and that's when [Harvey] threw a punch back at the man.

Then [Harvey] pulled out the gun. When the man noticed the gun he was like shocked, you know seeing the gun. And that's when the man grabbed the gun, they was [sic] struggling, and that's when I noticed they was [sic] struggling and I tried, went over there and tried to stop, you know, what was about to happen. But it was too late.

[Petitioner] explained that as the two struggled, he grabbed Harvey's arm to try to prevent Harvey from shooting Saraiva. [Petitioner] said two shots were fired; the first bullet missed the second shot struck Saraiva. [Petitioner] was shocked after he saw Saraiva fall down. He then ran off with Harvey toward Seventh Street. [Petitioner] said he ran home.

[Petitioner] denied ever holding the gun, denied shooting anyone, and denied helping anyone commit a robbery. He also denied asking his girlfriend, Brooks, to lie for him. [Petitioner] said [he told her] "if anyone asks If I was with her, you now, [she should say] that she don't know." He claimed he gave a false statement implicating "Boz" because he was scared and confused. He admitted giving the second statement and initialing it, but claimed that he never told police that he helped in any way with the robbery. Although he signed the statement, [Petitioner] claims the police were "rushing" him and his understanding of his rights was "not that good." [Petitioner] admitted that he lied in his first statement because he was scared; he claimed his second statement was truthful. [Petitioner] consistently claimed [Harvey] shot Saraiva.

(Document 4 attached to ECF No. 10 at 12-15).

On June 18, 1998, the jury found Petitioner guilty of all charges. (*Id.* at 3). At sentencing, counsel for Petitioner noted that there was a mandatory sentencing scheme in place, but that the Court should sentence Petitioner to the low end of that scheme based on Petitioner's

age at the time of the offense, his lack of a prior record, and Petitioner's status as a special education student who was subject to the influence of older young people.   (Document 39 attached to ECF No. 10 at 2-4).   Counsel also argued that although only two teachers testified to his good character at trial, there were dozens more willing to testify that he was a good student.   (*Id.* at 4). Counsel also argued that Petitioner was subject to rehabilitation per a letter filed by Garcia, the social worker who testified at trial, and that Petitioner's apparent lack of remorse was simply a result of his continuing to assert his innocence.   (*Id.*).   Petitioner also spoke on his own behalf at sentencing, apologizing for what was happening and insisting that he tried to stop what happened, but "was too late."   (*Id.* at 5-6).

The trial court, however, rejected that argument, finding that the heinous nature of the crime, which involved four young people stalking the streets with the purpose of robbing and potentially shooting someone, did not suggest the good character counsel and others ascribed to Petitioner, but rather indicated a criminal who "has complete disregard for the law, [and] complete disregard for other people."   (*Id.* at 8-9).   The Court likewise noted that there was a need for the Court to issue a sentence which would act as a strong deterrent – both to deter Petitioner specifically, and to deter others like him.   (*Id.* at 9-10).   The Court thus found that the only applicable mitigating factor was Petitioner's lack of a prior criminal record, but that mitigating factor was "so clearly and convincingly outweigh[ed]" by the aggravating factors including both the seriousness of the offense and the need to deter Petitioner and those like him that a sentence above the statutory minimum was required in Petitioner's case.   (*Id.* at 10).   The trial court therefore merged felony murder and second degree possession of a weapon for an unlawful purpose with the first degree murder charge, and sentenced Petitioner to a term of fifty years

imprisonment with a thirty year parole disqualifier.  (*Id.* at 10-11).  The Court also sentenced Petitioner to sentences of eighteen years with six years parole ineligibility on the robbery charge, and a four year sentence with eighteen months parole ineligibility for the final unlawful possession of a weapon count, both of which appear to run concurrently with the murder sentence.  (*Id.* at 11).

Petitioner appealed, raising several claims which he does not attempt to raise again in this habeas matter, and the Appellate Division affirmed his conviction and sentence in a lengthy opinion on June 2, 2000.  (Document 4 attached to ECF No. 10).  The New Jersey Supreme Court denied certification on June 13, 2000.  (Document 5 attached to ECF No. 10).  In April 2001, Petitioner filed with the New Jersey Courts a purported petition for post-conviction relief. (Document 8 attached to ECF No. 10).  Petitioner thereafter filed a full PCR petition on or about September 17, 2003, in which he first raised the ineffective assistance of counsel claims he brings in his current habeas petition.  (Document 9 attached to ECF No. 10).  The trial court initially denied Petitioner's PCR petition, making the following findings:

> It is argued that [Petitioner], a special ed. Student at the time of his arrest suffered from learning disabilities and that therefore, his competency to stand trial, his competency to have made a voluntary statement was lacking, and that he lacked – that his capacity to formulate the necessary mental status necessary to convict him of these crimes was lacking.
>
> So the question then before the court is . . . was there a failure on the part of counsel to raise these issues.  Information has been presented to the court [al]luded to by counsel here in the argument, the psychological reports [from the waiver hearing] that have been presented to the court here in connection with this matter.
>
> Based upon my review of those reports it is clear to me that they – while the evidence does support the conclusion that

[Petitioner] had learning disabilities that his . . . learning capacity was . . . at a borderline level.   There's also no information contained in these reports that supports a conclusion that he was suffering any psychiatric illness.

There is nothing here that says he lacked competence.   That is that he did not understand and appreciate the nature of the charges against him.   There is nothing that supports the conclusion that he had a diminished capacity.   That is he did not have the capacity to formulate the ability to act in a purposeful or knowing way.

The review of the proceedings indicates that he participated in the interview with the police and the time he gave his statement – again in the presence of . . . a parent.   He voluntarily waived his rights.   It is apparent that he understood the proceedings, that he understood the questions being posed to him, and was able to formulate answers to those questions that were appropriate and responsive to the questions before him.

There is nothing that allows this [C]ourt to conclude that the evidence supports a conclusion that [Petitioner] at the time of his trial was incompetent or suffered from diminished capacity.   Thus any failure on the part of his attorney to raise those issues, either in connection with the *Miranda* [hearing] or at the time of sentencing . . . as a mitigating factor or to raise as a bar to the prosecution of this case[,] that any failure of counsel to do that was ineffective assistance.   There simply was nothing to present to the court to argue that [Petitioner] lacked competency or that he suffered diminished capacity.

(Document 25 attached to ECF No. 10 at 15-16).

Petitioner thereafter appealed, arguing *inter alia* that PCR counsel provided ineffective assistance in his failure to file a brief in support of the PCR petition.   (Document 25 attached to ECF No. 10 at 3-4).   The Appellate Division agreed that PCR counsel's failure to file a brief amounted to ineffective assistance of PCR counsel and remanded the matter for a new hearing on whether Petitioner had presented a prima facie case for PCR relief.   (*Id.*).   On remand, the PCR

court denied Petitioner's PCR application on the record and by way of a separate order on January

27, 2012.   (*Id.* at 4).

In that decision, the PCR court made the following additional findings:

> Largely, this is a claim of ineffective assistance of counsel related to the claim that counsel failed to raise the learning disability and special education status of [Petitioner].   And it is contended that that failure occurred at three stages of the proceedings[:] . . . [a]t the *Miranda* [hearing, at] trial[,] and then at sentencing.

> With respect to the contention that the failure to raise a learning disability or special ed status, constituting ineffective assistance, the Court notes that in reviewing the record, it does not find that there are any facts from which it could be demonstrated that the fact that [Petitioner] was learning disabled or was a special ed student was sufficient to show that he had a mental deficiency that would some way render him incapable of or impairing his ability to participate in this case.

> There is nothing that indicates that he was disabled so that he could not knowingly and voluntarily waive his *Miranda* rights. That somehow that special ed status would have affected his waiver hearing in juvenile court, his participation in the trial, or even affect the sentencing.   We are not without a record here.   There was a waiver proceeding in the juvenile court.   There w[ere] psychologist[s] involved in that proceeding.

> And again the conclusion of the court is that there was not evidence that the mental deficiency was so severe that the absence of his presentation would have affected the outcome of the proceeding.   There is nothing to show that reasonable probability but for the failure to present that evidence, the result somehow would have been different.

> [The Court then discussed several claims not presented here]

> Again, it is not developed or demonstrated as to how [counsel's alleged failures] would have affected the outcome of this matter.   There is simply nothing that indicates to the Court that errors committed by trial counsel, if there were any, were [of] such

> a substantial nature . . . that it is reasonably probabl[e] that the results would have been different [absent those alleged errors].
>
> I must conclude that there has not been a prima facie showing of ineffective assistance of counsel demonstrated in this case from which the Court could determine . . . that a[n evidentiary] hearing is required.   This P.C.R. application is denied.

(Document 41 attached to ECF No. 10 at 25-28).

Petitioner appealed, and the Appellate Division affirmed the denial of Petitioner's PCR petition on August 1, 2014, for substantially the same reasons expressed by the trial court in both of its decisions denying PCR relief.   (Document 25 attached to ECF No. 10 at 15-18).   As to the *Miranda* hearing claim, the Appellate Division added the following:

> Based on our review of the record, we agree that [Petitioner] failed to make a prima facie showing of ineffective[ assistance].   The fact that [Petitioner] was a special education student and functioned at a low intellectual level does not alone constitute a sufficient factual basis to conclude that he did not understand his rights when he waived them.   When [Petitioner] testified at the suppression hearing, [Petitioner] generally acknowledged his understanding of the *Miranda* warnings, identifying only isolated phrases that he claimed he did not understand.   The motion judge found this testimony not to be credible, a finding entitled to . . . deference.   No evidence has been presented to refute that finding to create a prima facie case of ineffective assistance on this ground.   Accordingly, the PCR court correctly concluded that an evidentiary hearing was not warranted.

(*Id.* at 17-18).   The New Jersey Supreme Court denied Petitioner's petition for certification on February 3, 2015.   *See State v. Mathis*, 220 N.J. 572, 108 A.3d 632 (2015).   Petitioner filed the instant habeas petition on or about March 23, 2015.   (ECF No. 1).

## II.  DISCUSSION

## A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *White v. Woodall*, -- U.S. --, --, 124 S. Ct. 1697, 1702 (2014) (quotations omitted). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be

no reasonable dispute that they were wrong." *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## B.   Analysis

### 1.   Petitioner's request for an evidentiary hearing

Petitioner argues that he should be granted an evidentiary hearing on his petition for a writ of habeas corpus. 28 U.S.C. § 2254(e)(2) generally bars habeas petitioners who are challenging their State court convictions from receiving evidentiary hearings where the petitioner failed to develop the factual record underlying his claims in the State courts. That rule, however, does not apply where the petitioner "unsuccessfully sought an evidentiary hearing in the PCR court and unsuccessfully appealed from the denial of his PCR petition" because such actions indicate that the petitioner did not fail to develop the record, but was denied the opportunity to do so. *Branch v. Sweeney*, 758 F.3d 226, 241 (3d Cir. 2014). "In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Palmer v. Hendricks*, 592 F.3d 386, 393 (3d Cir. 2010) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007)). Although the decision to provide a hearing is within the discretion of the court in such cases, that decision is subject to two considerations which must guide the Court's exercise of that discretion:

First, in determining whether or not to hold an evidentiary hearing,

26

courts should "consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro*, 550 U.S. at 474[]. In other words, courts considering the appropriateness of an evidentiary hearing should determine whether the petition presents a prima facie showing which, if proven, would enable the petitioner to prevail on the merits of the asserted claim. *See, e.g., Campbell v. Burris*, 515 F.3d 172, 184 (3d Cir. 2008); *Wells v. Petsock*, 941 F.2d 253, 259 (3d Cir. 1991); *Smith v. Freeman*, 892 F.2d 331, 338 (3d Cir. 1989). The reasons underlying such a consideration are self-evident-given "AEDPA's acknowledged purpose of reducing delays in the execution of state and federal criminal sentences," *Schriro*, 550 U.S. at 475[] (quotation marks, citations, and brackets omitted), a court should be reluctant to convene an evidentiary hearing to explore the claims of a petitioner whose pleadings are factually insufficient to suggest any entitlement to habeas relief. *See, e.g., Campbell*, 515 F.3d at 184 ("bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing") (quoting *Mayberry v. Petsock*, 821 F.2d 179, 185 (3d Cir. 1987)); *Anderson v. Att'y Gen. of Kansas*, 425 F.3d 853, 858-59 (10th Cir. 2005) (to warrant an evidentiary hearing, a habeas petitioner's "factual allegations must be specific and particularized, not general or conclusory") (quotation marks and citation omitted).

Second, "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro*, 550 U.S. at 474[]. That is, even if the factual allegations in the habeas petition are sufficient to make out a prima facie claim for habeas relief, a district court may decline to convene an evidentiary hearing if the factual allegations are "contravened by the existing record." *Id.* (citation omitted); *see also Campbell*, 209 F.3d at 290. As the Supreme Court has explained, "[i]f district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts." *Schriro*, 550 U.S. at 475[].

*Palmer*, 592 F.3d at 393.

Even assuming that Petitioner did not fail to develop the factual record in the state courts

in so much as he was denied a hearing by the PCR court, Petitioner is not entitled to an evidentiary

hearing.   Because Petitioner has failed to establish *Strickland* prejudice for the reasons set forth

below, Petitioner has failed to establish a prima facie case of ineffective assistance, and as a result

has not shown that he is entitled to federal habeas relief.   As a result, no evidentiary hearing is

necessary on Petitioner's ineffective assistance of counsel claims.   *Id.* at 394.   This Court will

therefore deny Petitioner's motion for an evidentiary hearing.


**2.   Petitioner's ineffective assistance of counsel claims**

Petitioner's asserts that he received ineffective assistance of counsel prior to and during his

criminal trial.   The standard which governs such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test
> set forth in the Supreme Court's opinion in *Strickland v.
> Washington*, 466 U.S. 668 (1984).   To make out such a claim under
> *Strickland*, a petitioner must first show that "counsel's performance
> was deficient.   This requires [the petitioner to show] that counsel
> made errors so serious that counsel was not functioning as the
> 'counsel' guaranteed by the Sixth Amendment."   *Id.* at 687; *see
> also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).
> To succeed on an ineffective assistance claim, a petitioner must also
> show that counsel's allegedly deficient performance prejudiced his
> defense such that the petitioner was "deprive[d] of a fair trial . . .
> whose result is reliable."   *Strickland*, 466 U.S. at 687; *Shedrick*,
> 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper
> standard for attorney performance is that of 'reasonably effective
> assistance.'"   *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).   A
> petitioner asserting ineffective assistance must therefore show that
> counsel's representation "fell below an objective standard of
> reasonableness" under the circumstances.   *Id.*   The reasonableness
> of counsel's representation must be determined based on the
> particular facts of a petitioner's case, viewed as of the time of the
> challenged conduct of counsel.   *Id.*   In scrutinizing counsel's

performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-281 (D.N.J. 2015).

Most of Petitioner's arguments as to counsel's ineffectiveness arise from Petitioner's assertion that counsel should have raised Petitioner's status as a special education student at various points of his criminal proceedings. Specifically, Petitioner asserts that counsel should have raised his special education status during the *Miranda* hearing, at trial, and at sentencing as a mitigating factor. Petitioner also asserts that counsel should have raised these same claims on direct appeal, and that appellate counsel failed to argue that the trial court did not consider the totality of the circumstances in denying his *Miranda* motion on direct appeal. This Court will

turn to each of those arguments in turn.

**a.  Petitioner's claim that counsel was ineffective at the *Miranda* hearing**

Petitioner first argues that his trial counsel was constitutionally ineffective in failing to properly raise Petitioner's special education status during his *Miranda* hearing.   Petitioner asserts that, had counsel provided proper expert testimony and other information regarding Petitioner's mental functioning, the trial court would have found that his waiver of his *Miranda* rights was not knowing, intelligent, and voluntary.   The problem with this, and all of Petitioner's ineffectiveness claims, however, is that Petitioner has failed to provide any information as to exactly what information it is that counsel should have presented.   The only documentary evidence Petitioner submits in support of his assertion that counsel should have provided more information to the trial court are the three expert reports provided to the juvenile court during the waiver proceedings. As this Court will discuss below, those reports are insufficient to establish that Petitioner was prejudiced by counsel's alleged failings.

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny, a statement taken during a custodial interrogation is only admissible at a criminal defendant's trial where that defendant has made a knowing, intelligent, and voluntary waiver of his rights.   384 U.S. at 444; *see also Sweet v. Tennis*, 386 F. App'x 342, 345 (3d Cir. 2010).   A valid waiver has two dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.   Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.   Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level

30

> of comprehension may a court properly conclude that the *Miranda*
> rights have been waived.

*Sweet*, 386 F. App'x at 345 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also Fare*

*v. Michael C.*, 442 U.S. 707, 725 (1979). Factors to be considered when weighing the totality of

the circumstances in cases involving a juvenile defendant include "the juvenile's age, experience,

education, background, and intelligence and . . . whether he has the capacity to understand the

warnings given to him, the nature of the Fifth Amendment rights [involved], and the consequences

of waiving those rights." *Fare*, 442 U.S. at 725; *see also Schneckloth v. Bustamonte*, 412 U.S.

218, 226 (1973). The presence of a parent or adult relative can be considered as a factor which

possesses the potential to mitigate a juvenile's age, immaturity, and inexperience and place him

on "a less unequal footing with his interrogators." *Gallegos v. Colorado*, 370 U.S. 49, 54

(discussing the voluntariness of a confession in a pre-*Miranda* setting), *reh'g denied*, 370 U.S. 965

(1962); *Fare*, 442 U.S. at 725. Although both age and mental capacity are factors to be

considered, neither, in and of itself, is sufficient to warrant suppression of a statement in all cases.

*See, e.g., Vance v. Bordenkircher*, 692 F.2d 978, 980-81 (4th Cir. 1982).

In considering a *Miranda* suppression decision during habeas review, "[f]ederal habeas

courts have an 'independent obligation' to determine whether a confession was voluntary."

*Sweet*, 386 F. App'x at 345 (quoting *Miller v. Fenton*, 474 U.S. 104, 112 (1985)). In undertaking

that independent obligation, the federal court is not bound by the state courts' ultimate decision as

to the voluntariness of a waiver of the petitioner's rights, but must "defer[] to state court fact-

finding as to 'subsidiary factual questions'" including as to the credibility of the witnesses who

testified at the suppression hearing. *Id.*; *see also Miller*, 474 U.S. at 110-12. Ultimately, if the

court concludes that the state court was correct in determining that, "under the totality of the circumstances, the confession was obtained in a manner compatible with the requirements of the Constitution," no habeas relief is warranted.  *Sweet*, 386 F. App'x at 345 (quoting *Miller*, 474 U.S. at 112).

Petitioner asserts that had his counsel raised his special education status directly through witness testimony, the outcome of his *Miranda* hearing would have been different.  Briefly, this Court notes that although Petitioner asserts that the trial court was not aware of the expert reports submitted during waiver proceedings, it is not clear from the record that the motion judge was unaware of those reports.  It is also worth noting that, on cross examination of one of the detectives who interrogated Petitioner, counsel did raise the special education status.  Regardless of these facts, however, Petitioner has failed to show prejudice in this context because he has not provided any directly applicable evidence showing what, if anything, an expert witness may have said regarding Petitioner's ability to knowingly and intelligently waive his rights, as Petitioner instead relies solely on the expert reports from the waiver hearing.

In support of his assertion that an expert or Petitioner's school records would have shown that Petitioner had low intelligence and thus would have been unable to knowingly and intelligently waive his *Miranda* rights, Petitioner provides only the three expert reports submitted during his waiver proceedings.  These reports, although they do comment on Petitioner's intelligence which they generally categorize as falling between low borderline to low average, are not directly on point and provide no solid information as to whether Petitioner was able to understand the *Miranda* warnings he was given, and make a knowing, intelligent, and voluntary waiver of those rights.  As the PCR court noted, the reports certainly support the suggestion that

32

Petitioner had a somewhat below average intelligence and had difficulty with reading.  The reports, however, provide no real evidence that Petitioner could not understand the *Miranda* warnings which he was given orally by the detectives in this case.  Even if this Court were to assume that Petitioner was unable to understand the warnings by reading them silently to himself, that the warnings were given orally not only to Petitioner but to Petitioner's mother who was present severely complicates Petitioner's arguments, and, to some extent, renders any question as to his reading abilities far less important.

By Petitioner's own admission on cross-examination, he understood all of the portions of the *Miranda* warnings except the word "present" and the phrase "if you wish."  Indeed, based on Petitioner's admissions and Petitioner's clearly asserted ability to exercise at the very least his ability to refuse to talk to police until his mother arrived, the motion judge found Petitioner's claims that he lacked an understanding of his rights completely incredible.  Providing that credibility determination with the deference it is due, and giving proper weight to the fact that Petitioner's mother was present and also agreed to the *Miranda* waiver, this Court cannot conclude that the facts presented, including the proffered reports, indicate that the motion judge would have reached a different conclusion had counsel more fully raised the special education issue.

The reports Petitioner presents do not provide a sufficient basis to question Petitioner's ability to understand the *Miranda* warnings he was given.  Those reports do not evaluate Petitioner's ability to understand those *Miranda* warnings, but only give a very general overview of Petitioner's mental and intellectual functioning.  This is not surprising, given the fact that those reports were authored solely for the purpose of determining whether Petitioner was capable of rehabilitation by the age of 19 – the standard applicable in New Jersey juvenile jurisdiction waiver

proceedings at the time of Petitioner's arrest.   Thus, those reports do not give this Court any sense of what even the three experts who authored those reports would have testified had they been asked to evaluate Petitioner's ability to understand his *Miranda* warnings.   That Petitioner has failed to provide a certification or affidavit from any expert regarding what testimony they would have given, nor provides such an affidavit from any of his teachers or school officials about what testimony they could have provided as to Petitioner's mental functioning and ability to intelligently waive his *Miranda* rights further weakens Petitioner's claim.   *See, e.g., Tolentino v. United States*, Civil Action No. 13-4168, 2014 WL 3844807, at *3 (D.N.J. July 31, 2014) (stating that the "[petitioner's] failure to include a sworn statement regarding the nature of [a witness's] proposed testimony is fatal to his making a *prima facie* showing of prejudice" based on counsel's failure to call such a witness); *see also Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001).

Petitioner has failed to provide sufficient evidence to make a prima facie showing that the outcome of Petitioner's *Miranda* hearing would have been different had counsel "properly" raised the issue of his special education status during that hearing through expert testimony or otherwise. There is insufficient evidence in the record, even considering the waiver reports, to indicate that Petitioner was unable to knowingly, intelligently, and voluntarily waive his *Miranda* rights given both the fact that Petitioner was read his rights orally by the detectives and Petitioner's mother was present and also freely chose to waive Petitioner's rights.   Combining this lack of evidence with the motion judge's credibility determination that Petitioner was not credible when he claimed he did not understand the warnings, this Court cannot conclude that Petitioner was incapable of making a knowing, intelligent, and voluntary waiver of his *Miranda* rights.   Given the facts before this Court including that credibility determination and the presence of Petitioner's mother during

the waiver, and even given Petitioner's youth, inexperience, and intellectual difficulties, it fully appears that the motion judge was entirely correct in concluding that Petitioner knowingly, intelligently, and voluntarily waived his *Miranda* rights, and the waiver reports provide no information sufficient to alter that conclusion.   As such, the PCR court neither unreasonably applied federal law, nor misapprehended the facts, and Petitioner is not entitled to habeas relief on this claim.

**b.   Petitioner's claim that counsel was ineffective for failing to raise his special education status during trial**

Petitioner further contends that his counsel was ineffective in so much as he failed to fully investigate Petitioner's special education status prior to the *Miranda* hearing and trial, and failed to secure and call witnesses regarding Petitioner's intellectual capacity during trial.   In *Strickland*, the Court held that defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.   In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."   466 U.S. at 691. "The failure to investigate a critical source of potentially exculpatory evidence may present a case of constitutionally defective representation," and "the failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness."   *United States v. Travillion*, 759 F.3d 281, 293 n. 23 (3d Cir. 2014) (internal quotations omitted); *see also United States v Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (noting that a complete absence of investigation usually amounts to ineffective assistance because a complete absence of investigation does not present a strategic

choice made by counsel); *United States v. Baynes*, 622 F.2d 66, 69 (3d Cir. 1980). To show

prejudice in regards to a claim that counsel conducted an incomplete investigation,

> a defendant basing an inadequate assistance claim on his or her
> counsel's failure to investigate must make "a comprehensive
> showing as to what the investigation would have produced. The
> focus of the inquiry must be on what information would have been
> obtained from such an investigation and whether such information,
> assuming admissibility in court, would have produce a different
> result."

*United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819

F.2d 1382, 1392 (7th Cir. 1987); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir.

2011) ("When a petitioner alleges that counsel's failure to investigate resulted in ineffective

assistance, the petitioner has the burden of providing the court with specific information as to what

the investigation would have produced."); *United States v. Green*, 882 F.2d 999, 1002 (5th Cir.

1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with

specificity what the investigation would have revealed and how it would have altered the outcome"

of Petitioner's case); *accord Untied States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008).

The standard applicable to claims that counsel was ineffective in failing to call certain

witnesses is similar. When presented with such a claim, courts "are 'required not simply to give

[the] attorney[] the benefit of the doubt, but to affirmatively entertain the range of possible reasons

[petitioner's] counsel may have had for proceeding as he did.'" *Branch v. Sweeney*, 758 F.3d

226, 235 (3d Cir. 2014) (quotations omitted). Moreover,

> *Strickland* requires that a defendant "overcome the presumption that, under the
> circumstances, the challenged action might be considered sound trial strategy." 466 U.S.
> at 689 (internal quotation marks omitted). If the Government "can show that counsel
> actually pursued an *informed* strategy (one decided upon after a thorough investigation of
> the relevant law and facts)," the effectiveness of counsel's assistance is "virtually

36

unchallengeable." *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005).
*United States v. Graves*, 613 Fed. App'x 157, 159, 2015 WL 3406548, at *2 (3d Cir. May 28,
2015).   As previously stated, however, where a petitioner fails to provide a sworn statement or
affidavit regarding a purported witness's proposed testimony, that Petitioner cannot make a prima
facie showing of *Strickland* prejudice, and that claim must fail.   *Tolentino*, 2014 WL 3844807 at
*3; *see also Duncan*, 256 F.3d at 201-02.

As in his *Miranda* claim discussed above, Petitioner fails to provide this Court with any
evidence other than the reports prepared in advance of the waiver hearing to suggest that counsel
failed to properly investigate his special education status and failed to call witnesses to testify to
that status at trial.   Indeed, that counsel did obtain the expert reports themselves clearly indicates
that counsel conducted at least some investigation into Petitioner's intellectual abilities, and that
this is not a case where no investigation was conducted.   As such, the onus is upon Petitioner to
make at least a prima facie showing of prejudice by indicating what information which was not
produced at trial would have been discovered with adequate investigation, and what testimony, if
any, a witness may have provided had he been called to testify.   Petitioner, however, does neither.
Petitioner's assertions that his school records establish his special education status suffers from
the fact that Petitioner does not actually provide any context nor information as to what relevance
Petitioner's special education status would have had if presented at trial.   Petitioner asserts,
without providing support for the assertion, that his special education status would have impacted
his credibility, but without any clear indication of what his "special education" status actually
meant or any information as to what information an expert or school official would have provided
about how Petitioner's intellectual functioning affected his credibility or behavior, Petitioner has

simply failed to show that the special education issue was of any significant importance to his trial, and has certainly failed to show that he was prejudiced in so much as he has failed to show that the provision of such information would have altered the outcome of his trial.

Considering the significant bordering on overwhelming evidence arrayed against Petitioner at trial, including the testimony of his girlfriend and the Diggs cousins who were present at the shooting, as well as Petitioner's own statement admitting to his presence at the scene of the shooting and at least partial participation in the robbery, it is difficult to imagine that Petitioner's special education status would have been sufficient to alter the outcome of his trial absent clear testimony about what that status entailed, how it impacted Petitioner's ability to act, and what affect it would have upon his credibility. Petitioner provides no evidence from which this Court can glean that information. As in the *Miranda* context, the waiver reports provide little to no information that is directly applicable to Petitioner's criminal trial. They do not establish that he was so intellectually deficient as to have a diminished capacity or an inability to understand the consequences of his actions, and they certainly don't have any direct bearing on his credibility as a witness. The reports provide little in the way of clear information about whether those experts were available to testify at trial, and what information they would have provided had they been called as witnesses. As Petitioner fails to provide a name, let alone an affidavit or statement of proposed testimony, as to any other witness counsel "failed" to call, Petitioner has failed to make a prima facie showing that he was prejudiced by counsel's failure to either investigate or call witnesses regarding Petitioner's special investigation status prior to or during trial. As Petitioner has failed to demonstrate prejudice, the decision of the PCR courts involved neither an unreasonable application of federal law, nor of the facts, and Petitioner's argument provides no

basis for habeas relief as a result.

### c. Petitioner's argument that counsel was ineffective in failing to raise his special education status as a mitigating factor at sentencing

Petitioner next argues that counsel was ineffective in failing to present evidence or witnesses at sentencing regarding his special education status.  In so doing, Petitioner notes that counsel mentioned Petitioner's special education classification to the Court, and mentioned the testimony at trial of Petitioner's teachers, but failed to provide expert testimony in support of Petitioner's mental status.  Petitioner argues that, had counsel provided such testimony, the trial court may have found additional mitigating factors which could have impacted his sentence.

Petitioner points to two statutory mitigating factors in particular.  First, Petitioner argues that his low intellectual functioning, combined with his youthful age, a point which counsel did argue, might amount to "substantial grounds tending to excuse or justify [his] conduct, though failing to establish a defense" under N.J. Stat. Ann. § 2C:44-1(b)(4).  Petitioner asserts that, had counsel submitted unspecified evidence and called witnesses Petitioner has not named regarding his intellectual difficulties, the Court would have found that such difficulties would be sufficient to excuse his behavior.  Petitioner's failure to provide sworn statements as to the testimony of any alleged witnesses again prevents this Court from being able to find that Petitioner was prejudiced by the failure to call those witnesses.  *See Tolentino*, 2014 WL 3844807 at *3; *see also Duncan*, 256 F.3d at 201-02.  To the extent that Petitioner argues that the expert reports from the waiver hearings would establish that his mental functioning would establish an excuse for his behavior, Petitioner is simply incorrect.  Although those reports do provide that Petitioner had learning

39

difficulties and was of a borderline to low average intelligence, they do not categorically show that Petitioner did not understand his actions or that they were wrong.   Petitioner's actions after the shooting, including providing an admittedly false statement to the police and asking his girlfriend to do likewise if she were asked likewise clearly indicates that Petitioner understood the gravity of what he had done.   Thus, even considering the waiver reports, Petitioner has failed to provide any evidence which would support a conclusion that his intellectual difficulties would have been sufficient to in any way excuse his conduct.   Given the fact that the trial court did find that Petitioner's callous disrespect for the law, the need to deter him and others like him, and the heinous nature of Petitioner's actions severely outweighed any mitigatory value his youth or lack of a criminal history would have, it in no way appears that the trial court would have found that the information in the waiver reports would have been sufficient to excuse or justify Petitioner's conduct, and thus Petitioner has failed to show any prejudice as to this claim.

Although it suffers from the same weakness as his first sentencing claim in so much as Petitioner fails to provide a sworn affidavit from whatever expert could have testified at sentencing, Petitioner's second argument at first glance appears stronger.   Petitioner's second sentencing argument is that counsel's failure to raise his special education statement also prevented the sentencing court from finding the mitigating factor provided in N.J. Stat. Ann. § 2C:44-1b(13). Pursuant to that section, a sentencing court in New Jersey may find that the "conduct of a youthful defendant was substantially influenced by another person more mature than the defendant" as a mitigating factor at sentencing.   In support of this assertion, Petitioner points to the following statement in the report of Dr. Thompson presented during the waiver hearing:   "[Petitioner] presents as a follower, someone who could be easily persuaded by more successful anti-social

characters to become involved with them." (Document 2 attached to ECF No. 12 at 11). Petitioner also raises the following conclusion of Dr. Page in her report submitted in the waiver hearing: "[Petitioner] became involved with an older group of young people whom he, with his simplistic thinking saw as role models. He was influenced negatively by them." (Document 2 attached to ECF No. 12 at 23).

    Even if this Court assumes that Dr. Page and Thompson were available to testify at sentencing, and that they would have testified at sentencing exactly as they wrote several years earlier during the waiver proceedings, facts which Petitioner has in no way established, it does not follow that the court would have found the mitigating factor at issue. As to Dr. Thompson's report, while the doctor opines that Petitioner could be subject to influence, Dr. Thompson in no way suggests that that is necessarily what happened in this case. Likewise, although Dr. Page concludes that Petitioner saw his co-defendants as role models and that they negatively influenced Petitioner, the doctor does not conclude nor suggest that this influence resulted in the criminal conduct at issue here, let alone that it substantially influenced Petitioner's decision to engage in the robbery which resulted in Petitioner's conviction. Neither doctor specifically contextualizes their findings on Petitioner's being subject to influence by asserting that it was Petitioner's co-defendants who caused him to act. Indeed, given Petitioner's assertion in his second statement and during trial, as well as the information he gave those experts, it is doubtful that they could claim that Petitioner's criminal conduct was substantially influenced by his co-defendants in so much as Petitioner continued to assert that he never intended to rob Saraiva, and that he attempted to stop his co-defendant from shooting Saraiva during the struggle that ensued. Petitioner's own testimony at trial certainly suggests that Petitioner was not overborn by the older young people

with whom he spent the night of the shooting, and that he was capable of resisting them.

Given the trial court's findings as to the heinous and severe nature of Petitioner's conduct, as well as the fact that the "older" individuals present at the robbery were neither greatly older or in possession of an authority position over Petitioner, it is not clear that the trial judge would have found substantial influence in any event. *See, e.g., State v. Bieniek*, 200 N.J. 601, 610 n. 1, 985 A.2d 1251 (2010) (noting that New Jersey Courts have properly rejected this mitigating factor where a sixteen year old defendant engaged in criminal conduct that was clearly not childish in nature, and have properly found the mitigating factor where a thirteen year old was subject to a more mature and authoritative figure at the time of his criminal conduct, and asserting that finding this factor is only appropriate where the more mature individual directly contributed to the crime). Petitioner's assertion is likewise severely weakened by the trial court's finding that the nature of the crime, Petitioner's apparent lack of respect for the law, and the need for deterrence strongly outweighed the sole mitigating factor found by the court (Petitioner's lack of a criminal record). It is also highly unlikely that Petitioner's sentence would have been reduced on the basis of the influence of his co-defendants, which would arise from facts (the presence of older youths and Petitioner's agreeing to participate in a robbery with them) which were well known to the trial court at sentencing. As Petitioner has therefore failed to show that he was prejudiced by his counsel's alleged failings, his ineffective assistance claim is without merit, and the State courts neither unreasonably applied federal law nor the facts in rejecting his claims on post-conviction review.

**d.  Petitioner's claim that appellate counsel was ineffective in failing to raise the above**

**arguments on direct appeal**

In his final two grounds, Petitioner argues that appellate counsel proved constitutionally ineffective by failing to raise first the ineffective assistance of counsel arguments discussed above and second the argument that the trial court erred in weighing the totality of the circumstances in denying his *Miranda* suppression motion.   The *Strickland* standard applies to claims of ineffective assistance of appellate counsel.   *Smith v. Robbins*, 528 U.S. 259, 285 (2000).   "[I]t is a well established principle[, however,] that counsel decides which issues to pursue on appeal," *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996), and appellate counsel need not raise every nonfrivolous claim a defendant requests.   *See Jones v. Barnes*, 463 U.S. 745, 751 (1983).   As "[a] brief that raises every colorable issue runs the risk of burying good arguments" *id.* at 753, the heart of effective Appellate advocacy is "winnowing out weaker arguments . . . [in favor of] those more likely to prevail."   *Smith v. Murray*, 477 U.S. 527, 536 (1986).   Thus, the Supreme Court has held that "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."   *See Robbins*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

Petitioner's argument that appellate counsel was ineffective in failing to raise the ineffective assistance of counsel arguments discussed above is patently without merit.   Even if those claims were meritorious, which they clearly are not, Petitioner's ineffective assistance of counsel claims rely on his claim that counsel failed to call witnesses and present evidence which is not in the trial record including witnesses who would have discussed Petitioner's special education status and documentary evidence in support of such testimony.   Because those claims relied on information that was not in the trial record, such as the alleged witnesses that were not

called, and alleged evidence which was not submitted to the trial court, such claims would not be cognizable on direct appeal in New Jersey and could only be brought on collateral review. *See, e.g., State v. Johnson*, 837 A.2d 1131, 1135 (N.J. App. Div. 2003) (holding that although ineffective assistance of counsel claims most often are only appropriate on collateral review because they require information outside of the record, those claims are only cognizable on direct review where the Appellate Division can fully evaluate and decide the claim solely on the basis of the trial court record); *certification denied*, 179 N.J. 372, 845 A.2d 1254 (2004). As it is clear that the New Jersey Courts could not, and would not, have provided Petitioner relief on his ineffective assistance claims on direct review, it is clear that Petitioner's assertion that counsel was ineffective for failing to raise those claims is without merit.

Petitioner's assertion that counsel failed to raise the totality of the circumstances on direct review fairs no better. As discussed above, the totality of the circumstances clearly shows that Petitioner made a knowing, intelligent, and voluntary waiver of his *Miranda* rights, even if one were to consider the expert reports submitted during the waiver process in weighing those circumstances. As such, any appeal on the basis of the trial court's *Miranda* decision would have been of little to no merit, and certainly would not have been more meritorious than the claims which counsel did raise on direct review which resulted in an extensive opinion by the Appellate Division. As Petitioner's *Miranda* claim would have been without merit on direct appeal, counsel was not ineffective in failing to raise that claim. Petitioner is therefore not entitled to habeas relief.

## III.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he "has made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, Petitioner has failed to make a substantial showing that he was denied a constitutional right as jurists of reason could not disagree that Petitioner has failed to establish *Strickland* prejudice and he has thus not shown that the issues presented deserve encouragement to proceed further. This Court shall therefore deny Petitioner a certificate of appealability.

## IV. CONCLUSION

For the reasons stated above, Petitioner's motion for an evidentiary hearing is DENIED, Petitioner's petition for a writ of habeas corpus is DENIED, and Petitioner is DENIED a certificate of appealability. An appropriate order follows.

IT IS SO ORDERED.

DATED:      March 23, 2016

Hon. Jose L. Linares,
United States District Judge

45